No. _____

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

IN RE ROBERT LESLIE ROBERSON, III,

MOVANT.

---

## OPPOSED MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2244

Callie Heller
Emma V. Rolls
Assistant Federal Public Defenders
Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
Telephone:    (405) 609-5975
Facsimile:    (405) 609-5976
Callie_Heller@fd.org
Emma_Rolls@fd.org

Gretchen S. Sween
*Counsel of Record in state court*
712 Upson Street
Austin, TX 78703
(214) 557-5779
gsweenlaw@gmail.com

*Execution date set for October 16, 2025*

October 1, 2025

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the Judges of this Court may evaluate possible disqualification or recusal.

**Movant:**

Robert Leslie Roberson, III

**Counsel for Movant:**

Gretchen S. Sween, *Attorney*

Emma V. Rolls and Callie Heller, *Office of the Federal Public Defender, Western District of Oklahoma*

**Respondent:**

Eric Guerrero, *Texas Department of Criminal Justice, Correctional Institutions Division*

**Counsel for Respondent:**

Ellen Stewart-Klein, *Office of the Attorney General of Texas*

*/s/ Callie Heller*
Callie Heller
*Counsel for Movant*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ iv

REQUEST FOR RELIEF ..................................................................................... 1

STATEMENT OF FACTS .................................................................................... 1

I.    "[T]he Picture of What They Call Shaken Impact Syndrome." .................. 1

    A.    Nikki's illness and her father's arrest. ..................................................... 1

    B.    State's causation theory and sexual assault testimony at Roberson's trial. .................................................................................. 9

II.    The Evidence That Has Emerged Since Trial. ........................................... 14

    A.    The sea change in SBS/AHT has debunked the State's causation theory. ................................................................................. 14

    B.    A host of interrelated conditions caused Nikki's natural death. ............ 18

        1.    Expert opinions and evidence presented in the 2016 successive state habeas application and 2018-2021 evidentiary hearing on remand ........................................................................ 19

        2.    Expert opinions and evidence presented in the 2024 successive state habeas application .................................................... 25

        3.    Expert opinions and evidence presented in the 2025 successive state habeas application .................................................... 29

    C.    Roberson Has Been Diagnosed with Autism Spectrum Disorder. ........ 37

PROCEDURAL HISTORY .................................................................................. 38

STATEMENT REGARDING OTHER PENDING LITIGATION ......................... 42

ROBERSON MEETS THE REQUIREMENTS OF 28 U.S.C. §2244 TO RECEIVE AUTHORIZATION TO PROCEED IN DISTRICT COURT ON HIS SUCCESSIVE HABEAS APPLICATION ..................................................... 43

I.    Roberson Makes a Prima Facie Showing that He Satisfies Section 2244(b) on the Claim that His Conviction Rests on Since-Invalidated Forensic Science, Violating His Due Process Right. ................................. 44

    A.    Roberson did not present this claim in his prior federal application. ................................................................................................ 44

B.    Roberson could not have discovered the factual predicate for his due process claim previously through due diligence.............................45

C.    But for the due process violation, no reasonable factfinder would have found Roberson guilty.....................................................................47

    1.    Roberson's conviction, premised on now-invalidated hypothesis, is fundamentally unfair...................................................47

    2.    But for the due process violation, no reasonable factfinder would have convicted Roberson.........................................................50

II.    Roberson Makes a Prima Facie Showing that the Petition Would Be Timely or that the Statute of Limitations Can Be Excused Based on Actual Innocence. .....................................................................................53

CONCLUSION AND PRAYER FOR RELIEF ........................................................54

CERTIFICATE OF COMPLIANCE....................................................................56

CERTIFICATE OF CONFERENCE ....................................................................56

CERTIFICATE OF SERVICE .............................................................................57

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Maggio*,
  555 F.2d 447 (5th Cir. 1977) ..................................................................48

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) ..............................................................................48

*Dowling v. United States*,
  493 U.S. 342 (1990) ..............................................................................48

*Estelle v. McGuire*,
  502 U.S. 62 (1991) ................................................................................48

*Ex parte Roberson*,
  No. WR-63,081-01 (Tex. Crim. App. Sept. 16, 2009) ......................38

*Ex parte Roberson*,
  No. WR-63,081-03, 2016 WL 3543332 (Tex. Crim. App. June 16, 2016)........39

*Ex parte Roberson*,
  No. WR-63,081-04 (Tex. Crim. App. Sept. 11, 2024) ................................ 40, 41

*Ex parte Roberson*,
  No. WR-63,969-03 (Tex. Crim. App. Jan. 11, 2023) .........................40

*Ex parte Roberson,* No. WR-63,081-02, 2009 WL 2959738 (Tex. Crim.
  App. Sept. 16, 2009) ..............................................................................38

*Gimenez v. Ochoa*,
  821 F.3d 1136 (9th Cir. 2016) ...............................................................47

*Gonzales v. Thaler*,
  No. 612-CV-15, 2013 WL 1789380 (5th Cir. 2013) ..........................48

*In re Campbell,*
  750 F.3d at 523 (5th Cir. 2014) .............................................................54

*In re Danny Hill*,
  No. 20-3863, 2025 WL 903150(6th Cir. Mar. 25, 2025) ............................ 46, 47

*In re Davila*,
  888 F.3d 179 (5th Cir. 2018) .................................................................45

*In re Henderson*,
  462 F.3d 413 (5th Cir. 2005) .................................................................53

*In re Tex. House of Representatives*,
  No. 24-0884 (Tex. Oct. 17, 2024)...........................................................41

*In re Will,*
  970 F.3d 536 (5th Cir. 2020) ................................................................ 43, 46, 51

*In re Wood*,
  No. 25-10359 (5th Cir. Mar. 11, 2025...................................................44

*Johnson v. Davis*,
   No. 4:19-cv-03047 (N.D. Tex. July 30, 2020) ....................................54
*Johnson v. Dretke,*
   442 F.3d 901 (5th Cir. 2006) ...........................................................45
*Jones v. State*,
   No. 0087, 2021 WL 346552 (Md. Ct. Spec. App. Feb. 2, 2021) .........16
*Lee v. Glunt*,
   667 F.3d 397 (3d Cir. 2012) ............................................................47
*Lee v. Tennis*,
   No. 4:08–CV–1972, 2014 WL 3894306 (M.D. Pa. June 13, 2014) ............ 47, 50
*McQuiggin v. Perkins*,
   569 U.S. 383 (2013) .......................................................................54
*Porter v. Estelle*,
   709 F.2d 944 (5th Cir. 1983) ...........................................................48
*Roberson v. Director*,
   TDCJ-ID, 2014 WL 5343198 (E.D. Tex. Sept. 30, 2014)...................39
*Roberson v. State*,
   No. AP-74,671 (Tex. Crim. App. Jun. 20, 2007)...............................38
*Roberson v. Stephens*,
   577 U.S. 1033 (2015) .....................................................................39
*Roberson v. Stephens*,
   577 U.S. 1150 (2016) .....................................................................39
*Roberson v. Texas*,
   144 S. Ct. 129 (2023) .....................................................................40
*Roberson v. Texas*, 1
   45 S. Ct. 3 (2024) ..........................................................................41
*Roberson v. Thaler*,
   No 2:09-cv-327-TJW (E.D. Tex. Sept. 14, 2010)..............................44
*Sanders v. United States*,
   373 U.S. 1 (1963) ..........................................................................44
*Schlup v. Delo,*
   513 U.S. 298 (1995) .......................................................................54
*Spencer v. Texas*,
   385 U.S. 554 (1967) .......................................................................48
*United States v. Berry*,
   624 F.3d 1031 (9th Cir. 2010) .........................................................49
*United States v. Lovasco*,
   431 U.S. 783 (1977) .......................................................................48
*Ward v. State*,
   382 So.3d 574 (Ala. Crim. App. 2020) .............................................24

*Woods v. Estelle*,
   547 F.2d 269 (5th Cir. 1977) ................................................................48

**Statutes**

28 U.S.C. §2241 .................................................................................39
28 U.S.C. §2244(b) ................................................................. 1, 43, 53
28 U.S.C. §2244(b)(1)..........................................................................44
28 U.S.C. §2244(b)(2)..........................................................................43
28 U.S.C. §2244(b)(2)(B) ........................................................ 45, 52, 54
28 U.S.C. §2244(b)(2)(B)(i) .................................................... 44, 45, 46
28 U.S.C. §2244(b)(2)(B)(ii) ........................................................ 47, 50
28 U.S.C. §2244(b)(3)(C)......................................................................43
28 U.S.C. §2244(d)(1)............................................................... 53, 54
28 U.S.C. §2254 ..................................................................................39

**Rules**

5th Cir. R. 28.7 ..................................................................................44
Fed. R. App. P. 32.1............................................................................44

**Treatises**

Keith A. Findley, et al., ed., SHAKEN BABY SYNDROME: INVESTIGATING THE
   ABUSIVE HEAD TRAUMA CONTROVERSY (Cambridge Univ. Press 2023)....... 7, 16

**Other Authorities**

A.N. Guthkelch, *Problems of Infant Retino-Dural Hemorrhage with*
   *Minimal External Injury*, 12 HOUS. J. HEALTH L. & POL'Y (2012) ....................16
Anderst et al. 131 Pediatrics e1314 at e1319, April 2013 ......................................35
*Consensus statement on abusive head trauma in infants and young children*,
   48 PEDIATRIC RADIOLOGY 1048, 1048 (May 23, 2018)................... 17, 34, 35, 36
D.L. Chadwick, et al., *Shaken Baby Syndrome: A Forensic Pediatric*
   *Response*, 101 PEDIATRICS 321–23 (1998) .........................................15
Oxford Centre for Evidence-Based Medicine, *Levels of Evidence*, March
   2009.................................................................................16

## REQUEST FOR RELIEF

Robert Roberson, who is actually innocent, seeks authorization under 28 U.S.C. §2244(b) to file a second federal habeas petition to assert one claim: his conviction violates his federal right to due process because it rests on since-invalidated forensic science.

## STATEMENT OF FACTS

### I.    "[T]he Picture of What They Call Shaken Impact Syndrome."

### A.    Nikki's illness and her father's arrest.

Roberson's daughter, Nikki Curtis,[1] was born on October 20, 1999, to a drug-addicted, homeless woman supporting herself through prostitution; in the hospital, she was denied custody, and Nikki was given to her maternal grandparents, Verna and Larry Bowman.[2] 41RR44-45.[3] After learning of her birth and recognizing he might be the father, Roberson volunteered to take a paternity test; once his paternity was confirmed, the Bowmans eventually agreed to relinquish full custody of Nikki to him. *See* 43RR137-38.

---

[1] Nikki's last name came from her mother's boyfriend at the time, who played no role in Nikki's life after getting the mother to the hospital. 41RR45. She will be referred to as "Nikki" throughout this motion.

[2] Nikki's two older maternal half-brothers had previously been removed from the mother's care. Both had significant health issues: Fetal Alcohol Syndrome Disorder and a seizure disorder. 43RR104-108; 6EHRR149-153.

[3] Citations to the Reporter's Record are "RR" and to the 2018-2021 state evidentiary hearing are "EHRR," preceded by the volume number and followed by the page number or range.

Nikki had chronic health issues. Her first reported infection occurred a few days after birth. 42RR6. Thereafter, she had many antibiotic-resistant infections, including chronic ear infections that persisted even after she had tubes surgically implanted. *See* 43RR123-24. Nikki also suffered unexplained episodes where she would suddenly cease breathing, collapse, turn blue, and have to be revived. These episodes resulted in emergency room visits, a neurological work-up, a sleep monitor, and her pediatrician's recommendation that she not be moved between caregivers. 42RR7-9; EX42. At trial, these episodes were minimized as "breath-holding spells" that did not cause "any sort of real threat," although it was suspected Nikki had a neurological disorder that was causing seizures. Her chronic health issues were generally dismissed as "the normal sort of problems that infants have," not as a potential cause of her death. 42RR9, 6.

On January 28, 2002, soon after Roberson obtained custody, he and his mother took Nikki, who had been vomiting, coughing, congested, and having diarrhea for a week, to the local ER (Palestine Regional). The attending ER doctor prescribed potent drugs, including Phenergan (brand name for promethazine). Later that night, Nikki's temperature shot up to 103.1 degrees. Nikki was taken to her pediatrician the next morning (January 29th), where her temperature was measured at 104.5 degrees. But the pediatrician sent Nikki home with a second Phenergan prescription, this time in cough syrup with Codeine. 42RR10-11. The Bowmans took Nikki home

from the doctor's office, having agreed to keep her for two nights while Roberson's live-in girlfriend was in the hospital recovering from surgery. 43RR152. But the next night (January 30th), the Bowmans called Roberson, insisting that he pick up Nikki at their home in the country. Although Nikki was sick, the Bowmans had been involved in a bitter custody fight with Roberson's family for most of Nikki's life, and it was after 9:30 PM, the Bowmans insisted Roberson pick up Nikki and take her to his house. 43RR150-55.

When they got to his house, Roberson put Nikki into bed, which was a mattress and box springs he had propped up on cinderblocks to make it easier for his girlfriend when she got home after her surgery. *See* 41RR160; SX24. Roberson awoke in the early morning when he heard a strange cry and found Nikki on the floor. He saw a speck of blood on her mouth and wiped it off with a washcloth. They both eventually fell back asleep. But, later that morning, January 31st, Roberson woke up to find Nikki unconscious and saw that her lips were blue. He clutched Nikki's face to try to revive her, then brought her to the local ER. 41RR169-70. ER staff found Nikki didn't have a heartbeat; they performed CPR and chest compressions and intubated her. 41RR112. She then experienced "tachycardia," a rapid heartbeat caused by inadequate circulation of oxygenated blood. 41RR114. Later, a CT scan revealed that the breathing tube had not been inserted properly; it had to be removed and reinserted. 42RR87.

During multiple interviews, Roberson tried to explain Nikki's collapse, reporting that she had been sick and describing her strange cry and apparent fall out of bed, which he had not witnessed. Hospital staff and the police officers who were quickly called in did not know that Roberson was a person with then-undiagnosed Autism Spectrum Disorder. They perceived his flat affect and seemingly implausible explanation for his daughter's grave condition as evidence of culpability. *See, e.g.*, 41RR50-51 (prosecutor describing hospital staff's characterization of Roberson); 41RR69-71 (nurse describing Roberson's story and why she recommended police be called, as well as Roberson not appearing emotional); 41RR73 (nurse saying she "felt like spitting in his face" when Roberson said he would never mean to hurt Nikki); 41RR120-21 (different nurse describing Roberson not appearing properly upset); 41RR156 (responding detective describing Roberson as "unemotional and detached" at the hospital). The attending ER doctor—who had prescribed Nikki Phenergan days earlier—testified Nikki's symptoms were those of a "very severe coma."[4] The ER doctor observed "some bruising around the left side of [her] jaw," which he did not attribute to abuse. 42RR83, 87. But based on the CT scan of Nikki's head, showing bleeding under the dura and brain swelling, he discounted her recent illness and concluded Nikki's condition "did not result from a fall out of bed[,]"

---

[4] Well before triage began, Nikki had likely succumbed to brain death (which occurs after 10-12 minutes without oxygen); medical staff noted that Nikki's eyes were already "fixed and dilated" upon admission to the hospital. 2EHRR79; 8EHRR62.

"[t]hat would be basically impossible[,]" "extremely implausible," "very implausible," "very unlikely." 42RR80-87. Similarly, the initial nurse who had received Nikki at the ER, "triggered" by the bruising and by Roberson's "implausible" story of Nikki falling out of bed, told her supervisor that the police needed to be called. 41RR68-69.

The "abuse" accusation was further stoked by another nurse, who held herself out as a "Sexual Assault Nurse Examiner" (SANE), 41RR103-04, although she was not actually SANE certified. 41RR144. Unbidden, she performed a sexual assault exam on the comatose child. 41RR126-30. This nurse then told colleagues, investigators, and eventually, Roberson's jury she had seen "anal tears" she perceived as a sign of "sexual abuse." *See* 41RR127-28, 142. Although no one else ever purported to see what this nurse claimed to have seen, and although she did not account for the fact that the hospital's own records showed Nikki had been brought in two days before with a report of diarrhea for over a week and had been prescribed Phenergan suppositories and Imodium, the nurse's leap from purported skin "tears" in the anal region to "sexual abuse" was shared with law enforcement. At trial, she doubled-down on her false accusation by incorrectly insisting that diarrhea would not cause a child's anal region to crack or "tear." 41RR127-28. The nurse further denied the intubation process could cause Nikki's torn frenulum and testified it instead was a sign of sexual assault. 41RR136-37.

Meanwhile, the Bowmans told law enforcement and medical personnel Nikki had been "totally well" when Roberson had picked her up from their house the night before. *See* EX2. That demonstrably false report buttressed the assumption that Nikki's condition could and should be blamed on Roberson. 42RR108-109, 43RR80-81.

Because the local hospital in rural Palestine, Texas did not have the means to treat Nikki, she was transported, while on life support, to Children's Medical Center of Dallas. 41RR135. In Dallas, a pressure monitor was surgically screwed into her skull to try to reduce internal pressure.[5] *See* 42RR96. Nikki's case was referred to a child abuse pediatrician (CAP), Dr. Janet Squires, who became the linchpin of both Roberson's arrest and his conviction. She examined Nikki and found no evidence of sexual abuse. 42RR100. She observed that CT scans of Nikki's head showed only a

---

[5] Though this was not explained to the jury, Dallas medical personnel also administered several drugs to stimulate blood flow: vasopressin, dopamine, heparin, and epinephrine. But because Nikki's brain was already dead by that point, the blood flowing to the brain could not enter it. 8EHRR72; 8EHRR75. This led to "the extensive amount of bleeding all throughout the head" that the jury was told could not have come from anything other than inflicted injury. 42RR85; *see also* 42RR102 (treating Dallas doctor testifying to "a lot of blood in various places, sort of between the two halves of the brain and in the front and over the top"); EX18. The Dallas hospital records also indicate that Nikki additionally had an inability to clot her blood, which made her susceptible to bruising and likely increasing bleeding inside her skull; this was not investigated or considered, let alone explained to Roberson's jury. *See* 3EHRR55; EX11.

"simple" impact site on the back of her head. 42RR102-103, 107.[6] But, consistent with the then-prevailing medical consensus, she attributed Nikki's triad of intracranial "injuries" observed in Nikki to evidence of violent shaking, 42RR106-108, despite the absence of any neck or spinal cord injury, 42RR127, which the science of biomechanics has since demonstrated is where any injury from shaking would be experienced. EX22.

Dr. Squires gave local law enforcement an affidavit describing her shaken impact syndrome[7] diagnosis, which police used to arrest Roberson even before an autopsy was performed. 41RR175-76. Just as she later testified, her affidavit attested, "The medical findings fit a picture of shaken impact syndrome. There is some flinging or shaking component which resulted in subdural hemorrhaging and diffuse brain injury. There was also an area of impact in the right back of the head,"

---

[6] These, and the CT scans taken by the Palestine hospital, were not admitted into evidence, and were lost by the State until a court clerk found them in 2018, as detailed *infra*, Statement of Facts Section II(B).

[7] As Dr. Squires explained, shaken impact syndrome and the more familiar term "shaken baby syndrome" (SBS) have the same meaning. 42RR106-107. SBS was eventually revised and renamed "Abusive Head Trauma" (AHT) in 2009. 4EHRR43-44. The origins of SBS, the shift to the more nebulous term AHT, while still relying on the core SBS premises, and a comprehensive explanation of current scientific understanding were described in a 2023 multidisciplinary treatise. Keith A. Findley, et al., ed., SHAKEN BABY SYNDROME: INVESTIGATING THE ABUSIVE HEAD TRAUMA CONTROVERSY (Cambridge Univ. Press 2023) ("Findley").

and concluded, "[m]assive rotational forces were the likely mechanism to cause this brain injury, and the pattern is indicative of a shaken impact syndrome." EX2.

Dr. Jill Urban, a forensic pathologist employed as a medical examiner in Dallas County's Southwestern Institute of Forensic Sciences ("SWIFS") performed the autopsy on February 2, 2002, and concluded that same day that Nikki's death was a homicide caused by blunt force head injuries.[8] EX3. An "Investigation Narrative" in the SWIFS file shows that, before the autopsy was performed, Dr. Urban was informed that Dallas Children's had made a "trauma" finding of "Retinal Hemorrhage, Subdural Hemorrhage, Cerebral Edema" and that the father had been arrested and was to be charged with "capital murder." EX4. A member of Palestine law enforcement, who claimed there was evidence of sexual abuse (although there was none), then sat in on the autopsy. *Id*. The autopsy did not reveal any skull fractures, neck injuries, or any serious bruising or external signs of injury. The autopsy report did contain an unexplained note about "macrophages," a sign of virus, in the lung tissue. EX3. A pediatrician's record, made two days before Nikki's collapse, had documented her temperature was 104.5 degrees and she had an "upper

---

[8] Dr. Urban did not investigate Nikki's medical history; conduct a differential diagnosis; consider the CT scans showing only a single, minor impact site on the back of Nikki's head (consistent with Roberson's report of a short fall); or wait for the toxicology report she had ordered (showing lethal levels of respiratory-suppressing prescription drugs in Nikki's system). 5EHRR201-209.

respiratory viral based infection." 42RR25. But those facts were not explored. Dr. Urban saw a large volume of blood under the dura and, consistent with the SBS hypothesis of that era, assumed the blood was caused by "blunt force injuries," which she told the jury was from an unknown combination of "shaking" and "impact." 43RR75-76.

### B.     State's causation theory and sexual assault testimony at Roberson's trial.

The State indicted Roberson on two counts of capital murder. It alleged: (1) he had "intentionally or knowingly" caused the death of "a person under the age of six"; and (2) he had killed Nikki "in the course of committing or attempting to commit the offense of aggravated sexual assault." 41RR41. Throughout jury selection, the State specifically invoked Shaken Baby terminology and invited each potential juror to consider just how "violent" the shaking would have to be to cause a child's death. *See, e.g.,* 7RR40, 88-89; 8RR23-25; 19RR20-21, 66-67. The State also emphasized with each potential juror its allegation that Roberson killed Nikki after committing sexual abuse. *See, e.g.*, 7RR25-27, 67, 75, 127; 8RR10; 19RR22, 58. In its opening statement, the State invited the jury to imagine violent shaking and said that medical experts would testify in support of the State's theory "that Nikki died or rather was the victim of child physical abuse consistent with the picture of what they call shaken impact syndrome." 41RR53-55. Roberson's lawyer, in his opening statement, conceded this was a "shaken baby" case, arguing only that,

because of his cognitive impairments, Roberson lacked any intent to kill. *See, e.g.*, 41RR57-61.

The State presented testimony from local medical staff, including the doctors who had treated Nikki and prescribed double doses of Phenergan in the days before her collapse. They emphasized how Roberson had not displayed "normal" emotion and that a short fall and Nikki's recent illness could not explain her condition. *See generally* 41RR50-160; 42RR80-87. The State elicited extensive, graphic testimony from the purported SANE nurse about "anal penetration" and her view of the proclivities of "pedophiles." 41RR129. The State also presented testimony from Roberson's notably impaired girlfriend of a few months, Teddie Cox, claiming she had witnessed Roberson shaking and otherwise mistreating Nikki—vague claims undocumented, previously unreported, and controverted by Teddie's own sister. 42RR169-177. But, ultimately, the State's homicide theory hinged on the medical testimony of Dr. Squires and Dr. Urban, who relied on the tenets of SBS/AHT as generally accepted in 2002-2003 and served as the sole medical witnesses regarding causation.

Dr. Squires testified that CT scans revealed "no fractures," but showed the triad of subdural blood, brain swelling, and "very obvious retinal hemorrhages." 42RR102-105. She concluded that the "medical findings" were "a picture of shaken impact syndrome" aka "shaken baby syndrome." 42RR105-106. She explained her

opinion that Nikki's injuries were caused by "very forcefully" shaking. 42RR106.
The State emphasized the triad of symptoms—"subdural hemorrhages, the retinal
hemorrhages, and the brain swelling"—and Dr. Squires repeatedly claimed they
indicated "shaking[.]" 42RR107.

Dr. Squires also rejected the notion that such injuries could arise from a fall:
"We see children fall out of windows and all sorts of things and we know what an
impact injury looks like[.]" 42RR108. The "proof" of shaking, for her, was the blood
"over the top of the brain." *Id.* She also opined that, immediately after such a shaking
incident causing a "deep brain injury," Nikki "would not have been normal." *Id.* The
kind of "shaking" that Dr. Squires envisioned was "a very violent forceful act."
42RR114. She used the language of biomechanics (not her field) in describing
Nikki's symptoms as "classically consistent with injuries from rotational force"
caused by shaking. 42RR120. She saw "no other indication of traumatic injuries"—
"no bruising," "no fractures," "no old fractures"—therefore, she concluded violent
shaking was *the* cause. 42RR123. She invoked the American Academy of Pediatrics
(AAP) 2001 position paper, which told pediatricians that they did not have to
consider anything other than abusive shaking upon seeing the triad. 42RR116-117;
EX38.

Dr. Urban similarly concluded that Nikki's death was caused by "blunt force"
and then defined the term as the result of impact and violent shaking. 43RR78-79;

11

43RR85-86. Though Dr. Urban did not use the term "Shaken Baby" in her autopsy report, she used "blunt force trauma" and "blunt force head injuries" and treated those terms as entirely consistent with her "shaking" opinions, testifying at trial that she could not distinguish between injuries caused by "shaking" and blunt "impact." 43RR85-86. Dr. Urban, like Dr. Squires, opined extensively about "shaking" as explaining Nikki's condition and used SBS terminology. *See* EX5 at 24-26.

Dr. Urban further testified that it was "not unusual" that the internal head condition was not accompanied by any fractures to the skull, because, in her opinion, it is the shaking that had caused the injuries that ultimately kill the child. 43RR79-81. In accordance with SBS, the absence of neck injuries or broken bones was not unusual because, in her opinion, a child's "weak neck" is somehow protected during violent shaking: "if the child is shaken, it's this very large object sitting on a fairly weak neck"—and so the neck is protected but the head is not. 43RR82. She did not provide any scientific support for that view. Similarly without recourse to science, she opined that children do not bruise easily because of excess "fat." 43RR89, 82, 81.

Dr. Urban found no evidence of old injuries, healed bone fractures, scar tissue, or other trauma and acknowledged that some of the small bruises observed on Nikki could have been caused by attempts to resuscitate her. 43RR95-96. But these findings seemed to reinforce her conviction that Nikki's death was caused by violent

shaking. 43RR82-83. She repeatedly emphasized the SBS triad: subdural hemorrhage/hematoma, brain swelling, and retinal hemorrhages. 43RR84-85. Dr. Urban also opined, consistent with SBS beliefs of that era, that, after being shaken, Nikki's injuries would have been immediately apparent—reflected in "a change in the level of consciousness." 43RR81. In other words, Dr. Urban believed that, immediately after the imagined abuse, Nikki would have shown clear signs of impairment, thus supporting an inference that the person with her at the time had caused her condition.

Dr. Urban's trial testimony corroborated Dr. Squires' SBS diagnosis and trial testimony; both opined that shaking could have caused, and probably did cause, the child's fatal condition. The trial transcripts show over 260 references to "shaking" and SBS terminology. EX5. The transcripts also show that a teddy bear, with no anatomical similarity to a 28-pound toddler, was repeatedly used as a demonstrative with witnesses who were invited to show the jury how Nikki had been shaken. 42RR52; 42RR69-70.

Just before the jury was charged, the State abandoned the capital murder count based on the sexual assault allegation. 44RR3-4. Yet the State continued to argue that there was evidence of a sexual assault based solely on the testimony of the self-appointed SANE who was not actually SANE-certified. 46RR58-60.

## II.    The Evidence That Has Emerged Since Trial.

The sea change in the relevant science that had previously allowed for presuming Nikki's death was a homicide, and the results of a belated investigation into Nikki's medical history and underlying conditions that that sea change enabled, have transformed the evidentiary landscape. If retried today, the trial would bear no resemblance to Roberson's 2003 trial, in which his own lawyer conceded his guilt contrary to his insistence that he had done nothing to harm his daughter. The evidence of "guilt" in the form of Roberson's misinterpreted affect and perceived lack of emotion is now rightfully understood, including by the lead detective, as symptoms of his Autism Spectrum Disorder. Modern science now tells us that Nikki's death was a tragedy that involved a severely ill child, prescribed contra-indicated, respiratory-suppressing medications, experiencing breathing arrest while sleeping sometime after a short fall from bed and a nightmare for the Autistic father who was not equipped to explain her complex medical condition when he repeatedly brought her to medical professionals seeking help.

### A.    The sea change in SBS/AHT has debunked the State's causation theory.

The prior medical understanding was that a specific set of intracranial symptoms could be viewed as categorical proof of SBS/AHT. More specifically, in 2002-2003, when Roberson was tried, the medical community invited doctors to infer conclusively that a child had been violently shaken from the presence of three

symptoms: subdural hematoma, brain swelling, and retinal hemorrhaging. Child abuse literature at that time called SBS a "clearly defined medical diagnosis," and referred to the triad as the "diagnostic features" of SBS that were "virtually unique to this type of injury." *See, e.g.*, D.L. Chadwick, et al., *Shaken Baby Syndrome: A Forensic Pediatric Response*, 101 PEDIATRICS 321–23 (1998). The assumption was that, where this "triad" was present, a child must have been the victim of intentionally inflicted abuse and that whoever had been caring for that child when the symptoms became manifest must have been the culprit—absent some verified major trauma such as a car wreck or a fall from a multistory building. Thus, no differential diagnosis was necessary.

Now, a differential diagnosis is *required* before abuse can be posited. Moreover, all core tenets of the SBS/AHT hypothesis have been debunked by evidence-based science. Experts in biomechanical engineering now universally agree that it is "literally impossible" to cause subdural bleeding through shaking; indeed, no study has demonstrated that shaking can produce *any* of the intracranial conditions long associated with SBS. 5EHRR98-131. Contemporary biomechanics further teaches that any head acceleration generated by shaking would be experienced first and foremost in the neck; thus, the neck is not "protected" during shaking, as SBS proponents surmised (and as both Dr. Squires and Dr. Urban testified at trial). 5EHRR102. And experts across many other disciplines—including forensic

15

pathologists, neurosurgeons, radiologists, hematologists, infectious disease experts,

emergency room physician, and a host of other specialists—have expressed deep

skepticism about the SBS/AHT hypothesis. *See generally* Findley, *supra*. Even Dr.

Norman Guthkelch, the neurosurgeon who had first proposed the Shaken Baby

hypothesis in the 1970s, ultimately expressed horror that his untested hypothesis had

been used to accuse caregivers of crimes. A.N. Guthkelch, *Problems of Infant Retino-*

*Dural Hemorrhage with Minimal External Injury*, 12 Hous. J. Health L. & Pol'y

(2012).

Experts have further explained the significance of the first "meta-study" of

SBS studies, published by an agency of the Swedish government in 2016.[9]

4EHRR51-52; 8EHRR35-38. The meta-study identified significant defects in the

literature endorsing SBS/AHT as a causation theory.[10] EX39. An appendix to the

study highlighted the absence of any uniform diagnostic criteria for SBS/AHT,

unlike other medical conditions. 4EHRR53-54. The meta-study also noted the

"circular" reasoning at the heart of SBS/AHT—which assumes that the presence of

---

[9] "Meta-studies"—statistical analyses combining results from multiple scientific studies addressing the same question—are considered to be the most trustworthy evidence-based medical literature. Oxford Centre for Evidence-Based Medicine, *Levels of Evidence*, March 2009.

[10] Courts recognized this study as compelling "new evidence" relevant to actual innocence claims warranting habeas relief from SBS-based convictions. *See, e.g.*, *Jones v. State*, No. 0087, 2021 WL 346552, n.26 (Md. Ct. Spec. App. Feb. 2, 2021).

subdural bleeding, brain swelling, and retinal hemorrhages proves that violent shaking and thus abuse occurred, so whenever these conditions are observed, abuse was presumed. 4EHRR54-55; 8EHRR36. The Swedish meta-study is but one example of the absence of evidence-based support for the hypothesis that shaking a baby or toddler can cause the triad. EX19-38.

Today, even those who still believe (absent scientific proof) that shaking a child can produce a subdural bleed, brain swelling, or retinal hemorrhages (but no neck injuries) have accepted that a differential diagnosis is required before SBS/AHT can be diagnosed, given the many other conditions now known to cause these symptoms. *See, e.g.*, *Consensus statement on abusive head trauma in infants and young children*, 48 PEDIATRIC RADIOLOGY 1048, 1048 (May 23, 2018) ("2018 Consensus Statement") ("When diagnosed [SBS/AHT] signifies that accidental and disease processes cannot plausibly explain the etiology of the infant/child's injuries.").[11]

---

[11] The 2018 Consensus Statement, although an implicit recognition of significant advances in science that the AAP had previously disregarded, was not a true "consensus" statement. Authored by a small group who agreed with each other and had testified in SBS cases for the prosecution, the statement did not account for the views of pediatricians and pediatric radiologists who disagreed with them and the views of forensic pathologists, clinical pathologists, hematologists, pediatric infectious disease specialists, pulmonologists, biomechanical engineers, and many other scientists who had long recognized the core premises underlying the SBS/AHT hypothesis have been discredited by modern evidence-based scientific research.

**B.      A host of interrelated conditions caused Nikki's natural death.**

Because of the version of SBS that was then widely accepted, even though it had never been validated, none of the State's trial experts considered any other evidence. The gradual debunking of SBS/AHT and the current requirement of a differential diagnosis prompted the need to investigate Nikki's underlying condition, which had not previously occurred.

Beginning in 2016 and continuing through this year, multiple highly qualified specialists have thoroughly reviewed all available medical records and the autopsy file—only made possible by the belated production of crucial records and by recent medical advances—and have concluded that, when Nikki died, she had a severe, undiagnosed chronic viral pneumonia compounded by a secondary acute bacterial pneumonia. Her infection progressed to sepsis. Sepsis reflects a system-wide failure to fight off infection—and thus a profoundly ill child. Her diseased lungs were pushed to respiratory failure by inappropriate prescription medications that further suppressed her breathing. Breathing arrest caused brain swelling, and her infection also caused Disseminated Intravascular Coagulation (DIC), a severe and often fatal bleeding disorder.

None of these circumstances were identified or even considered, let alone excluded, in assessing her condition when her father brought her to the Palestine ER

seeking help on January 31, 2002, or during the autopsy two days later. Now, both the State's causation theory and the very classification of Nikki's death as a homicide are untenable.

### 1. Expert opinions and evidence presented in the 2016 successive state habeas application and 2018-2021 evidentiary hearing on remand

Beginning in 2016 and through a post-conviction evidentiary hearing, Roberson's experts debunked the prosecution's causation theory and attested to the actual causes of Nikki's death. The experts relied on a report from the only radiologist to provide evidence in this case to date, *Dr. Julie Mack*, who interpreted Nikki's long-missing CT scans from the Palestine and Dallas hospitals, which captured Nikki's internal condition upon arrival at the hospitals.

The hearing began in 2018 and was continued the same day when the Anderson County District Clerk found those scans among other case-related materials stashed in a locked closet in the courthouse basement. 2EHRR85-87. Following additional delays related to seeking access to core medical records and expertise, as well as the COVID pandemic, the hearing resumed in 2021.

Roberson's experts concluded that the radiological evidence showed conclusively that Nikki had sustained a single impact to the right back of her head where a "goose egg" had formed and a small subdural bleed had commenced. They opined that the single impact was consistent with Roberson's report that Nikki had

fallen out of bed and inconsistent with Dr. Urban's testimony regarding multiple impact sites. In light of current scientific understanding and material new information about Nikki's condition, these experts concluded that Nikki's death was not caused by abuse but by natural and accidental causes:

*Dr. Janice Ophoven*, a licensed M.D. since 1971, board certified in forensic pathology and anatomic pathology with special training and experience in pediatrics and pediatric pathology, concluded that Nikki's death should not have been designated a homicide, in part because there is no scientific basis for looking at an impact site and concluding whether it was intentionally inflicted or the result of an accidental fall. Dr. Ophoven opined that Nikki's internal condition simply meant that she had suffered irreversible damage from oxygen deprivation.

Dr. Ophoven explained that anyone who has breathing and cardiac arrest can develop the same constellation of internal head conditions. If the brain is deprived of oxygen, brain swelling occurs. Then, as pressure against the brain increases, bleeding into the eyes, which are connected to the brain, can occur. Dr. Ophoven was confident that the precipitating event was not "shaking" or "multiple impacts" to the head. Moreover, she explained that Dr. Urban's autopsy pictures, to which the jury had been subjected, were misleading because they did not reflect Nikki's condition when she was brought to the ER but were taken after multiple intervening events had significantly altered Nikki's internal and external condition. 3EHRR13-81; EX6.

20

*Dr. Ken Monson*, a biomechanical engineer, explained that there is no scientific support for the false premise that shaking can cause the triad of internal head conditions without neck injury. He also explained how the laws of physics and modeling are utilized to study the injury-impact of falls with head impacts. Evidence was adduced of contemporary scientific studies, including a 2018 study, demonstrating that short falls can cause the exact kind of impact and internal bleeding observed in Nikki when she first arrived at the hospital (as seen in the CT scans taken of her head). 5EHRR215-16, 140-43; EX22. Dr. Monson observed that the trial testimony stating that a short fall could not have caused Nikki's condition was incorrect. 5EHRR27-28, 104-05. Dr. Monson explained how a teddy bear, such as that used as a demonstrative during Roberson's trial, weighing less than a pound, is not a comparable model in any relevant respect to a 28-pound toddler like Nikki and thus misled the jury. 5EHRR22-108.[12]

---

[12] Forensic pathologist and pioneer in debunking SBS, *Dr. John Plunkett*, who died before the hearing, also provided an affidavit supporting Roberson's 2016 state habeas application. His affidavit demonstrated that short falls could cause death and the triad of intracranial symptoms previously thought to be proof-positive of shaking. Dr. Plunkett and his research were summarily dismissed by the larger medical community for years. EX36; 5EHRR29-30. His affidavit, later admitted into evidence (but ignored by the habeas judge), explained how his SBS-skepticism was an outlier at the time of Roberson's 2003 trial. EX36. Indeed, the DA's office that prosecuted Roberson in 2003 was expressly told that, per the chief medical examiner at SWIFS, Dr. Plunkett and his research challenging core SBS assumptions were "garbage." EX37. In 2021, Dr. Monson provided unrebutted testimony regarding the biomechanical research that ultimately validated Dr. Plunkett's research and opinions. EX36; 5EHRR27-105.

*Dr. Carl Wigren*, a forensic pathologist who has performed thousands of autopsies and is a member of the American Academy of Forensic Sciences, concluded that Nikki's death was "absolutely not" a homicide, with SBS/AHT playing no role, based in part on: (1) the report of a fall; (2) the evidence (CT scans and autopsy photographs) showing only a single impact site to the back of Nikki's head that was consistent with the report that she had sustained a short fall; (3) evidence in the toxicology report of dangerous quantities of Phenergan/promethazine, now known to suppress the nervous system, in Nikki's bloodstream at the time of autopsy; (4) evidence that, shortly before her collapse, she had been prescribed Phenergan in two forms and cough syrup with Codeine, a narcotic that metabolizes into morphine and further suppresses the nervous system; and (5) evidence that Nikki had undiagnosed pneumonia. 5EHRR157-244; EX40.[13]

*Dr. Roland Auer*, a neuropathologist board certified in the United States and Canada, who is both a medical doctor and a Ph.D. scientist, the author of a leading forensic neuropathology treatise and over 130 scientific articles in peer-reviewed journals, and a researcher with extensive experience with head trauma, hypoxia,

---

[13] Dr. Wigren built on the work of forensic pathologist *Dr. Harry Bonnell*, who had submitted an affidavit in support of the 2016 filing. Before the evidentiary hearing was convened, Dr. Bonnell retired and moved to Belize. However, his sworn report was admitted into evidence. EX41.

hypoxic ischemia, and pediatric pneumonia, concluded that her death could not reasonably be deemed a homicide.

As a specialist in brain pathology, Dr. Auer clarified that trauma sufficient to cause internal brain damage would leave external markers on the skin in the form of corresponding bruises/contusions and likely corresponding skull fractures. He found no evidence suggesting significant trauma to Nikki's head, only one minor impact, "no support for multiple impact sites neither on the brain nor in the skull nor in the scalp," and "no evidence for multiple impact sites whatsoever" but instead found evidence in Nikki's lung tissue of advanced interstitial viral pneumonia. He explained that interstitial viral pneumonia causes hypoxia by disrupting the lung tissue and, if untreated, a cascade of symptoms will result in brain death: oxygen-deprived blood vessels leak into the dura; the blood accumulating outside of the brain causes swelling and increased intracranial pressure; the pressure inside the skull in turn causes retinal hemorrhages. He also noted that the drugs Nikki had been prescribed before her collapse—Phenergan, which depresses respiration, and Codeine, an opiate—would have done nothing to address her undiagnosed pneumonia but would have further hindered her ability to breathe. 8EHRR8-144, 55-56; EX18.

By contrast, the State relied on two witnesses. The first was Dr. Urban, who admitted she had never considered Nikki's medical history or a host of other material

factors and could not identify anything she had learned in the intervening years to warrant revisiting her 2002 opinions. 9EHRR121, 127. The second was Dr. James Downs, a member of the "Shaken Baby Alliance," an SBS/AHT advocacy group that teaches prosecutors how to obtain convictions based on the SBS/AHT hypothesis. 10EHRR112-15.

In an attempt to rebut Dr. Auer's comprehensive findings, including his conclusion that Nikki's death was caused by her undiagnosed interstitial viral pneumonia, Dr. Downs repeatedly claimed that Nikki's lungs were "normal, little kid lungs" and he saw "no pneumonia." 10EHRR74, 212, 242. Dr. Downs also (falsely) asserted that he did not believe he had "ever missed" pneumonia in an autopsy "since they're pretty much readily apparent grossly." 10EHRR221. Yet, as Dr. Auer had testified, interstitial viral pneumonia is not readily apparent grossly; identifying its effect on lung tissue requires special training that forensic pathologists do not receive. 8EHRR89, 100. Moreover, during cross-examination, Dr. Downs was confronted with an appellate decision granting habeas relief to a man who had been sentenced to death for intentionally causing the death of his infant son. Based in part on new evidence that the child had pneumonia at the time of his death, the court had found that Dr. Downs, who had performed the child's autopsy, had missed the pneumonia, which was not mentioned in his autopsy report or trial testimony. *See Ward v. State*, 382 So.3d 574 (Ala. Crim. App. 2020).

Finally, in addition to evidence debunking the SBS trial theory and providing the basis for Nikki's natural death, *Kim Basinger*, a registered nurse and certified SANE examiner, attested to the rampant ethical, procedural, and factual errors in the Palestine nurse's supposed SANE examination and testimony. EX7.

### 2.    Expert opinions and evidence presented in the 2024 successive state habeas application

Following the denial of relief after the hearing, and loss of subsequent appeals, Roberson filed a new successive state habeas application, relying on yet more intervening changes in the relevant science since 2016, as well as on new evidence corroborating that Nikki died of a severe, undiagnosed pneumonia exacerbated by inappropriate respiratory-suppressing medications prescribed during her final days by doctors who had missed her pneumonia. He provided three new expert reports, reflecting different medical specialties. These correlated opinions were only possible because of evidence that had emerged over the course of the previous habeas proceeding and thereafter.

*Dr. Francis Green*, an expert in lung pathology with nearly 50 years of experience, reviewed Nikki's medical history and examined her lung tissue under a microscope. His detailed report explained how two different types of pneumonia—a viral and a bacterial infection—were ravishing Nikki's lungs. He found that interstitial viral pneumonia had substantially thickened the cell walls of the tiny air sacs in Nikki's lungs, where oxygen is absorbed into the bloodstream. As those interstitial cell walls

thickened, Nikki's ability to breathe was greatly inhibited and, eventually, her brain and other organs were starved of oxygen. Dr. Green's detailed analysis showed that Nikki's pneumonia started many days, if not weeks, before her final hospitalization. This evidence from a highly qualified specialist also rebutted the State's experts suggestion that Nikki's lung condition was only a function of time spent on a ventilator. EX8.

Further, Dr. Green explained how it was only post-2020 that medical literature described the ways respiratory viruses interact with each other and with pathogenic bacteria to cause severe lung disease. Nikki had what is now understood as the most severe combination of viral plus bacterial disease, where the virus allowed bacteria to attach to the basement membrane and then penetrate the airway wall of her lungs. Nikki's viral inflammation increased the invasiveness of pathogenic bacteria, affecting her immune system by impairing neutrophil function, decreasing oxidative burst, and enhancing neutrophil apoptosis, thus increasing her susceptibility to bacterial superinfection. *Id.*

*Dr. Keenan Bora*, an expert in medical toxicology and emergency room medicine, concluded that a post-mortem toxicology report shows that Nikki had dangerously high levels of promethazine (aka Phenergan) in her system, likely explained by the fact that two different doctors prescribed the drug on two consecutive days. Dr. Bora explained that promethazine would have exacerbated the respiratory

problems caused by Nikki's undiagnosed pneumonia. Dr. Bora also noted that the second promethazine prescription was in cough syrup that included Codeine, a narcotic that would have further compounded Nikki's breathing challenges. He noted the 2004 FDA black box warning against giving patients under 24 months promethazine due to the potential for fatal respiratory depression. Dr. Bora concluded that these drugs likely hastened her respiratory depression and death from her severe infection (pneumonia) that developed into sepsis and then septic shock. EX9.

*Dr. Julie Mack*, a Harvard-trained pediatric radiologist, concluded that CT scans of Nikki's head, taken upon her arrival in the Palestine hospital, showed that she had only a single impact site on her head, *i.e.*, a "goose egg." These scans corroborated Roberson's report that Nikki had fallen out of bed and possibly hit her head a few hours before he woke up to find her unresponsive. But Dr. Urban had testified in the 2003 trial that Nikki had sustained multiple impacts to her head, which, along with "shaking," was the "blunt force trauma" that she concluded had killed Nikki. The incontrovertible radiological evidence, however, showed only one impact site.

The medical imaging further shows that this one minor impact site is associated with a small subdural bleed and no corresponding skull fractures, entirely consistent with an accidental fall out of bed and entirely inconsistent with Dr. Urban's shaking and multiple-impacts testimony. As Dr. Mack explained, the short fall with head impact might not have been fatal if experienced by a healthy child; but Nikki was

27

profoundly ill. EX10. Dr. Mack was also finally been able to review a series of chest x-rays of Nikki, including ones only produced to Roberson's counsel in 2024. In a supplemental affidavit, Dr. Mack concluded that these chest x-rays corroborated Dr. Green's conclusion that Nikki had a fatal lung infection (pneumonia). *Id.*

When Roberson was accused and tried, no medical expert considered, and thus the jury did not hear, medical testimony explaining how the combination of pneumonia, respiration-suppressing medications, and a short fall thoroughly explained Nikki's condition. Dr. Urban did not even obtain Nikki's medical records and thus did not know that Nikki had been extremely ill with a high fever and respiratory distress in the days preceding her collapse. Although a post-mortem toxicology report showed that Nikki had a large quantity of promethazine in her system, Dr. Urban did not investigate what promethazine was, much less any role it may have played in Nikki's death. She did not review any of the medical imaging taken of Nikki's head or lungs during her final hospitalizations. And she did not account for the effect on Nikki's body of two days of extensive medical intervention from the time she arrived at the hospital until the autopsy was performed—including the fact that she had had a pressure monitor surgically screwed into the top of her head, causing additional bleeding and bruising before Nikki was transported to SWIFS.

Though the 2016 application had explained the evolution in the understanding of SBS as of then and how the core principles underlying the hypothesis were no longer

valid, the vital evidence needed to explain precisely how Nikki died only became available piecemeal after that application was filed. The 2024 application explained all this—how these new expert assessments were only possible after habeas counsel obtained core pieces of evidence, unavailable when the previous application was filed, including: (1) the long-lost CT scans and x-rays of Nikki taken during her final hospitalizations; and (2) a complete autopsy file, including access to lung tissue slides made during the autopsy. Despite multiple discovery requests, subpoenas, and PIA requests, Roberson's legal team did not receive some components of the autopsy file until 2024 (x-rays taken during the 2002 autopsy).[14] After enlisting distinctly qualified experts who undertook a thorough reassessment of medical records, the new evidence provided additional and uncontroverted evidence that Nikki had died of natural and accidental causes.

### 3. Expert opinions and evidence presented in the 2025 successive state habeas application

During the 2021 evidentiary hearing, Roberson's counsel did not anticipate that the State and the habeas judge would entirely disregard the unrebutted expert testimony from a pediatric forensic pathologist, a biomechanical engineering specialist, a forensic pathologist, a neuropathologist, and the findings of the only

---

[14] Key medical records remain missing, including earlier head scans when Nikki was assessed for possible neurological problems in September 2000 because of her history of breathing apnea.

radiologist to study Nikki's long-lost CT scans. Because their expert testimony, collectively, established that Nikki had an undiagnosed pneumonia, had been overprescribed contra-indicated medications, and had no significant head trauma other than what was most logically attributed to the short fall out of bed reported by her father—none of which had been considered by the medical examiner—Roberson had not seen the need to entreat the court for more funding for yet more specialists— for instance, in lung pathology, medical toxicology, or hematology—although these specializations permit an even more nuanced understanding of Nikki's condition. But there were open questions about the difference in Nikki's appearance when brought to the hospital and her appearance two days later during the autopsy that the medical examiner had not accounted for. But now, every aspect of Nikki's condition has been explained. The last piece of the puzzle was the role DIC played.

*Dr. Michael Laposata*, M.D., Ph.D., a nationally recognized pathologist with expertise in bleeding disorders, concluded that Nikki's history of chronic infections is significant to assessing whether Nikki had DIC, as infections are the leading cause of DIC in infants and children. Dr. Laposata noted that her doctors' frequent prescription of five different synthetic antibiotics (on at least ten separate occasions) is also a significant factor; research shows that synthetic antibiotics impair platelet formation, which is critical to proper clotting. EX11. Dr. Laposata further concluded that Nikki's laboratory results in the days before her collapse and during her final

hospitalizations show unmistakable signs that Nikki had moderate DIC. His analysis revealed that Nikki's blood tests—some of which were specifically designed to identify bleeding disorders—reveal that Nikki had abnormally-shaped red blood cells, elevated blood-clotting times, and other markers highly suggestive of DIC. Dr. Laposata also explained that she had abnormal liver-function test results, which further corroborate his DIC diagnosis since the liver plays a role in the formation of the body's blood-clotting factors. DIC, which can be triggered by infection or a small intracranial bleed, is a significant finding, as Dr. Laposata explains:

> When a person experiences DIC, their body rapidly uses up all of the clotting factors. Then, after their clotting factors are fully depleted, they can bleed anywhere and potentially everywhere in their body. During an emergency resuscitation effort, like Nikki experienced when she arrived at Palestine Regional, a patient in DIC can develop bleeding under the skin in the form of bruises. Nikki's minor bruises on her face captured in the hospital photos and scalp are entirely consistent with her father's efforts to wake her, the life-saving efforts to resuscitate her upon her arrival at the Palestine ER, and then subsequent treatment by her medical providers during the course of her hospitalization until she died two days later.

> The most plausible explanation for Nikki Curtis' bleeding and bruising is the development of DIC starting months before the event which took her life. […] A major diagnostic error in which the diagnosis of DIC is missed occurs when individuals who are not expert in the field of coagulation and are unaware of chronic DIC, recognize only overt DIC. Nikki Curtis clearly had a chronic DIC because she suffered from infections through virtually her entire life. Minor trauma in such a patient with chronic DIC can lead to major bleeding, especially if the infection is worsening into something more life-threatening like pneumonia. The presence of prior apneic episodes and her recent high fever in this patient all suggest that her status was worsening, most likely as her infection was becoming more severe.

31

*Id.*

Dr. Laposata also explained that Dr. Downs' post-conviction testimony was patently erroneous. Dr. Downs claimed that Nikki did not have DIC because she would have had blood oozing everywhere, including in her IV lines. As Dr. Laposata attests:

> While patients with DIC are susceptible to bleeding anywhere, they often have bleeding and bruising in discrete areas, not everywhere as Dr. Downs suggested was required. Dr. Downs' analysis of Nikki's laboratory PTT and D-dimer results is also wrong. As I have noted previously, Nikki's laboratory results indisputably demonstrate she had moderate DIC, particularly when combined with her clinical history.

*Id.*

In sum, Dr. Laposata has concluded that Nikki's moderate DIC explains the contrast between the minimal bruising and subdural bleeding Nikki had when her father brought her to the Palestine ER and the more extensive intracranial bleeding and bruising Dr. Urban noted during the autopsy, which she incorrectly assumed was evidence of multiple inflicted impacts. Instead, Dr. Laposata concurred with other experts that Nikki had a bleeding disorder which, along with her severe infection that progressed to sepsis, caused her death.

*Ten additional unaffiliated pathologists* reviewed a factual summary and previous expert opinions about the cause of Nikki's death. All have extensive experience performing autopsies, assessing human tissue, and making cause and manner of death determinations. They signed a "Joint Statement of Pathologists"

32

(Joint Statement) in February 2025 expressing profound concern about Dr. Urban's refusal to revisit her autopsy. Based on publicly available information, they do not believe that the autopsy comports with current standards of care in their field. EX12. The Joint Statement urges reexamining the conclusions regarding the cause and manner of Nikki's death and asserts that the reexamination should be based on all relevant information, including the opinions of pathologists who have already studied the case and provided extensive written findings. *Id.*

The Joint Statement recognizes that, when the 2002 autopsy and 2003 trial occurred, medical experts considered the combination of subdural hematoma, brain swelling and retinal hemorrhage sufficient to make an SBS/AHT finding. The medical consensus also presumed that violent shaking caused immediate brain damage, allowing investigators to assume that a crime had occurred and then to artificially limit the likely suspect(s) to whomever was with the child at the time of her collapse. Caregivers, like Roberson, who denied doing anything to hurt their child, were perceived as liars. *Id.* Since then, the profession's understanding of these issues has evolved considerably. A forensic pathologist performing an autopsy today would consider undiagnosed pneumonia, dangerous medications, and a short fall significant and sufficient to explain Nikki's collapse and subsequent death. *Id.* The pathologists who signed the Joint Statement have concluded that the 2002 autopsy results are unreliable. They note that Dr. Urban reached her conclusions regarding

33

cause and manner of death on February 2, 2002, the same day the autopsy was performed without even waiting for critical test results. They believe these conclusions could not withstand scrutiny in light of contemporary scientific understanding, because it is now known that many naturally occurring phenomena, such as infection, genetic disorders, and accidental short falls with head impact can produce the same intracranial conditions once thought to be "diagnostic" of inflicted head trauma. *Id.*

The Joint Statement notes that, after years of studies exposing the lack of scientific underpinning for SBS/AHT, even those in the pediatric community who have long endorsed the hypothesis now recognize that "the work-up must exclude those medical diseases that can mimic AHT," which includes, critically, sepsis and DIC, both of which the medical evidence shows that Roberson's daughter Nikki had. *Id.* (citing 2018 Consensus Statement). The Joint Statement explains that the conditions Nikki had at the time of her death, including an undiagnosed viral and bacterial pneumonia that had likely caused DIC and sepsis, have been confused with SBS/AHT, and thus the AAP itself has cautioned against this type of error:

> because DIC can cause any type of bruising/bleeding, including ICH, the finding of DIC in the context of suspected child abuse could significantly change the clinical approach to a patient. In children with DIC and bleeding symptoms as the only finding concerning for abuse, consideration must be given to the multitude of primary causes of DIC, including trauma, sepsis, and primary bleeding disorders, among many others.

34

*Id.* (quoting Anderst et al. 131 Pediatrics e1314 at e1319, April 2013).

The Joint Statement urges that the medical evidence–that Nikki had an advanced infection (interstitial viral pneumonia and a secondary necrotizing bacterial pneumonia) and DIC–cannot be dismissed or ignored in making a reliable cause of death determination. Recent assessments by highly qualified medical experts have resulted in well-documented opinions that there was no homicide, suggesting that Roberson should not have been prosecuted for murder, let alone convicted and sentenced to death. *Id.*

Additionally, the Joint Statement avers that Dr. Urban's autopsy does not reflect an attempt to account for the effects of extensive medical treatment, undertaken to try to reverse Nikki's condition, between the time when she was brought to the ER unconscious with blue lips and fixed, dilated pupils on the morning of January 31, 2002, and when Dr. Urban conducted the autopsy two days later. Pathologists today know that treatment can alter the evidence available and can complicate the picture viewed at autopsy. *Id.* The Joint Statement expresses concern that, when Dr. Urban was asked in 2024 to meet with Roberson's counsel and with medical experts who have reexamined the case and concluded that Nikki's death was not a homicide, she (who is still employed by SWIFS as a medical examiner) was unwilling to participate in such a meeting. *Id.*; *see also* EX37; EX13 at 7-8; EX3. Dr. Urban's offer to give defense counsel a 10-to-15-minute phone conference is not,

in their professional opinion, sufficient in a case of this complexity. EX14. Medical examiners should be objective and willing to engage with multiple stakeholders in criminal investigations. EX12.

The Joint Statement emphasizes that failing to properly analyze clinical data, radiology, and medical records can further skew autopsy results. For instance, the CT scans made on January 31, 2002, show a small subdural hematoma and a swollen brain; but Dr. Urban never looked at those scans and did not recognize that the more extensive intracranial blood she observed two days later—and presumed to be a sign of multiple impact sites—were not present when Nikki arrived in the hospital and thus cannot reasonably be characterized as proof of trauma, inflicted or otherwise. *Id.*

Finally, the Joint Statement notes that contemporary understanding of the role of cognitive bias in death investigations has justifiably prompted some jurisdictions to prohibit law enforcement personnel directly involved in an investigation to be inside the autopsy suite during the autopsy, as occurred in this case. Several factors suggest cognitive bias is an issue here, including the hasty conclusions regarding cause and manner of death made the same day as the autopsy after being informed that Roberson had already been arrested using an SBS diagnosis and then the refusal to reconsider old findings based on new medical evidence and changes in scientific understanding during the intervening two decades. *Id*.

In addition to the above expert evidence, *Patricia Conklin* provided an affidavit attesting that both she and her sister, Teddie Cox, were pressured by CPS with the threat of having their children taken from them if they did not "get on board" with accusing Roberson. EX15. She further explained the falsity of Cox's testimony as she has known Roberson for most of his life, saw him often with Nikki, and never saw him harm her or anyone else.

### C.    Roberson Has Been Diagnosed with Autism Spectrum Disorder.

Evidence of Roberson's Autism Spectrum Disorder and how it affects the "normal" display of emotion was developed for the first time during his 2021 evidentiary hearing. 7EHRR64-138. Lead detective at the time of Roberson's arrest and one of the State's key trial witnesses, Brian Wharton, who testified in 2003 about his perception of Roberson's blunted and "odd" behavior, has now completely disavowed his former testimony. EX16. At the time, he had a hunch that Roberson "had some kind of disability or mental illness," and he noted that everyone interviewed at the hospital discussed Roberson's behavior as being "odd." But he had not been trained in mental health or developmental issues. He saw a "lack of emotion" and "a lack of understanding" and had no prior experience with Roberson—and certainly could not have known about his Autism Spectrum Disorder diagnosis, as it was not made until years later. *Id.*

Wharton further explained that he had unquestioningly accepted the SBS diagnosis then, based solely on that diagnosis, had authorized seeking an arrest warrant—even before an autopsy was performed. Wharton has acknowledged learning in the interim of the evolution in the medical understanding of SBS. He has attested to his belief today that no crime occurred. He has publicly urged relief for Roberson to prevent a horrible miscarriage of justice, the execution of an innocent man: "I am asking for those who care deeply about justice to urge another look at this case." EX17.

## PROCEDURAL HISTORY

Roberson was convicted of capital murder and sentenced to death on February 14, 2003, in the 3rd Judicial District Court of Anderson County, Texas. Trial counsel went on to represent Roberson on direct appeal. The Texas Court of Criminal Appeals (TCCA) affirmed Roberson's conviction and sentence in *Roberson v. State*, No. AP-74,671 (Tex. Crim. App. Jun. 20, 2007) (unpublished). Another lawyer, recommended by trial counsel, pursued an initial state habeas application. The habeas court recommended denying habeas relief by signing the State's proposed findings without holding any hearing, and the TCCA later denied all relief requested in the initial habeas application and dismissed a 2005 pro se filing as an unauthorized successive application. *Ex parte Roberson*, Nos. WR-63,081-01, WR-63,081-02, 2009 WL 2959738 (Tex. Crim. App. Sept. 16, 2009) (per curiam) (unpub.).

State habeas counsel continued to represent Roberson in the initial federal habeas proceeding over Roberson's objection. On September 14, 2010, a habeas corpus application was filed in federal court under 28 U.S.C. §§2241, 2254. On September 16, 2010, a 7-page Supplement was filed. The district court denied relief. *Roberson v. Director*, TDCJ-ID, 2014 WL 5343198 (E.D. Tex. Sept. 30, 2014). That decision was affirmed by this Court. *Roberson v. Stephens*, 619 F. App'x 353 (5th Cir. 2015). The United States Supreme Court denied certiorari review, *Roberson v. Stephens*, 577 U.S. 1033 (2015), as well as certiorari review of proceedings in this Court attempting to remove conflicted federal counsel from Roberson's case. *Roberson v. Stephens*, 577 U.S. 1150 (2016). The removal of conflicted counsel finally occurred while an execution date was looming.

The trial court set an execution date of June 21, 2016.  Roberson, who had been begging for new counsel since trial, thereafter spent nearly a decade attempting to vindicate his claims of innocence and due process violations in state court.

On June 16, 2016, the TCCA stayed the scheduled execution and remanded Roberson's successive habeas claims of due process violations, actual innocence under state law, and a conviction based on flawed forensic science under state law for further development. *Ex parte Roberson*, No. WR-63,081-03, 2016 WL 3543332 (Tex. Crim. App. June 16, 2016). The convicting court held an evidentiary hearing

beginning in August of 2018 and concluding in March of 2021.[15] Following the hearing, Judge Deborah Oakes Evans adopted, virtually verbatim, the State's 17-page proposed Findings of Fact and Conclusions of Law, rather than Roberson's 302-page version, and denied relief. The TCCA adopted the convicting court's Findings wholesale in an unreasoned opinion. *Ex parte Roberson*, No. WR-63,969-03 (Tex. Crim. App. Jan. 11, 2023) (per curiam) (unpub.). The United States Supreme Court denied certiorari review. *Roberson v. Texas*, 144 S. Ct. 129 (mem.) (2023).

Judge Evans, who subsequently recused herself, set Roberson's execution for October 17, 2024. Roberson filed another state habeas application, raising the new evidence that his conviction was based on "scientific" opinion further discredited since his 2016 application, renewed due process claims, a renewed actual innocence claim supported by yet more medical evidence, and a Sixth Amendment claim that his trial counsel had conceded his guilt over his objection. The TCCA summarily dismissed all claims without considering their merits. *Ex parte Roberson*, No. WR-63,081-04 (Tex. Crim. App. Sept. 11, 2024). The U.S. Supreme Court denied certiorari review, with Justice Sotomayor issuing a statement acknowledging Roberson had made a "serious showing of actual innocence." *Roberson v. Texas*,

---

[15] As discussed in Statement of Facts Section II(B), the hearing was continued the same day it started after Nikki's long-lost CT scans were discovered in the courthouse basement.

145 S. Ct. 3 (mem.) (2024). On October 16, the TCCA, over four dissents, summarily dismissed Roberson's fourth subsequent state habeas application, which had raised a renewed state-law claim that his conviction was based on flawed forensic science in light of a TCCA opinion days before, granting relief in a non-capital SBS case. *Ex parte Roberson*, No. WR-63,081-05, 2024 WL 4504434 (Tex. Crim. App. Oct. 16, 2024). The Texas Supreme Court stayed the execution on the day it was set to happen, due to a pending subpoena for Roberson to testify before a state legislative committee. On Pet. for Writ of Inj., *In re Tex. House of Representatives*, No. 24-0884 (Tex. Oct. 17, 2024).

Roberson filed a fifth subsequent state habeas application in February 2025, raising yet more new evidence of the junk science underlying his conviction, as well as a renewed actual innocence claim, and a procedural due process claim. He also filed with the TCCA a Suggestion to Reconsider its previous denials. Despite the pending habeas application, the trial court set Roberson's execution for October 16, 2025. Roberson then filed an Emergency Motion for Stay of Execution and Motion for Oral Argument in the TCCA on July 24, 2025. Next he filed a sixth subsequent state habeas application in August 2025, based on newly disclosed evidence of judicial misconduct, giving rise to new constitutional claims and a renewed actual innocence claim.

## STATEMENT REGARDING OTHER PENDING LITIGATION

Roberson's fifth and sixth subsequent state habeas applications and related motions, as described in the previous section, remain pending in the TCCA. He files this Motion now to comply with the Fifth Circuit rule 8.10.

## ROBERSON MEETS THE REQUIREMENTS OF 28 U.S.C. §2244 TO RECEIVE AUTHORIZATION TO PROCEED IN DISTRICT COURT ON HIS SUCCESSIVE HABEAS APPLICATION

When a petitioner seeks authorization to proceed on a second or successive habeas application, this Court performs an initial gatekeeping assessment, "authoriz[ing] the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." 28 U.S.C. §2244(b)(3)(C). Section 2244(b)(2) requires a three-pronged showing, as described by this Court:

> To receive authorization to file a successive habeas petition with the district court, Will must make a prima facie showing that: (1) his [] claim was not presented in a prior application; (2) the factual predicate for the [] claim "could not have been discovered previously through the exercise of due diligence"; and (3) he can establish by "clear and convincing evidence that, but for [the constitutional] error, no reasonable factfinder would have found" him guilty.

*In re Will,* 970 F.3d 536, 541 (5th Cir. 2020) (citing §2244(b)(2)). The petitioner is not required to prove that he meets §2244(b), nor that he is entitled to relief on the merits of the proposed claims. *Id*. Those are questions for the district court in the first instance after authorization. *Id.* The authorization-stage prima facie showing is "simply a sufficient showing of possible merit to warrant a fuller exploration." *Id.* at 543 (cleaned up).

## I.     Roberson Makes a Prima Facie Showing that He Satisfies Section 2244(b) on the Claim that His Conviction Rests on Since-Invalidated Forensic Science, Violating His Due Process Right.

### A.     Roberson did not present this claim in his prior federal application.

"At the threshold, any claim 'that was presented in a prior [federal habeas corpus] application shall be dismissed.'" *See* EX46 (*In re Wood*, No. 25-10359 (5th Cir. Mar. 11, 2025) (not designated for publication) at 3 (quoting §2244(b)(1)).[16] Roberson has not previously raised a due process violation based on the invalidated science underlying his conviction as a claim for federal habeas relief.[17] Section 2244(b)(1) therefore does not bar authorization and this Court "inquire[s] whether [Roberson] has shown that he is reasonably likely to meet the stringent requirements of subsections (b)(2)(B)(i) and (ii)." EX46 at 6 (cleaned up).

---

[16] This Court's unpublished opinion is not available in a publicly accessible electronic database, and is therefore attached to comply with Fed. R. App. P. 32.1 and 5th Cir. R. 28.7.

[17] The only references to SBS in Roberson's initial federal habeas petition came in various concessions made by his appointed *counsel* that Roberson had indeed shaken and thereby killed Nikki. Those "concessions" expressly contradicted Roberson himself who repeatedly entreated the court for substitute counsel willing to investigate his innocence. *See, e.g.*, Pet. for Habeas Corpus at 14, *Roberson v. Thaler*, No 2:09-cv-327-TJW (E.D. Tex. Sept. 14, 2010) ("The problem with this case is that this is a shaken-baby case successfully miscast into a death penalty case."). As the Petition began, "His federal habeas counsel assume that Roberson probably did contribute to the death of his two-year-old daughter." *Id*. at iii. No ground, factual allegation, or legal argument regarding the unreliability of the shaken-baby hypothesis used to convict Roberson, or any medical evidence of alternative causation, was raised in either the 2010 Petition or 7-page Supplement. *See Sanders v. United States*, 373 U.S. 1, 16 (1963) (explaining meaning of "ground" in successive filing context).

**B.     Roberson could not have discovered the factual predicate for his due process claim previously through due diligence.**

Second, Roberson can make a prima facie showing that "the factual predicate for [his due process claim] could not have been discovered previously through the exercise of due diligence." *See* 28 U.S.C. §2244(b)(2)(B)(i). For purposes of §2244(b)(2)(B)(i), "due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record." *Johnson v. Dretke,* 442 F.3d 901, 908 (5th Cir. 2006). Roberson can establish that he was objectively diligent in pursuing the evidence underpinning his due process claim.

The factual predicate for Roberson's claim did not develop until well after the 2010 filing of his initial habeas petition. *See In re Davila*, 888 F.3d 179, 184 (5th Cir. 2018) (emphasis in original) (explaining §2244(b)(2)(B) "asks whether due diligence at the *time of the first habeas petition* would have resulted in the discovery of the factual basis for the new claim such that it could have been included in the first petition"). Before then, scientists questioning SBS principles were dismissed as outliers, and the weight of the evidence-based erosion of the SBS principles used to convict Roberson had not yet coalesced into a new medical consensus. *See id*. at Section II(A). Finally, key medical evidence necessary to firmly establish that Nikki died, not from inflicted trauma, but of pneumonia was not discoverable until 2018 and beyond.

The (1) sea change in rejection of triad-based SBS diagnoses with no differential diagnosis, (2) case-specific medical advances finally enabling a comprehensive picture of Nikki's interrelated underlying medical conditions that explain her death and condition at autopsy, and (3) provision of long-suppressed critical medical records have all occurred piecemeal over the last several years. *See* Statement of Facts Sections II(A)-(B) (describing, *inter alia*, 2016 Swedish meta-study exposing lack of scientific validation for SBS; 2018 Consensus Statement from SBS proponents accepting need for differential diagnosis; 2018 discovery of critical CT scans lost by State since trial; 2020 advances in understanding of pneumonia; 2024 provision of long-sought critical autopsy slides; EX12 (2025 joint pathologist statement predicated on culmination of new medical understanding of Nikki's death)). *See also In re Danny Hill*, No. 20-3863, 2025 WL 903150, at *9 (6th Cir. Mar. 25, 2025) (finding §2244(b)(2)(B)(i) satisfied for authorization purposes as "Hill has made a prima facie showing that the factual predicate for his due-process claim includes the changing forensic standards. The new scientific standards alter our understanding of the very facts introduced at trial.").

"While this [C]ourt does not rule on the ultimate merits of the due-diligence inquiry at this stage, the facts show that [Roberson] made a sufficient showing of possible merit to warrant a fuller exploration by the district court." *In re Will*, 970 at 543 (cleaned up).

**C.    But for the due process violation, no reasonable factfinder would have found Roberson guilty.**

Under §2244(b)(2)(B)(ii), Roberson can make a prima facie showing that "but for [this due process violation], no reasonable factfinder would have found" him guilty.

**1.    Roberson's conviction, premised on now-invalidated hypothesis, is fundamentally unfair.**

Multiple federal courts have explicitly held that a conviction based on purported "scientific" evidence, later falsified by scientific advances, gives rise to a due process claim. *See, e.g.*, *Hill*, 2025 WL 903150, at **8, 14-15 (authorizing second or successive due-process claim based on changed science of forensic odontology); *Gimenez v. Ochoa*, 821 F.3d 1136, 1144 (9th Cir. 2016) (recognizing that due process claim based on faulty science, specifically, the SBS hypothesis, "is essential in an age where forensics that were once considered unassailable are subject to serious doubt"); *Lee v. Glunt*, 667 F.3d 397, 407 (3d Cir. 2012) (remanding to federal district court where, if disproven, trial testimony based on unreliable science undermined fundamental fairness of petitioner's entire trial, making a prima facie case for habeas relief on due process claim); *Lee v. Tennis*, No. 4:08–CV–1972, 2014 WL 3894306, at *16 (M.D. Pa. June 13, 2014) (recommending relief on remand where the petitioner "has met his burden of showing a due process violation in this case, since the verdict in this matter rests almost entirely upon scientific pillars which have now eroded").

These cases are grounded in long-standing federal constitutional principles that guarantee, on the most basic level, the right to a fundamentally fair trial based on reliable evidence. *See, e.g.*, *Spencer v. Texas*, 385 U.S. 554, 563–564 (1967) ("[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial"); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that "the exclusion of . . . critical evidence . . . denied [the defendant] a trial in accord with traditional and fundamental standards of due process"). The Supreme Court has explained that the introduction of faulty evidence is unconstitutional when "its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). *See also Estelle v. McGuire*, 502 U.S. 62, 70 (1991) (considering whether admission of battered child syndrome evidence represented due process violation).

This Court has found habeas relief justified on due process grounds where erroneously admitted, prejudicial evidence was "material in the sense of a crucial, critical highly significant factor." *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983) (quoting *Anderson v. Maggio*, 555 F.2d 447, 451 (5th Cir. 1977)); *see also Gonzales v. Thaler*, No. 612-CV-15, 2013 WL 1789380 at *3 (5th Cir. 2013) (examining whether admission of scientifically flawed firearms testimony was so arbitrary as to render trial fundamentally unfair); *Woods v. Estelle*, 547 F.2d 269, 271 (5th Cir. 1977) (explaining that the due process implications of erroneous evidence do not

stem from state evidentiary rules, but from resultant "error [] of such magnitude as to deny fundamental fairness…").

Junk-science evidence proven demonstrably false by scientific advances can thus be the source of a due process violation. Roberson's conviction violates due process because it was secured through false SBS testimony. Scientific and medical developments in the 22 years since Roberson's trial have exposed the State's cause-of-death hypothesis as fundamentally unreliable. *See* Statement of Facts Section II(A). The SBS/AHT hypothesis' flaws could not have been exposed to the jury through "vigorous cross-examination," because they were then widely accepted despite lacking validation. *United States v. Berry*, 624 F.3d 1031, 1040 (9th Cir. 2010). Indeed, the SBS/AHT hypothesis was considered so unassailable when Roberson was tried that his own lawyer conceded that Nikki's death was a "shaken baby" case. 41RR57-61. Nor could defense counsel have analyzed Nikki's lung tissue exposing her undiagnosed interstitial viral pneumonia; the expertise to identify that pneumonia did not emerge until years after Roberson's trial. 8EHRR170.

Roberson's jury was told a slew of falsehoods incompatible with contemporary scientific understanding. The jury was subjected to gruesome autopsy photos with Nikki's scalp pulled back revealing subdural blood, falsely informed this blood had been caused by "shaking" and "impacts," and told that evidence of "impact sites" included the top of her head, when that was where doctors had

screwed a pressure monitor into her skull—information not shared with the jury. The jury was falsely informed that Nikki had no neck injuries because a child's "weak neck" is somehow protected during shaking. The falsehoods shared with the jury included the lie about sexual abuse absent any credible evidence. This mass of false testimony, conveyed as scientifically valid, was used to convict an impaired, Autistic man working newspaper routes to earn a living.[18] *See* 7EHRR64-129. That record has now been supplemented by substantial new evidence from eminently qualified specialists, *see* EX6-12, and numerous new scientific studies, *e.g.*, EX19-34, establishing the flawed science used to convict Roberson, as well as his actual innocence.

### 2. But for the due process violation, no reasonable factfinder would have convicted Roberson.

Finally, satisfying the remainder of §2244(b)(2)(B)(ii), Roberson meets "[t]he standard [] of *reasonable doubt*—whether [he] has made a prima facie showing, by

---

[18] As described above, Roberson was not diagnosed with Autism Spectrum Disorder until 2018; his demeanor at the hospital was instead described for his jury as suspiciously emotionless, evidencing guilt. *See* 41RR50-160. Lee's, like Roberson's, conviction also rested in part on suspicion borne of misinterpretation. There, one of the "thin reeds" remaining of the evidence after scientific advances rested on "testimony regarding Lee's stoic nature in the face of his daughter's death, stoicism that was construed by one policeman as nonchalance, but which other evidence indicated may have simply reflected Korean cultural conventions when confronted by tragedy." *Lee*, 2014 WL 3894306, at *8.

clear and convincing evidence, that no reasonable factfinder would find him guilty." *In re Will*, 970 F.3d at 547 (emphasis retained).

As described above, experts from multiple disciplines have provided a comprehensive explanation for Nikki's death: she was a chronically and profoundly ill child whose diseased lungs were pushed to respiratory failure by contra-indicated medications. She had DIC and sepsis. None of these circumstances were identified, let alone accounted for in assessing her condition (1) upon arrival at the ER and (2) two days later during the autopsy. No reasonable factfinder could possibly convict Roberson if presented with the new evidence debunking the notion that Nikki sustained an inflicted injury of any kind—the State's causation theory is now indefensible; there was no crime. *See* EX8-11, EX18; *see also* EX16 (lead detective explaining his belief in Roberson's innocence).

Roberson's jurors heard no testimony from a lung pathologist, neuropathologist, pediatric radiologist, medical toxicologist, biomechanical engineer, or pathologist with special expertise in DIC—or any other kind of expert— because defense counsel at trial conceded SBS was the cause. But all of these new experts who have studied the case have now explained how the blood outside Nikki's swollen brain was not caused by shaking or abuse but was instead her body's response to severe infection and contra-indicated medications, culminating in sepsis, DIC, and finally respiratory and cardiac arrest. *See* EX10-12; EX18. Resuscitation

efforts, after her brain had already become non-perfused, further contributed to the condition captured in the autopsy photos that the jury was told, falsely, could only be explained by shaking and inflicted blunt impact. After Roberson's remanded evidentiary hearing, one juror came forward and provided an affidavit, entirely consistent with the trial record, attesting that the State and defense claim that shaking had caused Nikki's death, the testimony of sexual assault despite the charge being dropped, and Roberson's odd affect together "convinced [her] of guilt." EX35. She also attested, consistent with the trial record, to the complete absence of evidence that Nikki had been seriously ill with pneumonia or had been prescribed any dangerous medications. *Id.*

Because Roberson has made a prima facie showing that he meets §2244(b)(2)(B), this Court should authorize this claim to proceed in district court.

* * * *

Both the quality and quantity of faulty evidence used to obtain Roberson's 2003 conviction deprived him of a fundamentally fair trial and the due process the U.S. Constitution guarantees. Without the fundamentally unfair proceedings precipitated and defined by since-discredited SBS/AHT testimony; Autism symptoms misinterpreted as a guilty affect; and baseless slander of sexual abuse, the jury would not have convicted. Now Texas is poised to execute someone described as "like Forrest Gump." 7EHRR51. He stands condemned because he was unable to

explain the cause of his daughter's tragic death—which was so mystifying that it took numerous specialists and significant advances in science to illuminate. Allowing the conviction to stand risks a grave moral wrong—executing an innocent; but it also threatens fundamental conceptions of justice upon which we all depend.

## II.     Roberson Makes a Prima Facie Showing that the Petition Would Be Timely or that the Statute of Limitations Can Be Excused Based on Actual Innocence.

This Court has recently affirmed that its §2244(b) gatekeeping authority does not necessitate a decision at the authorization stage as to timeliness of the underlying petition under 28 U.S.C. §2244(d)(1). EX46 at 10-11.

Though this Court can again "leave it for the district court to decide" whether §2244(d)(1) is satisfied, *In re Henderson*, 462 F.3d 413, 417 (5th Cir. 2005), Roberson can meet §2244(d)(1). He has continuously attempted to vindicate his due process rights in state court since 2016, including with his fourth successive state habeas application—alleging ever-more new evidence and medical advances—filed earlier this year, while also only gaining access to critical evidence in the State's possession in 2018 and 2024, despite repeated requests. Further, his changed-science due process claim relies on evidence from an array of disciplines that have continuously built on previous experts' conclusions. In short, he has hardly lain behind the log.

Further, although Roberson can meet §2244(d)(1), the statute of limitations may be excused because Roberson can show that he is actually innocent. *McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013)); *see also id.* at 399 (holding limitations statute may be excused where petitioner can show "'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence'") (quoting *Schlup v. Delo,* 513 U.S. 298, 327 (1995)). Roberson incorporates here by reference all facts and legal arguments made above showing that no reasonable factfinder would have found him guilty of the underlying offense under §2244(b)(2)(B). Because Roberson alleged a "viable basis" for excusing the statute of limitations, this Court should permit Roberson to proceed on his argument that the statute of limitations can be excused based on his actual innocence. *In re Campbell,* 750 F.3d at 523, 533 (5th Cir. 2014). *Cf.* Order at 25, *Johnson v. Davis*, No. 4:19-cv-03047 (N.D. Tex. July 30, 2020) (ECF No. 18) (after this Court authorized successive habeas proceedings, granting evidentiary hearing to determine whether equitable tolling rendered successive habeas claim timely under AEDPA).

## CONCLUSION AND PRAYER FOR RELIEF

For the reasons stated, Roberson respectfully asks for authorization to proceed in district court and allow him to file the attached petition for writ of habeas corpus.

Dated: October 1, 2025

Respectfully submitted,

*/s/ Callie Heller*

Callie Heller
Emma V. Rolls
Assistant Federal Public Defenders
Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
Telephone:    (405) 609-5975
Facsimile:    (405) 609-5976
Callie_Heller@fd.org
Emma_Rolls@fd.org

Gretchen S. Sween
Counsel of Record in state court
712 Upson Street
Austin, TX 78703
(214) 557-5779
gsweenlaw@gmail.com

*Counsel for Movant*

## CERTIFICATE OF COMPLIANCE

I certify that (1) this Motion was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this Motion is 12,901 words, excluding parts of the Motion exempted by the rules of the court, and (3) this Motion has been scanned for viruses and the Motion is virus free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Callie Heller*
Callie Heller


## CERTIFICATE OF CONFERENCE

I certify that on September 30, 2025, I conferred by email with Ellen Stewart-Klein, counsel of record for the Respondent. She informed me that the Respondent is opposed to the relief requested.

*/s/ Callie Heller*
Callie Heller

## CERTIFICATE OF SERVICE

I certify that on October 1, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I have also sent a copy via email to counsel for the Director, Ellen Stewart-Klein, Ellen.Stewart-Klein@oag.texas.gov.

*/s/ Callie Heller*
Callie Heller