# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

| | | |
|---|---|---|
| IN RE | ) | No. _____ |
| ROBERT LESLIE ROBERSON III, | ) | |
|     MOVANT | ) | |
| | ) | |

## OPPOSED MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

## Appendix of Exhibits

| No. | Document |
|---|---|
| **Volume I** | |
| 1 | Proposed Successive Habeas Petition |
| 2 | Robert Roberson Arrest Warrant and Dr. Janet Squires' REACH affidavit |
| 3 | Nikki Curtis Autopsy Report |
| 4 | SWIFS Investigation Narrative |
| 5 | 2003 Trial References to SBS |
| 6 | CV & Affidavit of Dr. Janice Ophoven (2016) |
| 7 | CV & Affidavit of Kim Basinger |
| 8 | CV & Affidavit of Dr. Francis Green (2024) |
| 9 | CV & Affidavit of Dr. Keenan Bora (2024) |
| 10 | CV & Affidavit of Dr. Julie Mack (2024) |
| 11 | CV & Affidavit of Dr. Michael Laposata (2025) |
| 12 | Joint Statement of Pathologists (February 2025) |
| **Volume II** | |
| 13 | Transcript J. Urban testimony in Texas v. Young, (August 19, 2024) |
| 14 | Email from J. Urban's assistant to V. Potkin (August 20, 2024) |
| 15 | Declaration of Patricia Conklin |
| 16 | Declaration of Brian Wharton (2022) |
| 17 | Declaration of Brian Wharton with DMN OpEd (May 28, 2024) |

| | |
|---|---|
| 18 | CV & Report of Dr. Roland Auer (2021) |
| 19 | Göran Elinder et al, *Traumatic Shaking: The Role of the Triad in Medical Investigations of Suspected Traumatic Shaking*, Report No. 255E (Oct. 2016) |
| 20 | Chris Brook, *Retino-dural hemorrhages in infants are markers of degree of intracranial pathology, not of violent shaking*, Ann. Child Neur. Soc. 00(00): 1-7 (2024) |
| 21 | J. Tibballs and N. Bhatia, *Medical and Legal Uncertainties and Controversies in "Shaken Baby Syndrome" or Infant "Abusive Head Trauma,"* J. LAW & MED. 151-184 (May 2024) |
| 22 | Norrell Atkinson, et al., *Childhood Falls with Occipital Impacts*, 34 Pediatric Emergency Care 837-41 (2018) |
| 23 | D. Vaslow, *Chronic Subdural Hemorrhage Predisposes to Development of Cerebral Venous Thrombosis and Associated Retinal Hemorrhages and Subdural Rebleeds in Infants*, 35 Neuroradiology Journal 53-66 (2022) |
| 24 | I. Thiblin, et al *Retinal Haemorrhage in Infants Investigated for Suspected Maltreatment is Strongly Correlated with Intracranial Pathology*, 111 Acta Paediatrica 800-08 (2022) |
| **Volume III** | |
| 25 | W. Squier, *Infant Retinal Haemorrhages Correlate with Chronic Subdural Haemorrhage, not Shaking*, 111 Acta Paediatrica 714-15 (2022) |
| 26 | J. Andersson, et al *External Hydrocephalus as a Cause of Infant Subdural Hematoma: Epidemiological and Radiological Investigations of Infants Suspected of Being Abused*, 126 Pediatric Neurology 26-34 (2021) |
| 27 | S.M. Zahl, et al *Examining Perinatal Subdural Haematoma as an Aetiology of Extra-Axial Hygroma and Chronic Subdural Haematoma, Acta Paediatrica* (2019) |
| 28 | I. Thiblin et al., *Medical Findings and Symptoms in Infants Exposed to Witnessed or Admitted Abusive Shaking: A Nationwide Registry Study*, 15 PLOS ONE 8–9 (2020) |
| 29 | J. Mack, et al., *Anatomy and Development for the Meninges: Implications for Subdural Collections and CSF Circulation*, 39 PEDIATRIC RADIOLOGY 200–210 (2019) |
| 30 | N. Aoki, *Infantile Acute Subdural Hematoma with Retinal Hemorrhage Caused by Minor Occipital Impact Witnessed by an ICU Nurse: a Case* |

| | |
|---|---|
| | *Report*, 4 Journal of Pediatric Neurology and Neuroscience 47-50 (2020) |
| 31 | C. Brook, et al, *26 cm fall caught on video causing subdural hemorrhages and extensive retinal hemorrhages in an 8-month-old infant*, Clinical Case Reports (July 2024) |
| 32 | M. Hajiaghamemar, et al, *Infant Skull Fracture Risk for Low Height Falls*, 133 International Journal of Legal Medicine 847-62 (2019) |
| 33 | K Wester, et al, *Re-evaluation of Medical Findings in Alleged Shaken Baby Syndrome and Abusive Head Trauma in Norwegian Courts Fails to Support Abuse Diagnoses*, 111 Acta Paediatrica 779-92 (2022) |
| 34 | C. Brook, *Evidence for significant misdiagnosis of abusive head trauma in pediBIRN data*, For. Sci. Int'l: Synergy 6 (2023) |
| 35 | Declaration of Juror Terre A. Compton (2022) |
| 36 | CV & Declaration of John Plunkett, MD |
| 37 | Email to Anderson County DA re Dr. Plunkett |
| 38 | "Shaken Baby Syndrome: Rotational Cranial Injuries-Technical Report" *American Academy of Pediatrics* (2001). |
| 39 | Niels Lynoe, MD, PhD, et al. "Insufficient evidence for 'shaken baby syndrome' - a systematic review." |
| 40 | CV & Chart of Carl Wigren, MD (2020) |
| 41 | CV & Declaration of Harry Bonnell, MD |
| 42 | Pediatrician's letter re Nikki's apneic episodes (August 24, 2000) |
| **Volume IV** | |
| 43 | Texas Defender Service, *An Unfulfilled Promise: Assessing the Efficacy of Article 11.073* (July 2024) |
| 44 | Texas House Committee Interim Report, November 19, 2024 |
| 45 | Criminal Jurisprudence Hearing Transcript, Oct 21 2024 |
| 46 | *In re Wood*, No. 25-10359 (5th Cir. Mar. 11, 2025) (not designated for publication) |

# EXHIBIT 13

1           REPORTER'S RECORD

2         VOLUME 1 OF 1 VOLUMES

3       TRIAL COURT CAUSE NO. CR27181

4
THE STATE OF TEXAS,              ) IN THE DISTRICT COURT OF
5      Plaintiff,                )
                                 )
6 vs.                            ) 385TH JUDICIAL DISTRICT
                                 )
7 CLINTON LEE YOUNG,             )
       Defendant.                ) MIDLAND COUNTY, TEXAS
8

9

10    _____

11              **EVIDENTIARY HEARING**

12      **EXCERPT TESTIMONY OF JILL URBAN, MD**

13    _____

14

15

16      On the 19th day of August, 2024, the following

17 proceedings came on to be held in the above-titled and

18 numbered cause before the Honorable Sid Harle, Judge

19 Presiding, held in Midland, Midland County, Texas.

20      Proceedings reported by Ann M. Record, CSR, RMR,

21 CRR, CMRS, CRI, TMR, TCRR, CCR, Certified Shorthand

22 Reporter in and for the State of Texas by machine

23 shorthand.

24

25

Evidentiary Hearing - Testimony Excerpt
August 19, 2024

```
 1                        APPEARANCES

 2

 3  COUNSEL FOR PLAINTIFF, THE STATE OF TEXAS:

 4  MR. MATTHEW OTTOWAY
    State Bar Number 24047707
 5  Assistant Attorney General
    P.O. Box 12548, MC-048
 6  Austin, Texas  78711-2548
    Telephone:  (512)936-0683
 7  email:  matthew.ottoway@oag.texas.gov

 8
    MR. JOSHUA BENNETT SOMERS
 9  State Bar Number 24047261
    Office of the Attorney General, Criminal
10  Prosecutions Division
    300 W. 15th Street
11  Austin, Texas  78701
    Telephone:  (512)463-2100
12  email:  joshua.somers@oag.texas.gov

13
    MS. MARIE ANN 'MARIE' PRIMM
14  State Bar Number 00788538
    Assistant Attorney General & Pro Tem District Attorney
15  for Midland County
    Office of the Attorney General
16  300 W. 15th Street
    Austin, Texas  78701
17  Telephone:  (512) 936-0683
    email:  marie.primm@oag.texas.gov
18

19

20

21

22

23

24

25
```

1                    **APPEARANCES (CONTINUED)**

2

3  **COUNSEL FOR DEFENDANT, CLINTON LEE YOUNG:**

4  MS. DANALYNN RECER
   State Bar Number 00792935
5  Gulf Region Advocacy Center
   2307 Union Street
6  Houston, Texas   77007-6129
   Telephone:  (713)869-4722
7  Facsimile:  (713) 880-3811
   email:  dlrecer@aol.com

8

9  MR. PHILIP ALAN WISCHKAEMPER
   State Bar Number 21802750
10 Snuggs & Wischkaemper
   915 Texas Avenue
11 Lubbock, Texas   79401
   Telephone:  (806)763-9900

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **VOLUME 1**

2            Evidentiary Hearing - Testimony Excerpt

3  August 19, 2024

4                                                    PAGE VOL.

5  Proceedings  .....................................5    1

6

7  **STATE'S WITNESSES:**

8  Jill Urban, MD                 Direct    Cross    V.Dire
     By Ms. Primm                   6 v1
9     By Ms. Recer                          11 v1
     By Ms. Primm                  21 v1
10    By Ms. Recer                           23 v1

11 Reporter's Certificate ..........................27    1

12

13

14            **ALPHABETICAL INDEX OF WITNESSES**

15                                Direct    Cross    V.Dire

16 Urban, Jill                     6 v1    11 v1
                                  21 v1    23 v1

17

18 **\* REPORTER'S NOTE:**

19 By definition, per the Uniform Format Manual for Texas
   Reporters' Records, Rule 2.9, Dashes:  Interruptions of
20 speech must be denoted by the use of dashes ( -- ) at
   the point of interruption, and again at the point the
21 speaker resumes speaking.

22 Quotation marks within this Reporter's Record are used
   for clarification purposes and not necessarily
23 indicating a direct quote, reflecting words and phrases
   as spoken.

24

25

1                        **P R O C E E D I N G S**

2                    (Open court, defendant present)

3                    THE COURT:  Ms. Recer, who did you want

4    to call?

5                    MS. RECER:  Dr. Urban.  She's in the

6    restroom, though.

7                    MR. OTTOWAY:  She's in the restroom.

8    We'll get her in here, Your Honor.

9                    THE COURT:  Okay.  And who is this

10   gentleman?

11                   MR. OTTOWAY:  I believe that's their

12   expert.

13                   MS. RECER:  Yes, he is going to listen to

14   them.

15                   MR. OTTOWAY:  You excused him from the

16   rule.

17                   THE COURT:  All right.  Very good.

18                   Doctor, I'm not sure you were sworn

19   earlier with the rest of them.

20                   THE WITNESS:  No.

21                   (Witness sworn)

22                   THE COURT:  Thank you.  Good morning.

23   Have a seat.  Adjust the microphone, if you need to.

24

25

Jill Urban, MD - August 19, 2024
Direct Examination by Ms. Primm

1                          **JILL URBAN, MD,**

2    having been first duly sworn, testified as follows:

3                        **DIRECT EXAMINATION**

4    BY MS. PRIMM:

5        Q.   Dr. Urban, did you bring any records with you

6    today?

7        A.   I did.

8        Q.   Okay.  And can I see those records, please.

9                 Thank you, ma'am.  Do you know what's

10   contained in these records?

11       A.   Roughly, yes.

12       Q.   Okay.  Can you tell me what's contained in the

13   records?

14       A.   So it contains the autopsy report notes,

15   associated communications with this case.

16       Q.   All right.

17       A.   And there's a packet of photographs also.

18       Q.   Okay.  And I think the defense wanted to take

19   a look at that.

20               MS. RECER:  Yes, we have not seen this.

21               MS. PRIMM:  Just for the record's sake,

22   that was what Dr. Urban mentioned.  The documentation

23   that she brought with her has been tendered to defense

24   counsel, Ms. Recer.

25               MS. RECER:  I assume y'all want to take

Jill Urban, MD - August 19, 2024
Direct Examination by Ms. Primm

1  her on voir dire first.

2              MS. PRIMM:  Sure.

3              MS. RECER:  I mean, that's how most

4  people prefer, but either way is fine with me.  I didn't

5  know if you were waiting on me or if I was waiting on

6  you.

7              MS. PRIMM:  I was kind of waiting for you

8  to review the records so she could testify from her

9  records.

10             MS. RECER:  Yes.

11             MS. PRIMM:  I can go into her background

12  first.

13     Q.   (BY MS. PRIMM)  Dr. Urban, can you tell the

14  Court what it is you do for a living?

15     A.   So I am a forensic pathologist, and I perform

16  autopsies to determine cause and manner of death.

17     Q.   And where do you work?

18     A.   I am at the Dallas County Medical Examiner's

19  Office also known as the Southwestern Institute of

20  Forensic Sciences.

21     Q.   How long have you been a forensic pathologist?

22     A.   I have been a forensic pathologist board

23  certified for 24 years.

24     Q.   All right.  And have you been with the Dallas

25  County Medical Examiner's Office the entire time, or

Jill Urban, MD - August 19, 2024
Direct Examination by Ms. Primm

1   SWIFS?

2        A.    Yes.

3        Q.    Okay.  And what is your educational -- what

4   educational background do you have that allows you to be

5   a forensic pathologist?

6        A.    I have an undergraduate degree in anthropology

7   which I earned from Kansas State University.  After I

8   went to college, I went to med school at the University

9   of Kansas where I graduated with my MD.  After med

10  school, I did a five-year residency in anatomic and

11  clinical pathology at the University of Texas Southwest

12  Medical Center.  And after that, I did a one-year

13  fellowship in forensic pathology at the Southwestern

14  Institute of Forensic Sciences.

15       Q.    Okay.  And your job as a forensic pathologist,

16  what are your job responsibilities and job duties?

17       A.    Well, again, my primary job is to perform

18  autopsies to determine cause and manner of death.  And

19  every -- you know, my primary job duties are associated

20  with that.

21             I am also faculty at UT Southwestern.  So

22  I am responsible for teaching medical students,

23  residents, and pathology fellows.

24       Q.    All right.  And have you -- is forensic

25  pathology an accepted science?

```
 1        A.    Yes.

 2        Q.    And has it been recognized by courts across

 3   the State of Texas?

 4        A.    Yes.

 5        Q.    And have you been recognized as an expert and

 6   allowed to testify as a forensic pathologist in courts

 7   across the state of Texas?

 8        A.    Yes.

 9        Q.    And in several different counties; is that

10   correct?

11        A.    Yes.

12        Q.    And would you say you've been recognized as an

13   expert and allowed to testify about forensic pathology,

14   your opinion and findings on few or many occasions?

15        A.    Many.

16        Q.    All right.  I want to draw your attention

17   specifically to Case No. JP4374-01.  Are you familiar

18   with that?

19        A.    Yes.

20        Q.    Okay.  Did you actually perform the autopsy in

21   that case?

22        A.    I did not.

23        Q.    And did you sign off on the autopsy report?

24        A.    Yes.

25        Q.    And when another forensic pathologist signs
```

Jill Urban, MD - August 19, 2024
Direct Examination by Ms. Primm

1  off on the autopsy report, what does that mean?

2       A.    So typically that means I've had an

3  opportunity to review the autopsy report and associated

4  documents and am in agreement with it.

5       Q.    Okay.  Because if you weren't in agreement,

6  you wouldn't sign off on the report; is that correct?

7       A.    Correct.

8       Q.    Okay.  And in reviewing -- have you reviewed

9  the actual autopsy that we're discussing in this case?

10      A.    Yes.

11      Q.    And it is the autopsy performed on a man by

12  the name of Samuel Petrey, correct?

13      A.    Yes.

14      Q.    And in reviewing that, what do you do in

15  reviewing the case?

16      A.    Typically, I will read over the report in

17  particular focusing on the findings and also have the

18  opportunity to look over photographs and any associated

19  case notes.

20      Q.    And did you do that in this case?

21      A.    Yes.

22      Q.    And after reviewing all the documentation and

23  the photographs in this case, were you able to form an

24  opinion on the cause and manner of death in this case?

25      A.    Yes.

1    Q.    And what was your opinion?

2    A.    So in this case, it's gunshot wounds with a

3 manner of homicide.

4    Q.    Okay.

5              (Sotto voce discussion)

6              MS. PRIMM:  And I'll pass this witness.

7                    **CROSS-EXAMINATION**

8 BY MS. RECER:

9    Q.    Good morning, Dr. Urban.

10    A.    Good morning.

11    Q.    I'm just familiarizing myself with your file

12 here.

13              So you -- or this is actually with --

14 Dr. Parchman's file; is that right?

15    A.    Yes.

16    Q.    Okay.  And you said to Ms. Primm that you

17 reviewed the photographs and the report.

18    A.    Yes.

19    Q.    Okay.  Did you ever see Mr. Petrey's body?

20    A.    I -- this is an old case and I -- I cannot say

21 definitively whether or not I saw it.

22    Q.    Okay.  And so in -- there's things I haven't

23 seen yet.

24              So in your -- you mentioned -- you

25 described your training as a pathologist -- or medical

1    examiner, and your profession has some standards that

2    you follow; is that right?

3         A.   Yes.

4         Q.   Okay.  And what do those standards say are --

5    should be used as material for an autopsy, the

6    underlying material?

7         A.   I'm not sure specifically what you're asking.

8         Q.   What are you supposed to review, what are you

9    supposed to look at before you do an autopsy?

10        A.   Typically, we look at what's called a death

11   investigation narrative.  So that is information that is

12   provided by our death investigators who collect the

13   information that we have available prior to doing an

14   autopsy.

15        Q.   All right.  And is that information in this

16   folder?

17        A.   Yes.

18        Q.   Okay.  I'm going to --

19             MS. RECER:  If I may approach, Your

20   Honor.

21        Q.   (BY MS. RECER)  I'm going to ask you to find

22   that for me.

23             THE COURT:  Please.

24             MS. RECER:  I'm sorry, what?

25             THE COURT:  Please, approach.

1              MS. RECER:  Oh, okay.

2      Q.    (BY MS. RECER)  This is everything except for

3  the photographs.

4      A.    Okay.

5      Q.    So did you speak with the death investigator

6  yourself?

7      A.    Generally, when we're doing an autopsy, we are

8  going off the written narrative and then may talk to

9  them if we need additional information.  But in -- I

10  don't have any recollection of talking to the death

11  investigator on this case about this case.

12      Q.    All right.  And did -- if you know, in the

13  file, did Dr. Parchman talk to the investigator?

14      A.    I don't have any indication -- or notation

15  that she did.

16      Q.    Okay.  What was that death investigator's

17  name?

18      A.    Emma Prophet.

19      Q.    Okay.  And I don't expect you to recite the

20  whole thing, but can you tell me the gist of what Emma

21  Prophet conveyed to Dr. Parchment?

22      A.    So in this death investigative narrative,

23  we've got a face sheet that has the demographics of the

24  decedent when found dead -- when pronounced dead, who

25  did that, the investigating agency.  And then there is

Jill Urban, MD - August 19, 2024
Cross-Examination by Ms. Recer

1  an investigative narrative describing the circumstances

2  of the discovery of the body and also information about

3  a suspect and a weapon.

4      Q.   Okay.  And did you review the death

5  investigation before you signed this autopsy?

6      A.   I -- I don't know one way or the other.

7      Q.   So in what way does the information about the

8  crime scene and the suspect, how does that inform your

9  work?

10      A.   Typically, it will give us information as to

11  the manner of death.

12      Q.   What kind of information?

13      A.   So, you know, whether or not this looks like

14  it's going to be an accidental death, a homicide, a

15  suicide, natural death, something like that.

16      Q.   Okay.  And in your field as an expert you go

17  to trainings and you keep current with the literature?

18      A.   Yes.

19      Q.   Okay.  And is there literature about the

20  effect of that kind of information on the objectivity of

21  the medical examiner?

22      A.   There is.

23      Q.   Okay.  And what does that say?

24      A.   There's lots of information about potential

25  bias in the literature.  I'd say for the most part the

1  common practice is we do not do autopsies blind with no

2  information.

3      Q.   And in what way does the information from the

4  death investigator influence the autopsy?  Why do you

5  need that information, I mean?

6      A.   Well, depending on the type of case it is, you

7  know, I'm going to treat a -- for instance, a baby that

8  might be associated with a crib death differently than

9  an adult who was involved in a shooting.  So it's going

10 to inform what kind of -- you know, how we approach the

11 autopsy to start with.

12     Q.   But that's self-evident when you receive the

13 body, right, if it's a baby or an adult.  The

14 information about the investigation, the -- what the

15 investigating officer or the death officer thinks

16 happened or the investigation is suspect and so forth,

17 how does that influence you?

18     A.   Well, it may influence what kind of evidence I

19 collect.  You know, if there's suspicion of a sexual

20 assault, you know, I might get a sexual assault kit or

21 things like that.

22     Q.   Okay.  And in what way would information in a

23 shooting, what's -- what's the difference?

24     A.   I would say oftentimes one of the main things

25 that we are trying to determine in a shooting, you know,

 1  initially is whether it's suicide or homicide.

 2      Q.   And how does the information from the death

 3  investigator affect that?

 4      A.   Again, a lot of that is going to be based on

 5  scene investigation, the history of the decedent, how

 6  they were found, the location of the gunshot wound might

 7  leads us to think it's a suicide versus a homicide.

 8      Q.   Okay.  So if that information was wrong, then

 9  your conclusion relying upon would also be wrong or

10  could be in theory?

11      A.   Possibly.

12      Q.   Okay.  And -- just a second here.

13          So in this case, how did that information

14  from the death investigation influence Dr. Parchman, in

15  your opinion?

16          MS. PRIMM:  I'm going to object, Your

17  Honor.  That's speculative.

18          MS. RECER:  Exactly.  Thank you.

19          THE COURT:  I'll overrule the objection.

20          You can answer, if you know.

21      A.   Could you repeat the question?

22      Q.   (BY MS. RECER)  I was asking how did the death

23  investigation influence Dr. Parchman in her viewing of

24  this autopsy?

25      A.   I don't know how it influenced her.

Jill Urban, MD - August 19, 2024
Cross-Examination by Ms. Recer

1      Q.    Right.  Do you know if the information that
2   was provided is true or not?

3      A.    No.

4      Q.    Okay.  So as to Dr. Parchman, as you just
5   said, you don't know what she was thinking about this or
6   how it influenced her.

7      A.    Correct.

8      Q.    It would be speculation, as Ms. Primm said, to
9   guess that.

10             Okay.  And so in this case -- and, again,
11  I haven't seen the folder.  So I'm sort of asking this
12  blind.  Did the death investigator give you information
13  about how far away from Mr. Petrey they believed the
14  shooter to be?

15     A.    There's nothing specific about the range.

16     Q.    Okay.  And based on your interpretation of
17  Dr. Parchman's interpretation of what she saw, what is
18  your opinion as to the range?

19     A.    So there was one entrance wound that had
20  stippling which is consistent with a medium range
21  gunshot.

22     Q.    What is medium range?

23     A.    So it's going to depend on the type of weapon
24  and the type of ammunition.  But in general, that's
25  going to be somewhere between 1 to 3 feet.

Jill Urban, MD - August 19, 2024
Cross-Examination by Ms. Recer

1     Q.   I'm sorry, you said 1 to 3?

2     A.   Yes.

3     Q.   Okay.  And was it just stippling or was there

4 gun powder?

5     A.   There was also faint suggestion of what is

6 called soot.  So that's carbon from burning gun powder.

7     Q.   What is the significance of that?

8     A.   So that could put the range a little closer.

9 Typically soot only travels a foot.

10    Q.   Okay.  So is your opinion that Dr. Parchman's

11 opinion is that the shooter was about a foot away or no

12 more than a foot?

13    A.   Well, it could be a little bit more.

14    Q.   Okay.  How much more?

15    A.   Okay.  So, again, I -- it was described as a

16 faint suggestion of soot.  So it's -- I would say a

17 maximum of 3 feet, but it could have been closer to a

18 foot.

19    Q.   Described by whom as a faint suggestion?

20    A.   Dr. Townsend-Parchman.

21    Q.   Okay.  You didn't see it yourself.

22    A.   I've got -- I've seen the photographs.

23    Q.   But you can't personally attest to how much of

24 the soot there was.

25    A.   Correct.

Jill Urban, MD - August 19, 2024
Cross-Examination by Ms. Recer

```
 1        Q.    Okay.  And do you think that the distance

 2   between the shooter and the decedent is a relevant piece

 3   of information in a death investigation?

 4        A.    It could be, yes.

 5        Q.    Okay.  I apologize.  Give me just a moment.

 6              May I have that folder back, please?

 7        A.    Yes.  I pulled out the narrative too.

 8        Q.    Oh, thank you.  Thank you.

 9              All right.  So in the death

10   investigation, investigator describes the case as

11   kidnapping and states as facts that Mr. Petrey was

12   forced to go with two males.  In what way might that

13   influence a medical examiner in their findings?

14        A.    That report is certainly suggestive of it

15   being a homicide.

16        Q.    This report.

17        A.    Yes.

18        Q.    Okay.  But how does that influence you?

19        A.    Well, as a medical examiner or --

20        Q.    Yes.

21        A.    It's certainly -- you know, when I do an

22   autopsy, I am taking in what I see at the time of the

23   examination, toxicology testing, any ancillary

24   laboratory testing that I might do as well as the

25   investigation that is provided to me by other
```

1  investigators.

2              So, you know, together if I've got that

3  history and a case where there are two distinct gunshot

4  wounds of the head, one of which has no associated

5  firearm residue and is most likely a distant range shot,

6  you know, to me, that's going to add up to a homicide.

7      Q.   Okay.  So knowing that a suspected kidnapping,

8  knowing the names of people and where they were found,

9  does that influence you?

10     A.   It -- again, that's going to point to it

11 likely being done by another person.  You know, in the

12 death investigation narrative, it also describes a body

13 that appears to have been dumped.  There is not a

14 description of a handgun at the scene, you know, things

15 like that.

16     Q.   I'm sorry, what was dumped?  I just didn't

17 hear you.

18     A.   So the body was left at I think it was a pump

19 site.

20     Q.   Right.  Does it say the body was dumped there

21 or --

22     A.   No, dumped.

23     Q.   Dumped.  Okay.  So if that's not true, how

24 would that influence the autopsy?

25     A.   It's also possible that he died at the scene.

Jill Urban, MD - August 19, 2024
Redirect Examination by Ms. Primm

1      Q.    Why does it matter?

2      A.    Oftentimes a body who -- that is moved or, you

3  know, left someplace is more suggestive of it being a

4  homicide.

5      Q.    Okay.  Is there other information that you

6  provide besides just if it was a homicide or not?

7      A.    The manner of death as well as a complete

8  autopsy report.

9      Q.    Okay.

10     A.    I mean, the cause of death and the complete

11 autopsy report.

12     Q.    Okay.  So if the information about the faint

13 stippling is not correct and then the distance that

14 you've concluded on it would be not correct too; is that

15 correct?  Is that right?

16     A.    Yes.

17     Q.    Okay.  So you're relying on the truth of what

18 Dr. Parchman did and what this investigator did?

19     A.    Yes.

20     Q.    Okay.

21              (Sotto voce discussion)

22              MS. RECER:  I believe I'll pass the

23 witness.

24              **REDIRECT EXAMINATION**

25 BY MS. PRIMM:

Jill Urban, MD - August 19, 2024
Redirect Examination by Ms. Primm

1      Q.    Dr. Urban, when you looked at the photographs

2   in this case, did you evaluate them on your own, not

3   based on what Dr. Parchman found or what the

4   investigator said in the investigative report, did you

5   evaluate the pictures to see if you could see the

6   evidence of any soot or stippling?

7      A.    Yes.

8      Q.    And based on your own independent review of

9   the soot and stippling, did you form an opinion as to

10  the distance?

11     A.    I agree with Dr. Townsend-Parchman, yes.

12     Q.    I'm sorry?

13     A.    I agree with Dr. Townsend-Parchman.

14     Q.    Okay.  And that's based, not just on what

15  Dr. Parchman said in her report but what you saw in the

16  photographs, correct?

17     A.    Yes.

18     Q.    And in your independent review of the report,

19  your independent review of the photographs, did you find

20  any evidence of suicide in this case?

21     A.    No.

22     Q.    Did you find any evidence of an accident in

23  this case?

24     A.    No.

25     Q.    And in coming to your conclusion, did you come

1  to your conclusion based on your own independent review

2  of the photographs and the report?

3       A.   Yes.

4                 (Sotto voce discussion)

5       Q.   (BY MS. PRIMM)  Do forensic pathologists

6  regularly rely on the investigative report when they are

7  conducting an autopsy?

8       A.   Yes.

9       Q.   Okay.  And that's because they're out in the

10  field and you're not.

11       A.   Correct.

12       Q.   And that is in the field of forensic

13  pathology, that you rely on that.

14       A.   Yes.

15                 (Sotto voce discussion)

16              MS. PRIMM:  I'll pass the witness.

17              MS. RECER:  Just a couple follow-ups.

18                 **RECROSS-EXAMINATION**

19  BY MS. RECER:

20       Q.   So picking up right where you left off, you --

21  pathologists normally do -- or typically, as she said,

22  do rely upon the information from the investigators.

23  When you first described why that was important, you

24  said that you're able to call them if you need

25  additional information as you're doing the autopsy.

Jill Urban, MD - August 19, 2024
Recross-Examination by Ms. Recer

1                You weren't able to call this death
2   investigator, were you?
3        A.   I have no recollection of talking to her.
4        Q.   Okay.  Would you typically talk to the death
5   investigator of another doctor's -- I don't know if you
6   call them patient, a case.
7        A.   We call them decedents.
8        Q.   Decedents, okay.
9        A.   Not typically.
10       Q.   Okay.  And then drawing your independent
11  conclusions from the photos, in the standard of care for
12  medical examiners to issue an autopsy, you cannot issue
13  an autopsy based solely on photos, can you?
14       A.   We don't, no.  Yeah.  Correct.
15       Q.   And why don't you?
16       A.   I mean, because when we're doing an autopsy
17  report, it's based on doing an autopsy.
18       Q.   Okay.  And so you would never do one just
19  based on the photos.
20       A.   I would not issue an autopsy report based on
21  photographs.
22       Q.   Okay.  And why?
23       A.   Because then it's not an autopsy report.
24       Q.   Why does -- why couldn't an autopsy report be
25  done just from photos?

Evidentiary Hearing - Testimony Excerpt
August 19, 2024

1      A.   You know, an autopsy typically is an

2   examination of the body that includes organ dissection.

3      Q.   Right.  But could you do an autopsy report

4   from photos of the autopsy rather than doing the autopsy

5   yourself?

6      A.   I mean, I could issue an opinion or an

7   interpretation.  But to actually do an autopsy report, I

8   would do an autopsy.

9      Q.   Okay.

10            MS. RECER:  I believe that's all, Doctor.

11   Thank you so much.

12            MS. PRIMM:  I have no further questions

13   of this witness.

14            THE COURT:  Okay.  Excused subject to

15   recall for today?

16            MS. RECER:  Yes.

17            How can I get a copy of this?

18            THE COURT:  The rule has been invoked.

19            THE WITNESS:  Okay.

20            THE COURT:  And we're anticipating a

21   trial in October.

22            THE WITNESS:  Okay.  Great.  Thank you.

23            THE COURT:  Thank you very much.

24            MS. RECER:  We need to make a copy of

25   this.

```
 1                    THE WITNESS:  Okay.

 2                    MS. RECER:  How would you like us to do

 3   that?  Is it okay if my investigator goes to make a copy

 4   or --

 5                    THE WITNESS:  Yeah, that's fine.

 6                    MS. RECER:  -- does it need to stay with

 7   you?

 8                    Okay.

 9                    THE COURT:  All right.  Your next

10   witness.

11                    (Excerpt proceedings concluded at

12                    9:47 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Evidentiary Hearing - Testimony Excerpt
August 19, 2024

1  STATE OF TEXAS

2  COUNTY OF MIDLAND

3       I, Ann M. Record, Deputy Official Court Reporter in

4  and for the Midland County District Courts of Midland

5  County, State of Texas, do hereby certify that the above

6  and foregoing contains a true and correct transcription

7  of all portions of evidence and other proceedings

8  requested in writing by counsel for the parties to be

9  included in this volume of the Reporter's Record in the

10  above-styled and numbered cause, all of which occurred

11  in open court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of

13  the proceedings truly and correctly reflects the

14  exhibits, if any, offered by the respective parties.

15       I further certify that the total cost for the

16  preparation of all volumes of this Reporter's Record is

17  $182.25 and will be paid by Midland County.

18       WITNESS MY OFFICIAL HAND this 13th day of

19  September, 2024.

20
                    /s/Ann M. Record
21                  Ann M. Record
                    CSR, RMR, CRR, CMRS, CRI, TCRR, TMR, CCR (NM)
22                  TX CSR #4747/NM CCR #89
                    Expiration Date:  10/31/2026
23                  Method:  Machine Shorthand
                    Deputy Official Court Reporter
24                  Midland County District Courts
                    500 N. Loraine, Suite 1001
25                  Midland, Texas 79701
                    (432)688-4371 / ARecord@mcounty.com

# EXHIBIT 14

---------- Forwarded message ---------
From: **Melinda High** <Melinda.High@dallascounty.org>
Date: Tue, Aug 20, 2024 at 4:40 PM
Subject: Request to schedule meeting re: Autopsy of Nikki Curtis 0456-02-0299JU - (h) - (Nikki Curtis) Telephone Call:
To: Vanessa Potkin <vpotkin@innocenceproject.org>

**Afternoon,**

**Dr. Jill Urban just informed me again today that she have reviewed your expert's opinions.**

**Dr. Urban is willing to speak to one of your attorneys as a courtesy for ONLY 10-15 minutes and won't charge.**

**Please confirm receipt.**

**Thank you.**

# EXHIBIT 15

## DECLARATION OF PATRICIA ANN CONKLIN

Ny name is Patricia Ann Conklin. My date of birth is July 29, 1966. I reside at 250 East Dallas Ave., Apartment 7, Cooper, TX 75432. I am over the age of eighteen, mentally competent, and provide this declaration based on my personal knowledge and experience.

1. I currently work as a LVN at Birchwood Nursing & Rehabilitation.

2. I received a LVN nursing degree from Trinity Valley College in 2003. I have been working in nursing ever since then.

3. I have known Robert Roberson since he was a teenager. He is a little younger than I am. I was already married with young kids when I met him. Back then, he was friends with a boy named Dave Berryhill, who later married one of my sisters, and they had a daughter named Courtney. We were all living in Palestine, Texas then.

4. Robert does not have a mean bone in his body. He is a little slow. But I never saw him be mean to anyone, verbally or physically, during all the years I knew him.

5. My youngest sister, Teddie Cox, also knew Robert. They were in a relationship.

6. When Robert moved back home, he was trying hard to get custody of his youngest daughter Nikki, who was not yet two years old. She was then living with her grandparents on her mother's side. But I saw Robert with Nikki many times. What I saw was a loving father. He was attentive, encouraged Nikki to play, and was never dismissive or short with her. I never saw him do anything hurtful. I have a strong memory of him holding her on his hip with Nikki resting her head on Robert's shoulder. I never even saw him spank her.

7. Teddie had a daughter named Rachel. Rachel is my sister Teddie's only child. Teddie gave birth to Rachel when Teddie was 17 years old. Her father is Edward Cox. Rachel has gone through some terrible things and sometimes has trouble controlling her anger.

8. Teddie became involved with Rachel's father, Edward Cox. They met in Palestine. I had a bad gut feeling about him from the beginning. I shared my concerns with Teddie numerous times. But Teddie got together with him anyway. Pretty soon, I stopped spending time with Teddie when she was with Cox because I had this feeling something terrible was going to

happen. Eventually, when Rachel was about nine years old, she said some things to me that made me think that Cox had sexually abused her. I told Teddie about my fears and suggested she get Rachel to a doctor. My memory is that the doctor confirmed the possibility of sexual abuse, and Teddie then reported this to the police in Nacogdoches County where they had been living. Edward was eventually convicted of multiple counts of sexual assault of a child in Nacogdoches County.

9. Around this same time, Robert had moved back to Palestine. Robert is night and day from Ed Cox. When he learned what had happened to Rachel, he offered to help Teddie and Rachel move back to Palestine. By then, Robert had gotten a job delivering newspapers for the Palestine Herald. My daughters enjoyed going along with him during the evening routes and would argue over who would get to sit with him in the front seat. He also occasionally took Nikki and my nieces Rachel and Courtney along with him. I had no fear at all about my daughters spending time with Robert.

10. My mother, Shelia Grainger, helped Robert and Teddie get a small rental house near the Anderson County courthouse on Perry Street. This was the summer of 2001, and Robert did not yet have custody of Nikki, but she started going over to the house for visits with Robert and Teddie. I'm aware of those visits because I was present during some of them.

11. Teddie and Robert both loved Nikki. When Nikki's grandparents agreed that he should have custody, they were both so happy. The only trouble I saw was Rachel taking out some of her anger on little Nikki and having to be corrected.

12. Around that time, Teddie found out that she was going to need a hysterectomy. She was only 27 years old. She was very upset about this because, of course, this would mean she would not be able to have any more children. Robert was very patient with her and was going to be taking care of her when she got out of the hospital.

13. At that same time, Nikki was sick. I do not know the details. But when I heard that Nikki was not going to make it and that Robert was being accused of having hurt her, I could not believe it. But case workers with CPS came to me wanting me to report that I had seen Robert mistreating Nikki. Teddie and I talked about this. We were both threatened with having our kids taken away from us if we did not get on board with accusing Robert. I am a stronger person than my sister and had a better

understanding of my rights. This pressure did not work on me. But Teddie is different. She has never been a strong person.

14. I love my sister, but she has had a lot of issues. She did not finish high school. She was diagnosed with schizophrenia and would not always take her prescription medication. She had some struggles with the Fen/Phen diet medication. Back in 2002 when Nikki died, this was literally right after her hysterectomy. Her hormones were all over the place. And she was very, very upset about Nikki's death. She did not have a job. Robert was the one who had been supporting her and Rachel with his paper routes. She was not able to take care of Rachel, then ten years old, so our mother took Rachel in. I'm aware that Teddie kept writing to Robert at the jail and sounded like she was still planning to get back together with him.

15. Teddie was very confused and did not know what to believe. We were all being told by law enforcement and CPS that Robert had caused Nikki's death. She did not understand her own rights and was scared and drinking a lot. Then her father died.

16. During that horrible time, she tried to kill herself with pills and was hospitalized. Meanwhile, she was called before the Grand Jury to testify against Robert. At the same time, her husband, Ed Cox, was in jail in Nacogdoches County about to go to trial for sexually assaulting Rachel.

17. I understand that Cox's first trial ended with a mistrial. Before the second trial, Teddie, Rachel, Courtney, and I were all called to testify in Robert's trial. I stand by my own testimony to this day. I never saw Robert hurt Nikki and do not believe he is capable of shaking or beating her or any child. He was and is a gentle man. I also stand by my testimony that my sister has a problem with honesty. Teddie is a troubled person, and when she is scared, she tends to tell people what she thinks they want to hear. Then she has trouble telling the difference between reality and the stories she has told.

18. The same year that Robert was convicted, Cox's trial was held. I understand that Cox was convicted in September 2003 for multiple charges of sexual assaulting Rachel. He remains in prison to this day.

19. I understand that Teddie claimed at trial that Nikki was so scared of Robert that she cried whenever he came anywhere near her. That is not true. Although Nikki only lived with them for a couple of months, even before that, I saw Robert with Nikki many times. If Nikki was somehow

totally different with him when I was not around, Teddie never reported anything like that to me or anyone else in the family. What I saw was Robert being loving and caring with Nikki and with my own children. My experience watching him interact with people goes back for years before Nikki was even born.

20. After Robert was convicted, Teddie continued to struggle with mental problems and has never really been stable.

21. If called upon to testify in a court of law about any of the information in this declaration, I would willingly do so. I would have provided this information during the 2003 trial if the attorneys had asked me.

All of the above is true and correct to the best of my personal knowledge. I sign here under penalty of perjury.

Signed on ⟶ 2/6 ⟶, 2025:

*Patricia Ann Conklin*

Patricia Ann Conklin

# EXHIBIT 16

## Declaration of Brian Taylor Wharton

My name is Brian Taylor Wharton, my date of birth is 6 January 1961, and my address is 496 Rals Drive, Onalaska, Texas. I am over the age of eighteen and competent to make the following declaration. I could testify to the following facts under oath in a court of law if called upon to do so. This declaration is based on my personal knowledge:

1. I am an ordained United Methodist Elder. I currently serve as pastor for the First United Methodist Church in Onalaska, Texas.

2. From 1992 to 2006, I was employed by the Palestine Police Department, ultimately as the Assistant Chief of Police. I left law enforcement to attend seminary in Wilmore, Kentucky at Asbury Theological Seminary.

3. Before working for the Palestine Police Department, I served in the U.S. Army as a commissioned officer in the Military Police Corps.

4. In January of 2002, I was the Chief of Detectives and one of the investigators working the case involving the death of two-year-old Nikki Curtis that occurred in Anderson County. That investigation resulted in the arrest of Robert Roberson. I testified for the prosecution during his capital murder trial in February 2003.

5. I have long been troubled by this case and do not believe that justice was served.

1

6. I was troubled from the beginning by the sense that Mr. Roberson had some kind of mental disability or mental illness. But I was not trained in mental health issues at that time. I assumed his defense would make those assessments and present evidence and make appropriate relative arguments. The lack of emotion he displayed and the seeming lack of understanding about what was happening to him did not seem right. His demeanor did not seem normal, and that something seemed wrong with him is something that was discussed. Witnesses we interviewed at the hospital also mentioned how Mr. Roberson seemed odd. He was not behaving as expected either for a distraught parent, or a suspect. I learned only years later that he has since been diagnosed with Autism Spectrum Disorder.

7. I did not grow up in Palestine, so I did not know Mr. Roberson or his family. My first encounter with him was at the hospital on January 31, 2002. We did not investigate whether he had any history of mental illness or disabilities or head injuries or anything like that. We just noticed what we saw as a lack of what one might consider a proper response throughout the whole ordeal. The lack of emotion never changed.

8. I was also troubled by the way Mr. Roberson was prosecuted. From the very first morning at the hospital, there was a suggestion that Nikki had

been sexually assaulted. But I never saw any evidence to support that allegation. My memory is that this hypothesis was first put forward by a nurse at the Palestine Regional Hospital where Mr. Roberson had brought Nikki for treatment. The nurse was named Andrea Sims. She was the one who contacted law enforcement about Nikki and suggested a belief that she had been abused. My understanding at the time was that Nurse Sims was a certified Sexual Assault Nurse Examiner or "SANE." At the time I could not see what she claimed to see, which were supposedly "anal tears" on the comatose child. I learned years later that Nurse Sims was not actually certified as a SANE.

9. After arriving at the hospital one of the things that law enforcement was told was Nurse Sims' hypothesis about sexual abuse.

10. Law enforcement and medical personnel in the ER were all upset by the sight of this injured child.

11. Then I found Mr. Roberson and asked if he would talk to me about what had happened to his daughter. He said something about her falling out of bed. I then asked him if he would show us where Nikki got hurt. He did not hesitate to cooperate. Det. Muniz and I, in a police vehicle, followed his car to a small house on Perry Street near the Anderson County courthouse where he was then living.

3

12. Mr. Roberson let us in and allowed us to explore the house. We did not find any sign of a struggle or violence. But the house was messy and the bed was really just box springs and mattress set on cinder blocks, two bricks stacked on top of each other at each corner of the bed. It did not appear to me that a fall from that height could explain what had happened. I took pictures of the bed and other parts of the house.

13. Mr. Roberson told us that Nikki must have fallen out of bed in the night because he heard a cry, woke up, and found her on the floor at the foot of the bed. I measured the height of the bed but little else because we just did not see how a fall would explain Nikki's condition. We did not try to reenact what the fall might have looked like.

14. We specifically looked for blood and any sign that Nikki had been battered. We looked everywhere we thought was reasonable for some sign of violence. We could not find anything. Mr. Roberson himself told us that he had seen a small amount of blood on Nikki's mouth after he picked her up off the floor. He said that he had used a wash rag to wipe it off. He then found the wash rag and gave it to us. The few drops of blood on the wash rag were so small we would not likely have noticed them. We also confiscated a pillowcase and maybe a bedsheet that had some specks of blood on it too.

4

15. At some later date, we went back to the house and confiscated all of the bedding, looking for evidence of a sexual assault. My memory is that the testing that DPS performed did not produce any evidence to support the sexual assault allegation. There were also swabs taken of Nikki. Nothing from the sexual assault kit came back to support the concept of sexual abuse. But the DA's Office decided to go forward with the sexual assault allegations against Mr. Roberson anyway. I never felt comfortable about this because I saw no evidence to support it. It was obvious that, if Nurse Sims was allowed to tell jurors that she had seen "anal tears," that would be very prejudicial. We did not have any evidence beyond what Nurse Sims said, and I saw nothing supporting her opinion.

16. That first day, after investigating at Mr. Roberson's house, we asked if he would go with us to the police station and make a statement. He agreed. I am the one who typed up his first statement. We did not believe that his explanation about a fall from the bed explained Nikki's condition. We also did not understand his lack of emotion. He was passive and cooperative throughout and told the same story at the police station about hearing Nikki cry out, finding her on the floor at the foot of the bed, and seeing a little blood on her mouth. He told us about Nikki being sick recently, being taken to the hospital, seeing doctors, and being prescribed medications, but

we did not consider that relevant. He also reported trying to keep her up and then waking up a few hours later to find her unconscious and turning blue. He said he grabbed her face and shook her to try to rouse her. That was the only thing I remember him saying about shaking.

17. That first afternoon, a decision was made to transfer Nikki to Dallas Children's Hospital. Later that day or the next, we got a report from a doctor there, Janet Squires. She told us that she believed Nikki's internal condition indicated that Nikki had been violently shaken and that is what caused the bleeding and swelling under her scalp. She described "shaken baby" syndrome. I am not sure if that is the first time the "shaking' hypothesis came up. I did not know much about it, but Dr. Squires was the medical expert and she seemed certain that violent shaking explained Nikki's condition and also explained why Nikki did not have anything more than minor external bruising. We relied on an affidavit from Dr. Squires to arrest Mr. Roberson.

18. At the time of the investigation, no one ever suggested any other explanation for Nikki's condition other than the shaken baby concept.

19. I was not present during the autopsy that took place at the Dallas medical examiner's office. But one of my colleagues, Joe Berreth, was present and reported back to me.

20. Because of what the medical professionals told us, we did not investigate any other possible cause of death. I did not inquire into Nikki's medical history and would not have been qualified to assess those records. I did not consider whether her current illness and recent hospitalizations were relevant because the experts seemed convinced that she had died from an inflicted injury involving shaking. I did not investigate what medications Nikki had been prescribed the week of her death or what medications she had been given during the 24-hour before Mr. Roberson took custody of Nikki.

21. We were told that Mr. Roberson had picked up Nikki around 9:00 PM at night from her maternal grandparents' house. Their names were Verna and Larry Bowman. They were not investigated, and I was not informed of their own history with CPS. We never treated anyone else as a "suspect" other than Mr. Roberson.

22. We did not do an investigation of Nikki's own social history.

23. No medical professional at the time told me that Nikki had a viral infection or high fever in the days leading up to her death.

24. No medical professional at the time told me that Nikki had viral pneumonia or any symptoms of pneumonia.

25. No medical professional at the time told me that Nikki had been prescribed drugs (Phenergan and codeine cough syrup) that suppress the nervous system and can cause death in younger children with respiratory problems.

26. No medical professional at the time told me that Nikki had a history of breathing apnea during which she had been observed turning blue from lack of oxygen.

27. No medical professional at the time told me that Nikki had a clotting disorder or explained how that condition or the treatment she received in the ER might have affected her condition by the time the autopsy was performed.

28. No medical professional at the time told me that Nikki's breathing tube had initially been inserted wrong and had to be pulled out and reinserted in the Palestine ER. I saw her in the hospital, but do not remember seeing her without the breathing tube inserted.

29. The belief that Nikki had been the victim of abuse was the first and only cause of her fatal condition that anyone on my team considered at that time.

30. At the time, I relied on the medical professionals who treated Nikki in the hospital and the medical examiner who said that the cause of death was a homicide. But I never felt confident that we had gotten at the truth nor that Mr. Roberson was fully aware of what was happening in the process. For

years, I have expected that someone would approach me about failures in this case.

31. I agreed to testify in a court proceeding that was held in Anderson County in 2021. At the time, however, I had just had heart surgery and the COVID pandemic was still very concerning. Therefore, I had to appear via Zoom. There were a number of technical difficulties with the participants in court having trouble hearing me. I did not get to express fully my concerns about this case. It seems to me, in the most basic sense, the case falls apart because our first assumption, "shaken baby," is a fallacy. The insinuation of sexual assault and the apparent inability of Mr. Roberson to understand and fully participate are also deeply concerning. I had doubts then, but today I am certain that nothing here supports a continued effort by the State to execute Mr. Roberson.

I have read this declaration. I affirm that, to the best of my knowledge and under penalty of perjury, that the foregoing is true and correct.

Executed in Polk County, State of Texas, on the ___1st___ day of _December_, 2022.

Brian Taylor Wharton
Declarant

9

# EXHIBIT 17

## AFFIDAVIT OF BRIAN TAYLOR WHARTON

I, Brian Taylor Wharton, hereby affirm, under oath, as follows:

1.    I am over the age of eighteen, mentally competent, and provide this affidavit based on my own personal knowledge.

2.    From 1992 to 2006, I was employed by the Palestine Police Department in Anderson County, Texas. When I left to attend seminary, I was Assistant Chief of Police. I am now an ordained United Methodist Elder. I currently serve as a pastor for the First United Methodist Church in Onalaska, Texas.

3.    In January 2002, I served as lead detective in the investigation of the death of Nikki Curtis, the two-year-old daughter of Robert Roberson, which occurred in Anderson County. That investigation resulted in Mr. Roberson's arrest. I later testified for the prosecution during his capital murder trial in February 2003.

4.    Attached to this affidavit is a true and correct copy of my opinion editorial that was published in the *Dallas Morning News* on May 23, 2024. I drafted and submitted this opinion because I have long been troubled by this case and do not believe that justice was served. The facts stated in the opinion are true and correct to the best of my personal knowledge.

I hereby affirm the foregoing under penalty of perjury and the laws of the State of Texas, executed in Polk County, State of Texas, on ___5/28___, 2024.

Brian Taylor Wharton

ACKNOWLEDGEMENT

Before me _Sherry Brecheen_ a notary public, on this day personally appeared Brian Taylor Wharton, known to me to be the person whose name is subscribed to the foregoing instrument, who acknowledged to me that he executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office, this 28 day of _May_ , 2024.

Notary Public, State of Texas

Sherry Brecheen
My Commission Expires
7/15/2025
Notary ID
130970613

## OPINION

# Retired detective: Revisit death penalty case

### For 20 years, I've thought that justice was not served in toddler's death

#### By BRIAN WHARTON

I was a police officer in Palestine, Texas, for 14 years. I was the supervising detective, investigating and providing oversight in a case where Robert Roberson was accused of shaking his 2-year-old daughter, Nikki, to death. I testified for the prosecution and helped send Roberson to death row in 2003.

For 20 years, I have thought that something went very wrong in Roberson's case and feared that justice was not served. If there is no movement to correct this injustice, I fear myself and others will carry our guilt eternally.

I have come to believe that Nikki died of accidental and natural causes. I am convinced that she was not murdered. Roberson is innocent. There was no crime. I believe the science that was used to obtain Roberson's arrest and conviction has changed drastically since his arrest.

We investigators found no sign of violence in the home where Nikki had collapsed, and she did not look like she had been beaten. But after a CT scan of her head, we were given three words: "shaken baby syndrome." Those three words placed focus on Roberson to the exclusion of any other offender or potential cause of death. As an investigator, I deferred to the expert knowledge of a pediatrician and medical examiner in Dallas and followed their lead in explaining what then seemed inexplicable.

In 2002 when Roberson was arrested, the medical community seemed united in thinking that a



**Former detective Brian Wharton** says that for the past two decades, he's felt there was something wrong about the murder conviction of Robert Roberson in 2003.

File Photo/Staff

child with Nikki's set of internal symptoms must have been violently shaken or possibly struck against a hard surface, most likely by the last person with the child when she collapsed. Those, like Roberson, who denied doing anything to harm their injured children were assumed to be lying.

Now, however, I have observed how the version of the shaken baby hypothesis put before his jury as fact has been entirely debunked by evidence-based science. I also understand that a reexamination of the autopsy by experts has shown that Nikki had severe pneumonia, something that was not shared with us during the investigation. She was also taking prescribed medicines that are no longer given to children her age

because they can cause fatal breathing problems. Now it is recognized that many naturally occurring diseases that cause oxygen deprivation, including pneumonia, as well as short falls with a head impact, can cause the same set of internal conditions that Nikki had.

There is another post-conviction shaken baby case out of Dallas where the state has conceded that the convicted man should get a new trial. That conviction and Roberson's both hinge on the shaken baby hypothesis, and both cases were tried in the same era (2000 and 2003, respectively) when a version of shaken baby, now universally rejected, was viewed as sound medical knowledge. Both trials featured the very same Dallas-based child-abuse expert who told the juries

that three medical findings, often referred to as the "triad"— subdural bleeding, brain swelling, and retinal hemorrhage—could support an inference that abusive shaking and blunt impact explained how the child had collapsed.

Over two decades later, the shaken baby hypothesis has been discredited and accused caregivers have been exonerated or granted new trials. According to the National Registry of Exonerations, there have been at least 32 exonerations of those wrongfully convicted under the shaken baby hypothesis. I believe Roberson is the only person currently on death row in the United States because of a conviction based on this discredited science.

Beyond science, I have been haunted by a number of issues. Pri-

marily, why was Roberson's demeanor always flat and emotionless? Roberson did not display the kinds of emotion that I'd expect from a distraught parent. But neither did he behave like a guilty suspect. I felt certain that a defense lawyer would present evidence of mental impairment. Only years after trial, in his appeals, would we learn that Roberson was diagnosed with autism. This condition explains his apparent lack of emotion, but we — the detectives, the lawyers, the jury — did not understand that at the time.

Additionally, why did a nurse say that Nikki had been sexually abused when no one else — including me — saw any signs of such abuse? How and why did that insinuation get into the trial without any form of corroborating evidence?

Thankfully, we now have the opportunity to do something before it's too late. Anderson County District Attorney Allyson Mitchell could pause and take another look at Roberson's case. Although there is no execution date, the urgency is clear. A motion to reconsider a denial of Roberson's innocence claim is pending in the Texas Court of Criminal Appeals. I hope they take another look. There needs to be a public reckoning.

I am asking for those who care deeply about justice to urge another look at this case. Objectively, considering all the questions that have been raised and how science has evolved since 2003. It would be a terrible legacy for all of us to be associated with executing an innocent man based on a rush to judgment and bad science.

We must prevent Texas from making a tragic, irreversible mistake.

*Brian Wharton is an ordained elder in the United Methodist Church. When he retired from the Palestine Police Department in 2006, he was the assistant chief.*

# Texas universities need new direction, less activism

#### By ADAM KOLASINSKI

T exas elected officials and influential alumni are pleased with how University of Texas at Austin President Jay Hartzell handled the threat of disruptive pro-Palestinian protests on his campus.

Rather than tolerate illegal camping and other unruly actions that disrupted university life at other campuses,





# Our city.
# Our voices.

# EXHIBIT 18

**CURRICULUM VITAE**
**Roland N. Auer**

Revised February 22, 2021

## PERSONAL DATA



**Name:**          Roland Nikolaus Auer

**Address:**       #2703, 311- 6th  Avenue N.
(Home)            Saskatoon, Saskatchewan, Canada  S7K 7A9

**Address:**       Royal University Hospital
(Work)            103 Hospital Drive, Rm 2843A
                  Department of Pathology and Laboratory Medicine
                  University of Saskatchewan
                  Saskatoon, SK, Canada  S7N 0W8

**Telephone:**     (306) 655-1539 [office, hospital]
                  (306) 850-3277 [cell]

**Fax:**           (306) 655-2223 [hospital, departmental multi-user]

**E-mail:**        roland.auer@usask.ca [work, university]
                  roland.auer@saskhealthauthority.ca [work, hospital]
                  auerol00@gmail.com [private]

**Web Pages:**     https://medicine.usask.ca/profiles/pathology-and-laboratory-medicine/saskatoon/roland-auer.php
                  http://greatteachers.ucalgary.ca/person/roland_n_auer_md_phd
                  http://www.hbi.ucalgary.ca/research/components.php?name=members&op=view&id=51
**ResearcherID:**  G-7164-2011 http://www.researcherid.com/rid/G-7164-2011
**ORCID ID:**      http://orcid.org/0000-0001-9044-3419
**ResearchGate:**  https://www.researchgate.net/profile/Roland_Auer

**Citizenship:**   Canadian

**Languages:**     English, German (native speaker), Swedish, French (spoken & written)
                  Polish, Russian (rudimentary)

**Special Interests:**  old Canadian stamps, squash, aquarium, cycling

**Research Interests:**  hypoglycemia, ischemia, epilepsy, excitotoxins, drug neurotoxicity, brain-
                  behavior relationships

**Publication stats:**  H-index=48 (Institute for scientific Information) 7,386 citations
                  H-index=59 (Google Scholar) 11,658 citations
                  Peer-reviewed articles=130

EXHIBIT
APPX124

# CURRICULUM VITAE
## Roland N. Auer

## EDUCATION

| | |
|---|---|
| 1982-1985 | University of Lund |
| | Faculty of Medicine, Postgraduate |
| 1981 | University of Toronto |
| | Faculty of Medicine, Postgraduate |
| 1978-1981 | University of Western Ontario, |
| | Faculty of Medicine, Postgraduate |
| 1971-1978 | University of Alberta |
| 1977-1978 | Faculty of Medicine, Postgraduate |
| 1973-1977 | Faculty of Medicine |
| 1971-1973 | Faculty of Medicine |

## Primary, Secondary Education

| | |
|---|---|
| 1968-1971 | Eastglen Composite High School |
| 1965-1968 | Highlands Jr. High School |
| 1960-1965 | Cromdale Elementary School |

## DEGREES

| | | |
|---|---|---|
| 1985 | PhD | Medical Science, University of Lund, Sweden |
| 1977 | MD | University of Alberta |
| 1975 | BSc (Med) | University of Alberta |

## Certificates

| | |
|---|---|
| 1981 | American Board of Pathology: Neuropathology |
| 1981 | FRCPC, Neuropathology, Royal College of Physicians and Surgeons of Canada (#25) |
| 1980 | Diplomate of the National Board of Medical Examiners of the United States (#208625) |
| 1978 | Licentiate of the Medical Council of Canada (LMCC #46199) |

## AWARDS

| | |
|---|---|
| 2019 | Resident Doctors of Saskatchewan "Excellence in Teaching Award" |
| 2002 | Japan Society of the Promotion of Science award (1 Month, May 2002, Kagawa Medical School, Takamatsu, Kagawa prefecture, Shikoku, Japan) |
| 2001 | Heart & Stroke Foundation of Canada, Visiting Scientist Award, $10,250 |

## CURRICULUM VITAE
### Roland N. Auer

2000   Great Teachers Website, University of Calgary
http://greatteachers.ucalgary.ca/person/roland_n_auer_md_phd
1998   Gold Star award, teaching, Faculty of Medicine
1990   Alberta Heritage Foundation for Medical Research Scholarship (renewal)
1985   Alberta Heritage Foundation for Medical Research Scholarship
1981   Medical Research Council of Canada Fellowship
1973   Robert W. Tegler Undergraduate Scholarship
1973   First Class Standing, BSc Program
1971   Canadian Association of Physicists High School Examination (4th place in Alberta)
1971   W.A. Taschuk trophy in physics and chemistry
1971   McCoy-Burwash trophy in mathematics

**GRANTS** Total: $2.25 million (Cdn)

2006   Canadian Institutes of Health Research; $289,869 - 3 yrs "Cerebral Metabolism in
       Traumatic Brain Injury" ($96,623 × 3 yrs, with G.R. Sutherland)
2002   Heart & Stroke Foundation of Alberta, NWT & Nunavut; $40,000 – 1 yr "Hyperoxia, free
       radicals and ischemic brain damage" (July 2002 – June 2003)
2000   Canadian Institutes of Health Research; $314,568 - 4 yrs "NMDA Antagonist
       Neurotoxicity" (Oct. 1, 2000-Sept. 30, 2004)
2000   BioNebraska, Inc. US$45,000 (Cdn$66,784) "GLP-1 in focal cerebral ischemia" (July 1,
       2000 – Dec 31, 2001)
2000   Novartis Investigator in Schizophrenia Research; $20,000 "Brain Degeneration &
       Schizophrenia" (Apr 1, 2000 - Mar 31, 2001)
1996   Heart & Stroke Foundation of Canada; $149,973 – 3 yrs.
1995   Astra Pharmaceuticals Grant; $135,000 – 3 yrs.
1994   Medical Research Council of Canada; $200,827 – 2½ yrs.
1993   Canada-Fisons Fights Stroke, Pharmaceutical Co. Grant; $117,000 – 3 yrs.
1993   Heart and Stroke Foundation of Canada; $132,300 – 3 yrs.
1991   Medical Research Council of Canada; $210,657 – 3 yrs.
1991   Heart and Stroke Foundation of Canada; $56,000 – 2 yrs.
1990   Canadian Diabetes Association; $80,000 – 2 yrs.
1989   Medical Research Council of Canada; $128,394 – 2 yrs.
1989   Merck Sharp and Dohme Limited; $150,047
1988   Alberta Mental Health Research Council: $117,871 – 3 yrs.
1987   Foothills Hospital Research & Development Committee – $5,420
1987   Medical Research Council of Canada; $116,788 – 2 yrs.
1987   Juvenile Diabetes Foundation International; $77,404 (US) 2 yrs.
1985   Alberta Heritage Foundation for Medical Research Establishment Grant; $146,300 – 2 yrs.
1985   Alberta Heritage Foundation for Medical Research Major Equipment Grant - $79,931
1985   Alberta Heritage Foundation for Medical Research Major Equipment Grant - $16,920

**TEACHING**

***Medical Students***

**CURRICULUM VITAE**
**Roland N. Auer**

| | | |
|---|---|---|
| 1. | Lecture on Stroke - whole class | 1985-2010 |
| 2. | Small group teaching, medical students, clinical neuropathology | 1985-2010 |

### *Graduate Students*

| | |
|---|---|
| Neuroanatomy teaching (MDSC 619.20) MSc and PhD graduate students | 1986-2001 |
| Neuroscience II – Systems Neuroscience (Course director) (MDSC 619.20)  MSc and PhD graduate students | 1999-2001 |

### *Medical Graduates*

| | |
|---|---|
| Anatomic Pathology Residents | 1985-2010 |
| Neuropathology Residents | 1993-2010 |
| NPA8000 Université de Montréal : Pediatric Neuropathology | 2011-2014 |
| NPA8001 Université de Montréal : Functional Neuroanatomy | 2011-2014 |
| NPA8002 Université de Montréal : Nerve & Muscle disease | 2011-2014 |
| NPA8003 Université de Montréal : Adult Neuropathology | 2011-2014 |

### *Summer Students – HYRS program*                                   2001-2010

2000 – 2010. Neuroanatomy presentation for the HYRS Program (Heritage Youth Research Studentship = high school summer students), Alberta Heritage Foundation for Medical Research, Calgary, Alberta, last lecture July 14, 2010.

### POST-DOCTORAL FELLOWS SUPERVISED

| | |
|---|---|
| Makoto Oryu, MD | Post-doctoral fellow, Apr 1997 - 1998 |
| Fred Colbourne, PhD | Post-doctoral fellow, 1995 - 1998 |
| Osamu Miyamoto, MD | Post-doctoral fellow, 1994 - 1995 |

### STUDENTS SUPERVISED                          Degree awarded  (date)

| | |
|---|---|
| Vedashree Meher | MSc (June 2020) |
| John Kelly | FRCSC (2008) |
| Erin Flynn, BSc | MSc (May 2000) |
| Chang Zhu, MD | MSc (Jan. 1995) |
| Lorraine Anderson, BA, BSc | MSc (Feb. 1992) |
| Michel Rod, BSc | MSc (Dec. 1989) |
| Marios Papagapiou, BA | MSc (June 1989) |

## CURRICULUM VITAE
### Roland N. Auer

| Chris Voll, MB BCh MMed FCP | PhD (June 1989) |
| Murray Jensen, BSc | MSc (Nov. 1988) |

**ELECTIVE AND SUMMER STUDENTS**          **Date**

| David Curran | summer student 2006 |
| David Li | summer student 2006 |
| Zaafir Kherani | summer student 2004 |
| Rob Baldelli | MD student 1991 |
| Karen Chong | MD student 1990 |
| Jag Kohli | MD student 1988 |

**STUDENT EXAMINING and/or SUPERVISORY COMMITTEE**

| Aylin Reid | PhD | July 2007 – June 2010 |
| Stephan Bonfield | MSc | January 2006 – June 2009 |
| Sandra Young | PhD | January 2006 – August 2009 |
| Yuri Power | MSc | January 2006 – June 2009 |
| Esteban Ortiz | MSc | September 2006-June 2009 |
| Hamza Jalal | MSc | September 2007-September 2009 |
| Crystal Goertzen | MSc | 2005 |
| James Heida | MSc | 2005 |
| Leonie Moorhouse-Herx | MD/PhD | 2002 |
| Israeli Ran | MSc | 1998 |
| Marketa Horacek | MSc | 1996 |
| Isabel Roger | MSc | 1994 |
| Gigi Van Ostrand | MSc | 1993 |
| Barbara Skrajny | MSc | 1992 |
| Marian Buday | PhD | 1990 |
| Maeve O'Beirne | PhD | 1989 |
| Wei Dong Gao | PhD | 1988 |
| Perry Glimpel | MSc | 1988 |
| Brent Reynolds | MSc | 1988 |
| Janet Richmond | PhD | 1987 |

**APPOINTMENTS**

| 2015-present | Neuropathologist, University of Saskatchewan and Saskatchewan Health Region |
| 2010-2015 | Professor, Université de Montréal, Faculté de Medicine, Département de Pathologie (chairman: Dr. Luc L. Oligny 2010-2013, Dorothée dal Soglio 2013-2015) |

### CURRICULUM VITAE
### Roland N. Auer

| | |
|---|---|
| 1995-2010 | Professor, University of Calgary, Faculty of Medicine, joint appointment to Departments of Pathology (chairman: Dr. James R. Wright Jr) and Clinical Neurosciences (chairman: Dr. J. Gregory Cairncross) |
| 1989-1994 | Associate Professor, University of Calgary, Faculty of Medicine, joint appointment to Departments of Pathology (chairman: Dr. H. Benediktsson) and Clinical Neurosciences (chairman: Dr. T.E. Feasby) |
| 1985-1989 | Assistant Professor, University of Calgary, Faculty of Medicine, joint appointment to Departments of Pathology (chairman: Dr. N.B. Rewcastle) and Clinical Neurosciences (chairman: Dr. R.G. Lee) |
| 1982-1985 | 3½ yrs, M.R.C. Fellow, Laboratory of Experimental Brain Research, University of Lund, Sweden (Director: Dr. B.K. Siesjö) |
| 1981 | ½ year, Resident, Pediatric Neuropathology: Hospital for Sick Children, Toronto, Ontario (Director: Dr. L.E. Becker) |
| 1978-1981 | 2 years, Resident, Neuropathology: University and Victoria Hospitals, London, Ontario (Director: Dr. J.C.E. Kaufmann) |
| 1979-1980 | ¼ year, Resident, Neurosurgery: University Hospital (Dr. C.G. Drake), Victoria Hospital (Dr. H.W.K. Barr), War Memorial Children's Hospital, London, Ontario |
| 1979 | ¾ year, Resident, Neurology: - Adult Neurology (Director: Dr. H.J.M. Barnett) University and Victoria Hospitals, London, Ontario. - Pediatric Neurology (Dr. G.G. Hinton) War Memorial Children's Hospital, London, Ontario |
| 1977-1978 | 1 year, Resident, Anatomical Pathology: University of Alberta Hospital, Edmonton, Alberta (Director: Dr. G.O. Bain) |

## UNIVERSITY COMMITTEES, PROVINCIAL COMMITTEES

| | |
|---|---|
| 1993 - 1994 | Member, University Research Grants Committee, University of Calgary |
| 1988 | Member, Medical Library Committee, University of Calgary |
| 1987 - 1988 | Member, Medical Trust Committee, University of Calgary |
| 1989 - 1991 | Chairman, Medical Library Committee, University of Calgary |
| 1989 - 1992 | Member, Medical Student Electives Committee, University of Calgary |
| 1989 - 1991 | Member, Alberta Heritage Foundation for Medical Research Travel Grants Committee |

## NATIONAL, INTERNATIONAL COMMITTEES

| | |
|---|---|
| 2005 -2007 | Publications chair, Society for Cerebral Blood Flow and Metabolism |

**CURRICULUM VITAE**
**Roland N. Auer**

| | |
|---|---|
| 2003 -2007 | Board Member, Society for Cerebral Blood Flow and Metabolism |
| 2003 | Congress Chairman, Brain03 (Biannual meeting of the International Society of Cerebral Blood Flow & Metabolism), Telus Convention Centre, Calgary, June 30-July 4, 2003, 1000 delegates |
| 2000 | Member, Heart & Stroke Foundation of Canada Grants Committee |
| 2000 | Member, American Heart Association, Grants Committee (Stroke) |
| 1987 - 1992 | Member, Heart & Stroke Foundation of Canada Grants Committee |
| 1993 | Member, Heart & Stroke Foundation: National Cardiovascular Task Force on Stroke |
| 1993 - 1996 | Member, Medical Research Council of Canada Grants Committee |
| 1993 - 1994 | Member, FDA-commissioned FASEB panel on the safety of MSG as a food additive, Life Sciences Research Organization (LSRO), Bethesda, Maryland |
| 1998 - 2001 | Vice-President (Scientific Affairs) for the Canadian Stroke Society |

## INVITED PRESENTATIONS

1.  "Ischemic Models: what can go wrong and what can go right" at 24th International Symposium on Cerebral Blood Flow, Metabolism and Function, Chicago, Illinois, June 29-July 3, 2009. Organizer: Dr. I. Mhairi Macrae.

2.  "Topics in Medico-Legal Neuropathology" Canadian Association of Pathologists meeting, Halifax, Nova Scotia, July 14-17, 2009.

3.  Chair "Nervous System Damage and Repair Session" at 47th Annual Meeting of the Canadian Association of Neuropathologists, Niagara Falls, ON, September 5-8, 2007.

4.  "Rat Models of 2-Vessel and 4-Vessel Occlusions" at 23rd International Symposium on Cerebral Blood Flow, Metabolism and Function, Osaka, Japan, May 20-24, 2007.

5.  Canadian Association of Neuropathologists, 2005 Annual Meeting, Gordon Mathieson Lecture – "Hypoglycemic Brain Damage", St. John's Newfoundland, Canada, September 2005.

6.  "Cerebral Hypoglycemia" at 3rd International Hannover Conference on Hepatic Encephalopathy, Bremen-Vegesack, Germany, May 31 – June 4, 2003.

7.  "Calories, DNA Oxidation and Cancer" in Finland, Helsinki during the satellite meeting of the European Congress of Neuropathology and the 7th Congress of Neuropathology, London, UK, July 13-16, 2002.

8.  National Institute of Aging Workshops, "Neurocognitive Change after Cardiac Surgery", Bethesda, Maryland, USA, April, 2002.

9.  5th International Conference on Neuroprotective Agents, Clinical and Experimental Aspects, "Non-Pharmacologic Neuroprotection Against Brain Injury", Lake Tahoe,

**CURRICULUM VITAE**
**Roland N. Auer**

California, USA, September 17-21, 2000.

10.    XIV[th] International Congress of Neuropathology, Neuropathology 2000 "Gene Activation in Acute Brain Injury", Birmingham, UK, September 3-6, 2000.

11.    Western Canada Critical Care Course, "Hypothermia. A therapeutic modality to be studied?" Banff, Alberta, Canada, March 30, 2000.

12.    University of Texas Medical School, Dept. of Neurology -- Grand Rounds Lecture, "Hypoxic brain damage, ischemic brain damage, and their interaction", Houston, Texas, USA, March 3, 2000.

13.    The Canadian Congress of Neurological Sciences, "The Use of Insulin in Treating Experimental Cerebral Ischemia", Edmonton, Alberta, Canada, June 18, 1999.

14.    IV[th] International Symposium on Advances in Legal Medicine, "Hypoxic and Ischemic Brain Damage, and Their Interaction", Mainz, Germany, September 22-25, 1999.

15.    Beijing Medical University, Second Medical College, "Insulin in treating cerebral ischemia". Beijing, People's Republic of China, November 10, 1998.

16.    University of Arizona, Departments of Pharmacology and Toxicology "Dark, dead and other neurons and their significance in brain damage due to hypoglycemia and epilepsy" Tucson, Arizona, USA, January 7, 1998.

17.    University of Cincinnati College of Medicine. Departmental Research Seminar: "Insulin and the pathophysiology of ischemic necrosis in focal and global ischemia." Cincinnati, Ohio, USA, November 12-13, 1997.

18.    University of Cincinnati College of Medicine. CNS Grand Rounds: "Histotoxic hypoxia and hypoxic hypoxia – Do they really damage the brain?" Cincinnati, Ohio, USA, November 12-13, 1997.

19.    Boehringer Ingelheim Conference: "Advances in Stroke Management", Cancuń, Mexico, September 19-21, 1997.

20.    Canadian Congress of Neurological Sciences, Saskatoon, Saskatchewan, Canada, June 28, 1997.

21.    Second International Workshop on Maturation Phenomenon in Cerebral Ischemia-- Neuronal Recovery and Plasticity, Neuronal Recovery or Protection after Ischemic Insults, Tokyo, Japan, March 31 - April 1, 1996.

22.    Fernström Symposium, Lund, Sweden, June 13-16, 1994.

**CURRICULUM VITAE**
**Roland N. Auer**

23. Swiss Society of Neuropathology, Annual Meeting, St. Moritz, Switzerland, March 17-19, 1994.

24. NMDA/Ca$^{++}$ toxicity meeting, Rockville, Maryland, USA, October 25-26, 1993.

25. Speaker and Session Chairman, <u>International Conference on Neuroprotective Agents</u>, Rockland, Maine, USA, September 18-20, 1991.

26. Juvenile Diabetes Foundation International Workshop, <u>Diabetes and The Central Nervous System</u>, Arlington, Virginia, USA, June 29 – July 1, 1991.

27. 8th International Neurotoxicology Conference, <u>Role of Toxicants in Neurological Disorders: Experimental and Clinical Correlations</u>, Little Rock, Arkansas, USA, October 1-4, 1990.

28. Fidia Research Foundation Symposium <u>Excitatory Amino Acids 1990</u>, Montegrotto Terme, Padova, Italy, May 21-26, 1990.

## EDITORIAL BOARDS

1991 - 1998    Journal of Cerebral Blood Flow and Metabolism
1995 - 1998    CNS Drug Reviews
2009-present   Metabolic Brain Disease

## MANUSCRIPT REVIEWING (*ad hoc*)

American Journal of Pathology
Anesthesia and Analgesia
Annals of Neurology
Biological Psychiatry
BMC Neurology
Brain Research
Brain Research Bulletin
Canadian Journal of Neurological Sciences
Canadian Journal of Physiology and Pharmacology
Diabetes
European Journal of Neuroscience
Experimental Neurology
Experimental Gerontology
Experimental Neurology
Forensic Science International
Journal of Cerebral Blood Flow and Metabolism
Journal of Clinical Investigation
Journal of Neural Transmission

**CURRICULUM VITAE**
**Roland N. Auer**

Journal of Neuropathology and Experimental Neurology
Journal of Neuroscience Methods
Journal of Neuroscience Research
Neurobiology of Disease
NeuroReport
Neuroscience
Neuroscience Letters
Pediatric Research
Proceedings of the Society for Experimental Biology & Medicine
Stroke

## MEDIA

1.    City TV (Chum TV) March 19, 2009 "Helmets and the death of Natasha Richardson"

2.    CBC French Radio Canadienne SRC News, March 19, 2009. Natasha Richardson's death.

3.    CBC Radio Interview and call-in show. January 15, 2008.

4.    Calgary Herald, p. N12, December 27, 2007. "Boomers, seniors turn to mind-stretching games."

5.    CHQR Radio Morning Show, December 31, 2004. "SAD (Seasonal Affective Disorder)."

6.    CBC Calgary Eyeopener "Radio One Program" with Jim Brown, May 4, 2004. "Elderscam."

7.    CBC French Radio Canadienne SRC News, May 3, 2004 1800 & 2300 hrs. Re: "Postal scam of the elderly."

8.    Alberta ce Soir (CBRFT-TV), Edmonton, March 15, 2004, Ref #392476-10. Live Interview:  "Weighing benefits on health of visiting oxygen bar in Calgary."

9.    Calgary Herald, p. A1 and A6, July 2, 2003. "Brain experts pick city for meeting of minds."

10.   Globe and Mail, p. A17, April 23, 2002. "Horrible chiropractic hazards" by Margaret Wente.

11.   CBC Radio and Television, Calgary Eye Opener with Jeff Collins, 8:15 am, June 9, 1998. Live Interview: "Insulin and other new treatments for stroke."

12.   Calgary Herald, p. 2, June 3, 1998. "Quoted information on brain aneurysms in connection with rupture of aneurysm of David Walsh, founder of Bre-X minerals."

**CURRICULUM VITAE**
**Roland N. Auer**

13. CNN Interview, Headline News, August 29, 1995, Morning, August 30, 1995. Story: "Safety of monosodium glutamate."

14. TV (Channel 4) Appearance, Alberta Stroke Program, August 22, 1994. Story: "Discovery that insulin benefits ischemic brain damage."

15. TV (Channel 2) Appearance, Alberta Stroke Program, August 22, 1994. Story: "Discovery that insulin benefits ischemic brain damage."

16. CBC Radio Interview, August 17, 1994 and following days, Darrel Zerr, Interviewer.

17. Calgary Sun, Lifestyle Section, p. 45, May 6, 1994. "Silent attacker: Strokes can hit in the Prime of Life."

18. Ottawa Citizen, December 26, 1993 & London Free Press, December 27, 1993 (via Southam Star Network). Article: "Dad's stroke spurs researcher to discovery."

## PEER-REVIEWED

ResearcherID http://www.researcherid.com/rid/G-7164-2011 Publons h-index = 49, Google Scholar Hirsch index = 58; 11,416 literature citations (July 2020), 130 peer-reviewed articles.

1. **Auer RN**, Rice GPA, Amacher AL, Hinton GG, Gilbert JJ (1981) Cerebellar astrocytoma with benign histology and malignant clinical course *Journal of Neurosurgery* **54**:128-132 PMID: 7463115 http://doi.org/10.3171/jns.1981.54.1.0128  (68 citations)

2. **Auer RN**, Anderson R, Del Maestro RF (1981) A simple and reproducible experimental in vivo glioma model. *Canadian Journal of Neurological Sciences* **8**:325-331 PMID: 7326613 https://www.researchgate.net/publication/15871714  (106 citations)

3. **Auer RN**, Budney JL, Drake CG, Ball MJ (1982) Frontal lobe perivascular Schwannoma. *Journal of Neurosurgery* **56**:154-157 PMID: 7054414 http://doi.org/10.3171/jns.1982.56.1.0154  (74 citations)

4. **Auer RN**, Fox AJ, Kaufmann JCE (1982) The histologic effect of intraventricular injection of Metrizamide. *Archives of Neurology* **39**:60-61 PMID: 7055452 http://doi.org/10.1001/archneur.1982.00510130062018  (12 citations)

5. **Auer RN**, Gilbert JJ (1982) Cavum vergae without cavum septum pellucidum. *Archives of Pathology and Laboratory Medicine* **106**:462-463 PMID: 6896809 https://www.researchgate.net/publication/16301834  (27 citations)

6. Omojola MF, Fox AJ, **Auer RN**, Viñuela FV (1982) Hemorrhagic encephalitis produced by selective non-occlusive BCNU injection in the dog. *Journal of Neurosurgery* **57**:791-796 PMID: 7143062 http://doi.org/10.3171/jns.1982.57.6.0791  (35 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

7.  **Auer RN**, Becker LE (1983) Cerebral medulloepithelioma with bone, cartilage and striated muscle. *Journal of Neuropathology and Experimental Neurology* **42**:256-267 PMID: 6302229 http://doi.org/10.1097/00005072-198305000-00004  (71 citations)

8.  Nevander G, Ingvar M, **Auer RN**, Siesjö BK (1984) Irreversible neuronal damage after short periods of status epilepticus. *Acta Physiologica Scandinavic*a **120**:155-157 PMID: 6720326 http://doi.org/10.1111/j.1748-1716.1984.tb07388.x  (41 citations)

9.  **Auer RN**, Olsson Y, Siesjö BK (1984) Hypoglycemic brain injury in the rat. Correlation of density of brain damage with the EEG isoelectric time: A quantitative study. *Diabetes* **33**:1090-1098 PMID: 6500189 http://doi.org/10.2337/diab.33.11.1090  (393 citations)

10. **Auer RN**, Wieloch T, Olsson Y, Siesjö BK (1984) The distribution of hypoglycemic brain damage. *Acta Neuropathologica* **64**:177-191 PMID: 6496035 http://doi.org/10.1007/BF00688108  (430 citations)

11. Smith M-L, **Auer RN**, Siesjö BK (1984) The density and distribution of ischemic brain injury in the rat after 2 - 10 minutes of forebrain ischemia. *Acta Neuropathologica* **64**:319-332 PMID: 6507048 http://doi.org/10.1007/BF00690397  (1,048 citations)

12. **Auer RN**, Kalimo H, Olsson Y, Siesjö BK (1985) The temporal evolution of hypoglycemic brain damage. I. Light and electron microscopic findings in the rat cerebral cortex. *Acta Neuropathologica* **67**:13-24 PMID: 4024866 http://doi.org/10.1007/BF00688120  (241 citations)

13. **Auer RN**, Kalimo H, Olsson Y, Siesjö BK (1985) The temporal evolution of hypoglycemic brain damage. II. Light and electron microscopic findings in the rat hippocampus. *Acta Neuropathologica* **67**:25-36 PMID: 4024869 http://doi.org/10.1007/BF00688121  (120 citations)

14. Kalimo H, **Auer RN**, Siesjö BK (1985) The temporal evolution of hypoglycemic brain damage. III. Light and electron microscopic findings in the rat caudoputamen. *Acta Neuropathologica* **67**:37-50 PMID: 4024870 http://doi.org/10.1007/BF00688122  (73 citations)

15. Wieloch T, Engelsen B, Westerberg E, **Auer R** (1985) Lesions of the glutamatergic cortico-striatal projections ameliorate hypoglycemic brain damage in the striatum. *Neuroscience* **58**:25-30 PMID: 2864666 http://doi.org/10.1016/0304-3940(85)90323-4 (122 citations)

16. **Auer R**, Kalimo H, Olsson Y, Wieloch T (1985) The dentate gyrus in hypoglycemia. Pathology implicating excitotoxin mediated neuronal necrosis. *Acta Neuropathologica* **67**:279-288 PMID: 4050343 http://doi.org/10.1007/BF00687813   (119 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

17.  Nevander G, Ingvar M, **Auer RN**, Siesjö BK (1985) Status epilepticus in well oxygenated rats causes neuronal necrosis. *Annals of Neurology* **18**:281-290 PMID: 4051457 http://doi.org/10.1002/ana.410180303  (348 citations)

18.  Fredriksson K, **Auer RN**, Kalimo H, Olsson Y, Johansson BB (1985) Cerebrovascular lesions in stroke-prone spontaneously hypertensive rats. *Acta Neuropathologica* 68:284-294 PMID: 4090940 http://doi.org/10.1007/BF00690831  (85 citations)

19.  Kiessling M, **Auer RN**, Kleihues P, Siesjö BK (1986) Cerebral protein synthesis during long-term recovery from severe hypoglycemia. *Journal of Cerebral Blood Flow and Metabolism* **6**:42-51 PMID: 3944215 http://doi.org/10.1038/jcbfm.1986.6  (38 citations)

20.  **Auer RN**, Hall P, Ingvar M, Siesjö BK (1986) Hypotension as a complication of hypoglycemia leads to enhanced energy failure but no increase in neuronal necrosis. *Stroke* **17**:442-449 PMID: 3715941 http://doi.org/10.1161/01.STR.17.3.442  (28 citations)

21.  Lindvall O, **Auer RN**, Siesjö BK (1986) Selective lesions of mesostriatal dopamine neurons ameliorate hypoglycemic damage in the caudate-putamen. *Experimental Brain Research* **63**:382-386 PMID: 3758254 http://doi.org/10.1007/BF00236856  (27 citations)

22.  Kalimo H, Fredriksson K, Nordborg C, **Auer RN**, Olsson Y, Johansson B (1986) The spread of brain edema in hypertensive brain injury. *Medical Biology* **64**:133-137 PMID: 3747621 http://europepmc.org/abstract/med/3747621  (49 citations)

23.  **Auer RN**, Ingvar M, Nevander G, Olsson Y, Siesjö BK (1986) Early axonal lesion and preserved microvasculature in epilepsy-induced hypermetabolic necrosis of the substantia nigra. *Acta Neuropathologica* **71**:207-215 PMID: 3799137 http://doi.org/10.1007/BF00688041  (47 citations)

24.  **Auer RN** (1986) Progress Review: Hypoglycemic brain damage. *Stroke* **17**:699-708 PMID: 3526646 http://doi.org/10.1161/01.STR.17.4.699  (302 citations)

25.  Lindvall O, **Auer RN**, Siesjö BK (1988) Mechanisms of hypoglycemic brain damage. Evidence against a significant role of the noradrenergic locus ceruleus system. *Experimental Brain Research* **73**:219-223 PMID: 3145210 http://doi.org/10.1007/bf00279676  (5 citations)

26.  Ingvar M, Morgan PF, **Auer RN** (1988) The nature and timing of excitotoxic neuronal necrosis in the cerebral cortex, hippocampus and thalamus due to prolonged seizure activity. *Acta Neuropathologica* **75**:362-369 PMID: 3364160 http://doi.org/10.1007/BF0068778  (127 citations)

27.  **Auer RN**, Gallagher JC, Butt JC (1988) Solitary asymptomatic plaque of demyelination in the medulla oblongata. *Clinical Neuropathology* **77**:225-227 PMID: 3208460 http://www.researchgate.net/publication/19946759  (3 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

28.     Jensen ML, **Auer RN** (1988) Ketamine fails to protect against ischaemic neuronal necrosis in the rat. *British Journal of Anaesthesia* **61**:206-210 PMID: 3415892 http://doi.org/10.1093/bja/61.2.206  (61 citations)

29.     Voll CL, **Auer RN** (1988) The effect of post-ischemic blood glucose levels on the density and distribution of ischemic neuronal necrosis and infarction in the rat. *Annals of Neurology* **24**:638-646 PMID: 3059989 http://doi.org/10.1002/ana.410240508  (138 citations)

30.     **Auer RN**, Siesjö BK (1988) Biological differences between ischemia, hypoglycemia, and epilepsy. *Annals of Neurology* 24:699-707 PMID: 3061362 http://doi.org/10.1002/ana.410240602  (403 citations)

31.     Winder TR, **Auer RN** (1989) Sensory neuron degeneration in familial Kugelberg-Welander disease. *Canadian Journal of Neurological Sciences* **16**:67-70 PMID: 2924211 https://www.researchgate.net/publication/20232470  (11 citations)

32.     Jensen ML, **Auer RN** (1989) Intraventricular infusion of 2-amino-7-phosphonoheptanoate  (APH) mitigates ischemic brain damage. *Neurological Research* **11**:37-40 PMID: 2565549 https://www.researchgate.net/publication/20589719  (8 citations)

33.     **Auer RN**, Bell RB, Lee MA (1989) Neuropathy with onion bulb formations and pure motor manifestations. *Canadian Journal of Neurological Sciences* **16**:194-197 PMID: 2543490 https://www.researchgate.net/publication/20611643  (87 citations)

34.     Voll CL, Whishaw IQ, **Auer RN** (1989) Postischemic insulin reduces spatial learning deficit following transient forebrain ischemia. *Stroke* **20**:646-651 PMID: 2655186 http://doi.org/10.1161/01.STR.20.5.646  (93 citations)

35.     **Auer RN**, Jensen ML, Whishaw IQ (1989) Neurobehavioural deficit due to ischemic brain damage limited to half of the CA1 sector of the hippocampus. *Journal of Neuroscience* **9**:1641-1647 PMID: 2723745 PMCID: PMC6569828 http://www.jneurosci.org/content/9/5/1641.full.pdf+html  (274 citations)

36.     **Auer RN**, Hugh J, Cosgrove E, Curry B (1989) Neuropathologic findings in three cases of profound hypoglycemia. *Clinical Neuropathology* **8**:63-68 PMID: 2721042 https://www.researchgate.net/publication/20435278  (142 citations)

37.     Rod MR, **Auer RN** (1989) Pre- and post-ischemic administration of dizocilpine (MK-801) reduces brain damage after transient forebrain ischemia in the rat. *Canadian Journal of Neurological Sciences* **16**:340-344 https://www.researchgate.net/publication/20486387  (73 citations)

38.     Whishaw IQ, **Auer RN** (1989) Immediate and long-lasting effects of MK-801 on motor activity, spatial navigation in a swimming pool and EEG in the rat. *Psychopharmacology* **98**:500-507 PMID: 2505290 http://doi.org/10.1007/BF00441949  (183 citations)

## CURRICULUM VITAE
### Roland N. Auer

39.  Heyes MP, Papagapiou MP, Markey S, **Auer RN** (1990) Brain and plasma quinolinic acid in profound insulin-induced hypoglycemia. *Journal of Neurochemistry* **54**:1027-1033 PMID: 1689373 http://doi.org/10.1111/j.1471-4159.1990.tb02353.x  (27 citations)

40.  Rod MR, Whishaw IQ, **Auer RN** (1990) The relationship of structural ischemic brain damage to neurobehavioural deficit: the effect of postischemic MK-801. *Canadian Journal of Psychology* **44**:196-209 PMID: 2200595 http://doi.org/10.1037/h0084242  (73 citations)

41.  Papagapiou MP, **Auer RN** (1990) Regional neuroprotective effects of the NMDA receptor antagonist MK-801 (dizocilpine) in hypoglycemic brain damage. *Journal of Cerebral Blood Flow and Metabolism* **10**:270-276 PMID: 2154510 http://doi.org/10.1038/jcbfm.1990.44  (82 citations)

42.  Voll CL, **Auer RN** (1991) Postischemic seizures and necrotizing ischemic brain damage: Neuroprotective effect of postischemic diazepam and insulin. *Neurology* **41**:423-428 PMID: 2006013 http://doi.org/10.1212/WNL.41.3.423  (83 citations)

43.  Numerow LM, Krcek JP, Wallace CJ, Tranmer BI, **Auer RN**, Fong T (1991) Growing skull fracture simulating a rounded lytic calvarial lesion. *American Journal of Neuroradiology* **12**:783-784 PMID: 1882767 https://www.researchgate.net/publication/21272754  (15 citations)

44.  Voll CL, **Auer RN** (1991) Insulin attenuates ischemic brain damage independent of its hypoglycemic effect. *Journal of Cerebral Blood Flow and Metabolism* **11**:1006-1014 PMID: 1939378 http://doi.org/10.1038/jcbfm.1991.168  (207 citations)

45.  Jensen ML, **Auer RN** (1991) Intraventricular infusion of the selective σ-agonist 1,3-di-ortho-tolylguanidine mitigates ischemic brain damage in the hippocampus. *Neurological Research* **13**:257-260 PMID: 1687337 https://www.researchgate.net/publication/21469111  (6 citations)

46.  **Auer RN** (1991) Excitotoxic mechanisms, and age-related susceptibility to brain damage in ischemia, hypoglycemia and toxic mussel poisoning. *Neurotoxicology* **12**:541-546 PMID: 1684035 https://www.researchgate.net/publication/21471799 (46 citations)

47.  Rod MR, **Auer RN** (1992) Combination therapy with nimodipine and dizocilpine in a rat model of transient forebrain ischemia. *Stroke* **23**:725-732 PMID: 1579971 http://doi.org/10.1161/01.STR.23.5.725  (52 citations)

48.  Anderson LG, Zhao D, Dell K, Severson DL, **Auer RN** (1993) Brain protein kinase C assay using MARCKS substrate reveals no translocation due to profound insulin-induced hypoglycemia. *Brain Research* **606**:187-194 PMID: 8490715 http://doi.org/10.1016/0006-8993(93)90983-t  (4 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

49.  Wallace CJ, Fong TC, **Auer RN** (1993) Cystic intracranial schwannoma. *Canadian Association of Radiologists Journal* **44**:453-459 PMID: 8252428 https://www.researchgate.net/publication/14947720  (34 citations)

50.  Baldelli RJ, Green FHY, **Auer RN** (1993) Sulfide toxicity in rats: Mechanical ventilation and hypotension determine survival and brain necrosis. *Journal of Applied Physiology* **75**:1348-1353 PMID: 8226550 https://www.researchgate.net/publication/14971838  (27 citations)

51.  **Auer RN**, Siesjö BK (1993) Hypoglycaemia: Brain Neurochemistry and Neuropathology. *Baillière's Clinical Endocrinology and Metabolism*; International Practice and Research. Volume 7:3. Aynsley-Green A, Gregory JW (*eds*). Chapter 4. pp 611-625, Baillière Tindall, London PMID: 8379907 http://doi.org/10.1016/s0950-351x(05)80210-1  (223 citations)

52.  Hasan SU, Sarnat HB, **Auer RN** (1993) Vagal nerve maturation in the fetal lamb: An ultrastructural and morphometric study. *The Anatomical Record* **237**:527-537 PMID: 8311266 http://doi.org/10.1002/ar.1092370413  (20 citations)

53.  **Auer RN** (1994) Multifocal Motor Neuropathy. *Annals of Neurology* 35:246-247 PMID: 8109909 http://doi.org/10.1002/ana.410350224  (2 citations)

54.  **Auer RN**, Coulter KC (1994) The nature and time course of neuronal vacuolation induced by the NMDA antagonist MK-801. *Acta Neuropathologica* **87**:1-7 PMID: 8140890 http://doi.org/10.1007/BF00386248  (69 citations)

55.  Zhu CZ, **Auer RN** (1994) Intraventricular administration of insulin and IGF-1 in transient forebrain ischemia. *Journal of Cerebral Blood Flow and Metabolism* 14:237-242 PMID: 8113320 http://doi.org/10.1038/jcbfm.1994.30  (153 citations)

56.  Zhu CZ, **Auer RN** (1994) Centrally administered insulin and IGF-1 in transient forebrain ischemia in fasted rats. *Neurological Research* **16**:116-120 PMID: 7913995 https://www.researchgate.net/publication/15285228  (25 citations)

57.  **Auer RN**, Krcek J, Butt JC (1994) Delayed symptoms and death following minor head trauma with occult vertebral artery injury. *Journal of Neurology, Neurosurgery and Psychiatry* **57**:500-502 PMID: 8164004 PMCID: PMC1072884 http://doi.org/10.1136/jnnp.57.4.500  (52 citations)

58.  **Auer RN** (1994) Automated nerve fiber size and myelin sheath measurement using microcomputer-based digital image analysis: theory, method and results. *Journal of Neuroscience Methods* **51**:229-238 PMID: 8051953 http://doi.org/10.1016/0165-0270(94)90015-9  (69 citations)

59.  Whishaw IQ, Rod MR, **Auer RN** (1994) Behavioral deficits revealed by multiple tests in rats with ischemic damage limited to half of the CA1 sector of the hippocampus. *Brain Research Bulletin* **34**:283-289 PMID: 8055352 http://doi.org/10.1016/0361-9230(94)90065-5  (51 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

60.  **Auer RN** (1994) Assessing structural changes in the brain to evaluate neurotoxicological effects of NMDA receptor antagonists. *Psychopharmacology Bulletin* **30**:585-591 PMID: 7770624 https://www.researchgate.net/publication/15427817  (20 citations)

61.  Hamilton MG, Tranmer BI, **Auer RN**: Insulin reduction of cerebral infarction due to transient focal ischemia. *Journal of Neurosurgery* **82**:262-268 (1995) PMID: 7815155 http://doi.org/10.3171/jns.1995.82.2.0262  (192 citations)

62.  **Auer RN** (1995) Combination therapy with U74006F (tirilazad mesylate), MK-801, insulin and diazepam in transient forebrain ischaemia. *Neurological Research* **17**:132-136 PMID: 7609850 https://www.researchgate.net/publication/15588994  (25 citations)

63.  Gaul HP, Wallace CJ, **Auer RN**, Fong TC: MR findings in methanol intoxication: Case report. *American Journal of Neuroradiology* **16**:1783-1786 (1995) PMID: 8693975 http://www.ajnr.org/cgi/reprint/16/9/1783.pdf  (102 citations)

64.  Zhu CZ, **Auer RN** (1995) Graded hypotension and MCA occlusion duration: Effect in transient focal ischemia. *Journal of Cerebral Blood Flow and Metabolism* **15**:980-988 PMID: 7593359 http://doi.org/10.1038/jcbfm.1995.124  (91 citations)

65.  **Auer RN**, Anderson LG: Hypoglycemic brain damage: Effect of a dihydropyridine voltage-sensitive calcium channel antagonist. *Diabetologia* **39**:129-134 (1996) PMID: 8635663 http://doi.org/10.1007/bf00403954  (17 citations)

66.  **Auer RN**, Rowlands CG, Perry SF, Remmers JE (1996) Multiple sclerosis with medullary plaques and fatal sleep apnea (Ondine's curse). *Clinical Neuropathology* **15**:101-105 PMID: 8925593 https://www.researchgate.net/publication/14280754  (52 citations)

67.  Zochodne DW, Semmler RT, Ludwin SK, **Auer RN** (1996) Acute fulminant symmetrical vasculitic polyneuropathy: need for early biopsy. *Clinical Neuropathology* **15**:113-115 PMID: 8925595 https://www.researchgate.net/publication/14280756 (7 citations)

68.  Colbourne F, Sutherland GR, **Auer RN** (1996) An automated system for regulating brain temperature in awake and freely-moving rodents. *Journal of Neuroscience Methods* **67**:185-190 PMID: 8872884 http://doi.org/10.1016/s0165-0270(96)00047-7  (78 citations)

69.  **Auer RN**: Points of View (1996) Early application of the results of animal experimentation to human clinical trials: con. *Journal of Neurosurgical Anesthesiology* **8**:73-77 PMID: 8719196 http://doi.org/10.1097/00008506-199601000-00025 (2 citations)

70.  **Auer RN**, Coupland SG, Jason GW, Archer DP, Payne J, Belzberg A, Ohtaki M, Tranmer BI (1996) Post-ischemic therapy with MK-801 (Dizocilpine) in a primate model of transient focal brain ischemia. *Molecular and Chemical Neuropathology* **29**:193-210 PMID: 8971696 http://doi.org/10.1007/BF02815002 (31 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

71. Luvisotto TLC, **Auer RN**, Sutherland GR (1996) The effect of mannitol on experimental cerebral ischemia - revisited. *Neurosurgery* **38**:131-139 PMID: 8747961 http://doi.org/10.1097/00006123-199601000-00031  (89 citations)

72. **Auer RN** (1996) Effect of age and sex on NMDA antagonist-induced neuronal necrosis in rats. *Stroke* **27**:743-746 PMID: 8614941 http://doi.org/10.1161/01.STR.27.4.743  (72 citations)

73. Sutherland GR, Dix G, **Auer RN** (1996) Effect of age in rodent models of focal and forebrain ischemia. *Stroke* **27**:1663-1668 PMID: 8784145 http://doi.org/10.1161/01.STR.27.9.1663 (156 citations)

74. **Auer RN**, Alakija P, Sutherland GR (1996) Asymptomatic large pituitary adenomas discovered at autopsy. *Surgical Neurology* **46**:28-31 PMID: 8677484 http://doi.org/10.1016/0090-3019(96)00085-7 (34 citations)

75. Cregan EF, Peeling J, Corbett D, Buchan AM, Saunders J, **Auer RN**, Gao M, McCarthy DJ, Eisman MS, Campbell TM, Murray RJ, Stagnitto ML, Palmer GC (1997) [(+)-alpha-Phenyl-2-Pyridine-Ethanamine Hydrochloride], a low affinity uncompetitive N-Methyl-D-Aspartic acid antagonist, is effective in rodent models of global and focal ischemia. *Journal of Pharmacology and Experimental Therapeutics* **283**:1412-1424 PMID: 9400017 http://jpet.aspetjournals.org/content/283/3/1412.full (35 citations)

76. **Auer RN** (1997) Structural neurotoxicologic investigation of the glycine antagonist 5-nitro-6, 7-dichloroquinoxalinedione (ACEA-1021). *Neurotoxicology* **18**:53-62 PMID: 9215988 https://www.researchgate.net/publication/14003495 (14 citations)

77. Colbourne F, **Auer RN**, Sutherland GR: Characterization of postischemic behavioral deficits in gerbils with and without hypothermic neuroprotection. *Brain Research* **803**:69-78 (1998) PMID: 9729285 http://doi.org/10.1016/S0006-8993(98)00612-X (93 citations)

78. **Auer RN**: Insulin, Blood Glucose Levels, and Ischemic Brain Damage. *Neurology* 51 (suppl. 3) "Current Advances in the Management of Stroke", S39-S43, 1998 PMID: 9744832 http://www.neurology.org/content/51/3_Suppl_3/S39.abstract (138 citations)

79. Auer IA, **Auer RN** (1998) Metastatic dermatofibrosarcoma protuberans mimicking meningioma. *Clinical Neuropathology* **17**:190-193 PMID: 9707332 https://www.researchgate.net/publication/13578641 (24 citations)

80. Tsoi M, Rhee K-H, Bungard D, Li X-F, Lee S-L, **Auer RN**, Lytton J (1998) Molecular cloning of a novel potassium-dependent sodium-calcium exchanger from rat brain. *Journal of Biological Chemistry* **273**:4155-4162 PMID: 9461611 http://doi.org/10.1074/jbc.273.7.4155 (132 citations)

81. Colbourne F, **Auer RN**, Sutherland GR (1998) Behavioral testing does not exacerbate ischemic CA1 damage in gerbils *Stroke* **29**:1967-1971 PMID: 9731625 http://doi.org/10.1161/01.STR.29.9.1967 (42 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

82. Colbourne F, Sutherland GR, **Auer RN** (1999) Electron microscopic evidence against apoptosis as the mechanism of ischemic neuronal death. *Journal of Neuroscience* **19**:4200-4210 PMID: 10341224 PMCID: PMC6782610 http://www.jneurosci.org/content/19/11/4200.full#sec-1 (380 citations)

83. Colbourne F, Rakić D, **Auer RN** (1999) The effect of temperature and scopolamine on N-Methyl-D-Aspartate antagonist-induced neuronal necrosis in the rat. *Neuroscience* **90**:87-94 PMID: 10188936 http://doi.org/10.1016/S0306-4522(98)00375-3 (11 citations)

84. **Auer RN** (2000) Editorial - Hemicraniectomy for ischemic stroke: temerity or death cure? *Canadian Journal of Neurological Sciences* **27**:269 PMID: 11097511 http://doi.org/10.1017/S0317167100000950 (4 citations)

85. Miyamoto O, **Auer RN** (2000) Hypoxia, hyperoxia, ischemia and brain necrosis. Neurology **54**:362-370 PMID: 10668697 http://doi.org/10.1212/WNL.54.2.362 (204 citations)

86. Weeks SG, Silva C, **Auer RN**, Doig CJ, Gill MJ, Power C (2001) Encephalopathy associated with Staphylococcal endocarditis: Multiple neuropathologic findings. *Canadian Journal of Neurological Sciences* **28**:260-264 PMID: 11513347 http://doi.org/10.1017/S0317167100001438 (10 citations)

87. **Auer RN** (2001) Non-pharmacologic (physiologic) neuroprotection in the treatment of brain ischemia. *Annals of the New York Academy of Sciences* 939:271-282, 2001 PMID: 11462780 10.1111/j.1749-6632.2001.tb03635.x (107 citations) ISBN 1-57331-352-1

88. Slikker W, Jr, Jonas S, **Auer RN**, Palmer GC, Narahashi T, Youdim MBH, Maynard KI, Carbone KM, Trembly B (2001) Neuroprotection - Past Successes and Future Challenges. *Annals of the New York Academy of Sciences* 939:465-477, 2001 (8 citations) ISBN 1-57331-352-1

89. Barber PA, **Auer RN**, Buchan AM, Sutherland GR (2001) Understanding and managing ischemic stroke *Canadian Journal of Physiology and Pharmacology* **79**:283-296 PMID: 11294605 http://doi.org/10.1139/cjjp-79-3-283 (87 citations)

90. Flynn EP, **Auer RN** (2002) Eubaric hyperoxemia and experimental cerebral infarction. *Annals of Neurology* **52**:566-572 PMID: 12402253 http://doi.org/10.1002/ana.10322 (120 citations)

91. Fewell JE, Eliason HL, **Auer RN** (2002) Peri-OVLT E-series prostaglandins and core temperature do not increase after intravenous IL-1ß in pregnant rats. *Journal of Applied Physiology* **93**:531-536 PMID: 12133861 http://doi.org/10.1152/japplphysiol.01036.2001 (16 citations)

92. Shibuya S, Miyamoto O, **Auer RN**, Itano T, Mori S, Norimatsu H (2002) Embryonic intermediate filament, nestin, expression following traumatic spinal cord injury in adult

Page 19

**CURRICULUM VITAE**
**Roland N. Auer**

rats. *Neuroscience* **114**:905-915 PMID: 12379246 http://doi.org/10.1016/S0306-4522(02)00323-8  (129 citations)

93.  Achim C, **Auer R**, Bergeron C, Cardozo A, Deprez M, de Vos R, Duyckaerts C, Egensperger R, Esiri M, Frosch MP, Giannini C, Goebel HH, Graeber MB, Graham DI, Gray F, Haltia M, Hashizume Y, Ikeda K, Ironside JW, Kreutzberg GW, Lantos P, Lowe J, Ludwin S, Matsumoto Y, Olsson Y, Sasaki A, Scheithauer BW, Takahashi H, Tolnay M, Trojanowski JQ, Troost D, de F Webster H. (2002) Global democratic consensus on neuropathological disease criteria. *Lancet Neurology* **1**(6):340 PMID: 12849392 http://doi.org/10.1016/S1474-4422(02)00156-4  (7 citations)

94.  Zochodne DW, **Auer R,** Fritzler MJ (2003) Longstanding ataxic demyelinating polyneuropathy with a novel autoantibody. *Neurology* **60**:127-129 PMID: 12525735 http://doi.org/10.1212/01.WNL.0000040660.76868.3C  (8 citations)

95.  Kelly JJ, **Auer RN** (2003) Brief Report: Mefenamate, an agent that fails to attenuate experimental cerebral infarction. *Canadian Journal of Neurological Sciences* **30**:259-262 PMID: 12945952 http://doi.org/10.1017/S0317167100002699 (5 citations)

96.  Zygun DA, Doig CJ, **Auer RN**, Laupland KB, Sutherland GR (2003) Therapeutic hypothermia in severe traumatic brain injury: A 2003 Update. *Canadian Journal of Neurological Sciences* **30**:307-313 PMID: 14672261 http://doi.org/10.1017/S0317167100003000 (16 citations)

97.  **Auer RN** (2003) Diffuse cerebral infarction after cardiac arrest. *New England Journal of Medicine* **348**:2689 PMID: 12826648 http://doi.org/10.1056/NEJM200306263482618  (1 citation)

98.  **Auer RN**, McDonald DS (2003) Anatomy is still essential. *Canadian Medical Association Journal* **168**:829 PMID: 12668532 PMCID: PMC151979 http://www.cmaj.ca/content/168/7/829.1.full (4 citations)

99.  Nakagawa T, Miyamoto O, Janjua NA, **Auer RN**, Nagao S, Itano T (2004) Localization of nestin in amygdaloid kindled rat: an immunoelectron microscopic study. *Canadian Journal of Neurological Sciences* **31**:514-519 PMID: 15595259 https://www.researchgate.net/publication/8134492_Localization_of_nestin_in_amygdaloid_kindled_rat_an_immunoelectron_microscopic_study (9 citations)

100.  **Auer RN** (2004) Hypoglycemic brain damage. *Forensic Science International* **146**:105-110 PMID: 15542270 http://doi.org/10.1016/j.forsciint.2004.08.001  (425 citations)

101.  Zhu CZ, **Auer RN** (2004) Optimal blood glucose levels while using insulin to minimize the size of infarction in focal cerebral ischemia. *Journal of Neurosurgery* **101**:664-668 PMID: 15481723 http://doi.org/10.3171/jns.2004.101.4.0664  (87 citations)

102.  Nakamura T, Miyamoto O, **Auer RN**, Nagao S, Itano T (2004) Delayed precursor cell marker expression in hippocampus following cold-induced cortical injury in mice.

**CURRICULUM VITAE**
**Roland N. Auer**

*Journal of Neurotrauma* **21**:1747-1755 PMID: 15684766
http://doi.org/10.1089/neu.2004.21.1747 (14 citations)

103. **Auer RN** (2004) Hypoglycemic brain damage. *Metabolic Brain Disease* **19**:169-175
PMID: 15554413 http://doi.org/10.1023/B:MEBR.0000043967.78763.5b (126 citations)

104. Lambert J, Lamothe JM, Zernicke RF, **Auer RN**, Reimer RA (2005) Dietary restriction
does not adversely affect bone geometry and mechanics in rapidly growing male Wistar
rats. *Pediatric Research* **57**:227-231 PMID: 15585686
http://doi.org/10.1203/01.PDR.0000148715.61869.4E (38 citations)

105. **Auer RN**, Sutherland GR (2005) Primary intracerebral hemorrhage: pathophysiology.
*Canadian Journal of Neurological Sciences* 32 Suppl 2:S3-12, PMID:
16450803 http://doi.org/10.1017/S0317167100003322 (94 citations)

106. Gharbawie OA, **Auer RN**, Whishaw IQ (2006) Subcortical middle cerebral artery
ischemia abolishes the digit flexion and closing used for grasping in rat skilled reaching.
*Neuroscience* **137**:1107-1118 PMID: 16352401
http://doi.org/10.1016/j.neuroscience.2005.10.043 (44 citations)

107. Spencer SJ, **Auer RN**, Pittman QJ (2006) Rat neonatal immune challenge alters adult
responses to cerebral ischaemia. *Journal of Cerebral Blood Flow and Metabolism*
**26**:456-467 PMID: 16094315 http://doi.org/10.1038/sj.jcbfm.9600206 (44 citations)

108. Sutherland GR, **Auer RN** (2006) Primary intracerebral hemorrhage. *Journal of Clinical
Neurosciences* **13**:511-517 PMID: 16769513 http://doi.org/10.1016/j.jocn.2004.12.012
(205 citations)

109. Sutherland GR, Tyson RL, **Auer RN** (2008) Truncation of the Krebs cycle during
hypoglycemic coma. *Medicinal Chemistry* **4**:379-385 PMID: 18673151
http://doi.org/10.2174/157340608784872235 (48 citations)

110. Almekhlafi MA, Hu WY, Hill MD, **Auer RN** (2008) Calcification and endothelialization
of thrombi in acute stroke. *Annals of Neurology* **64**:344-348 PMID: 18570298
http://doi.org/10.1002/ana.21404 (58 citations)

111. Kherani ZS, **Auer RN** (2008) Pharmacologic analysis of the mechanism of dark neuron
production in aldehyde-fixed nervous tissue. *Acta Neuropathologica* 116:447-452
PMID: 18521615 http://doi.org/10.1007/s00401-008-0386-y (77 citations)

112. McCombe JA, **Auer RN**, Maingat FG, Houston S, Gill MJ, Power C (2009) Neurologic
immune reconstitution inflammatory syndrome in HIV/AIDS: outcome and
epidemiology. *Neurology* **72**:835-841 PMID: 19255411
http://doi.org/10.1212/01.wnl.0000343854.80344.69 (99 citations)

113. Kelly JJP, Stechishin O, Chojnacki A, Lun X, Sun B, Senger DL, Forsyth P, **Auer RN**,
Dunn JF, Cairncross JG, Parney IF, Weiss S (2009) Proliferation of human glioblastoma

**CURRICULUM VITAE**
**Roland N. Auer**

stem cells occurs independently of exogenous mitogens. *Stem Cells* **27**:1722-1733 PMID: 19544433 http://doi.org/10.1002/stem.98 (187 citations)

114. Wiltshire KM, Dunham C, Reid S, **Auer RN**, Suchowersky O (2010) Neuronal Intranuclear Inclusion Disease Presenting as Juvenile Parkinsonism. *Canadian Journal of Neurological Sciences* **37**:213-218 PMID: 20437931 http://doi.org/10.1017/S031716710000994X (13 citations)

115. Reimer RA, Maurer AD, Lau DCW, **Auer RN** (2010) Long-term dietary restriction influences plasma ghrelin and GOAT mRNA level in rats. *Physiology & Behavior* **99**:605-610 PMID: 20149910 PMCID: PMC3827011 http://doi.org/10.1016/j.physbeh.2010.01.034 (43 citations)

116. Kelly JJP, Blough MD, Stechishin ODM, Perizzolo M, Demetrick DJ, Steele L, **Auer RN**, Hader WJ, Westgate M, Parney IF, Jenkins R, Cairncross JG, Weiss S (2010) Oligodendroglioma cell lines containing t(1;19)(q10;p10). *Neuro-oncology* **12**:745-755 PMID: 20388696 PMCID: PMC2940664 http://doi.org/10.1093/neuonc/noq031 (71 citations)

117. Fletcher WF, Almekhlafi M, **Auer RN** (2012) Multiple Cranial Neuropathies Evolving over a Decade from Occult Perineural Basal Cell Carcinoma. *Archives of Neurology* **69**:134-135 PMID: 22232357 http://doi.org/10.1001/archneurol.2011.1064

118. Sarnat HB, Flores-Sarnat L, **Auer RN** (2013) Synaptogenesis in the fetal corpus striatum, globus pallidus and substantia nigra. Correlations with striosomes of Graybiel and dyskinesias of premature infants. *Journal of Child Neurology* **28**:60-69 PMID: 22532552 http://doi.org/10.1177/0883073812439752 (18 citations)

119. Sarnat HB, Flores-Sarnat L, **Auer RN** (2013) Sequence of synaptogenesis in the fetal neonatal cerebellar system – part 1: Guillain-Mollaret triangle (dentate-rubro-olivo-cerebellar circuit). *Developmental Neuroscience* **35**:69-81 PMID: 23689557 http://doi.org/10.1159/000350503 (15 citations)

120. Sarnat HB, Flores-Sarnat L, **Auer RN** (2013) Synaptogenesis in the fetal neonatal cerebellar system – part 2: pontine nuclei and cerebellar cortex. *Developmental Neuroscience* **35**:317-325 PMID: 23796553 http://doi.org/10.1159/000351031 (13 citations)

121. **Auer RN** (2013) John Kaufmann (1924-2013) *Brain Pathology* **23**:489-491 PMID: 23773605 http://doi.org/10.1111/bpa.12058

122. Lama S, **Auer RN**, Tyson R, Gallagher CN, Tomanek B, Sutherland GR (2014) Lactate in Severe Traumatic Brain Injury. *Journal of Biological Chemistry* **289**:20200-20208 PMID: 24849602 PMCID: PMC4106336 http://doi.org/10.1074/jbc.M114.570978 (45 citations)

123. Bissel SJ, **Auer RN**, Chiang C-H, Kofler J, Hurdoch GH, Nix WA, Painter M, Richer M, Sartelet H, Wang G, Wiley CA (2015) Human Parechovirus 3 Meningitis and Fatal

**CURRICULUM VITAE**
**Roland N. Auer**

Leukoencephalopathy. *Journal of Neuropathology and Experimental Neurology* **74**:767-777 PMID: 26115191 http://doi.org/10.1097/NEN.0000000000000215  (42 citations)

124.  Cao M, Cortes M, Moore CS, Leong S, Durosier LD, Burns P, Fecteau G, Desrochers A, **Auer RN**, Barreiro L, Antel J, Frasch MG (2015) Fetal Microglial *in vitro* Phenotype Carries Memory of Prior *in vivo* Exposure to Inflammation. *Frontiers in Cellular Neuroscience*, **9**: article 294, 1-17 PMID: 26300730 PMCID: PMC4524165 http://doi.org/10.3389/fncel.2015.00294 (35 citations)

125.  Garman RH, Li AA, Kaufmann W, **Auer RN**, Bolon B (2016) Recommended Methods for Brain Processing and Quantitative Analysis in Rodent Developmental Neurotoxicity Studies. *Toxicologic Pathology* **44**:14-42 PMID: 26296631 http://doi.org/10.1177/0192623315596858  (17 citations)

126.  **Auer RN**, Laganière JL, Robitaille YO, Richardson J, Dion PA, Rouleau GA, Shekarabi M. KCC3 Axonopathy (2016) Neuropathological Features in the Central and Peripheral Nervous System. *Modern Pathology* **29**:962-976 PMID: 27230413 http://doi.org/10.1038/modpathol.2016.90  (12 citations)

127.  Li AA, Sheets LP, Raffaele K, Moser V, Hofstra A, Hoberman A, Makris SL, Garman R, Bolon B, Kaufmann W, **Auer R**, Lau E, Vidmar T, Bowers WJ (2017) Recommendations for harmonization of data collection and analysis of developmental neurotoxicity endpoints in regulatory guideline studies: Proceedings of workshops presented at Society of Toxicology and joint Teratology Society and Neurobehavioral Teratology Society meetings. *Neurotoxicol Teratol* **63**:24-45 PMID: 28757310 PMCID: PMC6634984 https://dx.doi.org/10.1016/j.ntt.2017.07.001  (2 citations)

128.  Adams SJ, Kirk A, **Auer RN** (2018) Adult-onset leukoencephalopathy with axonal spheroids and pigmented glia (ALSP): Integrating the literature on hereditary diffuse leukoencephalopathy with spheroids (HDLS) and pigmentary orthochromatic leukodystrophy (POLD). *Journal of Clinical Neuroscience* **48**:42-49 PMID:29122458 http://doi.org/10.1016/j.jocn.2017.10.060  (17 citations)

129.  Olivier CJ, Li H, **Auer RN**, Dixit D (2019) Disseminated alveolar echinococcosis in a 74-year-old woman presenting with focal seizure. *Canadian Medical Association Journal* 191(34):E940-E943  PMID: 31451525  https://doi.org/10.1503/cmaj.181258 (1 citation)

130.  Rajput AH, Rajput EF, Bocking SM, **Auer RN**, Rajput A (2019) Parkinsonism in Essential Tremor Cases: A clinicopathological study. *Movement Disorders* **34**:1031-1040 PMID 31180613  https://doi.org/10.1002/mds.27729  (5 citations)

131.  Hernandez-Ronquillo L, Mahabadi HM, Moien-Afshari F, Wu A, Auer R, Zherebitskiy V, Borowsky R, Mickleborough M, Huntsman R, Vrbancic M, Cayabyab FS, Taghibiglou C, Carter A, Tellez-Zenteno JF (2020) The Concept of an Epilepsy Brain Bank. Review. *Front Neurol* **11**:833.  PMID: 32973652 PMCID: PMC7468480 https://doi.org/10.3389/fneur.2020.00833

CURRICULUM VITAE
Roland N. Auer

132.  Fehr CM, Auer RN (2020) Simultaneous Presentation of Glioblastoma Multiforme in Divorced Spouses *(in preparation)*

133.  Sharma P, Pittman QJ, **Auer RN** (2020) High Dose Stress Steroids Produced Dark Neurons, Not Dead Neurons *(in preparation)*

## BOOKS

1.  Oehmichen M, **Auer RN**, König HG: Forensic Neuropathology and Neurology. Springer-Verlag, October 2005, 686 pages. ISBN 3-540-235000-0, reviewed in *N Engl J Med* 355:103-104 http://www.springer.com/978-3-642-00698-2

## BOOK CHAPTERS, PROCEEDINGS

1.  **Auer RN**, Fox AJ, Kaufmann JCE: The histologic effect of intraventricular injection of Metrizamide, In: Matsumoto S, Satoh K, Tamaki N, Oi S (*eds*). Annual Review of Hydrocephalus. Vol 1. Neuron Publishing Co, Tokyo, Japan, 1983, p 19

2.  **Auer RN**, Smith M-L, Olsson Y, Siesjö BK: Localization and density of cell damage in ischemia, hypoglycemia, and status epilepticus. In: Bes A, Braquet P, Paoletti R, Siesjö BK (*eds*) Advances in Brain Ischemia Research. Vol I. Elsevier Press, Amsterdam, 1984, *pp 45-55*

3.  Wieloch T, **Auer RN**, Westerberg E, Tossman U, Ungerstedt U, Engelsen B: Hypoglycemic brain damage is mediated by excitotoxins. In: Roberts P, Storm-Mathisen J (*editors*) Excitatory Amino Acids. MacMillan Press, London, 1985 (1 citation)

4.  **Auer RN**, Smith M-L, Siesjö BK: Ischemic brain damage in the rat in a long term recovery model. In: Baethmann A (*ed*) NATO advanced study institute life sciences series. Mechanisms of Secondary Brain Damage. Plenum Publishing Corporation, New York, London, Washington, Boston, 1986, *pp 99-108*

5.  Jensen ML, **Auer RN**: The effects of parenteral ketamine and intraventricular APH in a rat model of transient ischemia. In: Krieglstein J (*ed*) Pharmacology of Cerebral Ischemia. Proceedings of the Second International Symposium on Pharmacology of Cerebral Ischemia held in Marburg (FRG) on 3-5 Oct. 1988. CRC Press, Inc., Boca Raton, Florida, 1988, *pp 217-220*

6.  Voll CL, **Auer RN**: Postischemic insulin ameliorates ischemic brain damage, In: Krieglstein J (*ed*) Pharmacology of Cerebral Ischemia. Proceedings of the Second International Symposium on Pharmacology of Cerebral Ischemia held in Marburg (FRG) on 3-5 Oct. 1988. CRC Press, Inc., Boca Raton, Florida, 1988, *pp 425-429*

**CURRICULUM VITAE**
**Roland N. Auer**

7.    **Auer RN**, Rod MR, Whishaw IQ: MK-801 (Dizocilpine): Efficacy and Limitations in Cerebral Ischemia. Brian Meldrum (*editor*), Excitatory Amino Acids, Vol. 5, Fidia Research Foundation Symposium Series. Raven Press, New York, 1991, *pp* 703-709 (5 citations)

8.    Siesjö BK, **Auer RN**: Pathophysiology and neuropathology of hypoglycemic brain damage. "Neuropathology" Supplement 4. Proceedings of the XIth International Congress of Neuropathology held in Kyoto, Japan, September 2-8, 1990. Humana Press, 1991. *pp* 467-469

9.    **Auer RN**: Modulation of Ischemic Neuronal Necrosis by Excitatory Amino Acid Antagonists. Daniel F. Hanley, MD (editor), Proceedings of the 1988 Scientific Meeting of the American Society for Neurological Investigation: Understanding the Biology of Human Cerebrovascular Disorders, 1991, *pp* 15-20

10.   **Auer RN**: Insulin, Hypoglycemia, and Ischemic Neuroprotection. Marangos PJ, Lal H (*editors*) Emerging Strategies in Neuroprotection. Chapter 14, *pp* 273-288. Birkhäuser, Boston, 1994.

11.   **Auer RN**: Workshop: Ischemia. Brain Pathology 4: 307-308 (1994) http://dx.doi.org/10.1111/j.1750-3639.1994.tb00911.x

12.   **Auer RN**, Benveniste H: Hypoxia and Related Conditions. Chapter 6, In: Graham D, Lantos P (*eds*) Greenfield's Neuropathology, 6th edition, *pp* 263-314, Edward Arnold, London, 1997 (54 citations)

13.   **Auer RN**: Histopathology of Cerebral Ischemia. Chapter 6, Section I. In: Ginsberg MD, Bogousslavsky J (*editors*) Cerebrovascular Disease, Volume 1, *pp* 90-101, 1997, Pathophysiology, Blackwell Science, Cambridge, MA, USA. (1 citation) ISBN 0-86542-425-X

14.   Colbourne F, **Auer RN**, Corbett D: Temperature Modulation in the Ischemic Maturation Phenomenon. In: Maturation Phenomena in Cerebral Ischemia II, U. Ito *et al* (*editors*) Springer-Verlag Berlin Heidelberg New York, *pp* 183-188, 1997

15.   **Auer RN:** Mechanisms of damage in pure hypoxic and pure ischemic brain insults. *Proceedings of the 4th International Symposium on Advances in Legal Medicine*, Mainz, Germany, September 22 – 25, 1999.

16.   **Auer RN**: Pure hypoxic and ischemic brain insults. Conference Information: 4th International Symposium on Advances in Legal Medicine (ISALM), Date: Sept 22-25, 1999 In: Oehmichen, M (*ed*) Research in Legal Medicine, Vol. 24, *pp* 27-39, Schmidt-Römhild, Lübeck, 2000 ISBN 3-7950-0321-0 (3 citations)

**CURRICULUM VITAE**
**Roland N. Auer**

17.    **Auer RN**: Non-pharmacologic (physiologic) neuroprotection in the treatment of brain ischemia. Conference Information: 5th International Conference on Neuroprotective Agents: Sept 17-21, 2000, Lake Tahoe, Nevada. Source: Neuroprotective Agents, Volume: 939  *pp* 271-282, 2001 http://dx.doi.org/10.1111/j.1749-6632.2001.tb03635.x (28 citations)

18.    **Auer RN**, Sutherland GR: Hypoxia and Related Conditions. Chapter 5, In: Graham D, Lantos P (*editors*) Greenfield's Neuropathology, 7th edition, *pp* 233-280, Edward Arnold, London, 2002. ISBN 0-340-74231-3 (25 citations)

19.    **Auer RN:** STROKE. Pathophysiology, Diagnosis and Management; 4th edition; *pp* 821-828; Chapter 41: Histopathology of Cerebral Ischemia; Churchill Livingstone; Robert Stevenson House 2004.

20.    **Auer RN**: Chapter 34 in Pathology & Genetics: Cerebrovascular Diseases. Hypoglycemic brain injury, *pp* 270-275. ISN Neuropath Press, 2005.

21.    **Auer RN**, Dunn JF, Sutherland GR: Hypoxia and Related Conditions. Chapter 2, In: Love, S, Louis DN, Ellison DW (eds) Greenfield's Neuropathology, 8th edition, volume 1, *pp* 63-120, Hodder Arnold, London, 2008.

22.    Colbourne F, **Auer RN**: Transient global cerebral ischemia produces morphologically necrotic, not apoptotic neurons. In: Fujikawa DG (*ed*) 2009. Acute Neuronal Injury: The Role of Excitotoxic Programmed Cell Death Mechanisms. New York: Springer. ISBN 978-0-387-73225-1

23.    **Auer RN**: Hypoglycemic Brain Damage. In: Fujikawa DG (*ed*) 2009. Acute Neuronal Injury: The Role of Excitotoxic Programmed Cell Death Mechanisms. New York: Springer. ISBN 978-0-387-73225-1

24.    **Auer RN**: Hypoglycemic Brain Damage. In: McCandless DW (*ed*) 2009. Metabolic encephalopathy. New York, Springer, ISBN 978-0-387-79109-8(H), *pp* 31-39

25.    **Auer RN**: Pathology of Stroke. In: Grotta, JC, Lo EH, (*editors*) 2014. Chapter 4 in Stroke: Pathophysiology, Diagnosis and Management. Elsevier ISBN 978-0-323-295444

26.    Pushie MJ, Meher V, Sylvain N, Hou H, Kudryk A, Kelly MB, **Auer RN**: Histological and Elemental Changes in Ischemic Stroke, Chapter 10 in: The Role of Excitotoxic Programmed Cell Death Mechanisms. Acute Neuronal Injury ISBN 978-3-319-77494-7

27.    **Auer RN**: Hypoglycemic Brain Damage, Chapter 11 in: The Role of Excitotoxic Programmed Cell Death Mechanisms. Acute Neuronal Injury ISBN 978-3-319-77494-7

**<u>EDITOR</u>**

**CURRICULUM VITAE**
**Roland N. Auer**

1. **Recording in Awake and Freely Moving Animals.** Methods. Volume 30, Number 2. June 2003, Editor: Roland N. Auer. Academic Press, Elsevier Science. ISSN 1046-2023 http://dx.doi.org/10.1016/S1046-2023(03)00070-7

## NON PEER-REVIEWED

1. Heyes MP, Papagapiou M, Leonard C, Markey SP, **Auer RN**: Effects of profound insulin-induced hypoglycemia on quinolinic acid in hippocampus and plasma. *Advances in Experimental Medicine and Biology* 294:679-682, 1991.

2. **Auer RN**: Calcium channel antagonists in cerebral ischemia: A Review. *Drugs in Development* (1993) *pp* 307-317 (12 citations)

3. **Auer RN**: Alberta Stroke Conference: Alberta Stroke Program, Banff, Canada, December 15-16, 1993. *Meeting Reports CNS* 4(1):1-4, 1995

4. **Auer RN**: Response to Article: Brain Upgrade. "Your Brain as Hardware" In: *Physicians' Computing Chronicle*, October/November 1997, p. 38

5. **Auer RN**: Pure Hypoxic and Ischemic Brain Insults. In: Oehmichen, M (ed) Research in Legal Medicine, Vol. 24, *pp* 27-39, Schmidt-Römhild, Lübeck, 2000 ISBN 3-7950-0321-0

## INTERNET PUBLICATIONS

1. Huntting KS: Basilar Artery Migraine (BAM) Acknowledgements, 2000. http://s-2000.com/bam/about_acknowledge.html

2. **Auer RN**: Computers in the Classroom: An Untested Love Affair. *The ATA Magazine* 82(1), 2001. http://www.teachers.ab.ca/Quick+Links/Publications/Magazine/Volume+82/Number+1/Articles/Computers+in+the+Classroom.htm

3. **Auer RN**:  Stroke. *Encyclopedia of Life Sciences*, pp. 1-5, Nature Publishing Group Macmillan Publishers Ltd., England, 2002, now published by Wiley. http://dx.doi.org/10.1038/npg.els.0000205

4. Wente M: Horrible Chiropractic Hazards. *HealthWatcher* A17, 2002. http://www.healthwatcher.net/chirowatch/com/Chiro-Lewis/gm020423wente-horriblehaz.html

5. Tannis A: Obesity: Why, How and More. *Vitality: Quest for a Healthy Diet*. Volumes Publishing: Kitchener, 2005. http://allisontannis.com/articles/Obesity.pdf

**CURRICULUM VITAE**
**Roland N. Auer**

6.    Grey Matters: The Aging Brain *CBC*. 2007
      http://www.cbc.ca/calgary/features/greymatters/

## LETTERS TO THE EDITOR

1.    **Auer RN**: Multifocal motor neuropathy. *Annals of Neurology* 246-247, 1994

2.    **Auer RN**: Response to Letter to the Editor re: J. Neurosurg 82:262-268, 1995. *Journal of Neurosurgery* 84:146-148, 1995

3.    **Auer RN**: Can eliminating monosodium glutamate from the diet affect Lennox-Gastaut syndrome? *Journal of the American Dietetic Association* **98**:2 (1998)
      http://doi.org/10.1016/s0002-8223(98)00194-1 (1 citation)

4.    **Auer RN**, Lau D, Reimer R: Obesity in Canadian children. *Canadian Medical Association Journal* 164:1563-1565, 2001.
      http://www.cmaj.ca/cgi/content/full/164/11/1563

5.    **Auer RN**: Diffuse Cerebral Infarction after Cardiac Arrest. *New England Journal of Medicine* 348:2689, 2003.

6.    **Auer RN** (2003) Whither Neuropathology? *Can J Neurol Sci* 30:299-301
      http://doi.org/10.1017/S0317167100002973 (2 citations)

7.    Johnson D, Auer R (2017) Dec 12 *Journal of Neurotrauma* PMID: 29233066
      http://doi.org/10.1089/neu.2017.5420  Commentary on: Jenny Carole A., Bertocci Gina, Fukuda Tsuguhiro, Rangarajan Nagarajan, and Shams Tariq. Biomechanical Response of the Infant Head to Shaking: An Experimental Investigation. *Journal of Neurotrauma*. April 2017, 34(8): 1579-1588

8.    Johnson LD, **Auer RN** (2018) pp 345-348 in Jan. 2018 *J Forensic Sci* PMID: 29314009
      http://doi.org/10.1111/1556-4029.13706  Commentary on: Jiang B, Zhu F, Cao L, Presley BR, Shen M, Yang KH "Computational Study of Fracture Characteristics in Infant Skulls Using a Simplified Finite Element Model." *J Forensic Sci* Jan 2017, Vol. 62, No. 1, 39-49

9.    Rajput AH, Rajput EF, Bocking SM, **Auer RN**, Rajput A (2019) Reply to: Parkinsonism in essential tremor cases: A clinicopathological study – were they really essential tremor? *Movement Disorders* **34**(11):1750  PMID 31743513  https://doi.org/10.1002/mds.27868

## MAGAZINES

1.    **Auer RN**: Speaking of chiropractors. The last word, *Chatelaine* October 2001, p. 198.

## CURRICULUM VITAE
### Roland N. Auer

2.    **Auer RN:** Computers in the Classroom: An Untested Love Affair. The *Alberta Teachers' Association magazine 82(1)*, Fall issue, pp. 6-25, 2001.

## ABSTRACTS (incomplete list)

1.    **Auer RN**, Kalimo H, Olsson Y, Siesjö BK: Permanent cell damage after hypoglycemic coma of 10-60 minutes duration: Severity and localization. *J Neurochem* 41:S144D, 1983.

2.    **Auer RN**, Kalimo H, Olsson Y, Siesjö BK: Hypoglycemic brain injury: Localization of permanent neuronal damage in a rat model allowing long term recovery. *Acta Neurol Scand* 68:199, 1983.

3.    Voll CL, **Auer RN**: Evidence for a role of epilepsy in the development of ischemic brain damage. *Can J Neurol Sci* 14:200, 1987.

4.    **Auer RN**, Voll CL: The effect of post-ischemic insulin on ischemic brain damage in the rat. *J Neuropathol Exp Neurol* 47:330, 1988.

5.    **Auer RN**, Voll CL: Post-ischemic hypoglycemia reduces ischemic damage to cerebral cortex and hippocampus in the rat. *Can J Neurol Sci* 15:176, 1988.

6.    **Auer RN**: Post ischemic modulation of cell death in the brain. *Ann Neurol* 26:413-414, 1989 http://dx.doi.org/10.1002/ana.410260326

7.    **Auer RN**, Rewcastle NB: Cervico-rhombencephalic Alexander's disease. *Brain Pathol* **7**:1217, 1997

8.    **Auer RN**, University of Saskatchewan, Canada, Abstract A11 of the 55th annual meeting of the Canadian Association of Neuropathologists, *Can J Neurol Sci* **42**: *suppl*, Page S5, December 2015 "Shaken Baby Syndrome – Unravelled" http://dx.doi.org/10.1017/cjn.2015.377

9.    **Roland N. Auer** and Francis H.Y. Green (2019) Poster 83 "Causes of Cardio-Respiratory Arrest in Infants and Toddlers with Retino-Dural Hemorrhage". Accepted at the 95th Annual Meeting of the American Association of Neuropathologists June 6-9, 2019. Grand Hyatt Hotel, Atlanta, Georgia.

10.    **Roland N. Auer** (2019) Poster 84 "Non-Perfused Brain and Retino-Dural Hemorrhage in Infants and Toddlers". Accepted at the 95th Annual Meeting of the American Association of Neuropathologists June 6-9, 2019. Grand Hyatt Hotel, Atlanta, Georgia.

11.    **Roland N. Auer** (2019) Platform 8 (Trauma and Forensics): "Shaken Baby Brains Show No Acceleration-Deceleration Relative to Surrounding Fluid". Selected for oral

**CURRICULUM VITAE**
**Roland N. Auer**

presentation at the 95th Annual Meeting of the American Association of Neuropathologists June 6-9, 2019. Grand Hyatt Hotel, Atlanta, Georgia.

## BOOK REVIEWS

1.  "Excitatory Amino Acid Neurotransmission" Volume 24 (Neurology and Neurobiology). Edited by T. Philip Hicks, David Lodge, Hugh McLennan. Alan R. Liss. Inc. New York, 454 pages. Reviewed in *Canadian Journal of Neurological Sciences* 15:91-92, 1988

2.  "The Healing Blade; A Tale of Neurosurgery" by Edward Sylvester. Published by Simon & Schuster, New York, N.Y. 240 pages. Reviewed in *The Medical Post,* September 14, 1993.

3.  "Molecular and Cellular Approaches to the Treatment of Neurological Disease" (Association for Research in Nervous and Mental Disease) Volume 71, p. 191-206, Edited by Stephen G. Waxman. Raven Press, New York. 415 pages. Reviewed in *Canadian Journal of Neurological Sciences* 21:371, 1994.

4.  "The NMDA receptor" 1994. Second Edition. Edited by G.L. Collingridge and J.C. Watkins. Oxford University Press. 503 pages. Reviewed in *Canadian Journal of Neurological Sciences* 24: 175, 1997.

5.  "Normal and Pathologic Development of the Human Brain and Spinal Cord" Dąmbska M, Wiśniewski KE. Published by John Libbey & Company Ltd, London, England. 212 pages. Reviewed in *Canadian Journal of Neurological Sciences* 28:277, 2001.

## SOCIETIES/ASSOCIATIONS

American Association of Neuropathologists
American Association for the Advancement of Science
Canadian Association of Neuropathologists
Canadian Diabetes Association (Clinical & Scientific Section)
Canadian Stroke Consortium
Canadian Stroke Society (until 2001, when Society was disbanded)
College of Physicians and Surgeons of Quebec
General Alumni Association, University of Alberta
IBRO (International Brain Research Organization)
International Society for Cerebral Blood Flow and Metabolism
Medical Alumni Association, University of Alberta
National Geographic Society
New York Academy of Sciences
Royal College of Physicians and Surgeons of Canada

**CURRICULUM VITAE**
**Roland N. Auer**

Royal Philatelic Society of Canada (life member)
Society for Neuroscience

**SUPERVISORS** (during training):

Dr. J.C.E. Kaufmann (neuropathology director - deceased)
Health Sciences Center
Department of Pathology
University of Western Ontario
London, ON  N6A 5C1

Supervisor during clinical training (neurosurgery):

Dr. John Girvin
Department of Clinical Neurological Sciences
University Hospital
339 Windermere Drive
London, ON  N6A 5A5

Supervisor during training in clinical pediatric neuropathology:

Dr. L.E. Becker (deceased)
Department of Pathology
Hospital for Sick Children
555 University Avenue
Toronto, ON  M5G 1X8

Supervisor during training in basic Neurochemical Research:

Dr. B.K. Siesjö (deceased)
Laboratory for Experimental Brain Research
E-Blocket, University Hospital
S-221 85 Lund, Sweden

Department heads for reference regarding 25 yr period at University of Calgary:

Dr. James R. Wright, Jr.
Professor and Head
Department of Pathology & Laboratory Medicine
Diagnostic & Scientific Centre Room C411
9, 3535 Research Road NW
Calgary, AB T2L 2K8

# CURRICULUM VITAE
## Roland N. Auer

Dr. J. Gregory Cairncross
Professor and Head
Department of Clinical Neurosciences
Foothills Hospital
1403 - 29 Street NW
Calgary, AB  T2N 2T9

Department heads, Montreal, 2010-2015:

Dr. Luc Oligny luc_oligny@ssss.gouv.qc.ca
3175 de la Côte Ste-Catherine
Hôpital Ste-Justine,
Département de Pathologie,
Montreal, Quebec, H3T 1C5

Dr. Dorothée dal Soglio dorothee.dal_soglio@ssss.gouv.qc.ca
3175 de la Côte Ste-Catherine
Hôpital Ste-Justine,
Département de Pathologie,
Montreal, Quebec, H3T 1C5

Current department head:
Dr. Fergall Magee

Current division head:
Dr. Marilyn Kinloch

 

**Neuropathology**

Roland Auer, MD PhD FRCPC

University of Saskatchewan and Saskatchewan Health Authority
Room 2843A, Royal University Hospital
103 Hospital Drive
Saskatoon, Saskatchewan, CANADA S7N 0W8
TEL: (306) 655-1539  FAX: (306) 655-2223
CELL: (306) 850-3277
roland.auer@usask.ca

February 9, 2021

Gretchen Sims Sween, Ph.D., J.D
Attorney & Counselor at Law
PO Box 5083                                    *via E-mail only*
Austin, TX 78763-5083
USA

**Re:  Death of Nikki Curtis**

Dear Ms. Sween:

You have asked me to review the cause of death and timing of the events that led to the death of Nikki Curtis. I am a board certified neuropathologist in Canada and the USA, as well as a scientist with a Ph.D. in brain damage mechanisms, having over 35 years of experience in forensic pediatric and adult neuropathology. My full credentials and relevant experience include a book on Forensic Neuropathology and extensive medico-legal experience, contained in a section at the end of this document. My current *curriculum vitae* is attached.

# Table of Contents

Table of Contents ............................................................................................................ 1

Involvement in this Case ................................................................................................. 3

Materials Examined: ........................................................................................................ 5

Three-sentence Summary ................................................................................................ 9

What This Case Is Not ..................................................................................................... 9

Clinical History ............................................................................................................... 9

Autopsy Findings in Lung ............................................................................................. 17

    Viral Interstitial Pneumonia ..................................................................................... 18

    Evidence of Aspiration ............................................................................................. 23

Upper Respiratory Tract ................................................................................................ 24

Brain ............................................................................................................................... 26

Non-Perfused Brain and Closure of Microcirculation ................................................. 26

BAPP stain interpretation ........................................................................................... 28

ß-amyloid Precursor Protein Staining as a Signature of Abuse ................................. 28

ß-amyloid Precursor Protein Staining in Other Conditions ....................................... 28

Energy Requirements of Axoplasmic Transport........................................................ 28

Neuraxonal Spheroids in Ischemia and in Early Childhood Deaths.......................... 29

Detour Hemorrhages ................................................................................................. 30

Retinal Hemorrhage ................................................................................................... 31

Optic Nerve Sheath ................................................................................................... 32

Cranial Dura Mater .................................................................................................... 34

Skin ............................................................................................................................ 36

Viruses Kill Young Children ...................................................................................... 37

Pneumonia of the Interstitial Type........................................................................... 37

Viruses Responsible ................................................................................................. 38

Atraumatic Bleeding in this Case .............................................................................. 39

Cause #1: Disseminated intravascular coagulation (DIC) ........................................ 39

Cause #2: Non-Perfused Brain.................................................................................. 40

Cause #3: Epinephrine Drip ...................................................................................... 41

Cause #4: Vasopressin & Dopamine ........................................................................ 41

Cause #5: Heparin: .................................................................................................... 42

Narrative Summary of What Happened to Nikki Curtis............................................. 42

Medical Examiner Cause of Death ............................................................................ 44

Lungs......................................................................................................................... 44

Blunt Force Everywhere .......................................................................................... 44

Factors at Play in the Original Misdiagnosis of Trauma ........................................... 45

Decline of the autopsy ............................................................................................. 45

Forensic Autopsies and Pediatric Lung Pathology ................................................... 45

The Rise of Child Abuse Diagnoses ......................................................................... 46

Orthodox Medical Beliefs Held in 2002 ................................................................... 47

Events and Causation ................................................................................................ 48

Identity and Credentials of Reviewer ....................................................................... 49

REFERENCES: ......................................................................................................... 50

## Involvement in this Case

In July of 2018, I was contacted by Carl Wigren, M.D., a forensic pathologist who is familiar with my work on interstitial viral pneumonia in infants and small children. My understanding was that Dr. Wigren had been retained as an expert in this case and had traveled to Dallas, Texas to the crime lab there to study the original autopsy slides associated with decedent Nikki Curtis. In reviewing the slides, he had observed issues with Nikki's lungs and asked me to take a look and consult with him, because of our different training and objectives (*i.e.* treatment, not diagnosis).

Subsequently, I learned that the court proceeding, then scheduled for mid-August of that year, had been unexpectedly interrupted after head scans taken of Nikki Curtis in 2002 were discovered in the courthouse basement. Therefore, I did not consult with Dr. Wigren at that time.

Later, after conferring with Mr. Roberson's counsel, I reviewed the autopsy report prepared by Jill Urban, M.D. dated February 2, 2002, two days after Nikki was brought to the hospital unconscious and showing signs of extended hypoxia. The autopsy report does not mention pneumonia but contains a reference to "Interbronchial aggregates of neutrophils and macrophages" observed in Nikki's lungs, an indication that she may in fact have had pneumonia. The autopsy report describes Nikki's respiratory system as follows:

RESPIRATORY SYSTEM: The upper airway is unobstructed. The laryngeal mucosa is smooth and unremarkable without petechiae. The pleural surfaces are smooth and shiny. The pulmonary arteries contain no emboli. The major bronchi are unremarkable. Sectioning of the lungs discloses a dark red-blue, moderately congested, slightly edematous parenchyma.

To assess the accuracy of the description in the autopsy and to assess whether there is evidence that Nikki had interstitial viral pneumonia—which she may have had for months before she collapsed—I asked for an opportunity to produce autopsy slides stained with Hematoxylin & Eosin (H&E) and special stains, a requirement for immunophenotyping of the cells to assess the potentially fatal process within the tissue. It was my understanding that the court entered an order directing the crime lab to provide new cuts of the original histology to enable me to conduct the necessary immunohistochemistry in my university lab. I wrote a letter explaining the request:



Gretchen Sims Sween, Ph.D., J.D.                    gsweenlaw@gmail.com                    Feb. 12, 2020
Attorney & Counselor at Law
PO Box 5083
Austin, TX 78763-5083
                                                                                                via E-mail only

Re:  Ex parte Robert Leslie Roberson III,
Trial Cause No. 26,162-A
CCA Cause No. WR-63,081-03
(Death of 2 year ol Nikki Curtis)

Dear Ms. Sween:

    You have asked me to help elucidate cause-of-death of 2 year old Nikki Curtis. To that end, I require autopsy routine slides stained with hematoxylin & eosin (H&E) and special stains, in view of the history of pneumonia. This is an absolute requirement for immunophenotyping of the cells in defining the nature of the potentially fatal process within the tissue, evidence required by the court.

    It is routine to perform special stains, and H&E-only examination is no longer the current standard, since the time of the original trial. It is routine to produce 5 micron paraffin blanks on charged slides designed for immunohistochemistry.  For each block containing lung, 6 slides are needed.

    This university hospital (above) has a world class immunohistochemistry lab run by Dr. Emina Torlakovic, who has published extensively on immunohistochemistry and quality control.[1,2] Thus, for quality control purposes, these must be performed here. A duplicate set will be made, pro bono, for the prosecution.

    The immunohistochemistry lab here will be able to make these slides, which will also be scanned in on an Aperio scanner, pro bono, for viewing on any computer as if on a microscope, by defense and prosecution experts alike.

However, thereafter, I was soon informed that, for whatever reason, the crime lab had destroyed all of the original histology (tissue) associated with Nikki.

Next, I requested that the complete set of original autopsy slides be sent to my lab for review. After some delays, I received from the Dallas County Medical Examiner:

## Materials Examined:

Received from the Dallas County Medical Examiner's Office by FedEx 8717 1020 9144



dated April 21, 2020 were microscopic glass slides in the above containers. All slides were laid out on standard cardboard trays, and no slides were broken or damaged.

This yielded the following 4 slides (2 for each eye), & 10 slides of organs other than brain:



The Neuropathology slides (of brain and surrounding membranes) totaled 13 slides:



The two sets of slides above were differently labelled, as shown, but all slides had the common accession 456-02 as shown above. All slides had either "UT Southwestern, Dallas Texas" for the Neuropathology slides or "Dallas Medical Examiner's Office" for the remaining slides.



In the close-up at left, it can be seen that one slide had the name Curtis on it.

Lastly, the PES Chain-of-Custody Form IFS # 0456-02 was enclosed (see next page) and included the name "Nikki Curtis" on it. Hence the slides forwarded me are deemed without doubt to be the actual autopsy slides of Nikki Curtis.

## PES Chain-of-Custody Form

| AGENCY NAME: | | IFS#: 0456-02 |
| DCME#: | SERVICE#: | TAG#: |
| COMPLAINANT'S NAME: Curtis, Nikki | | |

| Date | Items | Released By | Received By | Remarks |
|------|-------|-------------|-------------|---------|
| 4-7-2020 | #14 Slides #13 UTSW Slides | Signature: Histology Slide Printed Name: Storage | Signature: C Smith Printed Name: Crystal Smith | pulled at the request of Attorney Ashley Fourt |
| 4-7-2020 | #14 Slides #13 UTSW Slides | Signature: C Smith Printed Name: Crystal Smith | Signature: RuaNette Ellis Printed Name: RuaNette Ellis | Prepare for shipment |
| 4-7-2020 | #14 slides #13 UTSW Slides | Signature: RuaNette Ellis Printed Name: RuaNette Ellis | Signature: Fed Ex Printed Name: # 8758 9779 1432 | approved by Dr. Barnard |
| 4-9-2020 | #14 slides #13 UTSW Slides | Signature: Printed Name: JODEE NEIL | Signature: C Smith Printed Name: Crystal Smith | 4-21-20 Returned to SWIFS (sent to wrong address) |
| 4-21-2020 | #14 slides #13 UTSW Slides | Signature: C Smith Printed Name: Crystal Smith | Signature: RuaNette Ellis Printed Name: RuaNette J. Ellis | prepare for shipment |
| 4-21-2020 | 14 slides 13 UTSW Slides | Signature: RuaNette Ellis Printed Name: RuaNette J. Ellis | Signature: Fed Ex Roland Auer Printed Name: ROLAND AUER 8171 1020 9144 | International Air Waybill |
| | | Signature: Printed Name: | Signature: Printed Name: | |

1325 - PES Chain-of-Custody Form
SWIFS - PES Admin
Issuing Authority: PES Section Chief

Pg. 1 of 1
Effective: 8/1/2018 6:27:41 AM
rev. 1

I have reviewed the microscopic glass slides. My fact-based opinions are based on the objective evidence and are based on science, not potentially flawed medical algorithms. I draw attention to the distinction early because science can be at odds with medicine, the latter sometimes rushing to a judgement of what happened, without due consideration of the scientific basis of how pathophysiologic events evolve over time. The facts given here, and the science given, is given to the highest degree of certainty, considering our present state of knowledge.

## Three-sentence Summary

This 2-year-old had viral pneumonia with breathing arrest and fever, multiple visits to the doctor since age 7 days, culminating in a predictable cardiac arrest. Epinephrine drip superimposed upon cardiac arrest-induced disseminated intravascular coagulation led to recirculation detour hemorrhages around a non-perfused brain, which were misinterpreted as head trauma. Non-perfused brain, or brain death, results in detour hemorrhage around the brain, necessarily because the brain is non-perfusable, when circulation is restored.

## What This Case Is Not

This is not a fatal head injury.  That mistaken notion arises from misreading a goose egg from when the child fell off the bed due to hypoxia, and a misinterpretation the pathogenesis of subdural hematoma and retinal hemorrhage. The treating doctors are not to be faulted for failing to recognize the sequence of events that resulted in the internal head injuries that they observed. They were dealing with a young child in the midst of an irreversible health crisis and what they could observe in the ER plainly indicated a damaged brain. Nor did the treating doctors, under those circumstances, have time to stop and examine Nikki's medical history to make a complete differential diagnosis.

## Clinical History

Nikki was a sickly child from the beginning, and was born Nikki Curtis, at term on October 20, 1999 to Gwendolyn "Michelle" Bowman. A subsequent paternity test established that Robert Roberson was Nikki's biological father. Nikki, at birth, was placed in the custody of her maternal grandfather's care because of her mother's lifestyle. Mother was 22 years of age, and worked as a prostitute and had a history of intravenous drug abuse. CPS was involved from the beginning because she had already had children removed from her custody.

Nikki's 1 minute and 5-minute Apgars were 9 and 9, birth weight 3357 g, Length 52 cm. Estimated gestational age 39 weeks. Delivery was spontaneous vaginal. There are two older siblings: Christopher, born in 1996 and reportedly diagnosed with fetal alcohol syndrome and epilepsy and Matthew, born Nov. 19, 1997.

- November 8, 1999. Nikki presented in her 3rd week of life and was diagnosed with otitis media.  She had loose stools. *[Roland Auer] Otitis media (middle ear infection) is usually bacterial whereas the stools could be bacterial or viral in origin. Either way, the child was infected.*

- <u>December 21, 1999</u>.  At two months of age she was diagnosed with bronchiolitis (page 22 of 22 in "02 - early palestine medical records.pdf").  Dec. 21, 1999 RSV-negative (page 2 of 19 in "04 - NC Pediatric Associates Lifetime General Medical Records.pdf")  *[Roland Auer] RSV stands for respiratory syncytial virus. It infects the lungs of very young children. There are many other viruses that can do this in addition to RSV.*

- <u>March 31, 2000</u>.  She presents at 4 months with a history of cough and congestion.  Was on amoxicillin for bilateral otitis media since March 24.  Changed to Cefzil.  *[Roland Auer] Amoxicillin was used to treat a bacterial otitis media.*

- <u>April 21, 2000</u>.  At 5 months, she had quite a rough course over the previous month with resistant otitis media since four months of age.  Her weight gain slowed down. *[Roland Auer] Antibiotic resistance can give rise to chronic otitis media that is very difficult to treat. Chronic viral infections slow weight gain or can even lead to inanition.*

- <u>May 17, 2000</u>.  She was being treated for persistent bilateral otitis media at 6 months, with Amoxil, Cefzil, Augmentim and Bactrim.

- <u>June 8, 2000</u> bilateral myringotomy tubes were placed.  "Glue ear" was found.  Adenoiditis (page 34 of 43 in 03 - NC Ear Operation and Post-Op Records_June 2000.pdf") *[Roland Auer] The adenoids are lymphoid tissue in the pharynx. They can become enlarged with infection.*
  Blood work showed important abnormal results:
- WBC count elevated at 11.7 (4.8-10.8) $\times 10^{-3}$ mm$^3$ *[Roland Auer] An elevated white blood cell count is generally an index of infection.*
- Lymphocytes high at 80% of WBC (20-51%) *[Roland Auer] Of the five kinds of white blood cells, lymphocytes are elevated in chronic infections, often viral infections.*
- Granulocytes low at 3% (42%-75%) *[Roland Auer] When the bone marrow is fighting a virus with production of lymphocytes and monocytes, granulocytes, which fight bacterial infections, can be suppressed.*
- Eosinophils high at 9% (0-6%) *[Roland Auer] The function of this kind of white blood cell is not known, although it is increased in allergy and certain kinds of infection.*

- <u>June 14, 2000</u> at 7 months of age, stoppage of breathing was first noticed (page 4 of 22 in "02 - early palestine medical records.pdf") *[Roland Auer] Breathing stoppage has been noted as a harbinger of death in sudden infant death syndrome and in pneumonias in babies.*

- <u>July 13, 2000</u>.  She presented at 8 months with four episodes of vomiting.  Her temperature was 99°Fahrenheit.  Assessment was that she had gastroenteritis,

most likely viral in etiology. *[Roland Auer] A virus causes a low-grade fever such as this.*

- August 14, 2000 presented at 9 months with the following episode: while sitting on the floor playing under the custody of grandmother who was hemming some pants on Friday, Nikki made a funny cry. Grandmother turned around and Nikki was lying face down on the floor. Grandmother turned her over and she was blue and did not appear to be breathing. *[Roland Auer] Blue colour is a sign of deoxygenated hemoglobin. Inability to breathe is a sign of lung disease.* Grandmother gave Nikki a rescue breath and gave her a shake. She gave her a second breath and Nikki started breathing again and pinked up. She took her to the emergency room and they get a chest X-ray, pulse oximetry, but could find nothing. Nikki was sent home. *[Roland Auer] Although it is always easy to find fault in retrospect, Nikki should not have been sent home.*

On Saturday, it happened again. She was playing and gave a funny cry and when her cousin and grandmother turned around she was lying on her back on the floor again. She appeared blue. No rhythmic jerking was noticed. They gave one rescue breath and she did fine. They called the office and were told to just keep a real close eye on her. *[Roland Auer] These are life threatening events, but are not paid heed to as such.*

Physical examination showed a temperature of 99.4° F. *[Roland Auer] Although the fever has increased, it is still mild.* There was no cyanosis, clubbing or edema. Neurological exam was normal. The two episodes of apnea & cyanosis, within the 24 hour period, were deemed maybe seizures. *[Roland Auer] Focus on brain disease over lung disease is revealed here.*

Pediatric Neurology felt these episodes of cyanosis and apnea were breath-holding spells (page 3 of 8 in "05 - Texas Children's Hospital 09.19.2000.pdf").

- October 25, 2000 apneic episodes apparently cleared.

- November 14, 2000 presents at 12½ months with cough and congestion
  - T=99.7°F *[Roland Auer] We now have five months of fever, indicating chronic infection.*
  - Nose was erythematous and crusting around the nostrils *[Roland Auer] Upper respiratory infection (URI) can give this, and lower respiratory infection (LRI) will give pneumonia. Viruses can infect both, as well as bowel, to give diarrhea.*

- December 1, 2000 presented at 13 months with cough and a thick yellow runny nose
  - "Acute sinusitis" was the diagnosis, along with ear infections *[Roland Auer] The yellow color suggests bacteria and pus. A virus can weaken immune defences to bacteria, giving them opportunity for a secondary infection.*
  - Doctor concerned about allergy, so Claritine was prescribed

- This was deemed a test of antihistamines (page 13 of 22 in "02 - early palestine medical records.pdf") *[Roland Auer] Allergy is possible in a baby this young, but infection must be considered.*

- <u>January 22, 2001</u> presented at 15 months
  - T=99.5°F *[Roland Auer] The low-grade fever continues, now present for seven months, half the child's life.*
  - breathing stops from time to time, on apnea monitor *[Roland Auer] this suggests chronic (not acute) lung disease, since it has also been going on for 7 months now.*

- <u>March 29, 2001</u> presents at 17 months with yellow/green rhinorrhea and cough. Also pulling at her ears. *[Roland Auer] The yellow and green color suggests bacteria. The cough indicates upper respiratory infection. Pulling at her ears indicates otitis media.*

- <u>April 20, 2001</u> presents with vomiting. Temperature 101.3°F. *[Roland Auer] Crescendo illness with an increase in fever. Vomiting indicates possible gastrointestinal illness.*

- <u>April 23, 2001</u> presents at 18 months for follow-up. Kept on Bactrim (a double antibiotic formulation of trimethoprim & sulfamethoxazole)

- <u>July 20, 2001</u> she presents at 21 months with a chief complaint of fever, on and off, low grade, over a week. Temperature measured at 100.9°F. (page 10 of 22 in "02 - early palestine medical records.pdf") *[Roland Auer] Now one year of fever. Highly suggestive of chronic viral infection.*

- <u>September 12, 2001</u> at 23 months, complaining of earache.
  - Suppurative left otitis media *[Roland Auer] This is a bacterial infection.*
  - Prescribed omnicef

- <u>September 21, 2001</u> follow-up:
  - Fever of 100°F *[Roland Auer] Fever now present for 14 of her 23 months of life.*
  - Soft, weepy, pink mass on left tympanic membrane. Felt to be granuloma.
  - Referred to Dr. Duncan for granuloma. (page 4 of 22 in "02 - early palestine medical records.pdf")
  - Infection felt to have cleared

- <u>November 30, 2001</u> she presented at 24 months with fever up to 103.3°F and a hacking cough for one month (*i.e.* since age 23 months). (page 7 of 22 in "02 - early palestine medical records.pdf") Injected right tympanic membrane. Nose with green nasal discharge. *[Roland Auer] A chronically sick child with fever and infection.*

Assessment:
- Rhinitis
- Otitis media

- December 7, 2001 she presented at 25 months with cough and congestion, mainly at night. She had erythema of the nose (red nose) with yellow/green rhinorrhea (runny nose with infected-looking material coming out). (page 6 of 22 in "02 - early palestine medical records.pdf") Erythematous pustules and papules on buttocks and perineum.
  - She was prescribed Augmentin (antibiotic amoxicillin) for folliculitis
  - She was prescribed codeine (an opiate) for cough *[Roland Auer] One must be careful prescribing an opiate, which suppresses breathing, in a child already prone to stopping breathing.*

- January 29, 2002 at age 27 months her fever was 103.1°F. She was on Tylenol and Motrin for that fever. She was thought to have a viral syndrome (page 7 of 22 in "02 - early palestine medical records.pdf") *[Roland Auer] The notion of a viral syndrome here is correct, with viral cytopathic effect of smudge cells in the interstitial pneumonia, autopsy-proven, although not noted by the medical examiner.*

- Nikki Curtis was taken to her pediatrician for a follow-up visit. It is uncontested that her fever was measured as **104.5 degrees Fahrenheit** at her doctor's office—and that she was then sent home with more prescriptions.

- On the morning of January 31, 2002, Nikki Curtis was brought back to the hospital unconscious and blue, indicating that she was not breathing. *[Roland Auer] This is a full cardiac arrest. If longer than 12 minutes or so, it is equivalent to brain death clinically or non-perfused brain pathologically, due to permanent closure of the brain microcirculation. In the afternoon of Jan. 31, we see the following in the chart, the 1502 entry "Pupils remain fixed and dilated" indicating she is still brain dead already that afternoon:*



- She was intubated because she was not breathing on her own—a process that had to be repeated after it was later discovered that the breathing tube had been inserted incorrectly, which worsened hypoxia. She never recovered so as to breathe again on her own. *[Roland Auer] This confirms that she was brain dead, meaning her brain microcirculation had closed.*

- Nikki was given <u>epinephrine</u>, 1.2 mg bolus at 2000 January 31, then dripped at 1ml/hr = 0.03µg/kg/min, ↑ to 0.14µg/kg/min at 0146 Feb 1, then ↓ to 0.12µg/kg/min at 0153, then ↑ to 0.14µg/kg/min at 0315, then ↑ to 0.14µg/kg/min at 0345 (pages 7 & 10 of 21 in file "13 - Childrens Medical pulled from trial exhibit.pdf"). *[Roland Auer] Epinephrine causes a hyperdynamic circulation around non-perfused brain, which together with DIC, gives copious bleeding around the non-perfused brain. Nikki is brain-dead, but resuscitation is undertaken.*

- Nikki was given <u>vasopressin</u>, 0.05 units/ml at rates of 0.5 mU/kg/min at 2045, 2 mU/kg/min at 2110, ↑ to 3 mU/kg/min at 2125, ↑ to 5 mU/kg/min at 2202, (page 7 of 21 in file "13 - Childrens Medical pulled from trial exhibit.pdf"). *[Roland Auer] Vasopressin increases the blood pressure further exacerbating the bleeding tendency.*

- Nikki was given <u>dopamine</u>, 1.6 mg/ml starting at 2100 at a rate of 2.22 µg/kg/min, ↑ to 5 µg/kg/min at 1945, ↑ to 7.5 µ/kg/min at 2222 (page 8 of 21 in file "13 – Children's Medical pulled from trial exhibit.pdf"). *[Roland Auer] Dopamine increases the force of contraction of the heart (termed an inotropic agent) further exacerbating the bleeding tendency.*

- Nikki was given <u>heparin</u>, 1000 U/ml starting at 2200 at a rate of 1ml/hr at 2200, and again at 2300 (page 10 of 21 in file "13 – Children's Medical pulled from trial exhibit.pdf"). *[Roland Auer] Heparin causes bleeding, by inhibiting factor X, and thrombin, in the blood clotting cascade-pathway.*

- During triage, it was discovered that she had significant internal bleeding within the skull but virtually no external injuries. Blood had pooled under the "dura" beneath her scalp. *[Roland Auer] This happens with non-perfused brain as flow during resuscitation is diverted around the brain in a detour manner, as blood is unable to go through the brain.* Imaging further showed no fractures, and a very abnormal brain, described as blackened on the right with major infarcted areas. *[Roland Auer] This is a description of non-perfused brain, due to lack of blood flow, not due to trauma. The idea of a fatal head injury is unsupportable here.*

- Blood work <u>January 31, 2002</u> showed:

  - Elevated D-dimer 16.8 (0-3) mg/L @20:04 page 39 *[Roland Auer] This split product of fibrin indicates clotting.*
  - Low lymphocytes 15.4 (35-65%) @20:04 page 39 *[Roland Auer] The marrow is likely suppressed for lymphocyte production.*
  - High neutrophils 74.2 (28-56%) @20:04 page 39 *[Roland Auer] Terminal bacterial infection will give this high response of acute white blood cells.*
  - Elevated PTT 35.4 (24.4-34.5 sec) @16:23 page 41 *[Roland Auer] this indicates a bleeding tendency due to consumption of clotting factors. The clotting and bleeding simultaneously is termed disseminated intravascular*

The University of Saskatchewan and Saskatoon Health Region:
Improving health through excellence in education, research and clinical care.

*coagulation, or DIC. Another good term that clarifies the condition is "consumption coagulopathy". Clotting factors have been consumed so bleeding occurs. It is like a person with enough money spending so much that they become poor, by human analogy to explain the condition.*

Above values from "07 - Children's Medical Center 1.31.2001-2.1.2002.pdf"

- <u>Feb 1, 2002</u> 01:11 X-ray – "Perihilar atelectasis or infiltrate" (page 26 of 125 in "07 - Children's Medical Center 1.31.2001-2.1.2002.pdf") *[Roland Auer] The lung infiltrate indicates her chronic pneumonia can be seen on x-ray. This is too fast to be explained by her hospital stay, since she has only been in hospital for a few hours.*

- <u>Feb 1, 2002</u> 03:34 Her lung fields on X-ray were interpreted as probably diffuse edema fluid (page 23 of 125 in "07 - Children's Medical Center 1.31.2001-2.1.2002.pdf") *[Roland Auer] These are features compatible with interstitial pneumonia and this was confirmed at autopsy, although not noted by the medical examiner.*

The coding summary at Children's Medical Center of Dallas is:

Principal diagnosis
      995.54 Child physical abuse *[Roland Auer] The massive evidence of lethal infection was ignored, both the primary viral infection and the secondary purulent (pustular) infections, treated with antibiotics.*
Secondary diagnoses
      852.25 Subdural hemorrhage – deep coma *[Roland Auer] subdural bleeding is reflexively associated with trauma, but here is due to a blood clotting disorder and reperfusion, both factors acting in concert. Coma is a clinical term quite separate from subdural hemorrhage and should not appear together and are quite independent.*
      362.81 Retinal hemorrhage *[Roland Auer] like subdural hematoma, retinal hemorrhage was reflexively assumed to imply child abuse, which infers knowledge of intent, as well as trauma, both being wrong.*
      863.89 GI injury NEC-closed
      518.81 Acute respiratory failure*[Roland Auer] The respiratory failure was chronic, not acute, going back to most of this child's short life.*
      790.6 Hyperglycemia *[Roland Auer] The high glucose level is reactive to the multiple, concurrent stress factors.*
      E967.0 Batter by father/Setpfth *(sic) [Roland Auer] This has no basis in fact or evidence, in this case.*

February 1, 2002 pronounced dead

The University of Saskatchewan and Saskatoon Health Region:
Improving health through excellence in education, research and clinical care.

The death summary from the Children's Medical Center of Dallas reads as follows:
"ADMISSION DATE: 01/31/2002
DATE OF DEATH 02/01/2002

PRINCIPAL DIAGNOSIS: BRAIN DEATH.

SECONDARY DIAGNOSES:
1. Severe closed head injury. *[Roland Auer] The scalp "goose-egg" is not a fatal head injury, and is common among children, especially those woozy with hypoxia due to pneumonia. The goose egg does not comprise a fatal head injury by virtue of not bruising the brain i.e. not causing a contusion. Conflating this with fatal head trauma in this case is medical error. A fatal head injury is used to attempt to explain the reperfusion detour hemorrhages around non-perfused brain.*
2. Intracranial hypertension *[Roland Auer] This explains the retinal hemorrhages.*
3. Diabetes insipidus *[Roland Auer] This occurs in many brain diseases and is due to lack of antidiuretic hormone, also termed vasopressin.*
4. Hyperglycemia *[Roland Auer] The high sugar is a result of stress (body hormones adrenaline and glucocorticoids).*

HISTORY OF PRESENT ILLNESS: Nikki is a two-year-old white female with traumatic brain injury. *[Roland Auer] The opening sentence contains a false assumption.* She was admitted to the ICU after transfer from Palestine, Texas with the highest Glasgow coma score recorded at 6. By the father's report, she was in bed with him when she cried out. He found her lying on the floor. She reportedly spoke with him appropriately and was naming cousins and relatives. When father next awoke, he found her limp with a pulse and chest rising. He took her to the emergency department where she was unresponsive. *[Roland Auer] The history mischaracterizes this as an acute event. It is a chronic lifetime illness with a terminal event that masqueraded as an acute event by virtue of death being an acute event. The chronic lifetime illness cannot be ignored and is what led to her terminal demise, as can be seen in Nikki's autopsy findings.*

HOSPITAL COURSE: In the emergency room, she received Mannitol, Decadron, and was intubated and then transferred to Children's Medical Center Emergency Room. A head CT showed significant severe right cerebral hemisphere edema with midline shift, positive right tentorial subdural hematoma. *[Roland Auer] The dura mater is highly vascular and bleeding in the tentorial dura is here termed subdural and traumatic. It is actually intradural, not subdural, and is atraumatic, not traumatic.* In the emergency room, an ICP monitor was placed by neurosurgery with an opening pressure of the 65. *[Roland Auer] The intracranial pressure of 65 means non-perfused brain, since the blood pressure must be 40 to 50 mmHg higher than the intracranial pressure to maintain the possibility of cerebral perfusion. The increased ICP also explains the retinal hemorrhages.* Nikki was transferred to the ICU where she received sedation, chemical paralysis, mild hyperventilation, and Mannitol. There was no improvement in her intracranial pressure. She was placed on an epinephrine drip to help maintain her blood pressure and cerebral perfusion pressure. *[Roland Auer] See section on Cerebral Perfusion Pressure below. The epinephrine drip will exacerbate the bleeding by creating*

*a hyperdynamic circulation and a high flow state. This will cause detour hemorrhage around the brain to retina dura and the sub- mucous plexus of the nose, as noted in Wikipedia under the "hot nose sign" and in the medical literature.*[1-5] *The dural and retinal bleeding can be considered a "hot dura" and "hot retina" sign.* She had evidence of loss of cerebral autoregulation as increasing her blood pressure increased her ICP. She also developed diabetes insipidus and hyperglycemia as further signs of the severe brain injury.

On the morning of February 1, 2002 sedation and paralysis was discontinued for initiation of the brain death protocol. A twitch test was later performed, which showed no evidence of neuromuscular blockade. Her first brain death exam[6,7] was performed by the critical care team and then second by the neurology service. Both examinations were consistent with brain death. An apnea test was then performed which showed a $PCO_2$ of 88 on the ventilator, a $PCO_2$ of 98 after 3 minutes, and a $PCO_2$ of 105 after 9 minutes. She was pronounced dead at 19:04. The Medical Examiner was notified and will perform an autopsy. The case number listed was 456-02. Southwest Transplant Alliance was notified. Patient evaluation was done and they declined Nikki as a candidate.

Studies performed also included a head CT, skeletal survey, and ophthalmology exam as part of the child abuse workup. The Reach Team has been involved in this case."

## Autopsy Findings in Lung

Death does not occur unless breathing or heart pumping function stops, either leading to stoppage of the other. Here, lung function was impaired for a year prior to death and we see that in the autopsy with florid evidence of viral infection.

The cause of death here is in the lung, and hence the lung pathology will be first reviewed. Normal lung (right, from a young child) is 95% air.



## Viral Interstitial Pneumonia



456-02 H&E lung - smudge cell & intra-alveolar macrophages 40× As the examination of the lungs began and microscope came into focus, the first thing apparent was a smudge cell (circled), a dark, pleomorphic nucleus seen in the lung when viruses take over the nucleus. This is a viral cytopathic effect. Also, intra-alveolar macrophages are seen. Lastly, a nodule of fibrosis in the lower right portion of the photograph is seen as pink fibrous tissue, and indicates this viral pneumonia is chronic.



456-02 H&E open lung spaces but lymphoid nodules 4× To view the general condition of the lung, we reduce the magnification to 4×. Here, we see a bronchiole entering the photo diagonally from the upper edge of the photo, with two lymphoid nodules (white arrows) surrounding it. The general condition of the lung is about 50% air here, with thickening of the interstitium and open air spaces. These are the histologic features of an interstitial pneumonia.

456-02 H&E lung - smudge cells and macrophages 60× Returning now to higher magnification again, we see some smudge cells, these being easy to find. Smudge cells are dark and look like cancer cells because the virus has taken over the nucleus. The interstitium (the tissue between the black arrows) is also thickened. This is viral interstitial pneumonia.



456-02 H&E lymphoid tissue - paratracheal 2× At right, we see the thyroid gland at the upper right and one of the tracheal rings as the arc of pink purple tissue with many artifactual folds across it. In the surrounding fat, we see three dark blue lymphoid nodules of varying sizes. The lumen of the trachea is the clear space at lower right. Tracheal cartilage indicated by the initials T.C.





456-02 H&E lymphoid tissue - paratracheal 10× The lymphoid nodules are seen at higher magnification at left in the mediastinal fat. While some lymphoid tissue is normal, the number of nodules, their size, and the sheer abundance of lymphoid tissue in and around the lung, indicates chronic infection.



The photo at left shows just how solid the lung is (consolidation, solidified lung, pneumonia) in the upper left quadrant of the photo. Some air spaces are seen in the remaining lung tissue, which is grossly thickened. A lymphoid nodule is growing within the actual lung tissue itself at the lower right (circled). Pink fibrous tissue is seen amidst the dark red blood cells of congested pulmonary vessels. At higher magnification seen below, this is both necrosis and fibrosis, both of which give and eosinophilic appearance you at this magnification. 456-02 H&E lung - lymphoid nodule and smudge cells 10×



Higher magnification of the boxed area above shows the intrapulmonary lymphoid tissue in the upper left and upper centre of the photograph. A smudge cell is circled at lower right, indicative of viral cytopathic effect. 456-02 H&E lung - lymphoid nodule and smudge cells 40×



Pulmonary fibrosis is seen as pink tissue in the lower right of the photograph indicating how chronic the lung disease is. No special stains could be done in assessment of the case however, because the lab has destroyed the underlying histological material. Another smudge cell is seen in the upper right (circled). When virus takes over the nucleus, they cause pneumocytes to get dark nuclei resembling cancer cells. This is termed a viral cytopathic effect 456-02 H&E lung - intra-alveolar histiocytes + 3 smudge cells 40×



Necrosis is seen in a vertical pink band running in the centre of the photograph. Necrotizing pneumonia is very severe. Some open alveoli are seen at the left. Macrophages are abundant. A tattered remnant of bronchiolar epithelium (the lining of the air-conducting tubes of the lung) is seen on the right (arrows). 456-02 H&E open lung & dead macrophages & bronchiolar epithelium 20×

## Evidence of Aspiration



In contrast to the tattered remnant of bronchiolar epithelium seen above, this bronchiole shows circumferentially intact bronchiolar epithelium. Nevertheless, the contents are cellular and consist of detritus, probably inhaled. Chronic lung disease characteristically has chronic aspiration, another component of lung disease in this chronically ill child. 456-02 H&E lung - detritus in bronchiole + smudge cell 20×



The boxed area shows a distinct (arrows) brush border of the bronchiolar columnar epithelium. The detritus shows macrophages and the surrounding interstitium shows cellularity and yet another smudge cell that is here circled. 456-02 H&E lung - detritus in bronchiole + smudge cell 40×

# Upper Respiratory Tract



The photo at left shows the trachea with submucous glands in purple. The lumen, or space through which inhaled and exhaled air passes is marked (Air). There is normal epithelium on the right (*), but the epithelium has been desquamated on the left forming a tracheal ulcer. An ulcer is where the lining cells of the air passage are gone. 456-02 H&E trachea - ulcer & mucus 10×



The photo below shows respiratory mucosa with submucous glands. The upper submucosa shows a dense lymphocytic infiltrate (*), indicating chronicity. The ratio of serous (purple) to mucous (lighter) glands is roughly normal. The serous and mucous glands are indicated by S and M respectively.





Serous glands are seen here in the submucosa, with tracheal cartilage forming a triangle at the lower right of the photomicrograph. There is squamous metaplasia of the tracheal epithelium, indicative of chronic, long-standing tracheal irritation. This is seen at higher magnification in the photograph below. 456-02 H&E trachea - squamous metaplasia & mucous-serous glands 10×



High-power magnification shows the squamous metaplasia in the tracheal epithelium. The basal lamina is thickened. A mitosis is seen (circled) in the tracheal epithelium indicating the chronic irritation has stimulated a regeneration reaction in the epithelium. The submucosa has granulation tissue in the form of abundant capillaries and fibrous tissue. This reparative reaction indicates severity, but is also indicative of chronicity. 456-02 H&E trachea - mitosis in regenerating epithelium in ulcer 40×

# Brain

## Non-Perfused Brain and Closure of Microcirculation



The cortex shows patchy ischemia, here seen in the cingulate gyrus. The corpus callosum is seen below and itself shows patchy pallor at the lower left. The features are those of non-perfused brain, not trauma, and will be seen at higher magnification now. NP28415-3 H&E patchy cingulate ischemia 2×

This stretch of neocortex at double the above magnification shows patchy edematous pallor throughout most of the section sparing the upper right quadrant. This is the patchy appearance throughout the brain, of non-perfused brain. The clear spaces of edema at left give increased brain weight due to water accumulation. This increases the intracranial pressure and gives rise to retinal hemorrhages. NP28415-2 H&E patchy cortical ischemia 4×



At 10× the magnification of the previous photo, we here see microcirculatory closure, as a compressed vessel at the lower right. Such a brain can never be perfused, and all blood directed to it will go to retina and dura. A dead neuron is seen in the middle. NP28415-1 H&E cortex - microcirculatory compression 40×

At left we see neurons



actually dissolving, the formal term being neuronal cytoclasis, for this process. No macrophages accompany the neuronal disappearance because the brain is non-perfused. This is permanent global ischemia, or, brain death.[7] Dying neuronal remnants are circled. NP28415-1 H&E neuronal acidophilia & cytolysis 40×

The University of Saskatchewan and Saskatoon Health Region:
Improving health through excellence in education, research and clinical care.

# BAPP stain interpretation

## ß-amyloid Precursor Protein Staining as a Signature of Abuse

ß-amyloid precursor protein staining has been ruled out as a signature of abuse by its occurrence in numerous conditions other than trauma. The staining of dilated axons in brain tissue occurs in many conditions other than trauma, noteworthy ischemia, but also in genetic conditions and any condition characterized by energy failure. This is because axonal transport is energy dependent. Beta amyloid precursor protein is transported down the axon and anything which inhibits axonal transport will cause spheroids. Thus, they are nonspecific. Spheroids are simply dammed up axoplasm, not flowing cytoplasm. They don't necessarily mean trauma.

## ß-amyloid Precursor Protein Staining in Other Conditions

The spheroids that result from ß-amyloid precursor protein accumulation can be seen in a variety of diseases. For example, in the $K^+$ channel axonal neuropathy also termed Andermann syndrome, a genetic disorder.[8] Neuraxonal spheroids are the signal feature of this genetic disease <u>in the brain</u> because it is an axonopathy. Pathologists often reflexively invoke trauma when they see spheroids, as in the pathologic interpretation of Nikki Curtis in the present case. However, the broad scientific view based on experience in interpreting neuropathologic sections in a spectrum of neuropathology indicate that this is a fallacy. Looking for spheroids as if they mean abuse or as if they are a signature of abuse implies that spheroids can give intent, necessary for diagnosis of abuse under the microscope, an impossibility.

Because axonal transport is energy intense, <u>energy failure from whatever cause</u> (cardiac arrest, for example), <u>can give spheroids</u>. While Sabina Strich did discover[9,10] spheroids in the 1950s, in adults that remained in coma with normal gross neuropathology, this traumatic setting is not relevant to the infant death in question here.

## Energy Requirements of Axoplasmic Transport

Axonal transport consists of motor proteins driving transport of cytoplasmic components including mitochondria.[11] The protein for forward or anterograde axonal transport is kinesin. The protein for retrograde axonal transport is dynein. Both proteins "walk" along the microtubule. Kinesin hydrolyzes one ATP molecule per step.

The polarity, positive outward, away from the neuronal cell body, thereby gives direction to axonal transport for the 2 motor proteins. The microtubule-based motors are both dependent on ATP,[12] with expenditure of energy as follows:

$4.8 \times 10^9$ ATP/s ion channel operation

$0.92 \times 10^9$ ATP/s maintaining resting membrane potential

Total distance travelled by synaptic vesicle proteins within the axonal arbor each day is 2.8 to 5.6 kilometers, using 3.5 to $7 \times 10^{11}$ ATP/day, a small fraction of the daily energy budget of the neuron, which has a $4.95 \times 10^{14}$ ATP/day TOTAL daily energy

expenditure. But this energy utilization is out there in the neuropil, away from the neuronal soma, or cell body. It is thus vulnerable to energy failure supply in the neuropil itself.

## Neuraxonal Spheroids in Ischemia and in Early Childhood Deaths

Ischemia inhibits both kinesin and dynein.[13,14] Neuraxonal spheroids would thus be expected from energy failure. It is evidentiary that ß-amyloid precursor protein staining is seen in ischemia, not only trauma.[15]

One study of 176 early childhood deaths aged 0 to 3 yrs found some degree of APP staining in 95% of cases.[16] This finding was seen as relevant to the hypothesis that spheroids are a signature of shaking. Either (1) most of these young deaths were shaken brains, or (2) this is a near normal occurrence due to imperfectly homogeneous axonal transport.

A meta-analysis of features associated with AHT and non-AHT found that diffuse axonal injury did not distinguish the type of trauma, even using the circular reasoning that the trauma was defined in part by the presence or absence of neuraxonal spheroids.[17] Neither were subarachnoid hemorrhage(s), cerebral edema, head and neck bruising, any bruising, nor vomiting evidentiary for either type of trauma.

## Detour Hemorrhages



At left we see the non-perfused brain at autopsy, surrounded by subarachnoid and subdural hemorrhage, easily misdiagnosed as trauma. These are detour hemorrhages forced around the non-perfused brain because the blood cannot pass through the brain due to microcirculatory closure (see above), with all the epinephrine, dopamine, vasopressin and heparin that was given to Nikki. DSC_2625.JPG



Here we see the base of the skull, which is atraumatic, as is the convexity of the skull. Noteworthy is the amount of subdural blood, which mistakenly invites a diagnosis of trauma, when in fact the subdural and intradural accumulation of blood results from the heparin, epinephrine, dopamine, vasopressin, disseminated intravascular coagulation, all in the face of a hyperdynamic circulation, *i.e.* high flow and high pressure state. DSC_2604.JPG

## Retinal Hemorrhage



At left we see a retina with the layer of rods and cones at the bottom, and the nerve fiber layer at the top. There is hemorrhage (arrows) in the nerve fiber layer and a small amount in the inner nuclear layer (circled) at left. These bright red blood cells signify nothing more than their escape from the vasculature. They are not indicia of trauma and hence cannot be indicia of "abusive" trauma. 456-02 H&E R eye retina 20×



The other eye here shows no hemorrhage, and thus could not support the hypothesis of traumatic shaking if that had occurred. Both eyes are embedded safely in fat and bone, and do not move. The 10 layered histology of a normal retina seen at left. The layer of rods and cones is at the bottom and the nerve fiber layer is at the top. 456-02 H&E L eye retina 20×

## Optic Nerve Sheath



The optic nerve of the left eye is seen centrally, here surrounded by a pink circumference of fibrous tissue termed the dura mater. The spacing between the optic nerve and the dura offers no tissue resistance and blood leaking finds its way without impedance to track along the subdural space of the optic nerve. 456-02 H&E L eye optic nerve 2×



The other eye also shows hemorrhages in the optic nerve sheath, here more in the dura than in the subdural space. The central retinal artery is seen at right, before it has plunged into the substance of the optic nerve, which it will do more anteriorly, towards the globe. 456-02 H&E R eye optic nerve 2× optic nerve sheath hemorrhages have no evidentiary value in determining whether abuse has occurred.[18,19] They are of pathophysiologic value in determining that leakage of blood has occurred, here, due to disseminated intravascular coagulation, and increased intracranial pressure.



A section of the right optic nerve at higher magnification shows muscle at the upper left of this photomicrograph with the optic nerve at the lower right. In between is a crescent shaped pink dura mater with hemorrhage within it (arrows). 456-02 H&E R eye optic nerve intradural hemorrhage 10×



At a different point along the length of the optic nerve we see here vessels (arrows) that give rise to the bleeding. The fact that the optic nerve sheath and the dura mater of the brain both show intradural hemorrhage which then becomes subdural, blows a fatal hole in the theory that subdural hematoma is due to tearing of bridging veins. It appears as intradural hemorrhage which goes to the path of least resistance, *i.e.* subdurally. 456-02 H&E R eye optic nerve intradural hemorrhage 20×

## Cranial Dura Mater



The cranial dura mater shows intradural hemorrhage (as does the optic nerve sheath dura mater, see above). As can be seen, the dura is vascular, as every neurosurgeon knows, and can bleed profusely intradurally. This flies in the face of the theory that trauma is necessary to cause subdural hemorrhage via tearing of bridging veins. 456-02 H&E dura mater 10×



With the massive amounts of blood seen in the subdural space, trauma is reflexively evoked, but is wrong in light of the anti-coagulated state due to disseminated intravascular coagulation (DIC, defined below) and heparin, combined with the massive blood pressure diverting blood around a non-perfused brain. Thus, homicide is indirectly called, by the bleeding which has other causes, both natural and iatrogenic (caused by treatment). The natural causes are her (i) infection-related DIC, (ii) cardiac arrest related DIC; iatrogenic causes are (iii) epinephrine, (iv) dopamine, (v) vasopressin and (vi) heparin. Thus, the emotive reaction of diagnosing a homicide due to trauma when the skull is opened and this is seen, is a diagnostic error. DSC_2596.JPG



The scalp and skull are atraumatic, without fracture. The blood spots seen are due to disseminated intravascular coagulation and firm touch of the skull, which is impossible to avoid when placing, positioning and lifting a child as in the insertion of the line seen in the next photograph. DSC_2615.JPG



The scalp and skull must be held steadily and firmly to insert lines such as this, and to suture them in place. When disseminated intravascular coagulation is present, it is impossible not to form hemorrhages, related to both the suturing, the line insertion, and the grasping of the skull necessary to perform the procedure. DSC_2592.JPG

## Skin



Whenever there is bruising in the skin, abuse is assumed. However, there is no way hospital staff can turn a child in bed or touch the skin firmly during insertion of intravenous lines or during intubation, without causing bruising, when disseminated intravascular coagulation is present. Here we see hemorrhage in the fat of the hypodermis (arrows). 456-02 H&E skin 2×



It is necessary to do a finger sweep prior to insertion of an orotracheal tube, or in fact inserting anything into the mouth. When the finger sweep occurs, the frenulum can be damaged. But here, we see the oral effect of disseminated intravascular coagulation. There may be infection in the mouth as well, but the frenulum histologically (see below) showed no iron or organisms. DSC_2597.JPG & 456-02 Fe frenulum 10×



# Viruses Kill Young Children

Respiratory viral infection is a major cause of morbidity and mortality in infants and in toddlers.[20] We review here the resulting pneumonia, and then the responsible viruses.

## Pneumonia of the Interstitial Type

In general, pneumonia can affect humans at all stages of life and is the commonest worldwide killer of kids under 5. Pneumonia kills the very old and the very young. Especially, viral pneumonia in the young has been recognized in literature of over half a century.[20-68]

Chronic interstitial pneumonia of infancy was described in detail by Schroeder and co-workers in 1992[69] and by Anna-Luise Katzenstein in 1995,[70] the same clinical pulmonary scientist to have described lymphomatoid granulomatosis.[71] Pneumonia has been described as an insidious killer due to the compensation, or adaptation that can take place to progressive hypoxia, akin to climbing Mount Everest. Not all pneumonias produce purulent sputum. Especially nonbacterial pneumonias produce a round cell infiltrate (macrophages and lymphocytes, termed chronic inflammation), and are chronic. Reviews of interstitial lung disease in infancy indicates it is a killer of babies[69,70,72] seen also in the graph below, from the European Respiratory Society:[73]



## Viruses Responsible

In the present era of post-13-valent pneumococcal conjugate vaccine, pneumococcal disease has fallen and viruses now remain the most common cause of community-acquired pneumonia in young children.[74,75]

A number of viruses can cause pneumonia at this age.[74,76] This includes rhinovirus, community acquired pneumonia,[77-80] caused by a virus that is common and usually causes no disease other than upper respiratory infection.[80] However, it has become clear that lower respiratory infection by a rhinovirus can be seen in immunocompetent babies.[81,82] In an article in Reviews of Medical Virology, Hayden summarized in 2004 already that "Clinical studies report that HRV infection is the second most frequently recognized agent associated with pneumonia and bronchiolitis in infants and young children".[80]

One population-based study[74] enrolled 2638 children of median age 2 yrs, 89% of whom had radiographic pneumonia (11% did not have radiographic pneumonia! This accords with another large study[73]). 21% required intensive care and 3 died. Among 2222 children with radiographic pneumonia and specimens available for both bacterial and viral testing, a viral and/or bacterial pathogen was detected in 1802 (81%); ≥1 virus in 1472 (66%), bacteria in 175 (8%), and bacterial-viral co-detection in 155 (7%). Annual pneumonia incidence was 15.7/10,000 children, with the highest rates among children <2 yrs (62.2/10,000). Of the 2222 children with radiographic pneumonia, inter-rater agreement among the 3 study radiologists in a 10% random sample of radiographs was 84%. The most commonly detected pathogens were RSV (28%), HRV (27%), HMPV (13%), AdV (11%), *M. pneumoniae* (8%), PIV (7%), influenza (7%), CoV (5%), *S. pneumoniae* (4%), *S. aureus* (1%), and *S. pyogenes* (<1%). Human rhinovirus was thus second place in frequency. Rhinovirus was detected year round, with little seasonality. We usually do not know the strain (A, B or C) of rhinovirus. In a 5 year study,[83] 643 children with radiographically confirmed community acquired pneumonia, 72.9% were positive for at least one virus. All 3 HRV types were circulating, HRV–A being identified in 51.6%, HRV–B in 9.3% and HRV–C in 39.1%. Table 1 shows that 31.1% of children with rhinovirus pneumonia were <1 year of age. Different strains circulated during several seasons, and the nucleotide sequences clustered with the known serotypes. The authors concluded that a large number of genotypes could be involved in causing pediatric community acquired pneumonia and that these can be different from year to year. These findings are in accord with those of Iwane et al, who studied the different rhinovirus species in young US children hospitalized for pneumonia.[78] Results from other countries appear similar with respect to rhinovirus strains, specifically in the 1-11 month age group (see Table 4[79]).

The European Respiratory Society task force on interstitial lung disease recommends that "Any child with a normal birth history, presenting with the signs and symptoms suggestive of ILD lasting for >3 months should be evaluated for ILD."[73] A diagnosis was rendered in 177 of 185 patients, and in 56 of 58 in children < 2 years of age. Of 111 immunocompetent children with interstitial pneumonia for which data are available, 10 showed positive results, detecting adenovirus (n=1) EBV (n=4) influenza (n=1) parvovirus (n=1), CMV (n=1) and Mycoplasma pneumoniae (n=1).[73] Children <1 yr of age comprised 46% of cases in a 12-year long study of interstitial lung disease in 48 children aged 1 month to 18 years.[84] Onset of symptoms occurred most often in infancy.

Other viruses must be considered. These include <u>metapneumovirus</u>, Epstein-Barr virus, <u>adenovirus</u> and <u>cytomegalovirus</u>.[72] Infant pneumonia can be caused by both EBV and CMV[80,85-,88] Human herpes virus 6 (<u>HHV-6</u>), should be considered in sudden death in infancy.[89]

There is still much we don't know about viruses, yet they have incorporated themselves into our DNA, comprising roughly 8% of it. Only recently, <u>redondovirus</u> was discovered, and in respiratory samples.[90] Its role in childhood pneumonias such as the present case is as yet unknown.

*Pneumocystis carinii* pneumonia produces an interstitial pneumonia in infants.[72]

To clarify the exact virus is academic but desirable. An approach similar to that in SIDS would be necessary, and even in SIDS such an approach has not been implemented. Nikki Curtis resembles SIDS with her near-miss apnea of breathing episodes. SIDS also shows interstitial pneumonia.[91-93]

Since SIDS epidemiologically has strong support for a viral etiology and a strong cytokine response,[94-98] in addition to the lung pathology,[91-93] and approach examining for many viruses at one time may be useful, such as an automated Multiplex PCR panel.[99] Still, as just outlined, there is much we don't know about viruses, and a virus yet undiscovered may be at play in SIDS or in interstitial pneumonias such as that which killed Nikki Curtis.

## Atraumatic Bleeding in this Case

Trauma was the only cranial consideration for the oozing hemorrhages, despite the absence of bruising or fracture. This conclusion ignores other causes that are supported by evidence.

### Cause #1: Disseminated intravascular coagulation (DIC)

When the heart stops, the stagnation can give rise to consumption of clotting factors called disseminated intravascular coagulation, or DIC. Because this consumes the clotting factors, bleeding can result. In fact, bleeding and clotting simultaneously are the hallmark of DIC. We see that in the present case. The oozing hemorrhage we see throughout the autopsy, together, argue that cardiac arrest DIC occurred. DIC following cardiac arrest is known from the literature, including its occurrence in very young children[100-103] such as Nikki Curtis. The blood drawn January 31, 2002 showed elevated D-dimer 16.8 (normal 0-3), establishing that Nikki Curtis in fact had disseminated intravascular coagulation.

## Cause #2: Non-Perfused Brain

The massive cerebral edema, the dusky brown discoloration of the cortex noted, and the scattered red or eosinophilic neurons throughout the brain are all characteristic of non-perfused brain.[104] We here define non-perfused brain: After roughly 10 minutes of non-perfusion the brain undergoes irreversible closure of the microcirculation. Such a brain can never be perfused again and is termed non-perfused brain, or brain death[6,7] in clinical parlance and in the media.

Blood coming up from the heart to the brain, via the 2 carotid arteries and 2 vertebral arteries, the 4 arteries that supply the brain, is essentially at cardiac pressure. When the cerebral circulation is encountered, there is resistance. The amount of resistance depends on the intracranial pressure. Thus, the mean arterial pressure must be at least 40 or 50 mmHg higher than the intracranial pressure for perfusion to occur. This is given simply in the following equation for perfusion pressure:



MABP – ICP = perfusion pressure

(must be > 40 mm Hg to overcome cerebrovascular resistance)

Where MABP is the mean arterial blood pressure (diastolic + ⅔ of the pulse pressure) and ICP is the intracranial pressure. Obviously either a drop in mean arterial pressure, or an increase in intracranial pressure, can give rise to loss of perfusion pressure.

The cause of the non-perfused brain is prolonged global ischemia with leakage of fluid across the endothelium with separated tight junctions. This is illustrated here:

A swollen brain is



one whose endothelium is leaking. Endothelium is the lining of the capillaries. These leak when the heart stops. Their junctions are ripped apart, as here at right. The tight junctions (*zonulae occludentes* in Latin) rip apart (white arrows) like a ski jacket zipper in the middle, and allow fluid to leak from the vessel, creating cerebral edema. Once the water leaks out, it presses the vessel closed from the outside, and the microcirculation is collapsed and closed to perfusion.

One major consequence of this is that when circulation is reestablished with epinephrine, even partially, it drives blood around the brain in a diversion of blood around non-perfused brain. In a 2-year old, 60% of the cardiac output normally goes through the brain.[106] but with non-perfused brain, this high flow of blood is diverted around the brain, because it cannot go through the brain. This gives "detour hemorrhages" seen in the retina, dura, subarachnoid space and in the nose, the so-called hot nose sign[1,5,107-111] also illustrated (right) in Wikipedia.



https://en.wikipedia.org/wiki/Hot_nose_sign  These are all signs of brain death. The retinal hemorrhages can be considered a "hot retina sign", and the "dural blood" can be considered a "hot dura sign", all due to hyperperfusion consequent to Nikki's non-perfused brain.

## Cause #3: Epinephrine Drip

Epinephrine is needed to try and restart the heart and save the child. Protocols for childhood resuscitation include the use of epinephrine.[112,113] The epinephrine drip used here is entirely justified in an emergency medical situation.

However, epinephrine causes a hyperdynamic circulation. By this we mean that blood pressure and blood flow are both increased. The normal blood pressure of a child is dependent on age, increasing from infancy. Cardiac output is equal to the stroke volume times the pulse. In the file "11 - Children's Hospital Dallas ECG.pdf" the pulse of Nikki Curtis is noted to be 165 bpm at 20:21:11 on January 31, 2002. The systolic blood pressure is up to 127mmHg on page 19, the 50th percentile for girls at this age being 89 and the 95th percentile 118mmHg (see Table 3, page 84[114]). Because of the epinephrine, her blood pressure is off-the-charts high for a 2 year old girl.

## Cause #4: Vasopressin & Dopamine

Vasopressin, also termed antidiuretic hormone for its water preserving properties within the body, has protean actions. It acts on the brain to promote group thinking and

bonding friendship. It acts on the blood vascular system to increase the blood pressure, hence its name.

Dopamine also has protean effects within the brain, being the pleasure hormone. It is deficient in Parkinonism. Peripherally, the same molecule stimulates the force of contraction of the heart, an action termed "inotropic" for drugs. The inotropic action of dopamine sustains the blood pressure, which is why it is used in clinical situations such as the resuscitation of Nikki Curtis.

### Cause #5: Heparin:

Heparin is a powerful anticoagulant and can cause so much bleeding it has been used as a murder weapon by making the victim bleed.[115] It is used here to keep perfusion going. But as an anticoagulant, it acts together with the above cause #1 of the bleeding, disseminated intravascular coagulation. Together, heparin and DIC are synergistic in causing bleeding. This powerful anticoagulant profile that existed in Nikki acted on the imposed detour of blood flow around non-perfused brain, giving rise to massive bleeding around the non-perfused brain. We recall that 60% of the blood flow coming out of the heart normally goes to brain,[106] but has to go around it if there is non-perfused brain as in Nikki Curtis. Fueled by epinephrine, vasopressin and dopamine, the high flow naturally bleeds due to heparin and DIC.

## Narrative Summary of What Happened to Nikki Curtis

Nikki was a sickly child with chronic febrile pulmonary infection, with the following evidence for that, from the original chart:
- Temperature was measured at 104.5°F (40.27°C)
- Weight 27 lb 13oz. (12.64 kg)
- High fever
- Viral etiology
- Alternatively, unresolved upper respiratory infection.
- Prescribed omnicef antibiotic
- Phenergan with codeine for cough

Inserted into the above clear history of double infection with both virus and bacteria is abuse, which obfuscates, fogs clear thinking and insidiously detracts from medical issues, here severe. Abuse is mentioned on page 9, 12, as nightmares on visitation with her biological father and paternal grandmother. Maternal grandmother is allegedly "concerned" about abuse on visits. June 13, 2001. Doctors bought into this, relating the nightmares to shifting from maternal to paternal grandparents (page 12 of 22 in "02 - early palestine medical records.pdf")

Nikki Curtis's medical records show that she was a sickly child from birth and

suffered from chronic, antibiotic-resistant infections throughout her short life. The illnesses included persistent ear infections, required that the ear drums be surgically pierced and drainage tubes implanted—but that procedure did not resolve the problem.

Two days before her death, she presented at her pediatrician's office with a fever of 104.5°F and respiratory congestion, which can block the Eustachian tube that drains the ear and thus increase the risk/severity of middle ear infections. Emergency Room records from Palestine Regional Medical Center indicate that her ear drums were "erythematous" (inflamed and possibly infected) on January 31, 2002. This condition was not, however, investigated or considered in assessing the cause of her loss of consciousness or death.

Nikki Curtis's medical records show that she had repeated episodes of "breathing apnea" when she would stop breathing and turn blue. Although she was referred for a neurological work-up to determine whether she had a seizure condition, the head scans from this examination were not consulted at the time of her death (and have since been destroyed). The cause of the breathing apnea was never explained or resolved, but may relate to viral, and hence antibiotic resistant, interstitial pneumonia.

For over a week before Nikki Curtis's death, she was quite ill. On January 28, 2002, she was taken to the Emergency Room with an infection, and her caregivers reported that she had had nausea, diarrhea, and high fever for a week before that. She was prescribed Phenergan suppositories and codeine cough syrup, medications that suppress the central nervous system.

Interstitial pneumonia is characteristically and understandably missed, because forensic pathologists are not trained to recognize it. They usually are adept at recognizing bronchopneumonia and relate this to a ventilator. But interstitial pneumonia is a chronic disease of childhood. It causes weight loss and eventuates in death. And, critical here: the decreased lung function causes death via reducing blood pressure and cardiac function.



The interstitial pneumonia led to cardiac arrest due to the profound effect of deficient blood oxygenation

The University of Saskatchewan and Saskatoon Health Region:
Improving health through excellence in education, research and clinical care.

on the blood pressure. This is illustrated here from my own work in my own laboratory.[116] This is how the cardiac arrest took place in Nikki. Her lungs show it.

One of the effects of pediatric resuscitation nowadays is due to the use of epinephrine,[112,113] which produces a hyperdynamic circulation around a non-perfused brain. The resulting detour hemorrhages are seen in the retina, nose, dura, and are misinterpretable as a head injury, and bleeding is equated only to trauma, absent a differential diagnosis. Resuscitation gives bruises that result from touching an infant with a hyperdynamic, leaking circulation.[117]

# Medical Examiner Cause of Death

## Lungs

- The right lung weighed 170 g and the left weighed 150 g (normal R/L weights at age 2 being 88g and 76g[118]). The autopsy report prepared on February 2, 2002 includes the following notation indicating lung cut surface was dark red-blue, a very abnormal appearance. Lung tissue should be pink.

  ```
  RESPIRATORY SYSTEM: The upper airway is unobstructed. The laryngeal mucosa is
  smooth and unremarkable without petechiae. The pleural surfaces are smooth and
  shiny. The pulmonary arteries contain no emboli. The major bronchi are
  unremarkable. Sectioning of the lungs discloses a dark red-blue, moderately
  congested, slightly edematous parenchyma.
  ```

- Under microscopy, the description is that Nikki Curtis had (undiagnosed)

  ```
  Lung: Interbronchial aggregates of neutrophils and macrophages.
  ```

  interstitial (here termed "interbronchial") pneumonia:

## Blunt Force Everywhere

- Brain weight was 1550g, the normal for this age being 1064 g.[119,120] The brain was described as having 10 mL of subdural blood over the right cerebral convexity and another 10 mL of subdural blood supratentorial on the right. 5 mL of blood were present in the right middle cranial fossa There was thin-film subdural blood on the right anterior cranial fossa and thin-film subdural over the left parietal region. The brain itself was described as having generalized edema with flattened gyri and prominent tonsils of the cerebellum. The tonsils are the portion of the cerebellum that herniates into the spinal cord when the brain

volume has increased, from whatever cause. There are no contusions described on the brain. The microscopy of the brain describes patchy acute necrosis in the neocortex, deep grey matter and brainstem. Remarkably, β-amyloid precursor protein stains (BAPP stains) were used to diagnose trauma, despite the abundant evidence of ischemia. Axonal transport is an energy dependent process and it is a mistake to consider neuraxonal spheroids as evidence of only trauma. They can also be due to energy failure. See below.

The lungs show inflammation and necrosis, as richly illustrated in the microscopy of the lung, above. Most pathologists are not trained in the evaluation of the lung for interstitial pneumonia, regrettably.

# Factors at Play in the Original Misdiagnosis of Trauma

Multiple conversion factors led to the original diagnosis of traumatic brain injury in the face of abundant evidence of lethal, progressive infection of the pulmonary system. These factors will be reviewed in turn, for clarity.

## Decline of the autopsy

Since its heyday in the 1800s and early part of the 1900s, the autopsy has been in decline, now for the better part of a century. This is evidenced by titles containing those words.[121-123]

The decrease in autopsies has resulted in (i) decreased quality control in hospitals, (ii) failure to get closure of the heart and mind of families suffering death of a family member, (iii) decreased teaching materials for doctor trainees and (iv) decreased expertise in interpretation of autopsies. As these effects of the autopsy decline became apparent, the word "unfortunate" was added to the title of articles describing the decline of the autopsy.[124] Yet, since the turn of the millennium, the decline has continued, with autopsy rates near zero in many hospitals.[125,126] Fewer autopsies have led to fewer pathologists doing them, with dwindling expertise. The last bastion of the autopsy is in forensics.

## Forensic Autopsies and Pediatric Lung Pathology

Short on budget, yet with the legal requirement to clarify cause of death in all suspicious, out of hospital and accidental deaths, unexplained deaths and unexpected death, forensic pathology is in many places operating on a shoestring.

Infant and toddler lung pathology is not the province of forensic pathologists. There are a number of reasons for missing major pneumonias, as in the present case of Nikki Curtis dying of a transparently evident pneumonia hiding in plain sight.

First is that pneumonia is a common autopsy finding. Forensic pathologists see some form of lung disease in almost every autopsy. It is easy to grow into a state of disregard for any pneumonia, over time.

Second is the fact that anyone who has been on a ventilator can get a bronchopneumonia. Albeit different from interstitial pneumonia, the two are often conflated due to lack of expertise in reading lung tissue in children under the microscope. As illustrated in this report, Nikki Curtis has a bronchopneumonia component due to chronic aspiration, this not being a case of ventilator pneumonia.[127-134] Yet bronchopneumonia is often conflated with interstitial pneumonia or aspiration pneumonia.

Third is the idea that pneumonia cannot be the cause of death and is not lethal. This has been corrected by the coronavirus epidemic and it is now realized that people can be completely asymptomatic and collapse as a first presentation: https://youtu.be/iiV1pAt8Iik But Nikki Curtis was even sicker than asymptomatic, clinically, and pathologically showed deep, longstanding, necrotizing viral infection in her lungs. Nevertheless, her pneumonia was missed. The facts indicate that pneumonia runs the gamut from asymptomatic to lethal, *i.e.* the widest spectrum possible. Pneumonia is a killer, and is the commonest worldwide cause of childhood death under age 5.

The fourth general reason that forensic autopsies call bleeding trauma is that trauma is what forensic pathology is inclined to find.  But if the only thing you have is a hammer, the whole world looks like a nail.  Trauma, over natural illness, is seen diagnosed in many forensic cases nowadays due to the presence of bleeding. But a comprehensive consideration of bleeding requires knowledge of blood clotting disorders (seen in Nikki Curtis in the form of DIC), damage to the vessel wall (likely in Nikki Curtis due to the circulating infectious agents of bacteria and virus) and the dynamic pressures of the circulation (seen in Nikki Curtis due to the epinephrine drip creating a hyperdynamic circulation). All these considerations have nothing to do with trauma, yet are rarely given forensic consideration.

## The Rise of Child Abuse Diagnoses

With the decline in autopsy diagnoses came a rise in child abuse diagnoses, concurrently and in almost inverse proportion, filling the vacuum. Thus, came out in the 1970s,[121-123] child abuse was gaining traction with a single major paper in the 60s[135] and several uni-authored papers by two different authors in the 1970s,[136-139] concurrent with autopsy decline. The authors were radiologist John Caffey and neurosurgeon Norman Guthkelch, both having made true, lasting contributions in the 1940s that stood the test of time.[140-144]

Caffey was enamored with his own hypothesis that shaking might be the cause of unexplained infant deaths, writing impassioned 4-line poems promulgating it, in his articles:

Hark ye, good parents, to my words true and plain,
When you are shaking your baby, you could be bruising his brain.
So save the limbs, the brain, even the life of your tot;
By shaking him never; never and not.[137]

Guard well your baby's precious head,
Shake, jerk and slap it never,
Lest you bruise his brain and twist his mind,
Or whiplash him dead, forever.[139]

Caffey died 4 years after he wrote this last shaken baby poem, on September 2, 1978. PubMed has 4 obituaries in radiologic[145-147] and pediatric[148] journals praise his contributions as the father of pediatric radiology, recognizing his many awards and contributions to infantile cortical hyperostosis, Perthe's disease and the cerebral palsy mental retardation that comes from shaking. "He was concerned with the written and spoken word, and was a skilled semanticist. His book and his articles are masterpieces of language and construction."[147] But Caffey had no training in science, neither in clinical trials nor laboratory bench research, and did not live long enough to learn that his last contribution was a mistake. He entered radiology by chance, and "was looked upon by so many as the high priest of the field with his monumental treatise its bible".[145]

Guthkelch, in contrast, died 45 years after his 1971 paper, on July 28, 2016 and saw the effects of his paper play out in courts of law around the world. He was aghast, and spent the last few decades of his life trying to undo the damage wrought on families by the shaken baby hypothesis: https://youtu.be/jlIs3Kn45GY where Doctor Guthkelch states that the reasoning that goes into the hypothesis is false, leading to incarceration of innocent people. Dr. Guthkelch wrote a retraction paper in the Houston Journal of Health, Law & Policy in 2012.[149] He was lucid to the end and lived into his 101st year before succumbing to a bladder infection.

## Orthodox Medical Beliefs Held in 2002

Beliefs in 2002 were that shaken baby syndrome had some problems revealed by physics, therefore proponents of SBS in the medical community thought it best to invoke impact as well as shaking. The logical incongruity of shaking and impact not being the same thing, was overcome by simply combining the terms in a new manufactured entity called shaken impact syndrome. Thus, near the bottom of page 1 in the file (*italics added*) "10 - REACH Children's Medical Center of Dallas Consult Note_02.01.2002.pdf" the following is written: "Her diagnosis is massive brain injury. *The only reasonable explanation is trauma*. The medical findings fit a picture of *shaken impact syndrome*.

There was some flinging or shaking component which resulted in subdural hemorrhaging and diffuse brain injury. There was also an area of impact in the right back of the head." This conjured scenario of flinging or shaking as a mechanism of brain damage arriving at the cranium via a fragile neck, has no basis in physics nor in the facts of this particular case.

Nevertheless, in 2002, shaken impact syndrome was believed to be a unitary entity and was regularly diagnosed. By 2009, shaking went mostly out the window because of an article written by the American Academy of Pediatrics by Cindy Christian et al.,[150] cautioning against invoking a sole shaking as a mechanism and substituting the new term Abusive Head Trauma. This new incarnation of abuse without a specific mechanism, nevertheless preserved shaking as a mechanism, and doctors were still free in what they could say in court, with respect to shaking versus impact.

It was not until 2017 that shaking was debunked. A study commissioned by Sweden, which looked at over 3000 papers in the medical literature, found insufficient evidence for the existence of shaken baby syndrome.[151] There was predictable pushback especially from the pediatric radiologic community and from the child-abuse community[152-154] One article even proclaimed "Shaken Baby Syndrome is Real" in the title.[155] While some circular reasoning has persisted[156-158] to their credit, the pediatric radiologic community found within itself a lack of science, promoting "unfounded assertions of equivalence", and this was published.[159]

All these events transpired since 2002 and should cause a complete re-examination of the case, performed here in this report, because medical belief systems have changed. Furthermore, many of the events in this report have nothing to do with Robert Roberson and he could not conceivably be held responsible for events carried out in hospital, nor for the long infectious history of the child:

## Events and Causation

This is a serious case, as execution due to the death penalty is at play. It is appropriate to review causality in the events that transpired in Nikki Curtis, specifically with respect to Robert Roberson. We do this here in point form:

1. The long history of fevers cannot have been caused by Mr. Roberson.
2. The breathing difficulties and apneic spells are those akin to those seen in babies later dying of SIDS. Mr. Roberson cannot be held accountable for these.
3. The fact that the child was sent home by a pediatrician, a child with a very high fever of 104.5°F, two days prior to death is not something for which Mr. Roberson can be held responsible.
4. The misplaced intubation tube, with the endotracheal tubes being inserted too far into one lung, cannot be Mr. Roberson's responsibility. It damaged Nikki, in that hypoxia worsens ischemia.[116]

5. The administration of hemorrhage-inducing, pressure-inducing drugs such as heparin, epinephrine, dopamine and vasopressin cannot be attributed to Mr. Roberson.

6. The disseminated intravascular coagulation that promotes bleeding, cannot have been caused by Mr. Roberson.

7. The fact that this occurred at a time when physicians easily believed in bleeding around the brain being equivalent to child abuse, cannot be attributed to Mr. Roberson.

8. In sum, Mr. Roberson cannot be deemed the cause of the medical findings nor any of the iatrogenically (doctor-induced) events that in turn caused Nikki Curtis's death.


## Identity and Credentials of Reviewer

- Physician and principal investigator scientist. Peer-reviewed publications (129) including trauma research[160] https://www.ncbi.nlm.nih.gov/pubmed/24849602 and cerebral hemorrhage.[161-163]

- Directed his own scientific laboratory for 25 years as a peer-review funded, principal investigator.

- Conducted scientific experiments in his own research laboratory on hypoxia,[164,116] hyperoxia,[116,165] hypoglycemia,[166-171] ischemia[172-203] epilepsy,[204-206] neuropsychology,[175,176,178,185,203,207] neurotoxicology,[207-213] and CNS trauma[160,214,215] as well as other scientific domains[216-219] including effect of early life immune challenges on responses to adult ischemia[220] and bodily effects of caloric restriction.[221,222]

- Over $2.2 million in peer-reviewed grant funding

- Google Scholar H-index of 58 (top 2% of scientists) with over 11,000 citations

- 129 peer-reviewed publications: 34 papers cited over 100 times, 12 papers cited over 200 times, 1 paper cited 1,027 times by others.

https://scholar.google.com/citations?user=BDmZ7H4AAAAJ&hl=en&oi=ao

- 35 years of experience in pediatric and adult neuropathology

- Wrote Hypoxia chapter in standard textbook – Greenfield's Neuropathology (6th,7th,8th editions)

- Wrote forensic book with Dr. Manfred Oehmichen entitled "Forensic Neuropathology and Associated Neurology"

- MD from Canada, PhD from Sweden, board certified in Canada and US


I have 35 years of research and clinical neuropathology experience in hemorrhage, ischemia, hypoxia, and trauma, and have conducted primary research (experimental science) in specifically in brain trauma. We developed a weight drop

model of craniocerebral trauma, and interrogated cerebral metabolism with magnetic resonance spectroscopy, finding a lactate increase that metabolically appeared already after 20 minutes. This trauma research was chosen for the cover of the Journal of Biological Chemistry.[160]

The facts and opinions set forth herein are given based on scientific evidence, which has changed since the time of the trial. Evidence based reasoning, logic and avoidance of fallacious thinking give us the highest certainty possible.  Literature cited augments the experience of the writer as a practicing experimental scientist, and a practicing clinical pathologist with 3½ decades of experience, in both science and medicine.

Sincerely,

*Roland Auer*

Roland N. Auer MD PhD FRCPC

## REFERENCES:

1.    Takehara Y, Takahashi M, Isoda H, Kaneko M, Sakai T, Tanaka T, Sato H, Yamamoto T (1989) Scintigraphic evaluation of brain death with 99mTc-d,l-hexamethyl-propyleneamine oxime (HMPAO) *Radioisotopes* **38**:335-338

2.    Andersen AR (1989) 99mTc-D,L-hexamethylene-propyleneamine oxime (99mTc-HMPAO): basic kinetic studies of a tracer of cerebral blood flow *Cerebrovasc Brain Metab Rev* **1**:288-318

3.    Larar GN, Nagel JS (1992) Technetium-99m-HMPAO cerebral perfusion scintigraphy: considerations for timely brain death declaration *J Nucl Med* **33**:2209-2211

4.    de la Riva A, González FM, Llamas-Elvira JM, Latre JM, Jiménez-Heffernan A, Vidal E, Martínez M, Torres M, Guerrero R, Alvarez F (1992) Diagnosis of brain death: superiority of perfusion studies with 99Tcm-HMPAO over conventional radionuclide cerebral angiography *Br J Radiol* **65**:289-294

5.    Tsuchida T, Sadato N, Nishizawa S, Matoba N, Fujita T, Tamaki N, Konishi J, Tamai S, Shingu K, Yonekura Y (1993) [99mTc-HMPAO SPECT in the brain death--a case report] *Kaku Igaku* **30**:663-667

6.    Black P McL (1978) Brain Death *N Engl J Med* **299**:338-344, 39

7.    Mathur M, Ashwal S (2015) Pediatric brain death determination *Semin Neurol* **35**:116-124

8.      Auer RN, Laganière JL, Robitaille YO, Richardson J, Dion PA, Rouleau GA, Shekarabi M (2016)
        KCC3 axonopathy: neuropathological features in the central and peripheral nervous system *Mod
        Pathol* **29**:962-976

9.      Strich SJ (1956) Diffuse degeneration of the cerebral white matter in severe dementia following
        head injury *J Neurol Neurosurg Psychiat* **19**:163-185

10.     Strich SJ (1970) Lesions in the cerebral hemispheres after blunt head injury *J Clin Pathol Suppl (R
        Coll Pathol)* **4**:166-171

11.     Lin MY, Sheng ZH (2015) Regulation of mitochondrial transport in neurons *Exp Cell Res* **334**:35-
        44

12.     Guedes-Dias P, Holzbaur ELF (2019) Axonal transport: Driving synaptic function *Science* **366**:

13.     Abe K, Aoki M, Kawagoe J, Yoshida T, Hattori A, Kogure K, Itoyama Y (1995) Ischemic delayed
        neuronal death. A mitochondrial hypothesis *Stroke* **26**:1478-1489

14.     Aoki M, Abe K, Yoshida T, Hattori A, Kogure K, Itoyama Y (1995) Early immunohistochemical
        changes of microtubule based motor proteins in gerbil hippocampus after transient ischemia *Brain
        Res* **669**:189-196

15.     Ryu J, Horkayne-Szakaly I, Xu L, Pletnikova O, Leri F, Eberhart C, Troncoso JC, Koliatsos VE
        (2014) The problem of axonal injury in the brains of veterans with histories of blast exposure *Acta
        Neuropathol Commun* **2**:153

16.     Jensen LL, Banner J, Ulhøi BP, Byard RW (2014) ß-Amyloid precursor protein staining of the
        brain in sudden infant and early childhood death *Neuropathol Appl Neurobiol* **40**:385-397

17.     Piteau SJ, Ward MG, Barrowman NJ, Plint AC (2012) Clinical and radiographic characteristics
        associated with abusive and nonabusive head trauma: a systematic review *Pediatrics* **130**:315-323

18.     Muller PJ, Deck JHN (1974) Intraocular and optic nerve sheath hemorrhage in cases of sudden
        intracranial hypertension *J Neurosurg* **41**:160-166

19.     Leeuw MD, Beuls E, Jorens PG, Parizel P, Jacobs W (2015) The optic nerve sheath hemorrhage is
        a non-specific finding in cases of suspected child abuse *J Forensic Leg Med* **36**:43-48

20.     Tregoning JS, Schwarze J (2010) Respiratory viral infections in infants: causes, clinical
        symptoms, virology, and immunology *Clin Microbiol Rev* **23**:74-98

21.     Morozenko MA, Barysheva AE, Timofeyeva GA, Bystryakova LV, Kalinnikova ON (1963)
        Diagnostic  value of the complement fixation reactions in viral respiratory infections of infants
        *Acta Virol* **7**:534-541

22.     Klimkova NK, Makarov IV, Krasikova VA, Ritova VV (1972) [Roentgenologic changes in the
        lungs in acute viral respiratory infections in newborn and premature infants] *Vopr Okhr Materin
        Det* **17**:12-16

23.     Henigst W (1975) [Respiratory tract infections of viral origin in infants. Examination of 103
        serum pairs in autumn and following spring] *Med Klin* **70**:1831-1836

24.     McIntosh K (1978) Interferon in nasal secretions from infants with viral respiratory tract
        infections *J Pediatr* **93**:33-36

25.     Makhlinovskaia NL (1979) [Problems in the clinical diagnosis of acute pneumonia in respiratory viral infections in infants] *Vopr Okhr Materin Det* **24**:11-15

26.     Chobotar'ova VD, Povolots'kyi IaL, Korniienko AB, Kryvokhats'ka LD (1979) [Serum endogenous interferon indices in acute respiratory viral infections in young infants] *Pediatr Akus Ginekol* :15-17

27.     Rainite-Audiene AB, Uspenskii IuS, Priimiagi LS, Kremerman IB, Voloshina LZ (1979) [Evaluation of the effectiveness of prodigiozan in acute respiratory viral infections in young infants] *Pediatriia* :44-46

28.     Cheshik SG, Ketiladze ES, Lipkovich SA, Ivanova LA, Poliakova TG (1980) [Role of viral and viral-bacterial associations in the course of acute pneumonias in respiratory viral infections in young infants] *Pediatriia* :31-35

29.     Belova MN, Makarova ZS (1980) [Prevention of acute respiratory viral infections in infants attending nurseries] *Med Sestra* **39**:47-48

30.     Vujosevic M, Dodic-Savic M, Polak D, Petrovic R (1980) [Treatment of respiratory viral infections in infants and small children] *Srp Arh Celok Lek* **108**:1305-1314

31.     Pikuza OI, Maianskii AN, Belagai IV (1982) [Role of immune complexes in newborn infants with acute respiratory viral infections and pneumonia] *Pediatriia* :22-24

32.     Imrei L, Sótonyi P (1982) Electron microscopic investigations on the upper respiratory tracts of infants and children for detecting viral infections *Int J Pediatr Otorhinolaryngol* **4**:215-224

33.     Rainite-Audiene AB, Priimiagi LS, Kremerman IB, Rozhukas AA (1985) [Evaluation of levamisole as an interferon inducer in young infants with respiratory viral infections] *Pediatriia* :38-40

34.     Hemming VG, Prince GA (1986) Intravenous immunoglobulin G in viral respiratory infections for newborns and infants *Pediatr Infect Dis* **5**:S204-S206

35.     Vicente M, Wu E, Carrasco L, Acevedo C, Ramírez R, Peña A, Larrañaga C, Morales T (1988) [Viral participation in acute lower respiratory infections in infants] *Rev Chil Pediatr* **59**:353-358

36.     Lomako LT, Grak LV, Kovaleva IA (1989) [Myocardial contractility and hemodynamic indicators in newborn infants with acute respiratory viral infections] *Pediatriia* :22-24

37.     Torbicka E, Tranda I, Roszkowska-Sliz L, Wilczynski J, Jankowski M (1990) [Clinical observations in acute viral respiratory tract infections in infants under 2 years of age] *Przegl Epidemiol* **44**:203-214

38.     Kellner G, Popow-Kraupp T, Popow C, Kundi M, Kunz C (1990) Surveillance of viral respiratory tract infections over a one year period in mainly hospitalized Austrian infants and children by a rapid enzyme-linked immunosorbent assay diagnosis *Wien Klin Wochenschr* **102**:100-106

39.     Kinney JS, Robertsen CM, Johnson KM, Gaddis M, Wheeler R, Jackson MA, Daily DK (1995) Seasonal respiratory viral infections. Impact on infants with chronic lung disease following discharge from the neonatal intensive care unit *Arch Pediatr Adolesc Med* **149**:81-85

40.     Tecu C, Gherghina I, Constantinescu C, Chirita C, Ionita E, Alexandrescu V, Matepiuc M, Lupulescu E, Vizitiu O (1996) Viral etiology of acute respiratory infections in infants and young children *Roum Arch Microbiol Immunol* **55**:333-339

41.     Armstrong D, Grimwood K, Carlin JB, Carzino R, Hull J, Olinsky A, Phelan PD (1998) Severe
        viral respiratory infections in infants with cystic fibrosis *Pediatr Pulmonol* **26**:371-379

42.     Joshi P, Shaw A, Kakakios A, Isaacs D (2003) Interferon-gamma levels in nasopharyngeal
        secretions of infants with respiratory syncytial virus and other respiratory viral infections *Clin Exp
        Immunol* **131**:143-147

43.     Giovannini M, Rossi GA, Merolla R, Arena F, Cutrera R, Dalla Casa P, D'Andrea N, Galluzzo C,
        Indinnimeo L, Ivaldi M, Pifferi M, Rinaldi G, Torcoletti M, Zuccotti GV (2003) [Respiratory
        diseases in infants hospitalized during the 1st 2 years of life for viral lower respiratory tract
        infections: a one-year follow-up] *Minerva Pediatr* **55**:149-155

44.     Aberle JH, Aberle SW, Rebhandl W, Pracher E, Kundi M, Popow-Kraupp T (2004) Decreased
        interferon-gamma response in respiratory syncytial virus compared to other respiratory viral
        infections in infants *Clin Exp Immunol* **137**:146-150

45.     Fodha I, Vabret A, Ghedira L, Seboui H, Chouchane S, Dewar J, Gueddiche N, Trabelsi A,
        Boujaafar N, Freymuth F (2007) Respiratory syncytial virus infections in hospitalized infants:
        association between viral load, virus subgroup, and disease severity *J Med Virol* **79**:1951-1958

46.     Broughton S, Sylvester KP, Fox G, Zuckerman M, Smith M, Milner AD, Rafferty GF, Greenough
        A (2007) Lung function in prematurely born infants after viral lower respiratory tract infections
        *Pediatr Infect Dis J* **26**:1019-1024

47.     Boivin G, Caouette G, Frenette L, Carbonneau J, Ouakki M, De Serres G (2008) Human
        respiratory syncytial virus and other viral infections in infants receiving palivizumab *J Clin Virol*
        **42**:52-57

48.     Jartti T, Lee WM, Pappas T, Evans M, Lemanske RF Jr, Gern JE (2008) Serial viral infections in
        infants with recurrent respiratory illnesses *Eur Respir J* **32**:314-320

49.     Calvo C, García-García ML, Blanco C, Vázquez MC, Frías ME, Pérez-Breña P, Casas I (2008)
        Multiple simultaneous viral infections in infants with acute respiratory tract infections in Spain *J
        Clin Virol* **42**:268-272

50.     Fairchok MP, Martin ET, Chambers S, Kuypers J, Behrens M, Braun LE, Englund JA (2010)
        Epidemiology of viral respiratory tract infections in a prospective cohort of infants and toddlers
        attending daycare *J Clin Virol* **49**:16-20

51.     Drysdale SB, Wilson T, Alcazar M, Broughton S, Zuckerman M, Smith M, Rafferty GF, Johnston
        SL, Greenough A (2011) Lung function prior to viral lower respiratory tract infections in
        prematurely born infants *Thorax* **66**:468-473

52.     O'Callaghan-Gordo C, Díez-Padrisa N, Abacassamo F, Pérez-Breña P, Casas I, Alonso PL, Roca
        A (2011) Viral acute respiratory infections among infants visited in a rural hospital of southern
        Mozambique *Trop Med Int Health* **16**:1054-1060

53.     Laurent C, Dugué AE, Brouard J, Nimal D, Dina J, Parienti JJ, Vabret A (2012) Viral
        epidemiology and severity of respiratory infections in infants in 2009: a prospective study *Pediatr
        Infect Dis J* **31**:827-831

54.     Bennett NJ, Tabarani CM, Bartholoma NM, Wang D, Huang D, Riddell SW, Kiska DL, Hingre R,
        Rosenberg HF, Domachowske JB (2012) Unrecognized viral respiratory tract infections in

premature infants during their birth hospitalization: a prospective surveillance study in two
neonatal intensive care units *J Pediatr* **161**:814-818

55.    Sankaran K, Kalappurackal M, Tan B (2013) Prevention of respiratory syncytial viral infections in
late preterm infants *Zhongguo Dang Dai Er Ke Za Zhi* **15**:241-248

56.    Ferronato AE, Gilio AE, Vieira SE (2013) Respiratory viral infections in infants with clinically
suspected pertussis *J Pediatr (Rio J)* **89**:549-553

57.    Kawabuchi-Kurata T, Misaki T, Suehiro Y, Komano AJ, Kase T, Takahashi K (2014)
Longitudinal study on respiratory viral co-infections in the presence or absence of clinical
manifestation in infants aged 0-2 years *Jpn J Infect Dis* **67**:216-220

58.    Drysdale SB, Alcazar-Paris M, Wilson T, Smith M, Zuckerman M, Peacock JL, Johnston SL,
Greenough A (2015) Viral lower respiratory tract infections and preterm infants' healthcare
utilisation *Eur J Pediatr* **174**:209-215

59.    Arruda E, Jones MH, Escremim de Paula F, Chong D, Bugarin G, Notario G, Matsuno AK, Pitrez
PM, Vo P, Suzuki C, Rosario Filho N, Stein RT (2014) The burden of single virus and viral
coinfections on severe lower respiratory tract infections among preterm infants: a prospective birth
cohort study in Brazil *Pediatr Infect Dis J* **33**:997-1003

60.    Olabarrieta I, Gonzalez-Carrasco E, Calvo C, Pozo F, Casas I, García-García ML (2015) Hospital
admission due to respiratory viral infections in moderate preterm, late preterm and term infants
during their first year of life *Allergol Immunopathol (Madr)* **43**:469-473

61.    García-Garcia ML, González-Carrasco E, Quevedo S, Muñoz C, Sánchez-Escudero V, Pozo F,
Casas I, Calvo C (2015) Clinical and Virological Characteristics of Early and Moderate Preterm
Infants Readmitted With Viral Respiratory Infections *Pediatr Infect Dis J* **34**:693-699

62.    Caserta MT, Yang H, Gill SR, Holden-Wiltse J, Pryhuber G (2017) Viral Respiratory Infections in
Preterm Infants during and after Hospitalization *J Pediatr* **182**:53-58.e3

63.    Long SS (2017) Low rate of viral respiratory infections in infants in the NICU *J Pediatr* **182**:3

64.    Boonyaratanakornkit J, Englund JA, Magaret AS, Bu Y, Tielsch JM, Khatry SK, Katz J, Kuypers
J, Shrestha L, LeClerq SC, Steinhoff MC, Chu HY (2018) Primary and Repeated Respiratory
Viral Infections Among Infants in Rural Nepal *J Pediatric Infect Dis Soc* :

65.    Rodriguez-Martinez CE, Acuña-Cordero R, Sossa-Briceño MP (2018) Predictors of prolonged
length of hospital stay or readmissions for acute viral lower respiratory tract infections among
infants with a history of bronchopulmonary dysplasia *J Med Virol* **90**:405-411

66.    Alchikh M, Conrad T, Hoppe C, Ma X, Broberg E, Penttinen P, Reiche J, Biere B, Schweiger B,
Rath B (2019) Are we missing respiratory viral infections in infants and children? Comparison of
a hospital-based quality management system with standard of care *Clin Microbiol Infect*
**25**:380.e9-380.

67.    Deschamp AR, Hatch JE, Slaven JE, Gebregziabher N, Storch G, Hall GL, Stick S, Ranganathan
S, Ferkol TW, Davis SD (2019) Early respiratory viral infections in infants with cystic fibrosis *J
Cyst Fibros* :

68.    Aykac K, Karadag-Oncel E, Tanir Basaranoglu S, Alp A, Cengiz AB, Ceyhan M, Kara A (2019)
Respiratory viral infections in infants with possible sepsis *J Med Virol* **91**:171-178

69.    Schroeder SA, Shannon DC, Mark EJ (1992) Cellular interstitial pneumonitis in infants. A clinicopathologic study *Chest* **101**:1065-1069

70.    Katzenstein AL, Gordon LP, Oliphant M, Swender PT (1995) Chronic pneumonitis of infancy. A unique form of interstitial lung disease occurring in early childhood *Am J Surg Pathol* **19**:439-447

71.    Katzenstein ALA, Carrington DB, Liebow AA (1979) Lymphomatoid granulomatosis. A clinicopathologic study of 152 cases *Cancer* **43**:360-373

72.    Balasubramanian S, Janakiraman L, Ganesh R, Deenadayalan M, Naidu RK (2007) Interstitial lung disease in infancy *Indian J Pediatr* **74**:637-639

73.    Clement A, ERS Task Force (2004) Task force on chronic interstitial lung disease in immunocompetent children *Eur Respir J* **24**:686-697

74.    Jain S, Williams DJ, Arnold SR, Ampofo K, Bramley AM, Reed C, Stockmann C, Anderson EJ, Grijalva CG, Self WH, Zhu Y, Patel A, Hymas W, Chappell JD, Kaufman RA, Kan JH, Dansie D, Lenny N, Hillyard DR, Haynes LM, Levine M, Lindstrom (2015) Community-acquired pneumonia requiring hospitalization among U.S. children *N Engl J Med* **372**:835-845

75.    Shaughnessy EE, Stalets EL, Shah SS (2016) Community-acquired pneumonia in the post 13-valent pneumococcal conjugate vaccine era *Curr Opin Pediatr* **28**:786-793

76.    Othman HT, Abu Elhamed WA, Hassan DM, Soliman MS, Abdel Baset RW (2016) Respiratory syncytial virus and human metapneumovirus in severe lower respiratory tract infections in children under two *J Infect Dev Ctries* **10**:283-289

77.    Scott DJ, Gardner PS, McQuillin J, Stanton AN, Downham MA (1978) Respiratory viruses and cot death *Br Med J* **2**:12-13

78.    Iwane MK, Prill MM, Lu X, Miller EK, Edwards KM, Hall CB, Griffin MR, Staat MA, Anderson LJ, Williams JV, Weinberg GA, Ali A, Szilagyi PG, Zhu Y, Erdman DD (2011) Human rhinovirus species associated with hospitalizations for acute respiratory illness in young US children *J Infect Dis* **204**:1702-1710

79.    Fry AM, Lu X, Olsen SJ, Chittaganpitch M, Sawatwong P, Chantra S, Baggett HC, Erdman D (2011) Human rhinovirus infections in rural Thailand: epidemiological evidence for rhinovirus as both pathogen and bystander *PLoS One* **6**:e17780

80.    Hayden FG (2004) Rhinovirus and the lower respiratory tract *Rev Med Virol* **14**:17-31

81.    Papadopoulos NG (2004) Do rhinoviruses cause pneumonia in children? *Paediatr Respir Rev* **5 Suppl A**:S191-S195

82.    Sinaniotis CA (2004) Viral pneumoniae in children: incidence and aetiology *Paediatr Respir Rev* **5 Suppl A**:S197-S200

83.    Daleno C, Piralla A, Scala A, Senatore L, Principi N, Esposito S (2013) Phylogenetic analysis of human rhinovirus isolates collected from otherwise healthy children with community-acquired pneumonia during five successive years *PLoS One* **8**:e80614

84.    Fan LL, Mullen AL, Brugman SM, Inscore SC, Parks DP, White CW (1992) Clinical spectrum of chronic interstitial lung disease in children *J Pediatr* **121**:867-872

85.   Schroten H, Manz S, Köhler H, Wolf U, Brockmann M, Riedel F (1998) Fatal desquamative
      interstitial pneumonia associated with proven CMV infection in an 8-month-old boy *Pediatr
      Pulmonol* **25**:345-347

86.   Tomashefski JF Jr, Butler T, Islam M (1989) Histopathology and etiology of childhood
      pneumonia: an autopsy study of 93 patients in Bangladesh *Pathology* **21**:71-78

87.   Marrero Clemente GM, Fargas N, García I, García L, Valcárcel M (2013) Atypical presentation of
      congenital cytomegalovirus infection in a neonate admitted to the neonatal intensive care unit: a
      case report *Bol Asoc Med P R* **105**:45-48

88.   Yagmur G, Ziyade N, Elgormus N, Das T, Sahin MF, Yildirim M, Ozgun A, Akcay A, Karayel F,
      Koc S (2016) Postmortem diagnosis of cytomegalovirus and accompanying other infection agents
      by real-time PCR in cases of sudden unexpected death in infancy (SUDI) *J Forensic Leg Med*
      **38**:18-23

89.   Hoang MP, Ross KF, Dawson DB, Scheuermann RH, Rogers BB (1999) Human herpesvirus-6
      and sudden death in infancy: report of a case and review of the literature *J Forensic Sci* **44**:432-
      437

90.   Spezia PG, Macera L, Mazzetti P, Curcio M, Biagini C, Sciandra I, Turriziani O, Lai M, Antonelli
      G, Pistello M, Maggi F (2020) Redondovirus DNA in human respiratory samples *J Clin Virol*
      **131**:104586

91.   Werne J, Garrow I (1953) Sudden Apparently Unexplained Death During Infancy. I. Pathologic
      Findings in Infants Found Dead *Am J Pathol* **29**:633-675

92.   Werne J, Garrow I (1953) Sudden Apparently Unexplained Death During Infancy. II. Pathologic
      Findings in Infants Observed to Die Suddenly *Am J Pathol* **29**:817-831

93.   Garrow I, Werne J (1953) Sudden Apparently Unexplained Death During Infancy. III. Pathologic
      Findings in Infants Dying Immediately after Violence, Contrasted with Those after Sudden
      Apparently Unexplained Death *Am J Pathol* **29**:833-851

94.   An SF, Gould S, Keeling JW, Fleming KA (1993) Role of respiratory viral infection in SIDS:
      detection of viral nucleic acid by in situ hybridization *J Pathol* **171**:271-278

95.   Raza MW, Blackwell CC (1999) Sudden infant death syndrome, virus infections and cytokines
      *FEMS Immunol Med Microbiol* **25**:85-96

96.   Desmons A, Terrade C, Boulagnon C, Giusti D, Nguyen Y, Andreoletti L, Fornes P, Digeon B,
      Leveque N (2013) Post-mortem diagnosis, of cytomegalovirus and varicella zoster virus co-
      infection by combined histology and tissue molecular biology, in a sudden unexplained infant
      death *J Clin Virol* **58**:486-489

97.   Blackwell C, Moscovis S, Hall S, Burns C, Scott RJ (2015) Exploring the risk factors for sudden
      infant deaths and their role in inflammatory responses to infection *Front Immunol* **6**:44

98.   Goldwater PN (2020) SIDS, prone sleep position and infection: An overlooked epidemiological
      link in current SIDS research? Key evidence for the "Infection Hypothesis" *Med Hypotheses*
      **144**:110114

99.   Baker T, Schandl C, Presnell SE, Madory J, Nolte FS, Batalis N (2017) Use of an Automated
      Nested Multiplex Respiratory Pathogen PCR Panel Postmortem in the Pediatric Forensic Setting *J
      Forensic Sci* **62**:1223-1228

100.    Wada T, Gando S, Mizugaki A, Yanagida Y, Jesmin S, Yokota H, Ieko M (2013)
        Coagulofibrinolytic changes in patients with disseminated intravascular coagulation associated
        with post-cardiac arrest syndrome--fibrinolytic shutdown and insufficient activation of fibrinolysis
        lead to organ dysfunction *Thromb Res* **132**:e64-e69

101.    Leitner JM, Jilma B, Spiel AO, Sterz F, Laggner AN, Janata KM (2010) Massive pulmonary
        embolism leading to cardiac arrest is associated with consumptive coagulopathy presenting as
        disseminated intravascular coagulation *J Thromb Haemost* **8**:1477-1482

102.    Hayase T, Yamamoto Y, Yamamoto K, Abiru H, Minowa Y, Matsumoto H, Fukui Y (1997) A
        case of disseminated intravascular coagulation probably arising from sudden infant death
        syndrome *Nihon Hoigaku Zasshi* **51**:438-441

103.    Takemoto Y, Tanaka S, Tanabe J, Nakamura Y, Kohama A, Shibata S (1986) Studies on the
        effects of primary therapy for DIC following circulatory arrest *Am J Hematol* **21**:377-382

104.    Auer RN, Dunn JF, Sutherland GR: Hypoxia and Related Conditions. In:Love S, Louis DN,
        Ellison DW(eds). Greenfield's Neuropathology. 8th ed., Edward Arnold, London. 2008:pp 63-119

105.    Smith ML, Auer RN, Siesjö BK (1984) The density and distribution of ischemic brain injury in
        the rat following 2-10 min of forebrain ischemia *Acta Neuropathol* **64**:319-332

106.    Wintermark M, Lepori D, Cotting J, Roulet E, van Melle G, Meuli R, Maeder P, Regli L, Verdun
        FR, Deonna T, Schnyder P, Gudinchet F (2004) Brain perfusion in children: evolution with age
        assessed by quantitative perfusion computed tomography *Pediatrics* **113**:1642-1652

107.    Orrison WW Jr, Champlin AM, Kesterson OL, Hartshorne MF, King JN (1994) MR 'hot nose
        sign' and 'intravascular enhancement sign' in brain death *Am J Neuroradiol* **15**:913-916

108.    Baron M, Brasfield J (1999) A 37-year-old man with severe head trauma, and a "hot nose" sign on
        brain flow study *Chest* **116**:1468-1470

109.    Huang AH (2005) The hot nose sign *Radiology* **235**:216-217

110.    Appelt EA, Song WS, Phillips WT, Metter DF, Salman UA, Blumhardt R (2008) The "hot nose"
        sign on brain death nuclear scintigraphy: where does the flow really go? *Clin Nucl Med* **33**:55-57

111.    Zuckier LS (2016) Radionuclide Evaluation of Brain Death in the Post-McMath Era *J Nucl Med*
        **57**:1560-1568

112.    American Heart Association (2006) 2005 American Heart Association (AHA) guidelines for
        cardiopulmonary resuscitation (CPR) and emergency cardiovascular care (ECC) of pediatric and
        neonatal patients: pediatric basic life support *Pediatrics* **117**:e989-1004

113.    American Heart Association, American Academy of Pediatrics (2006) 2005 American Heart
        Association (AHA) guidelines for cardiopulmonary resuscitation (CPR) and emergency
        cardiovascular care (ECC) of pediatric and neonatal patients: neonatal resuscitation guidelines
        *Pediatrics* **117**:e1029-e1038

114.    Dionne JM (2017) Updated Guideline May Improve the Recognition and Diagnosis of
        Hypertension in Children and Adolescents; Review of the 2017 AAP Blood Pressure Clinical
        Practice Guideline *Curr Hypertens Rep* **19**:84

115.    Tartaglia R, Prineas S, Poli D, Albolino S, Bellandi T, Biancofiore G, Bertolini G, Toccafondi G (2020) Safety Analysis of 13 Suspicious Deaths in Intensive Care: Ergonomics and Forensic Approach Compared *J Patient Saf* :

116.    Miyamoto O, Auer RN (2000) Hypoxia, hyperoxia, ischemia, and brain necrosis *Neurology* **54**:362-371

117.    Plunkett J (2006) Resuscitation injuries complicating the interpretation of premortem trauma and natural disease in children *J Forensic Sci* **51**:127-130

118.    Schulz DM, Giordano DA, Schulz DH (1962) Weights of organs of fetuses and infants *Arch Pathol* **74**:244-250

119.    Ho KC, Roessmann U, Hause L, Monroe G (1986) Correlation of perinatal brain growth with age, body size, sex, and race *J Neuropathol Exp Neurol* **45**:179-188

120.    Thompson WS, Cohle SD (2004) Fifteen-year retrospective study of infant organ weights and revision of standard weight tables *J Forensic Sci* **49**:575-585

121.    Corrigan GE (1970) Decline of the autopsy *N Engl J Med* **282**:633

122.    Roberts WC (1978) The autopsy: its decline and a suggestion for its revival *N Engl J Med* **299**:332-338

123.    Anonymous (1978) The decline of the autopsy *N Engl J Med* **299**:1315-1316

124.    Handler S (1998) The unfortunate decline of the autopsy *Minn Med* **81**:22-24

125.    Ward HE, Clarke BE, Zimmerman PV, Cleary MI (2002) The decline in hospital autopsy rates in 2001 *Med J Aust* **176**:91

126.    Davies DJ, Graves DJ, Landgren AJ, Lawrence CH, Lipsett J, MacGregor DP, Sage MP (Royal College of Pathologists of Australasia Autopsy Working Party) (2004) The decline of the hospital autopsy: a safety and quality issue for healthcare in Australia *Med J Aust* **180**:281-285

127.    Helling TS, Evans LL, Fowler DL, Hays LV, Kennedy FR (1988) Infectious complications in patients with severe head injury *J Trauma* **28**:1575-1577

128.    Cazzadori A, Di Perri G, Vento S, Bonora S, Fendt D, Rossi M, Lanzafame M, Mirandola F, Concia E (1997) Aetiology of pneumonia following isolated closed head injury *Respir Med* **91**:193-199

129.    Hsieh AH, Bishop MJ, Kubilis PS, Newell DW, Pierson DJ (1992) Pneumonia following closed head injury *Am Rev Respir Dis* **146**:290-294

130.    Rincón-Ferrari MD, Flores-Cordero JM, Leal-Noval SR, Murillo-Cabezas F, Cayuelas A, Muñoz-Sánchez MA, Sánchez-Olmedo JI (2004) Impact of ventilator-associated pneumonia in patients with severe head injury *J Trauma* **57**:1234-1240

131.    Zygun DA, Zuege DJ, Boiteau PJ, Laupland KB, Henderson EA, Kortbeek JB, Doig CJ (2006) Ventilator-associated pneumonia in severe traumatic brain injury *Neurocrit Care* **5**:108-114

132.    Sundar KM, Nielsen D, Sperry P (2012) Comparison of ventilator-associated pneumonia (VAP) rates between different ICUs: Implications of a zero VAP rate *J Crit Care* **27**:26-32

133.    Hui X, Haider AH, Hashmi ZG, Rushing AP, Dhiman N, Scott VK, Selvarajah S, Haut ER, Efron DT, Schneider EB (2013) Increased risk of pneumonia among ventilated patients with traumatic brain injury: every day counts! *J Surg Res* **184**:438-443

134.    Plurad DS, Kim D, Bricker S, Lemesurier L, Neville A, Bongard F, Putnam B (2013) Ventilator-associated pneumonia in severe traumatic brain injury: the clinical significance of admission chest computed tomography findings *J Surg Res* **183**:371-376

135.    Kempe CH, Silverman FN, Steele BF, Droegemueller W, Silver HK (1962) The battered-child syndrome *JAMA* **181**:17-24

136.    Guthkelch AN (1971) Infantile subdural haematoma and its relationship to whiplash injuries *Br Med J* **2**:430-431

137.    Caffey J (1972) On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation *Am J Dis Child* **124**:161-169

138.    Caffey J (1972) The parent-infant traumatic stress syndrome; (Caffey-Kempe syndrome), (battered babe syndrome) *Am J Roentgenol Radium Ther Nucl Med* **114**:218-229

139.    Caffey J (1974) The whiplash shaken infant syndrome: manual shaking by the extremities with whiplash-induced intracranial and intraocular bleedings, linked with residual permanent brain damage and mental retardation *Pediatrics* **54**:396-403

140.    Caffey J (1946) Infantile cortical hyperostoses *J Pediatr* **29**:541-559

141.    Guthkelch AN (1945) Management of recent fracture-dislocations of cervical spine *Br Med J* **2**:880-881

142.    Guthkelch AN (1948) Haemangiomas involving the spinal epidural space *J Neurol Neurosurg Psychiat* **11**:199-210

143.    Guthkelch AN (1949) Extradural haemorrhage as a cause of cortical blindness *J Neurosurg* **6**:180-182

144.    Guthkelch AN (1949) Large saccular aneurysm of the intracranial part of the vertebral artery *Br J Surg* **37**:107

145.    Silverman FN (1979) In memoriam. John P. Caffey 1895–1978 *Pediatr Radiol* **8**:124-125

146.    Jacobson HG (1979) Obituary: John Caffey, MD 30 March 1895--2 September 1978 *Clin Radiol* **30**:239-240

147.    Girdany BR (1979) John Caffey, 1895--1978 *AJR Am J Roentgenol* **132**:149-150

148.    Silverman FN (1994) John P. Caffey *J Pediatr* **124**:825-827

149.    Guthkelch AN (2012) Problems of infant retino-dural hemorrhage with minimal external injury *Hous J. Health Law & Policy* **12**:201-208

150.    Christian CW, Block R, Committee on Child Abuse and Neglect, American Academy of Pediatrics (2009) Abusive head trauma in infants and children *Pediatrics* **123**:1409-1411

151.    Lynøe N, Elinder G, Hallberg B, Rosén M, Sundgren P, Eriksson A (2017) Insufficient evidence for 'shaken baby syndrome' - a systematic review *Acta Paediatr* **106**:1021-1027

152.    Narang SK, Greeley CS (2017) Lynöe et al-#theRestoftheStory *Acta Paediatr* :

153.    Debelle GD, Maguire S, Watts P, Nieto Hernandez R, Kemp AM, Child Protection Standing Committee, Royal College of Paediatrics and Child Health (2018) Abusive head trauma and the triad: a critique on behalf of RCPCH of 'Traumatic shaking: the role of the triad in medical investigations of suspected traumatic shaking' *Arch Dis Child* **103**:606-610

154.    Laurent-Vannier A, Adamsbaum C, Raul JS, Rey-Salmon C, Rambaud C (2018) Flawed Swedish study on traumatic shaking is already being used by defence lawyers and its findings must be ignored *Acta Paediatr* **107**:2048-2050

155.    Strouse PJ (2018) Shaken baby syndrome is real *Pediatr Radiol* **48**:1043-1047

156.    Lynöe N, Elinder G, Hallberg B, Rosén M, Sundgren P, Eriksson A (2017) Is accepting circular reasoning in shaken baby studies bad science or misconduct? *Acta Paediatr* **106**:1445-1446

157.    Lynöe N, Juth N, Eriksson A (2018) From Child Protection to Paradigm Protection-The Genesis, Development, and Defense of a Scientific Paradigm *J Med Philos* :

158.    Lynöe N, Helgesson G, Juth N (2018) Value-impregnated factual claims may undermine medical decision-making *Clin Ethics* **13**:151-158

159.    May LA, Guillerman RP, Zhang W, Orth RC (2018) Unfounded conclusions of equivalence in diagnostic accuracy studies: a pervasive fallacy of inference in pediatric radiology scientific abstracts *Pediatr Radiol* **48**:1861-1866

160.    Lama S, Auer RN, Tyson R, Gallagher CN, Tomanek B, Sutherland GR (2014) Lactate storm marks cerebral metabolism following brain trauma *J Biol Chem* **289**:20200-20208

161.    Auer RN, Sutherland GR (2005) Primary intracerebral hemorrhage: pathophysiology *Can J Neurol Sci* **32 Suppl 2**:S3-12

162.    Sutherland GR, Auer RN (2006) Primary intracerebral hemorrhage *J Clin Neurosci* **13**:511-517

163.    Smith EE, Auer RN: Cerebral Microbleeds in Relation to Hypertensive Arteriopathy. In:Werring DJ(eds). Cerebral Microbleeds. Cambridge University Press, . 2011:pp 198

164.    Baldelli RJ, Green FHY, Auer RN (1993) Sulfide toxicity: mechanical ventilation and hypotension determine survival rate and brain necrosis *J Appl Physiol* **75**:1348-1353

165.    Flynn EP, Auer RN (2002) Eubaric hyperoxemia and experimental cerebral infarction *Ann Neurol* **52**:566-572

166.    Heyes MP, Papagapiou M, Leonard C, Markey SP, Auer RN (1990) Brain and plasma quinolinic acid in profound insulin-induced hypoglycemia *J Neurochem* **54**:1027-1033

167.    Papagapiou MP, Auer RN (1990) Regional neuroprotective effects of the NMDA receptor antagonist MK-801 (dizocilpine) in hypoglycemic brain damage *J Cereb Blood Flow Metab* **10**:270-276

168.    Anderson LG, Zhao D, Dell KR, Severson DL, Auer RN (1993) Brain protein kinase C assay using MARCKS substrate reveals no translocation due to profound insulin-induced hypoglycemia *Brain Res* **606**:187-194

169.    Auer RN (2004) Hypoglycemic brain damage *Metab Brain Dis* **19**:169-175

170.    Auer RN (2004) Hypoglycemic brain damage *Forensic Sci Int* **146**:105-110

171.    Sutherland GR, Tyson RL, Auer RN (2008) Truncation of the Krebs cycle during hypoglycemic coma *Med Chem* **4**:379-385

172.    Jensen ML, Auer RN (1988) Ketamine fails to protect against ischaemic neuronal necrosis in the rat *Br J Anaesth* **61**:206-210

173.    Jensen ML, Auer RN (1989) Intraventricular infusion of 2-amino-7-phosphonoheptanoate (APH) mitigates ischaemic brain damage *Neurol Res* **11**:37-40

174.    Voll CL, Auer RN (1988) The effect of postischemic blood glucose levels on ischemic brain damage in the rat *Ann Neurol* **24**:638-646

175.    Voll CL, Whishaw IQ, Auer RN (1989) Postischemic insulin reduces spatial learning deficit following transient forebrain ischemia in rats *Stroke* **20**:646-651

176.    Auer RN, Jensen ML, Whishaw IQ (1989) Neurobehavioral deficit due to ischemic brain damage limited to half of the CA1 sector of the hippocampus *J Neurosci* **9**:1641-1647

177.    Rod MR, Auer RN (1989) Pre- and post-ischemic administration of dizocilpine (MK-801) reduces cerebral necrosis in the rat *Can J Neurol Sci* **16**:340-344

178.    Rod MR, Whishaw IQ, Auer RN (1990) The relationship of structural ischemic brain damage to neurobehavioural deficit: the effect of postischemic MK-801 *Can J Psychol* **44**:196-209

179.    Voll CL, Auer RN (1991) Insulin attenuates ischemic brain damage independent of its hypoglycemic effect *J Cereb Blood Flow Metab* **11**:1006-1014

180.    Voll CL, Auer RN (1991) Postischemic seizures and necrotizing ischemic brain damage: neuroprotective effect of postischemic diazepam and insulin *Neurology* **41**:423-428

181.    Jensen ML, Auer RN (1991) Intraventricular infusion of the selective sigma-agonist 1,3-di-ortho-tolylguanidine (DTG) mitigates ischaemic brain damage in the hippocampus *Neurol Res* **13**:257-260

182.    Rod MR, Auer RN (1992) Combination therapy with nimodipine and dizocilpine in a rat model of transient forebrain ischemia *Stroke* **23**:725-732

183.    Zhu CZ, Auer RN (1994) Intraventricular administration of insulin and IGF-1 in transient forebrain ischemia *J Cereb Blood Flow Metab* **14**:237-242

184.    Zhu CZ, Auer RN (1994) Centrally administered insulin and IGF-1 in transient forebrain ischaemia in fasted rats *Neurol Res* **16**:116-120

185.    Whishaw IQ, Rod MR, Auer RN (1994) Behavioral deficits revealed by multiple tests in rats with ischemic damage limited to half of the CA1 sector of the hippocampus *Brain Res Bull* **34**:283-289

186.    Hamilton MG, Tranmer BI, Auer RN (1995) Insulin reduction of cerebral infarction due to transient focal ischemia *J Neurosurg* **82**:262-268

187.    Auer RN (1995) Combination therapy with U74006F (tirilazad mesylate), MK-801, insulin and diazepam in transient forebrain ischaemia *Neurol Res* **17**:132-136

188.    Zhu CZ, Auer RN (1995) Graded hypotension and MCA occlusion duration: effect in transient focal ischemia *J Cereb Blood Flow Metab* **15**:980-988

189.    Colbourne F, Sutherland GR, Auer RN (1996) An automated system for regulating brain temperature in awake and freely moving rodents *J Neurosci Meth* **67**:185-190

190.    Auer RN, Coupland SG, Jason GW, Archer DP, Payne J, Belzberg AJ, Ohtaki M, Tranmer BI (1996) Postischemic therapy with MK-801 (dizocilpine) in a primate model of transient focal brain ischemia *Mol Chem Neuropathol* **29**:193-210

191.    Luvisotto TL, Auer RN, Sutherland GR (1996) The effect of mannitol on experimental cerebral ischemia, revisited *Neurosurgery* **38**:131-138

192.    Sutherland GR, Dix GA, Auer RN (1996) Effect of age in rodent models of focal and forebrain ischemia *Stroke* **27**:1663-1667

193.    Cregan EF, Peeling J, Corbett D, Buchan AM, Saunders J, Auer RN, Gao M, Mccarthy DJ, Eisman MS, Campbell TM, Murray RJ, Stagnitto ML, Palmer GC (1997) -(S)-Alpha-phenyl-2-pyridine-ethanamine Dihydrochloride-, a low affinity uncompetitive N-methyl-D-aspartic acid antagonist, is effective in rodent models of global and focal ischemia *J Pharmacol Exp Ther* **283**:1412-1424

194.    Colbourne F, Auer RN, Sutherland GR (1998) Characterization of postischemic behavioral deficits in gerbils with and without hypothermic neuroprotection *Brain Res* **803**:69-78

195.    Colbourne F, Auer RN, Sutherland GR (1998) Behavioral testing does not exacerbate ischemic CA1 damage in gerbils *Stroke* **29**:1967-1970

196.    Colbourne F, Rakic D, Auer RN (1999) The effects of temperature and scopolamine on N-methyl-D-aspartate antagonist-induced neuronal necrosis in the rat *Neuroscience* **90**:87-94

197.    Colbourne F, Sutherland GR, Auer RN (1999) Electron microscopic evidence against apoptosis as the mechanism of neuronal death in global ischemia *J Neurosci* **19**:4200-4210

198.    Auer RN (2000) Hemicraniectomy for ischemic stroke: temerity or death cure? *Can J Neurol Sci* **27**:269

199.    Auer RN (2001) Non-pharmacologic (physiologic) neuroprotection in the treatment of brain ischemia *Ann N Y Acad Sci* **939**:271-282

200.    Kelly JJ, Auer RN (2003) Mefenamate, an agent that fails to attenuate experimental cerebral infarction *Can J Neurol Sci* **30**:259-262

201.    Zygun DA, Doig CJ, Auer RN, Laupland KB, Sutherland GR (2003) Progress in clinical neurosciences: therapeutic hypothermia in severe traumatic brain injury *Can J Neurol Sci* **30**:307-313

202.    Zhu CZ, Auer RN (2004) Optimal blood glucose levels while using insulin to minimize the size of infarction in focal cerebral ischemia *J Neurosurg* **101**:664-668

203.    Gharbawie OA, Auer RN, Whishaw IQ (2006) Subcortical middle cerebral artery ischemia abolishes the digit flexion and closing used for grasping in rat skilled reaching *Neuroscience* **137**:1107-1118

204.   Auer RN, Siesjö BK (1988) Biological differences between ischemia, hypoglycemia, and epilepsy *Ann Neurol* **24**:699-707

205.   Ingvar M, Morgan PF, Auer RN (1988) The nature and timing of excitotoxic neuronal necrosis in the cerebral cortex, hippocampus and thalamus due to flurothyl-induced status epilepticus *Acta Neuropathol* **75**:362-369

206.   Nakagawa T, Miyamoto O, Janjua NA, Auer RN, Nagao S, Itano T (2004) Localization of nestin in amygdaloid kindled rat: an immunoelectron microscopic study *Can J Neurol Sci* **31**:514-519

207.   Whishaw IQ, Auer RN (1989) Immediate and long-lasting effects of MK-801 on motor activity, spatial navigation in a swimming pool and EEG in the rat *Psychopharmacology (Berl)* **98**:500-507

208.   Auer RN, Coulter KC (1994) The nature and time course of neuronal vacuolation induced by the N-methyl-D-aspartate antagonist MK-801 *Acta Neuropathol* **87**:1-7

209.   Auer RN (1994) Assessing structural changes in the brain to evaluate neurotoxicological effects of NMDA receptor antagonists *Psychopharmacol Bull* **30**:585-591

210.   Auer RN (1996) Effect of age and sex on N-methyl-D-aspartate antagonist-induced neuronal necrosis in rats *Stroke* **27**:743-746

211.   Auer RN (1997) Structural neurotoxicologic investigation of the glycine antagonist 5-nitro-6,7-dichloroquinoxalinedione (ACEA-1021) *Neurotoxicology* **18**:53-62

212.   Auer RN (1998) Can eliminating monosodium glutamate from the diet affect Lennox-Gastaut syndrome? *J Am Diet Assoc* **98**:857

213.   Kherani ZS, Auer RN (2008) Pharmacologic analysis of the mechanism of dark neuron production in cerebral cortex *Acta Neuropathol* **116**:447-452

214.   Shibuya S, Miyamoto O, Auer RN, Itano T, Mori S, Norimatsu H (2002) Embryonic intermediate filament, nestin, expression following traumatic spinal cord injury in adult rats *Neuroscience* **114**:905-916

215.   Nakamura T, Miyamoto O, Auer RN, Nagao S, Itano T (2004) Delayed precursor cell markers expression in hippocampus following cold-induced cortical injury in mice *J Neurotrauma* **21**:1747-1755

216.   Hasan SU, Sarnat HB, Auer RN (1993) Vagal nerve maturation in the fetal lamb: an ultrastructural and morphometric study *Anat Rec* **237**:527-537

217.   Auer RN (1994) Automated nerve fibre size and myelin sheath measurement using microcomputer-based digital image analysis: theory, method and results *J Neurosci Meth* **51**:229-238

218.   Tsoi M, Rhee KH, Bungard D, Li XF, Lee SL, Auer RN, Lytton J (1998) Molecular cloning of a novel potassium-dependent sodium-calcium exchanger from rat brain *J Biol Chem* **273**:4155-4162

219.   Fewell JE, Eliason HL, Auer RN (2002) Peri-OVLT E-series prostaglandins and core temperature do not increase after intravenous IL-1beta in pregnant rats *J Appl Physiol* **93**:531-536

220.   Spencer SJ, Auer RN, Pittman QJ (2006) Rat neonatal immune challenge alters adult responses to cerebral ischaemia *J Cereb Blood Flow Metab* **26**:456-467

221.    Lambert J, Lamothe JM, Zernicke RF, Auer RN, Reimer RA (2005) Dietary restriction does not adversely affect bone geometry and mechanics in rapidly growing male wistar rats *Pediatr Res* **57**:227-231

222.    Reimer RA, Maurer AD, Lau DC, Auer RN (2010) Long-term dietary restriction influences plasma ghrelin and GOAT mRNA level in rats *Physiol Behav* **99**:605-610

# EXHIBIT 19

SBU ASSESSMENT • REPORT 255E/2016

# Traumatic shaking

## The role of the triad in medical investigations of suspected traumatic shaking

A systematic review



SWEDISH AGENCY FOR HEALTH TECHNOLOGY ASSESSMENT
AND ASSESSMENT OF SOCIAL SERVICES

Report series — This report is an SBU Assessment. It presents the results of a comprehensive systematic review of the available scientific evidence, including economic, social, and ethical impact analyses. The assessment was performed by a team of leading professional practitioners and academics and patient/user representatives  supported by SBU staff members. The certainty of the evidence for each finding was systematically reviewed and graded. The report has been reviewed by independent experts and the conclusions have been approved by SBU's Board of Directors.

ISSN — 1400-1403

Declaration of contents —
✓ Assessment of new/ established intervention
✓ Systematic literature search
✓ Relevance assessment (Study selection)
✓ Risk of bias assessment/ quality assessment
✓ Synthesis of results
✓ Quality of evidence assessed by SBU
✓ Quality of evidence sessed externally Based on systematic review

✓ Consensus process
✓ Produced in collaboration with experts in the field Patient/user involvement
✓ Ethical aspects Economic/health economic aspects Social aspects
✓ Approved by the SBU quality and priority group
✓ Approved by SBU's Board of Directors

Key words — Shaken Baby Syndrome, Infant, Child Abuse, Subdural Hematoma, Retinal Hemorrhage, Brain Edema

Published — October 2016

Period of validity — Results based on strong scientific evidence usually remain valid for a long time. Other results may become outdated over time. This is particularly true for results based on limited or insufficient scientific evidence.

Order — This report (no 255E) can be ordered from Strömberg distribution. Telephone: -+46 8 779 96 85 • Fax: +46 8 779 96 10 • Email: sbu@strd.se

Production — Graphic design by Åsa Isaksson, SBU. Printed by Elanders Sverige AB, Mölnlycke, 2017. Cover photo: Shutterstock

Translator — Joan Bevenius

Registration number — UTV2014/254

Cite this report — SBU. Traumatic shaking – The role of the triad in medical investigations of suspected traumatic shaking: A systematic review. Stockholm: Swedish Agency for Health Technology Assessment and Assessment of Scial Services (SBU); 2016. SBU report no 255E. ISBN 978-91-85413-98-0.

# Content

**Summary of the results**                                                          **5**

**1   Aim**                                                                          **7**

**2   Background**                                                                   **9**
What is traumatic shaking?                                                            9
Signs and symptoms                                                                   10
Presenting medical history                                                           10
Terminology                                                                          11
Investigation of injuries which may be attributable to traumatic shaking             12
Other possible causes (differential diagnoses) of the triad and its components       12
The triad – Signs and symptoms                                                       12
— Subdural hematoma                                                                  12
— Retinal hemorrhages                                                                13
— Encephalopathy                                                                     13
Diagnostic methods                                                                   13
— Intracranial examination                                                           13
— Retinal examination                                                                14

**3   Systematic evaluation: method**                                               **17**
Question to be addressed                                                             17
— PIRO                                                                               17
Criteria for inclusion and exclusion                                                 18
— Inclusion criteria                                                                 18
— Exclusion criteria                                                                 18
Methodology for selection of studies                                                 18
Assessment of relevance                                                              19
Assessment of the quality of individual studies                                      19
Method for synthesis of the results                                                  19
Assessment of the quality of the evidence                                           20

**4   Results**                                                                      **21**
Flow chart of literature search                                                      22
Quality of the evidence                                                              22

**5   Discussion**                                                                   **27**
Methodological issues                                                                28
— Definition of traumatic shaking                                                    28
— Classification of subjects into groups                                             29
— Circular reasoning in clinical and research settings                               29
— Diagnostic methods                                                                 30
Comparison with results of other reviews                                             31

**6    Issues for future research**    **33**
What measures are required to address the scientific uncertainties?    34
— International coordination    34
— Priority research topics    34

**7    Project group, external reviewers, board and councils**    **37**
Project group    37
— Experts    37
— SBU    38
Scientific reviewers    38
Conflicts of Interest    39
Scientific Advisory Committee – Brage    39
Scientific Advisory Committee – Eira    39
SBU's Board of Directors    40

**8    External collaboration**    **43**
Co-operation with interested parties    43
Networking with government authorities    43
The Swedish National Council on Medical Ethics    44

**9    Glossary**    **45**

**10   References**    **47**

**Appendix 1 Other possible causes of the components of the triad**    **55**

**Appendix 2 Biomechanical studies**    **59**

**Appendix 3 Ethical analysis of traumatic shaking**    **61**

**Appendix 4 Search strategies**    available at www.sbu.se/255e

**Appendix 5 Studies with high risk of bias
and excluded studies**    available at www.sbu.se/255e

TRAUMATIC SHAKING — THE ROLE OF THE TRIAD IN MEDICAL INVESTIGATIONS OF SUSPECTED TRAUMATIC SHAKING

# Summary of the results

The systematic review showed the following graded results:

- There is limited scientific evidence that the triad[1] and therefore its components can be associated with traumatic shaking (low quality evidence).

- There is insufficient scientific evidence on which to assess the diagnostic accuracy of the triad in identifying traumatic shaking (very low quality evidence).

**Limited scientific evidence (low quality evidence)** represents a combined assessment of studies of high or moderate quality which disclose factors that markedly weaken the evidence. It is important to note that limited scientific evidence for the reliability of a method or an effect does not imply complete lack of scientific support.

**Insufficient scientific evidence (very low quality evidence)** represents either a lack of studies, or situations when available studies are of low quality or show contradictory results.

Evaluation of the evidence was not based on formal grading of the evidence according to GRADE but on an evaluation of the total scientific basis.

---

[1] Three components of a whole. The triad associated with SBS usually comprises subdural hematoma, retinal hemorrhages and encephalopathy.

# 1 **Aim**

In cases of suspected traumatic shaking, the diagnosis has conventionally been based on three findings, referred to collectively as the triad, namely: subdural hematoma (bleeding between the dura mater and the brain), retinal hemorrhages, and various forms of brain symptoms (encephalopathy). The presenting history is often that of lethargy, seizures and apnea. The purpose of this evaluation was to determine how reliably the triad or its components can be explained by traumatic shaking of children up to one year of age.

# 2 **Background**

Child abuse was described in the medical literature as early as in the 1800's [1], but it was only much later that awareness of the practice became more widespread [2,3]. Child abuse can often be concealed within the family and there is a risk of underdiagnosis, in part because the child is unable to speak for itself. At the same time, overdiagnosis can have serious consequences, because families can be split apart on false grounds. Adherence to the healthcare principle that the triad is attributable exclusively to traumatic shaking can lead to overdiagnosis, because of failure to consider other possible causes of the child's condition.

## What is traumatic shaking?

Traumatic shaking occurs when a child is shaken in such a way that its head is flung backwards and forwards. In 1971, Guthkelch, a neurosurgeon, hypothesized that such shaking can result in a subdural hematoma, in the absence of any detectable external signs of injury to the skull [4]. The article describes two cases in which the parents admitted that for various reasons they had shaken the child before it became ill. Moreover, one of the babies had retinal hemorrhages. The association between traumatic shaking, subdural hematoma and retinal hemorrhages was described by Caffey in 1972 and referred to as Whiplash Shaken Infant Syndrome [2]. The injuries were believed to occur because shaking the child subjected the head to acceleration-deceleration and rotational forces. In 1987, this theory was queried by Duhaime et al. [5] in a biomechanical study which concluded that isolated shaking, in the absence of direct violence, is probably not of sufficient force to cause the injuries described above.

The name of the condition has since been changed to Shaken Baby Syndrome (SBS). There are a number of studies on the association between various clinical and radiographic findings and injuries caused by violent shaking of a child [6–13].

In recent years the term abusive head trauma (AHT) has been introduced (see section Terminology). The project group decided to apply the term "traumatic shaking" to the trauma mechanism and the "triad" to the actual signs and symptoms [13].

# Signs and symptoms

In the scientific literature, various signs and symptoms are described in association with traumatic shaking. The collective name "triad" has been adopted for the most frequently occurring injuries (subdural hematoma, retinal hemorrhage and encephalopathy). The main focus of this report is the triad (see section Terminology). Other signs are occasionally reported in association with traumatic shaking, including bruising to the chest, fractures of, for example, the ribs and shinbone (metaphyseal fractures), but these injuries are not included in the present review.

# Presenting medical history

When medical attention is sought for the affected child, the presenting history includes various clinical signs such as seizures, lethargy or other symptoms of encephalopathy. The initial clinical and radiographic examination can disclose the presence of, for example, subdural hematoma, or various symptoms of brain dysfunction. Subdural hematoma, retinal hemorrhages and various forms of encephalopathy can have serious sequelae, with permanent damage to the brain and/or the eyes. Permanent damage can comprise serious impairment of cognitive and/or motor function, with widespread adverse effects on the child's health, development and future quality of life and can ultimately even be fatal.

Healthcare personnel are encouraged to be alert to the findings which comprise the triad and are required by law (Social Services Act: Chapter 14, Section 1) to notify the Board of Social Welfare if they become aware, or suspect, that a child is being abused, or otherwise may need protection. In a frequently quoted article by the American Academy of Pediatrics, 1993 [14] physicians documenting trauma affecting the brain in newborns are encouraged to conduct a thorough examination and to be familiar with the clinical and radiographic findings which can confirm damage caused by traumatic shaking. The regional health care plan published by the Stockholm County Council 2011 stated:

"If there is no history of a traffic accident or a fall from a considerable height, the combinaton of subdural hematoma and encephalopathy with edema or hemorrhage strongly suggests that the child has been abused. If there are also

retinal hemorrhages then from the medical point of view the diagnosis of abuse is quite clear." [15].

Other regional care programmes as well as the statement by the Swedish National Board of Health and Welfare on children who are being abused or are at risk of abuse include guidelines on the care of infants in cases of suspected abuse [16,17].

In recent years however, the certainty with which it can be determined that the findings of the triad are in fact attributable to traumatic shaking has been questioned [18–26]. Many articles which have debated the subject of traumatic shaking and the symptoms and signs of the triad have been published in international and national journals and in the media. In this context, it is important to ascertain whether the conclusion that traumatic shaking is the cause of these signs and symptoms is based on evidence of the highest possible scientific quality. However, grading of scientific supporting evidence is based on the assessment of groups – not of individuals. In order for the justice system or social services to make a statement on the association between exposure and disease or injury, assessment of the individual case is required, with other observations and conditions also taken into account.

# Terminology

The English term for the triad is Shaken Baby Syndrome (SBS), which refers to the signs and symptoms which allegedly can arise after an episode of isolated traumatic shaking, i.e. shaking without the head impacting on any object.

In 2009 the American Academy of Pediatrics recommended a broader term, Abusive Head Trauma (AHT), which includes also direct trauma to the head [27]. Also to be found in the literature are several other terms, which partly or completely overlap the terms Shaken Baby Syndrome och Abusive Head Trauma (see Chapter 9). The terms are used in a variety of ways in the scientific literature and this contributes to the lack of methodological clarity in studies of the effects of traumatic shaking. The project group has therefore decided to limit the scope of the project to isolated traumatic shaking, thereby including only studies of cases in which there is no evidence of direct trauma (external injury) to the head. Furthermore, the authors have avoided the terms SBS and AHT because they imply both the signs and symptoms and the alleged mechanism behind the findings, even the intent. Instead, the authors chose to make a clear distinction between the injurious mechanism ("traumatic shaking") and the medical findings ("the triad").

# Investigation of injuries which may be attributable to traumatic shaking

Diagnosis of suspected brain injury is based on computerised tomography (CT) and/or magnetic resonance imaging (MRI). The presence of retinal hemorrhages is determined by examination of the fundus by ophthalmoscopy or fundoscopy.

# Other possible causes (differential diagnoses) of the triad and its components

In cases presenting with the triad, it is important to determine whether these can be attributed to causes other than traumatic shaking.

Subdural hematoma, retinal hemorrhages and encephalopathy have been described after delivery and in association with such conditions as various convulsive states, certain hemorrhagic diseases, infectious diseases, metabolic disorders, immunological diseases, skeletal diseases and vascular malformations (see Appendix 1 for details).

# The triad – Signs and symptoms

## Subdural hematoma

It is well-known that trauma to the head can give rise to subdural hematoma. In an adult, the underlying mechanism is rupture of one or more of the bridging veins, with bleeding into the subdural space. In many such cases there are often also external signs of trauma to the head in the form of soft tissue bleeding, but in other cases a CT scan may disclose internal injury in the absence of any evidence of external trauma.

Shaking an infant causes the movement of the brain to be out of synchrony with the movement of the skull. However, there is lack of consensus about the mechanism underlying the bleeding. It has been proposed that it may result from capillary injury [28,29]. As isolated traumatic shaking does not involve direct trauma to the head, there will be no external signs of head trauma such as swelling of soft tissues, contusions, lacerations or skull fractures. Hence, an incident is not classified as isolated traumatic shaking when soft tissue injuries or skull fractures are detected. Soft tissue injury and skull fracture(s) are therefore findings which exclude isolated traumatic shaking.

Imaging techniques have shown that subdural hematoma can occur in association with vaginal delivery, but is usually resorbed within a few weeks [22]. In the space created by the hematoma, effusion (leakage of fluid) may result in the development of a so-called subdural hygroma, which contains cerebrospinal fluid. It has been proposed that further bleeding in this space could occur spontaneously, or as a result of minor trauma [30–33]. It has also been proposed that an enlarged subarachnoid space could increase the risk of subdural hemorrhage [19,34–36].

## Retinal hemorrhages

Retinal hemorrhages associated with traumatic shaking have been attributed to transfer of shearing forces in the vitreous body of the eye to the retina, due to increased pressure in the venous blood vessels in the retina, resulting in rupture of the vessels [37–39]. It has also been proposed that during shaking, repetitive acceleration and deceleration create shearing forces between the vitreous body and the retina, as well as direct injury to the eyeball. However, bleeding in the fundus of the eye has also been demonstrated in association with subdural hematoma considered to be caused by disease and it is therefore possible that retinal hemorrhages can arise as a sequel to subdural hematoma. One possible explanation is that increased intracranial pressure caused by edema of the brain leads to increased pressure in the central optical vein, with congestion in the retina [40,41]. The relationship between subdural hematoma and retinal hemorrhages is supported by studies showing that isolated incidents of retinal hemorrhages are very rare [38,41]. Retinal hemorrhages have also been observed after normal vaginal deliveries [42].

## Encephalopathy

Encephalopathy can present with such signs as lethargy, seizures and dyspnea, among others. These signs may be attributable to frictional damage in the brain or the cervical medulla, and/or brain edema. Brain edema and brain hypoxia can cause irreversible brain damage. Increased intracranial pressure, for example due to brain edema or subdural hematoma, can also result in seizures, apnea and lethargy [43,44]. Brain edema can be revealed by both computed tomography (CT) and magnetic resonance imaging (MRI) and appears as effacement of the sulci and compression of the cerebral ventricles. These may be temporary conditions, which resolve without any permanent brain damage. The most serious condition can be revealed by CT and MRI as reduced differentiation between the white and grey matter of the brain, representing a global irreversible ischemic injury.

# Diagnostic methods

## Intracranial examination

While CT is based on the differences in absorption of x-ray radiation of substances and tissues of varying density, MRI exploits a number of different

properties of substances and tissues and thereby offers a richer and often more specific characterisation of the tissue being examined.

Both techniques allow observation of thin "sections" through the entire brain, with reconstructions in several planes, and also assessment of the intracranial vessels (by using contrast medium in the vessels). Both techniques provide similar information on changes in the brain ventricles and basal cisterns, such as compression of the ventricles in brain edema, widening in hydrocephalus, displacement due to hemorrhage and the risk of brain herniation.

However MRI can provide different information from CT, for example with respect to the presence of fresh blood, deposition of hemosiderin (a decomposition product of hemoglobin) and early ischemic and axonal injuries [45,46].

While an acute subdural hematoma in a small child comprises fresh blood, a subacute subdural hematoma is usually composed of a mixture of an upper layer of fluid and a sediment of coagulated blood [47]. The development of the hemorrhage over time results in different patterns on CT and MRI. The time frames for the development and duration of these patterns can overlap; hence determination of the age of the injury is uncertain [48]. In rare cases, calcifications can be mistaken for fresh blood, particularly in the brain tissue. On a CT scan, hemorrhage has a more robust pattern than that seen on various MRI sequences, which have a varying and partly overlapping appearance, depending on the composition of the bleeding and the time elapsed since the injury. CT assessment of the age of a subdural hemorrhage is therefore considered to be more reliable than assessment by MRI [49,50]. The ability to determine the age of a subdural hematoma can be important for correlation with the alleged time of injury.

Both CT and MRI can be used to determine brain edema, which appears as effacement of the sulci on the surface of the brain and compression of the ventricles and basal cisterns. CT is more reliable than MRI for assessing fractures.

## Retinal examination

Two methods can be used for examination of the ocular fundus. The most common is fundoscopy with or without dilatation of the pupil. More recently a photographic method has been developed (Retcam). This method allows subsequent assessment of the findings by other observers who are not aware of the case history or the purpose of the examination [51,52].

At autopsy the entire eye can be examined, and other findings can then be described [53,54].

Hemorrhage in the ocular fundus cannot usually be assessed by CT or MRI. However, in a recently published MRI study, a particular imaging sequence was compared with ophthalmoscopy and it was shown that in 83% of cases retinal hemorrhages could be detected by MRI [55,56].

In this context it is important to be aware that interpretations of CT, MRI and ocular fundoscopy findings are somewhat subjective and the experience of the individual observer can influence the final assessment.

# 3 Systematic evaluation: method

## Question to be addressed

The aim of the present investigation was to address the following question: With what certainty can it be claimed that the triad, subdural hematoma, retinal hemorrhages and encephalopathy, is attributable to isolated traumatic shaking (i.e. when no external signs of trauma are present)?

### PIRO

**P (Population):** Children ≤12 months of age

**I (Index test):** The triad in cases of suspected traumatic shaking

**R (Reference test/gold standard):** Admitted or witnessed traumatic shaking or other trauma

**O (Outcome measure):** Diagnostic accuracy

The Project has been conducted in accordance with the method described in SBU's manual [57].

# Criteria for inclusion and exclusion

## Inclusion criteria

### Study design

Case-control, cohort and registry studies and studies applying qualitative methods of analysis.

### Observations

In order to reduce the risk of random errors of selection, only studies comprising 10 or more cases were included. With respect to possible alternative explanations (differential diagnoses), the project group was of the opinion that one published case was sufficient to question the hypothesis that the triad is always caused by traumatic shaking. Articles on differential diagnoses were not quality assessed and are therefore not included in the basis for the results. If a subgroup of children who had been subjected to traumatic shaking and/or a subgroup aged ≤12 months (median and/or mean age) was included in AHT studies, then these were included by the project group. The mean age of children subjected to traumatic shaking is stated to be 2–3 months [58] and the project group therefore decided to limit the review to studies of children with a mean or median age of ≤12 months.

### Language

Articles written in English, German, French, Swedish, Danish and Norwegian were included.

### Other criteria

The project group decided to include only cases of traumatic shaking which were witnessed (e.g., video recorded) or in which someone had confessed to shaking the child.

## Exclusion criteria

The project group excluded studies of fewer than 10 cases and AHT studies which included external injury to the head and/or fractures and other injuries.

Studies identified in the literature search as biomechanical studies and studies which deal with other possible causes of the triad have been considered separately and are presented in Appendices 1 and 2.

# Methodology for selection of studies

Based on the question to be addressed by the project, the literature databases were searched systematically, in close collaboration between the information

specialist and the experts in the project group. The literature search encompassed the databases PubMed, Embase och Cochrane Library through October 15th, 2015. Further studies were searched for manually, through the reference lists of individual studies and systematic reviews. For a detailed description of search terms and limitations (see Appendix 4, www.sbu.se/255e).

## Assessment of relevance

The lists of abstracts generated by the literature search were scrutinised independently by two experts. Studies deemed by at least one of the experts to be relevant to the questions to be addressed by the project were retrieved in full text and scrutinised independently by two experts with reference to the project's inclusion criteria. Articles which were scrutinised in full text and did not meet the inclusion criteria were excluded: the main reason for exclusion was recorded (see Appendix 5, www.sbu.se/255e). Disagreements were addressed initially by discussion between the two experts who had read the article. In certain cases the entire project group was involved in the discussion and the decision about inclusion or exclusion was resolved by consensus.

## Assessment of the quality of individual studies

Because of the specific field of research, the project group modified SBU's template to assess the quality of the included studies and to determine the risk of bias (circular reasoning: see the section "Circular reasoning in clinical and research settings" in Chapter 5). The template includes i.a. the type of study (prospective, diagnostic, biomechanical etc), the main focus of the study and whether the study addressed subdural hematoma, retinal hemorrhages and/or encephalopathy. In accordance with SBU's guidelines, only studies of moderate or high quality were considered in the results and discussion [11].

Systematic reviews of the field were quality assessed using the AMSTAR instrument [57]. The results in the present report were based on original studies and not on other systematic reviews (see Chapter 5).

## Method for synthesis of the results

Meta-analysis is a statistical method for quantitatively appraising the results of several studies in order to obtain data from a larger sample and to achieve a more reliable assessment of the statistical uncertainty. In order to pool the results, the studies must have been conducted using similar methods and it must be possible to adjust the analyses for similar background factors. As only

one of the included studies used a reference group, it was not possible to undertake a meta-analysis.

# Assessment of the quality of the evidence

The quality of the evidence indicates the level of reliability of the results and is based on the assessment of study quality (risk of bias), inconsistency, imprecision, risk of publication bias and indirectness.

As no meta-analysis was possible, the results were based on a narrative synthesis of the included studies. Evaluation of the evidence was not based on formal grading of the evidence according to GRADE but on an evaluation of the total scientific basis. The quality of the evidence was deemed to be limited (low) when combined assessment of studies of high or moderate quality disclosed factors which markedly weaken the evidence. The quality of the evidence was deemed to be insufficient (very low) when there was a lack of studies, when the available studies were of low quality or when studies of similar quality showed contradictory results. It is important to note that limited evidence for the reliability of a method or an effect does not imply complete lack of scientific support.

# 4 **Results**

The literature search yielded 3773 abstracts, of which 1065 were retrieved in full text. Of these 1035 were excluded because they did not meet the inclusion criteria. Of the 30 remaining studies, two were assessed to have moderate quality and none of high quality. The main reason that so few studies met the quality requirements was that the published papers failed to provide information as to whether traumatic shaking was confessed to by the perpetrator or had been witnessed. Thus the results are based on only two studies of confessed traumatic shaking and a meta-analysis was therefore not possible. However, agreement between the results of the included studies was discussed in the project group.

# Flow chart of literature search

**Figure 4.1**
Flow chart of
literature search.



# Quality of the evidence

The systematic review showed the following graded results:

- There is insufficient scientific evidence on which to assess the diagnostic accuracy of the triad in identifying traumatic shaking (very low quality evidence).

- There is limited scientific evidence that the triad and therefore its components can be associated with traumatic shaking (low quality evidence).

The two included studies of moderate quality, both conducted in France, were based on cases in which the perpetrator confessed to subjecting the child to traumatic shaking. The study by Vinchon et al. was a prospective study. It was based on a register of traumatic head injury in children aged under 2 years, who were admitted to hospital between May 2001 and February 2009, in a catchment area with a population of about 4 million [59]. The material comprised 412 cases, of which 124 were classified as Inflicted Head Injury (IHI) and 288 as Accidental Trauma (AT).

In the group with inflicted injury (IHI group), there were 45 confessed cases: 30 by traumatic shaking and 15 in which the perpetrator admitted to other

external trauma. However, the article does not include detailed descriptions as to how the perpetrator inflicted the injuries, nor the circumstances under which the confession was obtained. This group of children was compared with 39 cases in which accidental trauma was witnessed in a public place (AT group).

In the group with inflicted trauma, 37 out of 45 (82%) had a subdural hematoma, compared with 17 out of 39 (44%) in the accidental trauma group; 37 out of 44 (84%) had retinal hemorrhages, compared with 6 out of 35 (17%) in the accidental trauma group and 12 out of 45 (27%) hade cerebral ischemia, compared with 1 out of 39 (3 percent) in the group with accidental head trauma.

The study by Adamsbaum et al. was a retrospective observational study, comprising 29 confessed cases of traumatic shaking (in which direct trauma to the head was described in 5 cases) and a comparative group of 83 unconfessed cases [60]. The criteria for inclusion in the study were subdural hematoma disclosed by a CT scan and confession by the suspected perpetrator. As subdural hematoma was one of the criteria for inclusion in the traumatic shaking group, only the results for retinal hemorrhages could be used in this investigation.

In the group in which traumatic shaking was confessed to (Group A) 24 children (83%) had retinal hemorrhages. In all cases where the perpetrator had confessed, the shaking was described as violent (100%) and in some cases (55%) the perpetrator admitted to repeated episodes of shaking. No correlation was established between the density of the subdural hematoma and the number of repeated episodes of shaking. In 14 out of 29 cases in Group A there was a detailed description of how the suspect had committed the act. In the other group (Group B) there were children who had been shaken in an attempt at revival, or had suffered accidental injury and some children for whom no explanation of the condition was presented: thus this group cannot be considered an acceptable reference group.

The studies by Vinchon et al. and Adamsbaum et al. both demonstrate that traumatic shaking can cause subdural hematoma and retinal hemorrhages. In the study by Vinchon et al., the group in which traumatic shaking was confessed to comprised a larger proportion of children with subdural hematoma, retinal hemorrhages and cerebral ischemia than the group of children who had been injured in a witnessed accident. Adamsbaum et al. compared a group of children in which the perpetrators had confessed to traumatic shaking, with a group of children in which the suspects had not confessed: this can result in inclusion bias in one or both groups. As only one of these two studies had a relevant reference group, it has not been possible to conduct a meta-analysis.

There are also other published cases which have been excluded (wrong population, wrong study design), but contain detailed descriptions of confessions which are in accordance with the two studies of moderate quality [61,62]. Because of the low number of studies of moderate or high quality it was not possible to determine the diagnostic accuracy of the triad in identifying traumatic shaking.

Table 4.1 Characteristics of included studies.

| Author Year Reference Country | Aims/focus Outcome | Study design Setting Inclusion and exclusion criteria | Number of cases Medical examinations | Results | Methodological considerations/ comments | Study quality |
|---|---|---|---|---|---|---|
| Vinchon 2010 [59] France | **Aims/focus** To compare the clinical, ophthalmological and radiological features of inflicted head injury (IHI) and accidental trauma (AT) and to test the diagnostic value of these findings **Outcome** Registered medical findings including SDH (density), RH and brain ischemia | **Study design** Prospective cohort study collecting medical information on all traumatic head injuries in infants from May 2001 to February 2009 **Setting** Diagnosis in pediatric intensive care unit or neurosurgical unit **Inclusion criteria** Children under the age of 24 months referred alive to the emergency room due to confessed inflicted head trauma (IHT), or witnessed accidental trauma (AT) **Exclusion criteria** Obstetric trauma | **Number of cases** IHI group: 45 cases of confessed inflicted head injury, 29 boys and 16 girls, mean age 3.8 month (range 0.8–18.3). IHI was caused by shaking in 30 cases and beating in 15 cases AT group: 39 cases of witnessed accidental injury, 23 boys and 16 girls, mean age 8.1 months (range 0–23.9) • 19 cases where the baby was a car passenger • 3 cases where the baby was in a carriage hit by a vehicle • 5 cases of defenestration • 11 cases injured by a short fall • 1 case without description **Medical examinations** Clinical examination including neurological symptoms CT scanning Fundoscopy X-ray and/or isotopic bone scanning skeletal survey | **IHI group** SDH: 37/45 (82%) RH: 37/44 (84%) Brain ischemia: 12/45 (27%) **AT group** SDH: 17/39 (44%) RH: 6/35 (17%) Brain ischemia: 1/39 (3%) **Diagnostic value** **SDH** Sensitivity: 0.822 Specificity: 0.552 PPV: 0.685 NPV: 0.724 **Severe RH** Sensitivity: 0.556 Specificity: 0.974 PPV: 0.961 NPV: 0.655 **Brain ischemia** Sensitivity: 0.267 Specificity: 0.971 PPV: 0.921 NPV: 0.505 | The report does not contain a detailed description of the method nor of the IHI cases. It is not possible to extract the results for the shaken baby cases in the IHI group There are limitations in the definitions of the diagnostic criteria The triad used by the authors consists of subdural hematoma, retinal hemorrhage, and absence of sign of impact No details about what the suspect had confessed and under which circumstances the confession was obtained | Moderate |

The table continues on the next page

**Table 4.1** continued

| Author Year Reference Country | Aims/focus Outcome | Study design Setting Inclusion and exclusion criteria | Number of cases Medical examinations | Results | Methodological considerations/ comments | Study quality |
|---|---|---|---|---|---|---|
| Adamsbaum 2010 [60] France | **Aims/focus** To correlate the history of confessed abusive head trauma (AHT) cases with medical findings and to compare medical findings in confessed cases of AHT with non-confessed cases **Outcome** Density and location of SDH, RH, fractures and skin ecchymosis | **Study design** Retrospective observational study with examined forensic evidence, from January 2002 to May 2009 **Setting** Not specified **Inclusion criteria** Children with AHT (presence of SDH on CT scan with or without traumatic skin lesions) and a perpetrator conviction, with or without confession **Exclusion criteria** Accidental trauma and metabolic or infectious pathology | **Number of cases** Group A: 29 cases where the perpetrator confessed violent shaking of the child. In 5 cases a final impact of the infants head on a bed was described by the perpetrator. 22 boys and 7 girls, mean age 4.7 ± 2.9 months. 27 cases were younger than 1 year Group B: 83 cases without confession of a causal relationship between violence and the child's symptoms. 63 boys and 20 girls, mean age 6 ± 5.3 months • 19 cases where the children was shaken in order to revive it from a life-threatening event • 28 cases where a minor accident was described • 36 cases where no mechanistic description was given **Medical examinations** Clinical examination CT scanning Fundoscopy X-ray skeletal survey MRI (only in confessed cases) | **Group A** RH: 24/29 (83%) SDH hyperdensity: 11/29 (38%) SDH hypodensity: 2/29 (7%) SDH mixed density: 16/29 (55%) 9 infants in Group A died. In 4 of the cases the perpetrator admitted head impact. **Group B** RH: 75/83 (90%) SDH hyperdensity: 28/83 (34%) SDH hypodensity: 0/83 (0%) SDH mixed density: 55/83 (66%) 16 infants in group B died No statistically significant difference between the two regarding incidence of RH, density of SDH, or location of SDH | A retrospective study design without an appropriate control group The inclusion criterion SDH was part of the triad, why the prevalence of SDH after shaking cannot be evaluated The report contains a detailed description of 14 cases in group A. No details under which circumstances the confession was obtained | Moderate |

AHT = Abusive head trauma; AT = Accidental trauma; CT = Computed tomography; IHI = Inflicted head injury; IHT = Inflicted head trauma; MRI = Magnetic resonance imaging; NPV = Negative predictive value; PPV = Positive predictive value; RH = Retinal hemorrhage; SDH = Subdural hematoma

# 5 Discussion

Although relatively many studies met the criteria for inclusion, the literature search identified only two studies of moderate quality. This is disconcerting, because traumatic shaking is very serious and has dramatic consequences for both the child and its family. The research field is complex, but this does not excuse, for example, circular reasoning and inadequate presentation of data collection. It is important that reviews of the field include consideration of the methodological flaws which characterise this field of research.

The studies by Adamsbaum et al. and Vinchon et al. were deemed to be of moderate quality. Although both studies have methodological limitations, they support the hypothesis that isolated traumatic shaking can give rise to the triad.

The prospective study by Vinchon et al. was based on more than 400 cases: 124 were classified as inflicted and 288 as accidental injuries to the skull. Forty-five were cases of confessed inflicted skull injury, of which 30 were cases of confessed isolated traumatic shaking (IHI group).

Thirty-nine cases were witnessed accidents (AT group). The advantage of this study is that all trauma cases presenting at the hospital were registered prospectively for many years. The study also has a clearly defined reference group, of children who had accidentally sustained injuries in the presence of a witness. However, this group of children is significantly older. One of the limitations of the study is the lack of detailed description of how and when the shaking incident occurred. Vinchon et al. analysed the components of the triad separately, but the authors also introduced a different combination for the triad, namely subdural hematoma, retinal hemorrhages and the "absence of scalp swelling".

However data on effects on the brain are registered in the study, in the form of seizures, lethargy and coma, among others. By definition, the group of children with isolated traumatic shaking will comprise only those cases without signs of external trauma, while the group with accidental injury will include cases with signs of external trauma. At an early stage of the investigation the project group contacted Dr. Vinchon in order to clarify certain ambiguities, but not all queries were answered. The questions included i.a. how retinal hemorrhages were defined, how the authors calculated sensitivity, specificity and the predictive value of the triad, why they chose a different triad component ("absence of scalp swelling" instead of encephalopathy) and under what circumstances the suspected perpetrator had confessed and what had been confessed.

The study by Adamsbaum et al. was a retrospective observational study which included 29 cases in which a suspect confessed to traumatic shaking. While detailed confessions were presented for 14 cases, it cannot be discounted that among the cases for which no detailed confession was forthcoming, there could be some in which shaking occurred after the child exhibited symptoms of brain damage. The study group was compared with a reference group comprising 83 unconfessed cases. However, this is not a "true" reference group, as there may be cases of traumatic shaking among the unconfessed cases. As subdural hematoma is a criterion for inclusion of all cases in the study, only the results for retinal hemorrhages can be considered.

During the literature review the project group identified other conditions or events which can also give rise to the three components of the triad. Some of these conditions or events do not result in permanent disability or are very rare, but it should be noted that the triad or its components can be attributable to causes other than shaking. It is therefore important to consider these possible differential diagnoses in investigations of suspected traumatic shaking. Decisions made by social services or the court system are based not only on medical findings, but also on other evidence.

An analysis of biomechanical studies (Appendix 2) disclosed contradictory results and no conclusions can be drawn as to the minimal forces capable of generating these injuries in children.

# Methodological issues

This review of the scientific evidence for diagnosis of traumatic shaking in children under the age of 12 months (mean or median age ≤12 months) disclosed a number of methodological issues in the published studies.

## Definition of traumatic shaking

The project was limited to studies in which traumatic shaking was considered to be the primary cause of the child's injuries, but several studies have adopted a wider definition, for example inflicted head injury. Thus it has not always

been possible to distinguish between an injury attributable to traumatic shaking and an injury attributable to direct trauma to the head.

## Classification of subjects into groups

Another methodological problem was that traumatic shaking was not always witnessed or confessed to by the suspected perpetrator, hence correct classification of cases into a traumatic shaking group or a reference group was uncertain. Thus there is a risk of incorrect evaluation of the association between the triad and traumatic shaking. Although there is a risk of false confessions, apart from film documentation, this is the only means of gaining an insight into what has actually happened to the infant. Because of the risk of false confessions, all confessions in these studies must be considered with caution.

Thus there are some risks associated with the decision of the project group to include only cases in which someone has confessed. The confession could be false because it was made as part of a plea bargain. It could also be false because the suspect has felt impelled to confess [63–65].

## Circular reasoning in clinical and research settings

Under the Social Services Act, the Board of Social Welfare must be notified not only of all cases of (suspected) child abuse, but also of other cases in which a child may be deemed to be vulnerable to harm and in need of protection. Those required to notify suspected child abuse are personnel within the health and medical services, dental, preschool, school, social and criminal services (Chapter 14, Section 1 of the Social Services Act).

In many cases, it is a child protection team which investigates cases of suspected traumatic shaking. Over the years these teams have developed criteria based on certain symptoms and signs which can be associated with isolated traumatic shaking, after exclusion of other possible causes of the child's condition [66,67]. Some of these criteria are associated with the carer's credibility. The carer is not considered trustworthy if he/she cannot provide an "acceptable" explanation for the child's condition, for example that the child had fallen from a low height and had not sustained any external injury. A change of statement – for example, the carer first denies shaking the child and later admits to doing so, but only after the child had stopped breathing or lost consciousness – also reduces the carer's credibility. If the child was shaken because it suddenly showed signs of being unwell (such as dyspnea or apnea), it is however reasonable to assume that the child's condition was already cause for concern before it was shaken and thus the symptoms were not attributable to the shaking. If however, such an explanation of events is not deemed "acceptable", the case is still classified as a case of traumatic shaking.

The child protection team's criteria are based primarily on a clinical approach [66,67]. Problems arise later, when and if these criteria are not tested unconditionally by researchers in systematic studies of the association between the triad and traumatic shaking. This means that the interpretation made by the child protection team characterises the scientific investigation and hypothesis testing

and this, in turn, means that the conventional approach is reinforced instead of being tested. However, if before the study it has already been assumed that the question to be addressed by the study has been answered, i.e. the association between the symptoms and signs of the triad and traumatic shaking has already been described (according to the child protection team's criteria), then circular reasoning occurs. Applied in this context, the reasoning results in a high risk of bias, which in turn results in a situation wherein the researcher does not know what is being compared (the traumatic shaking group may include children who have not been shaken and the reference group may include children who have been shaken). Sensitivity, specificity and predictive values calculated on comparison of such groups will result in incorrect conclusions. It will also result in incorrect calculations of incidence.

In order to avoid such circular reasoning, study cases and control cases must be identified introcontrovertibly. The project group has chosen to accept as study cases only those in which there was a witness to (or video documentation of) an incident of shaking or where someone has made a detailed confession of shaking the child.

## Diagnostic methods

There is uncertainty in determining the time at which a subdural hematoma arose. Moreover this uncertainty is greater in children under 12 months of age, because the characteristics of subdural hemorrhage at this age differ somewhat from those in adults. A subdural hematoma in a small child or infant usually consists of an upper layer of fluid and a sediment of coagulated blood: if the subdural hematoma is subacute, this layer can exhibit various degrees of attenuation [47]. The application of CT and MRI scans has recently reduced this uncertainty somewhat [46], but caution must still be exercised in assessing the age of a hematoma because of the existence of different and partly overlapping patterns [48].

In both controlled experimental and observational studies, systematic errors can occur because various observers do not always make the same observations and/or interpret the observations differently. Agreement among different investigators in a study can vary according to how well-trained the observers are. This applies not only in general to observations and assessments, but of course also to examinations and assessments of the symptoms and signs in cases of suspected traumatic shaking.

In one study, for example, there were major variations among the observers' interpretation of retinal hemorrhages, i.e. interobserver agreement was low [51].

# Comparison with results of other reviews

The project group identified seven systematic literature reviews addressing the same or partly the same questions as the present report [68–74]. These reviews are not included in the results section of the present paper, but the project group scrutinised and assessed them because they are frequently cited in the scientific literature. All the systematic reviews were assessed by the project group to be of low quality (high risk of bias). Many of them were based on studies in which a team considered that a child had been shaken if it presented with the triad (circular reasoning, see section "Circular reasoning in clinical and research settings"). Another weakness in these reviews was that traumatic shaking was not specified and the more general term AHT was used instead, without a detailed description of what this term included.

# 6 Issues for future research

It is not possible to conduct randomised experiments in which children of various ages are subjected to various degrees of shaking. Biomechanical studies using dummies or models equipped with various inbuilt measuring instruments have been used to investigate the impact of mechanical forces on a child, but the results are contradictory. Further, for various reasons, it is difficult to extrapolate the results of animal experiments to infants.

The project group was therefore limited to observational studies in which exposure (in this case shaking) was assumed to have occurred. The most reliable are prospective cohort studies and ideally those subjects included in a traumatic shaking cohort should comprise cases in which the perpetrator has confessed in a detailed confession, including documentation of the circumstances under which the confession was obtained.

In many of the scrutinised studies, the children in the reference group were significantly older than those in the traumatic shaking group. The brain, skeleton and neck muscles in a 2-month old baby are different from those of an 8-month old. Hence, at the age of 0–2 months, an infant can be assumed to be more vulnerable to injury from shaking than an older baby. Comparison of two groups of children (traumatic shaking and accidental injury groups) which are not age-matched can lead to selection bias and incorrect conclusions. Studies with matched age groups would allow calculation of sensitivity and specificity and predictive values. In this context, an opinion on the probability that the triad was attributable to traumatic shaking could be expressed with greater certainty.

There is a lack of detailed knowledge about the pathophysiology of the development of subdural and retinal hemorrhages associated with vaginal delivery. Although most bleedings related to delivery are symptomless and disappear (are resorbed) within a few months, occasionally a hemorrhage can degenerate into a hygroma [19,30,36]. This circumscribed collection of fluid is contained by a membrane in which small vessels form and it is considered that this in turn can lead to renewed bleeding (rebleeding) and a chronic subdural pool of fluid. The possibility cannot be discounted that in certain cases, rebleeding can cause symptoms [19,36]. This could be one reason why a child suddenly exhibits signs of encephalopathy (lethargy, apnea and/or seizures), causing the carer to seek medical attention. Hypothetically such rebleeding could occur spontaneously or in response to minor trauma. There is therefore an urgent need for research into the pathophysiology and the natural course of subdural and retinal hemorrhages. Our understanding of the sequelae to traumatic shaking could also be improved by the development of better biomechanical models, for example models which take into account the impact of traumatic shaking on both the brain and the cervical vertebrae.

# What measures are required to address the scientific uncertainties?

The reasons for scientific uncertainty in this field vary and should therefore be managed in different ways; from coordination of the entire field of research with respect to the direction future research should take, to conducting studies using correct methodologies and detailed descriptions of how the studies have been conducted.

## International coordination

In order to improve diagnosis within the field, broad coordination at international level is required to ensure a study population of adequate size. Researchers in the field should strive to agree on which research questions are most urgent and collaborate to facilitate larger studies and to use similar study designs, allowing the results to be compared more readily. It should also be possible to establish an international register of confessed and well-documented cases.

## Priority research topics

Of particular importance are studies intended to improve the diagnostic accuracy of diagnostic imaging of the brain, the cervical spine and the eyes [75]. There is also a need for better methods of studying the natural course of the observed injuries. Differential diagnosis such as bleeding in neonates associated with delivery also needs to be studied in order to identify the natural course of events [22,36,76,77]. Further research is also required in order to improve understanding of the pathophysiology underlying the triad. Refined biomechanical models would also contribute to improved understanding of traumatic shaking.

As far as possible, of course, studies should meet all the predetermined quality criteria. It is also important that the researchers are blinded with respect to the suspected mechanism of origin of the injuries and that the results are presented in such a way as to allow diagnostic accuracy to be calculated. This latter requirement thus means that each individual finding must be assessed in both the study group and the reference group.

One of the reasons that it was difficult to find evidence in this field is that in many studies the method and the results were inadequately described. With respect to future studies, the project group presents the following recommendations of requirements to be met, in order that the quality of the studies can be assessed and that meta-analyses can be conducted:

The studies should:

- Comprise prospective observational studies of confessed and well-documented cases with reliable methodology, in which the risk of false confessions was minimised;

- Be age-matched (study group and reference group);

- Contain detailed presentations of how the study material was collected, including documentation of the examination technique and detailed presentations of any complementary investigations undertaken in order to exclude differential diagnoses;

- Demonstrate that the observers of the symptoms and signs were blinded to (i.e. were unaware of) the suspected or alleged cause of the findings and describe how the blinding was achieved;

- Present raw data, sensitivity/specificity and confidence intervals;

- Be based on a material of adequate size and apply a uniform method of examination throughout;

- Present a detailed account of the confession, what was confessed to and the circumstances under which the confession was made.

# 7 Project group, external reviewers, board and councils

## Project group

### Experts

**GÖRAN ELINDER**
Professor of Pediatrics,
Karolinska Institutet, Stockholm,
and Senior Consultant in Pediatrics

**ANDERS ERIKSSON**
Professor of Forensic Medicine,
Umeå University, and Senior
Consultant in Forensic Medicine,
the National Board of Forensic
Medicine

**BOUBOU HALLBERG**
PhD, Karolinska Institutet,
Stockholm, and Senior Consultant
in Pediatrics and Neonatology,
Karolinska University Hospital,
Stockholm

**NIELS LYNØE**
Senior Professor of Medical Ethics,
Karolinska Institutet, Stockholm,
and specialist in Family Medicine

**PIA MALY SUNDGREN**
Professor of Diagnostic Radiology,
Lund University, and Senior
Consultant in Neuroradiology,
Skåne University Hospital, Lund

**MÅNS ROSÉN**
Adjunct Professor of Health
Technology Assessment,
Karolinska Institutet, Stockholm

**BJÖRN-ERIK ERLANDSSON**
External Collaborator, Biomechanical
studies (Appendix 2), Professor of
Medical Technology, Royal Institute
of Technology, Stockholm

**SBU**

**FRIDA MOWAFI**
Project Manager

**HANNA OLOFSSON**
Information Specialist

**MARIANNE HEIBERT-ARNLIND**
Project Manager until September
2015

**ANNA ATTERGREN GRANATH**
Project Administrator

**IRENE EDEBERT**
Assistant Project Manager

**LAURA LINTAMO**
Analyst

**ANNA BJÖRKLÖF**
Communication Responsible

# Scientific reviewers

SBU engages external reviewers in its reports. The reviewers contributed valuable comments, which have improved the report. The final version of the report, however, may not include all the alterations or additions recommended by the external reviewers, partly because they were not always in agreement. Therefore the external reviewers do not necessarily support all parts of the report.

The following external reviewers were engaged in this report and consented to inclusion of their names here:

**STEVEN LUCAS***
PhD, Senior Consultant
in Pediatrics, Uppsala University
Children's Hospital, Sweden

**NILS-ERIC SAHLIN**
Professor of Medical Ethics,
Lund University, Stockholm,
Sweden

**TIIT MATHIESEN**
Adjunct Professor of Neurosurgery,
Karolinska Institutet, and Senior
Consultant in Neurosurgery,
Karolinska University Hospital,
Stockholm, Sweden

**ARNE STRAY-PEDERSEN***
Associate Professor, Institute of
Clinical Medicine, University of Oslo,
and Senior Consultant in Forensic
Pathology and Clinical Forensic
Medicine, Oslo University Hospital,
Norway

**TITTI MATTSSON**
Professor of Public Law,
Lund University, Stockholm,
Sweden

**INGEMAR THIBLIN***
Professor of Forensic Medicine,
Uppsala University, and Senior
Consultant in Forensic Medicine
at the National Board of Forensic
Medicine, Sweden

---

* These reviewers have provided open statements – for more information contact SBU.

# Conflicts of Interest

In accordance with SBU's requirements, the experts and scientific reviewers participating in this project have submitted statements about conflicts of interest. These documents are available at SBU's secretariat. SBU has determined that the conditions described in the submissions are compatible with SBU's requirements for objectivity and impartiality.

# Scientific Advisory Committee – Brage

SBU´s scientific advisory committee, Brage, has reviewed the material presented in this report.

**LARS HANSSON**
Chair, Professor, Care Science,
Lund University

**CHRISTEL BAHTSEVANI**
Reg Nurse, Med Dr, Care Science,
Malmö University

**PER CARLSSON**
Professor, Health Economics,
Linköping University

**BJÖRN-ERIK ERLANDSSON**
Professor, Medical Technology,
KTH Royal Institute of Technology,
Stockholm

**ARNE GERDNER**
Professor, Social work, School of
Health and Welfare, Jönköping

**LENNART ISELIUS**
Associate Professor, Healthcare
Director, County of Västmanland

**MUSSIE MSGHINA**
Associate Professor, Senior
Consultant, Psychiatry,
Karolinska University Hospital

**LARS SANDMAN**
Professor, Ethics, Borås University

**BRITT-MARIE STÅLNACKE**
Professor, Senior Consultant,
Rehabilitation medicine,
Umeå University

**SVANTE TWETMAN**
Professor, Dental Care, Halmstad and
University of Copenhagen, Denmark

# Scientific Advisory Committee – Eira

SBU´s scientific advisory committee, Eira, has reviewed the material presented in this report.

**KJELL ASPLUND**
Chair, Professor, Stockholm

**HENRIK ANDERSHED**
Professor of Psychology,
Associate Professor of Criminology,
Örebro University

**KRISTINA BENGTSSON BOSTRÖM**
Associate Professor, Billingens
Medical Center, Skövde

**CHRISTINA BERGH**
Professor, Department

of Obstetrics and Gynecology,
SU/Sahlgrenska, Göteborg

**ANNA EHRENBERG**
Professor of Care Science/Nursing,
Dalarna University, Falun

**INGEMAR ENGSTRÖM**
Professor of Child and Adolescent
Psychiatry, Ethics, Örebro University

**NILS FELTELIUS**
Associate Professor,
Medical Products Agency

**YLVA NILSAGÅRD**
Associate Professor, Physical therapy,
CAMTÖ, Region Örebro County

**STEN-ÅKE STENBERG**
Professor of Sociology,
Stockholm University

**KATARINA STEEN CARLSSON**
PhD, Swedish Institute for Health
Economics, Lund

# SBU's Board of Directors

SBU's board of directors has approved the conclusions presented in this report.

**NINA REHNQVIST**
Chair of the Board, professor,
Karolinska Institutet

**SUSANNA AXELSSON**
Director General, SBU

**HEIKI ERKERS**
Chair, Union for Professionals

**EVA FRANZÉN**
Director of Research and
Development, Swedish National
Board of Institutional Care

**ÅSA FURÉN-THULIN**
Head of Division,
Swedish Association of
Local Authorities and Regions

**JAN-INGVAR JÖNSSON**
Secretary General,
Swedish Research Council

**BJÖRN KLINGE**
Professor, Karolinska Institutet
and Malmö University

**LARS-TORSTEN LARSSON**
Associate professor, Director
of department, National Board
of Health and Welfare

**STEFAN LINDGREN**
Professor, Lund University,
University Hospital MAS,
Chair of the Swedish Society
of Medicine

**STIG NYMAN**
Chair, Swedish Association
of Health Professionals

**SINEVA RIBEIRO**
President, Swedish Association of
Health Professionals

**AGNETA VON SCHOTING**
Chair, NSK-S

**HEIDI STENSMYREN**
Chair, Swedish Medical Association

**ANDERS SYLVAN**
Director, County Council
of Västerbotten

**HÅKAN SÖRMAN**
Direktor General,
The Swedish Association of Local
Authorities and Regions

**KARIN TENGVALD**
Professor emerita,
Linköping University

# 8 External collaboration

## Co-operation with interested parties

The project management held meetings with members of the Swedish National Association for Families' Rights at the beginning of the project in order to inform them of the project and to solicit opinions.

## Networking with government authorities

In conjunction with the release of the report, representatives of the following authorities were invited to SBU for information about the results: the Ombudsman for Children in Sweden, the Swedish Health and Social Care Inspectorate, the Swedish Prison and Probation Service, the Swedish National Board of Health and Welfare, the Swedish Association of Local Authorities and Regions, the Swedish Police Authority, the Swedish National Board of Forensic Medicine, and the Swedish Prosecution Authority.

# The Swedish National Council on Medical Ethics

The analysis of the ethics was conducted by the Swedish National Council on Medical Ethics.

# 9 **Glossary**

| | |
|---|---|
| **AHT** | Abbreviation for Abusive Head Trauma: damage to the skull caused by maltreatment of the child |
| **AT** | Abbreviation for Accidental Trauma |
| **Attenuation** | Attenutation: absorption of radiation in the body, which varies in accordance with the density of the tissues. |
| **BE** | Abbreviation for Brain Edema/Edema |
| **Child protection team** | Interdisciplinary team which investigates cases of suspected child abuse |
| **CT** | Abbreviation for Computed Tomography |
| **Hydrocephalus** | Increased volume of cerebrospinal fluid in the cavities of the brain |
| **Hygroma** | Accumulation of fluid, possibly arising after an earlier episode of bleeding |
| **IHI** | Abbreviation for Inflicted Head Injury or Intentional Head Injury: head injury caused by abusive maltreatment of the child |
| **IHT** | Abbreviation for Inflicted Head Trauma: injury to the head resulting from abusive maltreatment of the child |
| **MF** | Abbreviation for Metaphyseal Fracture: a fracture in the growth zone of a long bone, e.g in the shinbone just below the knee |
| **MRI** | Abbreviation for Magnetic Resonance Imaging |
| **MRT** | Abbreviation for Magnetic Resonance Tomography (see MRI) |
| **RB/RH** | Abbreviation for Retinal Bleeding/hemorrhage, intraocular bleeding |
| **SAH** | Abbreviation for Subarachnoidal Hemorrhage: bleeding in the subarachnoid space, i.e. between the soft meninges of the brain ) |
| **SBS** | Abbreviation for Shaken Baby Syndrome; a syndrome comprising three components, the triad |

| | |
|---|---|
| **SDH** | Abbreviation for Subdural Hemorrhage, Subdural Hematoma: bleeding under the dura |
| **Subarachnoid space** | The space between the soft meninges |
| **Traumatic shaking** | The injurious mechanism when a child is shaken violently (not to be confused with the medical findings, "the triad") |
| **Triad** | Three components of a whole. The triad associated with SBS usually comprises subdural hematoma, retinal hemorrhages and encephalopathy |

# 10 References

1.  Tardieu A. Etude médico-légale sur les sévices et mauvais traitements exercés sur des enfants. Annales d'hygiène publique et de médecine légale; 1860.

2.  Caffey J. On the theory and practice of shaking infants. Its potential residual effects of permanent brain damage and mental retardation. Am J Dis Child 1972;124:161-9.

3.  Kempe CH, Silverman FN, Steele BF, Droegemueller W, Silver HK. The battered-child syndrome. Jama 1962;181:17-24.

4.  Guthkelch AN. Infantile subdural haematoma and its relationship to whiplash injuries. Br Med J 1971;2: 430-1.

5.  Duhaime AC, Gennarelli TA, Thibault LE, Bruce DA, Margulies SS, Wiser R. The shaken baby syndrome. A clinical, pathological, and biomechanical study. J Neurosurg 1987;66:409-15.

6.  Minns RA, Jones PA, Tandon A, Fleck BW, Mulvihill AO, Elton RA. Prediction of inflicted brain injury in infants and children using retinal imaging. Pediatrics 2012;130:e1227-34.

7.  Fujiwara T, Okuyama M, Miyasaka M. Characteristics that distinguish abusive from nonabusive head trauma among young children who underwent head computed tomography in Japan. Pediatrics 2008;122:e841-7.

8.  Myhre MC, Grogaard JB, Dyb GA, Sandvik L, Nordhov M. Traumatic head injury in infants and toddlers. Acta Paediatr 2007;96:1159-63.

9.  Tung GA, Kumar M, Richardson RC, Jenny C, Brown WD. Comparison of accidental and nonaccidental traumatic head injury in children on noncontrast computed tomography. Pediatrics 2006;118:626-33.

10. Vinchon M, Defoort-Dhellemmes S, Desurmont M, Dhellemmes P. Accidental and nonaccidental head injuries in infants: a prospective study. J Neurosurg 2005;102:380-4.

11. Keenan HT, Runyan DK, Marshall SW, Nocera MA, Merten DF. A population-based comparison of clinical and outcome characteristics of young children with serious inflicted and noninflicted traumatic brain injury. Pediatrics 2004; 114:633-9.

12. Bechtel K, Stoessel K, Leventhal JM, Ogle E, Teague B, Lavietes S, et al. Characteristics that distinguish accidental from abusive injury in hospitalized young children with head trauma. Pediatrics 2004;114:165-8.

13. Harding B, Risdon RA, Krous HF. Shaken baby syndrome. BMJ 2004; 328:720-1.

14. American Academy of Pediatrics Committee on Child Abuse and Neglect: Shaken baby syndrome: inflicted cerebral trauma. Pediatrics 1993;92:872-5.

15. Flodmark O. Stockholms läns landsting regionalt vårdprogram: Vid misstanke om fysisk misshandel av späda barn. Hämtad från: http://bit.ly/294D4O4, 16-06-28. 2011.

16. Socialstyrelsen. Barn som far illa eller riskerar att fara illa. ISBN: 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-209-5. Hämtad från: http://www.socialstyrelsen.se/publikationer2014/2014-10-4 160817. 2014.

17. Västra Götalandsregionen. Regional riktlinje: Spädbarnsmisshandel. Hämtad från: http://bit.ly/2bxdajq 160817. 2014.

18. Bode-Janisch S, Bultmann E, Hartmann H, Schroeder G, Zajaczek JE, Debertin AS. Serious head injury in young children: birth trauma versus non-accidental head injury. Forensic Sci Int 2012;214:e34-8.

19. Gabaeff SC. Investigating the possibility and probability of perinatal subdural hematoma progressing to chronic subdural hematoma, with and without complications, in neonates, and its potential relationship to the misdiagnosis of abusive head trauma. Leg Med (Tokyo) 2013;15:177-92.

20. Geddes JF, Tasker RC, Adams GG, Whitwell HL. Violence is not necessary to produce subdural and retinal haemorrhage: a reply to Punt et al. Pediatr Rehabil 2004;7:261-5.

21. Geddes JF, Tasker RC, Hackshaw AK, Nickols CD, Adams GG, Whitwell HL, et al. Dural haemorrhage in non-traumatic infant deaths: does it explain the bleeding in 'shaken baby syndrome'? Neuropathol Appl Neurobiol 2003;29:14-22.

22. Kelly P, Hayman R, Shekerdemian LS, Reed P, Hope A, Gunn J, et al. Subdural hemorrhage and hypoxia in infants with congenital heart disease. Pediatrics 2014;134:e773-81.

23. Lantz PE, Couture DE. Fatal acute intracranial injury, subdural hematoma, and retinal hemorrhages caused by stairway fall. J Forensic Sci 2011;56:1648-53.

24. Miller R, Miller M. Overrepresentation of males in traumatic brain injury of infancy and in infants with macrocephaly: further evidence that questions the existence of shaken baby syndrome. Am J Forensic Med Pathol 2010;31:165-73.

25. Guthkelch AN. Problems of infant retino-dural hemorrage with minimal external injury. Hämtad från: http://bit.ly/29b5qqn 160629. Houst J Health Law Policy 2012;12.

26. Högsta domstolen. Dom. Mål nummer B 3438-12. 2014.

27. Christian CW, Block R; Committee on Child Abuse and Neglect; American Academy of Pediatrics. Abusive head trauma in infants and children. Pediatrics 2009;123:1409-11.

28. Squier W. The "Shaken Baby" syndrome: pathology and mechanisms. Acta Neuropathol 2011;122:519-42.

29. Geddes JF, Hackshaw AK, Vowles GH, Nickols CD, Whitwell HL. Neuropathology of inflicted head injury in children. I. Patterns of brain damage. Brain 2001;124:1290-8.

30. Feldman KW, Bethel R, Shugerman RP, Grossman DC, Grady MS, Ellenbogen RG. The cause of infant and toddler subdural hemorrhage: a prospective study. Pediatrics 2001;108:636-46.

31. Greiner MV, Richards TJ, Care MM, Leach JL. Prevalence of subdural collections in children with macrocrania. AJNR Am J Neuroradiol 2013;34:2373-8.

32. McKeag H, Christian CW, Rubin D, Daymont C, Pollock AN, Wood J. Subdural hemorrhage in pediatric patients with enlargement of the subarachnoid spaces. J Neurosurg Pediatr 2013;11:438-44.

33. Ravid S, Maytal J. External hydro-cephalus: a probable cause for subdural hematoma in infancy. Pediatr Neurol 2003;28:139-41.

34. Drubach LA, Johnston PR, Newton AW, Perez-Rossello JM, Grant FD, Kleinman PK. Skeletal trauma in child abuse: detection with 18F-NaF PET. Radiology 2010;255:173-81.

35. Ghosh PS, Ghosh D. Subdural hema-toma in infants without accidental or nonaccidental injury: benign external hydrocephalus, a risk factor. Clin Pediatr (Phila) 2011;50:897-903.

36. Hymel KP, Jenny C, Block RW. Intracranial hemorrhage and rebleeding in suspected victims of abusive head trauma: addressing the forensic contro-versies. Child Maltreat 2002;7:329-48.

37. Howard MA, Bell BA, Uttley D. The pathophysiology of infant sub-dural haematomas. Br J Neurosurg 1993;7:355-65.

38. Kivlin JD, Currie ML, Greenbaum VJ, Simons KB, Jentzen J. Retinal hemorr-hages in children following fatal motor vehicle crashes: a case series. Arch Ophthalmol 2008;126:800-4.

39. Levin AV, Christian CW, Committee on Child A, Neglect SoO. The eye exam-ination in the evaluation of child abuse. Pediatrics 2010;126:376-80.

40. Firsching R, Muller C, Pauli SU, Voellger B, Rohl FW, Behrens-Baumann W. Noninvasive assessment of intracranial pressure with venous ophthalmodyna-mometry. Clinical article. J Neurosurg 2011;115:371-4.

41. Lashutka MK, Chandra A, Murray HN, Phillips GS, Hiestand BC. The relationship of intraocular pressure to intracranial pressure. Ann Emerg Med 2004;43:585-91.

42. Laghmari M, Skiker H, Handor H, Mansouri B, Ouazzani Chahdi K, Lachkar R, et al. [Birth-related retinal hemorrhages in the newborn: incidence and relationship with maternal, obstet-ric and neonatal factors. Prospective study of 2,031 cases]. J Fr Ophtalmol 2014;37:313-9.

43. Friden HG, Ekstedt J. Volume/pressure relationship of the cerebrospinal space in humans. Neurosurgery 1983;13:351-66.

44. Shapiro K, Fried A. Pressure-volume relationships in shunt-dependent child-hood hydrocephalus. The zone of pres-sure instability in children with acute deterioration. J Neurosurg 1986;64:390-6.

45. Robinson RJ, Bhuta S. Susceptibil-ity-weighted imaging of the brain: current utility and potential applications. J Neuroimaging 2011;21:e189-204.

46. Schelhorn J, Gramsch C, Deuschl C, Quick HH, Nensa F, Moenninghoff C, et al. Intracranial hemorrhage detection over time using susceptibility-weighted magnetic resonance imaging. Acta Radiol 2015;56:1501-7.

47. Vinchon M, Noule N, Tchofo PJ, Soto-Ares G, Fourier C, Dhellemmes P. Imaging of head injuries in infants: temporal correlates and forensic impli-cations for the diagnosis of child abuse. J Neurosurg 2004;101:44-52.

48. Bradford R, Choudhary AK, Dias MS. Serial neuroimaging in infants with abusive head trauma: timing abusive injuries. J Neurosurg Pediatr 2013;12:110-9.

49. Adamsbaum C, Morel B, Ducot B, Antoni G, Rey-Salmon C. Dating the abusive head trauma episode and perpetrator statements: key points for imaging. Pediatr Radiol 2014;44 Suppl 4:S578-88.

50. Vezina G. Assessment of the nature and age of subdural collections in nonacci-dental head injury with CT and MRI. Pediatr Radiol 2009;39:586-90.

51. Mulvihill AO, Jones P, Tandon A, Fleck BW, Minns RA. An inter-observer and intra-observer study of a classification of RetCam images of retinal haemorr-hages in children. Br J Ophthalmol 2011;95:99-104.

52. Tandon A, McIntyre S, Yu A, Stephens D, Leiby B, Croker S, et al. Retinal haemorrhage description tool. Br J Ophthalmol 2011;95:1719-22.

53. Levin AV. Retinal hemorrhage in abusive head trauma. Pediatrics 2010;126:961-70.

54. Wygnanski-Jaffe T, Levin AV, Shafiq A, Smith C, Enzenauer RW, Elder JE, et al. Postmortem orbital findings in shaken baby syndrome. Am J Ophthalmol 2006;142:233-40.

55. Zuccoli G, Panigrahy A, Haldipur A, Willaman D, Squires J, Wolford J, et al. Susceptibility weighted imaging depicts retinal hemorrhages in abusive head trauma. Neuroradiology 2013;55:889-93.

56. Hughes LA, May K, Talbot JF, Parsons MA. Incidence, distribution, and duration of birth-related retinal hemorrhages: a prospective study. J AAPOS 2006;10:102-6.

57. SBU. Assessment of methods in health care. Stockholm: Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU). http://www.sbu.se/globalassets/eng_metodboken_160808.pdf. 2016.

58. Parks S, Sugerman D, Xu L, Coronado V. Characteristics of non-fatal abusive head trauma among children in the USA, 2003–2008: application of the CDC operational case definition to national hospital inpatient data. Inj Prev 2012;18:392-8.

59. Vinchon M, de Foort-Dhellemmes S, Desurmont M, Delestret I. Confessed abuse versus witnessed accidents in infants: comparison of clinical, radiological, and ophthalmological data in corroborated cases. Childs Nerv Syst 2010;26:637-45.

60. Adamsbaum C, Grabar S, Mejean N, Rey-Salmon C. Abusive head trauma: judicial admissions highlight violent and repetitive shaking. Pediatrics 2010;126:546-55.

61. Bartschat S, Richter C, Stiller D, Banschak S. Long-term outcome in a case of shaken baby syndrome. Med Sci Law 2016;56:147-9. Epub 2015 Jun 8.

62. Bell E, Levin A, Shouldice M. A perpetrator confesses. Child Abuse Negl 2011;35:74-7.

63. Esernio-Jenssen D, Tai J, Kodsi S. Abusive head trauma in children: a comparison of male and female perpetrators. Pediatrics 2011;127:649-57.

64. Gertner N, Brower B, Shechtman P. Why the Innocent Plead Guilty: An Exchange. New York Review of Books 2015;January 8:23.

65. Kassin S, Drizin S, Grisso T, Gudjonsson G, Lee R, Redlich A. Police-induced confessions: Risk factors and recommendations. Law Hum Behav 2010;34:38.

66. Reece RM. What are we trying to measure? The problems of case ascertainment. Am J Prev Med 2008;34:S116-9.

67. Duhaime AC, Alario AJ, Lewander WJ, Schut L, Sutton LN, Seidl TS, et al. Head injury in very young children: mechanisms, injury types, and ophthalmologic findings in 100 hospitalized patients younger than 2 years of age. Pediatrics 1992;90:179-85.

68. Bhardwaj G, Chowdhury V, Jacobs MB, Moran KT, Martin FJ, Coroneo MT. A systematic review of the diagnostic accuracy of ocular signs in pediatric abusive head trauma. Ophthalmology 2010;117:983-992.e17.

69. Kemp AM, Jaspan T, Griffiths J, Stoodley N, Mann MK, Tempest V, et al. Neuroimaging: what neuroradiological features distinguish abusive from non-abusive head trauma? A systematic review. Arch Dis Child 2011;96:1103-12.

70. Maguire S, Pickerd N, Farewell D, Mann M, Tempest V, Kemp AM. Which clinical features distinguish inflicted from non-inflicted brain injury? A systematic review. Arch Dis Child 2009;94:860-7.

71. Maguire SA, Kemp AM, Lumb RC, Farewell DM. Estimating the probability of abusive head trauma: a pooled analysis. Pediatrics 2011;128:e550-64.

72. Maguire SA, Watts PO, Shaw AD, Holden S, Taylor RH, Watkins WJ, et al. Retinal haemorrhages and related findings in abusive and non-abusive head trauma: a systematic review. Eye (Lond) 2013;27:28-36.

73. Piteau SJ, Ward MG, Barrowman NJ, Plint AC. Clinical and radiographic characteristics associated with abusive and nonabusive head trauma: a systematic review. Pediatrics 2012;130: 315-23.

74. Togioka BM, Arnold MA, Bathurst MA, Ziegfeld SM, Nabaweesi R, Colombani PM, et al. Retinal hemorrhages and shaken baby syndrome: an evidence-based review. J Emerg Med 2009;37:98-106.

75. Hadley MN, Sonntag VK, Rekate HL, Murphy A. The infant whiplash-shake injury syndrome: a clinical and pathological study. Neurosurgery 1989;24: 536-40.

76. Rooks VJ, Eaton JP, Ruess L, Petermann GW, Keck-Wherley J, Pedersen RC. Prevalence and evolution of intracranial hemorrhage in asymptomatic term infants. AJNR Am J Neuroradiol 2008;29:1082-9.

77. Looney CB, Smith JK, Merck LH, Wolfe HM, Chescheir NC, Hamer RM, et al. Intracranial hemorrhage in asymptomatic neonates: prevalence on MR images and relationship to obstetric and neonatal risk factors. Radiology 2007;242:535-41.

78. Stray-Pedersen A, Omland S, Nedregaard B, Klevberg S, Rognum TO. An infant with subdural hematoma and retinal hemorrhages: does von Willebrand disease explain the findings? Forensic Sci Med Pathol 2011;7:37-41.

79. De Leeuw M, Beuls E, Jorens P, Parizel P, Jacobs W. Delta-storage pool disease as a mimic of abusive head trauma in a 7-month-old baby: a case report. J Forensic Leg Med 2013;20:520-1.

80. Mansour AM, Jaroudi MO. Recurrent vitreous haemorrhage and epidural haematoma in a child with hypofibrinogenaemia. BMJ Case Rep 2012 Jul 9;2012.

81. Botte A, Mars A, Wibaut B, De Foort-Dhellemmes S, Vinchon M, Leclerc F. Two children with cerebral and retinal hemorrhages: do not diagnose shaken baby syndrome too rapidly. Arch Pediatr 2012;19:42-6.

82. Pinto FC, Porro FF, Suganuma L, Fontes RB, de Andrade AF, Marino Jr R. Hemophilia and child abuse as possible causes of epidural hematoma: case report. Arq Neuropsiquiatr 2003;61:1023-5.

83. Ermis B, Ors R, Tastekin A, Orhan F. Severe congenital factor X deficiency with intracranial bleeding in two siblings. Brain Dev 2004;26:137-8.

84. Kato K, Kobayashi C, Katayama Y, Moriyama N, Shiono J, Kudo K, et al. Forty-two-day-old boy with acute idiopathic thrombocytopenic purpura. Pediatr Int 2010;52:485-7.

85. Carrim ZI, Arbabi EM, Long VW. Presumed non-accidental injury with retinal haemorrhages--findings from a tertiary referral centre in the United Kingdom. Brain Inj 2012;26:1716-22.

86. Guddat SS, Ehrlich E, Martin H, Tsokos M. Fatal spontaneous subdural bleeding due to neonatal giant cell hepatitis: a rare differential diagnosis of shaken baby syndrome. Forensic Sci Med Pathol 2011;7: 294-7.

87. Ambade VN, Malani AP, Kukde HG, Meshram RN. A rare case of head injury associated with Albers Schonberg disease. J Forensic Leg Med 2007;14:92-5.

88. Innis MD. Vitamin K deficiency disease. J Orthomol Med 2008;23:15-20.

89. Demiroren K, Yavuz H, Cam L. Intracranial hemorrhage due to vitamin K deficiency after the newborn period. Pediatr Hematol Oncol 2004;21: 585-92.

90. Brousseau TJ, Kissoon N, McIntosh B. Vitamin K deficiency mimicking child abuse. J Emerg Med 2005;29:283-8.

91. Visser DY, Jansen NJ, Ijland MM, De Koning TJ, Van Hasselt PM. Intracranial bleeding due to vitamin K deficiency: Advantages of using a pediatric intensive care registry. J Intensive Care Med 2011;37:1014-20.

92. Shemie S, Cutz E. Late hemorrhagic disease of the newborn: A fatal presentation of hepatobiliary disease masquerading as shaken baby syndrome. J Intensive Care 1995;10:315-8.

93. Wetzel RC, Slater AJ, Dover GJ. Fatal intramuscular bleeding misdiagnosed as suspected nonaccidental injury. Pediatrics 1995;95:771-773.

94. Nassogne MC, Sharrard M, Hertz-Pannier L, Armengaud D, Touati G, Delonlay-Debeney P, et al. Massive subdural haematomas in Menkes disease mimicking shaken baby syndrome. Childs Nerv Syst 2002;18:729-31.

95. Agrawal S, Peters MJ, Adams GG, Pierce CM. Prevalence of retinal hemorrhages in critically ill children. Pediatrics 2012;129:e1388-96.

96. Speidel B, Allbery S, Love T. MR of infant subdural hemorrhage: Incidence, etiology, and imaging differentiation. Pediatr Radiol 2015;45:137-8.

97. Salvatori MC, Lantz PE. Retinal haemorrhages associated with fatal paediatric infections. Med Sci Law 2015;55:121-8.

98. Adeleye AO, Shoshan Y, Cohen JE, Spektor S. Ruptured middle cerebral artery aneurysm in an infant presenting as acute subdural hematoma: a case report. Pediatr Neurosurg 2008;44:397-401.

99. Kemp AM, Joshi AH, Mann M, Tempest V, Liu A, Holden S, et al. What are the clinical and radiological characteristics of spinal injuries from physical abuse: a systematic review. Arch Dis Child 2010;95:355-60.

100. Wirtschafter J, Weissgold DJ, Budenz DL, Hood I, Rorke LB. Ruptured vascular malformation masquerading as battered/shaken baby syndrome: A nearly tragic mistake. Surv Ophthalmol1995;39:509-12.

101. Reddy AR, Clarke M, Long VW. Unilateral retinal hemorrhages with subarachnoid hemorrhage in a 5-week-old infant: is this nonaccidental injury? Eur J Ophthalmol 2010;20:799-801.

102. Fledelius HC. Retinal haemorrhages in premature infants: a pathogenetic alternative diagnosis to child abuse. Acta Ophthalmol Scand 2005;83:424-7.

103. Abedzadeh-Kalahroudi M, Talebian A, Jahangiri M, Mesdaghinia E, Mohammadzadeh M. Incidence of neonatal Birth injuries and related factors in Kashan, Iran. Arch Trauma Res 2015;4:e22831.

104. Smith WL, Alexander RC, Judisch GF, Sato Y, Kao SC. Magnetic resonance imaging evaluation of neonates with retinal hemorrhages. Pediatrics 1992; 89:332-3.

105. Schoppe CH, Lantz PE. Are peripapillary intrascleral hemorrhages pathognomonic for abusive head trauma? J Forensic Sci 2013;58:228-31.

106. Galaznik JG. A case for an in utero etiology of chronic SDH/effusions of infancy. J Perinatol 2011;31:220-22.

107. McNeely PD, Atkinson JD, Saigal G, O'Gorman AM, Farmer JP. Subdural hematomas in infants with benign enlargement of the subarachnoid spaces are not pathognomonic for child abuse. AJNR Am J Neuroradiol 2006;27:1725-8.

108. Piatt JH, Jr. A pitfall in the diagnosis of child abuse: external hydrocephalus, subdural hematoma, and retinal hemorrhages. Neurosurg Focus 1999;7:e4.

109. Miller D, Barnes P, Miller M. The significance of macrocephaly or enlarging head circumference in infants with the triad: further evidence of mimics of shaken baby syndrome. Am J Forensic Med Pathol 2015;36:111-20.

110. Bishop FS, Liu JK, McCall TD, Brockmeyer DL. Glutaric aciduria type 1 presenting as bilateral subdural hematomas mimicking nonaccidental trauma. Case report and review of the literature. J Neurosurg 2007;106:222-6.

111. Hartley LM, Khwaja OS, Verity CM. Glutaric aciduria type 1 and nonaccidental head injury. Pediatrics 2001;107:174-5.

112. Juul K, Andersen J, Cvitanich VB, Lund AM. Case 2: Suspected nonaccidental injury – Quest for the diagnosis. Acta Paediatrica, Int J Pediatr 2006;95:1323-5.

113. Fitzgerald NE, MacClain KL. Imaging characteristics of hemophagocytic lymphohistiocytosis. Pediatr Radiol 2003;33:392-401.

114. Edwards RJ, Allport TD, Stoodley NG, O'Callaghan F, Lock RJ, Carter MR, et al. External hydrocephalus and subdural bleeding in infancy associated with transplacental anti-Ro antibodies. Arch Dis Child 2012;97:316-9.

115. Ganesh A, Jenny C, Geyer J, Shouldice M, Levin AV. Retinal hemorrhages in type I osteogenesis imperfecta after minor trauma. Ophthalmology 2004;111:1428-31.

116. Paterson CR, Monk EA. Temporary brittle bone disease: association with intracranial bleeding. J Pediatr Endocrinol Metab 2013;26:417-26.

117. Odom A, Christ E, Kerr N, Byrd K, Cochran J, Barr F, et al. Prevalence of retinal hemorrhages in pediatric patients after in-hospital cardiopulmonary resuscitation: a prospective study. Pediatrics 1997;99:E3.

118. Pham H, Enzenauer RW, Elder JE, Levin AV. Retinal hemorrhage after cardiopulmonary resuscitation with chest compressions. Am J Forensic Med Pathol 2013;34:122-4.

119. Barnes PD, Galaznik J, Gardner H, Shuman M. Infant acute life-threatening event – dysphagic choking versus non-accidental injury. Semin Pediatr Neurol 2010;17:7-11.

120. Korkmaz A, Yigit S, Firat M, Oran O. Cranial MRI in neonatal hypernatraemic dehydration. Pediatr Radiol 2000;30: 323-5.

121. Innis MD. Vaccines, apparent life-threatening events, Barlow's disease, and questions about "shaken baby syndrome". Journal of American Physicians & Surgeons 2006;11: 17-9.

122. Margulies S, Prange M, Myers BS, Maltese MR, Ji S, Ning X, et al. Shaken baby syndrome: a flawed biomechanical analysis. Forensic Sci Int 2006;164:278-9; author reply 282-3.

123. Cory CZ, Jones BM. Can shaking alone cause fatal brain injury? A biomechanical assessment of the Duhaime shaken baby syndrome model. Med Sci Law 2003;43:317-33.

# Appendix 1
# Other possible causes of the components of the triad

In determining the clinical diagnosis, differential diagnoses are considered. In cases where a child presents with symptoms and signs suggesting brain damage, further investigation is required. This report has therefore taken note of differential diagnoses, disclosed in the database searches, which offer alternative explanations for the various symptoms and signs of the triad, either separately or as the complete triad. These articles are usually in the form of case reports of isolated patients without a reference group and have therefore not been included in the quality assessment. However, the project group considered that it would still be of interest to present these potential alternative explanations for the triad.

**Table 1**
Other possible causes (differential diagnosis) of the triad and its components.

| | Disease/condition | Reported findings from the triad | Reference number (number of cases, or cases/study population size) Reported finding from the triad |
|---|---|---|---|
| Diseases or conditions causing hemorrhagic symptoms | von Willebrand's disease | SDH, RH | [78] (1) |
| | Delta storage pool disease | SDH, BE, RH | [79] (1) |
| | Hyperfibrinogenemia | RH (including vitreous hemorrhage) | [80] (1) |
| | Hemophilia A | SDH/RH | [81] (2) [RH] [82] (1) [SDH] |
| | Factor X deficiency | SDH | [83] (2) |
| | Idiopathic thrombocytopenic purpura | ICH | [84] (1) |
| | Kasabach-Merrit syndrome thrombocytopenia | RH | [85] (1) |
| | Hepatitis | RH, BE, SDH | [86] (1) |
| | Albers-Schönberg disease | SDH | [87] (1) |
| | Vitamin K deficiency | SDH (ICH)/BE/RH | [88] (3) [SDH] [89] (17) [SDH] [90] (1) [SDH] [91] (16) [SDH,] [92] (1) [SDH, BE, RH] [93] (1) [SDH, BE] |
| | Menkes disease (Copper deficiency) | SDH | [94] (1) |
| | Unspecified | RH, SDH | [95] (1) [96] (3) |
| Infections | Infection | RH | [97] (4) |
| | Infection with or without hypoxia | SDH (intradural bleeding) | [21] (10/30) |
| Vascular malformations | Aneurysm, Arterio-venous malformation | SDH (SAH)/BE/RH | [98] (1) [SDH] [99] (1) [SDH, BE] [100] (1) [SDH, BE] [101] (1) [SDH, RH] |
| Prenatal and birth-related injuries | Prematurity | RH | [102] (11) |
| | Delivery injury | SDH (ICH)/RH | [18] (2) [SDH] [103] (3) [ICH] [96] (3) [SDH] [56] (53) [RH] [104] (10) [RH] |
| | Normal delivery (or prenatal) | SDH/RH | [77] (17/97) [SDH] [39] (94/252) [RH] [76] (32/63) [SDH] |
| | Prenatal trauma | RH | [105] (2) |
| | Congenital SDH | SDH | [106] (1) |
| | Congenital heart disease | SDH | [22] (66/152) |

*The table continues on the next page*

| | Disease/condition | Reported findings from the triad | Reference number (number of cases, or cases/study population size) Reported finding from the triad |
|---|---|---|---|

Table 1 continued

| | Disease/condition | Reported findings from the triad | Reference number (number of cases, or cases/study population size) Reported finding from the triad |
|---|---|---|---|
| Large head size | Enlarged SA space/ External hydrocephalus/ Benign enlargement of the subarachnoid spaces | SDH | [31] (6/108) [32] (4/177) [107] (7) [33] (3) [96] (6) |
| | External hydrocephalus | RH, SDH | [108] (1) [109] (6) |
| Metabolic diseases | Glutamic aciduria | SDH/RH | [110] (1) SDH [111] (1) SDH [112] (1) SDH, RH |
| Immunological diseases | Hemo-phagocytic lymphohistiocytosis | SDH, SAH (ICH), BE, RH | [113] (1) |
| | Transplacental acquisition of anti-Ro antibodies | SDH | [114] (2) |
| Skeletal diseases | Osteogenesis imperfecta | SDH, RH | [115] (3) |
| | Brittle bone disease | SDH/RH | [116] (20/20) SDH (11/20) RH |
| Other | Hypoxia and resuscitation | RH | [117] (1/33) [118] (1) |
| | Hypoxia | SDH/intradural bleeding | [21] (20/30) |
| | Choking and resuscitation | SDH (SAH), RH | [119] (1) |
| | Resuscitation in patients with retinopathy of prematurity | RH | [118] (2) [117] (1/33) |
| | Hypernatremia and dehydration | ICH, BE | [120] (1) |
| | Leukemia | RH | [95] (3) |
| | Vaccine-induced vitamin C deficiency | SDH, BE | [121] (2) |

**BE** = Brain edema; **ICH** = Intracranial hemorrhage; **RH** = Retinal hemorrhage; **SAH** = Subarachnoid hemorrhage; **SDH** = Subdural hematoma

# Appendix 2
# Biomechanical studies

In order to study the biomechanisms underlying injuries due to traumatic shaking and related questions, various physical and virtual models have been created to simulate shaking of an infant, with the aim of analysing certain effects of shaking. Thirty scientific articles on biomechanics which were identified in the literature search were studied more closely. Several review articles present a good understanding of the field and also understanding of general traumatic brain injuries independent of age. Most of the articles present experiments using models and simulations of biomechanical forces and many also present preliminary data, but few of the experiments have been repeated. The results presented in the articles are very diverse, from case reports to construction of various models intended to explain the mechanisms involved in traumatic shaking. A few articles comprise comments about another article. One such example pointed out that the authors of a previous article had made a 10-fold error in calculations as to whether or not an injury could occur [122]. Some studies present clearly contradictory results. One example of this is presented below.

Duhaime et al. present a biomechanical model for traumatic shaking [5]. The work is regarded as a reference article and has served as the basis of many other experiments and the method has been further developed. The article concludes that it is not possible to achieve damaging effects by shaking.

Cory och Jones' article [123] is based on a biomechanical model modified from Duhaime's [5]. This article shows that Duhaime's model is flawed and the results show that the forces generated by shaking of a child can in many cases exceed the minimum forces needed to cause injury.

Thus the scientific basis of these studies is divergent and no definite conclusions can be drawn with respect to the minimum forces required to result in injury.



# Appendix 3
# Ethical analysis of traumatic shaking[1]

The Swedish National Council on Medical Ethics has conducted an ethical analysis of 'traumatic shaking' in connection with the Swedish Agency for Health Technology Assessment and Assessment of Social Services' report on the subject.

The Council has not undertaken any scientific assessment of the basic material. As such, the analysis is based on the Agency's results as presented in the report, which can be summarised as follows:

- "There is insufficient scientific evidence on which to assess the diagnostic accuracy of the triad in identifying traumatic shaking (very low quality evidence)."

- "There is limited scientific evidence that the triad and therefore its components can be associated with traumatic shaking (low quality evidence)."

- "The triad or its components can be attributable to causes other than shaking."

---

[1] This is an unofficial translation of an ethical analysis performed by The Swedish National Council on Medical Ethics (Smer). In the translation process, some linguistic nuances may have been lost. To comply with the SBU terminology, Smer is using the term 'traumatic shaking' in this translation.

# Outline

The analysis begins with an analysis of the term traumatic shaking. The rest of the ethical analysis is structured according to two dimensions. The first identifies the parties with an interest in the issue, and the second identifies the ethical values that come into play in connection with a possible shaken baby situation. Finally, the various crucial values are weighed up and the value conflicts that can arise in this process are considered.

# Conceptual problems

The term 'traumatic shaking' has been used in cases when the triad of subdural bleeding, retinal bleeding and various forms of brain injury are found in an infant. The Swedish Agency for Health Technology Assessment and Assessment of Social Services' review of the scientific literature found limited scientific evidence that the triad and therefore its components may occur due to traumatic shaking, but it was also found that the triad or its components may also be due to causes other than shaking.

According to the Swedish Agency for Health Technology Assessment and Assessment of Social Services' report, there is insufficient scientific evidence "to assess the diagnostic accuracy of the triad in identifying traumatic shaking".

The doctor dealing with the family of the child with the triad may also have sources of information available other than those offered by medical imaging, neurological examinations and retinal examinations. There may be other injuries to the body that support the suspicion of abuse, or observations made in discussions with the custodial parents. It is an ethical requirement that all of this is considered in the doctor's assessment before any concerns are reported to the social welfare committee.

The doctor has a duty to precisely describe everything that has emerged in the examination, both injuries that have emerged and the information that the custodial parents provide concerning the course of events and any other circumstances. It is also essential that all injuries are documented meticulously, both for medical professionals' use and  in case of future legal proceedings.

Every decision made by medical professionals, whether diagnostic or therapeutic in nature, is based on both fact and values. In this context, 'fact' refers to a description of all relevant findings made through physical, radiological, laboratory-based and other medical examinations of the child. However, it should be borne in mind that 'fact' may also include judgments, e.g. assessments of medical imaging findings. The next stage in the doctor's work is to evaluate the medical findings and the substance of the custodial parents' account of events. This is a different kind of task to the factual description. Here, the doctor has an important ethical responsibility to ensure that assessments are based only on science and tried and tested experience.

## Parties

The starting point for the analysis is a scenario in which an infant, accompanied by one or two custodial parents, arrives at a health care facility with injuries that give rise to a clinical suspicion that abuse may be a cause of the child's injuries. If the child's injuries include the triad of symptoms and findings, the question of an eventual traumatic shaking arises. Already at this stage, there are several parties with a legitimate interest in how the situation is handled. These are the child, its custodial parents and various health care professionals. Where applicable, the child's siblings may also be affected by the process. At a later stage, the situation may also involve social services staff and political officials (e.g. in the social welfare committee), as well as police, prosecutors and the judicial authorities at various levels.

## Values

The child has a unique status in this situation due to various considerations based on ethical values. In this context we are talking about very young children. This means that the child itself is entirely incapable of explaining what has happened, and therefore cannot, for obvious reasons, safeguard its own interests. The injuries in question in situations in which traumatic shaking is suspected may be serious in nature, both in acute terms and also in the longer term. The injuries may be life-threatening, or entail a risk of permanent consequences in terms of the child's development, health and future quality of life.

For these reasons, an ethical analysis of traumatic shaking should be primarily based on a child perspective. The key ethical question is how the child's interests can best be safeguarded, as it can never be acceptable that a young child is subjected to abuse.

It is an ethical duty that the young, unprotected child's interests are safeguarded by somebody else. It would normally be the duty of the child's custodial parents to safeguard its interests. In a situation in which traumatic shaking is suspected, however, it is often one (or both) of the custodial parents who may have caused the injuries. This means that they may not have discharged their parental responsibilities.

In the scenario outlined here, the immediate responsibility for safeguarding the child's crucial values falls to the medical professionals dealing with the family at the hospital. In such situations, staff must act based on their professional ethics and applicable legislation.

The first step may be taking vital, acute medical measures required by the child's state of health. All necessary medical measures must be taken to remedy and alleviate the child's acute injuries and prevent future after-effects. Naturally, this is the top priority in handling the case.

If the suspicion arises that the injuries may have occurred due to violence, it is the doctor's duty to investigate this suspicion on the basis of science and tried and tested experience. It is also the doctor's duty under Chapter 14, Section 1 of the Social Services Act (2001:453) to report to the social welfare committee any suspicions of risk of harm to the child.

Society has an explicit responsibility to protect children in a number of respects. This is clear from various laws, including the Social Services Act and the Care of Young Persons Act (1990:52). The former provides opportunities for society to intervene in consultation with the custodial parents, while the latter provides opportunities for society to take measures to protect the child without the custodial parents' consent. As a last resort, the social welfare committee can take the child into care outside the home.

The Convention on the Rights of the Child, which is currently being incorporated into Swedish law, outlines a number of fundamental rights enjoyed by all children, including the right to protection of their life and health, the right to grow up in good conditions and the right to good care. The Convention was drawn up based on a rights perspective, but it also rests on central ethical principles of adult society's responsibility for children's life situation, to protect what are crucial values for all children.

When a doctor asks a child's custodial parents whether the child's injuries may have been caused by some external event of which they are aware, it is uncommon for them to admit it immediately (Lowenstein 2004). In this situation, it is important that the doctor does not take on the judicial system's role of determining whether an offence has taken place or accusing a particular individual. The custodial parent(s) has/have a legitimate interest in ensuring that certain values that are crucial to them are considered in the situation. These include the right to good care, which the custodial parents are generally anxious to ensure regardless of the cause or any intent (Leuthner 2001). Moreover, it is an important value for them that they are listened to adequately and that the hospital's handling of the situation has an impartial and unbiased starting point with respect to all conceivable causes of the injuries observed.

For medical staff, it is a crucial value to be met with respect for their professional duties from both a medical and an ethical perspective. It is usually the doctor who is responsible for assessing the likelihood that the injuries observed in the child may have been caused by an adult, usually one of the custodial parents, and thus could be a sign of traumatic shaking. For the doctor, it is of considerable value to be allowed space to consider the decision of whether or not to report any concerns. A decision to report is associated with considerable consequences for both the child and the custodial parents, and must therefore be well-founded and well-considered. Such a decision should always be taken in consultation with at least one other doctor.

The doctor also has an interest in having sufficient training and expertise in the area of child abuse to be able to handle these ethically and psychologically very difficult situations in a professional manner.

Social services have a radically different division of responsibility compared to medical professionals. The decision-making mandate for measures without custodial parents' consent rests with the political officials in the social welfare committee, represented in urgent situations by their delegated chair. The basis for the decision is, however, produced by social services staff. They have professional ethical rules for their work that must be taken into account in situations of this nature. For social services staff it is a crucial value to safeguard the child's interests and protect the child from threats to its life, health and development. It is a crucial value for social services that the information that they receive from medical professionals is medically correct, well-founded and formulated in such a way that conclusions about the cause of injuries observed are not reported without a solid basis.

If the case – immediately or at a later stage – is subsequently transferred to police, prosecutors and courts, those authorities will have a similar interest with respect to information from medical professionals. If and when a case comes to court, it is important for the court to have access to scientific expertise to express an opinion in accordance with the professional ethical principles and applicable legal rules concerning certificates and opinions.

## Value conflicts

There are several significant value conflicts with respect to traumatic shaking. One of the most important concerns whose interests should take precedence – the child's or the custodial parents'. From a child perspective there cannot be any doubt that the child's interests have the highest priority in several respects. Firstly, the child needs to have its injuries examined and treated professionally and competently in a medical setting. If it is suspected that the injuries may have been caused by abuse, there is an additional obvious need for protection of the child's life and health.

On the other hand, the custodial parent(s) suspected of shaking a child has/ have a legitimate interest in not being condemned when innocent. Here we see a potential value conflict that can be described as an ethical dilemma in the sense that there is no entirely problem-free solution.

This dilemma can also be expressed in terms of the risks of underdiagnosis and overdiagnosis. Underdiagnosis refers to children who really have been subjected to shaking not being identified and thus not receiving society's protection against further abuse or growing up in conditions that are otherwise inadequate. Such underdiagnosis may occur due to a lack of competence or vigilance among medical professionals, or a lack of willingness or ability to investigate suspicions of traumatic shaking in a professional manner.

Overdiagnosis may occur if doctors who encounter children presenting the diagnostic triad immediately assess this as evidence that shaking and shaking alone is the cause of the injuries observed. This is thus a matter of confusing a hypothesis of a possible cause for a child's injuries with a claim of certain

knowledge that there is such an unambiguous and certain link between cause and effect.

This process thus creates a risk that the continued treatment in such a case will mainly be characterised by a 'validation strategy' (Melzer et al, 2013). This means that further measures are taken purely to confirm the hypothesis, and that insufficient account is taken of information that could disprove the hypothesis.

Both under- and overdiagnosis are extremely problematic from an ethical point of view. Overdiagnosis protects many children, both those in whom traumatic shaking is established as cause and a number of others. Nonetheless, it leads to families being split up, some of them on false premises. Separating children from their custodial parents is a serious intervention that should only be implemented when a child runs a clear risk of abuse at home. The fact that other children in the family may be taken into care may further exacerbates the situation.

The value conflict outlined above between the interests of the child and the custodial parent(s) needs to be related to the legal principle that no innocent person should be convicted of a crime. Overdiagnosis of traumatic shaking results in a number of children being protected, some of whom really are victims of such shaking, but this is at the expense of a number of custodial parents being deprived of their liberty without having committed an offence. However, underdiagnosis of traumatic shaking leads to children who are being mistreated remaining in a harmful home environment, at risk of future acts of violence.

The medical controversy that has surrounded traumatic shaking in Sweden and around the world is largely about whether there is established scientific support for the claim that the symptomatic triad of subdural bleeding, retinal bleeding and brain injury is caused by shaking and shaking alone. The Swedish Agency for Health Technology Assessment and Assessment of Social Services' report shows that there is scientific evidence – albeit limited – for the idea that the triad may be caused by shaking, but that there are other illnesses and events that can cause the triad or its constituent parts.

This raises the question of when doctors can and should express an opinion when it comes to traumatic shaking. Ethically, it is particularly important that doctors and other medical professionals are observant with respect to injuries in young children that could conceivably have been inflicted by human hands, even if the custodial parents deny anything of the sort. The clinical examination and treatment of injuries must be entirely robust. The question is whether a doctor can express an opinion about the cause of the observed injuries with scientific certainty at a later stage. The doctor has, as previously outlined, a range of different information to take into account when assessing the possible causes of the injuries. To state on the basis of the mere existence of the triad that it was definitely caused by shaking must, however, be considered incompatible with both doctors' professional ethics and the regulations concerning legal certificates (Albert et al, 2012).

This observation does not mean that there cannot be grounds to report concerns in spite of this uncertainty, as the child's need for protection is a broader issue than the question of the cause of the injuries.

# Conclusions

The Swedish National Council on Medical Ethics has based this ethical analysis on the observation in the Swedish Agency for Health Technology Assessment and Assessment of Social Services' report that scientific evidence concerning traumatic shaking is limited. There is limited scientific evidence that the 'triad' of symptoms or its constituent parts may occur due to shaking, but the report states that there are differential diagnoses that can also cause the three symptoms/findings in the triad.

The Council considers that it is ethically problematic for medical professionals to establish with certainty that certain specific injuries in infants are automatically evidence that they were caused by shaking. Such overdiagnosis of traumatic shaking should not occur when the state of scientific knowledge is so limited (Riggs & Hobbs, 2011).

The Council also considers that underdiagnosis is ethically problematic, in the sense that it means that children who really have been subjected to shaking are not identified and examined by medical professionals. This risk can, however, be limited through improved professional training on child abuse in general and traumatic shaking in particular, within both health care services and social services.

The Council would like to emphasise the importance of medical professionals observing their duty to report to the social welfare committee cases in which it is suspected that children have been mistreated in any way. This is particularly applicable in cases where any kind of child abuse is suspected. Medical professionals must be able to combine high vigilance of suspected traumatic shaking with caution with respect to expressing an opinion on the cause of the injuries observed, since the state of scientific knowledge does not permit any clear conclusions in this area.

# References

Albert DM, Weisberger Blanchard J & Knox BL. Ensuring appropriate expert testimony for cases involving the 'shaken baby'. JAMA 2012; 308: 39-40.

Leuthner SR. Ethical challenges in the care of the shaken baby. Journal of Aggression, Maltreatment & Trauma 2001; 5: 341-347.

Lowenstein LF. Recent research and views on shaking baby syndrome. International Journal of Psychiatry in Medicine 2004; 34: 131-141.

Meltzer CC, Sze G, Rommelfanger KS, Kinlaw K, Banja JD & Wolpe PR. Guidelines for the ethical use of neuroimages in medical testimony: report of a multidisciplinary conference. American Journal of Neuroradiology 2014; 35: 632-637.

Riggs JE & Hobbs GR. Infant homicide and accidental death in the United States, 1940–2005: ethics and epidemiological classification. Journal of Medical Ethics 2011; 37: 445-448.

This ethical analysis was produced by Ingemar Engström, Swedish National Council on Medical Ethics expert, in consultation with Kjell Asplund and Chatrine Pålsson Ahlgren.

This text was adopted at the Swedish National Council on Medical Ethics ordinary meeting on 26 August 2016. The text was adopted by members Kjell Asplund (Chair), Finn Bengtsson, Sven-Olov Edvinsson, Chatrine Pålsson Ahlgren, Åsa Gyberg-Karlsson, Barbro Westerholm and Anders Åkesson. Experts Lars Berge-Kleber, Ingemar Engström, Göran Hermerén, Ann Johansson, Olle Olsson, Bengt Rönngren, Nils-Eric Sahlin, Anna Singer and Elisabet Wennlund were also involved in preparing the case.

On behalf of the Council,

**KJELL ASPLUND**
Chair, Swedish National Council on Medical Ethics

## SBU – Swedish Agency for Health Technology Assessment and Assessment of Social Services

web: www.sbu.se/en • twitter: @SBU_se • telephone: +46-8-412 32 00

REPORT NO 255E • PUBLISHED 2016 • ISBN 978-91-85413-98-0

# EXHIBIT 20





Annals of the
Child Neurology Society
Open Access

RESEARCH ARTICLE

# Retino-dural hemorrhages in infants are markers of degree of intracranial pathology, not of violent shaking

Chris Brook* 

Faculty of Sciences, Universidad de La Laguna (ULL), La Laguna, La Laguna, Santa Cruz de Tenerife, Spain

**Correspondence**
Chris Brook, Faculty of Sciences, Universidad de La Laguna (ULL), Calle Padre Herrera, s/n, 38200 La Laguna, Santa Cruz de Tenerife, Spain. Email: chbrook@ull.edu.es

**Funding Information**
None

Received: 13 November 2023; Revised: 28 January 2024; Accepted: 5 February 2024

*Annals of the Child Neurology Society* 2024; 00(00): 1–7

doi: 10.1002/cns3.20065

## Abstract

**Aim:** This study analyzed whether retino-dural hemorrhages in infants are markers of the degree of intracranial pathology, rather than evidence of violent shaking.

**Methods:** Using data from 420 infants with acute intracranial pathologies, comparison of clinical findings is made between cases diagnosed as abusive head trauma (AHT) and four categories: cases where caregivers report no trauma; cases of witnessed or admitted AHT; cases where caregivers report accidental trauma; and witnessed accidents. The data are then controlled for degree of intracranial pathology by only comparing cases in each category that have evidence of hypoxic-ischemic swelling.

**Results:** Although categories differ in clinical findings when all data are considered, they do not differ when the data are controlled for degree of intracranial pathology.

**Conclusions:** The data suggest that the clinical findings widely considered to be indicative of shaking are instead markers of the degree of intracranial pathology. Previous results showing differences were driven by selection effects, whereby different categories have different fractions of serious cases. Most notably, caregiver and witnessed reports of accidental head trauma led doctors to explore intracranial pathologies across a broader spectrum of severity, including milder cases, as opposed to situations where no head trauma is reported.

**Keywords:** abusive head trauma; evidence-based medicine; retinal hemorrhage; shaken baby syndrome

## Introduction

A range of clinical findings are often associated with abusive head trauma (AHT) that involves shaking, including encephalopathy, extensive, widespread retinal hemorrhages (RH), bilateral and interhemispheric subdural hemorrhages (SDH), respiratory compromise, and seizures.[1,2] When a combination of such clinical findings is present, the process for diagnosing AHT involves eliminating other known causes such as bleeding disorders or metabolic disease. In particular, the combination of encephalopathy, SDH, and RH is often referred to as the "triad," but also as retino-dural hemorrhages in infants.[3]

However, the evidentiary association between these clinical findings and traumatic shaking has been criticized for its heavy reliance on circular reasoning and/or admissions made during the investigative or judicial process.[4–10] Neither diagnoses nor admissions made during the investigative or judicial process make reliable scientific reference standards to robustly categorize cases as AHT. These weaknesses in methodology have made some researchers question the validity and accuracy of the manner in which such clinical findings are used to diagnose AHT.[11]

A further problem with studies that claim to establish an evidentiary link between particular clinical findings and

© 2024 The Author. *Annals of the Child Neurology Society* published by Wiley Periodicals LLC on behalf of the Child Neurology Society.
This is an open access article under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited, the use is non-commercial and no modifications or adaptations are made.

2831326/7, 0, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/cns3.20006 by Test, Wiley Online Library on [13/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

AHT is the failure to control for the degree of cerebral pathology.[1,12,13]

An alternative theory suggests that clinical findings normally associated with AHT may be markers of the degree of intracranial pathology rather than indicators of shaking.[14,15]

This study controls for the degree of intracranial pathology when comparing various categories of cases and investigates whether it explains the different rates of clinical findings between the different categories of cases.

## Methods

### Data

The data set used for this study comprises 420 infants sourced from a publication by the Pediatric Brain Injury Research Network (PediBIRN) (https://www.pedibirn.com/home.php). PediBIRN is a collaborative initiative involving multiple university-affiliated medical centers in the United States, aimed at establishing a clinical decision rule for evaluating AHT. The cases incorporated in the data set were drawn from eight medical centers participating in the pediBIRN collaboration, spanning the period between February 2011 and March 2021. The median age of infants was 5 months, ranging from 0 to 36 months, with 265 (63%) male and 155 (37%) female. The following summarizes the methodology used by the pediBIRN collaboration to create this publicly available data set.

All included infants had undergone intensive care hospitalization and exhibited symptomatic, acute, closed traumatic cranial or intracranial injuries, as confirmed through computerized tomography (416 infants) and/or magnetic resonance imaging (234 infants). Individuals with preexisting brain abnormalities or those involved in motor vehicle collisions were systematically excluded. Furthermore, those with medically diagnosed causes were omitted, meaning that all cases in the data set were assumed to be traumatic.

To standardize the classification of the data, investigators from the participating medical centers addressed a series of inquiries:

1. *Was the event of the child's head injury witnessed and thoroughly described by an impartial, independent observer? (a) Yes, and the observer characterized it as an "accidental" or "nonabusive" head injury event, (b) Yes, and the observer characterized it as an "inflicted" or "abusive" head injury event, or (c) "No or unknown."*
   In this study, cases corresponding to response (a) in question 1 are designated as *witnessed accidents.*
   Cases corresponding to response (b) are designated as *witnessed AHT.*
   For cases with response (c), investigators provided additional details by addressing further questions:

2. *Was the individual responsible for the child at the time of the head injury—or when the child's illness became evident—asked to provide an explanation? Of the 289 cases that were not witnessed [i.e., responded (c) to question 1], 276 cases answered affirmatively to question 2.*
   The cases that answered negatively to question 2 are excluded from this study. Among the cases where investigators answered affirmatively to question 2, investigators were subsequently queried:

3. *Which of the following statements most accurately summarizes the caregiver's account of the child's head injuries and immediate clinical presentation? (a) The caregiver described an "accidental" or "nonabusive" head injury event, (b) The caregiver explicitly admitted to "inflicted" or "abusive" head trauma, (c) The caregiver specifically denied any head trauma before the child's symptoms emerged, or (d) The caregiver declined to provide an explanation.*

Cases corresponding to response (a) in question 3 are categorized as *reported accidents*. Cases corresponding to response (b) are categorized as *admitted AHT*. Cases corresponding to response (c) are categorized as *reported no trauma.*

Investigators were additionally asked to document the final consensus diagnosis provided by treating and consulting medical professionals. Response choices were definitive AHT, probable AHT, undetermined, probable non-AHT, and definitive non-AHT.

### Case categories

In this study, four categories of cases are explored:
- ***Reported no trauma***: The caregiver specifically denied that the child experienced any head trauma before he or she became symptomatic.
- ***Witnessed or admitted AHT***: AHT was witnessed by an independent observer, or an admission to AHT was made.
- ***Reported accidents***: The caregiver described an accidental or nonabusive head injury event.
- ***Witnessed accidents***: The head injury was accidental, as witnessed and described thoroughly by an unbiased, independent observer.

Cases of *reported accidents* and *reported nontrauma* were not witnessed by an unbiased, independent observer. There were only three cases of witnessed AHT, so the category of *witnessed or admitted AHT* is statistically dominated by admitted cases.

These four categories of cases are then compared with cases that are ***diagnosed AHT***, that is, those cases with a final consensus diagnosis of definitive or probable AHT.

The caregiver was defined as "the person responsible for the child when he/she was acutely head-injured or first

© 2024 The Author. *Annals of the Child Neurology Society* published by Wiley Periodicals LLC on behalf of the Child Neurology Society.

28313267, 0, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/cns3.20065 by Test, Wiley Online Library on [13/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

became clearly and persistently ill with clinical signs linked to acute traumatic head injuries."[16]

## Clinical findings

The clinical findings explored in this study (and the number of cases with each finding) are:

**Respiratory compromise**: acute respiratory compromise (180).

**Circulatory compromise**: acute circulatory compromise (147).

**Seizure(s)**: seizure(s) at the scene of injury, during transport, in the emergency department, or prior to hospital admission (139).

**Hypoxia-ischemia**: brain hypoxia, ischemia, and/or swelling (142).

**Acute encephalopathy**: alteration or loss of consciousness at the scene of injury, during transport, in the emergency department, or prior to hospital admission (223).

**Acute encephalopathy > 24 hours**: as above where loss of consciousness lasts longer than 24 hours (110).

**Bilateral SDH**: SDH overlying both cerebral hemispheres (167).

**Interhemispheric SDH**: SDH involving or extending from the interhemispheric space (133).

**Severe RH**: RH described by an ophthalmologist as dense, extensive, covering a large surface area, and/or extending to the ora serrata (133).

**Triad**: bilateral and/or interhemispheric SDH plus acute encephalopathy plus severe RH (94).

Such clinical findings are often indicative of AHT and in particular of violent shaking.[2]

## Statistical tests

The $p$ values were calculated using the chi-squared test through the Python routine chi2_contingency from the scipy.stats module. Statistical significance was determined with a threshold of $p < 0.05$, while high significance was denoted by $p < 0.01$. Tables 1 and 2 present the occurrence rates of various clinical findings within case categories, alongside statistical comparisons between diagnosed cases and each of the other case categories, displaying $p$ values and odds ratios accompanied by their respective 95% confidence intervals.

In order to statistically compare categories of cases with diagnosed cases, the two must be independent variables. Presumably, independently witnessed accidents, independently witnessed abuse, and admissions may have an impact on diagnostic decisions, meaning that the diagnosis may be dependent on such information as well as on the clinical findings. Therefore, such cases are excluded from the diagnosed AHT cases when comparisons are made with

the case categories. In practice, this exclusion did not affect the results or conclusions of this article: including them made minimal quantitative difference and no qualitative difference.

When comparing case categories with diagnosed cases, some cases will fall into the particular case category and will also be diagnosed as AHT. These cases are also excluded from the statistical tests. So, for example, cases in the category *reported no accident* that were diagnosed with AHT are excluded from the diagnosed AHT cases when these two populations are compared. This ensures that the two groups being compared are mutually exclusive. This means that the number of diagnosed AHT cases in Tables 1 and 2 will differ in each comparison. As with witnessed and admitted cases, including these cases does not affect the conclusions. Such exclusions are quantitively minimal and qualitatively make no difference to the results or conclusions: no $p$ value in Table 1 or 2 changes from significant to insignificant or from insignificant to significant when these cases are included.

## Results

Table 1 compares rates of clinical findings in cases diagnosed AHT to cases in each category, namely cases in the categories *reported no trauma*, *witnessed or admitted AHT*, *reported accidents*, and *witnessed accidents*.

There are no significant differences between cases diagnosed as AHT and those in the category of *reported no trauma*, nor with cases in the category *admitted/witnessed AHT*. By contrast, there are significant (or highly significant) differences in all clinical findings between cases diagnosed as AHT and cases in the categories *reported accidents* and *witnessed accidents*.

Table 2 summarizes the comparison of rates of clinical findings between cases diagnosed AHT and the same four categories of cases summarized in Table 1, but now including only cases with high degrees of intracranial pathology, as evidenced by the existence of hypoxia-ischemia. The rates of the clinical findings increase in each of the categories in Table 2 as compared with those in Table 1, reflecting the correlation between hypoxia-ischemic swelling and these clinical findings that are often associated with AHT.

No statistical significance is found when comparing clinical findings in cases diagnosed as AHT with those in cases in any other category, with the single exception of a slightly significant ($p = 0.03$) lower rate of respiratory compromise in the category *admitted/witnessed AHT* than in diagnosed AHT.

© 2024 The Author. *Annals of the Child Neurology Society* published by Wiley Periodicals LLC on behalf of the Child Neurology Society.

C. Brook

28313267, 0, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/cns3.20065 by Test, Wiley Online Library on [13/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## Discussion

Table 1 summarizes the statistical similarities in clinical findings between diagnosed and the category of *admitted AHT* and documents differences between diagnosed cases and the category *witnessed accidents* (non-AHT). These results have been documented in several studies and have been interpreted as demonstrating the specificity of these clinical findings for AHT, and validating the methods used to diagnose AHT.

It is also well established in the literature that cases where caregivers report no trauma (they "deny" that trauma has occurred) demonstrate statistically similar clinical findings as cases of diagnosed AHT and admitted AHT, as is also presented in Table 1. The "denial" of trauma is therefore considered a red flag suggestive of AHT.[17,18]

The statistical similarities presented in Table 1 between the categories of *witnessed accidents* and *reported accidents* have also been documented and have recently been interpreted as corroborating evidence that caregivers are generally telling the truth when they report a traumatic accident.[19]

However, when comparing clinical findings across different categories of cases, it is crucial to carefully consider the methods employed for case selection within each category. The

**Table 1.** Comparison of rates of findings between cases diagnosed as abusive head trauma (AHT) and cases of reported no trauma, cases of witnessed or admitted AHT, cases of reported accidents, and cases of witnessed accidents. The *p* values and odds ratio (with 95% confidence interval) are shown for the comparison between diagnosed AHT and each of the other categories.

| | Reported no trauma Diagnosed AHT | Admitted or witnessed AHT Diagnosed AHT | Reported accident Diagnosed AHT | Witnessed accident Diagnosed AHT |
|---|---|---|---|---|
| Clinical finding | Rates | Rates | Rates | Rates |
| | *p* value | *p* value | *p* value | *p* value |
| | OR (95%) | OR (95%) | OR (95%) | OR (95%) |
| Respiratory compromise | 59/95 (62%) | 9/19 (47%) | 80/232 (34%) | 18/48 (37%) |
| | 66/109 (60%) | 121/192 (63%) | 67/106 (63%) | 121/192 (63%) |
| | **0.82** | **0.18** | **<0.001** | **<0.001** |
| | 1.07 (0.6–1.9) | 0.53 (0.2–1.4) | 0.31 (0.2–0.5) | 0.35 (0.2–0.7) |
| Circulatory compromise | 48/95 (50%) | 9/19 (47%) | 66/232 (28%) | 13/48 (27%) |
| | 58/109 (53%) | 103/192 (53%) | 56/106 (52%) | 103/192 (53%) |
| | **0.70** | **0.60** | **<0.001** | **<0.001** |
| | 0.9 (0.5–1.6) | 0.78 (0.3–2.0) | 0.35 (0.2–0.6) | 0.32 (0.2–0.6) |
| Seizure(s) | 45/95 (47%) | 9/19 (47%) | 64/232 (27%) | 10/48 (20%) |
| | 51/109 (46%) | 91/192 (47%) | 50/106 (47%) | 91/192 (47%) |
| | **0.93** | **0.99** | **<0.001** | **<0.001** |
| | 1.02 (0.6–1.8) | 1.0 (0.4–2.6) | 0.43 (0.3–0.7) | 0.29 (0.1–0.6) |
| SDH bilateral/ interhemispheric | 77/95 (81%) | 16/19 (84%) | 94/232 (40%) | 17/48 (35%) |
| | 89/109 (81%) | 192/192 (83%) | 90/106 (84%) | 161/192 (83%) |
| | **0.91** | **0.97** | **<0.001** | **<0.001** |
| | 0.96 (0.5–1.9) | 1.0 (0.3–3.7) | 0.12 (0.1–0.2) | 0.11 (0.05–0.2) |
| Acute encephalopathy | 63/95 (66%) | 12/19 (63%) | 109/232 (46%) | 24/48 (50%) |
| | 76/109 (69%) | 192/192 (69%) | 71/106 (66%) | 192/192 (69%) |
| | **0.60** | **0.55** | **<0.001** | **0.01** |
| | 0.85 (0.5–1.5) | 0.74 (0.3–2.0) | 0.44 (0.3–0.7) | 0.43 (0.2–0.8) |
| Acute encephalopathy >24 h | 43/95 (45%) | 7/19 (36%) | 47/232 (20%) | 8/48 (16%) |
| | 40/109 (36%) | 80/192 (41%) | 45/106 (42%) | 80/192 (41%) |
| | **0.21** | **0.68** | **<0.001** | **<0.001** |
| | 1.43 (0.8–2.5) | 0.82 (0.3–2.2) | 0.34 (0.2–0.6) | 0.28 (0.1–0.6) |
| Severe RH | 58/92 (63%) | 10/18 (56%) | 51/159 (32%) | 4/20 (20%) |
| | 58/107 (54%) | 115/188 (61%) | 67/104 (64%) | 115/188 (61%) |
| | **0.21** | **0.6** | **<0.001** | **<0.001** |
| | 1.44 (0.8–2.5) | 0.79 (0.3–2.1) | 0.26 (0.2–0.4) | 0.16 (0.05–0.5) |
| Triad | 36/92 (39%) | 7/18 (39%) | 40/159 (25%) | 4/20 (20%) |
| | 46/107 (42%) | 82/188 (43%) | 43/104 (41%) | 82/188 (43%) |
| | **0.58** | **0.70** | **0.01** | **0.04** |
| | 0.85 (0.5–1.5) | 0.82 (0.3–2.2) | 0.48 (0.3–0.8) | 0.32 (0.1–1.0) |

Abbreviation: OR, odds ratio.

    © 2024 The Author. *Annals of the Child Neurology Society* published by Wiley Periodicals LLC on behalf of the Child Neurology Society.

2813267, 0, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/cns3.20065 by Test, Wiley Online Library on [13/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table 2.** Comparison of rates of clinical findings between cases diagnosed as abusive head trauma (AHT) and cases of reported no trauma, cases of witnessed or admitted AHT, cases of reported accidents, and cases of witnessed accidents, but only for cases with hypoxia-ischemia.

| | Reported no trauma + Hyp-isch Diagnosed AHT + Hyp-isch | Admitted or witnessed AHT + Hyp-isch Diagnosed AHT + Hyp-isch | Reported accident + Hyp-isch Diagnosed AHT + Hyp-isch | Witnessed accident + Hyp-isch Diagnosed AHT + Hyp-isch |
|---|---|---|---|---|
| Clinical finding | Rates *p* value OR (95%) | Rates *p* value OR (95%) | Rates *p* value OR (95%) | Rates *p* value OR (95%) |
| Respiratory compromise | 43/54 (79%) 42/51 (82%) **0.72** 0.84 (0.3–2.2) | 4/8 (50%) 84/102 (82%) **0.03** 0.21 (0.0–0.9) | 49/60 (81%) 46/57 (80%) **0.89** 1.1 (0.4–2.7) | 11/14 (78%) 84/102 (82%) **0.73** 0.79 (0.2–3.1) |
| Circulatory compromise | 35/54 (64%) 38/51 (74%) **0.28** 0.63 (0.3–1.5) | 4/8 (50%) 72/102 (70%) **0.22** 0.42 (0.1–1.8) | 42/60 (70%) 38/57 (66%) **0.70** 1.2 (0.5–2.5) | 8/14 (57%) 72/102 (70%) **0.31** 0.56 (0.2–1.7) |
| Seizure(s) | 29/54 (53%) 30/51 (58%) **0.60** 0.81 (0.4–1.8) | 5/8 (62%) 57/102 (55%) **0.72** 1.32 (0.3–5.8) | 31/60 (51%) 29/57 (50%) **0.93** 1.0 (0.5–2.1) | 6/14 (42%) 57/102 (55%) **0.36** 0.59 (0.2–1.8) |
| SDH bilateral/ interhemispheric | 44/54 (81%) 43/51 (84%) **0.70** 0.82 (0.3–2.3) | 8/8 (100%) 86/102 (84%) **0.23** – | 44/60 (73%) 46/57 (80%) **0.34** 0.66 (0.3–1.6) | 12/14 (85%) 86/102 (84%) **0.89** 1.1 (0.2–5.5) |
| Acute encephalopathy | 46/54 (85%) 47/51 (92%) **0.26** 0.49 (0.1–1.7) | 6/8 (75%) 91/102 (89%) **0.23** 0.36 (0.1–2.0) | 56/60 (93%) 48/57 (84%) **0.12** 2.6 (0.8–9.1) | 12/14 (85%) 91/102 (89%) **0.70** 0.73 (0.1–3.7) |
| Acute encephalopathy >24 h | 36/54 (66%) 32/51 (62%) **0.67** 1.2 (0.5–2.6) | 4/8 (50%) 67/102 (65%) **0.37** 0.52 (0.1–2.2) | 37/60 (61%) 38/57 (66%) **0.57** 0.80 (0.4–1.7) | 7/14 (50%) 67/102 (65%) **0.25** 0.52 (0.2–1.6) |
| Severe RH | 41/52 (78%) 37/51 (72%) **0.46** 1.4 (0.6–3.5) | 7/8 (87%) 77/100 (77%) **0.49** 2.1 (0.2–17.9) | 35/54 (64%) 44/55 (80%) **0.08** 0.46 (0.2–1.1) | 3/6 (50%) 77/100 (77%) **0.14** 0.3 (0.1–1.6) |
| Triad | 29/54 (55%) 30/51 (58%) **0.75** 0.88 (0.4–1.9) | 5/8 (62%) 59/100 (59%) **0.85** 1.2 (0.3–5.1) | 29/54 (53%) 31/55 (56%) **0.78** 0.90 (0.4–1.9) | 3/6 (50%) 59/100 (59%) **0.66** 0.69 (0.1–3.6) |

Abbreviation: OR, odds ratio.

scrutiny of selection methods ensures that any comparisons drawn are equitable and unbiased. What might initially appear to be results stemming from disparities in clinical findings between categories can instead reflect how cases were selected to be categorized. These phenomena are commonly referred to as "selection effects."

Two factors contribute to the selection effects that underlie the results observed in Table 1, when comparing categories of cases involving intracranial pathologies in infants and not controlling for degree of intracranial pathology.

First, when accidental head trauma is witnessed—be it by a caregiver in the *reported accidents* category or by an independent observer in the *witnessed accident* category—caregivers are inclined to seek medical attention even if symptoms are mild or absent. Conversely, in scenarios without traumatic incidents, caregivers are less likely to take an infant with minor or absent symptoms to the hospital. This inherent selection effect leads to cases involving *witnessed accidents* or *reported accidents* exhibiting a broader spectrum of intracranial pathologies, with such cases having a larger tail toward lower degrees of intracranial pathology compared with cases where there is no head trauma, such as the *reported no trauma* category.

Second, the symptoms associated with intracranial pathologies often lack specificity. Signs such as fussiness, colicky

2813267, 0, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/cns3.20065 by Test, Wiley Online Library on [13/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

crying, vomiting, and apnea can stem from various conditions, resulting in multiple potential diagnoses. Consequently, in the absence of head trauma reports, the exploration of intracranial pathologies tends to be less common unless the pathology's severity is remarkable. Conversely, when instances of non-specific symptoms are coupled with reported and/or witnessed head trauma, medical professionals are more likely to investigate intracranial pathologies. This, in turn, leads to identifying cases at the lower end of the intracranial pathology spectrum within the *reported accidents* or *witnessed accidents* categories than in the *reported no trauma* category.

The cases diagnosed AHT are selected to have high rates of clinical findings associated with AHT because diagnosis is predicated on the prevalence of these clinical findings. If such clinical findings are instead markers of degree of intracranial pathology, then cases with relatively low degrees of intracranial pathology will not be selected.

Similarly, cases with clinical findings associated with AHT are investigated by child protection units and subsequently by police. Indeed, in many jurisdictions it is mandatory for health professionals to report cases for investigation when clinical findings associated with AHT are present. These investigations can lead to suspicion falling on caregivers, their questioning, and in some instances leading to admissions. Even if all the admissions are true (there are a range of reasons why many of the admissions are likely false[10]), these cases have been flagged for investigation due to clinical findings thought to be associated with AHT, which then "selects" cases with such clinical findings.

These factors and selection effects on degrees of intracranial pathologies associated with the various categories explain why the rates of clinical findings associated with AHT vary between the categories in Table 1. When the selection effects are controlled for by only selecting cases with high degrees of intracranial pathology, the rates of clinical findings associated with AHT are essentially the same in all categories, as seen in Table 2.

The results suggest that these clinical findings are not indicators of violent shaking but are instead markers of the degree of intracranial pathology, and that various selection effects are responsible for different categories of cases comprising broader or narrower ranges of such degrees of intracranial pathology.

Strengths of this study include the use of prospectively acquired and uniform pediBIRN data, and a methodology that is free from circular reasoning. Limitations include the inability to independently verify clinical findings that are accepted at face value, and a lack of detailed information as to the degree of independence of witnesses.

In summary, the theory supporting the notion that clinical findings linked with AHT, such as the triad of acute encephalopathy, diffuse SDH, and severe RH, serve as markers of the degree of intracranial pathology is supported by the data.

## Author Contributions

**Chris Brook**: Conceptualization; formal analysis; methodology; writing—original draft.

## Conflict of Interest

The author declares no conflicts of interest.

## Data Availability Statement

Used publicly available data.

## ORCID

*Chris Brook* http://orcid.org/0000-0002-0534-4115

## References

1. Hymel KP, Boos SC, Armijo-Garcia V, et al. An analysis of physicians' diagnostic reasoning regarding pediatric abusive head trauma. *Child Abuse Negl*. 2022;129:105666.

2. Choudhary AK, Servaes S, Slovis TL, et al. Consensus statement on abusive head trauma in infants and young children. *Pediatr Radiol*. 2018;48(8):1048-1065. doi:10.1007/s00247-018-4149-1

3. Guthkelch AN. Problems of infant retino-dural hemorrhage with minimal external injury. *Houst J Health Law Policy*. 2012;12:201-208.

4. Fung ELW, Sung RYT, Nelson EAS, Poon WS. Unexplained subdural hematoma in young children: is it always child abuse? *Pediatr Int*. 2002;44:37-42.

5. Donohoe M. Evidence-based medicine and shaken baby syndrome: part I: literature review, 1966-1998. *Am J Forensic Med Pathol*. 2003;24(3):239-242.

6. Vinchon M. Reply to Pr Charles Hyman: the scientific controversy over abusive head trauma in infants. *Childs Nerv Syst*. 2011;27:203-204.

7. Findley K, Barnes PD, Moran DA, Squier W. Shaken baby syndrome, abusive head trauma, and actual innocence: getting it right. *Houst J Health Law Policy*. 2012;12(2):258.

8. Elinder G, Eriksson A, Hallberg B, et al. Traumatic shaking: the role of the triad in medical investigations of suspected traumatic shaking. *Acta Paediatr (Stockholm)*. 2018;107:3-23.

9. Brook C. Evidence for significant misdiagnosis of abusive head trauma in pediBIRN data. *Forensic Sci Int Synergy*. 2023;6:100314. doi:10.1016/j.fsisyn.2023.100314

10. Rossant C, Brook C. Why admitted cases of AHT make a low quality reference standard: a survey of people accused of AHT in France. *Forensic Sci Int Synergy*. 2023;6:100312.

11. Findley KA, Rossant C, Sasakura K, Schneps L, Squier W, Wester K, eds. *Shaken Baby Syndrome: Investigating the*

© 2024 The Author. *Annals of the Child Neurology Society* published by Wiley Periodicals LLC on behalf of the Child Neurology Society.

*Abusive Head Trauma Controversy*. Cambridge University Press; 2023.

12. Binenbaum G, Mirza-George N, Christian CW, Forbes BJ. Odds of abuse associated with retinal hemorrhages in children suspected of child abuse. *J Am Assoc Pediatric Ophthalmol Strabismus*. 2009;13(3):268-272.

13. Bhardwaj G, Jacobs MB, Martin FJ, et al. Photographic assessment of retinal hemorrhages in infant head injury: the Childhood Hemorrhagic Retinopathy Study. *J Am Assoc Pediatric Ophthalmol Strabismus*. 2017;21(1): 28-33.

14. Thiblin I, Andersson J, Wester K, Högberg G, Högberg U. Retinal haemorrhage in infants investigated for suspected maltreatment is strongly correlated with intracranial pathology. *Acta Paediatr (Stockholm)*. 2022;111(4):800-808. doi:10.1111/apa.16139

15. Squier W. Retinodural haemorrhage of infancy, abusive head trauma, shaken baby syndrome: the continuing quest for evidence. *Dev Med Child Neurol*. 2023;66(3):290-297.

16. Hymel KP, Willson DF, Boos SC, et al. Derivation of a clinical prediction rule for pediatric abusive head trauma. *Pediatric Crit Care Med*. 2013;14:210-220.

17. Hettler J, Greenes DS. Can the initial history predict whether a child with a head injury has been abused? *Pediatrics*. 2003;111(3):602-607. doi:10.1542/peds.111.3.602

18. Hymel KP, Lee G, Boos S, et al. Estimating the relevance of historical red flags in the diagnosis of abusive head trauma. *J Pediatr*. 2020;218:178-183.

19. Brook C. Data-driven evidence shows truthful caregiver histories and significant overdiagnosis of abusive head trauma. *Ann Child Neurol Soc*. 2023;1(4):299-304. doi:10.1002/cns3.20035

© 2024 The Author. *Annals of the Child Neurology Society* published by Wiley Periodicals LLC on behalf of the Child Neurology Society.

28313267, 0, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/cns3.20065 by Text, Wiley Online Library on [13/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# EXHIBIT 21

# Medical and Legal Uncertainties and Controversies in "Shaken Baby Syndrome" or Infant "Abusive Head Trauma"

## James Tibballs and Neera Bhatia*

*Uncertainties and controversies surround "shaken baby syndrome" or infant "abusive head trauma". We explore Vinaccia v The Queen (2022) 70 VR 36; [2022] VSCA 107 and other selected cases from Australia, the United Kingdom and the United States. On expert opinion alone, a "triad" of clinical signs (severe retinal haemorrhages, subdural haematoma and encephalopathy) is dogmatically attributed diagnostically to severe deliberate shaking with or without head trauma. However, the evidence for this mechanism is of the lowest scientific level and of low to very low quality and therefore unreliable. Consequently, expert opinion should not determine legal outcomes in prosecuted cases. Expert witnesses should reveal the basis of their opinions and the uncertainties and controversies of the diagnosis. Further, the reliability of admissions of guilt while in custody should be considered cautiously. We suggest abandonment of the inherently inculpatory diagnostic terms "shaken baby syndrome" and "abusive head trauma" and their appropriate replacement with "infantile retinodural haemorrhage".*

**Keywords:** *Shaken baby syndrome; abusive head trauma; law; medicine; infants; expert medical evidence*

## I. Introduction

A 2022 Australian case focused on the cause of a brain injury in an infant consisting of a "triad" of clinical signs: acute subdural haematoma, retinal haemorrhages and encephalopathy.[1] In the absence of witness testimony or confession by an accused person this "triad" of clinical signs, when unaccompanied by other injuries, has been imputed by many to be the result of deliberate rapid and forceful shaking, known originally, in an inculpatory manner, as "shaken baby syndrome" (SBS) but currently as "abusive head trauma" (AHT).[2] In this article, we review some of the scientific evidence and explore selected case law from Australia, the United Kingdom and the United States. We consider whether in shaken baby cases the courts should place heavy reliance on expert medical testimony that relates to the "triad" of signs in the absence of alternative explanations.

In 1946 Dr John Caffey advised physicians to search for other injuries in infants, especially long bone fractures, if they identified subdural haematomas.[3] In 1971 Dr Norman Guthkelch evaluated subdural haematomas and their association with whiplash injuries and considered repeated shaking as a cause as

---

* James Tibballs: Associate Professor, The University of Melbourne, Department of Paediatrics. Neera Bhatia: Associate Professor, Deakin University, Geelong, Australia, School of Law, Faculty of Business and Law. We thank the editor and the anonymous reviewers whose comments helped us improve our article.

*Correspondence to*: neera.bhatia@deakin.edu.au.

[1] *Vinaccia v The Queen* (2022) 70 VR 36; [2022] VSCA 107. The application for leave to appeal to the High Court in this case was dismissed: *Vinaccia v The King* [2023] HCASL 44.

[2] Hereafter we refer to "shaken baby syndrome" as SBS and "abusive head trauma" as AHT.

[3] J Caffey, "Multiple Fractures in the Long Bones of Infants Suffering from Chronic Subdural Hematoma" (1946) 56(2) *American Journal of Roentgenology* 163.

---



© 2024 Thomson Reuters (Professional) Australia Limited for further information visit www.thomsonreuters.com.au or send an email to care.anz@tr.com

Please note that this article is being provided for research purposes and is not to be reproduced in any way. If you refer to the article, please ensure you acknowledge both the publication and publisher appropriately. The citation for the journal is available in the footline of each page.

For information concerning permission to republish material from this journal, either in part or in its entirety, in any medium, please refer to **http://sites.thomsonreuters.com.au/journals/permissions.**
For general permission queries, contact **LTA.permissions@thomsonreuters.com**

opposed to an effect of trauma.[4] Injury might occur from one incident of shaking or from repeated incidents on separate occasions. Caffey developed Guthkelch's theory of "whiplash shaken infant syndrome" to what became commonly known as "shaken baby syndrome" (SBS).[5] The literature considered non-accidental injuries and circumstances where a child might present with three signs regarded together as pathognomonic for SBS: (1) subdural haematomas; (2) retinal haemorrhaging; and (3) a wide range of encephalopathies. Today, these signs are commonly known as the "triad" of clinical signs. However, in the late 1980s, it was postulated that shaking alone was unlikely to cause SBS/AHT and that head impact was required.[6] In 2009, the American Academy of Pediatrics declared that the term "abusive head trauma" (AHT) was a more appropriate and inclusive term to include mechanisms in addition to shaking:

> Although shaking an infant has the potential to cause neurologic injury, blunt impact or a combination of shaking and blunt impact cause injury as well. Spinal cord injury and secondary hypoxic ischemic injury can contribute to poor outcomes of victims. The use of broad medical terminology that is inclusive of all mechanisms of injury, including shaking, is required.[7]

This topic is shrouded with ambiguity in the medical and legal literature.[8] The 2022 Victorian Court of Appeal case of *Vinaccia v The Queen* (*Vinaccia*) is the focus of this article and our modest attempt to revisit this tendentious issue from a clinical and legal perspective.

## Aims and Structure of Article

In Part II we provide some basic background anatomical and physiological information concerning the brain, the retinae and retinal haemorrhages and describe the gradation and quality of existing scientific evidence. In Part III we consider whether there is any controversy surrounding SBS/AHT and the possibility of any legal and clinical ambiguity. In Part IV we explore the legal landscape and selected case law from various jurisdictions where SBS/AHT has been considered in some detail. We discuss the focus case of this article *Vinaccia* in more detail and briefly consider some cases from the United Kingdom, the United States and several others from Australia. We note that the topic of SBS has received modest attention in Australia; however, given the 2022 Court of Appeal judgment, it is timely for Australian medical and legal professionals and policy-makers to develop a deeper understanding of SBS/AHT and its short and long-term legal implications on families and those accused of shaking infants to death.

The *Vinaccia* judgment is technical and lengthy in its discussion of SBS/AHT. In our legal analysis, we have attempted to extrapolate key issues and the nuances and intricacies of SBS/AHT including the expert opinion that was provided and considered at length by the three judges (Forrest, Emerton and Walker JJA). We also note that there was division among the judges in the Court of Appeal – Walker J was the minority in the judgment, and we have discussed at length her Honour's remarks. Part V considers the role of the courts and expert witness testimony in cases of SBS/AHT. In Part VI we provide some suggestions to mitigate some of the uncertainty and controversy that surround SBS/AHT. This is followed by our concluding remarks.

---

[4] AN Guthkelch, "Infantile Subdural Hematoma and Its Relationships to Whiplash Injuries" (1971) 2 *British Medical Journal* 430; D Roygardner et al, "A Scoping Review of Abusive Head Trauma Epidemiology, Legal Controversies and Prevention" (2020) 13(4) *International Journal of Child Health and Human Development* 355.

[5] J Caffey, "On the Theory and Practice of Shaking Infants: Its Potential Residual Effects of Permanent Brain Damage and Mental Retardation" (1972) 124 *American Journal of Diseases in Children* 161.

[6] AC Duhaine et al, "The Shaken Baby Syndrome: A Clinical, Pathological, and Biomechanical Study" (1987) 66(3) *Journal of Neurosurgery* 409.

[7] CW Christian and R Block, "Committee on Child Abuse and Neglect, Abusive Head Trauma in Infants and Children" (2009) 123(5) *Pediatrics* 1409, 1410.

[8] See generally EB Zakirova, "Shaken Baby Syndrome: As a Controversy in Wrongful Conviction Cases" (2018) 81(3) *Albany Law Review* 1027; JA Moreno and B Holgren, "Dissent into Confusion: The Supreme Court, Denialism, and the False 'Scientific' Controversy over Shaken Baby Syndrome" (2013) 1 *Utah Law Review* 153; D Tuerkheimer, "The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts" (2009–2010) 87(1) *Washington University Law Review* 1.

## II. CLINICAL CONSIDERATIONS

### A. The Brain, Retinae, Bridging Veins, Subdural Haematoma and Retinal Haemorrhage

Since the retinae (retinas) are essentially extensions of brain tissue and the optic nerves are surrounded by the same membranes as the brain, pathological conditions affecting the brain can also affect the retinae. This applies to arterial supply, venous drainage and intracranial pressure. The venous outflow from the brain passes via "bridging veins" from its surface through the outer membrane covering the brain (dura mater) into venous sinuses and then to the heart. These veins, delicately suspended in cerebrospinal fluid, are prone to rupture with sudden linear or acceleration-deceleration shearing stresses, resulting in subdural haematoma. The pathophysiology of retinal haemorrhage in SBS/AHT is not well understood[9] but traction exerted on the retina by the attached chamber of vitreous humour (the eye's shock absorber) is regarded as the mechanism. Other putative mechanisms for retinal haemorrhages include increased intracranial or intrathoracic pressure, hypoxaemia and coagulopathies.

### B. The Level and Quality of Medical Scientific Evidence

When formulating a guideline or diagnosing a medical condition such as SBS/AHT the National Health and Medical Research Council of the Australian Government recommends the use of GRADE – the Grading of Recommendations Assessment, Developing and Evaluation (NHMRC 2019) system to assess the certainty of a body of evidence (Table 1), whether from a systematic review of randomised controlled trials (level I), a randomised controlled trial (level II), a pseudorandomised trial (level III-1), a comparative study with concurrent controls (Level III-2), a comparative study without concurrent controls (level III-3) or a case series with either post-test or pre-test/post-test outcomes (level IV). These levels define whether the true effect (outcome) is close to or remote from the estimated (measured/observed) effect. Case series are thus the lowest in the hierarchy of levels of scientific evidence and are generally eschewed by authoritative organisations in their construction of clinical guidelines. In addition to the level of evidence, the quality of the evidence provided by a study is required. This can also be assessed by GRADE by which evidence is graded into four categories: high, moderate, low, and very-low quality.

**TABLE 1. Levels of Scientific Evidence**

| Grade of Evidence | Definition |
|---|---|
| High (level I) | There is confidence that the true effect lies close to the estimate of the effect. |
| Moderate (Level II) | There is moderate confidence that the true effect is likely to be close to the estimate of the effect but there is a possibility that it is substantially different. |
| Low (level III) | There is limited confidence in the effect estimate: the true effect may be substantially different from the estimate of effect. |
| Very low (level IV) | There is very little confidence in the effect estimate: the true effect is likely to be substantially different from the estimate of effect. |

While randomised and non-randomised trials have a *high* default quality rating, observational studies have a default low-quality rating since they have multiple inherent problems of bias. Under four domains of selection, ascertainment, causality and reporting, case reports and case series may be upgraded or downgraded. We use a composite tool to evaluate the methodological quality of selected case series (Table 2). It requires the answers to specific questions.

---

[9] HH Song and SF Jain, "Update on Non-accidental Trauma" in A Ramasubramanian (ed), *Pediatric Ophthalmology: Current Practices in Ophthalmology* (Springer, 2022) 227.

**TABLE 2.  Evaluation of Quality of Case Reports and Series\***

| Domain | Leading Explanatory Questions |
|---|---|
| Selection | Were there clear criteria for inclusion in the case series? Was the condition measured in a standard, reliable way? Were valid methods used for identification of the condition? Did the case series have consecutive inclusion of participants? Did the case series have complete inclusion of participants? |
| Ascertainment | Was the exposure adequately ascertained? Was the outcome adequately ascertained? Was statistical analysis appropriate? |
| Causality | Were there other causes that may explain the observation ruled out? |
| Reporting | Was there clear reporting of the demographics of the participants? Was there clear reporting of clinical information of the participants? Were the outcomes or follow-up results of cases clearly reported? Was there clear reporting of the presenting sites/clinics? |

\* Table Two is adapted from MH Murat et al, "Methodological Quality and Synthesis of Case Series and Case Reports" (2018) 23(2) *BMJ Evidence Based Medicine* 603 and Z Munn et al, "Methodological Quality of Case Series Studies: An Introduction to the JBI Critical Appraisal Tool" (2020) 18(10) *JBI Evidence Synthesis* 2127.

## C. "Mimics" of SBS/AHT

The true cause of retinal haemorrhages may be confounded by "mimics". These include cardiopulmonary resuscitation (CPR), intracranial hypertension and traumatic falls. Some representative case series are evaluated below. While CPR and intracranial hypertension may be excluded with some confidence, traumatic falls from low heights are a genuine differential diagnosis of the "triad".

### 1. Cardiopulmonary Resuscitation

The possibility that CPR may result in retinal haemorrhages is based on the physiological concept that manual compression of the chest wall increases intrathoracic pressure which is transmitted via the thoracic to the intracranial vascular system. Retinal haemorrhages are sometimes observable after CPR for infants.

Pham et al observed that retinal haemorrhages occurred in six of 22 (27%) children after CPR. Of these, five were said to have predisposing factors including one as the victim of SBS/AHT, one was the victim of probable child abuse, one was the victim of severe motor-accident head trauma and two had established retinopathy of prematurity.[10] The remaining child had no known predisposing factor. In all children, the investigators identified small numbers of "dot and flame" haemorrhages in the peripapillary area or along the major vascular arcades with occasional scattered haemorrhages in the macula. The investigators concluded that retinal haemorrhages are uncommon after CPR. The cases are highly selected and without providing any confirmative details, this study contains a foregone conclusion, that for two children, that retinal haemorrhages are indicative of SBS/AHT or abusive injury. It is thus downgraded from *low* to *very-low* evidence.

Binenbaum et al studied 38 children after CPR. Of these, seven (18%) had retinal haemorrhages of whom six had coexistent medical conditions including four with AHT, one with septic shock, and one with a ruptured arteriovenous malformation.[11] The seventh child had sustained near-drowning. In the four cases of AHT, retinal haemorrhages were numerous, diffuse, bilateral and multilayered in three cases and unilateral in one case. In the child with septic shock, the haemorrhages were intraretinal

---

[10] H Pham et al, "Retinal Haemorrhage after Cardiopulmonary Resuscitation with Chest Compressions" (2013) 24(2) *American Journal of Forensic Medicine and Pathology* 122.

[11] G Binenbaum et al, "Patterns of Retinal Haemorrhage Associated with Cardiac Arrest and Cardiopulmonary Resuscitation" (2021) 25(6) *Journal of AAPOS* 324.e1 <https://doi.org/10.1016/j.jaapos.2021.06.005>.

and bilateral but only 1-2 at the posterior poles. In the child with the arteriovenous malformation and subarachnoid haemorrhage, 4-8 retinal haemorrhages were intraretinal or preretinal while in the child with near-drowning there was a single unilateral superficial intraretinal haemorrhage. The investigators concluded that retinal haemorrhage is rarely associated with CPR without a coexisting condition and recommended that another cause, other than CPR, should be sought when the retinal haemorrhages are multiple and multilayered. This report fails to provide evidence that four cases were actually due to SBS/AHT. It thus downgraded from *low* to *very-low* evidence.

Odom et al studied 43 children with non-traumatic illnesses who required CPR.[12] Most had a preceding coagulopathy. The investigators excluded victims of trauma, suspected child abuse, near-drowning or seizures. Since they observed small punctate retinal haemorrhages in only one child, they concluded that retinal haemorrhages are rarely found after CPR. This study is flawed by the inclusion of children with coagulopathy which could cause retinal haemorrhages and by a failure to justify the exclusion of children with suspected child abuse, that is, it has selection bias. It is thus downgraded from *low* to *very-low* quality of evidence.

These small series of case reports are not only the lowest in the hierarchy of scientific evidence, but they are also the lowest quality of evidence at that level. Two of the reports[14] are seriously biased by assuming that retinal haemorrhages per se are indicative of abuse, that is, "circular reasoning" has been employed.

### *2. Intracranial Hypertension*

Raised intracranial pressure (intracranial hypertension) has been proposed as an independent cause of retinal haemorrhages in children suspected of sustaining traumatic head injury. Several case series involve correlation with the presence/absence of retinal haemorrhages.

Binenbaum et al prospectively measured the opening pressure, by lumbar puncture, of spinal fluid in children presenting consecutively with a variety of conditions and combined these with retrospective measurements from children who had had the pressure measured in another institution.[13] Inclusion criteria for the study were the absence of trauma, brain tumour and current spinal fluid drainage, and a lumbar pressure $\geq 20$ cm of water. Among 100 children, the mean pressure was 35 cm $H_2O$ (range 20–56). Of 16 children with retinal haemorrhages, eight had superficial intraretinal peripapillary haemorrhages adjacent to a swollen retinal disc while eight had splinter haemorrhages confined to the disc region. In these 16 children, the mean opening pressure was 42 cm $H_2O$. The investigators concluded that retinal haemorrhages are associated with raised intracranial pressure but are intraretinal and located adjacent to a swollen optic disc. Although this is a reliable conclusion, the quality of the study does not rise above a low category. The investigators ventured to conclude that when retinal haemorrhages are numerous, multilayered or in the retinal periphery they are unlikely to be due to intracranial hypertension. This latter conclusion is mere conjecture since the investigators did not study any such patients.

Minns et al studied a cohort of 112 children of whom 57 were victims of accidental traumatic brain injury, 21 had been concluded by child protection services to be victims of inflicted traumatic brain injury and 34 had non-traumatic encephalopathies.[14] Intracranial pressure was measured directly but differently in 42 children while 21 children had a range of radiological or clinical signs of raised intracranial pressure and 49 children had neither pressure measurement nor radiological or clinical signs of raised intracranial pressure. In the subgroup of children with measured intracranial hypertension, all five victims (100%) of non-traumatic brain injury had retinal haemorrhages whereas five of 31 (16%) victims of traumatic brain injury had retinal haemorrhages but the association of intracranial hypertension with the presence or absence of retinal haemorrhages was not statistically significant ($P = 0.329$), and in all 10 children with haemorrhages the number of haemorrhages had no significant relationship to the intracranial

---

[12] A Odom et al, "Prevalence of Retinal Hemorrhages in Pediatric Patients after In-hospital Cardiopulmonary Resuscitation: A Prospective Study" (1997) 99(6) *Pediatrics* <https://doi.org/10.1542/peds.99.6.e3>.

[13] G Binenbaum et al, "Patterns of Retinal Haemorrhage Associated with Increased Intracranial Pressure in Children" (2013) 132(2) *Pediatrics* e430 <https://doi.org/10.1542/peds.2013-0262>.

[14] See nn 10, 11. See also RA Minns et al, "Raised Intracranial Pressure and Retinal Haemorrhages in Childhood Encephalopathies" (2017) 59(6) *Developmental Medicine & Child Neurology* 597.

pressure. When this subgroup with measured intracranial pressure was combined with that in which pressure was not measured but exhibiting radiological/clinical signs of intracranial hypertension that is assumed to be high, there was a significant relationship between retinal haemorrhages and intracranial hypertension but this relationship was independent of the cause. The investigators concluded that "in the absence of a hypothesis-driven clinical trial", despite a relationship between intracranial hypertension and presence of retinal haemorrhages, the aetiology of retinal haemorrhages cannot be proven. This study is downgraded to very-low quality because of selection bias in that no evidence was offered to correctly assign children to different aetiology groups. Moreover, ascertainment bias is present because intracranial pressure was measured by different methods and in many children, intracranial hypertension was assumed to be present.

### 3. Short Falls, Subdural Haematoma and Retinal Haemorrhage

It is well known that subdural haematoma is often associated with significant head trauma but less known that such injury in infants can be caused by minor falls, such as from a parent's arms or from a sitting/standing position, as illustrated by the following series of case reports.

Aoki and Masuzawa presented a series of 26 infants (average age 8.1 months) who sustained acute subdural haematomas due to apparently minor head trauma, not associated with either cerebral contusion or loss of consciousness.[15] The most common mechanism was a backward fall with occipital strike from a sitting or standing position and characteristically onto a soft "Japanese mat" surface, all followed by convulsions, and vomiting or irritability in some cases. Several had fallen from a bed or from a parent's back. Most infants recovered but two eventually died, one developed epilepsy and another mild mental disability. All 26 infants had retinal and preretinal haemorrhages, some had multiple haemorrhages. None had skull fractures. In none of these infants was a mechanism of abusive head injury entertained although the clinical presentation, consisting of a "triad" of signs, could have been otherwise regarded as AHT. This study of short-distance falls is downgraded to very-low quality because it is selective for injuries resulting in subdural haematoma. Aoki also reported a single case of a thin acute subdural haematoma with mild bilateral retinal haemorrhages occurring in a seven-month-old infant who had fallen backwards from a sitting position at home.[16] Although the infant recovered, they were admitted to the hospital for observation. While in hospital, a nurse witnessed the infant again falling from a sitting position with mild occipital impact against a metallic bed railing, causing loss of consciousness. Imaging showed the subdural haematoma had increased substantially in size while ophthalmoscopy showed bilateral multiple newly-developed multiple-layered retinal haemorrhages. These reports, of low quality, show that minor traumatic injuries which can cause subdural haematomata can also cause multiple retinal haemorrhages.

The overall risk of head injury from all falls and specifically from short falls is better provided by Burrows et al who performed a cross-sectional study of the risk of head injury (skull fracture and/or intracranial injury) sustained by all children younger than six years admitted to United Kingdom hospitals after falls from September 2009 to February 2010. Of 1,775 cases (median age 18 months, interquartile range 30 months), 342 had a computed tomography (CT) scan.[17] Of the latter, 58 (16.9%) had skull fracture alone and 47 (13.7%) had an intracranial injury with or without skull fracture. Infants less than one year and toddlers 1–2 years constituted 1,032 of all admissions (58%) and in these 169 had CT scans revealing isolated skull fractures in 36 of 100 infants (36%) and in 14 of 69 of toddlers (20%). The incidence of intracranial injury in these two age groups were 20/100 (20%) and 5/69 (7%) respectively. Two toddlers with intracranial injury died. The median age of 233 infants and toddlers who fell from a person's arms was 0.3 years (interquartile range 1.1) and in whom 21 (9%) had a skull fracture and

---

[15] N Aoki and H Masuzawa, "Infantile Acute Subdural Haematoma: Clinical Analysis of 26 Cases" (1984) 61(2) *Journal of Neurosurgery* 273.

[16] N Aoki, "Infantile Acute Subdural Haematoma with Retinal Hemorrhage Caused by Minor Occipital Impact Witnessed by an ICU Nurse: Case Report" (2020) 4(1) *Journal of Pediatric Neurology and Neuroscience* 47.

[17] P Burrows et al, "Head Injury from Falls in Children Younger than 6 Years of Age" (2015) 100(11) *Archives of Disease in Childhood* 1032.

15 (6.4%) an intracranial injury. The odds ratio of sustaining these injuries compared to falling from a sitting or standing position was 6.94 (3.54–13.6). This study is upgraded to moderate quality due to its thorough case selection, ascertainment, and reporting domains. It confirms that significant head injury, even death, may occur in children after falls from low height and brain injury may be present without skull fracture. Indeed, in another study, among 13 fatalities from SBS/AHT all had signs of blunt trauma to the head but in seven it was detected only at autopsy.[18]

Trench et al sought to differentiate accidental head injury from SBS or non-accidental injury.[19] After excluding cases considered to be maltreatment, they prospectively studied 154 children less than two years of age (mean 10.1 months) admitted to hospital with head trauma from a fall, most commonly from a stroller or rolling off a bed from a height of 1.2 metres or less (median height 90 cm). Of these, 122 children (79%) had skull fractures, 16 had intracranial injury (10.4%: 14 epidural haematomas, one subarachnoid haemorrhage, one contusion) while three had retinal haemorrhages (1.9%), all unilateral. The investigators concluded that low-level accidental falls causing epidural bleeding can also cause retinal haemorrhages, and that an observation of diffuse and bilateral retinal haemorrhages must indicate non-accidental trauma. Although this study rightly links intracranial head injury with retinal haemorrhages, it is otherwise seriously flawed it did not study any confirmed cases of non-accidental injury and is thus downgraded to very-low quality.

## D. Multiplicity and Patterns of Retinal Haemorrhages

The multiplicity and patterns of retinal haemorrhages have hitherto been regarded as pathognomonic for a clinical diagnosis of SBS/AHT. In particular, when the haemorrhages are present throughout the layers of retinal tissue, and they are split (retinoschisis) often identified when associated with macular folding. Indeed, the American Academy of Ophthalmology issued a dogmatic statement to this effect in 2015:

> Even without a supporting history, the diagnosis of shaken baby syndrome can still be made with confidence on the basis of characteristic clinical findings … When extensive retinal hemorrhage accompanied by perimacular folds and schisis cavities are found in association with intracranial hemorrhage or other evidence of trauma to the brain of an infant without another clear explanation, abusive head trauma can be diagnosed with confidence.[20]

That retinoschisis can be caused by mechanisms other than shaking as illustrated by several case reports, notwithstanding the low to very-low scientific level.

Shuman and Hutchins documented two cases in which severe retinal haemorrhages with retinoschisis in infants were caused by natural causes.[21] One infant aged 3½ months was claimed by a parent to suddenly become stiff during bottle feeding and then remained lethargic. Seizures were suspected. A brain CT scan identified a large subdural interhemispheric haematoma. Ophthalmological examination revealed preretinal haemorrhage and areas of retinoschisis in the right eye and vitreous haemorrhage in the left eye. A clinical diagnosis of non-accidental head injury was applied. Unfortunately, the infant's condition progressed to death. At autopsy, additional subarachnoid and intradural haemorrhages with cerebral oedema were identified, along with a vascular malformation of the falx cerebri which was concluded to be the real cause of death. Ophthalmological pathology consisted of bilateral optic nerve sheath haemorrhages and extensive bilateral retinal haemorrhages and retinal folds. The other 14-month-old toddler accidently fell from a miniature train sustaining a severe head injury causing eventual death. Post-mortem ophthalmological examination revealed bilateral retinal and optic nerve sheath haemorrhages with retinal folding in one eye.

---

[18] Duhaine et al, n 6.

[19] V Trenchs et al, "Retinal Haemorrhages in Head Trauma Resulting from Falls: Differential Diagnosis with Non-accidental Trauma in Patients Younger than 2 Years of Age" (2008) 24(7) *Childs Nervous System* 815.

[20] American Academy of Ophthalmology, *Abusive Head Trauma/Shaken Baby Syndrome-2015* (March 2015) <https://www.aao.org/education/clinical-statement/abusive-head-traumashaken-baby-syndrome>.

[21] MJ Shuman and KD Hutchins, "Severe Retinal Hemorrhages with Retinoschisis Are NOT Pathognomonic for Abusive Head Trauma" (2017) 62(3) *Journal of Forensic Science* 807.

## E. Animal Studies

Given that generally scientific studies cannot be performed ethically in human infants, investigators have employed various animal models using young laboratory rodents or domestic animals to simulate shaking in infantile AHT. In general, none have been able to replicate the full human anatomical observations reliably, attributed correctly or incorrectly to AHT, due to neuroanatomic and ocular species differences and lack of resemblance of animal head shaking models to infantile shaking.[22] Nonetheless, insights into human pathological mechanisms have been gained. For example, a lamb hand-shaken freely mobile head model showed that shaking alone (10 times, of 30 seconds duration, over 30 minutes), without impact injury, was fatal in three anaesthetised small lambs, but not in larger lambs.[23] In the fatally injured lambs, widespread axonal injury was present in the cerebral hemispheres, brainstem and craniocervical junction. It was posited that axonal injury in the latter caused death by apnoea and cardiorespiratory arrest. Although retinal neurons were damaged, haemorrhages were not detected. In an anaesthetised piglet model, a single rapid head rotation caused retinal haemorrhages, typically at the vitreoretinal attachment but also in the peripheral retina, anterior chamber, optic nerve and sheath in most animals.[24] The investigators postulated that acceleration/deceleration forces cause traction on the retina by the vitreous thereby causing retinal haemorrhage but they cautioned against extrapolating the porcine injuries to humans because of interspecies anatomical ocular differences. Irrespective of all observations in animal studies, they do not attain any level in the gradation of human scientific evidence.

## F. Biomechanical Studies

As with animal studies, biomechanical studies do not enter the hierarchy of human scientific evidence, but they are not uninformative. In a detailed review, Ommaya et al discuss the fundamentals of traumatic infantile brain injury as revealed by studies of impacts and repetitive shaking using anaesthetized primates and mechanical models.[25] Most importantly, all brain injuries including concussion, subdural haemorrhage, subarachnoid haemorrhage, brain parenchymal haemorrhage and contusions are much more likely to be caused by impacts from short falls (eg <90 cm) than by repetitive shaking, notwithstanding the possibility that repetitive shaking could be associated with impacts, for example, with a tabletop. While shaking causes changes in angular velocity (acceleration-deceleration) and hence shearing stresses within the brain, impacts cause not only abrupt changes in linear velocity but also much larger changes (50–100 times) in angular velocity than those caused by shaking. Moreover, since the maximum attainable shaking angular velocity in models of one-month-old infants did not reach the minimum velocity to cause injury in subhuman primate brains of similar mass. Duhaine et al opined that shaking alone could not cause SBS/AHT and that impact is required. However, repetitive manual shaking is associated with injuries to the cervical cord and spine.[26] The biomechanics of retinal haemorrhages are less well understood. The reviewers noted that based on the relatively small mass of the eyeball, the force required by shaking to produce retinal haemorrhage is biomechanically improbable. They supported a rise in intracranial pressure in traumatic brain injury as the mechanism of retinal haemorrhage but pointed out that such a hypothesis required testing, and they ventured to say that such haemorrhages are not pathognomonic for intentional injury.

[22] JW Finnie and PC Blumbergs, "Animal Models of Pediatric Abusive Head Trauma" (2022) 38(12) *Childs Nervous System* 2317.

[23] JW Finnie et al, "Neuropathological Changes in a Lamb Model of Non-accidental Head Injury (the Shaken Baby Syndrome)" (2012) 19(8) *Journal of Clinical Neuroscience* 1159.

[24] B Coats et al, "Ocular Hemorrhages in Neonatal Porcine Eyes from Single, Rapid Rotational Events" (2010) 51(9) *Investigative Ophthalmology & Visual Science* 4792.

[25] AK Ommaya, W Goldsmith and L Thibault, "Biomechanics and Neuropathology of Adult and Paediatric Head Injury" (2002)16(3) *British Journal of Neurosurgery* 220.

[26] Duhaine et al, n 6.

## H. The Dogma of Shaken Baby Syndrome or Abusive Head Trauma

The association between retinal haemorrhages and abusive head injury has been regarded as a tenet or dogma of child protection services but in recent times has been criticised. The main criticism is that the diagnosis is based on the bias of circular reasoning, or self-fulfilment, that SBS/AHT is diagnosed by identification of the "triad" of signs and then the diagnosis is evaluated by observation of the same "triad". In essence, since such haemorrhages are observed in cases of known or suspected deliberate violent shaking the identification of such haemorrhages in other cases must be (falsely) diagnostic of the same mechanism. This precludes the identification of causes, whether known or unknown, other than violent shaking. Such circular reasoning is reinforced by the appellation of injury as "abusive head trauma" or "inflicted head trauma" just as much as that conveyed by "shaken baby syndrome".

In an attempt to overcome the bias of circularity, Vinchon et al compared 45 cases of confessed inflicted head trauma (IHT) with 39 cases of objectively observed accidental head trauma in France.[27] Retinal haemorrhages were classified as absent, mild or severe according to depth and extent. Individual features in favour of IHT were subdural haematoma, severe retinal haemorrhages and absence of signs of impact with predictive values of 0.685, 0.961 and 0.830 respectively. However, only severe retinal haemorrhages in the absence of impact was specific for IHT. When all three features were combined, the specificity for IHT was 100% but with a sensitivity of only 24.4%. In a review (vide infra), this study was evaluated as one of only two as having a moderate risk of bias.[28] However, we take issue with this assessment for multiple reasons.

First, 15 of the 45 cases of IHT were "beaten baby syndrome" with peripheral fractures. This outright annuls any diagnosis of AHT by the "triad" alone and itself constitutes circularity bias. Second, Vinchon did not include all degrees of retinal haemorrhage in the calculation of the diagnostic value for the two groups (IHT: none 7; mild 3; moderate 9; severe 25. ACT: none 29; mild 5; moderate 0; severe 1). When all the data are utilised, the specificity of any retinal haemorrhage for inflicted trauma is 0.82, sensitivity 0.84, positive predictive value 0.86, negative predictive value 0.81 and overall accuracy of the test of retinal haemorrhage for IHT is 0.56, that is, only marginal. The authors had concluded that severe retinal haemorrhage was pathognomonic for IHT. We disagree. Third, of the 84 cases evaluated, five had no ophthalmological examination (four in group, one in IHT group). Fourthly, an undefined number of cases of confession were obtained from Court hearings, which was criticised[29] and subsequently, Vinchon was unable to determine whether such confessions were genuine or not.[30] Lastly, Vinchon et al claimed that the absence of signs of head impact was one of the three signs in favour of IHT, which is a bizarre claim since 17 of the 45 infants had signs of impact including five with skull fractures.[31] Consequently, in terms of using the "triad" alone to diagnose AHT, we downgrade this article to very-low quality due to bias in the selection of cases, bias in the selection of data, lack of data, bias in analysis and statistical irregularities.

Another French study retrospectively compared clinical findings in 29 confessed and 83 unconfessed cases of AHT to determine the mechanism of injury.[32] In confessed cases, shaking was described as extremely violent and repeated in 55% of cases 2–30 times, on average 10 times, sometimes daily. The percentages of outcomes and of presenting symptoms and signs in the two groups (confessed vs

[27] M Vinchon et al, "Confessed Abuse versus Witnessed Accidents in Infants: Comparison of Clinical, Radiological, and Ophthalmological Data in Corroborated Cases" (2010) 26(5) *Childs Nervous System* 637.

[28] G Elinder et al, "Traumatic Shaking: The Role of the 'Triad' in Medical Investigations of Suspected Traumatic Shaking: A Systematic Review (Internet)" (Swedish Council on Health Technology Assessment (SBU), SBU Assessment No 255, 26 October 2016).

[29] N Lynøe et al, "Insufficient Evidence for 'Shaken Baby Syndrome' – A Systematic Review" (2017) 106(7) *Acta Paediatrica* 1021.

[30] M Vinchon, "Response to Lynøe: Questions about Isolated Trauma Shaking and Confessions" (2017) 33(9) *Childs Nervous System* 1423.

[31] Vinchon et al, n 27.

[32] C Adamsbaum et al, "Abusive Head Trauma: Judicial Admissions Highlight Violent and Repetitive Shaking" (2010) 126(3) *Pediatrics* 546.

unconfessed) were not significantly different: death 31 vs 19; vomiting 7 vs 10; seizures 66 vs 60; cardiopulmonary arrest 7 vs 14; bone fractures 38 vs 23; bruising 38 vs 51; subdural haematoma 100 vs 99. All confessions occurred during police custody or legal investigations. All perpetrators described violently shaking infants held under their arms and in 24% of cases followed by violent impact of the infant's head on a bed. The study confirmed the violence of shaking and was upgraded to a moderate level of quality in the Swedish systemic review,[33] notwithstanding the lack of reliability of confessions of French perpetrators of SBS/AHT.[34]

## III. IS SHAKEN BABY SYNDROME OR ABUSIVE HEAD TRAUMA A CONTROVERSIAL ISSUE?

There is an ongoing discussion about whether SBS/AHT is a controversial issue in medico-legal fields.[35] Medical and legal practitioners concede that it is a topic where there is little agreement, rather there is a variety of differing views about the legitimacy of an SBS/AHT diagnosis. Both opponents and proponents of SBS/AHT have varying opinions about whether child head injury cases should be considered with (1) purely a medical diagnosis; (2) relied on as evidence per se for SBS/AHT and/or (3) whether expert opinion alone should determine the outcome of a criminal or civil case of SBS/AHT.

The topic of SBS/AHT is a controversial issue that is emotionally, medically, and legally fraught. It has garnered academic, public and media attention,[36] and the implications of significant reliance on medical opinion about SBS/AHT in court cases and legal determinations have far-reaching effects on the livelihoods of those accused of deliberately shaking a child to death. If there are other possible causes of the "triad", then SBS/AHT should not be concluded as having been legally proven beyond a reasonable doubt – and a claim of negligence or a charge of homicide should not be made. As Roygardner et al observe, there have been several inconsistent legal outcomes in SBS/AHT cases even where there the case facts have been similar.[37] This has resulted in disparate case verdicts and stark sentencing determinations ranging from acquittals to probation to life imprisonment.[38] Findley et al note that in the United States, the Courts are increasingly beginning to recognise the controversy and uncertainty in cases where SBS/AHT has been diagnosed as the sole cause of head trauma causing death – and have overturned several convictions.[39]

## A. Medical Ambiguity

Supporters of SBS/AHT quite simply claim that there is no controversy. Some paediatricians have acknowledged that, while there *might* be some disagreement about SBS/AHT, any controversy should be ignored because engaging with it impedes a physician's ability to diagnose abuse.[40] Possible denial or

---

[33] Elinder et al, n 28.

[34] C Rossant and C Brook, "Why Admitted Cases of Make a Low Quality Reference Standard: A Survey of People Accused of in France" (2022) 29(6) *Forensic Science International* <https://doi.org/10.1016/j.fsisyn.2022.100312>.

[35] We are considering SBS alone, unaccompanied by any other injuries that would indicate previous non-accidental injury.

[36] See, eg, W Storr, "'We Believe You Harmed Your Child': The War over Shaken Baby Convictions", *The Guardian*, 8 December 2017 <https://www.theguardian.com/news/2017/dec/08/shaken-baby-syndrome-war-over-convictions>; C Vedelago, "Top Scientists Question Basis for Victoria's Baby Shaking Prosecutions", *Sydney Morning Herald*, 8 May 2021 <https://www.smh.com.au/national/top-scientists-question-basis-for-victoria-s-baby-shaking-prosecutions-20210513-p57rkm.html>.

[37] D Roygardner et al, "A Scoping Review of Abusive Head Trauma Epideiology, Legal Controversies and Prevention" (2020) 13(4) *International Journal of Child Health and Human Development* 355, 359.

[38] Roygardner et al, n 37.

[39] K Findley et al, "Feigned Consensus: Usurping the Law in Shaken Baby Syndrome/Abusive Head Trauma Prosecutions" (2019) 4 *Wisconsin Law Review* 1212, 1213. For some examples, see *People v Ackley*, 870 NW 2d 858 (Mich, 2015) finding ineffective assistance of counsel for failure to present medical evidence disputing the prosecution experts' SBS based opinions. See also *People v Bailey*, 999 NYS 2d 713, 724 (NYS Cnty Ct, 2014) finding newly discovered evidence of emerging medical research challenging the SBS diagnosis.

[40] RW Block, "Child Abuse-Controversies and Imposters" (1999) 29(9) *Current Problems in Pediatrics* 249, 253–255.

---

recognition of SBS/AHT by some of its ardent proponents sits in stark contrast with a statement by the American Academy of Pediatrics stating in 2009:

> Few pediatric diagnoses engender as much debate as AHT, in part because of the social and legal consequences of the diagnosis. The diagnosis can result in children being removed from their homes, parents losing their parental rights, and adults being imprisoned for their actions. Controversy is fueled because the mechanisms and resultant injuries of accidental and abusive head injury overlap, the abuse is rarely witnessed, an accurate history of trauma is rarely offered by the perpetrator, and there is no single or simple test to determine the accuracy of the diagnosis, and the legal consequences of the diagnosis can be so significant.[41]

Further, over four decades after first highlighting the potential issues caused by head trauma in children, Guthkelch continues to assert that controversy is a "normal and necessary part of scientific discourse".[42] He notes that the emotiveness and division that SBS/AHT has caused "interfered with a commitment to pursue the truth".[43] As others have noted, "it is healthy and inevitable to have some controversy in the development of scientific knowledge in an area that is not well understood or where there are significant uncertainties and ambiguity".[44] This is especially the case, as Findley et al note, in areas of medicine that lack defined clinical criteria or what is referred to as a "gold standard" – where physicians treating similar symptoms or characteristics may conclude or interpret them in different ways or may disagree in a specific case. SBS/AHT is one such area of medicine that lacks a "gold standard". Considering this, the "triad" of signs should not be conclusively relied on to diagnose head trauma as non-accidental abuse.[45] In an attempt to understand the "triad" of signs better, studies have been conducted across several disciplines, including engineering, pathology and science.[46] However, no study or experiment to date has been able to conclude unequivocally that the "triad" of signs is pathognomonic to SBS/AHT.[47] This point is raised in our focus case of *Vinaccia*, discussed later. There is a complete absence and inability to test the force required to cause SBS/AHT as this would require shaking an infant. The closest alternative has been to create biofidelic models (that represent human infants) to test the force required but the results have not been accurate.

Of note is a systematic review undertaken by the Swedish Agency for Health Technology Assessment and Assessment (SBU) – which had a particular focus in the case of *Vinaccia* which we discuss later. To test the hypothesis pertaining to the "triad" of signs in SBS/AHT, a panel comprised of experts in paediatrics, forensic medicine, radiology, medical epidemiology, medical ethics and medical research (but no ophthalmologist) performed an extensive systematic review of singular cases and series of cases in the medical literature. The panel reviewed 3,773 journal abstracts and 1,065 full texts but reduced these to 30 after exclusions due to circular reasoning and methodological shortcomings, leaving only two articles with a moderate risk of bias for analysis. The panel excluded studies of fewer than 10 cases and cases which included external injury. The SBU report conceded that the two selected articles both support the hypothesis that isolated traumatic shaking can give rise to the triad but it concluded that there was "insufficient scientific evidence on which to assess the diagnostic accuracy of the 'triad' in

---

[41] Christian and Block, n 7, 1410.

[42] AN Guthkelch, "Problems of Infant Retino-Dural Hemorrhage with Minimal External Injury" (2012) *Houston Journal of Health Law & Policy* 201, 201.

[43] Guthkelch, n 42.

[44] Findley et al, n 39, 1222.

[45] S Narang, "A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome" (2011) 11(3) *Houston Journal of Health Law & Policy* 505, 571.

[46] ML Henneberg, "Admissibility Frameworks and Scientific Evidence: Controversies in relation to Shaken Baby Syndrome/ Abusive Head Trauma" (2015) 4 *British Journal of American Legal Studies* 555, 578.

[47] For some examples of studies conducted see W Squier and J Mack, "The Neuropathology of Infant Dural Haemorrhage" (2009) 187(1–3) *Forensic Science International* 6; RC Cantu and AD Gean, "Second-impact Syndrome and a Small Subdural Haematoma: An Uncommon Catastrophic Result of Repetitive Head Injury with a Characteristic Imaging Appearance" (2010) 27(9) *Journal of Neurotrauma* 1557; T Bey and B Ostick, "Second Impact Syndrome" (2009)10(1) *Western Journal of Emergency Medicine* 6; BM Togioka et al, "Retinal Hemorrhages and Shaken Baby Syndrome: An Evidence-based Review" (2009) 37(1) *Journal of Emergency Medicine* 98.

identifying traumatic shaking (very-low quality evidence)".[48] Such evidence to support the "triad" of signs as diagnostic of SBS/AHT has been labelled "junk science" by some as if to be discarded.[49] We disagree. Although the SBU report is a low level of scientific evidence and of very-low quality, due to selection bias, it and individual articles are nonetheless scientific evidence. The question therefore is, to what extent if any, may the SBU report and any articles support an expert's opinion, either for or against the diagnostic value of the triad. This is the crux of a controversy, in the absence of high-level scientific evidence.

It is commonly believed that SBS/AHT presents very shortly after a shaking event. Thus, in most cases, physicians suspect that the last parent/caregiver who cared for the child "violently shook" the child to cause SBS/AHT.[50] The likelihood of "other causes" of the traumatic injury to the child are less common and less likely to be considered. Nevertheless, there might be other causes for child traumatic head injury. An increasing number of individuals and groups have criticised the unwavering support that SBS/AHT has received for decades. Many have started to question the "triad" of signs and discuss other causes of injury. For example, in 2019 DeHaan identified three emerging themes concerning the legitimacy of SBS/AHT:

(1) The "temporal link" between trauma and the "triad". New evidence suggests a child may remain lucid and not show any signs for up to 72 hours after the injury.[51]

(2) The degree of trauma required to cause such catastrophic injury. Low-impact events may cause similar injury to those from significant events such as multi-story falls or major car accidents.[52]

(3) A range of conditions should be considered as causing the "triad" including congenital malformations, genetic and metabolic conditions, coagulation disorders, infectious diseases, vasculitis, autoimmune conditions and nutritional deficiencies.[53]

## B. Legally Problematic

There are serious legal implications that arise from non-conclusive medical opinion in cases of SBS/AHT requiring court intervention. The courts rely on the "opinion" or "personal knowledge" of physicians, but an important role for judges in such cases is to be able to gauge the most relevant and appropriate findings because in most SBS/AHT cases there is opposing medical expert opinion.[54]

Some commentators have pointed out that "it is absurd to argue that medical diagnosis proves murder".[55] Evidence to a court about a medical cause of an injury cannot answer two fundamental legal questions pertaining to actus reus (guilty act) and mens rea (guilty mind). It is key to any legal prosecution to determine how the injuries were sustained and whether they were accidental, reckless, negligent, or intentional.

In civil tort cases, proof of causation is a fundamental legal requirement and no less relevant in medical cases. However, the courts are reticent to judge based on causation alone.[56] In cases of SBS/AHT, causation proves especially difficult. When considering whether an accused violently shook a child, an expert is being asked to consider cause and effect, but only the latter (effect) has been observed (usually death). The cause in the case of SBS/AHT remains largely unproven and based on clinical judgment – a

---

[48] Elinder et al, n 28.

[49] *Vinaccia v The Queen* (2022) 70 VR 36, [90]–[91], [436], [438]; [2022] VSCA 107.

[50] L DeHaan, "Building on a Shaky Foundation: The Argument for Changing Investigation Procedures in Shaken Baby Syndrome Cases" (2019) *Michigan State Law Review* 556, 563.

[51] DeHaan, n 50, 564.

[52] DeHaan, n 50, 564.

[53] DeHaan, n 50, 564; Findley et al, n 39, 1214.

[54] Findley et al, n 39, 1237.

[55] See also AK Choudhary et al, "Consensus Statement on Abusive Head Trauma in Infants and Young Children" (2018) 48(8) *Pediatric Radiology* 1048, 1049 <https://doi.org/10.1007/s00247-018-4149-1>.

[56] See *Bowers v Norfolk S Corp*, 537 F Supp 2d 1343 (MD Ga, 2007).

case of ipse dixit. Thus, all inferences of the cause of trauma come from the physician alone. We now turn to consider some cases concerning SBS/AHT, commencing with our Australian focus case.

## IV. SELECTED CASE LAW

### A. Vinaccia v The Queen

The Victorian Court of Appeal refused leave to appeal a child homicide conviction in this case.[57] In 2019, Jesse Vinaccia was convicted of homicide caused by his handling and shaking to death of 16-week-old baby Kaleb in a manner that was either unlawful and dangerous or criminally negligent. While in Vinaccia's sole care on 23 January 2016, Kaleb was found unresponsive and floppy in his cot. An ambulance was called and Kaleb was taken to hospital. Kaleb had suffered a sudden respiratory and cardiac collapse. He died seven days later. Earlier in January 2016, Kaleb had been taken to the emergency department of a hospital after his mother noticed an egg-shaped protrusion (raised fontanelle) at the top of his head. He was also vomiting. However, after improvement, he was discharged for outpatient follow-up.

In the previous year, Kaleb had been checked by a general practitioner after concern was raised about the disproportionate size of his head. He was seen on three occasions for vaccines, vomiting and measurement of his head circumference.[58] At the trial, it was stated that the infant had clinical signs of the "triad": subdural haemorrhages, retinal haemorrhages and encephalopathy, which in the absence of any alternative explanation was attributed by expert witnesses to deliberate forceful shaking. Jesse Vinaccia was sentenced to 8.5 years' imprisonment. He appealed the conviction.

The appeal was heard before Forrest, Emerton and Walker JJA. Vinaccia sought to appeal his conviction on *five grounds* that we will discuss below. He principally appealed on the ground that the clinical diagnosis of inflicted head injury based on the "triad" of signs was derived from improper science (also referred to as "junk science").[59]

The *second* ground of appeal was based on the premise of a substantial miscarriage of justice, that the expert witness Dr Tully had provided incorrect evidence, and that new evidence should be admitted demonstrating how Dr Tully's evidence at trial had caused a miscarriage of justice. The evidence claimed to be incorrect was that (1) "there is no scientific controversy, or dispute, in the scientific community as to the diagnostic utility of the 'triad' to confirm that an infant had died as a result of non-accidental physical abuse";[60] and (2) "that there is consensus within the scientific community that the 'triad' can be used to determine whether death of an infant is the result of non-accidental physical abuse".[61]

The *third* ground for the appeal was that new evidence about the cause of the infant's death should be admitted to demonstrate Vinaccia's innocence, or at the least to create a reasonable doubt as to his guilt. The new evidence suggested that the infant had a benign enlargement of the subarachnoid space (BESS) a medical alternative cause of death rather than abusive head injury.[62]

The appellant, also sought to convince on a *fourth ground*, that the evidence related to the "triad" should not have been adduced in the trial as the probative value of that evidence was by its unfair prejudice.[63]

The *fifth* ground for the appeal was that the verdict was unsafe and unsatisfactory and could not be supported by the evidence, namely, (1) "the prosecution could not have … excluded the reasonable possibility that the death of the deceased was caused by a pre-existing medical condition independent

---

[57] *Vinaccia v The Queen* (2022) 70 VR 36; [2022] VSCA 107. The application for leave to appeal to the High Court was also dismissed. See *Vinaccia v The King* [2023] HCASL 44.

[58] *Vinaccia v The Queen* (2022) 70 VR 36, [24]–[25]; [2022] VSCA 107.

[59] *Vinaccia v The Queen* (2022) 70 VR 36, [3]; [2022] VSCA 107. Grounds 2 and 5 were amended, and ground 1 was abandoned, in an Amended Notice of Application for Leave to Appeal, filed after the oral hearing.

[60] *Vinaccia v The Queen* (2022) 70 VR 36, [3]; [2022] VSCA 107.

[61] *Vinaccia v The Queen* (2022) 70 VR 36, [3]; [2022] VSCA 107

[62] *Vinaccia v The Queen* (2022) 70 VR 36, [3]; [2022] VSCA 107.

[63] *Vinaccia v The Queen* (2022) 70 VR 36, [3]; [2022] VSCA 107.

of any acts of the accused"; and (2) "the prosecution could not have excluded the reasonable hypothesis consistent with innocence that the acts or conduct of the accused as described in the record of interview did not amount to unlawful and dangerous act/s or criminal negligence".[64]

Grounds 2–4 relied on evidence not adduced at the trial, concerning the cause of Kaleb's death. The applicant sought to adduce evidence on appeal from three new Scandinavian witnesses, Professors Anders Eriksson, Knut Wester and Ulf Högberg.[65] These witnesses questioned the scientific basis of the "triad" of signs for SBS/AHT and proposed alternative causes for Kaleb's death.[66]

In our following discussion, we will not be discussing the grounds of appeal sequentially, but rather as they were considered in the judgment. The main ground for appeal that will make up our discussion is ground 3. First, however, we consider a few procedural matters that were discussed by the Court of Appeal, then turn to ground five before discussing the other grounds in turn.

### 1. Justices Forrest and Emerton

#### (a) Extension of Time

An extension of time to file the notice of application for leave to appeal was declined for several reasons. The applicant's solicitor filed an affidavit in support of an extension of time a year after the conviction and 11 months after the time prescribed by s 270 of the *Criminal Procedure Act 2009* (Vic). In the filed affidavit, the applicant's solicitor set out several grounds in support of the extension time that had not been challenged including:

> [L]ogistical challenges that accompanied the applicant's change of solicitors in late October/early November 2019; the very large volume of material that needed to be examined so as to prepare appropriate appeal grounds; the steps taken to seek opinions from the Scandinavian witnesses; and the impact of the COVID-19 pandemic on the efforts to prepare the written case for the applicant, as well as on the broader preparation for the appeal.[67]

In the judgment, their Honours stated that the explanation for the delay was persuasive and leave for an extension of time would have been granted had one or more of the proposed grounds of appeal been meritorious.

#### (b) New Evidence Procedure

Their Honours noted that the application was complex in nature. This was evidenced during the leave to appeal process. Additionally, the applicant tendered several documents from the "Scandinavian witnesses" that were lengthy and very technical. The respondent was able to call rebuttal evidence from several witnesses, namely, Dr Joanna Tully (the forensic paediatrician who investigated Kaleb's death); Dr Linda Iles (the forensic pathologist who performed Kaleb's post-mortem examination) and Professor Michael Ditchfield (the paediatric radiologist who examined Kaleb's MRI (magnetic resonance imaging) head scans). All three witnesses gave technical evidence and provided documentation. At a direction hearing in June 2021, the respondents objected to the applicant being permitted to bring forward grounds of appeal based on new evidence stating it would be futile for the Court of Appeal to receive such evidence, further that the new evidence could not "lead the Court of Appeal to conclude that the conviction should be set aside".[68] In August of the same year, it was determined by the Court that it was "neither necessary nor appropriate … to rule finally on the objection at this stage".[69] It would be a matter for the bench that hears the substantive application for leave to appeal.

Thus, the substantive application for leave to appeal was that it should hear the new evidence, and determine whether to admit it in the substantive application (stage 1). If it was determined to admit

---

[64] *Vinaccia v The Queen* (2022) 70 VR 36, [3]; [2022] VSCA 107.

[65] Referred to in the judgment as the "Scandinavian witnesses". See *Vinaccia v The Queen* (2022) 70 VR 36, [4]; [2022] VSCA 107.

[66] *Vinaccia v The Queen* (2022) 70 VR 36, [4]; [2022] VSCA 107.

[67] *Vinaccia v The Queen* (2022) 70 VR 36, [8]; [2022] VSCA 107.

[68] *Vinaccia v The Queen* (2022) 70 VR 36, [5]; [2022] VSCA 107.

[69] *Vinaccia v The Queen* (2022) 70 VR 36, [6]; [2022] VSCA 107.

the new evidence, its impact would be considered on the proposed grounds of appeal that rely on that evidence (stage 2). The Court noted that the two stages could not be separated, stating that the "evidence now sought to be adduced by the applicant which was not adduced at trial should only be received if the Court is persuaded that it must lead to the setting aside of the applicant's conviction".[70] To do so required the Court of Appeal to consider the proposed grounds. If stage 2 was determined in the applicant's favour, then stage 1 would fall away. In conclusion, it was determined by the Court of Appeal that the evidence could be heard, and the Court could consider its impact on the grounds that the applicant sought to rely on it.

### (c) Child Homicide Offence

The Court of Appeal considered the offence of child homicide under s 5A of the *Crimes Act 1958* (Vic) – committed when a person by his/her conduct kills a child under the age of six years old in circumstances that under the Act would constitute manslaughter. Here, the prosecution at trial alleged child homicide by an unlawful and dangerous act or by gross or criminal negligence. The burden of proof was assumed by the prosecution for the former:

(a) that the applicant committed the act that caused Kaleb's death;
(b) that the act was committed consciously, voluntarily and deliberately;
(c) that the act involved a breach of the criminal law; and
(d) that a reasonable person in the position of the applicant, performing that act, would have realised that he was exposing Kaleb to an appreciable risk of serious injury.[71]

Or the latter:

(a) that the applicant owed Kaleb a duty of care;
(b) that he breached that duty by criminal negligence – that is, that his conduct involved a great falling short of the standard of care which a reasonable person would have exercised in all of the circumstances, and that there was a high risk that death or serious injury would result from that conduct; and
(c) that the breach of that duty of care caused Kaleb's death.[72]

Dr Tully provided medical opinion that Kaleb had died as a result of traumatic injury to the head that was most likely caused by forces that were acceleration, deceleration and rotational movements. The post-mortem performed by Dr Iles concluded that the infant had suffered a brain injury and significant bilateral retinal haemorrhages. There was also evidence of severe hypoxic-ischaemic encephalopathy that led to the lack of oxygen to the brain. It was noted that bruising was caused by medical intervention but with no signs of external trauma.[73] Other evidence was provided by Kaleb's mother concerning his health leading up to the date of his death, including vomiting after feeding and his need for extra attention. There was also discussion about his previous visits to the hospital due to his enlarged head circumference and fluid found on his brain.

### 2. Ground Five

Here, the evidence of the Scandinavian witnesses was not relied on, but constituted the basis for a challenge to the jury's verdict on the ground that it was unsafe and unsatisfactory. Pursuant to s 276(1) of the *Criminal Procedure Act 2009* (Vic), "a Court must allow an appeal against conviction if the appellant satisfies the Court that the verdict of the jury is unreasonable or cannot be supported having regard to the evidence".[74] A huge body of evidence was called on in the appeal for grounds 2–4 that we discuss later but is not relevant here. The focus here was whether the verdict was "unreasonable or unsupported having regard to evidence at trial",[75] the jury verdict can only be considered based on the evidence that was before it. The main evidence at trial that is relevant to ground 5 came from Dr Tully and Dr Iles.

---

[70] *Vinaccia v The Queen* (2022) 70 VR 36, [13]; [2022] VSCA 107.

[71] *Vinaccia v The Queen* (2022) 70 VR 36, [16]; [2022] VSCA 107.

[72] *Vinaccia v The Queen* (2022) 70 VR 36, [17]; [2022] VSCA 107.

[73] *Vinaccia v The Queen* (2022) 70 VR 36, [46]; [2022] VSCA 107.

[74] *Vinaccia v The Queen* (2022) 70 VR 36, [51]; [2022] VSCA 107.

[75] *Vinaccia v The Queen* (2022) 70 VR 36, [53]; [2022] VSCA 107.

*(a) Dr Tully*

Dr Tully had examined Kaleb on 23 January at the hospital after he was admitted to the hospital's intensive care unit after his cardiorespiratory arrest at home. The doctor was given his brief medical history from the mother and informed that Kaleb was not feeding well, was sleepier than usual and was vomiting for about a month leading up to his admission to the hospital on 14 January regarding his raised fontanelle. Investigations concluded some abnormality and possible fluid between the brain and skull and the potential need for drainage by way of a tap (that was never carried out). Kaleb's condition improved and he had stopped vomiting.

On his admission to hospital on 23 January he was critically unwell and suffering subdural haemorrhages on both sides of the brain. Dr Tully spoke with the applicant, Jesse Vinaccia about the events that led to the admission on 23 January and was told that Kaleb did not take his entire bottle of milk but did not vomit. When the applicant went to check on Kaleb in his cot 30 minutes after putting him down, he found him soiled and went to change him and noticed he was floppy and not breathing.[76] He went on to say that Kaleb's heart was not beating so he proceeded to perform CPR with assistance and guidance from a 000 call taker.

Dr Tully discussed Kaleb's previous hospital admission between 14 and 17 January and conceded that a fontanelle tap would have been preferable during this period in addition to an examination of Kaleb's eyes to check for retinal haemorrhaging – neither of these procedures was performed during his first hospital admission.[77] Dr Tully also stated that there was a reasonable possibility that the failure to perform the procedures during these visits to the hospital may have led to increased intracranial pressure.[78]

Dr Tully's examination of the child on 25 January was limited and largely a visual inspection due to his fragile state and connection to life-support machines. She did not see any signs of visible skin grasping or skeletal injuries. His head circumference was measured at the 95th percentile for a child of his age. Several other blood tests and examinations were undertaken and there was no indication of anything significant to Kaleb's presenting condition. The working diagnosis put forward was that Kaleb had suffered a head injury caused by intentional head trauma – finding the "triad" of signs.[79]

The doctor opined that in the absence of any other explanation for the significant trauma, and without any other diagnosis "that combination of findings is most likely to be caused by forceful shaking with or without associated impact against a firm surface".[80] Dr Tully accepted under cross-examination that Kaleb's pre-existing conditions may have predisposed him to a subdural haemorrhage that could have occurred spontaneously or with trivial force. Nonetheless, Dr Tully did not accept that there was a reasonable possibility for enlarged extra-axial spaces and subdural fluid making him more vulnerable to the injuries with which he presented on 23 January.[81] She went on to explain the connection between the "triad" of signs and forceful shaking[82] and stated that the pattern and severity of retinal haemorrhaging that was found in Kaleb was indicative of a high level of force applied to him before his collapse. She also stated that Kaleb's increasing head circumference was difficult to weigh up in the significance of factors, and while it was concerning it was not the cause of his death.[83] Rather a supervening event … "something has happened in the interval between Kaleb's two Hospital admissions, almost certainly just before he collapsed, to cause that".[84]

[76] *Vinaccia v The Queen* (2022) 70 VR 36, [61]; [2022] VSCA 107.

[77] *Vinaccia v The Queen* (2022) 70 VR 36, [63]–[67]; [2022] VSCA 107.

[78] *Vinaccia v The Queen* (2022) 70 VR 36, [68]; [2022] VSCA 107.

[79] See *Vinaccia v The Queen* (2022) 70 VR 36, [77]; [2022] VSCA 107 for a breakdown of all of the conditions that Dr Tully listed as Kaleb having suffered.

[80] *Vinaccia v The Queen* (2022) 70 VR 36, [78]; [2022] VSCA 107.

[81] *Vinaccia v The Queen* (2022) 70 VR 36, [81]; [2022] VSCA 107.

[82] *Vinaccia v The Queen* (2022) 70 VR 36, [82]; [2022] VSCA 107.

[83] *Vinaccia v The Queen* (2022) 70 VR 36, [88]; [2022] VSCA 107.

[84] *Vinaccia v The Queen* (2022) 70 VR 36, [88]; [2022] VSCA 107.

Dr Tully also stated that it was impossible to measure the level or magnitude of force required to cause the "triad" of signs. She went on to state that the only way to measure such force was to shake babies to measure the force required. She described how biofidelic models (models that represent human infants) had been used as an attempt to garner some results but were contradictory and could not be relied on for genuine and legitimate results. Thus, the current understanding of the force threshold required for the "triad" of signs largely consisted of data collected from the individuals who had confessed to shaking babies and causing severe injury. Dr Tully described the type of injury Kaleb had suffered as that seen in a few circumstances such as "'motor vehicle accidents, high velocity, crush injuries to the head and falls from a height'. She accepted that it would be unusual for a child who had sustained injuries in such a way to present with no external injuries".[85] She described significant force as "well beyond ordinary handling".[86]

When cross-examined, Dr Tully agreed that the finding of the "triad" of signs did not immediately or conclusively indicate non-accidental injury. She also accepted and agreed that there is ongoing controversy over the level of force required to cause such injuries – due to the lack of controlled trials and the use of biofidelic models of human infants.

### (b) Dr Iles

Dr Iles performed the autopsy on Kaleb.[87] In her opinion, Kaleb's death was due to severe brain injury due to a lack of blood and oxygen. Dr Iles also stated that her evidence as to retinal haemorrhages was qualified by ascertainment bias – in her function as a forensic pathologist, she only examined the eyes of infants when inflicted injury was suspected. She conceded that given the uncertainties of the requisite force to produce the "triad" of injuries in general, she did not have an adequate evidential basis to determine whether the applicant's description of events could account for Kaleb's injuries considering his pre-existing conditions.[88]

Based on the above, ground 5 was considered as two contentions. The first contention was that the evidence at trial did not allow the prosecution to exclude as a reasonable possibility that Kaleb's death was caused by a pre-existing medical condition independent of the applicant's acts. The majority in the Court of Appeal dismissed this contention because an earlier MRI on January 15 found only small bilateral hygromas and only mild ventricular dilation and by Kaleb's discharge from the hospital on 17 January, his fontanelle had mostly retreated and was more settled. In contrast: "Upon admission on 23 January 2016 he was unconscious, his extra axial space than might have been expected and there was evidence of subdural bleeding. Retinal haemorrhages bilaterally were observed on 25 and 26 January and the autopsy conducted on 1 February 2016 revealed severe hypoxic ischaemic brain injury with extensive subdural haemorrhages and patchy subarachnoid haemorrhages."[89]

It was open for the jury to conclude that the cause of Kaleb's death was some action undertaken by the applicant before the child's decline. It was also open for the jury to exclude any reasonable possibility of a pre-existing medical condition independent of the applicant's act. The cause of death was not challenged by the defence.

The second contention under ground 5 was that it was not open to the jury to conclude that the applicant minimised or understated his actions when describing them in his police interview. It was not open to the jury to be satisfied beyond reasonable doubt that he was guilty of the offence charged, whether it be by unlawful and dangerous act or by criminal negligence.[90] Many of the applicant's answers during the police interview were accompanied by visual demonstrations. It was open for the jury to conclude that the applicant became frustrated with Kaleb while he was lying on his play mat and that he put Kaleb in

---

[85] *Vinaccia v The Queen* (2022) 70 VR 36, [92]; [2022] VSCA 107.

[86] *Vinaccia v The Queen* (2022) 70 VR 36, [94]; [2022] VSCA 107.

[87] *Vinaccia v The Queen* (2022) 70 VR 36, [100]–[101]; [2022] VSCA 107.

[88] *Vinaccia v The Queen* (2022) 70 VR 36, [115]; [2022] VSCA 107.

[89] *Vinaccia v The Queen* (2022) 70 VR 36, [118]; [2022] VSCA 107.

[90] *Vinaccia v The Queen* (2022) 70 VR 36, [124]; [2022] VSCA 107.

his cot using a swinging motion. The applicant appeared to be anxious about Kaleb and went back to check on him. When questioned the applicant left open the possibility of Kaleb being "shaken" or having used "some degree of force" when putting him into the cot.[91]

Both Dr Tully and Iles agreed on the ultimate cause of death and the mechanism that brought about the death. Therefore, the majority found that it was open for the jury to conclude that the force applied to Kaleb was well beyond those to which the applicant admitted in his police interview. On this basis, the jury was also open to convict the applicant on the offence charged, that Kaleb was shaken with force beyond normal handling of a child of that age. The majority of the Court of Appeal concluded that the jury was open to finding all elements of child homicide by unlawful and dangerous act or by criminal negligence.

### 3. Ground Three

The Court of Appeal considered whether to allow admittance of "fresh" or "new" evidence by the applicant.[92] "Fresh" evidence is that which was either not available at the trial or could not have been obtained by the accused with reasonable diligence, whereas "new" evidence is that which was either available or discoverable with reasonable diligence. The thresholds for "fresh" and "new" evidence to prove a miscarriage of justice differ. "Fresh" evidence requires a significant possibility that it would lead the jury to acquit the accused whereas "new" evidence must either show the convicted to be innocent or to raise such a doubt about guilt that the verdict should not stand.

The evidence, whether "fresh" or "new", which was under consideration by the Court of Appeal, related to the scientific basis for using the "triad" as a diagnostic tool for SBS/AHT. The majority of the Court of Appeal reviewed the evidence presented at trial and the appeal under the following headings: (1) The SBU report, criticisms of it and support for it as given by some of its authors including those of the defence's Scandinavian experts Professors Eriksson, Högberg and Wester; (2) Opinions of prosecution experts Drs Tully and Iles; and (3) Several studies published after the trial and (4) retinal haemorrhages as a sign of SBS/AHT.

#### (a) The SBU Report

The report was presented to the Court by Professor Eriksson and supported by Professors Högberg and Westers. It concluded that the evidence in favour of the "triad" being caused by SBS/AHT was scant and of such low quality that it concluded there was a lack of connection between any or all three elements of the "triad". The report had concluded that there was insufficient scientific evidence (of very-low quality) on which to assess the diagnostic accuracy of the "triad" in identifying traumatic shaking and limited scientific evidence (of low quality) that the "triad" and therefore its components can be associated with traumatic shaking. The panel authors had excluded numerous studies in their review because child protection teams had employed "circular reasoning" to diagnose SBS/AHT by assuming that a child had been shaken when no other explanation existed. We note that they also excluded studies of less than 10 patients. We appraised one of the two finally selected articles of the SBU report to be very-low quality, and the quality of the report itself to be no higher than low.

The Court of Appeal was critical of the report being adduced because it had been available before the trial and yet had not been adduced. Nonetheless, the Court of Appeal ruled that the SBU report was "nebulous and speculative" in being able to identify only two articles (of low quality) while excluding cases of external trauma other than the "triad" of cases series less than 10 (yet including single case reports), and of only considering witnessed or confessed cases.[93] Moreover, both articles that the report selected for analysis actually violated its inclusion criteria in that they analysed cases with associated injuries. The Court noted that the report had attracted severe criticism from the Royal College of Paediatrics and

---

[91] *Vinaccia v The Queen* (2022) 70 VR 36, [128]; [2022] VSCA 107.

[92] *Vinaccia v The Queen* (2022) 70 VR 36, [151]; [2022] VSCA 107.

[93] *Vinaccia v The Queen* (2022) 70 VR 36, [428]; [2022] VSCA 107.

Child Health (RCPCH),[94] while support for the validity of AHT as a scientific medical diagnosis was issued in a consensus statement (without evidence) by 15 national and international medical societies.[95] The consensus statement also claimed that there was no substantiation of the proposal that birth-related subdural haemorrhages can result in sudden collapse, coma or death caused by acute bleeding into previously asymptomatic chronic collection. It also observed that subdural haematoma is uncommon in BESS and if it is present SBS/AHT should be considered. The majority also rejected the opinions of other expert witnesses, namely those of Professor Johan Duflou and Dr Byron Collins (forensic pathologists) that Kaleb was susceptible to acute subdural haemorrhage due to pre-existing chronic subdural haemorrhage.

### (b) Opinions of Drs Tully and Iles

Drs Tully and Iles, called for the prosecution, supported the RCPCH criticisms of the SBU report, denied that a real controversy existed in diagnosing SBS/AHT but acknowledged that "circular reasoning" existed in categorising victims of trauma and acknowledged the potential lack of reliability of confessions.

Instead of the SBU report, the majority preferred the opinions of Drs Tully and Iles. Dr Tully claimed that there is "a large body of peer reviewed and published evidence"[96] that the injuries sustained by Kaleb is associated with SBS/AHT and that:

> Given the inability to perform prospective randomised clinical trials regarding AHT, … clinicians must rely on the critical evaluation of a large body of well-performed retrospective epidemiological studies as well as advances in clinical, pathophysiological and biomechanical knowledge and understanding informed by animal studies, computational modelling, improved biomechanical modelling and advances in radiological techniques.[97]

Dr Iles conceded that:

> "[T]he evidence-base for pure shaking events causing subdural haemorrhages, retinal haemorrhages and encephalopathy is necessarily indirect and weaker than the other types of inflicted injury. It relies on exclusion of other causes for the elements of the triad injuries …" and "there is abundant evidence for this in case series literature, and in criminal law in infants".[98]

She maintained that:

> [A] diagnosis of AHTis only made following an extensive medical multidisciplinary process that includes history, examination findings, and radiological and laboratory investigations, with consideration given to excluding conditions known to produce one or more of the triad injuries.[99]

We note that the evidence existing in favour of the "triad" (alone) being pathognomonic for SBS/AHT was not considered by the Court and not adduced by Drs Tully and Iles.

### (c) Studies Post-dating the SBU Report

Several articles were published by the Scandinavian authors post-dating the SBU report and the trial. These are retrospective studies on infants identified in registers of infants investigated for child abuse in Sweden and Norway.[100] These studies claiming to support the SBU paradigm that the "triad" does

---

[94] GD Debelle et al, "Abusive Head Trauma and the Triad: A Critique on behalf of RCPCH of Traumatic Shaking: The Role of the Triad in Medical Investigations of Suspected Traumatic Shaking" (2018) 103(6) *Archives of Diseases in Childhood* 606 <https://doi.org/10.1136/archdischild-2017-313855>.

[95] Choudhary et al, n 55.

[96] *Vinaccia v The Queen* (2022) 70 VR 36, [228]; [2022] VSCA 107.

[97] *Vinaccia v The Queen* (2022) 70 VR 36, [230]; [2022] VSCA 107.

[98] *Vinaccia v The Queen* (2022) 70 VR 36, [234]; [2022] VSCA 107.

[99] *Vinaccia v The Queen* (2022) 70 VR 36, [235]; [2022] VSCA 107.

[100] I Thiblin et al, "Medical Findings and Symptoms in Infants Exposed to Witnessed or Admitted Abusive Shaking: A Nationwide Registry Study" (2020) *PLoS One* e0240182: 1; I Thiblin et al, "Retinal Haemorrhage in Infants Investigated for Suspected Maltreatment Is Strongly Correlated with Intracranial Pathology" (2021) 111(4) *Acta Paediatrica* 800; K Wester et al, "Re-evaluation of Medical Findings in Alleged Shaken Baby Syndrome and Abusive Head Trauma in Norwegian Courts Fails to Support Abuse Diagnoses" (2022) 111(4) *Acta Paediatrica* 779.

not indicate SBS/AHT. They were incorporated into the testimonies of the Scandinavian experts at the appeal and were considered as "new" evidence. These three articles, along with another article[101] were criticised heavily at the appeal by Drs Tully, Iles and Professor Ditchfield, and by other authors in the medical literature because of methodological problems including selection bias,[102] false clinical information,[103] inadequate ophthalmological examinations and simplistic classifications of severity of retinal haemorrhages,[104] circular reasoning and selection bias.[105] In general, the conclusions made in these articles were not supported by the evidence presented. Although the articles could be viewed as "new" evidence, they were lumped with the SBU report by the majority judges as being "spurious and nebulous" and were not persuasive.

### (d) Retinal Haemorrhages as a Sign of SBS/AHT

The Court of Appeal considered in depth the crucial role of retinal haemorrhages in the diagnosis of SBS/AHT. It noted that the SBU report, due to impossibly strict criteria, included only a small amount of information available and considered retinal haemorrhages generically throughout rather than their patterns and severity.[106] The Court examined the articles of Levin,[107] Levin, and Shian[108] and Binenbaum et al[109] and the majority accepted that raised intracranial pressure did not cause widespread severe retinal haemorrhaging, in contrast to trauma, but that there was difficulty distinguishing retinal haemorrhaging caused by AHT from those caused by accidental trauma. This view was supported by Dr Tully. The relevance of the pattern of retinal haemorrhages was dismissed by Professor Eriksson who relied on the study of Mulvihill et al[110] who had shown that ophthalmologists cannot reliably distinguish between the causes of retinal haemorrhages. The Court noted that there was no suggestion that Kaleb had suffered any kind of accidental trauma and that he had bilateral optic nerve sheath haemorrhages and extensive bilateral retinal haemorrhages involving all layers of the retinae. Professors Wester and Högberg both claimed that the haemorrhages were due to high intracranial pressure, the latter citing intracranial pathology and the former BESS (*vide infra*) but the Court was not persuaded that the cause of Kaleb's retinal haemorrhages was a non-traumatic one.

### Alternative Diagnoses

The Court of Appeal also considered in detail a proposition arising from a publication by Professor Wester[111] that Kaleb most likely died from complications from BESS with a susceptibility to minor trauma. BESS had been considered by both the prosecution and the applicant's experts as a potential factor in Kaleb's death before the trial. Professor Wester claimed that the underlying cause of Kaleb's death was rapidly developing external hydrocephalus complicated by a subdural haematoma associated

---

[101] J Andersson et al, "External Hydrocephalus as a Cause of Infant Subdural Hematoma: Epidemiological and Radiological Investigations of Infants Suspected of Being Abused" (2022)126 *Pediatric Neurology* 26.

[102] Thiblin et al, "Retinal Haemorrhage in Infants Investigated for Suspected Maltreatment Is Strongly Correlated with Intracranial Pathology", n 100.

[103] Wester et al, n 100.

[104] Thiblin et al, "Retinal Haemorrhage in Infants Investigated for Suspected Maltreatment Is Strongly Correlated with Intracranial Pathology", n 100.

[105] Andersson et al, n 101.

[106] *Vinaccia v The Queen* (2022) 70 VR 36, [282]; [2022] VSCA 107.

[107] AV Levin, "The SBU Report: A Different View" (2017) 106(7) *Acta Paediatrica* 1037.

[108] T Shaw and AV Levin, "Retinal Hemorrhages in Children: The Role of Intracranial Pressure" (2012)166(7) *Archives of Pediatrics & Adolescent Medicine* 623.

[109] Binenbaum et al, n 13; G Binenbaum et al, "Retinal Hemorrhage Patterns: A New Paradigm" (2021) 25(4) *Journal of American Association for Pediatric Ophthalmology and Strabismus* e3 <https://www.sciencedirect.com/science/article/abs/pii/S1091853121002287>.

[110] AA Mulvihill et al, "An Inter-observer and Intra-observer Study of a Classification of RetCam Images of Retinal Haemorrhages in Children" (2011) 95(1) *British Journal of Ophthalmology* 99.

[111] K Wester, "Two Infant Boys Misdiagnosed as 'Shaken Baby' and Their Twin Sisters: A Cautionary Tale" (2019) 97 *Perspectives in Paediatric Neurology* 3.

---

with BESS.[112] His opinion stemmed from the observation that Kaleb's head circumference increased rapidly (from the 5th to 95th percentile) from birth to eight days before his sudden collapse. This history, along with measurements of the subarachnoid spaces on the MRI at the first hospital admission on 15 January, which showed bilateral subdural fluid collections and lateral ventricles at the upper range of normality, was taken by Professor Wester as evidence that Kaleb had hydrocephalus and BESS before his collapse. Moreover, when CSF was eventually surgically tapped after the collapse later in January 2016, it was described as "dark (old) blood stained CSF"[113] while at autopsy, organising membranes were recognised in the subdural space suggested a subdural haemorrhage of some weeks of age. Professor Wester claimed that BESS is a special form of hydrocephalus able to cause elevated intracranial pressure resulting in retinal haemorrhaging. However, the concept of BESS on the MRI measurements was challenged vigorously by the prosecution through a paediatric radiologist, Professor Ditchfield, convincing the Court that the radiological criteria on the MRI scan for BESS were non-existent. Moreover, it was argued by the prosecution experts that even if BESS had been present it would not have given rise to the subarachnoid and parenchymal haemorrhages and to a life-threatening episode resulting in Kaleb's death.[114]

The Court also considered the proposition of Professor Högberg that rebleeding into a pre-existing subdural hygroma, arising from an asymptomatic subdural haemorrhage before, during birth or in the neonatal period, explained Kaleb's sudden collapse on 23 January 2016. His opinion was based upon the findings of intrauterine growth retardation, an increasing head circumference after birth and the identification of a subdural hygroma at Kaleb's admission between 14 and 17 January 2016. These observations in association with the absence of injuries to the neck, cervical vertebrae and spinal cord and the absence of grip marks on the ribcage at autopsy suggested to Professor Högberg that traumatic shaking had not occurred. Rather, it was more likely that subdural and subarachnoid rebleeding had occurred spontaneously or due to minor trauma causing raised intracranial pressure and bilateral retinal haemorrhaging. In opposition to this claim, Drs Tully and Iles testified that although birth-related subdural haemorrhages are common, most are asymptomatic and resolve and that rebleeding rarely causes the symptoms of a space-occupying brain lesion and do not cause catastrophic collapse.

Consequently, the majority of the Court of Appeal ruled that the SBU report and the "Scandinavian evidence" did not meet a standard to justify acquittal of the applicant based on a miscarriage of justice. However, we note that evidence in support of the opinions of Drs Tully and Iles to support their claims of the "triad" being diagnostic of traumatic shaking was not adduced and was not considered by the Court. The Court relied upon the opinions of experts who did not present evidence and who in part relied upon opinions of others.

### *4. Ground Four*

Under this ground, it was alleged that there was a substantial miscarriage of justice due to the admission of evidence as to the "triad" and the probative value of the evidence was outweighed by the danger of unfair prejudice to the applicant, and this should have been prevented as per s 137 of the *Evidence Act 2008* (Vic) that states:

> In a criminal proceeding, the Court must refuse to admit evidence adduced by the prosecutor if its probative value is outweighed by the danger of unfair prejudice to the accused.[115]

Since it was not disputed in the judgment that all three signs relevant to the "triad" were identified at the time of Kaleb's death, it was therefore presumed that the evidence that the applicant considered should not have been admitted was Dr Tully's and the finding that supported a diagnosis of SBS/AHT.[116] The applicant contended that any connection between the "triad" of injuries and the diagnosis of SBS/AHT

---

[112] *Vinaccia v The Queen* (2022) 70 VR 36, [326]; [2022] VSCA 107.

[113] *Vinaccia v The Queen* (2022) 70 VR 36, [329]; [2022] VSCA 107.

[114] *Vinaccia v The Queen* (2022) 70 VR 36, [423]; [2022] VSCA 107.

[115] *Vinaccia v The Queen* (2022) 70 VR 36, [434]; [2022] VSCA 107.

[116] *Vinaccia v The Queen* (2022) 70 VR 36, [435]; [2022] VSCA 107.

was based on "junk science" and while Dr Tully's evidence might have appeared to be based on science it was actually not scientific.[117] The contention here was largely based on the criticisms of the conventional diagnostic method as discussed in the SBU report. Notably, the criticisms raised were that the scientific studies that underpinned the diagnostic "triad" of injuries were disadvantaged by circular reasoning – preventing scientific validity and a causal connection between forceful shaking and the "triad" of injuries. Therefore, the constellation of findings to diagnose SBS/AHT lacked a proper scientific basis.[118] In light of this, the applicant asserted that Dr Tully's evidence about the mechanism causing Kaleb's death lacked probative value and was therefore in danger of an unfair prejudice from the jury overvaluing the worth of Dr Tully's evidence.[119]

The majority of the Court of Appeal however disagreed. It found that the probative value of Dr Tully's evidence about the significance of the "triad" of injuries in relation to a diagnosis of SBS/AHT coupled with Dr Illes evidence was high. Further, the majority found that the applicant had mischaracterised a well-established body of scientific literature as being "junk science".[120] It found that by questioning the scientific validity of the "triad" the applicant appeared to be reproducing the SBU report that criticised the use of the "triad". The applicant's contention did not address the evidence before the jury at trial that the diagnosis of SBS/AHT was drawn after a multifaceted and careful process considering several medical disciplines and eliminating all other possible causes – noting that the "triad" is merely one aspect of that process that arises as a result of a constellation (a combination of findings).[121]

The Court of Appeal stated that once the applicant's criticisms of the scientific validity of the evidence were stripped away, the high probative value of that evidence became very clear stating, "the unfair prejudice alleged by the applicant – that 'a jury may overestimate the potency of this evidence because it is clothed in [a suspect] scientific discourse' – can be dismissed for the same reason".[122]

Further, no objection was made at trial to the diagnostic evidence of Drs Tully and Iles. Although it did not prevent the applicant from raising the matter in appeal, failure to object rendered the applicant's task at appeal significantly more onerous. The Court of Appeal found this ground not meritorious.

### *5. Ground Two*

This ground contended that there had been a miscarriage of justice due to:

(a) Dr Tully denying at trial that there was a scientific controversy as to the utility of "the triad" as a diagnostic tool in the determination of the existence of when, in fact, there is such a controversy; and
(b) Dr Tully asserting that there was a consensus in the scientific community that the "triad" can be used to determine the existence of when, in fact, there is no such consensus.[123]

It was alleged that as an expert witness these assertions were incorrect and contrary to Dr Tully's obligations. The applicant stated that the controversy under this ground was adduced by evidence sought to be exposed. This included evidence from Professors Högberg, Wester and Eriksson about the utility of the "triad" and PowerPoint slides used in two lectures given by Dr Tully to trainees about child abuse. Under cross-examination at the trial Dr Tully had stated that the term "triad" consisted of three features: encephalopathy, subdural haemorrhages and retinal haemorrhages, and that the "triad" was used in a more legal setting, rather than medical. She also accepted that there was controversy that surrounded the issue of the level of force required to produce the "triad" due to the lack of biofidelic models. When questioned under cross-examination later, Dr Tully stated that she was unsure whether impact alone could have caused Kaleb's injuries.[124] Under re-examination by the prosecutor, Dr Tully also stated

---

[117] *Vinaccia v The Queen* (2022) 70 VR 36, [436]; [2022] VSCA 107.

[118] *Vinaccia v The Queen* (2022) 70 VR 36, [436]; [2022] VSCA 107.

[119] *Vinaccia v The Queen* (2022) 70 VR 36, [437]; [2022] VSCA 107.

[120] *Vinaccia v The Queen* (2022) 70 VR 36, [438]; [2022] VSCA 107.

[121] *Vinaccia v The Queen* (2022) 70 VR 36, [440]; [2022] VSCA 107.

[122] *Vinaccia v The Queen* (2022) 70 VR 36, [441]; [2022] VSCA 107.

[123] *Vinaccia v The Queen* (2022) 70 VR 36, [445]; [2022] VSCA 107.

[124] *Vinaccia v The Queen* (2022) 70 VR 36, [449]; [2022] VSCA 107.

that the term "shaken baby syndrome" is no longer used, as discussed by Royal Colleges throughout America, Europe and Japan (though still used colloquially) and the term now used is "abusive head trauma" due to the "the idea that this constellation or combination of findings is thought to occur as a result of forceful shaking, but also maybe associated impact".[125]

The PowerPoint slides used by Dr Tully (in 2017 and 2019) were generated and had not been disclosed before trial, thus considered to be "fresh evidence". The slides that Dr Tully used contained statements that SBS/AHT is controversial, citing papers by Geddes and Squire – both of whom have robustly discussed the medical and legal controversies and uncertainties of SBS/AHT. Further, the slides noted that SBS/AHT posed several challenges for clinicians and the area was "plagued by non – believers".[126] She also referred to the need for early eye examination and spinal imaging. When questioned in Court, Dr Tully stated that many of the controversies noted in her slides were "perceived controversies" confined to the legal forum and often reflected in the media. The applicant asserted that Dr Tully's evidence that denied any controversy surrounding the topic of SBS/AHT and the diagnostic utility of the "triad" was incorrect. Further, she contended that the PowerPoint slides should have been disclosed at the trial and that Dr Tully was an advocate for the "triad" being diagnostic of SBS/AHT as was evidenced in her language in the slide with reference to "nonbelievers".[127]

The majority of the Court of Appeal, however, held that the applicant failed to demonstrate a substantial miscarriage of justice on this ground. It found that Dr Tully was not obliged to disclose the slides in question, and if they had been disclosed, she would have explained her opinion and evidence in a similar fashion. Namely, while there is some controversy, it is not relevant to a medical diagnosis of SBS/AHT where rigorous investigation has been undertaken.

Importantly, not all of the Bench agreed in this case. There was division in the Court of Appeal. While the majority (Justice Forrest and Emerton) concluded the above, Walker J provided the following judgment.

### (a) Dissenting judgement of Walker JA

In rejecting ground 5 and it being not necessary to consider ground 4, but upholding grounds 2 and 3, Walker JA allowed the appeal and made an order that the accused be acquitted. The totality of the evidence at the trial and on appeal, from her perspective, was such that a reasonable hypothesis consistent with innocence was not excluded. Her Honour was unable to find that the applicant had not shaken Kaleb with significant force and stated that it may be *likely* that he had done so but the necessary elements of child homicide had not been proven beyond reasonable doubt.[128]

### 6. Ground 3

The reasons for upholding ground 3 were the following. First, that the evidence from the Scandinavian experts, whether regraded as "new" or "fresh", showed that the prosecution had not excluded the possibility that Kaleb suffered from a pre-existing condition, namely BESS, that caused or contributed to his death by making him susceptible to subdural haemorrhage from handling but falling short of forceful shaking.

Second, the clinical evidence in favour of BESS was that before collapse Kaleb had been vomiting, had a bulging fontanelle, a rapidly enlarging head size to the 95th centile, possible hydrocephalus, sun-setting eyes (all indicative of raised intracranial pressure) and subdural hygromas with post-mortem evidence of prior haemorrhage.

Third, there were flaws in the testimonies of the prosecution experts, Drs Tully and Iles and Professor Ditchfield. The radiological evidence that BESS had not existed was based on misleading arbitrary measurements on MRI scans.[129] Moreover, her Honour was highly critical of the lack of evidence that the

---

[125] *Vinaccia v The Queen* (2022) 70 VR 36, [451]; [2022] VSCA 107.

[126] *Vinaccia v The Queen* (2022) 70 VR 36, [454]–[455]; [2022] VSCA 107.

[127] *Vinaccia v The Queen* (2022) 70 VR 36, [467]; [2022] VSCA 107.

[128] *Vinaccia v The Queen* (2022) 70 VR 36, [641]; [2022] VSCA 107.

[129] *Vinaccia v The Queen* (2022) 70 VR 36, [562]; [2022] VSCA 107.

pattern of retinal haemorrhages could only have been caused by significant force[130] with the exclusion of accidental trauma and other medical causes.

### 7. Ground 2

In upholding ground 2, Walker JA concluded that Dr Tully had given evidence that was incorrect and contrary to her obligations as an expert witness. The evidence which was incorrect was Dr Tully's claim that there was no scientific controversy or dispute as to the diagnostic utility of the "triad" to confirm SBS/AHT and that there was consensus in the scientific community that the "triad" could be used to determine whether the death of an infant was the result of SBS/AHT. The fresh evidence introduced at the appeal was (1) two "PowerPoint" slide presentations by Dr Tully used before the trial to teach paediatricians and trainees about child abuse; (2) the expert evidence given by Professors Eriksson, Högberg and Wester about the lack of reliability of the triad to diagnose (which was found unnecessary to consider); and (3) Dr Tully's evidence at the appeal. Her Honour found that Dr Tully's slides confirmed the existence of a controversy about the diagnostic utility of the "triad".[131] Whereas at the trial and appeal, Dr Tully did not accept that the science surrounding the triad was unsettled or that there continuing controversy about the validity of the "triad" as a diagnosis of SBS/AHT[132] while relying upon the Consensus Statement and eschewing the SBU report.[133] Her Honour noted that the PowerPoint presentations contradicted Drs Tully's testimony and that Dr Tully had not disclosed the existence of a controversy under her obligations under *Practice Note SC CR 3: Expert Evidence in Criminal Trials*. Her Honour noted that "had the PowerPoint slides been in evidence before the jury, I consider there is a reasonable possibility that they might not have accepted Dr Tully's unequivocal assertion that there was no medical controversy concerning the 'triad'. Had they taken that path of reasoning, there is a reasonable possibility that they would not have convicted the applicant. Thus, I am satisfied that there has been a substantial miscarriage of justice, and ground 2 is made out"[134] and "on ground 2 … the conviction should be set aside a new trial ordered".[135]

The Court relied heavily on expert opinion in determining the cause of the "triad" of infant traumatic brain injury. More broadly, is it evident that a controversy exists concerning the validity of the "triad" as a valid diagnostic tool (when no other injury is apparent) for SBS/AHT. The main cause of the controversy is the lack of high-level and high-quality scientific evidence. The evidence both for and against the "triad" as a valid diagnostic tool is of low scientific level and of low or very-low quality.

We posit that any opinion expressed by a medical expert should be accompanied by whatever evidence exists to form the basis of their opinion, and thus be open to scrutiny. In *Vinaccia*, the evidential basis for the prosecution's case was not presented but rather was based on expert personal experience and derived from the opinions of others working in the field. The basis for objectivity thus appeared to be lacking. In addition, the trial defence failed to adduce available expert opinions that could have influenced the outcome perhaps by showing that low-impact trauma may be responsible for catastrophic injuries in a vulnerable victim.

We now turn to consider briefly how other jurisdictions have dealt with cases of SBS/AHT, namely the United States and the United Kingdom. A significant number of cases in the United States have required court intervention in SBS/AHT cases. They have attracted controversy in the courts and the media. Some decisions have been overturned and found to have resulted in wrongful convictions where it has been concluded that physicians have incorrectly diagnosed SBS/AHT. In some cases, developments and shifts in science and understanding of SBS/AHT have led to courts overturning previous decisions or at the

---

[130] *Vinaccia v The Queen* (2022) 70 VR 36, [618]; [2022] VSCA 107.

[131] *Vinaccia v The Queen* (2022) 70 VR 36, [709]; [2022] VSCA 107.

[132] *Vinaccia v The Queen* (2022) 70 VR 36, [734]–[735]; [2022] VSCA 107.

[133] *Vinaccia v The Queen* (2022) 70 VR 36, [734]–[735]; [2022] VSCA 107.

[134] *Vinaccia v The Queen* (2022) 70 VR 36, [742]; [2022] VSCA 107.

[135] *Vinaccia v The Queen* (2022) 70 VR 36, [743]; [2022] VSCA 107.

least, enabling those convicted to appeal decisions. This is not restricted to the United States; similar concerns have been raised in the United Kingdom.[136] We briefly consider a few below.

## B. The United States: State v Audrey Edmunds

This much-publicised case concerned Audrey Edmunds, convicted of first-degree reckless homicide for allegedly shaking six-month-old Natalie Beard in 1996.[137] An hour after taking her morning milk bottle while in the care of Edmunds, police and paramedics were called as the baby had difficulty breathing. She was taken to hospital but died later that evening in October 1995. An autopsy found that Natalie had suffered extensive brain damage, and a forensic pathologist attributed the death to SBS/AHT.

At trial, the prosecution presented several expert witnesses who claimed that, with a reasonable degree of medical certainty, the baby had suffered SBS/AHT. The experts told the Court that the baby would have had "an immediate and obvious response" to being shaken.[138] The accused testified that she had not shaken the baby. Her defence team presented an expert who claimed that the injury could have been caused earlier, and in fact, the baby's medical records indicated that she had been treated for repeated symptoms of lethargy, irritability, and vomiting – all symptoms that could have resulted from an earlier brain injury. It was further suggested that the parents could have caused the death. The prosecution, however, claimed that the medical history was irrelevant, and the jury agreed. Edmunds was sentenced to 18 years' imprisonment.

In 2006, a decade after her sentence, medical opinion on SBS/AHT had evolved and new research challenging the "triad" had emerged, forming the basis of the appeal to vacate Edmund's conviction. Experts testified that previous symptoms considered as evidence of SBS/AHT could now be linked to several other clinical causes, including accidents, illness, infection, old injuries, and congenital defects. Dr Patrick Barnes from Stanford University testified that even an innocuous ear infection could spread to the brain with deadly consequences. Further, in 2007 the physician who conducted Natalie's autopsy, Dr Robert Huntington III began to doubt his original finding in the case. At an evidentiary hearing, he testified that he was no longer of the belief that it was clear that the baby had died shortly after her injury. An additional five other physicians testified on behalf of Edmunds that the cause or the timing of the injuries causing the baby's death could not be determined from the available evidence. Despite this, the trial judge dismissed the motion for a new trial.[139] However, a year later in 2008, the Wisconsin 4th District Court of Appeals overturned the conviction, stating a "a shift in mainstream medical opinion"[140] cast doubt on whether shaking could have caused the brain injury leading to Natalie Beard's death. A new trial was ordered, and Edmunds was released on bond in February 2006. In July, the District Attorney's office decided not to proceed with the prosecution.

## C. The United Kingdom: R v Henderson; R v Butler

These two cases were determined together, but separate judgments were given in each case. The appellants appealed their convictions in relation to SBS/AHT.[141] The key legal issue in these cases concerned the correct approach to take on expert evidence regarding SBS/AHT. In summing up, the Court of Appeal concluded there were two important features of cases of SBS/AHT. First, that the realistic possibility

---

[136] There are approximately 100 SBS cases in the United Kingdom each year in which a child dies, and a caregiver is imprisoned. Dr Waney Squier changed her view on SBS due to the evolving science on the issue. However, she received harsh criticism for this from the police, judges, and the General Medical Council and she was initially struck off for supposedly overreaching her expertise. See 3DC, "Press Release: Preliminary Study of UK Shaken Baby Syndrome Cases Raises Serious Concerns" (10 January 2022) <https://3dc.org.uk/press-release-preliminary-study-of-uk-shaken-baby-syndrome-cases-raises-serious-concerns/>.

[137] *State v Audrey Edmunds*, 746 NW 2d 590 (Wis Ct App, 2008).

[138] Centre on Wrongful Convictions, *Audrey Edmunds* <https://www.law.northwestern.edu/legalclinic/wrongfulconvictions/exonerations/wi/audrey-edmunds.html>.

[139] Centre on Wrongful Convictions, n 138.

[140] Centre on Wrongful Convictions, n 138.

[141] *R v Henderson* [2010] 2 Cr App Rep 24; [2010] EWCA Crim 1269.

of an unknown cause must not be overlooked, and the jury should be reminded of that possibility. Jurors should be instructed that unless the evidence leads them to exclude any realistic possibility of an unknown cause they cannot convict. In such cases where it is relevant to do so, they should be reminded that "medical science develops and that which was previously thought unknown may subsequently be recognised and acknowledged".[142]

The second important feature of SBS/AHT cases that was considered was that the jury needs directions as to how it should approach conflicting expert evidence:

> [W]here the expert evidence is fundamental to the case, that the jury should approach that expert opinion in the same way as they do in every other criminal case is inadequate. It is difficult enough for Family Division judges to express their reasons for accepting or rejecting conflicting expert evidence, despite their experience. Juries, we suggest, should not be left in cases requiring a higher standard of proof to flounder in the formation of a general impression. Lacking the experience of Family Division judges, a jury needs to be directed to reliable evidence and the basis for distinguishing that which may be relied upon and that which should be rejected.[143]

### *1. R v Henderson*

Maeve Shepherd was almost 11 months of age. While in the care of the appellant, Karen Henderson, Maeve collapsed and was taken to hospital.[144] She remained in a critical condition for two days and died on 4 March 2005. It was alleged by the prosecution that Henderson had shaken the baby or that shaking the baby had caused an impact to her head on a soft surface leading to her collapse and subsequent death. After a six-week trial with eleven expert medical witnesses called by the prosecution and one by the defence, a jury convicted the appellant of manslaughter by a majority of 10 to two in November 2007. Henderson was charged with manslaughter and given a three-year term of imprisonment.[145]

At the trial, Henderson gave evidence that she had not shaken the baby and was not responsible for her death. She gave an account of events on the day, including that the baby was taken to the hospital and she relayed a history of recurring infections and sickness prior to 2 March 2005 when Henderson (with permission from the baby's mother) had taken her to the hospital and she had been diagnosed with a viral infection.[146] Expert witness testimony claimed that the baby could have died of natural causes. However, the prosecution relied on medical testimony for the jury to convict highlighting the "triad" of signs in evidence.[147]

An appeal was sought based on fresh evidence from two experts that cast doubt on the reliability of the conclusion that Henderson unlawfully killed the baby. The appeal focused on two issues: (1) ophthalmological evidence; and (2) neuropathological evidence. The evidence given by Professor Luthert in relation to retinal folds and trauma was considered by the Court of Appeal. However, the Court stated that Professor Luthert's evidence amounted to no more than an expression of greater doubt and greater caution than that to which Mr Elston, the consultant ophthalmic surgeon who examined Maeve's eyes while she was alive would subscribe.[148] It was also noted that there had been the discovery of a case of retinal folds due to leukemia and "thus without any traumatic cause this case emphasises the importance of recognising the limits of medical knowledge at any given time and the need to appreciate that which has never previously been contemplated may nonetheless occur".[149] The Court also stated, "we must recognise the limits of medical science and in particular that there may be events, deaths

---

[142] *R v Henderson* [2010] 2 Cr App Rep 24, [217]; [2010] EWCA Crim 1269.

[143] *R v Henderson* [2010] 2 Cr App Rep 24, [218]; [2010] EWCA Crim 1269.

[144] *R v Henderson* [2010] 2 Cr App Rep 24, [9]; [2010] EWCA Crim 1269.

[145] *R v Henderson* [2010] 2 Cr App Rep 24, [10]; [2010] EWCA Crim 1269.

[146] *R v Henderson* [2010] 2 Cr App Rep 24, [12]–[18]; [2010] EWCA Crim 1269.

[147] *R v Henderson* [2010] 2 Cr App Rep 24, [19]; [2010] EWCA Crim 1269.

[148] *R v Henderson* [2010] 2 Cr App Rep 24, [43]; [2010] EWCA Crim 1269.

[149] *R v Henderson* [2010] 2 Cr App Rep 24, [43]; [2010] EWCA Crim 1269.

or symptoms which are unexplained and unforeseen. Further, any conclusion must acknowledge the importance of the burden of proof in the context of cases such as these".[150]

In addition to the "triad", the prosecution relied on neuropathological evidence – retinal folds and axonal damage (damages to the nerve fibres). At trial, Dr Squier and Dr Al-Sarraj both asserted that they could distinguish between diffuse axonal injury and traumatic axonal injury. Dr Al-Sarraj asserted that he could determine that the traumatic axonal injury was about two to three days old, consistent with Maeve sustaining that injury on 2 March 2005. However, on appeal, the defence sought to rely on evidence from Dr Leestma a neuropathologist from Chicago. Dr Leestma challenged the assertions that it was possible to attribute the appearance of axonal damage within the cortico-spinal tracts to trauma. However, throughout his cross-examination, Dr Leestma informed the Court that while he had diagnosed SBS/AHT many years before in the middle-to-late 1980s, in his consulting role he had seen many cases of head injury to babies where there were no external signs. He did acknowledge that he had not systematically reviewed the literature since the mid-1990s.[151] The Court of Appeal preferred the opinion of Dr Al-Sarraj, finding Dr Leestma's knowledge was far more limited and historic and had not conducted autopsies or given evidence in cases concerning babies being shaken for several years.[152]

Lord Justice Moses stated, "there is no basis upon which this Court can say that the jury was not entitled after being properly directed by Mr Justice Keith (trial judge) to conclude that the expert evidence proved, beyond a reasonable doubt, that the defendant had shaken Maeve with excessive force".[153] The Court concluded that attempts at appeals were "understandable because there remains the unsolved mystery of how so admired a childminder as this appellant should have been responsible for the use of excessive force, even momentarily, when handling this baby. But that was a problem with which the jury had to grapple".[154] Further, "this is a case where the issue of unexplained cause in an area of developing medical science was properly laid before the jury. The justification for rejection of that possibility and for acceptance of the prosecution case is plain from the summing-up".[155] The Court dismissed the appeal.[156]

### 2. R v Butler

Ellie Butler was seven weeks old when she was taken to hospital by her father on 15 February 2007. Although there were no visible signs of a recent injury, she had suffered a serious head injury with a conclusion supporting the "triad" signs of SBS/AHT.[157] The father was charged with murder.

The trial lasted four weeks during which 15 medical witnesses were called by the prosecution and three by the defendant from the specialities of ophthalmology, paediatric neurology and paediatric neuroradiology.[158] The case was tried almost entirely on medical evidence and opinion.[159] The specialists were able to demonstrate that all other known medical causes had been excluded. There was agreement concerning the mechanism of the severe retinal haemorrhages in that they were caused by the shearing injuries of shaking. However, this required re-visiting, when contrary to expectation the haemorrhaging resolved, and the infant made a full recovery during the trial without evidence of residual damage.[159] That recovery cast doubt on a severe shaking injury such as in SBS/AHT cases. The ophthalmologists did not exclude shaking or other trauma and one expert thought that causation would be the same for both retinal and subdural haemorrhages.[160]

[150] R v Henderson [2010] 2 Cr App Rep 24, [44]; [2010] EWCA Crim 1269.

[151] R v Henderson [2010] 2 Cr App Rep 24, [60]; [2010] EWCA Crim 1269.

[152] R v Henderson [2010] 2 Cr App Rep 24, [61]; [2010] EWCA Crim 1269.

[153] R v Henderson [2010] 2 Cr App Rep 24, [74]; [2010] EWCA Crim 1269.

[154] R v Henderson [2010] 2 Cr App Rep 24, [74]; [2010] EWCA Crim 1269.

[155] R v Henderson [2010] 2 Cr App Rep 24, [79]; [2010] EWCA Crim 1269.

[156] R v Henderson [2010] 2 Cr App Rep 24, [83]; [2010] EWCA Crim 1269.

[157] R v Henderson [2010] 2 Cr App Rep 24, [84]; [2010] EWCA Crim 1269.

[158] R v Henderson [2010] 2 Cr App Rep 24, [87]; [2010] EWCA Crim 1269.

[159] R v Henderson [2010] 2 Cr App Rep 24, [91]; [2010] EWCA Crim 1269.

[160] R v Henderson [2010] 2 Cr App Rep 24, [92]; [2010] EWCA Crim 1269.

The judge noted that the jury would have to look at the evidence as a whole, acknowledging. the ophthalmological evidence weakened the "triad" of signs. Nonetheless, the father was convicted and sentenced to 18 months' imprisonment.

On appeal, it was stated that the view of the ophthalmological evidence "was not correct". The recovery demonstrated that the retinal haemorrhages could not be relied upon as evidence of shaking. On the contrary, it was evidence of an unknown cause.[161] Further, that "recovery is unusual and casts doubt on the reliance which can be placed upon the triad at all".[162] On appeal it was noted that the absence of one or more features of the "triad" in and of itself does not exclude a conclusion of non-accidental head injury and other evidence might be presented that is "so compelling that it excludes an unknown cause and proves the unlawful violence alleged". However, here, "it is not the case".[163] The Court of Appeal concluded that there was no rational basis on which a jury could reject an unknown cause for the baby's injury based on the ophthalmological evidence. Therefore, the appeal was allowed, and the conviction was quashed.[164]

These two English cases briefly discussed above highlight the ongoing controversy and uncertainty surrounding SBS/AHT. The issue is a live topic in Australia, the United Kingdom and the United States. In addition to the case of *Vinaccia*, other cases have recently reappeared in the spotlight in Australia based on a lack of scientific evidence to substantiate SBS/AHT. We discuss two of those cases below. It is timely to better understand the controversies surrounding this issue as further cases might appear before the courts contesting brain injuries caused by shaking.

## D. Other Australian Cases

We consider two additional Australian cases with similar circumstances but different outcomes.

### 1. R v Rowe

This case garnered significant media and academic attention.[165] Although born prematurely, by three months Alanah was healthy and had regular health check-ups.[166] During the last week of her life Alanah became unsettled and irritable. On 19 August 2015, Joby drove the baby's mother to work while he then cared for Alanah. On her return, the mother noticed that the baby was pale and gasping for breath.[167] She performed CPR while waiting for emergency services. Paramedics were able to re-establish cardiac output. Joby told the paramedics he had attempted to give Alanah a bottle feed when she began coughing, gasping, and then vomiting. She also had a nosebleed and fell backwards and became unconscious.[168] Joby denied shaking the baby and there were no external injuries.

On 30 August 2015, the baby's condition was determined to be incompatible with survival and life support was withdrawn. A post-mortem revealed a range of injuries included the "triad" of signs.[169]

[161] *R v Henderson* [2010] 2 Cr App Rep 24, [107]; [2010] EWCA Crim 1269.

[162] *R v Henderson* [2010] 2 Cr App Rep 24, [107]; [2010] EWCA Crim 1269.

[163] *R v Henderson* [2010] 2 Cr App Rep 24, [110]; [2010] EWCA Crim 1269.

[164] *R v Henderson* [2010] 2 Cr App Rep 24, [110]–[118]; [2010] EWCA Crim 1269.

[165] *R v Rowe* [2018] VSC 490. A paper concerning apparent lack of evidence in this case was published but was later retracted. See generally C Brook, "Is There an Evidentiary Basis for Shaken Baby Syndrome? The Conviction of Joby Rowe" (2019) 53(2) *Australian Journal of Forensic Sciences* 1. There is an increasing number of cases of SBS being reported in the press that are going before the Australian courts. See C Vedelago and L Mannix, "Legal Threats and Police Searches: Debate Explodes over Baby Shaking Science", *The Age*, 19 May 2021 <https://www.theage.com.au/national/victoria/legal-threats-and-police-searches-debate-explodes-over-baby-shaking-science-20210513-p57rkp.html>. Legal threats and police searches: Debate explodes over baby shaking science (theage.com.au). Recently, Bradley Hooper was jailed in the Victorian Supreme Court for 8.5 years by Lasry J. Hooper was convicted of homicide after the judge was satisfied beyond reasonable doubt that the man had shaken his eight-week-old son to death and had also abused the child on previous occasions. See *R v Hooper* [2023] VSC 398.

[166] *R v Rowe* [2018] VSC 490, [4].

[167] *R v Rowe* [2018] VSC 490, [8].

[168] *R v Rowe* [2018] VSC 490, [11].

[169] *R v Rowe* [2018] VSC 490, [14].

Two medical experts gave evidence stating that in their opinion Alanah's death was the result of injuries caused by violent shaking with or without impact on a soft surface.[170] Further, neither doctor considered that there was any other reasonable explanation.[171] A third doctor stated that "the widespread extent of the retinal haemorrhages were suggestive of significant head trauma".[172] In 2018, Joby Rowe was convicted of homicide and sentenced to nine years' imprisonment.[173]

### 2. R v Lee

This case has received scant attention. The ACT Supreme Court considered whether evidence by medical experts that injuries causing shaking was admissible and whether the guilt of the accused was proved beyond reasonable doubt.[174] The accused was acquitted.

The baby in this case, Charlie, had been born prematurely at 38 weeks gestation after a preceding false labour. Although she was in good condition, she had extensive facial contusion. The day before the incident Charlie was noted to have a "a bloodshot eye" but was behaving normally. The accused, when alone with Charlie, took her then aged three weeks into the shower with him, but on emerging he stated that she appeared not to be breathing. On instruction from a nurse with whom he was in telephone conversation over a period of twenty minutes, he applied first-aid by putting put Charlie on his knee sloping down and "tapped her (on the buttocks) repetitively" to shift any water or secretions that she may have inhaled. The nurse immediately went to the home to find Charlie improved but advised that she be taken to hospital. In the emergency Department of Calvary Hospital, Charlie had very shallow breathing, a slow heart rate (100/minute) and was hypothermic (35°C). Darkened areas were noted over each buttock. After stabilisation, Charlie was transported to Canberra Hospital where prolonged seizures occurred. A brain CT scan on admission and a later MRI scan identified a subdural haemorrhage and damage to brain parenchymal tissues which developed into areas of cysts and gliosis. Ophthalmologists found bilateral retinal haemorrhages. At the age of two years, Charlie had recovered, had no developmental problems, her retinae had healed, and her eyesight appeared normal.

The accused was charged with assault and with recklessly inflicting grievous bodily harm. The trial was before Crispin J. Seven medical experts from the disciplines of paediatrics, radiology and ophthalmology opined collectively that the constellation of injuries (the triad of subdural haemorrhage, damage to the brain parenchyma and marked bilateral retinal haemorrhages) were inflicted by prolonged traumatic acceleration-deceleration of the brain inflicted by severe repetitive shaking with her head suddenly coming to a stop against an object.

Judge Crispin noted that it was impossible for the medical experts to opine that the injuries had been inflicted deliberately since the " divining the state of mind of an unknown person would not fall within his or her field of specialised knowledge".[175] Moreover, his Honour, noted that the evidence "did not suggest that there was any way in which acceleration/deceleration injuries caused by an intentional infliction of force could be differentiated from acceleration/deceleration injuries caused by accidental application of force".[176]

His Honour also noted a paucity and lack of quality of empirical research on potentially critical issues, and he was critical of expert opinion based on interviews with people who had admittedly shaken babies undertaken to determine which type of injuries resulted from their actions. Concluding such evidence to be unreliable, he stated:

---

[170] *R v Rowe* [2018] VSC 490, [16].

[171] *R v Rowe* [2018] VSC 490, [16].

[172] *R v Rowe* [2018] VSC 490, [17].

[173] *R v Rowe* [2018] VSC 490, [30].

[174] *R v Lee* [2001] ACTSC 133.

[175] *R v Lee* [2001] ACTSC 133, [42].

[176] *R v Lee* [2001] ACTSC 133, [42].

> The fact that it may be difficult to ascertain the truth does not relieve the Crown of the need to prove the defendant's guilt beyond reasonable doubt, nor does it permit the Court to act upon some lesser standard determined by reference to the quality of evidence available.[177]

He added, "in any event, evidence that injuries have been caused in a certain manner could not, of itself, prove that similar injuries cannot be caused by some other mechanism".[178]

His Honour was satisfied that that the evidence was admissible as to the opinions of the experts that the injures could have been caused by either a blow or by vigorously shaking, but he ruled that the evidence was not admissible that the injuries were caused in that manner, whether by the accused or otherwise, or that they could only have been caused in that manner.[179] He found that the expert opinions were not based wholly or even substantially on the witnesses' specialised body of knowledge but rather on speculation, inference and reasoning beyond their fields of expertise.[180] His Honour recognised the lack of knowledge as to how much force and with what duration are required to create such injuries in the brain of a neonate except that it would be a reasonably substantial force. He rejected all comparisons of injuries with motor vehicle accidents and of experimental injuries sustained experimentally by animals on the basis of lack of similarity. He held that opinions of experts based on these concepts were inadmissible because the experts cannot have specialised knowledge of non-existent evidence[181] and also based on ss 135 and 137 of the *Evidence Act 1995* (Cth) because in his Honour's view any probative value that they may have had was substantially outweighed by unfair prejudice to the accused.[182]

Defence counsel argued that other conditions were in part or wholly responsible for the infant's injuries. Among these were hypoxaemia (caused by aspiration of water resulting in laryngeal spasm) and hypothermia sustained during the shower, an undiagnosed arteriovenous malformation (of which Charlie's forebears had a history), birth trauma causing prolonged convulsion and over-vigorous first-aid.

On the basis of the medical evidence presented, his Honour was unable to exclude the potential for previous brain haemorrhage, contributory effects of hypothermia and the hypoxaemic laryngeal spasm. In particular, he was unable to exclude the possibility of a sufficient shearing force in the infant's brain caused by prolonged and forceful over-vigorous slapping of the buttocks in a head-down position, and was unable to exclude the prolonged seizures as being the possible result rather than the cause of cerebral ischaemia and the retinal haemorrhages. He rejected the concept of a simultaneously occurring "constellation" of injuries as only possible from a single cause.[183]

He noted it was incumbent on the Crown to prove beyond a reasonable doubt that the injuries could not have been caused in a manner consistent with the innocence of the accused.[184] He concluded that "the mere fact that a number of people, even a number of experts, believe something does not warrant the conclusion that it must be true".[185] He ruled that here was no prima facie case for assault and although there was a prima facie case for inflicting reckless grievous bodily harm, there was plainly insufficient evidence to prove the guilt of the accused beyond reasonable doubt.

In the following section we will discuss briefly expert witness testimony and opinion. For sharpness, we will focus on the Victorian evidence legislation given that our focus case of *Vinaccia* is the Victorian case heard before the Victorian Court of Appeal.[186]

---

[177] *R v Lee* [2001] ACTSC 133, [48]–[50].

[178] *R v Lee* [2001] ACTSC 133, [51].

[179] *R v Lee* [2001] ACTSC 133, [52].

[180] *R v Lee* [2001] ACTSC 133, [52].

[181] *R v Lee* [2001] ACTSC 133, [69]–[70].

[182] *R v Lee* [2001] ACTSC 133, [83].

[183] *R v Lee* [2001] ACTSC 133, [137].

[184] *R v Lee* [2001] ACTSC 133, [153].

[185] *R v Lee* [2001] ACTSC 133, [162].

[186] We note *Evidence Act 2008* (Vic) (*2008 Act*) is the principal Act introducing uniform evidence law into Victoria. The *2008 Act* is mainly uniform with the *Evidence Act 1995* (Cth), *Evidence Act 1995* (NSW), and the *Evidence Act 2004* (NI), and for the most part with *Evidence Act 2001* (Tas). Combined, these Acts are referred to as the *Uniform Evidence Acts* (the *UEA*).

## V. THE COURT AND EXPERT WITNESS TESTIMONY

### A. Admissibility of Evidence

Under s 76 (the opinion rule) of the *Evidence Act 2008* (Vic) an opinion is inadmissible. Expert opinion might also be relevant under s 79 where, "If a person has specialised knowledge based on the person's training, study or experience, the opinion rule does not apply to evidence of an opinion of that person that is wholly or substantially based on that knowledge".[187] Any expert opinion proffered must satisfy three criteria: (1) the expert must possess specialised knowledge; (2) that knowledge must be based on relevant training, study or experience; and (3) the opinion must be based on that specialised knowledge, a nexus criterion.[188] The opinion that is offered must be wholly or substantially based on the expert's claimed specialised knowledge. Each opinion must be examined for its basis and may be disqualified or ruled inadmissible if the nexus cannot be established.[189]

Using its discretionary powers, a court can rule expert opinions inadmissible, a power broad enough to prevent the miscarriage of justice.[190] A number of courts have explored the meaning of the term "specialised knowledge" at length.[191] The Chief Justice in *Honeysett v The Queen* found that s 79 has two limbs. Under the first, it is necessary to identify "specialised knowledge" derived from one of the three named sources, namely, training, study or experience.[192] Under the second limb, it is necessary that the opinion be wholly or substantially based on that specialised knowledge.[193] The Chief Justice referred to s 79 in the case of *R v Tang* and highlighted a distinction between specialised knowledge and common or general knowledge as a useful commonsense approach to the meaning of "specialised knowledge", stating:

> [T]he word "knowledge" connotes more than subjective belief or unsupported speculation. The term applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.[194]

Further, "specialised knowledge" need not be derived from tested or reliable fields of study, using accepted and proven methods. Thus, when an expert opinion is contentious or based on new or cutting-edge science, reliability as a criterion is paramount and is ultimately a question for the Court or a jury.[195]

Opinions based on discussions with others are unlikely to qualify as there is no nexus and witnesses are unavailable to be cross-examined. They may also be rejected if the probative value of an opinion is outweighed by prejudice caused to the defendant.

### B. Duties to the Court and Responsibility of Expert Witnesses

An expert is obliged to disclose the facts or assumptions on which an opinion is based. Further, the facts and assumptions "must be capable of proof by admissible evidence; and evidence must be admitted to prove the facts and assumptions upon which the opinion is based".[196] In order for expert opinion to be

---

[187] *Evidence Act 2008* (Vic) s 79.

[188] *Evidence Act 2008* (Vic) s 79(1).

[189] See *Honeysett v The Queen* (2014) 253 CLR 122; [2014] HCA 29.

[190] Section 135 or 137 permits a Court to exercise these powers where the probative value of an opinion is outweighed by its prejudicial effect. See *R v Van Dyk* (2000) NSWCCA 67.

[191] A recent case to discuss this issue was *R v Fleming* [2023] NSWSC 560. A well-cited example is *R v Tang* (2006) 65 NSWLR 681; [2006] NSWCCA 167.

[192] *Honeysett v The Queen* (2014) 253 CLR 122, [23]; [2014] HCA 29.

[193] *Honeysett v The Queen* (2014) 253 CLR 122, [23]; [2014] HCA 29.

[194] *Honeysett v The Queen* (2014) 253 CLR 122, [23]; [2014] HCA 29; *R v Tang* (2006) 65 NSWLR 681, 712 [138]; [2006] NSWCCA 167.

[195] See *Tuite v The Queen* (2015) 49 VR 196; [2015] VSCA 148.

[196] Australian Law Reform Commission, *Uniform Evidence Law*, Report No 102 (August 2010)<https://www.alrc.gov.au/publication/uniform-evidence-law-alrc-report-102/9-the-opinion-rule-and-its-exceptions/opinions-based-on-specialised-knowledge/>.    For

admissible it must be based on known evidence, and ultimately be reliable. There has been previous debate in Australia about the most appropriate test to apply to an area of expert knowledge that is new and developing. The courts have sought to acknowledge and recognise circumstances where a body of expert knowledge has "general acceptance" in the "relevant, usually scientific discipline".[197] Australian courts have been influenced by those in the United States on this issue.[198] Under r 702 of the United States Federal Rules of Evidence "a Court must make an assessment of whether the reasoning or methodology underlying expert opinion evidence is scientifically valid". There has been some discussion in Australia about whether this type of approach might restrict the admission of evidence that is thought to be based on "junk science", demanding more robust and rigorous admissibility criteria or whether it would make little to no difference to the quality of expert opinion of scientific evidence.

Further, "the admissibility of expert opinion evidence depends on proper disclosure and proof of the factual basis of the opinion" – known as the "basis rule".[199] The term deals with two propositions. First, the lower the correlation between the facts proved and the facts assumed, the less weight is given to expert opinion. Second, where the facts proved and the facts assumed are substantially different, the point might be reached where the opinion carries little weight. We contend that due to the low scientific level and often low quality of the scientific evidence in favour of the "triad" for SBS/AHT any expert opinions are likely to be more prejudicial rather than probative and bring into question the reliability of the evidence as admissible.

## VI. SUGGESTIONS

We make some suggestions below that might mitigate some of the controversy that surrounds SBS/AHT.

### A. Renaming the Term for "Triad" Injuries

The controversy is specifically about "shaking" and whether any constellation of clinical and/or imaging findings can reliably distinguish natural or accidental causes from deliberate shaking. We agree with the original suggestion made by Guthkelch[200] and endorsed recently by Squier that the term "retinodural haemorrhage of infancy" or similar is preferable.[201] This term best describes the objective findings of a clinical condition, makes no presuppositions, and avoids the negative connotations and implications of fundamental intent associated with "shaken baby syndrome" and "abusive head trauma". Squier notes that a medical doctor who uses the term "abusive head trauma" (or perhaps SBS) might be overreaching and making a legal determination rather than only a medical one. He states:

> [A]n expert goes too far when he or she diagnoses the injury as "abusive head trauma" or opines that the inflicted trauma amounted to child abuse. The ordinary understanding of the term "abuse" – as opposed to neglect or carelessness – implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge when performing the act that caused the head trauma. An expert may not offer an opinion on the intent or criminal responsibility of the accused.[202]

Changing the term used to describe injuries is especially pertinent in cases where it might be found that a baby who has suffered the "triad" of injuries was not in fact "shaken" – given that the core of the controversy surrounding SBS/AHT is whether a baby has been "shaken" or not. Shifting away from

---

an in-depth and detailed discussion of expert evidence law, see I Freckelton, *Expert Evidence: Law, Practice, Procedure and Advocacy* (Thomson Reuters, 7th ed, 2024).

[197] This approach is sometimes known as the "Frye test", after a decision of that name delivered by the Supreme Court of the United States – *Frye v United States*, 293 F 1013 (DC Cir, 1923).

[198] See *Daubert v Merrell Dow Pharmaceuticals* 509 US 579 (1993).

[199] Australian Law Reform Commission, n 196; Freckelton, n 196.

[200] Guthkelch, n 42.

[201] W Squier, "Retinodural Haemorrhage of Infancy, Abusive Head Trauma, Shaken Baby Syndrome: The Continuing quest for Evidence" (2023) *Developmental Medicine and Child Neurology* <https://doi.org/10.1111/dmcn.15676>.

[202] Squier, n 201, 2.

---

the terms "shaken baby syndrome" and "abusive head trauma" might take some of the sting out of the debate, thus allowing genuine cases of SBS/AHT to be concluded impartially.

## B. Prosecution Duties and the Role of Confession

As we have highlighted earlier, given that the scientific evidence is unreliable in this area, we posit that expert witness opinion should not be heavily relied upon. We suggest that cases of SBS/AHT should maintain a *legal* focus when determining whether a person should be convicted of homicide or where there might be a claim of negligence. The legal principles of criminal law or civil law should be applied, and the role of the prosecution should be to prove convictions beyond a reasonable doubt. This must include meeting the requirements of mens rea and actus reus in relation to shaking an infant to death as opposed to accidental or rough handling and also satisfy the medical conditions.

We also note that confessions obtained while in police custody or during legal investigations can be unreliable[203] and suggest that they should be balanced against other compelling and important information.

Rossant and Brook note that admitted cases diagnosed as SBS/AHT might be used as a reference standard in studies that attempt to determine which findings should be used to diagnose SBS.[204] There has been much criticism of the use of "admitted or confessed cases" as a reference standard.[205] Rossant and Brook note that this is especially precarious when the circumstances under which the admission was made are unknown.[206] We agree with the authors, that this is especially significant in cases of SBS/AHT where a prosecution team is likely to have considerable power to bargain with the accused where the charges can range from murder to manslaughter and recklessly causing serious injury with fewer years of potential imprisonment.[207]

To further highlight the problematic nature of confessions in cases of SBS/AHT, Rossant and Brook conducted an anonymous survey (Adikia Survey) between December 2020 and July 2021 in France with families who had been disputing medical diagnoses of child abuse.[208] The survey received responses from 150 people suspected or accused of SBS/AHT in France between the years 2004 and 2021. After the first analysis of data, 118 unique SBS/AHT case responses were analysed. All respondents declared that no SBS/AHT had actually occurred, 97 cases involved police interrogation, and 77 respondents stated that the police had presented the diagnosis of child abuse as "absolutely certain and irrefutable".[209] Further, 45 respondents stated they had been informed that "confessing to abuse would let the justice be more lenient".[210] It was found that 24 respondents stated that they were informed that a confession to abuse would permit the doctors to better treat the child. Of the respondents, 42 said that they were told that confessing to abuse would allow the other parent to regain custody of their child. Eleven respondents said they had made a voluntary false confession to spare their partner/spouse and to assist the child to be reunited with the other parent. The survey found that those who "assuming responsibility" for harming a child or providing an explanation that met the satisfaction of their accusing medical practitioner allowed the return of the child.[211]

---

[203] Rossant and Brook, n 34.

[204] Rossant and Brook, n 34.

[205] Squier, n 201.

[206] Rossant and Brook, n 34.

[207] In Victoria murder and manslaughter are offences under the Common law. The maximum penalty for murder is life imprisonment. The maximum penalty for manslaughter is imprisonment for 25 years. Under s 5 of the *Crimes Act 1958* (Vic), a person found guilty of manslaughter is liable to a maximum penalty of imprisonment for 25 years. A Court sentencing a person for murder or manslaughter must impose a term of imprisonment unless particular circumstances exist; however, there is no mandatory minimum period of imprisonment for these offences. Under *Sentencing Act 1991* (Vic) ss 3(a) (definition of *Category 2 offence*), 5(2H)–(2I) manslaughter is a Category 2 offence if it was committed on or after 20 March 2017. Courts must impose custodial sentences for Category 2 offences except in particular circumstances.

[208] Rossant and Brook, n 34.

[209] Rossant and Brook, n 34.

[210] Rossant and Brook, n 34.

[211] Rossant and Brook, n 34.

For the best interests of the child, the authors note that some parents might make admissions that are untrue. Further, the authors found that in SBS/AHT cases the interrogator (commonly a police officer or doctor) might assert that guilt is based on medical opinion – which we have noted can be contentious. Other researchers have found that interrogators who presume guilt from the outset are likely to ask (1) incriminating questions; (2) conduct more coercive interrogations; and (3) try harder to elicit a confession. This might lead to a greater risk of a false confession.[212] Thus for multiple reasons, confessions of guilt are highly suspect.

## C. Sensitive Investigation

We suggest that cases of SBS/AHT should be investigated cautiously, carefully, and sensitively. The issue of SBS/AHT is controversial and socially and academically polarising. Cases of SBS/AHT have been receiving increasing attention in Australia, the United States and the United Kingdom. It is important to recognise that imputations and determinations that are made about a person deliberately shaking a baby causing severe injury or death have short – and long-term impacts on the lives of many people. Any investigation must be conducted thoroughly and impartially and without any predetermined conclusion or judgment.

## VII. CONCLUSIONS

The identification of retinal haemorrhages, subdural haemorrhage and encephalopathy in an infant should not infer pathognomonically that the causative mechanism was deliberate severe shaking. The scientific evidence supporting any cause of the "triad" of clinical signs is of the lowest level and moreover is of the low to very-low quality due to multiple bias. Consequently, there should be limited confidence in any diagnosis. Due to the limitations in the scientific evidence, the identification of the "triad" could imply, at best, that trauma may have been involved by rapid and severe acceleration-deceleration of the contents of the brain. Since this mechanism is generated by both severe violent shaking and other types of trauma, it is very difficult to differentiate between them. Moreover, confounders and mimics of trauma add to the uncertainties and controversies of SBS/AHT.

The "triad" of signs is neither exclusively characteristic of an accidental traumatic acceleration-deceleration mechanism nor is it indicative of deliberate and violent shaking. All the features of the "triad" may occur with minor head trauma. In our view, the only fair and appropriate opinion open to physicians is that a "traumatic acceleration-deceleration injury" may have occurred while the determination of the mechanism of that injury is the remit only of legal proceedings. It would be preferable to regard the injury as due to an unknown mechanism – idiopathic, rather than as deliberately abusive.

We should abandon the inculpatory terms of "shaken baby syndrome", "abusive head trauma", "non-accidental injury" and similar terms when the "triad" of clinical signs is recognised. It would be better from a clinical and legal perspective to describe such injuries initially as "(idiopathic) infantile retinodural haemorrhage". Expert witnesses should have an obligation to reveal to a court the scientific evidence on which they base their opinion and its potential deficits in terms of reliability. In addition, they should acknowledge the medical controversies concerning the lack of reliability of the "triad" in diagnosing SBS/abusive head injury.

---

[212] SM Kassin, CC Goldstein and K Savitsky, "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" (2003) 27 *Law and Human Behaviour* 187; C Hill, A Memon and P McGeorge, "The Role of Confirmation Bias in Suspect Interviews: A Systematic Evaluation" (2008) 13(2) *Legal and Criminological Psychology* (2008) 357; FM Narchet, CA Meissner and MB Russano, "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" (2011) 35(6) *Law and Human Behaviour* 452.

# EXHIBIT 22

Downloaded from https://journals.lww.com/pec-online by d4DPuJ7PWDCvCZzSDXWj73YYx2OOmGOYmAAhKiasivqdg/tUdUFPicI7kpfCehrw0c4MffyAEMuxeKB3L70gBWGGvj3OKPr4euxHYmQwkPmYpt J.4M41 on 03/22/2019

# Childhood Falls With Occipital Impacts

*Norrell Atkinson, MD,\*† Rick R. van Rijn, MD, PhD,‡ and Suzanne P. Starling, MD\**

**Objectives:** Falls are commonly reported in children who present with both accidental and inflicted brain injuries. Short falls rarely result in serious or life-threatening injuries. Our purpose is to describe a series of cases of short falls with occipital impact leading to subdural hemorrhage (SDH).
**Methods:** We present a series of 8 witnessed accounts of young children diagnosed as having SDHs after striking the back of their heads during a short fall. Child-abuse physicians were surveyed to determine if they had evaluated a child younger than 24 months diagnosed as having SDH, with or without retinal hemorrhages, following a witnessed fall with occipital impact. Submitted cases were analyzed.
**Results:** The median age of the children was 12.5 months. All fell backward from a standing or seated position onto a hard surface and immediately developed symptoms. There was an average of 4 witnesses per case. Physical examinations were normal; however, the majority of children had enlarged head circumferences. All were previously healthy. Six of 8 children had unilateral convexity SDH. All children had varying degrees of retinal hemorrhage but no retinoschisis. The majority of children had returned to their baseline within 24 hours of hospitalization.
**Conclusions:** Although a larger study is needed to identify the full spectrum of injuries, we postulate that, if a history of a fall with an occipital impact is elicited during a trauma workup, accidental injury should be considered.

**Key Words:** falls, occiput, retinal hemorrhage, subdural hemorrhage

(*Pediatr Emer Care* 2018;34: 837–841)

**C**hild abuse is prevalent across the globe. The World Health Organization has reported that a quarter of all adults have been physically abused as a child.[1] One of the most devastating forms of physical abuse is abusive head trauma (AHT). Subdural hematomas and retinal hemorrhages are a hallmark sign of AHT.[2] These injuries lead to a wide range of symptoms ranging from mild neurocognitive disorders to severe physical and mental disability and death. Cases of potential AHT can pose a challenge to the clinician and medical examiner.

When faced with the differential diagnosis of AHT, perpetrators often attribute the child's injury to a short fall.[3–5] Children frequently fall short distances from furniture, such as beds or couches, but these falls seldom result in serious injuries. Multiple studies over the past 50 years have shown that injuries resulting from falls are associated with a mortality rate of less than 0.5 deaths per 1 million children per year.[6–8] Thus, when a child is diagnosed as having a subdural hemorrhage (SDH) and retinal hemorrhages (RHs) with a history of a short fall, there is a significant concern for inflicted injury. Simple parietal skull fractures are the most common severe injury seen with short falls.[5] Little has been written about specific short-distance falls that could be related to serious intracranial trauma.

In this article, we present a series of 8 witnessed accounts of young children diagnosed as having SDH with and without RH after striking the back of their heads as a result of a short-distance backward fall. The purpose of this series is to describe cases with occipital impact leading to a presentation with a SDH. This case series will provide data that can be used in the medical and forensic evaluation of cases of potential AHT.

## METHODS

Members of the Ray E. Helfer Society, a subspecialty society for physician specialists in child abuse, were surveyed electronically to determine if they had ever evaluated a child younger than 24 months diagnosed as having SDH with or without RH following a witnessed fall with an occipital impact. A directly witnessed event was defined as a fall that was observed by an adult or verbal child. An indirectly witnessed event was characterized as having been "witnessed" by a person who heard or observed some element of the fall, such as hearing the child hit the floor or hearing the child cry then finding him lying supine on the floor. Cases required medical evaluation reports by a child abuse pediatrician (CAP) and adequate investigation by police and social services. All cases required a final assessment that the child's presentation was determined to be accidental.

Institutional review board approval was required from all participants' institutions prior to submitting cases for this study. A detailed data collection tool was used by each contributor to retrospectively abstract case information. Deidentified radiographic images and ophthalmologic examination photographs were submitted when available. The data was analyzed for trends to define the type of injuries children sustain with occipital impacts. Statistical means, medians, and percentages of the data were performed.

## RESULTS

Twenty-three members of the Ray E. Helfer Society reported experience with 1 or more of these case types. Among these initial respondents, case collecting forms and requests for local institutional review board approval were digitally distributed, after which only 9 cases were subsequently submitted by respondents for inclusion in this case cohort study. Eight of these cases met the study criteria; 1 case was excluded because the child had only RH without a SDH.

The median age was 12.5 months (range, 7–16 months) for the 4 boys and 4 girls included in this study. All were noted to be healthy prior to their fall. None of the children had a relevant prior medical history or a clinical history of either head trauma or suspected child abuse. All falls occurred within the home setting and were witnessed by adults and/or children related to the child. The objects from which the children fell were no more than 1 m in height, and in ground-level cases, the children were standing on the ground. All of the children landed onto a hard surface on impact. Table 1 details the case histories.

### Observation of Trauma Mechanism

Table 2 describes the number and type of direct and indirect witnesses in each case.

From the \*Eastern Virginia Medical School/Children's Hospital of The King's Daughters, Norfolk, VA; †Children's National Medical Center, Washington, DC; and ‡Emma Children's Hospital-Academic Medical Center Amsterdam, the Netherlands.
Disclosure: The authors declare no conflict of interest.
Reprints: Norrell Atkinson, MD, Children's National Medical Center,
111 Michigan Ave NW, Washington, DC 20010
(e-mail: natkinson@childrensnational.org).
Copyright © 2017 Wolters Kluwer Health, Inc. All rights reserved.
ISSN: 0749-5161

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*Atkinson et al* — *Pediatric Emergency Care* • Volume 34, Number 12, December 2018

**TABLE 1.** Case Summaries With Radiographic and Ophthalmologic Findings

| Patient | Sex | Age, mo | Presenting History | Surface | Skeletal Survey | Follow-up Skeletal Survey | CT Finding | MRI Findings | Eye Findings |
|---|---|---|---|---|---|---|---|---|---|
| 1 | M | 10 | Fall backward from high chair | Concrete | (−) | N/A | B interhemispheric SDH | B SDH | R: IRH, SRH |
| 2 | M | 9 | Standing on couch, fell backward onto floor while reaching for bottle | Wood | (−) | (−) | L SDH | L SDH acute (performed 3 d postadmission) | L: IRH to posterior pole |
| 3 | F | 13 | Standing in large basket on floor; mom hears her crying and finds her lying in supine position in the tipped-over basket on the floor | Thin carpet over concrete | (−) | (−) | L parietotemporal SDH | Not done | B IRH |
| 4 | F | 14 | Standing on floor, pushed backward by 3-y-old brother | Concrete | (−) | (−) | R small to moderate SDH; mass effect with 7-mm midline shift | Acute R SDH; focal acute infarction of the splenium of the corpus callosum | L: Multiple peripapillary IRH R: Peripheral IRH |
| 5 | F | 13 | Fall backward from a standing position on a couch | Concrete | (−) | (−) | B (L > R) frontoparietal SDH with thin perifalcine/peritentorial R SDH; prominent B subarachnoid spaces, slightly prominent B ventricles | Subacute SDH; L subdural hygroma, R perifalcine hygroma, prominent subarachnoid space | L: Extensive IRH R: IRH "few and confined to central pole" |
| 6 | M | 7 | Seated on bed fell backward onto floor | Concrete | (−) | (−) | 3-mm acute R frontoparietal SDH near coronal suture; blood in anterior interhemispheric fissure; small amount of bleeding at R vertex | Not done | L: IRH confined to posterior pole |
| 7 | M | 12 | Standing on couch, fell backward hitting back of head against wooden table before hitting the floor | Wood | (−) | (−) | L SDH with midline shift | Postsurgical evacuation; B (L > R) occipital and L frontal gyral ischemia; small B SDH | L: numerous PRH, IRH, SRH to posterior pole and periphery R: 25–30 PRH, IRH, SRH to posterior pole with scattered RH at periphery |
| 8* | F | 16 | Standing in front yard with multiple other family members. One child pushes another child who then fell backward into 16-mo-old; 16-mo-old fell from standing to seated position then hit her head | Cobblestone pavement | Negative autopsy | N/A | L SDH overlying frontal, parietal, and temporal lobes. Diffuse but asymmetrical edema with marked loss of grey-white matter differentiation. Complete effacement of sulci with 6.2-mm midline shift from L to R and severe effacement of the L lateral ventricle, 3rd ventricle, and basilar cisterns. Serpiginous linear densities near vertex suggestive of possible subarachnoid hemorrhage | Not done | Visible only on autopsy |

*Autopsy findings: Diffusely swollen brain. L SDH (cerebellar) and focal SAH, patchy brainstem SAH. Necrotic cerebellar tonsils with herniation into foramen magnum. L optic nerve sheath hemorrhages, few small focal RHs at the nerve fiber layer. Acute necrosis at the lumbar and thoracic levels of spinal cord with focal SAH and widespread white matter injury associated with swollen and degenerating oligo-dendroglial cells.

B indicates bilateral; CT, computed tomography; IRH, intraretinal hemorrhage; L, left; PRH, preretinal hemorrhage; R, right; SRH, subretinal hemorrhage.

© 2018 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*Pediatric Emergency Care* • Volume 34, Number 12, December 2018
*Childhood Falls With Occipital Impacts*

**TABLE 2.** Case Witnesses

| Patient | Directly Witnessed | Indirectly Witnessed | Others Present in Home (Excluding Witnesses) |
|---|---|---|---|
| 1 | Mother | 0 | Father upstairs |
| 2 | Mother | Father outside heard mother shouting | 9-y-old sibling outside with father |
| 3 | 0 | Mother and maternal grandmother heard child crying and found child on floor | 13-y-old sibling |
| 4 | Mother, mother's adult friend | 9- and 6-y-old siblings heard fall | Incident involved 2 other 2-y-old children |
| 5 | 15-y-old aunt | Mother, father, maternal grandmother, and 6-y-old heard fall | 0 |
| 6 | 0 | 14-y-old sibling's back toward child (but heard fall and then cried) | 7 children, father |
| 7 | 1 adult relative, 3 day-care children (aged 5, 7, 9 y) | 0 | Multiple day-care children present |
| 8 | Grandmother, uncle, 4 children (aged 7–12 y) | 0 | 0 |

## Clinical Symptoms

Table 3 describes the progression of clinical symptoms and time of presentation to the hospital following each fall. Every child developed symptoms immediately after the fall, and medical attention was sought by all caretakers when the child became acutely symptomatic. Each child was described either to have a "stunned" appearance or to be crying at the time of the fall.

## Examination Findings

The majority (5/7) of the children (1 child was not measured) had a head circumference greater than the 90th percentile for age. Cutaneous injuries (3/8) were the only significant findings identified on physical examination; 2 mobile children were found to have bruises and/or abrasions to the forehead, shins, and knees from prior accidental events. These bruises were all located at sites that are common for accidental injury in mobile children.[9] One child had a "rectangular-shaped bruise" on the back of his head after reportedly hitting a rectangular wood coffee table before striking the floor; none of the other children were reported to have evidence of head contact injuries (soft tissue swelling or bruising) on presentation.

Indirect ophthalmoscopy was performed by an ophthalmologist in all cases. Photographic images from these examinations

were provided in 4 of 8 cases; the remainder of the examinations was limited to written descriptive findings (location and number). Retinal hemorrhages were present by ophthalmoscopy in 7 of 8 children; 4 of 7 were bilateral. In the 1 fatal case, the indirect retinal examination showed no RHs, but autopsy revealed left optic nerve sheath hemorrhages and a few small retinal RHs at the nerve fiber layer. No retinoschisis was reported in any case.

No fractures were identified on 8 of 8 initial skeletal surveys, and 5 of 5 follow-up skeletal surveys were also negative (Table 1).

None of the children had skull fractures. Unilateral convexity SDHs were present in 6 of 8 children; 2 had large hemorrhages with mass effect on the brain, one of which required surgical evacuation. In the 5 children who had magnetic resonance imaging (MRI) scans, 2 children had areas of brain infarction (patients 4 and 7). One child (patient 5) had prominent subarachnoid spaces. Table 1 summarizes the computed tomography and MRI findings.

## Outcomes

Most children in this study were alert and responsive and had returned to their baseline within 24 hours of hospitalization; however, 2 children were comatose/poorly responsive on admission to the hospital, and 1 required surgical evacuation of the brain hemorrhage. One child died. The median duration of hospitalization

**TABLE 3.** Clinical Symptoms Following Fall

| Patient | Presentation to Hospital | Progression of Symptoms Following Fall |
|---|---|---|
| 1 | 24 h | Quiet for several seconds ➔ inconsolable crying (>10 min) ➔ eye deviation/decreased alertness ➔ doctor evaluated ➔ looked well ➔ ↓alert in afternoon ➔ doctor evaluated ➔ looked well ➔ well overnight ➔ decreased alertness in morning ➔ vomited ➔ to hospital 24 h after fall |
| 2 | Immediate | Cried immediately ➔ difficult to console ➔ limp ➔ eyes roll back ➔ turned blue ➔ shaking/limp ➔ improved in hospital but with altered consciousness |
| 3 | Immediate | Cried immediately ➔ seizure ➔ multiple episodes of vomiting ➔ unconsciousness ➔ lethargic/unresponsive at hospital |
| 4 | Immediate | Cried immediately ➔ stood and walked to mother ➔ cry ➔ eyes rolled back ➔limp ➔ unresponsive ➔ seizure |
| 5 | 8 h | Stunned appearance ➔ cried when picked up ➔ difficult to console ➔ looked well and then put down for bed ➔ woke up fussy 8 h after fall ➔ fed ➔ multiple episodes of emesis ➔ hospital (irritable) |
| 6 | Immediate | Cried 1 min ➔ limp ➔ eyes roll back ➔ altered mental status |
| 7 | Immediate | Crawled to caretaker ➔ limp a few minutes later ➔ unresponsive ➔ altered consciousness |
| 8 | Immediate | Attempted to stand ➔ appeared dizzy and fell over ➔ cried ➔ seizure ➔ apneic ➔ unresponsive ➔ to hospital ➔ died 19 h after fall |

*© 2018 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*Atkinson et al*                                                    *Pediatric Emergency Care* • Volume 34, Number 12, December 2018

was 4.5 days. All surviving children returned to their baseline level of activity/behavior by discharge; 3 were prescribed antiepileptic medications for a brief duration following hospital discharge.

## DISCUSSION

We describe a series of 8 witnessed occipital impact falls in young children resulting in SDH and RHs. All of the children in this series had short-distance falls onto a hard surface, with the majority of the children falling from an elevated surface. Several of the children were witnessed to hit the back of their heads against an object before striking the ground. A smaller number of children were pushed or fell backward from the standing position. The children's injuries all mimicked findings seen with AHT. If witnesses to the events had not been present, a high suspicion of abuse in these cases would have been justified. This high suspicion is justified because of the fact that short-distance falls generally do not cause serious intracranial injury.[6,10,11] Based on literature, AHT should be part of the differential diagnosis in a child with a SDH and history of a short fall. In a systematic review of literature, SDHs were significantly associated with AHT (odds ratio, 8.2; 95% confidence interval, 6.1–11).[2] In the same systematic review, unilateral SDHs were also significantly associated with AHT (odds ratio, 4.9; 95% confidence interval, 1.3–19.4; $P = 0.02$); however, the heterogeneity of the latter group of studies was high ($Q_2 = 8.1$, $P = 0.017$, $I^2 = 75.3\%$). Based on a pooled analysis of literature, Maguire et al[12] calculated that the presence of retinal hemorrhages in children with intracranial hemorrhage has a predicted probability for AHT of 20% to 95%.

Our cases all had a full investigation to exclude child abuse as cause of the injuries. Two single case reports have been published of children who fell backward with posterior head impacts sustaining similar intracranial findings.[13,14] In contrast to our cases, these cases lacked sufficient information to confidently exclude AHT as a cause for the injuries. A 1984 case series reported multiple children with similar findings; however, none of these cases were investigated for child abuse.[15]

Similar to the presentation of AHT, all of the children in this series immediately developed symptoms; there was no lucid interval. Two children had delayed hospital presentations but were described as immediately symptomatic at home and then slowly worsened. Previous studies on accidental and inflicted head trauma have found that children become symptomatic proximate in time to their injuries and that there is no lucid interval before symptoms appear.[16–20] Findings in our study suggest that children who strike their occiput also become symptomatic immediately after they are injured. Although there was a spectrum of clinical symptoms on presentation, 7 of 8 children returned to their baseline level of activity prior to discharge from the hospital.

Studies in adults report a higher proportion of significant intracranial injuries, including subdural and subarachnoid hemorrhages in snowboarders and female wrestlers with occipital impact.[21–25] Instability in the ventrodorsal position is thought to predispose snowboarders to backward falls, which are not easily braced by the upper limbs.[21] It is unclear why falls with occipital impacts result in more significant intracranial injuries; however, it is hypothesized that direct impact to the occiput of the skull during a posterior fall may introduce an inertial component of force to the brain that results in SDHs.[23] Although children and adults cannot be compared directly, there are similarities between the adult studies and this population. With a posterior fall, a child may be less likely to reflexively brace the fall. A fall in the anterior-posterior direction may also introduce a component of inertial force or angular moment that is not typically seen with a short linear fall. The one fatality in this series was pushed, likely introducing a greater rotational force than was introduced in the children who fell with no initial velocity. Retinal hemorrhages are hypothesized to result from vitreoretinal traction produced by repetitive acceleration-deceleration forces and are not typically seen with short falls.[26] All of the children in this study had varying degrees of RHs. We hypothesize that this could be the result of a rotational component involved with occipital impacts.

There were several limitations to our series. First, we required that medical evaluation reports by a CAP and adequate investigation by police and social services were required in order to be certain that the cases included in our series were indeed accidental. Although this is important from a clinical and forensic medical perspective, it introduces a selection bias in our study population. Second, our definition of a witnessed fall included directly or indirectly witnessed cases, sometimes witnessed by children. However, studies have shown that children have accurate contextual memories and are able to recount long and coherent narratives and free narratives.[27,28] In all cases, with indirect or child witnesses, a thorough evaluation by a CAP did not identify concerns for maltreatment. Third, we did not have data on the height of the child at the time of the accident, and we could not calculate the exact fall height at the level of the head. However, in all cases, the fall height is to be regarded as a short fall. Finally, this series contained only a small number of patients; although 28 cases were identified, only 8 were submitted. Most of the initial responders ultimately did not submit their cases for inclusion. Although a larger number of included cases would have strengthened our conclusion, our aim was to describe a trauma mechanism leading to SDH in young children.

In conclusion, if a pediatrician or a medical examiner is confronted with a child with a SDH and RH and a history of a fall with an occipital impact, in the absence of other signs of maltreatment, accidental injury should be considered. Further research should be conducted regarding this mechanism of head injury in young children.

## ACKNOWLEDGMENT

The authors thank their case contributors: Michelle Clayton, MD; Cynthia Delago, MD; Rachel Gilgoff, MD; Nancy Harper, MD; and Jamie Kondis, MD.

## REFERENCES

1. World Health Organization. Child Maltreatment 2014. *World Health Organization Web site*. Available at: http://www.who.int/mediacentre/factsheets/fs150/en/. Accessed May 31, 2015.

2. Kemp AM, Jaspan T, Griffiths J, et al. Neuroimaging: what neuroradiological features distinguish abusive from non-abusive head trauma? A systematic review. *Arch Dis Child*. 2011;96:1103–1112.

3. Keenan HT, Runyan DK, Marshall SW, et al. A population-based comparison of clinical and outcome characteristics of young children with serious inflicted and noninflicted traumatic brain injury. *Pediatrics*. 2004; 114:633–639.

4. Coats B, Margulies SS. Potential for head injuries in infants from low-height falls. *J Neurosurg Pediatr*. 2008;2:321–330.

5. Case ME. Accidental traumatic head injury in infants and young children. *Brain Pathol*. 2008;18:583–589.

6. Chadwick DL, Bertocci G, Castillo E, et al. Annual risk of death resulting from short falls among young children: less than 1 in 1 million. *Pediatrics*. 2008;121:1213–1224.

7. Haney SB, Starling SP, Heisler KW, et al. Characteristics of falls and risk of injury in children younger than 2 years. *Pediatr Emerg Care*. 2010;26: 914–918.

                    © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

8. Osifo OD, Iribhogbe P, Idiodi-Thomas H. Falls from heights: epidemiology and pattern of injury at the accident and emergency centre of the University of Benin Teaching Hospital. *Injury*. 2010;41: 544–547.

9. Maguire S, Mann M. Systematic reviews of bruising in relation to child abuse-what have we learnt: an overview of review updates. *Evid Based Child Health*. 2013;8:255–263.

10. Case ME, Graham MA, Handy TC, et al. Position paper on fatal abusive head injuries in infants and young children. *Am J Forensic Med Pathol*. 2001;22:112–122.

11. Hymel KP, Makaroff KL, Laskey AL, et al. Mechanisms, clinical presentation injuries and outcomes from inflicted vs. non inflicted head trauma during infancy; results of a prospective multicentered comprehensive study. *Pediatrics*. 2007;119:922–929.

12. Maguire SA, Kemp AM, Lumb RC, et al. Estimating the probability of abusive head trauma: a pooled analysis. *Pediatrics*. 2011;128: e550–e564.

13. Denton S, Mileusnic D. Delayed sudden death in an infant following an accidental fall: a case report with review of the literature. *Am J Forensic Med Pathol*. 2003;24:371–376.

14. Gardner HB. A witnessed short fall mimicking presumed shaken baby syndrome. *Pediatr Neurosurg*. 2007;43:433–435.

15. Aoki N, Masuzawa H. Infantile acute subdural hematomas. *J Neurosurg*. 1984;61:273–280.

16. Willman KY, Bank DE, Senac M, et al. Restricting the time of injury in fatal inflicted head injuries. *Child Abuse Negl*. 1997;21:929–940.

17. Starling SP, Holden JR, Jenny C. Abusive head trauma: the relationship of perpetrators to their victims. *Pediatrics*. 1995;95:259–262.

18. Starling SP, Patel S, Burke BL, et al. Analysis of perpetrator admissions to inflicted traumatic brain injury in children. *Arch Pediatr Adolesc Med*. 2004;158:454–458.

19. Biron D, Shelton D. Perpetrator accounts in infant abusive head trauma brought about by a shaking event. *Child Abuse Negl*. 2005;29:1347–1358.

20. Biron DL, Shelton D. Functional time limit and onset of symptoms in infant abusive head trauma. *J Paediatr Child Health*. 2007;43:60–65.

21. Nakaguchi H, Fujimaki T, Ueki K, et al. Snowboard head injury: prospective study in Chino, Nagano, for two seasons from 1995 to 1997. *J Trauma*. 1999;46:1066–1069.

22. Nakaguchi H, Tsutsumi K. Mechanisms of snowboarding-related severe head injury: shear strain induced by the opposite-edge phenomenon. *J Neurosurg*. 2002;97:542–548.

23. Fukuda O, Takaba M, Saito T, et al. Head injuries in snowboarders compared with head injuries in skiers. A prospective analysis of 1076 patients from 1994 to 1999 in Niigata, Japan. *Am J Sports Med*. 2001; 29:437–440.

24. Chaze B, McDonald P. Head injuries in winter sports: downhill skiing, snowboarding, sledding, snowmobiling, ice skating and ice hockey. *Neurol Clin*. 2008;26:325–332.

25. Nomoto J, Seiki Y, Nemoto M, et al. Head trauma in female professional wrestlers. *Neurol Med Chir (Tokyo)*. 2007;47:147–151.

26. Levin AV. RH and child abuse. *Recent Adv Pediatr*. 2000;18:151–219.

27. Friedman WJ, Reese E, Dai X. Children's memory for the times of events from the past years. *Appl Cogn Psychol*. 2011;25:156–165.

28. Fivush R, Haden C, Adam S. Structure and coherence of preschooler's personal narratives over time. *J Exp Child Psychol*. 1995;60:32–56.

© 2018 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT 23



*Original Article*

The Neuroradiology Journal
2022, Vol. 35(1) 53–66
© The Author(s) 2021
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/19714009211026904
journals.sagepub.com/home/neu
$\circledS$SAGE

# Chronic subdural hemorrhage predisposes to development of cerebral venous thrombosis and associated retinal hemorrhages and subdural rebleeds in infants

**Dale F Vaslow[1]** 

## Abstract

For infants presenting with subdural hemorrhage, retinal hemorrhage, and neurological decline the "consensus" opinion is that this constellation represents child abuse and that cerebral venous sinus thrombosis and cortical vein thrombosis is a false mimic. This article contends that this conclusion is false for a subset of infants with no evidence of spinal, external head, or body injury and is the result of a poor radiologic evidence base and misinterpreted data. Underdiagnosis of thrombosis is the result of rapid clot dissolution and radiologic under recognition. A pre-existing/chronic subdural hemorrhage predisposes to development of venous sinus thrombosis/cortical vein thrombosis, triggered by minor trauma or an acute life-threatening event such as dysphagic choking, variably leading to retinal and subdural hemorrhages and neurologic decline. These conclusions are based on analysis of the neuroradiologic imaging findings in 11 infants, all featuring undiagnosed cortical vein or venous sinus thrombosis. Subtle neuroradiologic signs of and the mechanisms of thrombosis are discussed. Subarachnoid hemorrhage from leaking thrombosed cortical veins may be confused with acute subdural hemorrhage and probably contributes to the development of retinal hemorrhage ala Terson's syndrome. Chronic subdural hemorrhage rebleeding from minor trauma likely occurs more readily than bleeding from traumatic bridging vein rupture. Radiologists must meet the challenge of stringent evaluation of neuro imaging studies; any infant with a pre-existing subdural hemorrhage presenting with neurologic decline must be assumed to have venous sinus or cortical vein thrombosis until proven otherwise.

## Keywords

Infant, cerebral venous sinus thrombosis, chronic subdural hemorrhage, retinal hemorrhage, abusive head trauma

## Introduction

Chronic venous sinus thrombosis (CVST) is an uncommon disorder in infants defined as a blood clot in the cerebral venous system (superficial and deep cerebral veins and/or the venous sinuses) which drains blood from the brain. CVST occurs most frequently during the neonatal period and is rare thereafter. CVST can lead to brain hemorrhages, infarction, swelling, and permanent damage or death. It is difficult to recognize clinically, typically manifesting with seizures (Szs) and other medical signs and symptoms that overlap other medical conditions. The causes and triggers are multifactorial including, but not limited to, trauma, dehydration, and infection. Neuroimaging is critical to making the diagnosis. In the neonatal period the diagnosis is usually made with ultrasound. In infancy magnetic resonance imaging (MRI) and computed tomography (CT) are most useful. There is no "gold standard" for making the diagnosis and the neuroradiologic protocols vary from center to center and from patient to patient.[1–11]

CVST and cortical vein thrombosis (CVT) are underdiagnosed neuroradiologically for several reasons: imaging is underutilized, finding and distinguishing clot from adjacent findings and artifacts is difficult, distinguishing normal from thrombosed cortical veins is difficult, the venous sinuses rapidly recanalize, subtle imaging findings are poorly recognized, less severe cases of CVST may lack parenchymal abnormalities, subarachnoid hemorrhage from leaking, thrombosed cortical veins is often mistaken as acute subdural hemorrhage, radiologists are often inattentive to venous

[1]Department of Radiology, Harry S. Truman Veterans Administration Hospital, Columbia, MO, USA

**Corresponding author:**
Dale F Vaslow, 2504 Lenox Place, Columbia, MO 65203, USA.
Email: vaslowd@missouri.edu

structures in their search pattern, and clinicians fail to suspect CVST or include CVST as an indication when ordering the examination.[1,2,4,10–18]

Neuroimaging is underutilized by clinicians for several reasons: the symptoms are nonspecific, the most common clinical finding, Szs, are easily controlled with a single antiepileptic drug, published underestimates of CVST incidence yield a low level of clinical suspicion, early misdiagnosis of acute abusive head trauma (AHT) inhibits further evaluation, and a poor understanding of the pathophysiology of CVST minimizes its cognizance.

A subdural fluid collection is defined as chronic when there is presence of neomembranes. Neomembranes form within about 2–3 weeks after an initial subdural fluid collection occurs and are the mechanism for the eventual removal of the collection. Importantly, neomembranes are subject to rebleeding[19] from little or no trauma. Different classifications for subdural collections including chronic subdural hemorrhage (cSDH), mixed acute subdural hemorrhage (aSDH) and cSDH, subdural hygroma (SDHy), subdural effusion (SDE), subdural collection (SDC), and an increase of the extraaxial fluid spaces (IEAFS) (aka benign SDHy) are referred to as cSDH in this article. The pathogenesis of the preexisting subdural hemorrhage (SDH) is discussed by others.[20–42]

AHT is a term or label commonly, inappropriately, used by pediatricians and others as a medical diagnosis. AHT embodies an action and intent on the part of a perpetrator, and thus is a legal term, not medical or scientific. AHT is a legal hypothesis based on medical evidence. This article makes no attempt to prove or disprove AHT, but rather to seek a scientific hypothesis that fits the medical scientific data. Nevertheless, because of its wide use the label AHT shall be used herein.

AHT may present with signs and symptoms that vary from subtle to severe. Intracranial hemorrhage (ICH), retinal hemorrhage (RH), encephalopathy, and a child protection team evaluation are the basis for AHT.[43] AHT remains controversial especially in instances where the child exhibits no other evidence of traumatic injury and the caregiver's story is purportedly inconsistent with the intracranial imaging findings.[44–48] This article contends that an incomplete evidence base and poor understanding of the pathophysiology of AHT perpetuates this dogma.

In the last decade MRI imaging with the introduction of susceptibility weighted imaging (SWI) has improved the detection of blood. Tubular shaped clots in cortical veins located over the vertex of the brain is now reported more frequently. Such clots are "considered markers of acutely disrupted veins."[49] AHT is deemed certain when SDH and venous injury are identified radiologically.[50] The proponents of this theory complain that venous injury has been misinterpreted in the court as CVST/CVT and claim that CVST/CVT cannot mimic the findings seen in AHT.[18,43]

The purpose of this article is to discuss infant CVST using accepted science principles based on analysis of neuroimaging studies from legal cases. The hypothesis that cSDH predisposes to development of CVST or CVT is examined. CVST in the presence of cSDH is strongly associated with cSDH rebleeding, subarachnoid hemorrhages (SAHs), and RH (Terson's syndrome); and CVST may be triggered by minor trauma or an acute life-threatening event (ALTE).[1] Attention is brought here to the finer details of reading and interpreting the imaging studies. It is contended that infant CVST is underdiagnosed and underreported. All cases of CVST/CVT in this series were originally "diagnosed" as AHT.

## Methods

As a neuroradiology expert the author examined 11 consecutive cases of infant AHT on behalf of defendants who deny the accusation of child abuse. Cases with overt evidence of appendicular/axial skeletal trauma were not accepted for review. The availability of radiologic and clinical data is variable; all imaging studies were from Digital Imaging and Communications in Medicine (DICOM) files from different institutions including general and children's hospitals. No infant health outcome follow-ups are available. Legal outcomes were obtained from communications with defending attorneys. The radiologic analysis herein is based solely on the author's interpretation of the studies using accepted neuroradiologic practices with particular attention to CT, MRI, and magnetic resonance venography (MRV) imaging artifacts.[4,5,7,13,15,17,18,51]

## Results

Table 1 gives the findings for the 11 cases of this series. Examples of the radiologic imaging findings are given in the Figures. Benign enlargement of subarachnoid spaces (BESS) is defined as enlarged subarachnoid spaces measuring greater than 4 mm, often measured opposite to the side of a cSDH. BESS is indeterminate when there are diffuse, symmetric, bilateral cSDHs or the brain sulci are effaced, i.e. brain swelling.[38] Equivocal sinus clot is a clot adherent to the wall of the sinus lumen that cannot be distinguished from adjacent intradural hemorrhage (IDH). Probable/possible CVST implies equivocal clot in a venous sinus and/or secondary signs. cSDH is defined as subdural MRI high T2, CT low density or the presence of a neomembrane.

Five out of 11 cases include both CT and non-postsurgical MRI images that were variably delayed by 1–3 days; post-surgical and follow-up neuroradiologic studies are not included. MRV studies were performed in only two cases, and only one was performed contemporaneously.

Eleven of 11 cases show cSDH, CVT, SAH along the thrombosed cortical veins, and Szs. Only one case shows a completely thrombosed venous sinus (case 1). Eight of the 11 cases exhibit CVST or probable CVST and one shows possible CVST. One of 11 cases shows hemispheric hypoxic ischemic encephalopathy (HIE); 3/11 show HIE patterns consistent with CVST. Four of the 11 cases feature an intraparenchymal hemorrhage; 2/11 show cerebellar hemorrhages. Five of the 11 cases show tentorial blooming artifacts consistent with venous thrombosis or intradural hemorrhage (IDH). Five of the 11 cases feature BESS with documented abnormally enlarging head circumference (HC) and another 5/11 show enlarged or probably enlarged extra-axial spaces with cSDH. One case shows compartmentalized, differently aged SDH indicative of neomembranes. Four of the 11 cases show focal acute/subacute SDHs suggesting cSDH rebleeds. All cases with the exception of case 5 featured interhemispheric IDH. Ten of the 11 cases feature ophthalmologically diagnosed RH, and hence the AHT/shaken baby syndrome (SBS) triad (SDH, RH, and neurologic decline).

Three of the 11 cases were traumatic, two from short falls and one from head compression. In case 3 a nondepressed occipital fracture resulted from stationary head compression. The mother caught herself with an outstretched hand on the child's forehead while leaning over to change a diaper when her other child jumped on her back. In case 6 the infant rolled off bed after bathing (see Figure 8). In case 10 the infant fell backwards from an upright standing position from the sitting parent's knee striking the occiput on a jigsaw mat (see Figures 2(e)–(g); 4(b); 7; and 9(b)). In cases 2 and 4 there was frequent vomiting preceding collapse (see Figures 5(b), 9(a), and 2(a)). In case 7 the premature infant (premie) had postnatal, in-hospital episodic bradycardia and charted rapid head circumference (HC) increase. During the second week at home the child presented with dysphagic choking, was admitted for a brief resolved unexplained event (BRUE), and developed post-admission Szs that prompted MRI studies (see Figures 3(b), 4(a), 5(c) and (d), and 6). In case 8 the infant had episodic wheezing related to tracheal stenosis (see Figures 2(b) and 3(a)).

For case 1 the defendant was found not guilty of AHT. For case 2 the charges were dropped by the prosecutor after back and forth correspondence with the prosecution physicians. For case 3 the mother accepted a plea bargain for two more years jail time after already serving one year. In case 4 the infant was returned to the home with no further legal action. In case 5 there was a custody agreement. In case 6 a local neurosurgeon volunteered to become the defense expert, ending my consultation. Subsequently the defendant retained parental rights and to avoid a trial accepted 7 years probation that ends with case dismissal and no criminal record. For case 7 a criminal trial is pending. For case 8 my consultation occurred after the defendant confessed to "resuscitative shaking" and accepted a plea bargain. Cases 9 and 11 were consultations with no further involvement. For case 10 the judge absolved the parents of wrongdoing.

## CVST and CVT

Figure 1(a) shows superior sagittal sinus (SSS) thrombus in an infant imaged 1 h after emergency room (ER) arrival and less than 4 h after a Sz/apnea onset. In Figure 1(b) right transverse sinus hyperdense clot on day 1 recanalizes on day 2, showing that CVST may resolve within hours. Examples of small residual clots in the venous sinuses in CT images are seen in Figures 2(a)–(f) and 5(d) and in MR images in Figures 2(g), 3 (a) and (b). It is known that in infants and neonates CVST resolves rapidly leading other authors to conclude that it is of "utmost importance" to perform radiologic imaging early after symptom onset.[2,10,11]

The Figure 8 lower left image shows the typical appearance of black SWI signal along a serpiginous right bridging vein (BV) indicative of diapedesis of blood into the subarachnoid space from CVT. Other sites of thrombus include the vein of Labbe, tentorial veins, and superficial Sylvian veins (see Figures 2(d), 9 (a) and (b)).

This study shows that CVST is found less frequently than CVT. This is contrary to the expectation that for non-traumatic CVST there are "widespread changes involving both the superficial and deep venous systems."[2,3,9,10,18] This suggests that the venous sinuses recanalize more rapidly than the cortical veins. If so, one reasons that thrombus dissolves more rapidly in larger caliber, higher flow vessels receiving blood from more tributaries. When the clot originates in the cortical veins it may or may not propagate distally. Since CVT does not uniformly correlate with CVST, CVT may not correlate with the pattern of brain imaging pathology.

## Intraparenchymal hemorrhage (IPH) and HIE

Figures 3(a) and 5(a)–(d) show IPH in the cerebellum and parieto-occipital lobes in SWI and CT images. Importantly, IPH in these locations are characteristic of CVST involving the transverse venous sinuses. The cerebellum is one of the most common locations for IPH associated with CVST.[2,4,10–12,15,18,44,52] Figure 4 shows abnormal diffusion weighted MRI signal of the posterior brain that is consistent with CVST.[53]

## SAH and SDH

See Figure 6 for examples of the differences between SDH and SAH. The BV passes through the border cell layer, aka virtual subdural space, typically within 1–2 cm from the SSS where it drains. It courses through the subarachnoid space closely adherent to the arachnoid membrane for most of its length, and in the subpial space as smaller branch tributaries.[21,54–58] SAH from a leaking BV typically has a serpiginous, lumpy



**Figure 1.** (a) Case 9 coronal and sagittal computed tomography (CT) images showing superior sinus acute thrombus and right superior extra-axial focal, acute hemorrhage in the subdural/subarachnoid spaces. Note the subtle visual differences in density in the superior sagittal sinus (SSS) that measure about 10–20 HU difference. Note the focally narrowed posterior SSS. (b) Case 1 stacked sagittal CT images on day one (superior) and day 2 (inferior) showing right transverse acute clot (arrows) on day 1 that resolves on day 2. It is visually helpful to magnify and adjust the window/level settings in multiple contiguous slices to see the clot. SAH: subarachnoid hemorrhage; SDH: subdural hemorrhage.

configuration along a BV (Figure 8) and may be spread widely, often distinguished from SDH by a CT density or MRI signal difference. Pathology studies have shown patchy areas of blood along the arachnoid membrane in cases of CVT.[16]

Figures 1(a), 3(b), and 6 show focal, acute SDHs, distinguished by their location more than 2 cm from the SSS and hemispherically shaped with the flat side against the dura. The location lateral to the BV subdural segment mitigates against BV rupture into the subdural space and the focality mitigates against cSDH rebleeding from violent shaking. The probable cause is a venous backpressure induced rebleed from the fragile network of blood vessels comprising the outer neomembrane, a similar mechanism to venous backpressure induced IPH from CVST.[4,14] This is contrary to the "consensus" opinion that SDH is not a sequela of CVST.[43,59]

In Figure 7 the day 1 CT image shows layered extra-axial blood on the left side; an outer cSDH and an inner SAH. The day 3 MR image shows a single layer cSDH and resolution of the SAH. SAH resolves rapidly, whereas SDH does not. Careful thickness measurements showed no interval thickening of the SDH nor evidence of new blood products within the cSDH. It is important to distinguish a layered acute on chronic SDH from SAH/SDH layering.

In Figure 8 (case 6) focal aSDH is seen in the vicinity of the crossing intact, nonruptured BV that may be the result of neomembrane rebleeding, leakage from the thrombotic, recanalized BV, or leakage from a stretched BV.

Figure 5(d) shows posterior falx IDH, a common finding in this series and commonly observed in cases of AHT. The venous plexus of posterior falx and tentorium is especially prominent in infants.[35] IDH originates intradurally from small veins and there is no BV rupture.[11,35,44,60,61] This should not be a surprise to neuroradiologists who understand that the dura behaves like a sponge that expands under the influence of cerebral



**Figure 2.** (a) Case 4 sagittal and coronal computed tomography (CT) images showing residual clot in the left transverse sinus. Beam hardening streak artifact confounds the interpretation. (b) Case 8 axial and coronal CT images showing clot in right transverse sinus (also see Figure 3). (c) and (d) Case 11 axial and sagittal CT images show small focus residual clot in the right transverse sinus and stacked sagittal CT images show left vein of Labbe hyperdense clot. (e) and (f) Case 10 sagittal CT images. Blow to back of head causes focal extraaxial hemorrhage and difficult to ascertain left transverse sinus thrombosis. (g) Case 10 coronal T2. Rapid resolution leaves trace residual clot. BESS: benign enlargement of subarachnoid spaces. TS: transverse sinus.

spinal fluid (CSF) hypotension suggesting that dural engorgement by blood is an expected consequence of venous hypertension.[62] Unfortunately for years this author mistakenly taught radiology residents the standard dogma that interhemispheric IDH is specific evidence of AHT from ruptured bridging veins.

## Discussion

### cSDH predisposes to CVT/CVST

The cSDHs associated with CVT/CVST in this report suggests cSDH is a predisposing factor for development of CVT/CVST. At play here are the triad of factors that

*The Neuroradiology Journal 35(1)*



**Figure 3.** (a) Case 8 axial susceptibility weighted imaging (SWI) magnetic resonance (MR) images showing residual clot in right transverse sinus (large open arrow) and nonvisualized clot in coronal T2 image with punctate right cerebellar hemosiderin deposit (arrowhead). (b) Case 7 clockwise - T1 sagittal, T2 sagittal, T2 coronal, T1 axial MR images showing superior sagittal and transverse sinus residual thrombus (small arrows), and right superior focal subdural focal rebleed (large arrow).



**Figure 5.** (a) Case 1 Gradient echo T2* susceptibility weighted angiography (SWAN) axial magnetic resonance (MR) images show right parietal-occipital multifocal hemosiderin stains (arrows); (b) Case 2 susceptibility weighted imaging (SWI) axial MR images show bilateral cerebellum hemosiderin deposits; (c) Case 7 SWI axial MR image shows right occipital tiny hemosiderin deposit; (d) computed tomography (CT) coronal image showing right parietal focal hyperdense hemorrhage (also see Figure 3(a) from Case 8) and falx intradural hemorrhage (IDH) (large open arrow).



**Figure 4.** (a) Case 7 Diffusion-weighted imaging (DWI) (left) and Apparent diffusion coefficient (ADC) axial magnetic resonance (MR) images show abnormal diffusion primarily involving the posterior brain drained by the straight and bilateral transverse sinuses. Note involvement of thalami. (b) Case 10 DWI MR images shows subtle high signal posteriorly corresponding to the expected CVST affected venous territory.



**Figure 6.** Case 7 clockwise T2 coronal, T1 coronal, T2 sagittal, and susceptibility weighted imaging (SWI) axial magnetic resonance (MR) images showing focal high T1, low T2/SWI signal subdural (SD) and subarachnoid (SA) space hemorrhages.



**Figure 7.** Case 10 shown on left computed tomography (CT) axial image features a left layered acute/chronic extraaxial hemorrhage on day 1. Shown on right is a T2 axial magnetic resonance (MR) image on day 3 with single layer subdural hemorrhage (SDH). CVST: cerebral venous sinus thrombosis.

lead to vessel thrombosis, namely stasis of blood flow, vessel damage, and blood coagulopathy that were posited over 100 years ago by Virchow.[2–4,10,12,15,18,44]

cSDH predisposes to CVST by slowing the blood flow. The bridging veins on the side of chronic SDH are smaller in caliber than normal.[18] A small caliber vein has greater resistance to flow and hence slower flow than a larger caliber vein. It is well known from brain perfusion studies that the blood flow is diminished on the side of the brain with SDH.[26] CVST is typically observed on the same side as a cSDH. Sites of venous sinus narrowing are known predisposing factors, such as from a depressed occipital bone.[4,11,14,63] In both cases 3 and 10 the child suffered a blow or compressive force to the back of the head that led to CVST.

Other slow flow causative factors need to be considered. Bridging veins feature a smooth muscle ring at the entrance to the SSS.[16,21,55,58] This ring acts as a regulatory valve that maintains the pressure drop over the length of the BV and its patency over a range of intracranial pressures. SDH/IDH in the vicinity of the valve may affect its function, perhaps via a nitrous oxide pathway. Hypoxia, local or global, is known to relax smooth muscle and thus affects vein and valve function.

The second leg of Virchow's triad is exposure of the BV endothelium from mechanical forces from trauma. Reports of CVST from penetrating head trauma are many, but from blunt trauma are sparse.[64] Third, coagulopathy is the result of dehydration, pro-thrombotic factors, and infection of adjacent tissue, such as mastoid infection in older children.[4,7] In the infant with a cSDH the subdural collection contains known inflammatory factors[65] that may induce CVT.[66]

Episodic hypoxia, which is relatively common in neonates and infants, may be an important



**Figure 8.** Case 6 clockwise Fluid attenuated inversion recovery (FLAIR) coronal, T1 sagittal, T1 axial, and T2 axial magnetic resonance (MR) images show and left superior intact, thrombosed bridging vein (BV) without significant blood leakage (solid large white arrow), and a right superior intact, probably patent bridging vein with subarachnoid space blood leakage (small white arrows) and adjacent subdural space blood from a chronic subdural hemorrhage (cSDH) rebleed or leakage from BV stretching or prior BV thrombosis (large open white arrow).



**Figure 9.** (a) Case 2 and (b) case 10 susceptibility weighted imaging (SWI) axial magnetic resonance (MR) images showing superficial Sylvian vein blooming artifact (small black arrows) compatible with thrombosis and tentorial vein blooming artifacts (large open black arrows) compatible with thrombosis/intradural hemorrhage (IDH). Also note bilateral optic nerve sheath and left retinal hemorrhages (small white arrows).

contributing etiologic factor in the onset of CVST. In case 7 the premature infant had multiple in-hospital bradycardic events and a presenting episode of dysphagic choking indicative of hypoxia. Cases 1 and 8 had

presenting dysphagic choking. During an episode of brain hypoxia, such as from a laryngeal chemoreflex (dysphagic choking),[6,8,20,44,45,67–70] hypoxic induced valve malfunction could adversely affect BV blood

flow, perhaps from vein collapse. Further, hypoxia is prothrombotic, which could promote BV thrombosis.[71,72]

### The importance of the cSDH

The importance of cSDH was recognized nearly 90 years ago in early autopsy studies on infants and was associated with head enlargement, convulsions, and retinal hemorrhage. Not all studies were associated with trauma, hence other causes of cSDH such as birth trauma, insignificant trauma, spontaneity, a bleeding diathesis, infection, and other etiologies were considered.[34] More recently, several authors have listed nontraumatic causes.[16,22,28,33,37,38,41,44,58,69,73–75]

A cSDH is defined as an SDH/SDHy sufficiently aged to develop neomembranes. Such neomembranes develop as early as about 2–3 weeks after an aSDH and after a persistent SDHy.[20] Neomembranes are thin and are not typically seen in neuroimaging studies. A thin layer of hemosiderin along the inner membrane of a cSDH may differentiate between a SDHy and cSDH,[76] though is not typically reported. The vascular outer membrane shows MRI postcontrast enhancement, though not readily distinguished from the adjacent dura.[62] When the SDH is compartmentalized, as recognized by a sharp boundary between SDHs of different blood ages, neomembranes are recognized.

The external neomembrane located adjacent to the vascular dura is rich in blood vessels with giant capillaries from which bleeding occurs easily, either from minor trauma or spontaneously.[4,11,16,20,26,38,54,63,77] In the presence of BESS neomembrane rebleeding is thought to persist without counterpressure from the cerebral hemispheres,[29] thus rendering infants with BESS vulnerable to cSDH growth (BESS is uncommonly identified in neuroimaging studies of infants[38] and is typically reported by radiologists as a benign condition that resolves by age 2–3 years).

The symptoms of cSDH alone or cSDH rebleeding are often "inconsequential" and not responsible for a sudden neurologic decline.[22,29,78] cSDH is often asymptomatic and discovered in association with macrocrania.[3,27,29–31,33,38,41,63,73,74,78] On the other hand, cSDH is important in AHT cases: most babies with the AHT/SBS triad have a cSDH.[16,43] In an effort to increase "certainty for forensic physicians and neuroradiologists in diagnosing AHT" a retrospective investigation of 628 children age <2 years old with an initial cranial CT and MRI (if available) evaluation during the period 2002–2013 was performed.[79] Twenty-nine of 628 cases had SDH/SDHy (see Table 1). Eleven of 29 had CVT and convincingly were "very likely to have been exposed to SBS/AHT."

### cSDH incidence

In the epidemiologic study by Hobbs et al.[25] the estimated incidence of SDH and SDE in the British Isles for ages 0–1 years is 24/100,000. As the study noted "accurate definition of the composition of high density intracranial collections by imaging techniques is difficult particularly in chronic cases." (p. 954) Therefore, their estimate of SDH/SDE may be considered an upper bound on the incidence of cSDH.

In the comprehensive study by Zahl and Wester[73] on Norwegian children hospitalized for intracranial expansion the incidence of hydrocephalus with ICH for age <1 year is 13/100,000. Since the ratio cSDH/ICH is not known, this estimate is an upper bound.

### BV rupture

The source of SDH in SBS/AHT is most commonly thought to result from BV rupture by rotational forces from shaking or impact. The alternate hypothesis for the source of SDH/IDH is inner dural plexus bleeding from nontraumatic hypoxia and abnormal hemodynamic forces including venous hypertension.[80] In attempting to determine whether SDH is traumatic or nontraumatic, thoughtful consideration must be given to the evidence and analysis of BV rupture versus the alternatives.

When there is no preexisting SDH, BV rupture in the subdural space is not well supported by pathology studies, nor reliable experimental studies on adult BVs, nor current biomechanical models which lack fidelity to the infant BV.[16,55,81] None of the experimental studies on BV rupture simulate the actual milieu in the infant brain.[54,82] BV rupture at autopsy is infrequent and difficult to verify.[80] A large autopsy study series on fetuses, infants, and children did not show BV rupture;[60] unfortunately, BV thrombosis was not analyzed in that study.[83]

For an infant with a cSDH the anatomic sources of SDH within the cSDH include the BV and the neomembrane. Bleeding from the BV occurs by rupture or diapedesis/oozing. SDH from BV diapedesis/oozing has been observed with imaging and pathological observation when there is venous tension and venous thrombosis.[16] A BV rupture may produce a large SDH.[16] Bleeding from the neomembrane occurs from little or no force.[22] Nontraumatic bleeding from the neomembrane from CVT/CVST is recognized when it manifests as small, focal hemorrhages within a cSDH. Such hemorrhages are consistent with an application of the alternate hypothesis to the neomembrane.

The relationship between trauma severity and the quantity and distribution of bleeding from BVs and neomembranes into a cSDH is not established. Some large, distributed SDHs within a cSDH may be the result of the accumulation of blood over time from small nontraumatic or minor traumatic causes. Thus, a large, nonfocal cSDH bleed does not uniformly equate to violent trauma. Small, focal SDHs within a cSDH are probably not the result of violent trauma; a

**Table 1.** Findings for the 11 cases of this series.

| CASE | AGE MO | CLINICAL | CT SDH | MRI SDH | HIE | RH | CVT | OVT | CVST | IPH | BESS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7.5 (25WP) | Sz, IR, PF, DC, RP | R: ↑ | POST VENTRICULOSTOMY | B THAL, R PO VI | N | Y | TVT | Y D1 N D2 | R PO | Y |
| 2 | 4.5 | Sz, PF, RP, E | B: ↓ ↑ | B: ↓→↑T1, ↑T2 | N | R | Y | SSVT TVT | + | B CB | HCM |
| 3 | 5.5 (26WP) | HX, Sz, PF, E, RP, BR | R: ↓ | ND | R HEM, L ACA INF | LU | Y | N | N | N | + |
| 4 | 1 (34WP) | Sz, PF, E, D | R: ↓→ L: ↓→↑↑ | R:↓→↑T1,↑T2 L:↓→↑T1,↑T2 / F→↑↑T1,↓T2 | L PO VI | R>L | Y | Y | + | R PAR | HCM |
| 5 | 5.5 | Sz | B: ↓ | B: ↑T1, ↑T2 | N | LU | Y | ±SSVT | N | N | Y |
| 6 | 8.5 | SF, Sz, RP, UR | B: →↓ R: F ↑ | R: ↑T1,↑T2 / F ↑↑T1,↑T2, L: ↓↑T1,→↑T2 M →↑T1,↑T2 | N | B | Y | N | ± | N | HCM |
| 7 | 2 (31WP) | Sz, BR, PF, DC, RP, UR | ND | B: →↑T1,↑T2 R:F ↑T1,↑T2 | B THAL, PO, PROL | B | Y | TVT R SSVT | Y | N | HCM |
| 8 | 4 | Sz, PF, E, DC, RP | B: thin →↓ | B: ↓T1, ↑T2 | N | B | Y | TVT | + | R CB | HCM |
| 9 | 7 | Sz, RP | R: F ↑ L: ↓ | ND | N | LU | Y | N | Y | N | Y |
| 10 | 6 | SF, Sz, UR | R: ↓ L: →↓ | R: THIN →↑T1, ↑T2 L: →↑T1, →↑T2; | N | B | Y | TVT L SSVT | Y | N | Y |
| 11 | 2.5 | Sz | R: →↓ L: ↓ | ND | N | LU | Y | N | Y | N | ± |

ACA: anterior cerebral artery; B: bilateral; BESS: benign enlargement of the subarachnoid spaces; BR: bradycardia; CB: cerebellum; CT: computed tomography; CVST: cerebral venous sinus thrombosis; CVT: cortical vein thrombosis; D: dehydration; D1: day 1, day 2; DC: dysphagic choking; E: emesis; F: focal; HC: head circumference; HCM: HC measured abnormal growth; HEM: hemispheric; HIE: hypoxic ischemic encephalopathy; HX: head compression; INF: infarct; IPH: intraparenchymal hemorrhage; IR: irritable; L: left; LU: laterality unknown; M: membrane; MO: months; N: no; ND: not done; OVT: other venous thrombosis sites; P: premie; PAR: parietal; PF: poor feeding; PO: parietal-occipital; PROL: perirolandic; R: right; RH: retinal hemorrhage; RP: respiratory difficulties; SDH: subdural hemorrhage; SF: short fall; SSVT: superficial sylvian vein thrombosis; THAL: thalamus; TVT: tentorial vein thrombosis; UR: unresponsive; V: venous; VI: venous infarct; W: week; Y: yes.
Symbols used: ↓→↑ = hypo/iso/hyper intense/dense, ± = possible or equivocal, + = probable.

nontraumatic etiology such as CVT/CVST or a minor traumatic etiology is favored.

BV rupture into a cSDH differs from rupture into the dural border cell layer. The BV segment crossing the dural border cell layer is more susceptible to rupture than the BV subarachnoid segment because it is variably thinned, has no supporting trabeculae, has no supporting collagen, and has no blood brain barrier (BBB) and is susceptible to injury from rotational forces is based on studies of adult BVs in vitro.[54] For a BV crossing a BESS the two-sphere biomechanical model predicts rupture from minor trauma.[84] The BV segment stretched across a cSDH is probably more susceptible to traumatic rupture than a normal BV crossing the dural border cell layer. A two-sphere model of a BV crossing a cSDH consists of the outer sphere dura and the inner sphere arachnoid membrane and attached arachnoid segment of the BV bound to the brain by the arachnoid trabeculae. The prestressed BV stretched across the cSDH is susceptible to rupture; thus, by extrapolation the model predicts rupture of the BV crossing a cSDH from minor forces. Additionally, damage to the endothelium from stretching may expose the subendothelial tissue and trigger thrombosis. A thrombosed BV cSDH segment may rupture from the pre-existing stretch forces.

Distinguishing a cSDH neomembrane rebleed from a subdural BV rupture is important. In cases 1–11 the absence of significant, non-focal aSDH strongly implies that the infants were not violently shaken and thus no BV rupture occurred. The published images in references[18,42,79,85] show cSDH, but only one with an aSDH (Yilmaz et al., Figure 2).[42] The authors tacitly conclude that traumatic BV injury occurs more readily than cSDH neomembrane rebleeds. This has not been proven and remains a dubious assertion, particularly since it is now well accepted that cSDH rebleeding occurs with little or no trauma. A stretched BV crossing a cSDH leaks blood into the subarachnoid space, not the subdural space,[16] a finding reinforced by the findings in this study with the exception of case 6.

The sources of SAH include CVT diapedesis and BV rupture. It is claimed that BV rupture in the subarachnoid space leads to a minimal SAH.[18] Distinguishing CVT from BV rupture is indeterminate radiologically. According to Hahnemann et al. "a gold standard for the radiological depiction of BV thrombosis does not exist."[79] (p. 300) Yet, CVT has been interpreted as a specific sign of AHT.[18,42,79,85] Zahl et al. assert that thrombosis is not a marker of BV rupture in infants with alleged AHT.[86] Rambaud reports BV ruptures from autopsies.[49] In the radiologic study by Krasnokutsky CVST/BV thrombosis from trauma did not correlate with trauma severity.[14] While distinguishing CVT from BV rupture based on the SAH produced is indeterminate, the foregoing discussion on cSDH bleeding suggests that small, focal SDHs mitigate against violent trauma.

## aSDH

This study shows CVST/CVT related small, focal aSDHs are consistent with venous backpressure bleeding from neomembranes. This contradicts Choudhary et al.'s statement that "neither aSDH nor RH has ever been identified as a consequence of cortical sinus and venous thrombosis."[18] (p. 1804) The study by McLean et al.[59] in a study of 42 children aged 1 day to 19 years old showed no SDH associated with CVST. However, the study excluded 6/42 children with disappearance of thrombus on follow-up imaging, those most likely to be infants. Other nontraumatic causes of SDH by venous/capillary rupture include whooping cough, pyloric stenosis, convulsions, subdural empyema, and post-partum asphyxiation,[34,68,80,87] likely venous backpressure induced.

## CVT/CVST association with RH (Terson's syndrome)

This study shows strong correlation between CVT/CVST and RH. It is known that the multilayered RH commonly attributed to AHT may also be seen following normal birth, and from increased intracranial pressure (ICP)/hypoxia, Valsalva retinopathy, an ALTE, and in Terson's syndrome.[16,20,63,69,87–91] The latter is the product of increased ICP and the effects of SAH from a ruptured aneurysm. The optic nerve sheath contains a segment of the central retinal vein which is the probable source of sheath SAH and RH.[89] SAH in the sheath is less likely derived directly from the brain since CSF flow in the optic nerve channel is impeded by trabeculations in the sheath subarachnoid space. The role of venous hypertension in the development of RH in infants is not well understood, but probably differs from older children since the cavernous sinuses are not developed until about 6–7 months of age.[2,92] At a younger age ophthalmic venous drainage occurs via anastomoses to the face and nasopharynx veins through emissary channels that lack valves. Importantly the neonate/infant peripheral brain is supplied by pial arteries which diminish in importance beyond infancy. Thus, SAH from CVT in the neonate/infant brain may more profoundly raise the ICP. Since the combination of SAH and venous/intracranial hypertension associated with CVST simulates a ruptured aneurysm, Terson's syndrome is expected.

## CVT/CVST incidence

Estimates of the ratio CVST/cSDH are scant and confounded by underestimates of CVST. In the studies by Miller[20] and Hahnemann[79] CVT/cSDH=2/6 and 11/29 respectively. Using the aforementioned upper bound estimates of cSDH=(13–24)/100,000, the CVT incidence is less than about (4–8)/100,000. For comparison the incidence of infant CVST is often cited as 0.67/100,000/year for ages 1–18.[3] Accordingly 54% occur in the first year and 43% as neonates. Thus, the incidence for infants is 1.3/100,000 for ages 1–12 months,

and 6.5/100,000 for neonates. Other estimates for the CVST incidence in neonates are 12/100,000/year or higher[1] and 40/100,000.[4]

### Neurologic decline

cSDH rebleeds are expected as a matter of natural course and are not known to naturally lead to the sequelae of HIE or RH. The question remains: in the absence of major trauma, what leads to neurologic decline? Galaznik has proposed that CVST/CVT is the cause.[93] The analysis and findings herein support the hypothesis that cSDH coupled with a triggering factor leads to CVST/CVT and neurologic decline. The triggering factors include minor trauma, dehydration, hypoxia, dysphagic choking, an ALTE, a blood disorder, and infection. Alternately, neurologic decline may result from Szs, often associated with CVST/CVT, that cause excitotoxic brain damage.[94] Another mechanism for neurologic decline is a rapid rise in intracranial pressure from a sudden change in intracranial volume either from a cSDH rebleed or episode of brain hypoxia/edema, possibly related to an ALTE.[20]

## Conclusions

This article shows that a cSDH in an infant, often in association with an enlarging HC, has particular significance as a predisposing factor to develop CVT/CVST. CVT/CVST is strongly associated with neurologic decline, RHs, and cSDH rebleeds (the SBS/AHT triad) and can no longer be considered a "false mimic" of AHT. CVT/CVST-induced cSDH rebleeding represents an alternative mechanism for BV rupture as the source of SDH in infants. These conclusions behoove physicians to rigorously evaluate for CVT/CVST in infants presenting with neurologic decline.

### Acknowledgement

Patrick Barnes supplied reviews for two cases, though his reviews were not relied on. Charles Hyman submitted one case for consultation.

### Conflict of interest

The author declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author received no financial support for the research, authorship, and/or publication of this article.

### ORCID iD

Dale F Vaslow https://orcid.org/0000-0002-1614-5277

### References

1. Berfelo FJ, Kersbergen KJ, van Ommen CH, et al. Neonatal cerebral sinovenous thrombosis from symptom to outcome. *Stroke* 2010; 41: 1382–1388.

2. Dlamini N, Billinghurst L, and Kirkham F. Cerebral venous sinus (sinovenous) thrombosis in children. *Neurosurg Clin N Am* 2010; 21: 511–527.

3. deVeber G, Andrew M, Adams C, et al. Cerebral sinovenous thrombosis in children. *NEJM* 2001; 345: 417–423.

4. Hedlund GL. Cerebral sinovenous thrombosis in pediatric practice. *Pediatr Radiol* 2013; 43: 173–188.

5. Heller C, et al. Cerebral venous thrombosis in children – a multifactorial origin. *Circulation* 2003; 108: 1362–1367.

6. Barnes P and Krasnokutsky M. Imaging of the central nervous system in suspected or alleged nonaccidental injury, including the mimics. *Top Magn Reason Imaging* 2007; 18: 53–74.

7. Ichord RN, Benedict SL, Chan AK, et al. Paediatric cerebral sinovenous thrombosis: Findings of the International Paediatric Stroke Study. *Arch Dis Child* 2015; 100: 174–179.

8. Shroff M and deVeber G. Sinovenous thrombosis in children. *Neuroimag Clin N Am* 2003; 13: 115–138.

9. Stam J. Thrombosis of the cerebral veins and sinuses. *NEJM* 2005; 352: 1791–1798.

10. Kersbergen KJ, Groenendaal F, Benders MJNL, et al. Neonatal cerebral sinovenous thrombosis: Neuroimaging and long-term follow-up. *J Child Neurol* 2011; 26: 1111–1120.

11. Eichler F, Krishnamoorthy K, and Grant PE. Magnetic resonance imaging evaluation of possible neonatal sinovenous thrombosis. *J Pediatr Neurol* 2007; 37: 317–323.

12. Sebire G, Tabarki B, Saunders DE, et al. Cerebral venous sinus thrombosis in children: Risk factors, presentation, diagnosis, and outcome. *Brain* 2005; 128: 477–489.

13. Bracken J, Barnacle A and Ditchfeld M. Potential pitfalls in imaging paediatric cerebral sinovenous thrombosis. *Pediatr Radiol* 2013; 43: 219–231.

14. Krasnokutsky MV. Cerebral venous thrombosis: A potential mimic of primary traumatic brain injury in infants. *AJR Am J Roentgenol* 2011; 197: 503–507.

15. Leach JL, Fortuna RB, Jones BV, et al. Imaging of venous thrombosis: Current techniques, spectrum of findings, and diagnostic pitfalls. *Radiographics* 2006; 26: S19–S43.

16. Squier W. The "Shaken Baby Syndrome," pathology and mechanisms. *Acta Neuropathol* 2011; 122: 519–554.

17. Provenzale JM and Kranz PG. Dural sinus thrombosis: Sources of error in image interpretation. *AJR Am J Roentgenol* 2011; 196: 23–31.

18. Choudary AK, Bradford R, Dias MS, et al. Venous injury in abusive head trauma. *Pediatr Radiol* 2015; 45: 1803–1813.

19. Hymel KP, Jenny C and Block RW. Intracranial hemorrhage and rebleeding in suspected victims of abusive head trauma: Addressing the forensic controversies. *Child Maltreat* 2002; 7: 329–348.

20. Miller D, Barnes P and Miller M. The significance of macrocephaly of enlarging head circumference in infants with the triad. *Am J Forensic Pathol* 2015; 36: 111–120.

21. Mack J, Squier W and Eastman JT. Anatomy and development of the meninges: Implications for subdural collections and CSF circulation. *Pediatr Radiol* 2009; 39: 200–210.

22. Gabaeff SC. Investigating the possibility and probability of perinatal subdural hematoma progressing to chronic

subdural hematoma, with and without complications, in neonates, and its potential relationship to the misdiagnosis of abusive head trauma. *Leg Med* 2013; 15: 177–192.

23. Greiner MV, Richards TJ, Care MM, et al. Prevalence of subdural collections in children with macrocrania. *AJNR Am J Neuroradiol* 2013; 34: 2373–2378.

24. Rooks VJ, Eaton JP, Ruess L, et al. Prevalence and evolution of intracranial hemorrhage in asymptomatic term infants. *AJNR Am J Neuroradiol* 2008; 29: 1082–1089.

25. Hobbs C, Childs AM, Wynne J, et al. Subdural haematoma and effusion in infancy: An epidemiologic study. *Arch Dis Child* 2005; 90: 952–955.

26. Ikeda A, Sato O, Tsugane R, et al. Infantile acute subdural hematoma. *Childs Nerv Sys* 1987; 3: 19–22.

27. Kemp AM. Investigating subdural haemorrhage in infants. *Arch Dis Child* 2002; 86: 98–102.

28. Loh JK, Lin CL, Kwan AL, et al. Acute subdural hematoma in infancy. *Surg Neurol* 2002; 58: 218–224.

29. Markwalder TM. Chronic subdural hematomas: A review. *J Neurosurg* 1981; 54: 637–645.

30. McKeag H, Christian CW, Rubin D, et al. Subdural hemorrhage in pediatric patients with enlargement of the subarachnoid spaces. *J Neurosurg Pediatr* 2013; 11: 438–444.

31. McNeely PD, Atkinson JD, Saigal G, et al. Hematomas in infants with benign enlargement of the subarachnoid spaces are not pathognomonic for child abuse. *AJNR Am J Neuroradiol* 2006; 27: 1725–1728.

32. Mori K, Sakamoto T, Nishimura K, et al. Subarachnoid fluid collection in infants complicated by subdural hematoma. *Childs Nerv Syst* 1993; 9: 282–284.

33. Pittman T. Significance of a subdural hematoma in a child with external hydrocephalus. *Pediatr Neurosurg* 2003; 39: 57–59.

34. Sherwood D. Chronic subdural hemorrhage in infants. *Am J Dis Child* 1930; 39: 980–1021.

35. Squier W and Mack J. The neuropathology of infant subdural haemorrhage. *Forensic Sci Int* 2009; 187: 6–13.

36. Talbert DG. Is "shaken baby syndrome" the malignant peak of a "benign hydrocephalus of infancy" iceberg? *J Trauma Treatment* 2012; 1: 2–6.

37. Till K. Subdural haematoma and effusion in infancy. *Brit Med J* 1968; 3: 400–402.

38. Tucker J, Choudary AK and Piatt J. Macrocephaly in infancy: Benign enlargement of the subarachnoid spaces and subdural collections. *J Neurosurg Pediatr* 2016; 18: 16–20.

39. Vezina G. Assessment of the nature and age of subdural collections in nonaccidental head injury with CT and MRI. *Pediatr Radiol* 2009; 39: 586–590.

40. Vinchon M, Delestret I, DeFoort-Dhellemmes S, et al. Hematoma in infants: Can it occur spontaneously? Data from a prospective series and critical review of the literature. *Childs Nerv Syst* 2010; 26: 1195–1205.

41. Wittschieber D, Karger B, Niederstadt T, et al. Subdural hygromas in abusive head trauma: Pathogenesis, diagnosis, and forensic implications. *AJNR Am J Neuroradiol* 2015; 36: 432–439.

42. Yilmaz U, Korner H, Meyer S, et al. Multifocal signal loss at bridging veins on susceptibility-weighted imaging in abusive head trauma. *Clin Neuroradiol* 2015; 25: 181–185.

43. Choudary AK, Servaes S, Slovis TL, et al. Consensus statement on abusive head trauma in infants and young children. *Pediatr Radiol* 2018; 48: 1048–1065.

44. Barnes P. Imaging of nonaccidental injury and the mimics: Issues and controversies in the era of evidence-based medicine. *Radiol Clin N Am* 2011; 49: 205–229.

45. Findley KA, Risinger DM, Barnes PD, et al. Feigned consensus: Usurping the law in shaken baby syndrome/abusive head trauma prosecutions. *Wisconsin Law Review* 2019; 5: 1211–1267.

46. Lynoe N, Elinder G, Hallberg B, Rosen M, et al. Insufficient evidence for "shaken baby syndrome" – a systematic review. *Acta Paediatr* 2017; 106: 1021–1026.

47. Lynoe N and Eriksson A. Hidden clinical values and overestimation of shaken baby cases. *Clin Ethics* 2019; 14(3): 151–154.

48. Papetti R, Kaneb P and Herf L. The "Consensus statement on abusive head trauma in infants and young children." *Santa Clara Law Rev* 2019, 59: 299–367.

49. Rambaud C. Bridging veins and autopsy findings in abusive head trauma. *Pediatr Radiol* 2015; 45: 1126–1131.

50. Haute Autorite de Sante. Syndrome du bébé secoué ou traumatisme crânien non accidental par secouerment. 2017. Available at: www.has-sante.fr/jcms/c_2794425/fr/syndrome_du_bebe_secoue_ou_traumatisme_cranien_non_accidentel_par_secouement

51. Widjaja E, Shroff M, Blaser S, et al. 2D Time-of-flight MR venography in neonates: Anatomy and pitfalls. *AJNR Am J Neuroradiol* 2006; 27: 1913–1918.

52. Teksam M, Moharir M, deVeber G, et al. Frequency and topographic distribution of brain lesions in pediatric cerebral venous thrombosis. *AJNR Am J Neuroradiol* 2008; 29: 1961–1965.

53. Zimmerman RA, Bilaniuk LT and Farina L. Non-accidental trauma in infants: Diffusion imaging, contributions to understanding the injury process. *J Neuroradiol* 2007; 34: 109–114.

54. Yamashima T and Friede RL. Why do bridging veins rupture into the virtual subdural space? *J Neurol Neurosurg Psychiatry* 1984; 47: 121–127.

55. Famaey N, Cui ZY, Musigazi GU, et al. Structural and mechanical characterization of bridging veins: A review. *J Mech Behav Biomed Mat* 2015; 41: 222–240.

56. Mortazavi MM, Denning M, Yalcin B, et al. The intracranial bridging veins: A comprehensive review of their history, anatomy, histology, pathology, and neurosurgical implications. *Childs Nerv Syst* 2013; 29: 1073–1078.

57. Han H, Tao W and Zhang M. The dural entrance of cerebral bridging veins into the superior sagittal sinus: An anatomical comparison between cadavers and digital subtraction angiography. *Neuroradiology* 2007; 49: 169–175.

58. Miller JD and Nader R. Acute subdural hematoma from bridging vein rupture: A potential mechanism for growth. *J Neurosurg* 2014; 120: 1378–1384.

59. McLean LA, Frasier LD and Hedlund GL. Does intracranial venous thrombosis cause subdural hemorrhage in the pediatric population? *AJNR Am J Neuroradiol* 2012; 33: 1281–1284.

60. Scheimberg I, Cohen MC, Zapata Vazquez RE, et al. Nontraumatic intradural and subdural hemorrhage and hypoxic ischemic encephalopathy in fetuses, infants, and children up to three years of age: Analysis of two audits of 636 cases from two referral centers in the United Kingdom. *Pediatr Devel Path* 2013; 16: 149–159.

61. Geddes JF, Tasker RC, Hackshaw AK, et al. Dural haemorrhage in non-traumatic infant deaths: Does it explain

the bleeding in "shaken baby syndrome"? *Neuropath Appl Neurobiol* 2003; 29: 14–22.

62. Antony J, Hacking C and Jeffree RL. Pachymeningeal enhancement – a comprehensive review of the literature. *Neurosurg Rev* 2015; 38: 649–659.

63. Piatt JH. A pitfall in the diagnosis of child abuse: External hydrocephalus, subdural hematoma, and retinal hemorrhages. *Neurosurg Focus* 1999; 7: 1–7.

64. Beer-Furlan A, Cimonari de Almeida C, Noleto G, et al. Dural sinus and internal vein thrombosis complicating a blunt head injury in a pediatric patient. *Childs Nerv Syst* 2013; 29: 1231–1234.

65. Suzuki M, Endo S, Inada K, et al. Inflammatory cytokines locally elevated in chronic subdural haematoma. *Acta Neurochir (Wien)* 1998; 140: 51–55.

66. Mack J. Private communication.

67. Barnes PD, Galaznik J, Gardner H, et al. Infant acute life-threatening event – dysphagic choking versus non-accidental injury. *Semin Pediatr Neurol* 2010; 17: 7–12.

68. Talbert DG. Paroxysmal cough injury, vascular rupture, and "shaken baby syndrome." *Med Hypotheses* 2005; 64: 8–13.

69. Gabaeff SC. Challenging the pathophysiologic connection between subdural hematoma, retinal hemorrhage and shaken baby syndrome. *West J Emerg Med* 2011; 12: 144–158.

70. Hansen JB, Frazier T, Moffatt M, et al. Evaluation of the hypothesis that choking/ALTE may mimic abusive head trauma. *Acad Pediatr* 2017; 17: 362–367.

71. Hamer JD, Malone PC and Silver IA. The PO2 in venous valve pockets: Its possible bearing on thrombogenesis. *Br J Surg* 1981; 68: 166–170.

72. Esmon CT. Basic mechanisms and pathogenesis of venous thrombosis. *Blood Rev* 2009; 23: 225–229.

73. Zahl SM and Wester K. Routine measurement of head circumference as a tool for detecting intracranial expansion in infants: What is the gain? A nationwide survey. *Pediatrics* 2008; 121: e416–e420.

74. Aoki N. Chronic subdural hematoma in infancy. *J Neurosurg* 1990; 73: 201–205.

75. Minns RA. Shaken baby syndrome: Theoretical and evidential controversies. *J R Coll Physicians Edinb* 2005; 35: 5–15.

76. Imaizumi T. Association between a black band on the inner membrane of a chronic subdural hematoma on T2*-weighted magnetic resonance images and enlargement of the hematoma. *J Neurosurg* 2003; 99: 824–830.

77. Fung ELW, Sung RYT, Nelson EAS, et al. Unexplained subdural hematoma in young children: Is it always child abuse? *Pediatr Inter* 2002; 44: 37–42.

78. Adamsbaum C. Subdural collections and abusive head trauma. *J Neurosurg Pediatr* 2017; 19: 625–626.

79. Hahnemann ML, Kinner S, Schwager B, et al. Imaging of bridging vein thrombosis in infants with abusive head trauma: The "Tadpole Sign." *Eur Radiol* 2015; 25: 299–305.

80. Squier W. Shaken baby syndrome: The quest for the evidence. A review. *Devel Med Child Neurol* 2008; 50: 10–14.

81. Migueis, GFJ, Fernandes FAO, Ptak M, et al. Detection of bridging veins rupture and subdural haematoma onset using a finite element head model. *Clin Biomech* 2019; 63: 104–109.

82. Lowenhielm P. Dynamic properties of the parasagittal bridging veins. *Z Rechtsmedizin* 1974; 74: 55–62.

83. Scheimberg I. Private communication.

84. Papasian NC and Frim DM. A theoretical model of benign external hydrocephalus that predicts a predisposition towards extra-axial hemorrhage after minor head trauma. *Pediatr Neurosurg* 2000; 33: 188–193.

85. Adamsbaum C and Rambaud C. Abusive head trauma: Don't overlook bridging vein thrombosis. *Pediatr Radiol* 2012; 42: 1298–1300.

86. Zahl SM, Mack JA, Rossant C, et al. Thrombosis is not a marker of bridging vein rupture in infants with alleged abusive head trauma. Acta Paediatr 2021; 0: 1–9. online ahead of print. Available at: doi: 10.1111/apa.15908.

87. Talbert DG. Pyloric stenosis as the cause of a venous hypertensive syndrome mimicking true shaken baby syndrome. *J Trauma Treat* 2011; 1: 1–10.

88. Callaway NF, Ludwig CA, Blumenkranz MS, et al, Retinal and optic nerve hemorrhages in the newborn infant: One-year results of the Newborn Eye Screen Test (NEST) study. *Ophthamology* 2016; 123: 1043–1052.

89. Leestma J. Forensic aspects of intracranial equilibria. In: Leestma J, ed. *Forensic neuropathology*. 3rd ed. Boca Raton, FL: CRC Press, 2014, pp.364–414.

90. Maguire SA, Watts PO, Shaw AD, et al. Retinal haemorrhages and related findings in abusive and non-abusive head trauma: A systematic review. *Eye* 2013; 27: 28–36.

91. Mena OJ, Paul I and Reichard RR. Ocular findings in raised intracranial pressure. *Am J Forensic Med Path* 2011; 32: 55–57.

92. Chow MSM, Wu SL, Hui V, et al. Revisit the cavernous sinus from fetus to adult – new and old data. *Anat Rec* 2018; 301: 819–824.

93. Galaznik J. Private communication.

94. Moritani T, Smoker WRK, Sato Y, et al. Diffusion-weighted imaging of acute excitoxic brain injury. *AJNR Am J Neuroradiol* 2005; 26: 216–228.

# EXHIBIT 24



Received: 26 August 2021 | Revised: 1 October 2021 | Accepted: 5 October 2021

DOI: 10.1111/apa.16139

**REGULAR ARTICLE**

ACTA PÆDIATRICA
NURTURING THE CHILD
WILEY

# Retinal haemorrhage in infants investigated for suspected maltreatment is strongly correlated with intracranial pathology

**Ingemar Thiblin[1]** | **Jacob Andersson[1]** | **Knut Wester[2]** | **Göran Högberg[3]** |
**Ulf Högberg[4,5]**

[1]Department of Surgical Sciences, Uppsala University, Uppsala, Sweden

[2]Department of Clinical Medicine K1, University of Bergen, Bergen, Norway

[3]Private practice, Stockholm, Sweden

[4]Department of Women's and Children's Health, Uppsala University, Uppsala, Sweden

[5]Department of Epidemiology and Global Health, Umeå University, Umeå, Sweden

**Correspondence**
Ingemar Thiblin, Department of Forensic Medicine, Uppsala University, Box 1024, 751 40 Uppsala, Sweden.
Email: ingemar.thiblin@surgsci.uu.se

**Funding information**
The authors received no financial support for the research, authorship, and/or publication of this article

## Abstract

**Aim:** To test the two prevailing hypotheses regarding the aetiology of infant retinal haemorrhage: (a) traction forces exerted by the lens and/or corpus vitreum on the retina during infant shaking or (b) retinal vessel leakage secondary to intracranial pathology and raised intracranial pressure.

**Methods:** Comparison of medical findings and reported type of trauma in infants investigated for suspected physical abuse with presence ($n = 29$) or non-presence of retinal haemorrhage (RH) ($n = 119$).

**Results:** Intracranial pathology was recorded in 15 (13%) of the non-RH cases and in 27 (97%) of the RH cases ($p < 0.0001$). All 18 infants with bilateral RH had intracranial pathology. Of 27 infants subjected to witnessed or admitted shaking, two were in the group with RH. One had a single unilateral RH and no intracranial pathology. The other had bilateral RH and intracranial pathology with non-specific white matter changes, acute subdural and subarachnoid haemorrhages, and suspected cortical venous thrombosis. In 15 RH cases, there was no trauma reported and no findings other than RH and intracranial pathology. Accidental blunt head trauma was reported in 7 RH cases.

**Conclusion:** The present study indicates that RH in infants is secondary to intracranial pathology of non-specific aetiology.

**KEYWORDS**
infant abuse, intracranial pathology, retinal haemorrhage, subdural haemorrhage

## 1 | INTRODUCTION

Different mechanisms have been suggested to explain non-birth-related infant retinal haemorrhage, some solely involving traumatic aetiology and others pointing to either traumatic or non-traumatic aetiologies. Proposed mechanisms that are solely traumatic include traction forces on the retina exerted by the vitreous body when the infant is shaken[1,2] or disruption of retinal blood vessels by transmission shock waves along facial bones during blunt impact head injury.[3] Venous congestion resulting from increased intrathoracic pressure during forceful chest compression has also been suggested as a mechanism.[4]

A suggested mechanism that could arise through either traumatic or non-traumatic aetiology is leakage from congested retinal veins

**Abbreviations:** AHT, Abusive head trauma; ASAH, Acute subarachnoid haemorrhage; ASDH, Acute subdural haemorrhage; CSDH, Chronic subdural haemorrhage; ONSD, Optic nerve sheath diameter; RH, Retinal haemorrhage; RICP, Raised intracranial pressure; SBS, Shaken baby syndrome.

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited and is not used for commercial purposes.
© 2021 The Authors. *Acta Paediatrica* published by John Wiley & Sons Ltd on behalf of Foundation Acta Paediatrica.

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

because of raised intracranial pressure mediated via the optic nerve sheath.[5] Examples of traumatic aetiologies include retinal haemorrhage associated with subdural haemorrhage in infants injured in witnessed fall accidents[6,7] and traffic accidents.[8,9] Nontraumatic aetiologies include acute meningeal haemorrhage from a vascular malformation[10] or chronic subdural hematoma (CSDH)/hygroma, or external hydrocephalus with no evidence of trauma[11-13] and infectious disease.[14]

Despite these possible nontraumatic aetiologies, extensive retinal haemorrhage, especially when bilateral, has been claimed to be highly specific for infant abusive head trauma (AHT)[2,15] and described as a cardinal feature of shaken baby syndrome/abusive head trauma.[1] If such a specificity was the case, one would assume that a mechanism implying vitreoretinal traction as a separate local, intraocular event could cause RH independently of any intracranial pathology. Conversely, if the cause is an extraocular phenomenon, such as raised intracranial or intrathoracic pressure, one would expect the RH to be associated with these extraocular factors.

The purpose of the present study was to investigate the conflicting hypotheses that non-birth-related retinal haemorrhage in infants is independent of intracranial pathology, i.e. caused by direct forces in the eye vs. retinal haemorrhage being secondary to intracranial pathology associated with raised intracranial pressure.

## 2 | METHODS

### 2.1 | Study design

This is a comparative case series study.

### 2.2 | Participants

Infants (ages 1–365 days) who underwent examination because of suspicion of maltreatment during 1997 to 2014 were identified in the Swedish National Patient Register by the following ICD-10 codes (Swedish version of International Classification of Diseases 10th version): Z03.8K (observation for suspected maltreatment), Y07.9 (maltreatment and neglect by unspecified perpetrator), T74.1 (physical abuse, confirmed), and Y06 (neglect and abandonment). The medical records were requested from the paediatric departments in Sweden.

A total of 337 infants with any maltreatment diagnosis were identified, and medical records could be retrieved for 257 (76%). The inclusion criterion was that the infant had been examined with both fundoscopy and neuroimaging by computed tomography and/or magnetic resonance imaging, ultimately leading to inclusion of 148 infants.

### 2.3 | Case categorization

The 148 infants were categorized into two main groups with respect to the presence ($n = 29$) or non-presence of retinal haemorrhage (RH) ($n = 119$). The RH cases were divided into unilateral ($n = 10$) and

---

> **Keynotes**
>
> - The exact mechanism behind retinal haemorrhage in alleged abusive head trauma is unclear; a study that may clarify and possibly distinguish between proposed mechanisms is therefore warranted.
> - The present study revealed a strong correlation between presence of retinal haemorrhage and different types of subdural effusions. The correlation was apparently independent of underlying aetiology.
> - The results emphasize the need for studying infant retinal haemorrhage with well-defined abuse cases and controls.

bilateral RH ($n = 19$) subgroups for further comparisons of the main outcome. The examining ophthalmologists' original reports were not always available and when present, not systematically detailed. For this reason, RH was not graded beyond unilateral/bilateral.

### 2.4 | Outcome

The main outcome was defined as any kind of intracranial pathology, including intracerebral haemorrhage, acute subdural haemorrhage, chronic subdural haemorrhage, hygroma, acute subarachnoid haemorrhage, brain oedema, cortical vein thrombosis, sinus vein thrombosis, and contusions.

### 2.5 | Covariates

Additional outcomes registered for interpretation of pathogenesis were findings and symptoms consistent with raised intracranial pressure, reported type of trauma, signs of head trauma (scalp/facial soft tissue lesions and skull fractures), reason for seeking care, age in days, and sex.

Findings consistent with raised intracranial pressure were defined as any statement of papillary oedema, rapidly increasing head circumference, sunset gaze, increased suture diastasis, compressive effect of extra-cerebral effusion such as midline shift or compressed ventricles, alternatively an extra cerebral effusion (subarachnoid or subdural) in combination with enlarged ventricles as seen in external hydrocephalus[16] or objectively measured or observed raised intracranial pressure (such as "fluid emptying under high pressure") during neurosurgical interventions. Symptoms consistent with raised intracranial pressure were defined as vomiting, seizures, and lowered level of consciousness.

The type of reported trauma was based on statements by caregivers or witnesses: (a) shaking without blunt force trauma, (b) shaking with blunt force trauma, (c) solely blunt force trauma (both accidental and non-accidental), and (d) no trauma.

## 2.6 | Additional descriptive data

Age in weeks, birth data, history of trauma, and detailed results of neuroimaging and ophthalmological examination are reported at the individual level for the retinal haemorrhage cases.

## 2.7 | Statistics

Fisher's exact test was used to compare proportions, and the Wilcoxon rank sum test was used for comparisons of age. R version 1.2.1114 was employed for all calculations and graphical illustrations of descriptive statistics. A $p < 0.05$ was regarded as statistically significant.

## 2.8 | Ethics approval and consent to participate

The regional Ethical Review Board in Uppsala approved the study (2014–11–19 No 382). Approval for ordering medical records was obtained by the regional Ethical Review Board in Uppsala (2015–11–18 No 383/2) and by having the personal ID of the case medical records retrieved after each hospital's approval according to the Swedish Public Law and Privacy Act (2009:400).

## 3 | RESULTS

## 3.1 | General descriptive data

There was no difference in sex distribution between the 29 retinal haemorrhage (RH) cases and the 119 non-RH cases, 58% and 59% boys, respectively. Neither was there any statistically significant age difference between the two groups; the mean age in the RH infants was 104 - median age 82 (range, 16–355) days. Among the non-RH cases, the mean age was 140 - median age 116 (range, 3–349) days (W = 2060.50; $p = 0.09$) (Figure 1).

After exclusion of cases without intracranial pathology, the mean age for the retinal haemorrhage group was 108 days, and the median was 88 (range, 16–355) days. For the non-RH group, the mean age was 122 days, and the median was 119 (range, 19–294) days (W = 210; $p = 0.85$) (Figure 2).

## 3.2 | Reasons for seeking care

Neurological symptoms were the main reason for seeking care for all infants who had such symptoms, significantly more frequent in the retinal haemorrhage group (RH $n = 22$ of 29 [76%]; non-RH $n = 12$ of 119 [10%]; $p < 0.0001$). Other reasons for seeking care in both groups were increasing head circumference (RH group: $n = 4$ of 29 [14%]; non-RH group: $n = 3$ of 119 [2.5%]; $p = 0.03$), concern about possible injury after witnessed or admitted abuse by shaking or blunt head trauma (accidental or abusive; RH group: $n = 2$ of 29 [7%]; non-RH group: $n = 51$ of 119 [43%]; $p = 0.0002$), and symptomatic extracranial fractures (RH group: $n = 2$ of 29 [7%]; non-RH group: $n = 24$ of 119 [20%]; $p = 0.11$). In the non-RH group, seven infants were examined because a sibling had findings indicative of abuse, 17 were examined because of bruises, six because of incidental and asymptomatic skeletal findings on x-ray performed in the investigation of disease, two were referred for severe crying, and one because of burn injury. In two cases, the reason for seeking care remained unclear.

## 3.3 | Ocular and intracranial findings and neurological symptoms

Any kind of intracranial pathology was recorded in 15 (13%) of the 119 non-RH cases and in 27 (97%) of the 29 RH cases ($p < 0.0001$). All 19 infants with bilateral RH had intracranial pathology. Small and isolated RH was also found in two infants without intracranial pathology; a 3-week-old girl with spontaneous vaginal term delivery had two isolated RHs in one eye (Table S1 case 2). Shaking had been admitted,



**FIGURE 1** Age distribution in infants with ($n = 29$) and without ($n = 119$) retinal haemorrhage

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**FIGURE 2** Age distribution of infants with intracranial pathology with retinal haemorrhage (n = 27) and without retinal haemorrhage (n = 15)



**TABLE 1** Distribution of different kinds of intracranial pathology in infants with and without retinal haemorrhage

| Intracranial pathology | No RH (n = 119) | RH all (n = 29) | RH bilateral (n = 19) | RH unilateral (n = 10) | Fisher's exact test[a] |
|---|---|---|---|---|---|
| Any kind | 15 (13%) | 27 (97%) | 19 (100%) | 8 (80%) | RH all: (p < 0.0001) RH bi: (p < 0.0001) RH uni: (p < 0.0001) |
| ASAH[b] | 0 | 0 | 0 | | RH all:- RH bi:- RH uni:- |
| ASDH[c] | 1 (0.8%) | 1 (3%) | 1 (5%) | 0 | RH all: (p = 0.34) RH bi: (p = 0.11) RH uni: - |
| CSDH[d]/hygroma | 3 (2.5%) | 10 (34%) | 4(21%) | 6 (60%) | RH all: (p < 0.0001) RH bi (p = 0.001) RH uni: (p < 0.0001) |
| Mixed ASDH and CSDH/hygroma with ASAH | 3 (2.5%) | 2 (7%) | 2 (10%) | 0 | RH all: (p = 0.27) RH bi: (p = 0.14) RH uni: |
| Mixed ASDH and CSDH/hygroma without ASAH | 7 (5.8%) | 8 (28%) | 8 (42%) | 0 | RH all: (p = 0.002) RH bi: (p = 0.0001) RH uni:- |
| ASAH and ASDH | 1 (0.8%) | 3 (7%) | 2 (10%) | 1 (10%) | RH all: (p = 0.02) RH bi: (p < 0.05) RH uni: (p = 0.15) |
| Other (Supplementary table case 2,10, 12, 15, 21) | 0 | 5 (17%) | 2 (10%) | 3 (30%) | RH all:- RH bi:- RH uni:- |

[a]"No RH" is reference for all three RH groups.
[b]Acute subarachnoid haemorrhage.
[c]Acute subdural haemorrhage.
[d]Chronic subdural haemorrhage.

however without any recorded details of this shaking. The infant was asymptomatic, and the reason for seeking care was concern of possible injury caused by the admitted shaking. The other infant without intracranial pathology was an 11-week-old girl with a large head (head circumference +3 SD-Table S1 case 21). This infant had only a single RH in one eye. There were no neurological symptoms, and the reason for seeking care was a symptomatic femur shaft fracture.

Follow-up retinal examinations were reported in only one case—an 11-week-old girl with a chronic subdural haemorrhage that was surgically decompressed twice, first on day 2, and who later developed hydrocephalus (Table S1 case 14). At the first examination, there were discrete retinal haemorrhages in one eye; on the second examination 5 days later and after the child had been transferred to foster care, new RHs had developed in the posterior pole of the

same eye. On the third examination on day 14, all RHs had resolved—this infant was shunted because of hydrocephalus.

Papillary oedema was rare, described in only three cases, all in the retinal haemorrhage group (Table S1 cases 11, 17, and 23). One had a chronic subdural haemorrhage/hygroma without any component of acute haemorrhage; the two others had mixed density—unilateral subdural haemorrhage and tense fontanelles. The reason for seeking care was increasing head size in case 23 and vomiting, seizures, and reduced level of consciousness in the other two cases.

## 3.4 | Nature of intracranial pathology

For details regarding the types of intracranial pathology and their distribution between the two patient groups, see Table 1. A total of 42 of 148 infants had an intracranial pathological condition; in 40 cases this consisted of extra cerebral fluid collections containing blood elements. The great majority (n = 33, 82.5%) of these had blood elements indicating chronicity (chronic subdural haemorrhage/hygroma or mixed density chronic and acute subdural haemorrhage with or without acute subarachnoid haemorrhage). Isolated acute subarachnoid haemorrhage was not described in any of the cases, and acute subdural haemorrhage (with or without acute subarachnoid haemorrhage) was rare in both groups, four (14%) in the retinal haemorrhage group and two (1.7%) in the non-retinal haemorrhage group. Chronic subdural haemorrhage/hygroma as well as mixed density acute subdural haemorrhage and chronic subdural haemorrhage/hygroma was strongly associated with retinal haemorrhage, which applies also to when the isolated unilateral retinal haemorrhage group is analysed separately. Three infants had intracranial pathology other than, or in addition to subdural effusions. These were brain oedema (Table S1 case 12), contusion, intracerebral haemorrhage and chronic subdural haemorrhage (Table S1 case 10), and contusion (Table S1 case 15).

In three of the retinal haemorrhage cases (Table S1 cases 25, 28, and 29) and four of the non-RH cases, increased subarachnoid space and/or increased ventricle size were noted in the radiologist's report.

## 3.5 | Raised intracranial pressure

A comparison of findings indicative of raised intracranial pressure (see Material and Methods for definitions) in infants with intracranial pathology showed that 16 of 27 (59%) in the retinal haemorrhage group and 4 of 15 (27%) in the non-RH group had such findings (p = 0.06). Neurological symptoms (vomiting, seizures, lowered level of consciousness, apnoea) were recorded in 22 (76%) of the 29 RH cases and in 12 (10%) of the 119 non-RH cases (p < 0.0001). Those with unilateral vs. bilateral RHs differed significantly with respect to the presence of neurological symptoms compatible with raised intracranial pressure (5 unilateral [45%] vs.

17 bilateral [94%]; p = 0.006) and clinical and radiological findings indicating raised intracranial pressure (3 unilateral RH [30%] vs 13 bilateral RH [68%]; p = 0.01). Of the 29 infants with RH, 12 (41%) had both objective clinical/radiological findings and neurological symptoms compatible with raised intracranial pressure. Twenty-six (90%) of the 29 infants with RH had any combination of objective signs and/or neurological symptoms consistent with raised intracranial pressure.

Witnessed or admitted physical abuse of any kind was reported in 35 (29%) of the 119 non-RH cases and in two (7%) of the 29 RH cases (p = 0.005).

Of 27 infants subjected to witnessed or admitted shaking with (n = 4) or without (n = 23) blunt force impact, one had bilateral retinal haemorrhage. This infant also had intracranial pathology, including ASDH, acute subarachnoid haemorrhage, suspected small chronic subdural haemorrhage, suspected cortical vein thrombosis, and non-specific white matter changes. Another vaginally delivered 3-week-old infant subjected to abusive shaking had two isolated retinal haemorrhages without intracranial pathology.

## 3.6 | Other cranial findings

Three children, 3, 6, and 8 weeks old, in the retinal haemorrhage group had bruising and/or soft tissue swelling in the scalp with underlying skull fracture. Two infants, 24 and 25 weeks old, in the RH group had a skull fracture without a bruise or soft tissue swelling. Thus, five infants of 29 (17%) in the retinal haemorrhage group had a skull fracture. In the non-RH group, 18 of 119 (15%, mean age 16 weeks, median 15 weeks, range 0–33 weeks) had a skull fracture, 10 also with a related soft tissue injury and 3 with intracranial pathology (one chronic subdural haemorrhage, and two acute subdural haemorrhage). Nine additional infants had scalp hematoma without fracture in the non-RH group, one of whom had intracranial pathology (chronic subdural haemorrhage with high attenuating components interpreted as fresh blood).

## 3.7 | Reported type of trauma

Witnessed or admitted shaking without blunt force impact was reported in one (3%) of the 29 retinal haemorrhage cases (3-week-old vaginally delivered infant with unilateral RH and no intracranial pathology, Table S1 case 2) and in 22 (18%) of the 119 non-RH cases (p = 0.05). Witnessed or admitted shaking with blunt force impact was reported in one (3%) of the 29 RH cases (Table S1 case 3) and in three (2.5%) of the 119 non-RH cases.

Witnessed or admitted/reported blunt force was documented in nine (31%; abusive in 2, accidental in 7) of the 29 retinal haemorrhage cases and in 38 (32%; abusive in 26, accidental in 12) of the 119 non-RH cases.

In the 15 infants who had intracranial pathology without retinal haemorrhage, shaking with or without blunt force trauma was

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

not reported. Blunt force trauma (all accidental falls) was reported in eight of these cases. In six of the cases, no history of trauma was given. In the last case, a neighbour had informed the social authority of maltreatment, but there was no information about trauma in the medical records.

# 4 | DISCUSSION

## 4.1 | Principal findings

In the present study, there was a strong association between retinal haemorrhage and intracranial pathological conditions in infants with suspected shaken baby syndrome/abusive head trauma. Almost all (97%) infants with retinal haemorrhage also had intracranial pathology, whereas only a small proportion (13%) without retinal haemorrhage did so. Conversely, a large proportion (62%) of infants with intracranial pathology also had retinal haemorrhage. Retinal haemorrhage without intracranial pathology was found in only two cases. In both, the retinal haemorrhages (one in one infant, two in the other, Table S1 case 1 and case 2) were unilateral. The retinal haemorrhages in the 3 week old infant (Case 2) may have originated at birth since retinal haemorrhages may resolve over a period of several weeks.[17,18] For infants harbouring bilateral retinal haemorrhage, the association with intracranial pathology was absolute.

## 4.2 | Reasons for seeking care

There were large differences between the groups regarding what symptoms and findings that caused care givers to seek health care. For the retinal haemorrhage group, the reasons appeared in general to reflect more serious intracranial condition than the reasons given by the care givers in the non-RH group; neurological symptoms and increasing HC were significantly more common as reason for referral in the RH group, whereas concern that shaking alone or together with blunt head trauma had caused an injury was much more frequent in the non-RH group.

There was an overweight of objective findings of injury in the non-RH group too; however, these did not indicate severe *intracranial* conditions, but with extracranial locations, such as extracranial fractures, bruises, and incidental and asymptomatic skeletal x-ray abnormalities found during investigation of diseases. Moreover, some infants were examined because siblings had findings suggesting abuse.

## 4.3 | Mechanism of retinal haemorrhage

As discussed in the Introduction, the aim of the present comparative case series study was to test the two prevailing hypotheses of the mechanism of non-birth-related infantile retinal haemorrhages: vitreoretinal traction vs. leakage from congested retinal veins secondary to intracranial conditions. The fundamental predicted consequence of the latter hypothesis is that cases involving retinal haemorrhage should also have intracranial pathology, which was the case in our series. However, such an association does not necessarily prove causality. Unfortunately, follow-up ocular examination was reported in only one infant (Table S1 case 14) and demonstrated that new retinal haemorrhages did develop after the infant had been transferred to foster care. This finding indicates that the infant's retinal haemorrhage was secondary to the intracranial pathology and not caused by any direct, physical effects on the intraocular contents. In other words, the intracranial pathology preceded the retinal haemorrhage, and this finding supports the notion of causality between the two. In our study, findings indicative of raised intracranial pressure were significantly overrepresented in infants with bilateral RH compared with those having only unilateral retinal haemorrhage, suggesting a dose–response relationship that supports causality.

A study of children age <2 years with retinal haemorrhage showed that extensive retinal haemorrhage resolves to being not visible or mild within 1 to 2 weeks and does not persist as extensive for longer than a few days.[19] Thus, if the chain of causality repeated shaking–vitreoretinal traction–retinal haemorrhage is valid, the concomitant intracranial pathology would be expected to be acute. However, in our series, five infants with bilateral retinal haemorrhage had chronic subdural haemorrhage/hygroma without any component of fresh blood. This finding is incompatible with a simultaneous development of intracranial and ocular pathology but is compatible with retinal haemorrhage being secondary to intracranial pathology leading to intraocular vascular leakage. An association between non-acute intracranial pathology and retinal haemorrhage (also extensive) has previously been noted in infants with hygroma and external hydrocephalus.[11–13,16] Four infants in the present study had purely high density subdural haemorrhage on computer tomography, which would normally indicate acute subdural haemorrhage, and two of these infants also had acute subarachnoid haemorrhage. This observation might lead to the conclusion that the retinal haemorrhages and the intracranial pathology appeared at the same time, in other words that the two were independent of each other. However, because neuroimaging and ocular examinations were not performed in immediate connection to the infant showing signs of encephalopathy, the possibility of the retinal haemorrhages being secondary to intracranial pathology still remains.

Of 27 infants subjected to witnessed or admitted shaking, only one had bilateral retinal haemorrhage, and this infant was preterm with both chronic and acute intracranial conditions. Thus, retinal haemorrhage as a consequence of vitreoretinal traction does not gain support from the results of the present study.

## 4.4 | Raised intracranial pressure

Although assuming that infant retinal haemorrhage is secondary to intracranial pathology, as our results indicate, the precise mechanism of the retinal haemorrhage cannot be determined from the study data. However, the high proportion (90%) of infants with retinal

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

haemorrhage who also had findings or symptoms indicative of raised intracranial pressure suggests that this factor is important in retinal haemorrhage pathogenesis. It has been suggested that a rapid rise in intracranial pressure leads to decreased venous drainage of the eyes, resulting in vitreous hypertension and retinal or vitreous haemorrhage in adults.[21-23] Mena et al.[10] have suggested that the same mechanism may explain retinal haemorrhage in infants. This mechanism is consistent with the high proportion of mixed density-density subdural effusions in cases of retinal haemorrhage in the present study. A chronic subdural haemorrhage/hygroma or external hydrocephalus may be complicated by a spontaneous acute haemorrhage,[11,12,23-26] and a recent case report provides convincing evidence that such complications can cause extensive retinal haemorrhage.[7]

As is well known, raised intracranial pressure can lead to symptoms of encephalopathy, such as seizures, reduced level of consciousness, impaired breathing, and vomiting. Thus, a rise in the intracranial pressure from an acute haemorrhage in a chronic subdural haemorrhage or as a complication of external hydrocephalus may trigger symptoms such as vomiting, seizures, intense crying, or apnoea. These in turn may add to venous congestion by the Valsalva mechanism (vomiting, seizures) or increased brain perfusion as a response to hypoxia. In a study describing signs of progressive hydrocephalus in 107 children, 33 of whom were infants, retinal haemorrhage was not described in any case.[27] This observation seems to be in line with the hypothesis that retinal haemorrhage results from a rapid rise in the intracranial pressure rather than a slowly developing raised intracranial pressure over days, as suggested by Walsh and Hedges.[28] The cavernous sinuses are not developed until about 6–7 months age and the venous drainage occurs via anastomoses to the face and nasopharynx veins.[29] Perhaps this anatomical feature in the young infants makes them more prone to develop retinal haemorrhage in connection with a rapid raise of intracranial pressure.

## 4.5 | The lack of papillary oedema

Although the large majority (90%) of our infants with retinal haemorrhage had signs and/or symptoms of raised intracranial pressure, papillary oedema was described in very few (11%). Because some of the infants without papilledema in the present study had raised intracranial pressure verified by objective measures during neurosurgery, the non-presence of papilledema seems to be of limited value for ruling out raised intracranial pressure in infants with retinal haemorrhage. Unfortunately, very few studies exist on the presence of papilledema in infants with raised intracranial pressure. A rare occurrence of papilledema with probable raised intracranial pressure has earlier been described among infants with both non-shunted and shunted progressive hydrocephalus. In that study, 2 out of 33 (6%) had papillary oedema, whereas other signs of raised intracranial pressure such as tense fontanelle and splayed sutures were much more common.[27] Furthermore, studies on the optic nerve sheath diameter (ONSD) and intracranial pressure have demonstrated that a pathologically widened ONSD is rare in young infants as long as

the fontanels are open.[30,31] However, in infants/children with closed fontanels, the ONSD correlated well with the intracranial pressure elevation. As a widened ONSD most likely is a prerequisite for papilledema, the lack of papilledema in our infants can therefore not be taken as a sign of a normal intracranial pressure.

## 4.6 | Medico-legal implications

The results of the present comprehensive case series study suggest that non–birth-related retinal haemorrhages in infants are secondary to traumatic or non-traumatic intracranial pathology associated with raised intracranial pressure and that isolated shaking is unlikely to cause retinal haemorrhage independently of intracranial pathology. Consequently, the presence of retinal haemorrhage provides no reliable information about the aetiology of the intracranial pathology, and abusive head trauma cannot be inferred solely based on the combination of the two.

To move towards evidence-based medico-legal assessment of the aetiology of infant intracranial pathology, the examination needs to include risk factors for intracranial pathology, such as prematurity, small for gestational age, and multiparity,[32] and markers of benign external hydrocephalus, such as rapid increase in head size and certain radiological findings.[33] The neuroradiological examination should also include state-of-the-art procedures for detecting signs of vascular malformations and cerebral venous thrombosis.

## 4.7 | Strengths and limitations

To avoid a spurious correlation between intracranial pathology and retinal haemorrhage, the primary inclusion criterion in this study was that infants had to have been examined for the suspicion of maltreatment, irrespective of the findings. A drawback with this selection procedure is that infants with symptomatic intracranial pathology related to trauma corroborated by independent (not by acquaintance) observation were few, and cases related to diagnosed disease or vascular malformation were not included by definition, since shaken baby syndrome/abusive head trauma is regarded as a diagnosis by exclusion of non-traumatic causes.

A strength of the present study is the national coverage over a long period of 18 years, making it possible to identify several cases of suspected maltreatment examined by both neuroimaging and fundoscopy. As is always the case, the retrospective study design has its limitations. The quality of the information in the medical records is far from uniform with respect to descriptions of traumatic events, neuroimaging, and ocular examination, with the last variable especially making systematic grading of the pattern and extent of retinal haemorrhage beyond unilateral vs. bilateral impossible.

The retrospective design also means failure to retrieve medical records for all identified cases. The reason for the hospital turning down requisitions is unclear, but selection bias from findings or circumstances unique to the non-provided cases seems unlikely.

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 5 | CONCLUSION

The results of the present study indicate that non-birth-related retinal haemorrhage in infants are secondary to intracranial pathology associated with raised intracranial pressure, which may be of traumatic or non-traumatic origin and not the result of traction forces between the retina and vitreous body acting directly on the retinal vessels. Consequently, the presence or non-presence of RH cannot be regarded as a reliable basis for determining the underlying aetiology of the intracranial pathology. Furthermore, retinal haemorrhage is likely to have low sensitivity for detecting head trauma and thus also for ruling out infant maltreatment, making them of limited value in the investigation of suspected infant abuse.

### CONFLICT OF INTEREST

Ingemar Thiblin, Ulf Högberg, and Knut Wester have written statements and appeared in court in child abuse cases both on the request of the prosecutor or the court and the defence. Göran Högberg has written statements and appeared in court in child abuse cases on the request of the defence.

### ORCID

*Ingemar Thiblin* 🔾 https://orcid.org/0000-0002-2962-2466
*Jacob Andersson* 🔾 https://orcid.org/0000-0001-8266-1926
*Knut Wester* 🔾 https://orcid.org/0000-0001-8489-3931
*Ulf Högberg* 🔾 https://orcid.org/0000-0002-2121-7511

### REFERENCES

1. Levin AV. Retinal hemorrhage in abusive head trauma. Pediatrics. 2010;126(5):961-970.
2. Christian CW. Committee on child abuse and neglect, American academy of pediatrics. the evaluation of suspected child physical abuse. Pediatrics. 2015;135(5):e1337-e1354. https://doi.org/10.1542/peds.2015-0356. ISSN 0031-4005, 1098-4275.
3. Rao N, Smith RE, Choi JH, Xiaohu X, Kornblum RN. Autopsy findings in the eyes of fourteen fatally abused children. Forensic Sci Int. 1988;39(3):293-299.
4. Tomasi LG. Purtscher retinopathy in the battered child syndrome. Arch Pediatr Adolesc Med. 1975;129(11):1335.
5. Emerson MV, Jakobs E, Green WR. Ocular autopsy and histopathologic features of child abuse. Ophthalmology. 2007;114(7):1384-1394.
6. Atkinson N, van Rijn RR, Starling SP. Childhood falls with occipital impacts. Pediatr Emerg Care. 2018;34(12):837-841.
7. Aoki N. Infantile acute subdural hematoma with retinal hemorrhage caused by minor occipital impact witnessed by an ICU Nurse: a case report. J Pediatr Neurol Neurosci. 2020;4(1):47-50.
8. Vinchon M, Noizet O, Defoort-Dhellemmes S, Soto-Ares G, Dhellemmes P. Infantile subdural hematomas due to traffic accidents. Pediatr Neurosurg. 2002;37(5):245-253.
9. Kivlin JD, Currie ML, Greenbaum V, et al. Retinal hemorrhages in children following fatal motor vehicle crashes: a case series. Arch Opthalmol. 2008;126(6):800-804.
10. Mena OJ, Paul I, Reichard RR. Ocular Findings in raised intracranial pressure: a case of Terson syndrome in a 7-month-old infant. Am J Forensic Med Pathol. 2011;32(1):55-57.
11. Scheller J. Infantile retinal hemorrhages in the absence of brain and bodily injury. Acta Paediatr. 2017;106(12):1902-1904.
12. Wester K. Two infant boys misdiagnosed as "shaken baby" and their twin sisters: a cautionary tale. Pediatr Neurol. 2019;97:3-11.
13. Scheller J. An unexpected cause of bilateral retinal hemorrhage in a four-month-old boy. Pediatr Neurol. 2018;78:79. https://doi.org/10.1016/j.pediatrneurol.2017.07.015
14. Salvatori MC, Lantz PE. Retinal hemorrhages associated with fatal paediatric infections. Med Sci Law. 2015;55(2):121-128. PMID: 24644226.
15. Maguire SA, Watts PO, Shaw AD, et al. Retinal hemorrhages and related findings in abusive and non-abusive head trauma: a systematic review. Eye Lond Engl. 2013;27(1):28-36.
16. Maytal J, Alvarez LA, Elkin CM, Shinnar S. External hydrocephalus: radiologic spectrum and differentiation from cerebral atrophy. AJR Am J Roentgenol. 1987;148(6):1223-1230.
17. Naderian G, Fesharaki H, Sajjadi V, et al. Retinal hemorrhages in a neonate following vacuum extraction. J Ophthalmic vis Res. 2013;8(2):179-181.
18. Watts P, Maguire S, Kwok T, et al. Newborn retinal hemorrhages: a systematic review. J AAPOS. 2013;17(1):70-78.
19. Binenbaum G, Chen W, Huang J, Ying G-s, Forbes BJ. The natural history of retinal hemorrhage in pediatric head trauma. J Am Assoc Pediatr Ophthalmol Strabismus. 2016;20(2):131-135.
20. Lee HC, Chong S, Lee JY, et al. Benign extracerebral fluid collection complicated by subdural hematoma and fluid collection: clinical characteristics and management. Childs Nerv Syst. 2018;34(2):235-245.
21. Muller PJ, Deck JHN. Intraocular and optic nerve sheath hemorrhage in cases of sudden intracranial hypertension. J Neurosurg. 1974;41(2):160-166.
22. Medele RJ, Stummer W, Mueller AJ, Steiger H-J, Reulen H-J. Terson's syndrome in subarachnoid hemorrhage and severe brain injury accompanied by acutely raised intracranial pressure. J Neurosurg. 1998;88(5):851-854.
23. Vinchon M, Delestret I, DeFoort-Dhellemmes S, Desurmont M, Noulé N. Subdural hematoma in infants: can it occur spontaneously? Data from a prospective series and critical review of the literature. Child's Nerv Syst. 2010;26(9):1195-1205.
24. Laubscher B, Deonna T, Uske A, van Melle G. Primitive megalencephaly in children: natural history, medium term prognosis with special reference to external hydrocephalus. Eur J Pediatr. 1990;149(7):502-507.
25. Hellbusch LC. Benign extracerebral fluid collections in infancy: clinical presentation and long-term follow-up. J Neurosurg Pediatr. 2007;107(2):119-125.
26. Ghosh PS, Ghosh D. Subdural hematoma in infants without accidental or nonaccidental injury: benign external hydrocephalus, a risk factor. Clin Pediatr (Phila). 2011;50(10):897-903.
27. Kirkpatrick M, Engleman H, Minns RA. Symptoms and signs of progressive hydrocephalus. Arch Dis Child. 1989;64(1):124-128.
28. Walsh FB, Hedges TR. Optic nerve sheath hemorrhage. Am J Ophthalmol. 1951;34(4):509-527.
29. Chow MSM, Wu SL, Hui V, Chow TCH, Yew DT. Revisit the cavernous sinus from fetus to adult—new an old data. Anat Rec. 2018;301:819-824.
30. Kerscher SR, Schöni D, Hurth H, et al. The relation of optic nerve sheath diameter (ONSD) and intracranial pressure (ICP) in pediatric neurosurgery practice - Part I: Correlations, age-dependency and cut-off values. Child's Nervous System. 2020;36(1):99-106.
31. Kerscher SR, Schöni D, Neunhoeffer F, et al. The relation of optic nerve sheath diameter (ONSD) and intracranial pressure (ICP) in pediatric neurosurgery practice—Part II: Influence of wakefulness, method of ICP measurement, intra-individual ONSD-ICP correlation and changes after therapy. Child's Nervous System. 2020;36(1):107-115.

32. Högberg U, Andersson J, Squier W, et al. Epidemiology of subdural hemorrhage during infancy: a population-based register study. PLoS One. 2018;13(10):e0206340. https://doi.org/10.1371/journal.pone.0206340

33. Zahl SM, Egge A, Helseth E, Wester K. Benign external hydrocephalus: a review, with emphasis on management. Neurosurg Rev. 2011;34(4):417-432.

## SUPPORTING INFORMATION

Additional supporting information may be found in the online version of the article at the publisher's website.

**How to cite this article:** Thiblin I, Andersson J, Wester K, Högberg G, Högberg U. Retinal haemorrhage in infants investigated for suspected maltreatment is strongly correlated with intracranial pathology. Acta Paediatr. 2022;111:800–808. https://doi.org/10.1111/apa.16139

16512227, 2022, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/apa.16139 by Test, Wiley Online Library on [14/04/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License