# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

| | | |
|---|---|---|
| IN RE | ) | No. _____ |
| ROBERT LESLIE ROBERSON III, | ) | |
|     MOVANT | ) | |
| | ) | |

## OPPOSED MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

## Appendix of Exhibits

| No. | Document |
|---|---|
| **Volume I** | |
| 1 | Proposed Successive Habeas Petition |
| 2 | Robert Roberson Arrest Warrant and Dr. Janet Squires' REACH affidavit |
| 3 | Nikki Curtis Autopsy Report |
| 4 | SWIFS Investigation Narrative |
| 5 | 2003 Trial References to SBS |
| 6 | CV & Affidavit of Dr. Janice Ophoven (2016) |
| 7 | CV & Affidavit of Kim Basinger |
| 8 | CV & Affidavit of Dr. Francis Green (2024) |
| 9 | CV & Affidavit of Dr. Keenan Bora (2024) |
| 10 | CV & Affidavit of Dr. Julie Mack (2024) |
| 11 | CV & Affidavit of Dr. Michael Laposata (2025) |
| 12 | Joint Statement of Pathologists (February 2025) |
| **Volume II** | |
| 13 | Transcript J. Urban testimony in Texas v. Young, (August 19, 2024) |
| 14 | Email from J. Urban's assistant to V. Potkin (August 20, 2024) |
| 15 | Declaration of Patricia Conklin |
| 16 | Declaration of Brian Wharton (2022) |
| 17 | Declaration of Brian Wharton with DMN OpEd (May 28, 2024) |

| | |
|---|---|
| 18 | CV & Report of Dr. Roland Auer (2021) |
| 19 | Göran Elinder et al, *Traumatic Shaking: The Role of the Triad in Medical Investigations of Suspected Traumatic Shaking*, Report No. 255E (Oct. 2016) |
| 20 | Chris Brook, *Retino-dural hemorrhages in infants are markers of degree of intracranial pathology, not of violent shaking*, Ann. Child Neur. Soc. 00(00): 1-7 (2024) |
| 21 | J. Tibballs and N. Bhatia, *Medical and Legal Uncertainties and Controversies in "Shaken Baby Syndrome" or Infant "Abusive Head Trauma,"* J. LAW & MED. 151-184 (May 2024) |
| 22 | Norrell Atkinson, et al., *Childhood Falls with Occipital Impacts*, 34 Pediatric Emergency Care 837-41 (2018) |
| 23 | D. Vaslow, *Chronic Subdural Hemorrhage Predisposes to Development of Cerebral Venous Thrombosis and Associated Retinal Hemorrhages and Subdural Rebleeds in Infants*, 35 Neuroradiology Journal 53-66 (2022) |
| 24 | I. Thiblin, et al, *Retinal Haemorrhage in Infants Investigated for Suspected Maltreatment is Strongly Correlated with Intracranial Pathology*, 111 Acta Paediatrica 800-08 (2022) |
| **Volume III** | |
| 25 | W. Squier, *Infant Retinal Haemorrhages Correlate with Chronic Subdural Haemorrhage, not Shaking*, 111 Acta Paediatrica 714-15 (2022) |
| 26 | J. Andersson, et al, *External Hydrocephalus as a Cause of Infant Subdural Hematoma: Epidemiological and Radiological Investigations of Infants Suspected of Being Abused*, 126 Pediatric Neurology 26-34 (2021) |
| 27 | S.M. Zahl, et al, *Examining Perinatal Subdural Haematoma as an Aetiology of Extra-Axial Hygroma and Chronic Subdural Haematoma, Acta Paediatrica* (2019) |
| 28 | I. Thiblin et al., *Medical Findings and Symptoms in Infants Exposed to Witnessed or Admitted Abusive Shaking: A Nationwide Registry Study*, 15 PLOS ONE 8–9 (2020) |
| 29 | J. Mack, et al., *Anatomy and Development for the Meninges: Implications for Subdural Collections and CSF Circulation*, 39 PEDIATRIC RADIOLOGY 200–210 (2019) |
| 30 | N. Aoki, *Infantile Acute Subdural Hematoma with Retinal Hemorrhage Caused by Minor Occipital Impact Witnessed by an ICU Nurse: a Case* |

|  | *Report*, 4 Journal of Pediatric Neurology and Neuroscience 47-50 (2020) |
| 31 | C. Brook, et al, *26 cm fall caught on video causing subdural hemorrhages and extensive retinal hemorrhages in an 8-month-old infant*, Clinical Case Reports (July 2024) |
| 32 | M. Hajiaghamemar, et al, *Infant Skull Fracture Risk for Low Height Falls*, 133 International Journal of Legal Medicine 847-62 (2019) |
| 33 | K Wester, et al, *Re-evaluation of Medical Findings in Alleged Shaken Baby Syndrome and Abusive Head Trauma in Norwegian Courts Fails to Support Abuse Diagnoses*, 111 Acta Paediatrica 779-92 (2022) |
| 34 | C. Brook, *Evidence for significant misdiagnosis of abusive head trauma in pediBIRN data*, For. Sci. Int'l: Synergy 6 (2023) |
| 35 | Declaration of Juror Terre A. Compton (2022) |
| 36 | CV & Declaration of John Plunkett, MD |
| 37 | Email to Anderson County DA re Dr. Plunkett |
| 38 | "Shaken Baby Syndrome: Rotational Cranial Injuries-Technical Report" *American Academy of Pediatrics* (2001). |
| 39 | Niels Lynoe, MD, PhD, et al. "Insufficient evidence for 'shaken baby syndrome' - a systematic review." |
| 40 | CV & Chart of Carl Wigren, MD (2020) |
| 41 | CV & Declaration of Harry Bonnell, MD |
| 42 | Pediatrician's letter re Nikki's apneic episodes (August 24, 2000) |
| **Volume IV** | |
| 43 | Texas Defender Service, *An Unfulfilled Promise: Assessing the Efficacy of Article 11.073* (July 2024) |
| 44 | Texas House Committee Interim Report, November 19, 2024 |
| 45 | Criminal Jurisprudence Hearing Transcript, Oct 21 2024 |
| 46 | *In re Wood*, No. 25-10359 (5th Cir. Mar. 11, 2025) (not designated for publication) |

# EXHIBIT 43



JULY 2024

# An Unfulfilled Promise: Assessing the Efficacy of Article 11.073

## A CRITICAL EXAMINATION OF TEXAS'S "JUNK SCIENCE" LAW

### TEXAS DEFENDER SERVICE

# TABLE OF CONTENTS

**1**   **Executive Summary**

**3**     11.073 by the Numbers

**5**   **Introduction**

**7**     The Scientific and Legal Landscape Leading up to the Creation of Article 11.073

**10**     Text of Article 11.073

**11**   **Findings**

**22**   **Robert Roberson:  Evidence of Changed Science and Actual Innocence — Still Not Enough?**

**25**   **Recommendations**

**28**   **Conclusion**

**29**   **Endnotes**

# EXECUTIVE SUMMARY

No one should be forced to serve a prison sentence—or face the death penalty and be executed—because they were convicted based on unreliable forensic evidence. But the reality is that scores of innocent people are serving prison terms, or even facing execution, simply because their juries trusted forensic evidence—from DNA to fingerprints to ballistics—that was later found to be untrustworthy. Yet for years, in both Texas and across the country, people who were convicted based on flawed forensic evidence had no legal recourse in the courts to be relieved of their convictions.

Then, just over a decade ago, the Texas Legislature took a revolutionary step forward for people who were wrongfully convicted based on flawed forensics: it passed Texas Code of Criminal Procedure Article 11.073 (hereinafter 11.073). The first statute of its kind in the United States, 11.073 created a pathway for people whose convictions were based on false forensic evidence to show those faults and ultimately secure their freedom.

**Is Article 11.073 fulfilling its powerful initial vision: to grant relief to innocent people who are incarcerated on the basis of flawed scientific evidence?**

**The answer is no.**

Texas Defender Service systematically examined the more than 70 cases raised under 11.073 between September 2013 and December 2023. We found that 11.073 is not working to provide relief to innocent people convicted based on false or unreliable forensic evidence. Due both to the Texas Court of Criminal Appeals's (CCA) interpretation of the statute and lack of guidance in the statute itself, 11.073 is not operating as the Texas Legislature intended:

**#1—The Statute Does Not Go Far Enough to Protect Innocent People Who Were Convicted Based on Junk Science:** At the heart of 11.073 is the Texas Legislature's recognition that an innocent person convicted based on flawed forensic evidence should be able to overturn their conviction if they can show (1) that the evidence was flawed and (2) that without this flawed evidence, the jury would have found them "not guilty." This is the standard written in the statute itself, and it is designed to provide a pathway for innocent people who are serving sentences based on unreliable forensic evidence. But in practice, the CCA does not apply this standard. Instead, it usually only grants relief if a person can show evidence strong enough to eliminate any rational basis for their conviction, such as exonerating DNA evidence or an alternate perpetrator. This is the legal "actual innocence" standard, and it is higher than the standard written in the 11.073 statute. The legal "actual innocence" standard also places an impossibly high burden on innocent people convicted based on flawed forensic evidence. For the vast majority of people who are actually innocent, meeting the high evidentiary burden of the legal "actual innocence" standard years—or decades—after their conviction is out of the question.

Innocent incarcerated people are almost never in a position to do the intensive police work required to reconstruct a crime scene, uncover previously unknown eyewitnesses, or track down an alternate perpetrator. Moreover, original evidence may have gone stale, and eyewitnesses can be missing, deceased, or are no longer able to recall specific details.

**#2—The CCA Largely Restricts Relief to Cases Involving New DNA Evidence, Even Though Most Wrongful Convictions Are Based on Other Types of Flawed Forensic Evidence:** The CCA primarily grants relief in cases involving DNA evidence, ignoring many other cases involving false forensic evidence. This is concerning because nationwide data shows that false DNA evidence is only involved in a relatively small number of wrongful convictions.

**#3—The CCA is Not Granting Relief to Death-Sentenced People Under 11.073:** The CCA has never granted 11.073 relief to a person sentenced to death, as compared to granting relief to 31% of people who seek relief and are serving non-death sentences. Given the historically high rates of exonerations in capital cases, the total failure of the CCA to grant 11.073 claims for death-sentenced people—compared to nearly a third of all other people—is especially concerning.

**#4—People Without Counsel are Functionally Barred from Meaningfully Seeking Relief Under 11.073:** People who represent themselves in their 11.073 applications are effectively denied access to relief under 11.073 due to their lack of legal counsel. Of the 74 applications filed and adjudicated between September 2013 and December 2023, 19 were filed by people without lawyers. Of those 19 people without lawyers, only one has ever been granted relief, a stark drop-off from the 25% of people with counsel who receive relief.

**#5—Procedural Bars Prevent Large Numbers of 11.073 Applications from Being Considered on the Merits:** Despite having valid claims, many people who seek relief under 11.073 never receive consideration of their claims on the merits because of procedural issues. These barriers especially impact people sentenced to death and people without lawyers.

Texas took an extraordinary step in enacting 11.073, but more must be done to ensure that the statute operates as the Texas Legislature intended. In this report, we recommend steps the Texas Legislature can take to ensure that 11.073 serves its intended function: creating a pathway to relief for innocent people who were convicted on the basis of false or unreliable forensic evidence.

# 11.073 BY THE NUMBERS

74 applications have been filed and ruled on by the CCA under 11.073 since the inception of the statute.



## 20%

15 PEOPLE, OR 20% OF THOSE WHO APPLIED, HAVE RECEIVED RELIEF.

## 34%

People facing the death penalty have filed 25 applications, constituting 34% of all applications filed.

THE RATE OF RELIEF FOR PEOPLE FACING THE DEATH PENALTY IS **0%**

## Most Common 11.073 Claims

| Claim | |
|---|---|
| DNA | ████████████████████████ |
| Cause of Death | █████ |
| Eyewitness Testimony | ██ |

0   5   10   15   20   25   30   35

- The most commonly raised claims are errors related to DNA, appearing in 34 of the 74 applications filed. The second-most common error raised is cause of death determination (9 applications), followed by eyewitness testimony (5 applications).

- DNA claims are significantly overrepresented in successful applications. Of people granted relief under 11.073, nearly three-quarters—73%—were successful on DNA-based claims, even though DNA claims appeared in only 46% of applications.

## 73%

of the cases where the CCA has granted relief under 11.073 involved individuals who not only proved they were wrongfully convicted but also affirmatively demonstrated their actual innocence.

## Legal Representation

**Of the 74 applications filed and adjudicated,19, or 26%, were filed by people without lawyers,** and 55 were filed by people who had lawyers.



● Applicants with legal representation
● Applicants without legal representation

Only one person who filed without a lawyer has ever received relief under the statute, and he was out on parole. **People without lawyers received relief at a rate of 5%, compared with 25% of people with lawyers.** The CCA dismissed or denied 16 of 19, or 84%, of applications from people without counsel without a written order, compared to 16% of people who had legal representation.

## Procedural Bars





At least 28 of the 74 11.073 applications filed since 2013, or **38%, have been barred on procedural grounds**. This means that the CCA decided that the claims were procedurally barred, which then leaves the merits unaddressed.

**This pattern disproportionately affects people sentenced to death and people without lawyers,** two particularly vulnerable groups, who combined make up 23 of 28 of procedurally barred applications, or 82%.

# INTRODUCTION

The persuasive power of scientific evidence in the courtroom cannot be understated. Criminal defendants are often convicted based on testimony and evidence provided by experts in forensic science. Therefore, ensuring the reliability of scientific evidence is critically important.

However, science is continually evolving. As new facts and methods become part of scientific knowledge, conclusions can and do change.

In the 2000s, Texans began to recognize that the State needed a mechanism through which innocent people convicted by virtue of problematic forensic evidence could obtain relief from their wrongful convictions. Several scandals, exposés, and exonerations[1] revealed that many innocent people had been convicted based on flawed forensic science, from false DNA and fingerprint evidence to problematic arson assessments. In addition, court decisions showed that courts lacked clear guidelines for dealing with new forensic evidence in post-conviction cases, i.e., when evaluating new forensic evidence after an initial conviction.[2] Historically, post-conviction relief was only available if someone could prove a legal claim of actual innocence or show a violation of their federal constitutional rights, both of which required a high, and almost always impossible-to-meet, evidentiary burden. There was no mechanism to address situations where scientific advancements and evolving expert opinions challenged the evidence used to support a conviction.[3]

These high standards failed to protect people who were innocent and had been convicted based on false forensic evidence. For a person who is innocent, establishing actual innocence is, in the words of the CCA, a "Herculean task."[4] That task is often impossible years or decades after a conviction, as original evidence may have gone stale, and eyewitnesses can be missing, deceased, or are no longer able to recall specific details. Incarcerated people are not well-suited to doing the work of proving a legal actual innocence claim, which often requires identifying an alternate perpetrator, reconstructing the crime scene, unearthing previously unknown eyewitnesses, or finding entirely new evidence—work better suited to a police department than a criminal defendant. As a practical matter, then, before 11.073, innocent people who had been convicted because of problematic forensic evidence had no legal means to overturn their convictions.

After a series of failed bills, the Texas Legislature passed Senate Bill 344, later codified as Texas Code of Criminal Procedure Article 11.073 in 2013 and amended in 2015.[5] Colloquially known as the "junk science" law, 11.073 created a statutory, non-constitutional pathway for post-conviction relief for people who could present scientific evidence that was not available to be offered at their trial or contradicted scientific evidence relied on by the state at trial.[6] 11.073 was the first law of its kind in the nation and served as a response to "the changing landscape in the forensic sciences."[7]

In order to obtain relief under 11.073, a person must show that new, relevant scientific evidence is currently available and was not available at the time of their trial, the new science would be admissible under the Texas Rules of Evidence, and that they likely would not have been convicted if this new scientific evidence had been presented at their trial.[8] People seeking relief under 11.073 must also comply with specific procedural requirements codified in Texas Code of Criminal Procedure Article 11.07 Section 4 and Article 11.071 Section 5.

More than a decade has passed since the Texas Legislature enacted Article 11.073. This report looks at how effective this law has been since September 2013. When it enacted 11.073, the Texas Legislature advanced both a cutting-edge understanding of the fallibility of forensics and a new vision for post-conviction relief. The Legislature intended the statute to be a novel avenue for people whose convictions rested on science now deemed to be outdated or unreliable.[9] After reviewing the 11.073 applications that have been adjudicated by the CCA, this report finds that 11.073 is failing to live up to its promise.

This report recommends changes to improve the efficacy of 11.073 as a pathway to relief, to ensure the accuracy of convictions, and to uphold the integrity of the criminal legal system.

**Summary of Recommendations**

**#1—Revise the Standard for Granting Relief to Consider the Overall Impact of Flawed Scientific Evidence:** The law should be amended to focus on the reliability and significance of the scientific evidence presented and clarify that innocent people are not required to affirmatively show there is no possibility of their guilt, as this standard is almost always impossible for innocent people to meet.

**#2—Amend 11.073 to Include Penalty Phase Relief:** Allowing relief in cases where unreliable scientific evidence was used in the penalty phase can help ensure that defendants are not unfairly disadvantaged at any stage of the trial. This is especially important in cases with severe punishments, like the death penalty.

**#3—Expand Access to Legal Representation:** The law should ensure that indigent people can receive relief under 11.073 by guaranteeing they have access to legal counsel early in the process. This would help them navigate the complex legal system and potentially avoid dismissals for procedural defects.

**#4—Implement Discretionary Review by the CCA:** Shifting to discretionary appellate review would encourage rigorous fact-finding in trial courts, promote efficiency, and make relief more accessible.

**#5—Require Reasoned Explanations from the CCA:** Article 11.073 should require the CCA to provide reasoned explanations when it makes decisions on Article 11.073 claims. This would improve transparency and help people who seek relief under 11.073 understand the reasons for the court's decisions.

# THE SCIENTIFIC AND LEGAL LANDSCAPE LEADING UP TO THE CREATION OF ARTICLE 11.073

The enactment of 11.073 was a significant development in Texas's approach to post-conviction relief and the evolving role of scientific evidence in the legal system. In fact, with the passage of 11.073, Texas became the first state in the U.S. to have a specific legal pathway for people to overturn their convictions based on false forensic science. This development was preceded by several key events that give context to the motivations behind 11.073 and its anticipated impact on the legal system.

## 2001

The Texas Legislature enacted Article 38.39, establishing procedures for preserving any biological evidence secured in relation to the offense, and Chapter 64 of the Code of Criminal Procedure, creating a mechanism for convicted individuals to request DNA testing that could establish, by a preponderance of the evidence, that they would not have been convicted if exculpatory results had been available.

## 2002

In November, the Houston Police Department Crime Lab faced scrutiny after a state audit revealed troubling findings, including under-trained staff, mistake-ridden work, and contaminated evidence, leading to the closure of the lab's DNA and Serology Section.

## 2004

Cameron Todd Willingham was executed in February for allegedly setting a fire that killed his three young daughters. He maintained his innocence. After his execution, more questions about the arson investigation and the purportedly scientific evidence used in his conviction emerged, suggesting that the fire was not the result of arson.

## 2005

The Texas Legislature established the Texas Forensic Science Commission to investigate allegations of error and misconduct by forensic scientists that affect the integrity of forensic analysis results.

Congress authorized the National Academy of Sciences, which advises the federal government on scientific and technical matters, to conduct an independent study on forensic science.

## 2009

The National Academy of Sciences released Strengthening Forensic Science in the United States: A Path Forward, recommending the creation of an independent scientific oversight entity for forensic science, investment in research and standards setting, addressing cognitive bias, and educating judges and legal practitioners.[10]

Texas State Senator John Whitmire filed Senate Bill 1976, which would have enacted Article 11.073, aiming to allow wrongfully-convicted individuals to present new scientific evidence. The bill passed the Senate but did not prevail in the 81st Legislature.

## 2011

The CCA denied relief in Ex parte Robbins. Neal Hampton Robbins had filed a post-conviction application after the Harris County Medical Examiner's Office reconsidered its prior autopsy findings for the victim and ultimately amended the autopsy report to change the initial cause of death to "undetermined." The CCA held that despite the change, Robbins failed to prove that the State's medical examiner's testimony at his original trial was false.[11] Three judges dissented, noting that the change in the cause of death determination "raises an extremely serious concern about the accuracy of the original jury verdict."[12] The dissent held that Robbins should be granted a new trial and that the legal system needed a mechanism to deal with claims involving changed science.[13]

Senator Whitmire filed Senate Bill 317, which would have enacted Article 11.073, but it failed again.

## 2013

The Texas Legislature amended Article 39.14 of the Code of Criminal Procedure, mandating an open discovery process. The legislation, named the Michael Morton Act, honored Michael Morton, who was wrongfully convicted in Texas in 1987 and exonerated by DNA evidence in 2011 after it was discovered that prosecutors had withheld exculpatory evidence.

Senator Whitmire's Senate Bill 344 successfully passed through the Legislature, finally enacting Article 11.073. It went into effect on September 1, 2013.

## 2014

Days after the enactment of 11.073, Neal Hampton Robbins filed a new post-conviction application, raising no new facts but relying on 11.073 as a new legal basis for bringing a second application. The CCA granted Robbins a new trial, acknowledging 11.073 as a new legal basis, though concurring and dissenting opinions revealed uncertainty about whether a change in a testifying expert's opinion is sufficient to grant relief.

## 2015

Following the CCA's decision in Robbins's second case, 11.073(d) was amended to clarify that changes in scientific knowledge also apply to a change in the opinion of an expert who previously testified for the State.

# TEXT OF ARTICLE 11.073

(a) This article applies to relevant scientific evidence that:

   (1)was not available to be offered by a convicted person at the convicted person's trial; or

   (2)contradicts scientific evidence relied on by the state at trial.

(b) A court may grant a convicted person relief on an application for a writ of habeas corpus if:

   (1) the convicted person files an application, in the manner provided by Article 11.07 (Procedure After Conviction Without Death Penalty), 11.071 (Procedure in Death Penalty Case), or 11.072, containing specific facts indicating that:

   (A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

   (B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and

   (2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.

(c) For purposes of Section 4(a)(1), Article 11.07 (Procedure After Conviction Without Death Penalty), Section 5(a)(1), Article 11.071 (Procedure in Death Penalty Case), and Section 9(a), Article 11.072, a claim or issue could not have been presented previously in an original application or in a previously considered application if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application or a previously considered application, as applicable, was filed.

(d) In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the field of scientific knowledge, a testifying expert's scientific knowledge, or a scientific method on which the relevant scientific evidence is based has changed since:

   (1) the applicable trial date or dates, for a determination made with respect to an original application; or

   (2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

# FINDINGS

11.073 was meant to expand access to justice in post-conviction proceedings for people wrongfully convicted on the basis of false or unreliable forensic evidence. In reality, the Texas Court of Criminal Appeals's (CCA) implementation of the statute has shown inconsistency in application, a disregard for discredited scientific methods, a heavy investigative burden for people seeking relief (especially people without counsel), and a striking absence of relief in capital cases—meaning that potentially innocent people will be executed. Individually and cumulatively, these have detrimental effects on justice and mean that the statute is not fulfilling its intended purpose: providing relief to innocent people convicted based on flawed forensic evidence.

The following findings were developed by examining all 74 applications with 11.073 claims filed in Texas that received a CCA decision as of December 2023. They do not include data pertaining to pending 11.073 applications or data relating to four successful, expunged 11.073 applications. Records were obtained from the Texas Court of Criminal Appeals. Several people have filed more than one application with an 11.073 claim, and these were considered separate applications.

**Finding #1**

**The statute does not go far enough to protect innocent people who were convicted based on flawed forensic evidence.**

Under 11.073, a court may grant relief when it finds that "had the scientific evidence been presented at trial, on the preponderance of the evidence, the person would not have been convicted." On its face, the CCA typically uses 11.073's statutory language, but in application, the court appears to require the evidence to be strong enough to eliminate any rational basis for a conviction, which is the legal actual innocence standard. This places much too high a burden on the people it was designed to help. Innocent people often cannot definitively prove that there is no rational basis for their conviction years or decades after it occurred. Often, much of the original evidence has gone stale, been destroyed, or been lost.

In 73% of the cases where the CCA has granted relief under 11.073, the person seeking relief did not just prove they were wrongfully convicted—they also affirmatively proved their actual innocence.[14] Of the fifteen people granted relief under 11.073 since September 2013, 10 were either simultaneously granted relief on an actual innocence claim or presented evidence indicative of actual innocence.

The CCA's focus on whether a legal claim of actual innocence has been established can be seen across its opinions. In the following cases where the court granted relief, it emphasized exculpatory evidence rather than merely scientifically faulty inculpatory evidence.

Darryl Demitri Adams's aggravated sexual assault conviction was overturned under 11.073 after DNA testing not available at the time of his 1992 trial excluded him as a contributor to the DNA detected on vaginal swabs. The trial court had signed proposed findings drafted jointly by Adams and the State, which admitted that Adams had been misidentified.

In overturning the convictions of Richard Bryan Kussmaul, James Edward Long, James Wayne Pitts Jr., and Michael DeWayne Shelton, the CCA emphasized in an extensive discussion that DNA testing had excluded all four co-defendants as contributors to the DNA evidence and had, in fact, identified an alternative perpetrator.

Tyrone Day's sexual assault conviction was overturned after DNA testing excluded Day as a contributor to the DNA evidence and identified two other men as contributors.

Ernest Lee Sonnier's aggravated kidnapping conviction was overturned after DNA testing excluded Sonnier as a contributor and identified two other men as contributors. These two alternate perpetrators were known associates, both with felony convictions.

These examples demonstrate that, in practice, people seeking relief under 11.073 might need to go beyond proving the State's reliance on flawed science—they might need to provide evidence affirmatively showing innocence. For most innocent people who were convicted based on problematic forensic evidence, this standard is impossible to meet. As a result of the CCA's interpretation, 11.073 does not do enough to consistently protect all people who have been convicted on false and discredited scientific evidence.

Texas already has actual innocence as an independent pathway for post-conviction relief. To hold people seeking 11.073 relief to the same standard renders 11.073 moot and denies relief to many innocent people who will never be able to meet the actual innocence legal standard but can nonetheless show that their convictions were based on flawed forensics.

**Finding #2**

**Contrary to the language of 11.073 itself, the CCA does not grant relief for all kinds of new science; instead, it largely restricts relief to new DNA evidence.**

The text of 11.073 allows for relief based on any false scientific evidence. The statute recognizes that many scientific disciplines, at one time regularly used to secure convictions, have been found to be riddled with errors.[15] Those disciplines include fields as varied as blood spatter evidence, forensic pathology, fire debris investigation, shoeprints, bitemark evidence, firearms identification, gunshot residue, and DNA, to name a few. But new DNA evidence is the only consistently reliable type of evidence upon which the CCA grants relief. Eleven of 15 successful applications raised DNA-based claims. This is by far the most commonly raised type of claim, with 32 total DNA claims raised of the 74 applications examined by TDS; the second most commonly raised claims are those concerning the determination of the cause of death, with nine such claims having been raised. Still, DNA claims are significantly overrepresented in successful applications, constituting 73% of successful claims but only 43% of claims raised.

This is problematic because DNA evidence is only a tiny subset of potentially false forensic evidence, and in fact, most wrongful convictions are not based on DNA.[16] Of the 3,479 exonerations in the U.S. since 1989,[17] only 594 involved DNA evidence. In a study of 458 wrongful convictions involving false or misleading forensic evidence, a researcher found that while many cases involved issues with DNA, exonerations based on DNA have become less likely; now, it is more likely that other forensic flaws contributed to the conviction.[18]

While DNA evidence represents only a small subset of potentially flawed forensic evidence, it is the most commonly presented claim. This contradiction makes sense because DNA evidence uniquely has the power to definitively establish innocence or guilt, making it possible to overturn wrongful convictions based solely on its re-evaluation. Few other types of scientific evidence possess this same conclusive power, even though they can still significantly influence trial outcomes. This underscores the harm of prioritizing the concept of innocence over evaluating the reliability of the verdict in light of the evidence.

In creating 11.073, legislators acknowledged that a mechanism for relief pursuant to DNA issues had been recognized through the establishment of Chapter 64 of the Code of Criminal Procedure.[19] Instead of creating a provision for every type of discredited science, 11.073 "would establish a single standard" to address developments in "various fields."[20]

Although the Texas Legislature intended for 11.073 to encompass the full scope of scientific evidence that can affect a trial,[21] the CCA's interpretation narrows in on only a small subset of false forensic evidence. This excludes vast swathes of defendants whose convictions are based on false forensic techniques but whose cases involved no DNA.[22]

## Evidence at Issue in 11.073 Claims [23]

| Type of Evidence at Issue | Number of Claims Raised | Number of Claims Succeeded | Success Rate |
|---|---|---|---|
| DNA[24] | 32 | 11 | 34% |
| Cause of Death Determination | 9 | 1 | 11% |
| Eyewitness Testimony | 5 | 0 | 0% |
| Biomechanics | 4 | 0 | 0% |
| Pediatric Head Trauma | 4 | 0 | 0% |
| Scarring of the Hymen | 3 | 0 | 0% |
| Bite Mark Comparison | 3 | 1 | 33% |
| Time of Death Determination | 3 | 0 | 0% |
| Hypnosis | 2 | 0 | 0% |
| Ballistics | 2 | 1 | 50% |
| Shaken Baby Syndrome | 3 | 0 | 0% |
| Blood Pattern Analysis | 1 | 0 | 0% |
| Herpes Test | 1 | 0 | 0% |
| Cell Tower Evidence | 1 | 1 | 100% |
| Trace Evidence | 1 | 0 | 0% |
| Bruise Dating | 1 | 0 | 0% |
| Hair Comparison | 1 | 0 | 0% |
| Fingerprint | 2 | 1 | 50% |
| Handwriting Analysis | 1 | 0 | 0% |
| Effects of Opioids | 1 | 0 | 0% |
| Blood Alcohol Content | 1 | 0 | 0% |
| Physical Match Comparison | 1 | 0 | 0% |
| Burn Patterns | 1 | 0 | 0% |
| Collision Reconstruction | 1 | 0 | 0% |
| Psychiatric Testimony | 1 | 0 | 0% |
| Persistence of Spermatozoa | 1 | 0 | 0% |

**Finding #3**

**The CCA is not granting relief to death-sentenced people under 11.073.**

The CCA has decided 25 11.073 applications filed by people facing the death penalty since September 2013, which constitutes 34% of all applications filed. In that time, the CCA has not granted relief to a single death-sentenced person under the statute.[25] People who are not death-sentenced have received relief in 15 of 49 cases, or a rate of 31%. Of the 25 applications filed by people sentenced to death, 18 were dismissed or denied by the CCA without review of the underlying claim because the court determined they were procedurally barred. Of the 25 applications filed by people sentenced to death, most—64%—were dismissed or denied by an order no longer than a page and with no substantive discussion.

The deadly consequences of this pattern are clear: People may be executed following convictions that rest on faulty science because they are unable to obtain relief under 11.073. This is especially concerning because the rate of wrongful convictions of death-sentenced people is quite high. Since 1973, 200 people have been exonerated from U.S. death rows; 18 of these people were from Texas.[26] For every eight people executed, one person on death row has been exonerated. A 2014 study estimated that the rate of wrongful conviction is 4% in capital cases; the actual number may be far higher than that.[27]

Only seven applications filed by death-sentenced applicants were ever reviewed on the merits. One of the cases where the CCA subsequently denied relief is profiled below:

> **Areli Escobar:** Mr. Escobar was convicted of capital murder and sentenced to death for the sexual assault and fatal stabbing of a 17-year-old girl who lived in the same apartment complex.
>
> After his conviction, a 2016 audit by the Texas Forensic Science Commission revealed that lab technicians had used flawed science to calculate the odds of DNA results and had used expired materials during testing. Due to these findings, the Austin Police Department's lab was shut down.[28]
>
> Mr. Escobar filed claims under Article 11.073, challenging the validity of the DNA and fingerprint evidence that purportedly linked him to the crime scene. This evidence was crucial because Mr. Escobar did not know the victim and had no connection to her. The CCA authorized these claims and sent the case back to the trial court. After an evidentiary hearing, the trial court issued over 80 pages of findings, concluding that it would be "shocking to the conscience" to uphold the conviction given the "fundamentally unfair" trial.
>
> Following the trial court's findings, the Travis County District Attorney's office admitted error and agreed that Mr. Escobar's federal due process rights were violated by the use of faulty DNA evidence during his trial.

Despite the agreement between Mr. Escobar, the district attorney's office, and the trial court on the unreliability of the DNA evidence—and despite the CCA's typical practice of adopting trial court findings—the CCA did not adopt the trial court's findings in Mr. Escobar's case. Instead, the CCA ruled that Mr. Escobar had not shown that the DNA evidence was likely to have affected the jury's verdict.

Mr. Escobar took his case to the United States Supreme Court, which in January 2023 remanded the case and ordered the CCA to consider the district attorney's concession. In September 2023, the CCA again denied Mr. Escobar relief, and he has now taken his case to the Supreme Court once more.

**Finding #4**

**People without counsel are functionally barred from meaningfully seeking relief under 11.073.**

While all people seeking 11.073 relief struggle to obtain review, people without lawyers—pro se applicants—uniformly fare much worse than people with lawyers across almost every metric. Of the 74 applications filed and adjudicated between September 2013 and December 2023, 19 were filed by people without lawyers. Of those 19 people without lawyers, only one has ever been granted relief, a stark drop off from the 25% of people with counsel who receive relief. The CCA dismissed or denied 16 of 19 pro se applications without a written order—84% compared to 16% of people who had legal representation. Of the few cases in which the CCA has denied relief without a written order and with no statutory citation to give insight into the basis of the denial, most were filed pro se. People without lawyers receive significantly less rigorous trial court and CCA written decisions and are much more likely to be deemed procedurally barred.

While a statutory basis for appointing counsel for indigent people already exists, access to such counsel is only warranted "if the court concludes that the interests of justice require representation."[29] Further, as former CCA Judge Elsa Alcala pointed out in a dissent, "that statutory basis is seldom used by [the CCA] in order to mandate the appointment of counsel in these situations."[30] Additionally, trial courts must make a determination of indigency and appoint counsel if the trial court calls for an evidentiary hearing.[31] People without counsel who are seeking 11.073 relief often fail at the initial application stage and would not reach the point at which the CCA might call for the appointment of counsel.

Particularly in light of the high standard of review the CCA applies to 11.073 claims, people without lawyers are so disproportionately burdened by the requirements of 11.073 that they are functionally barred from relief. The investigative demands of putting together an 11.073 claim cannot be and have never been met by an incarcerated person working without the assistance of an attorney; the one successful person who did this without counsel was out on parole at the time of his application. While 11.073 provides a legal pathway for relief, this pathway cannot be successfully utilized by indigent people who lack the resources to meet the CCA's high demands. These people are penalized for their inability to hire counsel.

Some applications make it clear how many incarcerated people believe 11.073 may apply to their cases but do not know how to investigate such a claim. For example, Sergio Reyes Castillo submitted an 11.073 application stating that he simply wanted to have DNA testing done on evidence from his case after hearing about 11.073. The trial court responded by incorrectly stating that Mr. Castillo was not eligible for 11.073 because he had made a plea. The court stated further, "Applicant does not point out what scientific evidence is available or how this evidence would prove he would not have been convicted had he presented said evidence at trial." It is clear from the application that Mr. Castillo did not know how to go about getting DNA testing done and was asking for help in the only way he could think of—by writing to the court.

An excerpt of Mr. Castillo's 11.073 Application

Bartholomew Antonio Guzman's case is another example of how the system fails people without counsel. Mr. Guzman filed a subsequent post-conviction application arguing that the State's claim of shaken baby syndrome was not supported by the evidence.

The trial court sent Mr. Guzman's application to the CCA, and the CCA agreed that there was a valid basis for relief and instructed the trial court to make specific findings of fact and conclusions of law. The CCA also suggested that Mr. Guzman should be appointed a lawyer if a hearing was necessary. The trial court adopted the State's version of the findings, which were incomplete and did not address the CCA's instructions. The State's version recommended dismissing the case due to a procedural issue, even though the CCA had already ruled that this issue had been resolved.

The trial court sent the findings to the CCA, which remanded the case again for findings of fact and conclusions of law. The trial court signed poorly written findings that barely addressed Mr. Guzman's issues. Appended to the findings was an article about the validity of the diagnosis of shaken baby syndrome, which, though topical, did not address Mr. Guzman's specific claims. The trial court ignored his multiple requests for a lawyer until the day after sending the findings to the CCA, rendering the appointment almost meaningless.

The trial court did not give Mr. Guzman a copy of these findings or allow him to submit his own version before sending them to the CCA. Ultimately, the CCA denied Mr. Guzman's application.

The problems outlined throughout this report are heightened for people without lawyers, who do not have the guidance of an attorney in navigating the complex, demanding 11.073 application process. People without counsel could also be penalized in the future for even filing a pro se application. If they later acquire counsel and attempt to submit a successive 11.073 claim, they may be found procedurally barred and bound to the decision made on their earlier, and inevitably weaker, application. Incarcerated people without counsel and without funding do not have the means to develop 11.073 claims as the statute stands now.

**Finding #5**

**Procedural bars prevent large numbers of 11.073 applications from being considered on the merits.**

A procedural bar is a rule that precludes a court from fully considering a claim either because it was brought before the court incorrectly or because insufficient facts were presented. At least 28 of the 74 applications filed since 2013 have been barred on procedural grounds. In other words, the CCA dismissed these applications without considering the claim on the merits, instead determining that the claims could not be addressed. In addition to this, half of the claims found to be procedurally barred were dismissed or denied without a written order.

This pattern disproportionately affects people sentenced to death and people without lawyers, two particularly vulnerable groups, who combined account for 23 of the 28 procedurally barred applicants, or 82%. This is because people who are sentenced to death have often already filed a prior habeas application under 11.071, which oftentimes failed to raise any forensic science issues. But even if they never raised an 11.073 claim in their prior application, people must still overcome the procedural bar set out in 11.071 Section 5 before their claim can be assessed on its merits.[32] Many death-sentenced people who are wrongfully convicted can simply never overcome this bar, and their claims are never heard by a court, instead simply dismissed on procedural grounds. People without lawyers are likely to be procedurally barred for a different reason: without counsel, they are not well-versed enough in the statute to comply with all of its requirements.[33]

Article 11.073 was designed to give those convicted of crimes using faulty evidence a chance to present new scientific evidence. When procedural bars prevent any court from reaching the merits of an application, people who received an unfair trial are left incarcerated. Many of them are on death row and face execution despite serious questions about their guilt that have never been addressed by any court.

Of the 28 applications barred on procedural grounds, 13 were dismissed without a written order at all, and the remaining 15 were dismissed by orders that never provided more than a page of discussion and frequently used form language, seen below:

> We have reviewed the subsequent application and find that Applicant has failed to satisfy the requirements of Article 11.071, § 5(a). Accordingly, we dismiss the subsequent application as an abuse of the writ without considering the claims' merits.

Several capital applicants, profiled below, presented compelling claims that their convictions rested in part on junk science, but their 11.073 applications were nonetheless determined to be barred under 11.071 Section 5. These applicants continue to face execution by the State of Texas despite the possibility that their convictions rest on outdated or false science. The execution of a person who was convicted due to faulty forensics, simply because they were not able to overcome a procedural bar, raises serious concerns about the legitimacy and accuracy of the criminal justice system.

DeMontrell Miller: Mr. Miller was convicted of capital murder for the death of his two-and-a-half-year-old stepson. The State had no physical evidence or eyewitness testimony supporting its theory that Mr. Miller physically harmed the child. The State's entire case rested on the testimony of a forensic pathologist, who testified that the time of the injury that ultimately resulted in the child's death, a torn mesentery, could be pinpointed to a time during which the child was in Mr. Miller's care.

In his 11.073 application, he pointed out that the State's witness had changed his opinion. At trial, the State's witness testified that the child's mesentery was torn one to four hours before his death, when he was in Mr. Miller's care. After learning additional facts, the medical examiner now believes his original testimony to be incorrect and that the injury could have been caused earlier while the child was in the care of his mother.

The CCA dismissed the 11.073 claim without reviewing its merits, simply stating that the application was procedurally barred.

Rodney Reed: Mr. Reed was convicted of capital murder. The State's theory was that Mr. Reed abducted and raped the victim and then disposed of her body between 3:00 am and 5:23 am. The only evidence used to argue that there was a sexual assault was that Mr. Reed's sperm had been found inside the victim's body. However, Mr. Reed insisted that he was innocent, and he had had an ongoing consensual sexual relationship with the victim. In Mr. Reed's first 11.073 claim, his lawyers asserted that the jury disbelieved Mr. Reed because he was a Black man living in rural Texas and his victim was white; he was ultimately convicted by an all-white jury. In a declaration made 18 years after the trial, the State's expert changed his testimony, stating that the forensic evidence pointed not to rape but instead to a consensual sexual encounter—which is consistent with Mr. Reed's account. The expert's recantation was further supported by conclusions proffered by three of the nation's leading forensic pathologists.

Nonetheless, the CCA dismissed Mr. Reed's application without reviewing the merits, simply stating that the applications were procedurally barred.

While procedural bars commonly block the review of meritorious claims, such bars are particularly problematic for 11.073 claims because there is no further avenue for review in any other court, state or federal. Unlike some people seeking relief under 11.07 and 11.071, those with junk science claims do not have a clear pathway to bring their claims to federal court. While procedurally defaulted claims are generally ineligible for review by a federal court, a person with a Constitution-based claim found procedurally defaulted in state court can petition a federal court for review under the cause and prejudice standard. However, a person with a procedurally defaulted 11.073 claim has no such pathway because, as a function of 11.073, the claims fall outside of the Constitution.[34]

# ROBERT ROBERSON

## EVIDENCE OF CHANGED SCIENCE AND ACTUAL INNOCENCE—STILL NOT ENOUGH?

Robert Roberson, a special education student, dropped out of school after the 9th grade because of undiagnosed autism spectrum disorder. Coming from a very poor family, he joined the military and struggled to find stability. When he learned about his daughter Nikki, born to a young woman with a drug addiction, he was eager to take on the responsibility of fatherhood.

After gaining custody soon after Nikki turned two, Mr. Roberson worked multiple paper routes to support her. Nikki, who had been chronically ill since birth, suffered from a high fever and undiagnosed pneumonia during the week before her final collapse on January 31, 2002. First, she fell from bed, and Robert awoke upon hearing a strange cry, saw nothing wrong, comforted her, and then they both went back to sleep.



Robert Roberson and his daughter, Nikki

Later that morning, Mr. Roberson found her unresponsive with blue lips from oxygen deprivation. The State claimed that Nikki's collapse was caused by "shaken baby syndrome," now known as "abusive head trauma," suggesting that a combination of violent shaking and blunt head impact caused her condition. This hypothesis is now widely questioned. Mr. Roberson's legal team maintains that he is an innocent father who has spent over 20 years on death row for a crime that never occurred.

In 2016, a week before Mr. Roberson's scheduled execution, the CCA granted a stay and remanded his claims to the trial court, including an actual innocence claim and a challenge to the shaken baby hypothesis under Article 11.073. During his 2003 trial, State medical experts testified that violent shaking or blunt force were the only explanations for Nikki's death, dismissing the relevance of her recent high fever and illness. Mr. Roberson had taken Nikki to the ER and her pediatrician in the days before her collapse, but each time she was sent home with prescriptions no longer deemed suitable for children her age and condition. On the morning of her collapse, when Mr. Roberson sought medical help, he was met with suspicion.

Nikki's body showed virtually no external signs of injury, but a CAT scan revealed bleeding under the dura membrane, brain swelling, and retinal hemorrhages. In 2002, the medical consensus was that these symptoms could be used to "diagnose" abuse, dismissing the possibility that this triad could be caused by illness or accidental short falls with head impact. Whoever was with the child when he or she collapsed would be presumed guilty, especially if they denied doing anything to harm the child, as Mr. Roberson did. The jury saw disturbing autopsy photos showing blood under Nikki's scalp, and despite the absence of neck injuries, skull fractures, or broken bones, the internal conditions were attributed to shaking. Mr. Roberson's own lawyer conceded to the shaken baby diagnosis, arguing only that Mr. Roberson lacked intent due to his mental impairments, despite the fact he consistently denied harming Nikki and refused plea deals.



The Palestine, Texas, Courthouse where Robert Roberson was convicted

The jury heard testimony misinterpreting Mr. Roberson's autistic traits as a lack of appropriate emotion. Misleading testimony from a nurse suggested sexual abuse, although no other evidence supported this claim. The State dropped this allegation right before deliberations, but only after prejudicing the jury irreparably. The trial, focused on the shaken baby syndrome diagnosis and bolstered by the abuse pediatrician's and medical examiner's testimonies, portrayed Mr. Roberson as a monster.

Years later, new counsel for Mr. Roberson identified significant changes in the scientific understanding of the shaken baby hypothesis, used Article 11.073 to obtain a stay of execution, and then fought for an evidentiary hearing, which was eventually granted. His counsel presented evidence showing Nikki's condition could be explained entirely by her illness and the dangerous medications she had been prescribed rather than abuse. Long-lost CAT scans found in the courthouse basement during the evidentiary hearing showed a single minor head impact, aligning with Mr. Roberson's account of the fall from bed, not multiple impact sites. Expert analysis indicated Nikki's undiagnosed pneumonia, respiratory-suppressing medications, and the accidental fall could explain her condition, not any inflicted trauma.

Despite the evidence amassed during the 11.073 proceedings, in February 2022, the trial court recommended denying relief to Mr. Roberson. In doing so, the court simply adopted, virtually verbatim, a 17-page document drafted by the local prosecutors, typographical errors included. Mr. Roberson's 302-page proposed findings of fact and conclusions of law, which comprehensively summarized the new evidence from six expert witnesses from a range of disciplines, was ignored. The CCA's 2023 decision, which denied Mr. Roberson's claims, provided no explanation but merely adopted the trial court's findings, which did not mention any of the voluminous new evidence and instead invoked the outdated trial cause-of-death theory that had been challenged under Article 11.073. Neither the trial court nor the CCA acknowledge the significant scientific advancements and the exculpatory evidence presented.

According to the National Registry of Exonerations, since 1992, over 30 parents and caregivers in 18 states have been exonerated after being wrongfully convicted under the shaken baby hypothesis.[35] Yet Mr. Roberson, using Article 11.073 and much of the same changed science relied on in cases in other jurisdictions, was unable to obtain relief from the Texas courts. Unless his case is revisited before it is too late, he would be the first person in the U.S. executed based on the debunked shaken baby hypothesis.



Recent photo of Robert Roberson

# RECOMMENDATIONS

Based on our analysis of the Article 11.073 cases filed and adjudicated by the Texas Court of Criminal Appeals (CCA) since the law's enactment, we have identified opportunities for the Texas Legislature to strengthen the framework of review and address some of the ambiguities in the law's application. These recommendations have been crafted to promote the efficacy and fairness of post-conviction review where a person is convicted based on unreliable scientific evidence.

### Recommendation #1

**Revise the Standard for Granting Relief to Consider the Overall Impact of Flawed Scientific Evidence.**

The CCA has itself admitted that proving actual innocence is a "Herculean task."[36] But the vast majority of the decidedly few successful claims under Article 11.073 have placed significant emphasis on the legal "actual innocence" standard which requires eliminating any possibility of guilt, even though proof of this is not required under the statute. As explained throughout this report, most innocent people cannot meet the "actual innocence" legal standard. 11.073 could be more effective in protecting innocent people convicted based on flawed forensic evidence if courts could consider claims of false and discredited science as it does due process claims: granting relief if the evidence was more likely than not to contribute to a conviction. While typically discrete types of evidence are not treated this way, scientific evidence deserves due process treatment because of its weighty influence on juries.[37] If the statute permitted relief when it is more likely than not that the flawed scientific evidence relied on by the State contributed to the conviction, the focus would be on the reliability and significance of the scientific evidence presented rather than requiring an innocent person to meet the impossible burden of affirmatively disproving any possibility of their own guilt.

### Recommendation #2

**Amend 11.073 to Include Penalty Phase Relief.**

Once a person facing a capital sentence is found guilty, they proceed to the "penalty phase" of their trial, where the jury decides whether they deserve a life or death sentence. The jury makes this decision based on the presence of mitigating circumstances and aggravating circumstances, as well as based on whether the person presents a future danger to society. The introduction of unreliable or discredited scientific evidence during the penalty phase can skew the sentencing process by influencing the severity of a sentence. The prosecution can use scientific evidence to suggest a person's involvement in another offense, support an aggravating circumstance, or advance a theory of future dangerousness.

The CCA has interpreted the plain language of Article 11.073 to exclude penalty-phase relief.[38] However, permitting penalty-phase relief could help ensure that people are not unfairly disadvantaged by problematic scientific evidence at any stage of the trial. In capital cases where the death penalty is a possible outcome, discredited and unreliable scientific evidence can lead to wrongful executions, which is an irreversible miscarriage of justice.

Expanding Article 11.073's reach to the penalty phase would be a significant step toward more accurate and fair sentencing decisions. It would help address the impact of unreliable scientific evidence, uphold legislative intent, and promote public trust in the legal system, even in the most severe cases.[39]

### Recommendation #3

**Expand Access to Counsel for Indigent People Seeking Relief from their Wrongful Convictions.**

The legislature should add a statutory provision for the limited appointment of counsel for indigent people with potentially viable claims under Article 11.073. The provision should instruct courts to appoint such counsel before deciding whether to authorize the claims or grant merits review. Although a court can appoint an attorney to an indigent applicant "if the court concludes that the interests of justice require representation,"[40] courts rarely utilize this provision uniformly.[41] Currently, pro se applicants are typically appointed counsel only after their application is remanded for additional fact-finding. Furthermore, when the CCA directs trial courts to appoint counsel, it is usually in the event the trial court elects to hold an evidentiary hearing. This is insufficient, as it is often too late for applicants with claims that have substantive merit but fail because they lack technical procedural compliance.

Without legal representation, pro se applicants are significantly disadvantaged in the complex process of resolving issues that may require affidavits, depositions, interrogatories, or additional forensic testing. Therefore, early appointment of counsel is essential to ensure fair and effective access to justice for these applicants. Under Chapter 64, "[a] convicted person is entitled to counsel."[42] Once a person tells the trial court they want to file a motion under Chapter 64, the court must find reasonable grounds for the motion and determine that the person cannot afford a lawyer in order to appoint one.[43] Article 11.073 would benefit from a similar addition, ensuring people have access to the courts.

**Recommendation #4**

**Implement Discretionary Review by the CCA.**

To enhance the effectiveness of the post-conviction review process where junk science is at issue, 11.073 should be amended to give trial courts the power to enter final judgments and allow for discretionary review by the CCA. Under the current procedure, the CCA is required to review every post-conviction application submitted under Article 11.073, irrespective of the case's merits or the trial court's findings of fact and conclusions of law.

By shifting to a discretionary appellate review system, the CCA would have the authority to select which cases merit its attention based on the need to address legal or factual issues or the presence of novel questions of law.

This amendment would streamline the review process and provide trial courts with greater responsibility in evaluating claims under 11.073. Such a shift would encourage thorough and rigorous fact-finding and produce better trial court-level record-making. Furthermore, in cases where the applicant, State, and the trial court agree that relief should be granted, the judgment could be left undisturbed. This approach better aligns with the goal of granting relief to people convicted based on false and unreliable scientific evidence while promoting judicial efficiency and preserving the CCA's capacity to address the most pressing legal questions.

**Recommendation #5**

**Mandate the CCA to Explain Why It Has Denied or Dismissed an 11.073 Claim.**

The legislature should amend Article 11.073 to require the CCA to explain its reasoning in a written opinion any time it dismisses or denies relief under the statute. This amendment would enhance transparency in the decision-making process, offering valuable insight to legislators on the effectiveness and application of 11.073 and providing clear guidance to future litigants. This requirement is crucial because the current practice shows that the CCA either applies an overly stringent standard for authorization or relies on trial courts for substantive fact-finding and decision-making. Oftentimes, trial courts simply adopt the State's arguments with minimal scrutiny or explanation, resulting in applicants receiving little to no rationale for the rejection of their claims. By insisting on reasoned orders, the legislature could identify how 11.073 is being applied and address any shortcomings in its implementation.

# CONCLUSION

In summary, the implementation and application of Article 11.073 have highlighted several areas where improvements are necessary to ensure justice for innocent people convicted based on flawed forensic evidence. The recommendations provided would address these issues by clarifying procedural requirements, mandating reasoned opinions from the CCA, ensuring that the onerous showing of actual innocence is not a prerequisite for relief, and improving access to legal representation for indigent and pro se people. By making these changes, the legislature could enhance the fairness, reliability, and effectiveness of the post-conviction review process and ensure that wrongful convictions based on junk science are more readily addressed and rectified.

# ENDNOTES

[1] *Ex parte Robbins* (*Robbins II*), 478 S.W.3d 678, 695-700 (Tex. Crim. App. 2014) (Cochran, J., concurring). *See also DNA Testing Suspended as More Problems Emerge at Houston Crime Lab*, Innocence Project (Feb. 1, 2008), https://innocenceproject.org/dna-testing-suspended-as-more-problems-emerge-at-houston-crime-lab/; Houston Police Department Crime Laboratory Technical Review Panel, Report (May 31, 2005), http://www.hpdlabinvestigation.org/reports/050531report.pdf.

[2] *Ex parte Robbins* (*Robbins I*), 360 S.W.3d 446, 454 (Tex. Crim. App. 2011); *Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012).

[3] *Id.*

[4] *See Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006).

[5] Tex. Code Crim. Proc. Ann. art. 11.073.

[6] *Id.*

[7] Trevor Rosson, *A New Remedy for Junk Science: Article 11.073 and Texas's Response to the Changing Landscape in the Forensic Sciences.*, 48 St. Mary's L.J. 465, 467 (2017), https://commons.stmarytx.edu/thestmaryslawjournal/vol48/iss3/2.

[8] Tex. Code Crim. Proc. Ann. art. 11.073(a), (b).

[9] House Research Organization, Bill Analysis, Texas House of Representatives, 83rd Legislature, Regular Session, at 2 (May 15, 2013), https://hro.house.texas.gov/pdf/ba83R/SB0344.PDF.

[10] *Ten Years Later: The Lasting Impact of the 2009 NAS Report*, Innocence Project (Feb. 19, 2019), https://innocenceproject.org/lasting-impact-of-2009-nas-report/.

[11] *Robbins I*, 360 S.W.3d at 459.

[12] *Id.* at 469 (Cochran, J., dissenting).

[13] *Id.* at 471, 476 (Cochran, J., dissenting).

[14] *See Ex parte Fournier*, 473 S.W.3d 789, 793 (Tex. Crim. App. 2015) ("An actual innocence claim must be accompanied by new "affirmative evidence of the applicant's innocence.").

[15]*See* House Research Organization, Bill Analysis, Texas House of Representatives, 83rd Legislature, Regular Session, at 2 (May 15, 2013), https://hro.house.texas.gov/pdf/ba83R/SB0344.PDF.

[16] As of June 28, 2024.

[17] Exonerations by Year, National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/Exoneration-by-Year.aspx (last visited Jun. 28, 2024).

[18] John Morgan, *Forensic Testimony Archaeology: Analysis of Exoneration Cases and Its Implications for Forensic Science Testimony and Communications*, National Institute of Justice, Document No. 306259, at 31, 35 (March 2023), https://www.ojp.gov/pdffiles1/nij/grants/306259.pdf.

[19] House Research Organization, Bill Analysis, Texas House of Representatives, 83rd Legislature, Regular Session, at 2 (May 15, 2013), https://hro.house.texas.gov/pdf/ba83R/SB0344.PDF.

[20] *Id.*

[21] Senate Research Center, Bill Analysis, S.B. 344, 83rd Leg., R.S., at 1 (Feb. 28, 2013), https://capitol.texas.gov/tlodocs/83R/analysis/pdf/SB00344I.pdf#navpanes=0. ("The bill specifies that evidence to discredit scientific evidence presented at trial is among the types of claims or issues that can affect court consideration of an application for a writ of habeas corpus.").

[22] *See* Texas Code of Criminal Procedure chapter 64 for the procedure to file a Motion for Forensic DNA Testing. This is a motion that convicted people can submit to their convicting court requesting the court order the forensic DNA testing of evidence reasonably likely to contain biological material. While the procedures are different from Article 11.073, with some assumptions, it is arguable that all successful 11.073 claims based on DNA could have been granted relief through the gateway provided by Chapter 64. Tex. Code Crim. Proc. art. 64.01(a-1).

[23] Many applicants raised multiple claims based on different types of evidence. This chart catalogs all the claims raised. A claim is marked as successful only if the CCA granted relief in light of the type of evidence at issue. For example, one applicant raised claims based on ballistics and cell-tower evidence, but the applicant was only granted relief on the cell-tower evidence claim. The chart identifies this applicant as having raised a ballistics claim and a cell-tower evidence claim and as having succeeded on the cell-tower evidence claim.

[24] Four applicants granted relief based on DNA evidence claims were co-defendants.

[25] Furthermore, access to relief for death-sentenced people is limited by the CCA's refusal to provide a remedy when a person alleges innocence of the death penalty. An example of this is

"evidence that would show that the defendant was, in fact, a non-triggerman who did not have the culpability necessary to allow the imposition of the death penalty." *See Ex parte White*, 506 S.W.3d 39, 47 (Tex. Crim. App. 2016). In *Ex parte White*, the CCA contemplated whether to interpret the word conviction in 11.073 to encompass guilt and punishment, in 11.07 and 11.071, or like in Chapter 64. The CCA decided that it would run afoul of its principles of statutory construction to provide a remedy for punishment claims. *See Id.* at 52 ("Because applicant's proffered scientific evidence relates solely to punishment, his evidence cannot meet that requirement.").

[26] Death Penalty Information Center, Innocence Database, Texas, https://deathpenaltyinfo.org/database/innocence?state=Texas (last visited Jun. 28, 2024).

[27] Samuel R. Gross, Barbara O'Brien, Chen Hu & Edward H. Kennedy, *Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proc. Nat'l Acad. Sci. 7230, 7230-35 (2014), https://www.pnas.org/doi/epdf/10.1073/pnas.1306417111.

[28] Jolene Almendarez, *More Questions for Austin Police Department Crime Lab, Texas Tribune* (Jul. 30, 2016), https://www.texastribune.org/2016/07/30/more-questions-austin-police-department-lab/.

[29] Tex. Code Crim. Proc. Ann. art. 1.051(d)(3).

[30] *Ex parte Resendez*, No. WR-39,308-11, 2018 WL 849460, at *2 (Tex. Crim. App. Feb. 14, 2018) (Alcala, J., dissenting).

[31] *See, e.g.*, *Ex parte Gandy*, No. WR-22,074-10, 2018 WL 1516394, at *1 (Tex. Crim. App. Mar. 28, 2018) (remanding to the trial court and ordering that the trial court make a determination of indigence and appoint counsel if it elects to hold an evidentiary hearing).

[32] People who are not death-sentenced may face a similar procedural bar under 11.07 Section 4, but it is less common that they have filed an application in the past and the trial court may choose to engage in fact finding before the CCA determines whether the claims are barred.

[33] If a person raises an 11.073 claim in a subsequent application for a writ of habeas corpus, they must not only meet the requirements of 11.073. They must also comply with the procedures set out in 11.07 Section 4 if they are not sentenced to death, or 11.071 Section 5 if they are sentenced to death. Failure to meet these statutory requirements will result in their being procedurally barred from obtaining relief. 11.07 Section 4(a) provides:

> If a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed

under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

11.071 Section 5(a)(1) is functionally identical to 11.07 Section 4(a), providing:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

11.073(c) clarifies the scope of 11.07 Section 4(a)(1) and 11.071 Section 5(a)(1) for the purpose of 11.073 claims:

> For purposes of Section 4(a)(1), Article 11.07, Section 5(a)(1), Article 11.071, and Section 9(a), Article 11.072, a claim or issue could not have been presented previously in an original application or in a previously considered application if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application or a previously considered application, as applicable, was filed.

[34] Federal statutes allow federal courts to grant habeas relief to state prisoners to challenge convictions or sentences that violate a defendant's constitutional rights. *See* 28 U.S.C. § 2254(d)(2). 11.073 applicants may attempt to take their claims to federal court, but a court will likely find the claim to be outside of the scope of federal habeas review.

[35] National Registry of Exonerations, Exoneration Detail List, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited Jul. 1, 2024) (filter for cases tagged "SBS").

[36] *See Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006).

[37] *See* Ellory R. Dabbs, *Understanding the Impact of Scientific Testimony on Potential Jury Members: Independent and Interactive Effects of Expert Characteristics and Jury Member's Social Location*, 1-2 (2023) (unpublished Ph.D. dissertation, West Virginia University), https://researchrepository.wvu.edu/etd/12244. ("Although most criminal cases crimes end with a plea deal (Smith and MacQueen 2017; Gramlich 2023), where the defendant will plead guilty to the offense without ever asserting their innocence in front of a jury, those cases that do result in a criminal trial are increasingly relying on forensic evidence linking someone to a crime (Murphy 2015; Barbaro 2019; Bali et al. 2020; Ling, Kaplan, and Berryessa 2021). Over the last twenty years, the collection of forensic evidence has been increasingly important for those accused of a

violent crime. Forensic scientific evidence, such as DNA, blood spatter patterns, fingerprints, or bite marks, has been found to be crucial in criminal cases that go to trial.").

[38] *Ex parte White*, 506 S.W.3d 39, 52 (Tex. Crim. App. 2016).

[39] In the past three regular legislative sessions, the Texas House has passed bills aimed at addressing the CCA's ruling in *Ex parte White*; those bills have passed with near-unanimous, bipartisan support. Most recently, in 2023, the Texas House passed House Bill 205 by a vote of 144 yeas, one nay, and two present not voting. *See* H.B. 205, 88th Leg., R.S. (Tex. 2023), https://capitol.texas.gov/BillLookup/History.aspx?LegSess=88R&Bill=HB205 (last visited Jul. 1, 2024). The bill was not considered in the Senate. This same legislation also passed in 2021 with the same vote count; it did not pass in the Senate Criminal Justice Committee that year. *See* H.B. 275, 87th Leg., R.S. (Tex. 2021), https://capitol.texas.gov/BillLookup/History.aspx?LegSess=87R&Bill=HB275 (last visited Jul. 1, 2024). Similarly, in 2019, House Bill 464 passed the House by a vote of 130 yeas, one nay, and one present not voting. *See* H.B. 464, 86th Leg., R.S. (Tex. 2019), https://capitol.texas.gov/BillLookup/History.aspx?LegSess=86R&Bill=HB464 (last visited Jul. 1, 2024).

[40] Tex. Code Crim. Proc. art. 1.051(d)(3).

[41] *Ex parte Resendez*, No. WR-39,308-11, 2018 WL 849460, at *2 (Tex. Crim. App. Feb. 14, 2018) (Alcala, J., dissenting). ("[T]he statutory basis for appointing counsel to an indigent *pro se* habeas applicant in the interests of justice already exists in Texas, but that statutory basis is seldom used by this Court in order to mandate the appointment of counsel in these situations.").

[42] Tex. Code Crim. Proc. art. 64.01(c).

[43] *Id.*





TEXAS
DEFENDER
SERVICE

FOR MORE INFORMATION ABOUT TEXAS DEFENDER SERVICE, VISIT
WWW.TEXASDEFENDER.ORG

SPECIAL THANKS TO THE JUDITH FILLER FOUNDATION

Judith **Filler**
FOUNDATION

# EXHIBIT 44



*Interim Report*

TO THE EIGHTY-NINTH TEXAS LEGISLATURE

HOUSE COMMITTEE ON CRIMINAL JURISPRUDENCE
**NOVEMBER 2024**

# HOUSE COMMITTEE ON CRIMINAL JURISPRUDENCE

## TEXAS HOUSE OF REPRESENTATIVES

## Interim Report 2024

# Report & Recommendations for the

# 89th Texas Legislature

**Rep. Joe Moody**
Chair

**Ellic Sahualla**
Policy Director

**Rachel Wetsel**
Committee Clerk

# COMMITTEE ON CRIMINAL JURISPRUDENCE

## TEXAS HOUSE OF REPRESENTATIVES

JOE MOODY
Chair



DAVID COOK
Vice Chair

November 22, 2024

The Honorable Dade Phelan
Speaker, Texas House of Representatives
    *and*
Honorable Members of the Texas House of Representatives
Texas Capitol, Rm. 2W.13  |  Austin, TX 78701

    re:  Criminal Jurisprudence Interim Report 2024

Mr. Speaker & Members:

The House Committee on Criminal Jurisprudence for the 88th Texas Legislature is proud to submit this interim report for the 89th Texas Legislature's consideration.

Respectfully,

JOE MOODY
Chair

DAVID COOK **
Vice-Chair

*

DREW DARBY

JEFF LEACH

RHETTA BOWERS

CHRISTINA MORALES

BRIAN HARRISON **

SALMAN BHOJANI

NATE SCHATZLINE

\* Rep. Darby provided a statement in "Letters from Members" and now adds: "This letter was written before the Texas Supreme Court's decision in No. 24-0884. Still, my argument remains: the committee's work is unfinished, and no judgment should be made on Robert Roberson's guilt or innocence."

\*\* Agreed to, in part; see "Letters from Members" from Reps. Cook & Harrison for clarification.

# Foreword

Committees only work because of the support the Committee Coordinator's Office provides, so we'd first like to thank Stacey Nicchio, Damian Duarte, and the rest of their team. We owe a lot to staff from the Speaker's Office as well, especially Shakira "Ky" Pumphery, Margo Cardwell, Jason Briggs, and Cait Wittman. And the committee is indebted to House Parliamentarians Sharon Carter and Hugh Brady and Assistant Parliamentarian Tom Samuels, the Texas Legislative Council (especially Brett Ferguson), our sergeants-at-arms under Kara Coffee, Chief Clerk Stephen Brown and his office, and the many dedicated public servants outside the House who assisted the committee when it reached out to them (particularly TDCJ Governmental Affairs Director Kate Blifford).

The interim work of the committee wouldn't have been possible without the staff who work so hard for each member. And several House staffers, both inside and outside the committee, went above and beyond to help us get things done—to Emily Fankell, Cassie Hoyer, Jeff Madden, Lauren Young, Cassidy Zgabay, Kelly Peterson, Cara Santucci, Jackie Curatola, Ann Jacobo, and everyone else who lent a hand, thank you.

We also offer our sincerest gratitude to the numerous agencies, experts, and (above all) members of the public who shared information and insights with us throughout the interim. The witnesses who generously donated their time to testify at our hearings are in a very real way the co-authors of this report.

Finally, for reasons that will become apparent as you read, we make this commitment to Robert Roberson and his dauntless attorney, Gretchen Sween: We won't quit until the legal roadblocks and blind spots you've experienced no longer stand in the way of justice for future Texans.

# Table of Contents

**Foreword** ...................................................................................................................1

**Committee & Charges** .............................................................................................2

**Charge 1—Monitoring** ...........................................................................................3

Hearing .....................................................................................................................3

House Bill 17—Rogue Prosecutors ........................................................................4

Other Bills ................................................................................................................6

*House Bill 6—Fentanyl* ........................................................................................6

*House Bill 611—Doxing* ......................................................................................7

*House Bill 842—Driver's License Suspensions* ...................................................8

*House Bill 1221—Crime Victim Compensation* .................................................9

*House Bill 1442—Street Takeovers* ...................................................................10

*House Bill 1826—Retail Theft Task Force* .........................................................10

*House Bill 2897—Theft of Service* .....................................................................11

*House Bill 3956—Felony DNA Records* .............................................................12

*House Bill 4906—Campus Electronic Evidence Warrants* ................................13

Recommendations ...................................................................................................13

**Charge 2—Protecting Survivors** ........................................................................15

Hearing ...................................................................................................................15

Background .............................................................................................................15

Discussion ..............................................................................................................16

*Education & Intervention* ..................................................................................16

*Duress* ................................................................................................................17

Recommendations ..................................................................................................19

**Roberson & Writs** ...............................................................................................21

Hearing ...................................................................................................................21

Background .............................................................................................................22

*Investigation* ......................................................................................................22

*Trial* ...................................................................................................................23

*Post-conviction* ..................................................................................................25

*Lawmaker Involvement* ......................................................................................27

Discussion ..............................................................................................................29

*Why Did Robert's Case Go the Way It Did?* .....................................................29

*Article 11.073 Writs* ..........................................................................................30

*Neurodivergence* ...............................................................................................34

*What Awaits Robert Roberson?* .........................................................................35

Recommendations ..................................................................................................36

**Letters from Members** ........................................................................................38

**Endnotes** ..............................................................................................................44

# Committee & Charges

House Speaker Dade Phelan appointed the following members to serve on the House Committee on Criminal Jurisprudence for the 88th Legislative Session:

> Joe Moody—Chair
>
> David Cook—Vice Chair
>
> Drew Darby
>
> Jeff Leach
>
> Rhetta Bowers
>
> Christina Morales
>
> Brian Harrison
>
> Salman Bhojani
>
> Nate Schatzline[1]

House Rules gave the committee the following organization and jurisdiction:

> **Section 7. Criminal Jurisprudence**—The committee shall have nine members, with jurisdiction over all matters pertaining to:
>
> (1) criminal law, prohibitions, standards, and penalties;
>
> (2) probation and parole;
>
> (3) criminal procedure in the courts of Texas;
>
> (4) revision or amendment of the Penal Code; and
>
> (5) the following state agencies: the Office of State Prosecuting Attorney and the Texas State Council for Interstate Adult Offender Supervision.[2]

The committee was given the following interim charges:

> 1 **Monitoring**: Monitor the agencies and programs under the Committee's jurisdiction and oversee the implementation of relevant legislation passed by the 88th Legislature. Conduct active oversight of all associated rulemaking and other governmental actions taken to ensure the intended legislative outcome of all legislation, including the following: HB 17, relating to official misconduct by and removal of prosecuting attorneys.
>
> 2. **Protecting Survivors Against Crimes of Abusers**: Examine the shift in criminalization of children by human traffickers into other criminal enterprises, such as aggravated robbery, as well as the Texas Penal Code definition of "duress" as an affirmative defense for survivors of human trafficking and domestic violence. Make recommendations to prevent the criminalization of survivors of human trafficking and domestic violence for the crimes of their abusers.[3]

The committee studied these charges through testimony and written materials taken at hearings held in Austin on July 9th, September 16th, October 16th, and October 21st, 2024.

# CHARGE 1—MONITORING

Monitor the agencies and programs under the Committee's jurisdiction and oversee the implementation of relevant legislation passed by the 88th Legislature. Conduct active oversight of all associated rulemaking and other governmental actions taken to ensure the intended legislative outcome of all legislation, including the following: HB 17, relating to official misconduct by and removal of prosecuting attorneys.

## Hearing

The committee held hearings on July 9, 2024, in Capitol Extension room E2.030 and September 16, 2024, in Capitol Extension room E2.010 to consider charge one. This is the official witness list generated from electronic witness affirmation forms:

Implementation of HB 17
Edmonds, Shannon (Texas District and County Attorneys Association (TDCAA))
Petricek, Cleo (Self; Travis County Crime Victims Group)
Pressley, Nikki (Texas Public Policy Foundation)

Implementation of HB 6
Bruner, Sarah (Tarrant County Criminal District Attorney's Office)
Place, Allen (Texas Criminal Defense Lawyers Association)
Redwine, Shanna (Montgomery County District Attorney's Office)
Wilkerson, John (TMPA)

Implementation of HB 611
Flatt, Bryan (TMPA)
Voyles, Molly (Texas Council on Family Violence)

Implementation of HB 842
Holmes, Sylvia (Justice of the Peace & Constable Association)

Implementation of HB 1221
Henry, Patti (Self; County and district clerks association of texas)
Steffa, Ron (Tx Department of Criminal Justice)
*Registering, but not testifying:*
Clayton, Bryant (Texas Comptroller of Public Accounts)

Implementation of HB 1442
Gomez, Francisco (Houston Police Department)

Implementation of HB 1826
Bowen, Chris (Texas department of public safety)
Castillo, Korry (Comptroller of Public Accounts)

Implementation of HB 2897
Amps, Emily (Texas AFL-CIO)
Gharakhanian, Stephanie (Travis County District Attorney's Office)

Implementation of HB 3956
Henry, Patti (Self; County and District Clerks Association of Texas)
Mills, Brady (Texas Department of Public Safey - Crime Laboratory Division)

Implementation of HB 4906
Shepherd, Paul (University of Texas System)

The report and recommendations below are based on the testimony and materials these witnesses submitted to the committee as well as research conducted by committee staff.

House Bill 17—Rogue Prosecutors

The committee was specifically charged with monitoring and oversight of HB 17 by Rep. David Cook, which was captioned "relating to official misconduct by and removal of prosecuting attorneys."[4]

The bill was a response to "local prosecutors adopting internal policies and issuing public pronouncements that entire classes of crimes would not be prosecuted within their respective jurisdictions."[5] Under HB 17, a wholesale refusal to prosecute a specified offense is official misconduct, which can mean a prosecutor's removal through a petition filed by a resident in the prosecutor's jurisdiction.[6] The bill also created certain exceptions, such as pretrial diversion, and outlined procedures for handling and resolving these petitions.[7]

Four petitions have been filed across the state since HB 17 became law.[8] These have, in some instances, exposed the danger of the process being weaponized. In Hays County, for example, a petition was filed by the disgraced county clerk for relatively clear political purposes.[9] Another was filed in Travis County by a defendant who was then facing charges from the prosecutor's office.[10] On the other hand, each of these was quickly dismissed, so the protections built into the bill have been effective so far.

None of these petitions has resulted in removal of a prosecutor.[11] However, according to its author, the bill's primary goal has always been to unlink politics from prosecution and prohibit

blanket non-enforcement policies, which undermine the laws we pass.[12] In that sense, the new law has been a success because the policies that led to the filing of the bill in the first place have changed.[13] Prosecutors, for their part, have been satisfied with the exceptions within the bill, which have maintained the prosecutorial discretion necessary to do the job effectively.[14]

One witness expressed concern that implicit policies can still skirt the intent of the law.[15] Her solution would be an investigative body to oversee prosecutors, which could be more nuanced and responsive than a court applying rigid legal standards.[16] There was once a limited version of such an oversight body. The Prosecuting Attorneys Coordinating Council (PACC) lasted for eight years before being "disbanded in 1985 due to a lack of funding, inefficiencies, and redundant efforts."[17]

> Although we do believe in prosecutorial innovation, there's a difference between an innovative prosecutor and someone who's trying to erode the rule of law.
>
> NIKKI PRESLEY, TEXAS PUBLIC POLICY FOUNDATION

Other states have considered such oversight bodies, such as Georgia, where legislation to create an investigative commission has been proposed.[18] Others have alternative systems, such as removal by the governor in Florida or a petition to the state supreme court by the attorney general in Tennessee.[19] However, the Texas Constitution would have to be amended to implement any system that subjected a prosecutor to the authority of another entity or agency beyond the current removal petition structure.[20] As a result, any external oversight entity would be limited in scope, and as we saw firsthand with PACC, that might not be worth the results it could produce.

That issue—the cost of implementation and who bears it—has been a consideration in HB 17 from the beginning. There are undoubtedly some expenses borne by the parties involved, including the county in which removal is sought, the prosecutor appointed to pursue the petition, and the prosecutor the petition is meant to remove.

So far, in each real-world petition, costs have been absorbed within existing budgets, although that might not be feasible if a petition were taken all the way through trial.[21] The specter of personal responsibility for costs has also influenced removal petitions in the past,[22] although HB 17 does provide for possible attorney's fees to offset that.[23] Unfortunately, there's no similar deterrent for bad faith filings that are disposed of before the trial stage, which still impose some costs on local governments.

The committee also reviewed the implementation of several other bills. These were chosen for their suitability to being monitored so soon after being passed, either because of their technical nature or the quantifiable results we expect from them.

### House Bill 6 — Fentanyl

HB 6, by Rep. Craig Goldman, was captioned "relating to the designation of fentanyl poisoning or fentanyl toxicity for purposes of the death certificate and to the criminal penalties for certain controlled substance offenses; increasing a criminal penalty."[24]

Its bill analysis laid out the epidemic that prompted it:

> In recent years, overdoses in the United States have seen an alarming increase due to the increased production and smuggling of fentanyl, an incredibly potent synthetic opioid. According to the CDC, in the 12-month period ending in November 2022, more than 75,000 Americans died from an overdose of synthetic opioids, mainly from fentanyl. In Texas, the Department of Public Safety has seized over 353 million lethal doses of fentanyl since the beginning of Operation Lone Star in March 2021, according to the governor's office.[25]

HB 6 aimed to combat that crisis[26] through increased penalties for crimes involving fentanyl and the creation of new offenses that specifically cover manufacture or delivery of fentanyl that results in a death. The bill also imposed additional requirements for medical certification of fentanyl deaths and moved fentanyl into its own penalty group, with both measures intended to improve data collection about fentanyl crimes and deaths.[27]



## Texas Drug Deaths

More than 46 people have already been charged with fentanyl murder under HB 6—almost one per week at the time of the committee hearing.[28] HB 6 has actually shifted the lines

between federal and state prosecutions, with the federal government sometimes deferring to Texas in cases it would've once taken over.[29] This is a marked change from early in the fentanyl epidemic when police and prosecutors routinely reported difficulties in adequately charging these cases. Now, there's a greater sense among law enforcement professionals that the laws on the books meet the crimes being committed.[30]

The criminal defense bar has generally been supportive of the bill given the nature of the problem, with the exception of minimums that exceed 10 years. When a sentence is for more than 10 years, a jury can't recommend (and a judge can't give) community supervision, which limits the options available to finders of fact in favor of a one-size-fits-all approach and actually reduces the exposure a defendant faces when cases are pled down to probation.[31]

One remaining issue is uneven funding and resource distribution, with some smaller departments lacking access to tools like field test kits or naloxone.[32] The bill is also only part of the comprehensive approach needed, and educational programs in schools as well as other "demand side" efforts are essential in stemming the flow of fentanyl into our communities.[33] If anything, the need is even greater today because fentanyl is no longer purely an unexpected adulterant added to other substances—there's now a demand for fentanyl, and people are specifically seeking it out at levels that were previously uncommon.[34]

Still, fentanyl is pervasive and commonly seen mixed with other substances "that don't look like fentanyl, and so for our young people especially, it is something that can hide in plain sight, and that can catch folks who have no idea what they're taking off guard, and it can be something that can be so quickly fatal in such small amounts."[35] Many Texas leaders, including Governor Abbott,[36] have voiced support for decriminalizing fentanyl test strips, a harm reduction strategy designed to reduce the risk of overdose.[37] A bill to do so, HB 362 by Rep. Tom Oliverson, passed the House 143-2 but didn't receive a hearing in the Senate.[38]

### House Bill 611—Doxing

HB 611, by Rep. Gio Capriglione, was captioned "relating to the creation of the criminal offense of unlawful disclosure of residence address or telephone number."[39]

The bill addressed "doxing," which "refers to the public posting of an individual's personal information without the individual's permission and with the intent to cause harm to the individual or a member of the individual's family or household."[40] Doxing has become a pervasive problem in recent years and is one of the most damaging and even dangerous forms of online harassment because it bleeds over into a victim's real life.[41] At the same time, any effort to curtail doxing must be carefully balanced against our First Amendment rights.[42]

Until HB 611, Texas had no general criminal prohibition against doxing.[43] Now, it's a class B misdemeanor to post someone's address or telephone number on a public website with the intent to harm or threaten. That's increased to class A if it results in bodily injury.[44]

Doxing is often a significant and dangerous part of intimate partner abuse. It can be part of escalating psychological and emotional violence or coercive control for those still in abusive relationships, and it can also endanger survivors who've escaped them.[45] Advocates told the committee about the disheartening experience of having to tell survivors that there was no law against their personal information being exposed,[46] which is thankfully a thing of the past after HB 611.

> For those survivors [of family violence], when you are fleeing and seeking a new safe home, or you've gotten a new safe address, the idea that it could be made publicly available is terrifying.
>
> MOLLY VOYLES, TEXAS COUNCIL ON FAMILY VIOLENCE

One further step that can be taken is to raise public awareness about the new doxing law to discourage violations in the first place.[47] Both the format and the information covered by the law may also be worth broadening, and some states have added information such as bank accounts, private photographs, and digital signatures to doxing prohibitions.[48] And there are potential loopholes that still exist in publicly filed records, such as deeds and other documents maintained by county and district clerks, which may reveal the same information HB 611 sought to protect.[49]

### House Bill 842—Driver's License Suspensions

HB 842, by Rep. Jared Patterson, was captioned "relating to prohibiting the suspension of a person's driver's license or extension of the period of a driver's license suspension for certain driving while license invalid convictions; authorizing a fee."[50]

Formerly, Texas law required that a person's driver's license be suspended on conviction for driving while license invalid (DWLI)—a new suspension for being suspended—creating a barrier to proper licensure and a disincentive to resolving DWLI cases.[51] HB 842 sought to remedy that by prohibiting the Department of Public Safety (DPS) from suspending a license or extending an existing suspension after conviction of a DWLI, with some exceptions.[52]

The bill has proven straightforward, leading to a drop in both suspensions and occupational license applications, which are unnecessary when licenses aren't resuspended in the first place. This has been especially impactful for young drivers, who were previously being hit with unexpected suspensions that made it harder for them to work, go to school, and even attend to the basic necessities of modern commuter life. HB 842 has proven popular with judges and

has had no significant implementation issues, leading to some asking that it be made broader and forward-looking rather than applying to only a specific retroactive time period.[53]

### House Bill 1221—Crime Victim Compensation

HB 1221, by Rep. Will Metcalf, was captioned "relating to authorizing the comptroller to release a reported owner's unclaimed property to the owner's crime victim in certain circumstances and payment by the Texas Department of Criminal Justice of certain amounts owed by an inmate."[54]

Sometimes, prisoners who owe restitution to their victims have unclaimed property that could be used to satisfy their court-ordered obligations. However, only property owners themselves may submit a claim to the state's unclaimed property fund, so victims have had no way to access those monies.[55]

The bill closed that gap by requiring TDCJ to submit—and the comptroller to approve—a claim for property on behalf of a victim owed restitution based on a final conviction that put an offender in TDCJ custody. HB 1221 also provided procedures, rulemaking authority, and reporting requirements for these claims and collections.[56]

About 16% of inmates who owe court-ordered restitution have been found to have unclaimed property, and implementation has been simple from the perspectives of TDCJ and the comptroller.[57] While the amounts collected have been somewhat modest, each dollar recovered should go right into the pocket of a victim. However, getting it to them remains a stumbling block in many cases given the confidentiality of victim information, which may simply move



HB 1221 Collections

unclaimed funds from the comptroller to a clerk's office and no farther.[58] More work may be needed to capture victim contact information at the time of a restitution order so that money can be transferred to them when it's recovered.

### House Bill 1442—Street Takeovers

HB 1442, by Rep. Ann Johnson, was captioned "relating to the prosecution of certain criminal conduct involving a reckless driving exhibition or racing on a highway and to the forfeiture of contraband as a result of a reckless driving exhibition."[59]

Organized street racing and the phenomenon of street takeovers have become serious problems throughout the state in recent years.[60] Despite the increased attention on these dangerous and disruptive illegal activities, law enforcement officers have been hampered by a lack of clarity in Texas law.[61]

The bill addressed those shortcomings by adding racing and related offenses to the offense of engaging in organized criminal activity, elevating the penalties for organized street races and street takeovers. It also made property—including vehicles—used in these events subject to criminal asset forfeiture.[62]

Law enforcement agencies responding to the rise in these crimes were previously hampered by an inability to both meaningfully intervene and properly penalize participants. Under HB 1442, however, task forces have made real headway into stopping these activities in urban areas such as Houston and San Antonio and have begun to assist smaller jurisdictions with similar issues. In Houston alone, 20 vehicles have been seized as a direct result of HB 1442, and local law enforcement has assured the committee that measures have been put in place to protect innocent owners such as parents whose teenage child borrowed their car.[63]

In response to HB 1442 and increased enforcement generally, many organizers once promoting takeovers and races have begun moving to events on private property. While these private activities aren't illegal per se, they often involve stolen vehicles, and their unstructured, amateur nature has resulted in life-threatening injuries of both participants and spectators,[64] which might warrant exploration of criminal or regulatory solutions that enforce existing laws.

### House Bill 1826—Retail Theft Task Force

HB 1826, by Rep. Chris Turner, was captioned "relating to the establishment of an organized retail theft task force."[65]

The bill was the product of interim study by the Committee on Business & Industry, which found that organized retail theft was "a serious problem increasing in intensity in Texas and across the country and that retailers are looking for help combating it [because] when thieves

conduct organized retail crime across jurisdictions, it can be more difficult to apprehend and charge them due to a lack of coordination between jurisdictions."[66] HB 1826's solution was the creation of a statewide retail theft task force that would review laws and regulations in other jurisdictions, analyze the economic impact of organized retail theft, and make recommendations for outreach, prevention, and training to address it.[67]

As of the committee's meeting on July 9, 2024, the new task force had met three times and scheduled two more meetings, with a report to the Legislature due on or before December 1, 2024.[68] It had also conducted several site visits at brick-and-mortar retailers and had plans to interface with a fulfillment center to explore how the issue affects online retailers.[69] There's been no cost so far for the task force because it's staffed by existing and volunteer personnel.[70] Its work coincides with statewide efforts by DPS, which has seven full-time employees dedicated to organized retail theft—three in Houston, three in Dallas, and one in Austin, although they each work cases statewide.[71]

One issue that both the task force and law enforcement agencies like DPS have had to contend with is a lack of universal data across retailers since standards differ on when, how, or even if theft is reported.[72] There's also the matter of striking the right balance in both data gathering and enforcement that doesn't lump petty shoplifting in with the organized efforts targeted by HB 1826, which is part of what the task force's recommendations may assist with.[73]

### House Bill 2897—Theft of Service

HB 2897, by Rep. Armando Walle, was captioned "relating to the prosecution of the offense of theft of service."[74]

Theft of service prosecution involves notice requirements before criminal charges may be filed.[75] This process has traditionally been hampered by "conflicting provisions in state law regarding different types of theft by check," which can "not only create confusion for victims of crime, but can also frustrate attempts to prosecute these sorts of cases and recover restitution."[76] HB 2897 cleared up some of those conflicts by expanding acceptable notice addresses to include the address on a check used to secure service or in the records of the bank from which the check was drawn, or simply the address from the victim's own records, making it easier to meet statutory obligations before prosecution.[77]

The bill has already impacted the majority of all hot check cases, making it easier to resolve them without going to court and any prosecution more effective when it's needed.[78] It's also effectively improved an underused tool for battling wage theft, since theft of service is often a much faster avenue for recovering illegally withheld wages than filing through the Texas Workforce Commission.[79]

While HB 2897 has made finding the appropriate notice address easier, there are still cases where a victim can't locate any physical address to send notice to. Moreover, many victims still don't send notice to begin with, and many notices that are sent don't meet statutory guidelines. Expanding notice options to include email, text, or other modes of written communication and simplifying requirements for the actual contents of the notice itself (or simply promulgating a statewide form letter) would further expand access to restitution and justice.[80]

### House Bill 3956—Felony DNA Records

HB 3956, by Rep. Reggie Smith, was captioned "relating to the creation of DNA records for a person arrested for a felony offense and the expunction of DNA records in certain circumstances."[81]



*A buccal swab, the typical method of DNA sample collection*

"DNA typing is now universally recognized as the standard against which many other forensic individualization techniques are judged."[82] Collecting DNA specimens from offenders serves a dual purpose: it can solve "cold cases" where DNA was collected but not matched, and it can sometimes exonerate the falsely accused.[83] Our existing program for DNA collection after certain felony arrests has already paid those kinds of dividends.[84]

HB 3956 built on that by expanding the program to cover all arrests.[85] It also changed the collecting entity from arresting agencies to booking agencies, and given privacy concerns around the DNA database, the bill provided extensive requirements for expunging DNA information after acquittal, dismissal of charges, or other relief.[86]

Since the bill's passage, there have been over 71,000 samples taken and more than 900 hits. Those have already solved a number of cold cases, including a 2022 Georgia murder.[87] As it so often does, knowledge has proven to be power.

Despite this early promise, not all agencies are in compliance, mostly due to a lack of resources and training (something that DPS and the Texas Sherrif's Association are working together to fix). There's also a persistent issue of duplicate samples being taken at a rate of around 15%, which wastes the cost of each sample kit (about $5) in addition to officer time, although DPS

is attempting to reduce that rate through training, and the program as a whole still remains within the original fiscal note at the state level.[88]

Sample record destruction is just as important as sample record collection, and some procedural hurdles remain there. The number one issue is the need for an effective, uniform method for clerks to be informed that a DNA sample exists in the first place, such as the law enforcement vendor capturing that information and transmitting it or the prosecutor's office sending notice along with any resolution of a case. And there's no clear statutory definition of "dismissal" in this context—does the term include a prosecutor declining to pursue charges or a grand jury entering a "no bill," as just two examples?—leading to uncertainty about if and when some samples should be removed from the database.[89]

### House Bill 4906—Campus Electronic Evidence Warrants

HB 4906, by Rep. Cole Hefner, was captioned "relating to the installation and use of tracking equipment and access to certain communications by certain peace officers."[90]

Modern investigations routinely involve electronic evidence such as social media activity, direct messages, and text messages, and our statutes provide a process for peace officers to apply for search warrants for it. However, one type of officer was (probably inadvertently) excluded from the list of those who can apply: officers serving our schools.[91] HB 4906 corrected that oversight by simply adding peace officers employed by schools and universities to the list of potential applicants.[92]

The bill's intent was to level the playing field for all Texas peace officers and give those working for our schools the tools they need, which it's successfully done.[93] Although our largest state university system hasn't had to make use of the law yet, there have been past cases that could've otherwise been handled "in house" that had to be passed off to other law enforcement agencies so that electronic evidence could be secured. Under HB 4906, that shouldn't be necessary anymore, increasing the responsiveness and efficiency of investigations on our campuses that involve this kind of evidence.[94]

### Recommendations

The committee makes the following recommendations to the 89th Texas Legislature:

### Consider pretrial costs in rogue prosecutor petitions

HB 17 has worked well, and the prospect of having to pay attorney's fees has discouraged abuse of the removal petition process. However, petitions that are wholly without merit have so far been dismissed at the pretrial stage, which imposes a currently unrecoverable cost on

our counties and doesn't properly discourage bad faith filings. The Legislature should consider whether and how pretrial costs could be charged against a bad actor for filing such a pleading.

### Decriminalize fentanyl testing strips

Fentanyl testing strips are an effective harm reduction strategy that saves lives. While the Legislature doesn't condone drug use, we're faced with an epidemic that can lead to deadly results for the unsuspecting—especially young people who might simply be experimenting. The Legislature should decriminalize fentanyl testing strips.

### Eliminate all TXDL resuspensions

The retroactive provisions of HB 842 have been highly successful in getting suspended drivers properly licensed once again. The language should be made forward-looking—meaning no extension of a suspension simply because a person's license is already suspended—so that no Texan is caught in an endless loop of suspension and resuspension.

### Collect victim info for restitution

Victims of crime should be at the center of our criminal justice process, and we must do everything we can to make them whole. The Legislature should explore options for better connecting victims with later restitution payments while also protecting their privacy rights.

### Study the application of existing laws to private racing events

Although Texans should be free to take personal risks on private property, races and exhibitions that flout existing laws may endanger bystanders and facilitate illegal activity. The 89th Legislature should study enforcement gaps related to these events.

### Implement further theft of service notice reform

Notice requirements in theft of service cases should make it easy for honest mistakes to be corrected and thievery to be punished, so modern communication methods like email and text message should be permitted, and the state should promulgate templates for these notices.

### Clarify DNA database laws

Our DNA database should be operated with absolute clarity, including disposal of records when appropriate. The Legislature should develop a uniform method for informing clerks that a record exists when a dismissal or similar relief is granted, and our statute should thoroughly define the outcomes that entitle a person to the deletion of their record.

# CHARGE 2—PROTECTING SURVIVORS

Examine the shift in criminalization of children by human traffickers into other criminal enterprises, such as aggravated robbery, as well as the Texas Penal Code definition of "duress" as an affirmative defense for survivors of human trafficking and domestic violence. Make recommendations to prevent the criminalization of survivors of human trafficking and domestic violence for the crimes of their abusers.

## Hearing

The committee held a hearing on September 16, 2024, in Capitol Extension room E2.010 to consider charge two. This is the official witness list generated from electronic witness affirmation forms:

Garvens, Lillian (Lone Star Justice Alliance)
Jackson, Ross (Texas Public Policy Foundation)
Place, Allen (Texas Criminal Defense Lawyers Association)
Sweeney, Michael (Self; Texas Association Against Sexual Assault)

The report and recommendations below are based on the testimony and materials these witnesses submitted to the committee as well as research conducted by committee staff.

## Background

Human trafficking is slavery. It's "a crime that involves compelling or coercing a person to provide labor or services, or to engage in commercial sex acts. The coercion can be subtle or overt, physical or psychological."[95] "Although sometimes perceived as an issue affecting foreign-born individuals, data shows that many human trafficking victims are domestic."[96] Studies have revealed that as many as 17,500 people—mostly women and children—are trafficked in the United States every year.[97] In 2023, the National Human Trafficking Hotline received 2,379 substantive contacts in Texas alone.[98]

Profit is always the goal of trafficking, so traffickers often engage in other criminal activity and coerce their victims into participating as well. Doing so protects the trafficker by putting an additional layer between them and the crime, and these abusers are actually incentivized to

exploit minors for these criminal acts because young offenders are less likely to be harshly punished if caught.[99]

However, trafficking victims who commit crimes on behalf of their traffickers often have little in the way of legal defense. While Texas law does offer a defense specific to cases of prostitution,[100] the only protection available to trafficking victims who commit other crimes is the concept of "duress." Under current law, that defense is only available in very narrow circumstances: when the trafficking victim was "compelled to [commit the offense] by threat of imminent death or serious bodily injury to himself or another" that "would render a person of reasonable firmness incapable of resisting the pressure" and didn't "intentionally knowingly, or recklessly place[] himself in a situation in which it was probable that he would be subjected to compulsion."[101] Together, these requirements mean that duress can't be used as a defense for most trafficking-related crimes.[102]

## Discussion

While the duress defense is an important backend protection for victims of trafficking, the best solution is to keep them from being trafficked in the first place. That's a complex effort that requires many kinds of interventions, and our state has already begun taking steps towards keeping our most vulnerable Texans from being exploited by these criminal enterprises.

### Education & Intervention

Witnesses who testified before the committee all agreed that the first steps in protecting people from human trafficking are education and intervention, both at the earliest possible opportunity. Human trafficking often begins at a young age, with nearly half of all victims initially recruited by family members[103] and trafficking "relationships" being solidified by the time a child is in middle school.[104] As a consequence, victims often lack a reference point for what healthy relationships look like and may not even realize they've been trafficked.[105] There's also a mutual reinforcement between trafficking, abuse, and justice system involvement,[106] so by the time there's a law enforcement contact, it's that much more difficult to separate victims from the trafficking cycle.[107]

Both federal and state approaches have started to acknowledge how comprehensive the problem and its solutions are. The Department of Justice has described its anti-trafficking work as a "whole-of-government collaborative approach" that includes not just law enforcement, but also schools, workplaces, and healthcare providers.[108] Texas has similarly started to engage the issue broadly, beginning with the Texas Human Trafficking Coordinating Council in 2019. The council brings together designees from at least ten different bodies of state government for overall strategic responses to human trafficking.[109] Its first five-year plan,

released in 2020, included more than two dozen multifaceted strategies designed to systematically combat trafficking.[110]

Recent legislation has also taken an expansive view of anti-trafficking measures, such as the 87th session's HB 390, by Rep. Senfronia Thompson, which required specialized training for hospitality workers.[111] Similarly, a 2019 law that added signage requirements about human trafficking at transportation hubs has been expanded every session since and now includes locations ranging from tattoo studios to state parks.[112]

> It's not someone snatching you off the street. It's more often someone we know, we trusted, and even loved, that is pimping our boys and girls out onto the street. . . . It's a coercion that gets these individuals into the trafficking.
>
> MICHAEL SWEENEY, TEXAS ASSOC. AGAINST SEXUAL ASSAULT

Much work remains to be done. Although millions of dollars have been allocated to the issue, some funding gaps persist. Tellingly, as recently as 2022, the Health and Human Services Commission didn't have the resources to comply with even the legislatively mandated reporting requirement for its trafficked persons program account and grant program, which was designed to support housing and treatment for young trafficking victims.[113] There are also significant differences in resources between urban and rural areas.[114] Finally, the ongoing crisis in our foster system has had direct reverberations into the world of human trafficking: 1,164 children went missing and 386 children were confirmed or suspected to have been trafficked while in the state's conservatorship in 2023 alone.[115]

To be successful, both education and intervention must be comprehensive, well-funded, and as early as possible. For either to last, victims need ongoing protection and support—real-world alternatives to the awful situations they've found themselves in. Texas's work to end human trafficking has been strong, but it's only just beginning.

## Duress

Understanding our duress statute in trafficking cases is easiest with a concrete example, such as this anecdote shared with the committee:

> "Sarah" was first trafficked at the age of 3 by her mother. She would exchange access to her daughter for pills. [Sarah] was also abused by her mother's boyfriends and her grandfather. She was in over 35 different foster care homes throughout her childhood, and at the age of 14, her mother introduced her to a man who would soon become her pimp. He would set her up in motel rooms with johns, and while they were engaging in sexual acts with a minor, he would rob them, under the theory that those crimes would go unreported because they had just bought sex from a child.
>
> One night, things escalated, and Sarah and her pimp were both arrested. She was convicted and sentenced to 20 years on a determinate sentence at the age of 15. So, she was considered a co-conspirator in a aggravated robbery when in that same night she was being sold as a child in a sex trafficking exchange. Clearly, she was being

exploited—clearly, she was being trafficked—but not once in her entire court proceedings was it identified that she was a survivor of trafficking.[116]

Sadly, stories like these aren't uncommon.[117]

Worse, the duress defense wouldn't be available in a case like that. Although Sarah had been extensively traumatized, coerced, and may have had a general threat of violence hanging over her, she wasn't under "*imminent* threat of death or serious bodily injury" at the time of the robbery.[118] Sarah would also be judged against an imaginary "person of reasonable firmness"—not someone who had spent a lifetime being pimped. And even if those standards were met, a court might easily find that she put herself, even recklessly, in the position of being compelled to join in the robbery.

At least 37 states have more expansive duress standards that Texas could look to, many of which include coercive control factors such as psychological, emotional, and financial manipulation.[119] This is critical because the neurobiology of trauma responses to grooming is a relatively new field that's not widely understood—trauma bonding can make exploitation look like cooperation.[120] Ultimately, our duress statute should allow the judge or jury to hear all evidence related to trafficking in order to decide how a crime fits into it,[121] which would mirror recent statutory pushes to allow extraneous contextual evidence in the trials of sex crimes involving minors[122] and of family violence.[123]



## States With Duress Defenses for Trafficking Victims

Strong 10%

None 26%

Limited 64%

Witnesses provided the committee with a number of suggestions. Specific tweaks might include removing "imminent" as a requirement, expanding threats of violence to more forms of coercion or simply to coercion generally, and removing the element of whether the person

placed themselves in the situation altogether.[124] The Legislature might also provide a trafficking-related defense to specific offenses associated with it (much in the same way that it did for prostitution, but for theft, burglary, robbery, and so forth) or even make the affirmative defense an outright exception as a policy statement, which would require the prosecution to prove a defendant wasn't being trafficked at the time of the offense.[125]

Another possible change would be to the "person of reasonable firmness" element, since a trafficking victim is in a very different position than most other people. Rep. Senfronia Thompson's HB 327, which would have changed it to "a reasonable person in the situation" of the trafficking victim, passed the House with a strong majority this session.[126] It didn't receive a hearing in the Senate.

But a robust duress defense only solves part of the problem. Even if a trafficking victim who was coerced into a crime avoids conviction, the arrest and related records can be just as devastating to opportunities for employment, housing, education, and so forth.[127] That's part of the reason why Governor Abbott created a clemency program for trafficking victims in 2021, which has provided relief in some cases.[128] Other states have provided more comprehensive models that include options for nondisclosure, expunction, and even resentencing.[129] A resentencing option, which has been used in states like Oklahoma, would provide an especially meaningful opportunity for relief to trafficking victims who were already caught up in the system before any legislative reforms.[130]

Recommendations

The committee makes the following recommendations to the 89th Texas Legislature:

### Expand education & intervention efforts

Preventing trafficking in the first place isn't just the most effective approach to the problem— it also saves young, vulnerable victims untold human misery. The Legislature should prioritize education efforts and facilitate the earliest possible efforts to intervene in the lives of children who are at-risk.

### Address funding issues

Our agencies and local partners need the resources to fight trafficking effectively. Funding for interventions and victim support is critical, and the way it's distributed should account for the existing gap between urban and rural resources.

**Overhaul our foster care system**

While our state is making many strides towards improving its foster care system, we must redouble those efforts. If we don't overhaul foster care here, what should be a system of compassion may become a pipeline to human trafficking.

**Explore reforms to the duress defense**

Human trafficking victims are being revictimized in many cases where common sense tells us that a duress defense should apply. The Legislature should explore amendments to the duress statute, which may include removing the "imminent" danger requirement, expanding threats of violence to include coercion generally, removing the "placed themselves in the situation" exception, and changing the "person of reasonable firmness" standard to "a reasonable person in the situation" of the human trafficking victim. The choice of approach should ensure that the duress defense is broad enough to be used by trafficking victims but narrow enough to prevent abuse by anyone else.

**Expand post-conviction relief for trafficking victims**

Using the governor's clemency program for trafficking victims as a guidepost, the Legislature should consider nondisclosure, expunction, or even resentencing options for trafficking victims who are already caught up in our justice system as a result of being trafficked.

# ROBERSON & WRITS

Robert Roberson's case came to dramatic national attention this interim. It highlighted not just an individual injustice, but the unfulfilled promise of what was intended to be a pioneering Texas law—"junk science" writs under Article 11.073, Code of Criminal Procedure—that hasn't worked as intended. It also exposed critical problems in both appellate procedure and how our system responds to people with neurodivergence. The importance and urgency of these issues led the committee to explore them in two groundbreaking hearings.

Hearing

The committee held hearings on October 16, 2024, in Capitol Extension room E2.016 and October 21, 2024, in Capitol Extension room E2.010 to consider "criminal procedure related to capital punishment and new science writs under Article 11.073, Code of Criminal Procedure."[131] This is the official witness list generated from electronic witness affirmation forms:

Alcala, Elsa (Self)
Auer, Roland (Self)
Compton, Terre (Self)
Findley, Keith (Self)
Green, Francis (Self)
Grisham, John (Self)
Hebron-Jones, Estelle (Texas Defender Service)
Judson, Katherine (The Center for Integrity in Forensic Sciences)
McGraw, Phillip (Self)
Mitchell, Allyson (Anderson County Criminal District Attorney Office)
Montfort, Natalie (Self)
Salzman, Donald (Self)
Singer, Jeffrey A. (Self)
Sween, Gretchen (Self)
Wharton, Brian (Self)

The report and recommendations below are based on the testimony and materials these witnesses submitted to the committee as well as research conducted by committee staff.

## Background

Robert Roberson was convicted of the capital murder of his two-year-old daughter, Nikki Curtis, and sentenced to death in 2003. Since then, grave doubts have arisen about the science in the case, which Article 11.073, Code of Criminal Procedure, was created to address. Despite that, our junk science writ process hasn't had the impact this committee expected in Robert's case (or almost any other, for that matter), and he remains on death row.

## Investigation

In January of 2002, a DNA test confirmed that Robert was Nikki's father, and he took custody of her from her maternal grandparents soon after.[132] Nikki was a chronically ill child who suffered from antibiotic resistant infections, breathing apnea (a dangerous condition not to be confused with common sleep apnea), and disseminated intravascular coagulation (DIC), a clotting disorder.[133] Her breathing issues had resulted in her suddenly losing consciousness to the point of turning blue several times in the two years before Robert was part of her life.[134]

On January 28, 2002, Nikki had been suffering from vomiting, coughing, and diarrhea for the last five days. Robert took her to the hospital, where she was prescribed Phenergan, an anti-nausea medication that's no longer prescribed to children and now carries a "black box" warning for potential "fatal respiratory depression." The next morning, Robert brought Nikki back with a 104.5-degree fever, and Nikki was sent home with a codeine prescription—also known carry the risk of "slowed or difficult breathing and death, which appear to be a greater risk in children younger than 12 years." (No signs of other trauma were noted in either visit.)

The very next morning, Robert again returned to the hospital with Nikki, but this time she was blue and unconscious. Robert told hospital staff that he and Nikki had fallen asleep in his bed watching a movie and that he woke up in the middle of the night to find that she'd fallen out of bed. She had a bit of blood on her mouth, which he wiped with a rag, but she seemed fine otherwise. He got her back to sleep, but when they woke up, she was unresponsive. After repeatedly trying to wake her, he "crawled up on the bed and grabbed her face and shook it to wake her up. Then when she didn't wake up, [he] slapped her face a couple of times."[135]

External impressions were consistent with that: A nurse described a minimal facial bruise that looked like a handprint, with no black eye, blood, fracture, or any sign that Nikki had been struck.[136] Dr. Janet Squires, who took charge of Nikki's care after she was rushed from Palestine to Dallas for further care, also noted "minimal bruising" and a "little chin abrasion"

but "no scars, no unusual bruising or anything."[137] A CT scan revealed a single small impact site consistent with a fall,[138] and these were the injuries investigators later observed as well.[139]

The situation shifted into a criminal investigation almost immediately. Nikki's condition wasn't explainable as the result of a fall, and she presented with the triad of symptoms—"subdural hemorrhages, the retinal hemorrhages, and the brain swelling," as Dr. Squires described them at trial[140]—that were

> We constructed an appeals system because we understood that we get things wrong. We wrote laws to work within those appeals systems because we understand that we get things wrong. It's all pointless if nobody will admit, "We got it wrong." . . . Don't make my mistake.
>
> BRIAN WHARTON, PALESTINE CHIEF OF DETECTIVES (RET.)

then thought to exclusively signify shaken baby syndrome (SBS). Suspicions were also compounded by the fact that Robert is a person with autism, although it hadn't been diagnosed and wasn't well-understood at the time; his flat affect and unexpected reactions that day were instead taken as signs of deception and indifference.[141]

A lack of any other explanation for Nikki's condition and Robert's behavior defined the entire investigation. And with medical personnel believing (and law enforcement officers trusting) that the science made it an open-and-shut case, everything tunneled towards proving the predetermined answer: SBS, with Robert as the culprit. Under that cloud of predetermined guilt, Nikki was taken off life support without consulting Robert two days after he brought her to the hospital.[142]

### Trial

That singular focus was even more pronounced at trial. Several witnesses with staggering credibility problems offered testimony that defied verifiable facts but fit the narrative that Robert was a killer.[143] Perhaps the worst was a nurse who described a litany of injuries not seen by any other witness[144] and evidence she claimed pointed to Nikki having been sexually assaulted. (She also perjured herself by falsely saying she was a certified sexual assault nurse examiner.[145]) This theory—completely undermined by the evidence and rejected by the prosecution's own experts—actually led to a dubious effort to secure a jailhouse confession through a snitch. What followed was a story so obviously untrue that the prosecution, to its credit, didn't use it at trial.[146] Still, the sexual assault allegation was only abandoned at the end of the trial when no evidence supported it, *after* it had already inflamed the jury.[147]

There were also discrepancies in the medical theories that should've substantially muddied the waters. Dr. Squires testified that her "medical findings" were "a picture of shaken impact syndrome," also known as "shaken baby syndrome," caused by "very forcefully shaking the

head back and forth," with "no other indication of traumatic injuries," including "no bruising," "no fractures," and "no old fractures."[148] She further indicated that shaking was the mechanism of death—"the actual brain injury, we do not feel is explained by [the] single impact" she identified; "[t]here had to have been something more than just impact."[149] That single impact was not just identified visually, but through a CT scan "done soon after admission."[150]

Dr. Jill Urban performed an autopsy after Nikki passed away. Although she admitted that it was "very difficult to elucidate exactly [*sic*] much blows there were," she still suspected "multiple blows to different points on the head" due to the distribution of hemorrhages.[151] Unlike Dr. Squires, who saw Nikki promptly and reviewed CT scans, Urban simply reported what she saw after days of emergency care—medical efforts she conceded could've explained some of what she saw[152]—without reference to any other information, including the scans or Nikki's medical history (which would've revealed the DIC diagnosis that explained the new bruising, among other things).[153] Ultimately, though, her conclusion was that Nikki's death was caused by "blunt force trauma," which she explained this way:

> Typically in a—Especially in a child this age, blunt force can be caused both by—well, by an impact to the head, so being struck with something or being struck against something. *Shaking also falls into this definition of blunt force* and when enough—And although it doesn't seem like, you know, shaking is not necessarily striking a child, when you are-- When a child is say, shaken hard enough, the brain is actually moving back and forth within, again, within the skull, impacting the skull itself and that motion is enough to actually damage the brain.[154]

In her opinion, there was no way to separate injuries caused by blows and injuries caused by shaking as a cause of death—it was all one and the same.[155]

These issues were largely unrevealed until later habeas proceedings, and trial cross-examination focused almost exclusively on intent.[156] Lead investigator Brian Wharton described Robert's representation by saying that his attorneys "didn't do much" to the point that it "felt wrong"—they were "not vigorous," he was "not impressed," and while he could remember the times he testified in other cases where he "got his feelings hurt" by blistering cross-examination, that didn't happen at Robert's trial.[157]

In fact, Robert's counsel conceded it was "unfortunately a shaken baby case" from the start, telling the jury that the "evidence will show that Nikki did suffer injuries that are totally consistent with those applied by rotational forces more commonly known as shaken baby syndrome."[158] This exact scenario was addressed by the Supreme Court in 2018 when it held it unconstitutional for an attorney to admit guilt for strategic reasons when a defendant is determined to maintain innocence,[159] as Robert consistently did.

What that did make clear, though, was that the trial was over SBS. The prosecution agreed, saying in its opening statement that the evidence would show "the picture of what they call shaken impact syndrome."[160] That continued in closing, where the prosecution even began by saying that the case was "simpler than [the prosecutor] anticipated" because both sides agreed "this is a shaken baby case."[161] As both the lead investigator in the case and an actual juror in the trial told the committee, SBS was *the* theory of the case at trial, and that's what Robert was sent to death row for.[162]

### Post-conviction

In a capital case, where the ultimate penalty is on the table, the trial "has to be as perfect as we can make it."[163] Robert certainly didn't get that. In theory, a robust appellate system, including the Article 11.073 junk science writ the Texas Legislature created, is a backstop. Unfortunately, Robert's case has revealed its deficiencies.

There are essentially two kinds of appeals. One is a direct appeal, which is usually the first step in challenging a conviction or sentence. Direct appeals raise issues that are apparent from the record, like whether there was enough evidence or whether the judge made the right rulings. The other is an application for a writ of habeas corpus, which is usually the last resort on appeal. Habeas proceedings are about structural problems with the entire conviction, like violations of constitutional rights or actual innocence.[164]

Robert's direct appeal hit two barriers. The first appears, as at trial, to have been weak representation. The opinion by the Court of Criminal Appeals reveals that the scattershot appellate pleadings were almost all disposed of as raising "no new arguments to merit reconsideration of" well-settled law or as simply "obviously . . . contrary to a plain reading of the [applicable] statutes."[165] This issue of poor representation ran so deep that Robert wrote from jail that he felt his attorney was working for the prosecution, not for him.[166]

The second issue was the way our system gives almost total deference to the trial court. Without getting too into the weeds on criminal appellate law, it's fair to say that its default setting is that if a verdict can be supported in any way, it will be. In Robert's 2007 appeal, the guilt issue of intent and the special issues on punishment that led to his death sentence were upheld in that way.[167]

Robert found himself in similar trouble in his habeas corpus efforts. At the outset, things had improved for him. The Court of Criminal Appeals remanded his case back to the trial court to develop the record on a "junk science" claim, among others. He also had a new attorney who was capable and diligent, so the extensive hearings that followed over several *years* to

create that record were thorough. Including the hundreds of exhibits, the records from these proceedings number in the thousands of pages. In (very) brief, the evidence was:

> Dr. Francis Green, a 46-year expert in lung pathology, provided a detailed report showing that Nikki's lungs were infected with both viral and bacterial pneumonia, which caused brain damage by oxygen starvation.

> Dr. Keenan Bora, an expert in medical toxicology and emergency room medicine, concluded that the toxicology report showed dangerously high levels of promethazine in Nikki's body, a drug now known to be potentially fatal to children because it impairs breathing.

> Dr. Julie Mack, an expert in pediatric radiology, reviewed the CT scans rediscovered in the courthouse basement in 2018 and determined they showed a single minor impact site consistent with Robert's explanation of a fall off of a bed along with chest x-rays (some produced to Robert's counsel as late as this year) that supported Dr. Green's diagnosis of fatal lung infection.

> Dr. Janet Ophoven, who is board certified in forensic pathology and anatomic pathology with special training in pediatrics and pediatric pathology, held that Nikki's death could not be ruled a homicide and was consistent with irreversible damage from oxygen deprivation. She was confident that Nikki's condition was caused by neither shaking or impacts and that the autopsy was flawed and misleading.

> Dr. Ken Monson, biomechanical engineer who studies head injuries and directs the "Head Injury and Vessel Biomechanics Laboratory," explained that shaken baby syndrome assumptions about how shaking would cause internal head injuries but no neck injuries have been falsified and that the demonstratives used in Nikki's trial misled the jury.

> Dr. Carl Wigren, a forensic pathologist and member of the American Academy of Forensic Sciences with over 2,000 autopsies, concluded that Nikki's death was not a homicide based on the CT scan showing a single impact site consistent with a short fall, the toxicology report and prescriptions in use, and the pneumonia, which came together in an "unfortunate accident" that was "absolutely not" a homicide and didn't involve abusive head trauma.

> Dr. Roland Auer, a neuropathologist board certified in the United States and Canada, who is both a medical doctor and a Ph.D. scientist, the author of a leading neuropathology treatise and over 130 scientific articles in peer-reviewed journals, and a researcher with extensive experience with head trauma, hypoxia, hypoxic ischemia, and pediatric pneumonia, reviewed Nikki's records and drew the same conclusions. He found it impossible for her internal damage to have been caused by external impacts because they would have left external markers on the skin and likely corresponding skull fractures and found "no support for multiple impact sites neither on the brain nor in the skull nor in the scalp," and "no evidence for multiple impact sites whatsoever."[168]

Drs. Auer, Green, and Singer reiterated their testimony live before the committee.[169]

To summarize, new medical evidence not only debunked SBS here but also explained what happened: Nikki died from oxygen deprivation. She had a combination of bacterial and viral pneumonia plus dangerously high levels of drugs known to suppress breathing. When her brain was starved for oxygen, it suffered irreversible damage and hemorrhaging. None of these top-of-their-field experts saw evidence of multiple impacts; just like the prosecution's own Dr. Squires, they saw a single small impact consistent with a short fall. (To be clear, the committee

isn't a court and isn't taking the position that these medical experts definitively prove anything, merely that it's compelling scientific evidence that no court appears to have meaningfully engaged with, contrary to Article 11.073's intent.)

Meanwhile, the state produced only Dr. Urban to reiterate her autopsy claims, which were greatly undermined during the proceedings, and Dr. James Downs—a member of the "Shaken Baby Alliance," which is dedicated to defending the diagnosis—who claimed that Nikki had "normal little kid lungs" with "no pneumonia."[170] Dr. Downs was recently found to have missed pneumonia in a child autopsy, leading to a new trial for a man sentenced to death who'd been convicted based on Downs's testimony.[171]

After those proceedings, both sides were asked to provide the habeas court with proposed findings. The thoroughly documented proposal provided by Robert's attorney was 304 pages long, while the prosecution's was just 18.[172] The state's proposal was adopted almost verbatim (down to matching typos and drafting choices[173]), all calculated to deny relief. It relied almost exclusively on the trial evidence and hardly referred to the copious new medical evidence offered at the habeas proceedings. Incredibly, it both insisted on the continued validity of SBS but also that the trial was not really about SBS after all, and that "even if any evidence [about SBS] was false, it was not material to the verdict of the jury."[174]

When Terre Compton, an actual juror in Robert's 2003 trial, heard the revisionist argument that "shaken baby syndrome just doesn't play a role in this case; it's just not the central feature of this case," she said that, "Me being at the trial and in the jury . . . that is all that this case was based on was shaken baby syndrome." When she was told that government officials have since represented the case as something else, her assessment was clear: "It has pissed me off very much," she told the committee.[175]

Robert's attorney responded to those findings with objections and motions calling for the Court of Criminal Appeals to reject them. Those were denied, as was any habeas relief (including under Article 11.073), all without substantive written opinion.

### Lawmaker Involvement

During this interim, Robert's case received significant national attention. Traditional sources such as the Innocence Project amplified Robert's story, but he also found champions in celebrities like Dr. Phil and John Grisham as well as widespread exposure through social media. Closer to home, the case eventually attracted the eye of the House's Criminal Justice Reform Caucus. After meetings with attorneys involved in the case and independent research into the claims being made, the caucus led an effort to urge clemency for Robert, which was joined by 86 members of the House.

In early October, relief under Article 11.073 seemed imminent when the Court of Criminal Appeals ruled in another case that "scientific knowledge has evolved" to "undermine the State's theory of a case involving SBS," citing scientific experts, the *Journal of Neurosurgery* and *Journal for the British Academy for Forensic Science*, and other state and federal courts.[176] That case was not just similar to Robert's—it featured nearly identical testimony *from the same person*, Dr. Squires, about SBS. Shockingly, the court denied relief to Robert the very next day, with a concurring opinion continuing to hold (presumably based on the habeas court's findings of fact) that it was "not just a 'shaken baby' case."[177]

These developments led the committee to hold hearings about the issues raised by the case, especially the failure of our junk science writ law to provide any relief. At the close of its first hearing, committee members decided that it was crucial to hear from Robert himself. His perspective was unique as a person with autism who'd been through trial, appeal, and the writ process in what would be the first SBS-based execution in Texas. Some members also felt that, given the dispute about some of the facts of the case, they needed to look him in the eye and judge his credibility themselves.

On October 16, 2024, the committee unanimously voted to subpoena Robert to testify at a hearing on October 21st, the next possible date under House Rules. That meant interrupting Robert's execution, then scheduled for October 17th, which led to a stunning series of legal battles in district court, the Court of Criminal Appeals, and the Texas Supreme Court.[178] It also prompted a very public back-and-forth with the Texas Office of Attorney General.[179] At



*The committee's unanimously approved subpoena for Robert Roberson*

the time of this report, the Texas Supreme Court has just validated the committee's general power to subpoena an inmate, so the committee may still take Robert's testimony. What remains clear, however, is the committee's absolute conviction that the law didn't function as intended here.

Discussion

We often champion small government in Texas, but government is never bigger than when it takes a life. The members of this committee hold a wide range of views on capital punishment, but they're united in an expectation of certainty and procedural rigor when there's a death sentence.[180] Our laws are meant to ensure strong due process, but Robert's case demonstrates how spectacularly short those laws can occasionally fall. And while it's not the place of legislators to decide on guilt or innocence, it's absolutely the job of the legislature to make sure out laws work—and fix them when they don't.

### Why Did Robert's Case Go the Way It Did?

There's always been some difficulty fitting science, which by nature is always evolving, into criminal law, which by nature seeks certainty and finality. Balancing those needs means gatekeeping at the frontend and a willingness to adjust for scientific advancements on the backend. SBS as it played out for Robert was a case study in how both can go wrong.[181]

SBS wasn't developed for forensic purposes. It first appeared "in the *British Medical Journal* in 1971" in a paper by Dr. Norman Guthkelch that "was just two pages long . . . called 'Infantile Subdural Hematoma and its Relationship to Whiplash Injuries.'" The hypothesis was rooted in simple caution, since in northern England at the time, Guthkelch regularly saw parents who disciplined their small children by shaking them, which he believed could be dangerous.[182] He came to regret how it had been transformed into a diagnosis for criminal prosecution—one he believed was overused and frequently misapplied—saying in 2012 that, "I am frankly quite disturbed that what I intended as a friendly suggestion for avoiding injury to children has become an excuse for imprisoning innocent parents."[183]

Science is never more powerful (and dangerous) than when it's a wholesale substitute for investigation. With something like SBS, the science supplies both the *actus reus* and the *mens rea* while designating the victim and the offender. It's essentially a diagnosis of murder.[184]

Even when there are pieces for investigators to fill in, forensic science can immediately narrow their work—sometimes down to a universe of one, meaning that all other theories and potential evidence are discarded when they clash with what's believed to be scientific fact.[185]

Confirmation bias is a persistent problem in criminal justice and can be strongly exacerbated by the apparent certainty of science.[186]

That applies to trial as well, where the record that bounds every later review is created. While a defendant has no burden of proof in theory, jurors are always looking for an explanation in practice. When science provides only one story that makes sense, jurors usually follow that to a verdict.[187] And where science has turned out to be wrong, so too have many of the convictions based on it, as in cases involving things like bite mark analysis, hair sample analysis, and many former tenants of arson investigation—all now known to be junk science.[188]

We now know that SBS as it was understood at the time of Nikki's death falls into the same category; it's just not good science anymore.[189] In fact, SBS isn't even used as a term of art these days, having been replaced by "abusive head trauma," which has new standards associated with it. That reflects a multi-decade process of evolution and revision within the American Academy of Pediatrics, with major shifts in its position as recently as 2020.[190]

> If one is trying to get at the truth, why has it become about who can win and score points? We want to know what the truth is from the scientists. And if there were a way to do that, I think our judicial system would be greatly enhanced.
>
> GRETCHEN SWEEN, ATTORNEY FOR ROBERT ROBERSON

That process was slow and difficult here. Part of that is an apparent reluctance among the medical establishment (as among lawmakers and lawyers at times, no doubt) to publicly admit to such a mistake. SBS is also complicated by an emotional element because it purports to protect children and explain (with a villain to punish) why the unthinkable sometimes happens to them.[191] In the meantime, though, there have been more than 100 SBS convictions overturned nationwide, with almost three dozen of them resulting in complete exoneration.[192]

## Article 11.073 Writs

It might seem easier to acknowledge changed science (and thus, prior mistakes) in law than in medicine, but our whole appellate system is designed for finality—to uphold convictions, not upset them. For example, sufficiency of the evidence is decided merely by asking whether, viewing the evidence in the light most favorable to the verdict, any rational jury could have found each element of the offense beyond a reasonable doubt.[193] That means the jury is given almost complete deference and all conflicts in evidence are resolved in favor of the verdict.[194] Similarly, even a wholly incorrect and illegal ruling on evidence or procedure can usually be ignored as "harmless error" if it "had but a slight effect" on the verdict.[195] While TV thrillers spin the idea that technicalities undo sentences all the time, relief is actually rare. In fact, in a

nationwide study, the Bureau of Justice Statistics found that "appellate courts reversed, remanded, or modified *a component* of the trial court decision" in only 12% of all appeals.[196]

Deference makes some sense—our courts of appeals weren't made to second-guess the live impressions juries had of evidence, and we don't have the resources to try every case twice. But that also provides a path for a courtroom lie to become an unchallengeable truth, even when the jury plainly didn't get the whole story. That can also happen with habeas proceedings.

Earlier this year, the Texas Defender Service (TDS) released a comprehensive report about Texas junk science writs, and the title neatly summarized its findings: "An Unfulfilled Promise."[197] According to its analysis, in practice, our Court of Criminal Appeals seems to have employed a burden of proof much higher than the statute commands. Article 11.073 merely requires a preponderance for "not guilty," meaning more likely than not that *any* reasonable doubt would've existed. In practice, though, the court is effectively requiring affirmative proof of actual innocence, with the overwhelming majority of relief granted for irrefutable DNA exonerations.[198]

The report also highlighted the large number (38% of all writ applications) refused on procedural grounds, that only one has ever been granted to an applicant without a lawyer, and that relief has *never* been granted in a death penalty case.[199] It closed, coincidentally enough, with a review of Robert's case.[200] In exploring these findings with the committee, TDS was quick to laud the intent of Article 11.073 and called attention to the fact that it was created with child trauma cases in mind.[201] Its promise is still there; there's just work needed to fully realize it.

The interpretation the Court of Criminal Appeals has made of Article 11.073 isn't surprising. By



*Infographic by Texas Defender Service*

nature, it views legislation through a highly technical lens, not in a holistic or commonsense way. The standard itself is also a bad fit for an appeals court—speculating on what a jury might have done with evidence it didn't have (without any input from that jury) is little better than looking into a crystal ball.[202] And because that sits over a system meant to affirm convictions by design, that's what the crystal ball usually shows.[203]

These issues, plus deference to findings by a habeas court that didn't engage with the new science in any meaningful way, may have been why Article 11.073 didn't work for Robert. "May" is all we have—another crystal ball—because the court routinely denies relief with boilerplate language rather than any real explanation.[204] The only insight we have throughout Robert's case is Justice Yeary's recent concurring opinion, which does seem to be rooted in the dubious "fact" findings that have long haunted this case.[205] The only thing we can be certain of is that many paths are statutorily foreclosed—new developments that may have affected only punishment, like Robert's autism diagnosis, can't even be addressed by Article 11.073.[206]

Fortunately, the experts the committee consulted with presented a variety of solutions. The TDS report itself suggested:

1. Revise the Standard for Granting Relief to Consider the Overall Impact of Flawed Scientific Evidence
2. Amend 11.073 to Include Penalty Phase Relief
3. Expand Access to Counsel for Indigent People Seeking Relief from their Wrongful Convictions
4. Implement Discretionary Review by the CCA
5. Mandate the CCA to Explain Why It Has Denied or Dismissed an 11.073 Claim[207]

Each of these would have directly touched Robert's case and others like it. The burden of proof change would've been particularly impactful, and other states have recognized as much in their writ laws. Maryland, for example, looks for new evidence that "creates a substantial or significant possibility that the result may have been different"[208]—more than a mere chance, but far less than a preponderance. Other alternatives might be "probable cause" for an acquittal or a focus on whether the new science would've "materially altered" theory of the case for the state or the defense.[209] Any of these would help turn the court's focus to ensuring the full and fair presentation of all the evidence to a jury rather than protecting a verdict based on the limited or flawed evidence it may have originally heard.[210]

The fact that Article 11.073 only covers evidence impacting decisions on guilt, not punishment, has long been acknowledged as a flaw in the law but remains uncorrected.[211] As mentioned, it would include Robert's then-unknown autism diagnosis, but it's relevant to many cases—especially capital trials where punishment is often the sole question.

The remaining recommendations also have wide application. The fact that only one pro se application has ever been granted speaks loudly to the need for access to appointed counsel (Robert's case was taken on pro bono). Judicial economy urges the suggested shift to discretionary review, since in many instances, there's agreement between the state and the defense about relief with no need for the Court of Criminal Appeals to intervene, as it must under current law. Freeing up those resources would allow it more bandwidth for writing the substantive written opinions TDS has called for, the lack of which has been a serious issue in Robert's case and many others.

The committee was also fortunate enough to hear from Elsa Alcala, a former justice who sat on the Court of Criminal Appeals when Article 11.073 was first created and later amended. She echoed TDS's sentiments and added several more.[212] Her most dramatic suggestion was simply to eliminate the Court of Criminal Appeals. While it might seem extraordinary, Texas is actually one of only two states (the other being Oklahoma) that have separate high courts for criminal and civil matters, and Justice Alcala lodged a number of criticisms based on her firsthand knowledge suggesting that we may be better off with a single court of last resort for all cases. Nonetheless, that would require a constitutional amendment[213] and wouldn't directly address the issues with Article 11.073.

One that would have changed the course of Robert's case and many other death penalty matters would be to lower the threshold for a stay of execution when new science issues are being developed. In Robert's case, the vote was 5-4 against—hardly the commanding certainty most Texans would expect before an execution. And eliminating something that has impeded nearly two out of every five claims—procedural bars, such as the notion that the claim *could* have been raised earlier than it was—would ensure that we're elevating truth above finality.

Finally, coming back to that basic tension between science and law, the very structure of junk science proceedings is problematic. Criminal law is adversarial. Science is factual. When we bring it into court on a matter of innocence, legal maneuvering shouldn't determine how it's received—only a frank, expert-informed assessment of the science should.[214]

Anderson County District Attorney Allyson Mitchell told the committee that she "trusted the process," although she admitted that the process sometimes makes mistakes.[215] Yet the state lodged a running objection to all new scientific evidence during the habeas hearings, intending to undermine the entire purpose of the proceedings.[216] And prior each of the hundreds of DNA exonerations throughout the country, which proved a convicted person's absolute innocence, our adversarial system saw the state fighting for a theory of guilt.[217] When we turn

to science for answers in a habeas proceeding, our system must be set up to listen to it (whatever the answer) instead of defaulting to a battle about it.

Neurodivergence

"We found [Robert]—his affect was very flat, he was unemotional, he was answering our questions, he was cooperative, but it just, it didn't feel right," Brian Wharton told the committee. "Robert's unusual response[s] kind of put the light on him" from the start.[218] Years later, Robert was diagnosed as being on the autism spectrum, someone who has a very flat affect, isn't cognitively agile in expression or well developed in a social-emotion sense, and reacts atypically, especially in a crisis.[219] But no one—not the investigators, not the jury, not the attorneys for the prosecution or even the defense—ever learned of or accounted for Robert's autism. Instead, he was taken as deceptive and detached, which played a large role in steering the investigation.

These themes also recurred throughout the trial, with Robert being described as odd, cold, callous, and remorseless. Behaviors like dressing Nikki before taking her to the hospital and making a sandwich while speaking with investigators at his home seemed so abnormal they were signs of guilt.[220] Terre Compton, a juror in the case, told the committee that the jury found Robert's demeanor strange and that it probably influenced her decision because she had no other explanation for his behavior.[221]

Unfortunately, Robert's experience wasn't unique. Neurodivergent people and those with intellectual and developmental disabilities are more likely to be victims than perpetrators, yet people on the autism spectrum are seven times more likely than neurotypical people to find themselves in legal trouble for some of the same reasons Robert was viewed negatively.[222] Once in the justice system, neurodivergence can significantly impair a person's ability to communicate in the courtroom and assist in their own defense.[223] These are issues that are well-understood when providing access to justice for victims of crime,[224] but less often a focus when dealing with someone accused of a crime.

This isn't just an issue in Texas or even the United States; international studies have noted the need for, among other efforts, "mandatory autism training for police officers and the judiciary, with a focus on identifying autism and understanding the needs of autistic people so that reasonable adjustments are offered in all cases."[225] Texas has taken some initial steps, like allowing vehicle registrants to indicate "a health condition or disability that may impede effective communication with a peace officer," which may then be placed in a database to alert officers to potential communication issues during a traffic stop.[226] At the state level, law enforcement training on autism is basic at best,[227] but some law enforcement agencies have

begun to pursue more robust training on their own.[228] During our hearings, witnesses recommended further legislative work that included a mandate (and ideally, funding) for additional law enforcement training on interacting with people on the autism spectrum. Last session's HB 568, by Rep. Rhetta Bowers, which covered education and training for peace officers about Alzheimer's disease and dementia, was suggested as a useful template.[229]

Courtroom accommodation is just as important, but perhaps even more neglected. While Texas has long made efforts to break communication barriers related to sight, hearing, and language in our courts, neurodivergence is largely unaccounted for.[230] The challenges in legal participation can be at least as profound as a difference in language, though, because they affect everything about how someone understands and is understood by others.[231] There are also still significant unsettled issues about how evidence of autism is handled in legal proceedings, which (as was true for Robert) can affect both whether someone is found guilty and what punishment they receive.[232]

Deciding how to address these considerations is complicated, but also necessary. The prevalence of autism is only increasing, with one in 36 U.S. children diagnosed with it as of 2020.[233] To ignore it today is to leave an access-to-justice time bomb ticking away for tomorrow.



*A group of lawmakers meet with Robert Roberson at the Polunsky Unit in Livingston, TX*

### What Awaits Robert Roberson?

This committee's thorough review of the record confirms that Robert was convicted based on SBS, and to twist matters to claim otherwise is disingenuous, especially when the state's own lead investigator and a juror who heard that evidence at trial see it that way. And to

continue to hold that the new scientific developments since trial wouldn't have made a difference when a juror has explicitly told this committee that she wouldn't have convicted if she knew then what she knows now is beyond the pale.

Those facts should matter with a properly functioning Article 11.073, but what happens to him now is in the hands of other branches of our government. What's in the Legislature's hands is whether our junk science writ works for future Texans. The 89th Legislature must act to make sure it does.

Recommendations

The committee makes the following recommendations to the 89th Texas Legislature:

**Change the burden of proof for junk science writs**

The burden of proof in an Article 11.073, Code of Criminal Procedure, junk science writ application—now a preponderance of the evidence that new science would've meant an acquittal—must be changed to fulfill the law's original purpose. It should either require a showing only of a significant chance of a different outcome or simply that new science would have materially altered the state or defense theory of the case.

**Apply junk science writs to punishment issues**

Junk science writs should also apply to punishment issues to correct a longstanding drafting oversight in the law.

**Alter junk science writ procedures**

There are several procedural changes the Legislature should study and consider. Structurally, proceedings under Article 11.073 don't have to be adversarial; legal duties for both the state and defense and the rules of evidence that apply to these matters can instead empower courts to inquire into the science with expert guidance and the goal of scientific truth, not legal victory or defeat. By that same token, procedural bars should be reviewed and limited so that truth, not finality, is prioritized. And it may not be efficient for the Court of Criminal Appeals to handle all junk science claims—judicial economy might be better served by allowing trial courts to handle these applications and our high court to exercise its traditional discretionary review function when appropriate.

**Improve access to & understanding of junk science justice**

Only one junk science writ application has ever been granted for someone without an attorney. When scientific evidence plays a significant role in convicting or sentencing someone, they

should be given an appointed attorney to challenge it. Our law should also ensure that all attorneys handling these cases have a meaningful chance to challenge faulty findings of fact that may undermine future proceedings, and they should have the benefit of a written opinion explaining a court's decision when relief is denied.

## Increase training & accommodation around neurodivergence

Whether they're defendants, victims, or other participants, people on the autism spectrum deserve due process in our justice system, from law enforcement encounters to our courtrooms. The 89th Legislature should consider making greater training and resources on neurodivergence available to law enforcement, and our courts should ensure they're adequately addressing autism-related barriers during proceedings. We should also study and begin defining appropriate lanes for evidence of autism and how our courts and juries consider it.

# Letters from Members

Some members chose to submit letters providing further perspective on the report and the committee's interim work, which follow.



TEXAS HOUSE OF REPRESENTATIVES

# DAVID L. COOK

DISTRICT 96

November 16, 2024

The Honorable Joe Moody
Chair, House Committee on Criminal Jurisprudence
Room E2.112, P.O. Box 2910
Austin, Texas 78768

**RE: House Committee on Criminal Jurisprudence 88th Legislative Interim Report**

Dear Chairman Moody,

First of all, thank you for your service as Chairman of the House Committee on Criminal Jurisprudence for the 88th Legislative Session.

The purpose of this Addendum is to clarify my position on the Committee's Interim Report. On the face of the cover letter to the report, I have visibly limited my signature with an "**" to indicate my agreement to certain portions of the Committee's report. I am in agreement with Charge 1 and Charge 2 of the Committee's report, but I am not in a position to agree to the full contents of the section entitled "Roberson & Writs."

I firmly believe that the power of our government to exercise capital punishment necessitates that we treat each instance of its employ with the highest level of scrutiny. In cases where life and liberty will be deprived of a fellow human being, we must get it right. After nearly twenty hours of committee testimony across two interim hearings and in light of the fact that no defendant facing the death penalty has been granted relief, it is clear that Article 11.073 of the Texas Code of Criminal Procedure, also known as the "Junk Science" law, is wanting of additional consideration in the 89th Legislative Session.

While the Legislature certainly is not charged with executing or enforcing laws, the Legislature does have a duty to ensure that the laws it passes are implemented correctly by exercising its legislative and oversight functions. However, this legislative function shall not be misconstrued to give the Legislature the right or responsibility to determine guilt, innocence, execution, etc. We must respect and maintain the separate roles of each branch of government.

I am thankful to those who have reached out to me during this process on both sides of the matter. Many have expressed ideas regarding improving our process of appeals to uphold the best interest of justice for victims, as well as preserving the rights of the accused. I look forward to working with my colleagues next Session to pass any necessary changes to Article 11.073.

Respectfully submitted,

David L. Cook
House District 96

# TEXAS HOUSE of REPRESENTATIVES

CAPITOL OFFICE:
P.O. BOX 2910
AUSTIN, TEXAS 78768-2910
PHONE (512) 463-0331



DISTRICT OFFICE:
136 W. TWOHIG AVE., STE. E
SAN ANGELO, TEXAS 76903
PHONE (325) 658-7313

## Drew Darby

### DISTRICT 72

COKE • COLEMAN • CONCHO • GLASSCOCK • HOWARD • IRION • REAGAN • RUNNELS • STERLING • TOM GREEN

November 12, 2024

The Honorable Joe Moody
Chair, House Committee on Criminal Jurisprudence
Room E2.112
P.O. Box 2910
Austin, TX 78768

**Re: House Committee on Criminal Jurisprudence Interim Report to the 89th Legislature**

Dear Chairman Moody,

Thank you for your leadership of the House Committee on Criminal Jurisprudence (Committee) during the 88th Legislature.

**The purpose of my letter is to give notice of my intent not to sign the final interim report and provide a clear, concise, and complete rationale of my decision for the record.**

I agree with the Committee's findings in Charges 1 and 2. However, I have concerns about further opining on Robert Roberson's *specific* case in the attached report, as it relates to his guilt or innocence.

**Let me be clear: my intention not to sign the final interim report should not be used by unscrupulous actors for political purposes to negatively reflect on the members of the Committee or misconstrue my position on capital punishment, which I strongly believe in.**

Chairman Leach and you have provided exceptional leadership, and our fellow members have acted with the utmost care and diligence in this historic matter. They have acted without regard for their ego or political standing and have only sought, as we all do in the Texas House, to seek the truth and the right course of action.

The same cannot be said for the partisan and political agitators outside the Texas Legislature (Legislature), who have become vocal and unwelcome distractions in this process. Without cause or reason, they have unfairly maligned the work being conducted by this Committee and opined brazenly on this issue without regard for the sensitive and delicate nature of the subject at hand.

There are also those who will cry foul that certain filings by the Office of Attorney General (OAG) and other members of the Texas House who believe Mr. Roberson is guilty were not included in the final report. Let the record show I believe those claims lack any tangible merit and did not factor into my decision not to sign the attached report.

The purpose of this portion of the report, in my eyes, is not to provide a comprehensive summary on the interpretations of the evidence for or against Mr. Roberson, but to use Mr. Roberson as a case study to better understand the applications of a legislative process that affects the lives of millions of Texas.

When we began the examination into Mr. Roberson's case, I stated on the dais that I believed the purpose of the Committee process was not to determine the guilt or innocence of the accused but to review the "junk science" writs under Article 11.073, Code of Criminal Procedure, and to see if the Texas Court of Criminal Appeals (TCCA) is correctly interpreting the law as the Legislature intended, or instead setting a personal, higher burden of proof to the detriment of Texans.

**I cannot, and will not, enumerate on the testimony or evidence directly connected with Mr. Roberson's verdict; rather, I concern myself only with the process and procedures of Article 11.073, insofar as the Legislature should make necessary adjustments.**

For context, the Legislature first approved Article 11.073 writs under Senate Bill 344 in the 83rd Legislative Session to allow for a writ of habeas corpus in the event that *scientific knowledge* had changed since the accused's trial.

In 2015, the 84th Legislature passed House Bill 3724 to revise the statue to allow for such a writ if the *field of scientific knowledge* had changed, including a testifying expert's scientific knowledge. This change by the Legislature was to codify a legal TCCA opinion that held that a change in the scientific knowledge of a testifying expert would be a basis for habeas relief under the original law passed in 2013.

It is important to note that Subsection (b)(2) of Article 11.073 states that a court may grant a convicted person relief on an application for a writ of habeas corpus if:

"[T]he court makes the findings described by Subdivisions (1)(A) and (B) [the findings of relevant scientific evidence and facts] and also finds that, <u>had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted</u>."

As a result, deliberations on the legitimacy, or lack thereof, of any specific writ under Article 11.073 are, in many ways, connected, explicitly or implicitly, with conversations of guilt or innocence. Thus, my following observations and determinations regarding the matter are rooted *solely* in my earlier, essential question regarding the Article 11.073 process.

**As a member of the Texas House who voted for both Senate Bill 344 in 2013 and House Bill 3724 in 2015, I will state that, after numerous hours of testimony, I believe the TCCA incorrectly applied the "junk science" writs to Mr. Roberson's case based on the Legislature's intent of the statue. The Committee is also in lockstep on this matter.**

While I will not state what outcome a jury should determine in regards to Mr. Roberson, firsthand witnesses, including a former member of the jury, stated under oath that, had at least some of the materials in contention been presented at the trial, they, personally, would not have found Mr. Roberson, or someone in his situation, guilty.

**This meets the criteria set by the Legislature under Article 11.073, regardless of any other personal opinions by others on the matter.**

Subsequently, the Legislature should swiftly revisit the Article 11.073 statute to ensure clarity. Revisiting this statute and making necessary corrections is of the utmost importance. If the government is going to take a life, it should meet the highest standards possible and leave no doubts.

For the pending Roberson case, I voted for the historic subpoena compelling Mr. Roberson to come before the Committee; I agree with the OAG that the subpoena is *valid*. Mr. Roberson's inability to testify came down to a political decision, but that decision is still currently pending before the Texas Supreme Court.

The Supreme Court could uphold the subpoena and deliver Mr. Roberson back to the Committee for additional testimony. At the same time, the TCCA could reverse its decision and grant an appeal on Mr. Roberson's case, and/or the Texas Board of Pardons and Paroles could conduct an additional review.

I believe it is unwise, regardless of reason, to close the book on this agenda item until there is a finality to **all** the proceedings.

**The decision to withhold my signature is not one I have made lightly or quickly, but it is rooted in the fact that my original stated position has not changed: I do not believe that the Committee's role is to prove Mr. Roberson's guilt or innocence, and I will not make any statement or implication in my official capacity that can be seen as endorsing either outcome.**

Of course, my opinion is not, and should not be, the final word on this matter, nor reflective of the opinion of the Committee or any other person participating in the process.

**For those on the outside looking in, there should be no additional assumptions or false intents attributed to my decision not to sign the report outside of what is specifically stated in this letter.**

Chairman Leach and you know that many good people can have many different assessments regarding this situation, as well as regarding my decision and my interpretation of the facts as I understand them. I welcome all disagreements where they may arise, and I have nothing but the utmost respect for every member of the Committee.

I look forward to working with my fellow members to make any necessary adjustments to Article 11.073 in the upcoming 89th Legislative Session.

Thank you for the opportunity to provide this letter.

Sincerely,

Drew Darby



November 13, 2024

Fellow Texans,

I am grateful for all of the work that every single one of my colleagues on the Criminal Jurisprudence Committee have done during the interim, and, in particular, I have the greatest appreciation for the work related to the Robert Roberson case.

I have been proud of the unprecedented and historic efforts of the Committee, whose members put aside partisanship and the things that typically divide us to unite in the pursuit of justice for Mr. Roberson - and for all Texans - and to protect due process, separation of powers, and the integrity of our criminal justice system.

We have joined together to ensure that our children and the next generation do not inherit a state where potentially innocent people may have their lives deprived from them by the government. I want the state of Texas to lead the nation in almost everything, but executing potentially innocent people is not one of them.

This interim report is a quality document that has been the result of a lengthy, collaborative effort. While I agree in broad strokes with the discussions in the report, not every aspect of the report should be construed as necessarily being indicative of my exact policy preferences.

Any Texan should feel free to contact my office with any questions they may have regarding this report.

For liberty,

Brian Harrison

# Endnotes

1    H.J. of Tex., 88th Leg., R.S. 241 (2023).

2    Tex. H. Rule 3, § 7, H. Res. 4, 88th Leg., R.S. 63 (2023).

3    Speaker Dade Phelan, *Interim Committee Charges, Texas House of Representatives, 88th Legislature*, at 5, *available at* https://www.house.texas.gov/pdfs/committees/reports/interim/88interim/interim-charges-88thLeg.pdf.

4    Tex. H.B. 17, 88th Leg., R.S. (2023).

5    House committee bill analysis, Tex. H.B. 17, 88th Leg., R.S. (2023).

6    Tex. H.B. 17, 88th Leg., R.S. (2023).

7    *Id.*

8    *Hearing on Interim Charge 1 Before the House Comm. on Crim. Jur.*, 88th Leg. Interim (July 9, 2024)(statement of Shannon Edmonds)(recording available from the House Video/Audio Services Office).

9    *See* Sneha Dey, *Amid Personal Conflict, Hays County Clerk Turned to Republican's "rogue" prosecutor law to oust fellow Democrat*, The Texas Tribune, Sept. 22, 2023, *available at* https://www.texastribune.org/2023/09/22/hays-county-higgins-rogue-prosecutors-removal/ (describing personal animosity as basis for petition).

10   Serena Lin, *Lawsuit to Remove Travis County District Attorney Joeé Garza Faces Legal Hurdles*, Austin American-Statesman, Dec. 11, 2023, *available at* https://www.statesman.com/story/news/local/2023/12/11/lawsuit-to-remove-travis-county-district-attorney-jos-garza-faces-legal-hurdles/71850802007/.

11   Shannon Edmonds, *supra* note 8.

12   *Hearing on Interim Charge 1 Before the House Comm. on Crim. Jur.*, 88th Leg. Interim (July 9, 2024)(statement of Rep. David Cook)(recording available from the House Video/Audio Services Office).

13   *Id.*; *see, e.g.*, Erika Hernandez & Misael Gomez, *Bexar County DA to Change Some Policies Ahead of New 'Rogue' Prosecutor Bill Taking Effect*, KSAT, June 13, 2023, *available at* https://www.ksat.com/news/local/2023/06/13/bexar-county-da-to-change-some-policies-ahead-of-new-rogue-prosecutor-bill-taking-effect/ (reporting preemptive DA policy change in response to HB 17).

14   Shannon Edmonds, *supra* note 8.

15   *Hearing on Interim Charge 1 Before the House Comm. on Crim. Jur.*, 88th Leg. Interim (July 9, 2024)(statement of Chloe Petricek)(recording available from the House Video/Audio Services Office). However, policies covered by the bill are not limited to formal written policies. H.J. of Tex., 88th Leg., R.S. 2261 (2023).

16   Chloe Petricek, *supra* note 15.

17   House committee bill analysis, Tex. H.B. 200, 88th Leg., R.S. (2023).

18   *Hearing on Interim Charge 1 Before the House Comm. on Crim. Jur.*, 88th Leg. Interim (July 9, 2024)(statement of Nikki Pressley)(recording available from the House Video/Audio Services Office).

19   *Id.*

20   Shannon Edmonds, *supra* note 8; *see* Tex. Const. art. V, §§ 21 & 30 (specifying terms of county, district, and criminal district attorneys).

21   Shannon Edmonds, *supra* note 8.

22 El Paso County District Attorney Yvonne Rosales, who was facing a removal petition in 2022, asked the county to pay for her legal defense, which it declined to do. Jamel Valencia & Jhovani Carrillo, *El Paso County denies paying for legal fees in DA Yvonne Rosales' removal case*, KFOX14, Sept. 26, 2022, *available at https://kfoxtv.com/news/local/yvonne-rosales*. She then resigned prior to trial. Molly Smith & Robert Moore, *El Paso DA Yvonne Rosales resigns, ending troubled 2-year tenure*, El Paso Matters, Nov. 28, 2022, *available at* https://elpasomatters.org/2022/11/28/el-paso-texas-da-yvonne-rosales-resigns.

23 Tex. H.B. 17, 88th Leg., R.S. (2023).

24 Tex. H.B. 6, 88th Leg., R.S. (2023).

25 House committee bill analysis, Tex. H.B. 6, 88th Leg., R.S. (2023).

26 The chart below, based on data found at https://healthdata.dshs.texas.gov/dashboard/drugs-and-alcohol/fentanyl-trends, gives a sense of the scale of it in Texas.

27 Tex. H.B. 6, 88th Leg., R.S. (2023).

28 *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Rep. Craig Goldman)(recording available from the House Video/Audio Services Office).

29 *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Allen Place)(recording available from the House Video/Audio Services Office)

30 *See Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Shanna Redwine)(recording available from the House Video/Audio Services Office)(commenting positively on utility of HB 6 compared to previous law); *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of John Wilkerson)(recording available from the House Video/Audio Services Office)(same).

31 Allen Place, *supra* note 29; *see* TEX. CODE CRIM. PROC. arts. 42A.053 & 42A.056 (limiting underlying sentence for community supervision).

32 John Wilkerson, *supra* note 30.

33 Allen Place, *supra* note 29; Shanna Redwine, *supra* note 30. HB 3908, by Representative Terri Wilson, is one step in that direction. *See* Tex. H.B. 3908, 88th Leg., R.S. (2023)(fentanyl abuse and poisoning awareness in public schools).

34 *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Sarah Bruner)(recording available from the House Video/Audio Services Office)

35 Shanna Redwine, *supra* note 30.

36 James Barragán, *To combat opioid overdoses, Gov. Greg Abbott says he supports decriminalizing fentanyl testing strips*, The Texas Tribune, Dec. 1, 2022, *available at* https://www.texastribune.org/2022/12/01/greg-abbott-fentanyl-strips-opioid-overdose.

37 *See generally* U.S. Centers for Disease Control and Prevention, *What You Can Do to Test for Fentanyl, accessed on* Oct. 12, 2024*, available at* https://www.cdc.gov/stop-overdose/safety/index.html.

38 H.J. of Tex., 88th Leg., R.S. 1321 (2023).

39 Tex. H.B. 611, 88th Leg., R.S. (2023).

40 House committee bill analysis, Tex. H.B. 611, 88th Leg., R.S. (2023).

41  See, e.g., Hannah Mery, The Dangers of Doxing and Swatting: Why Texas Should Criminalize These Malicious Forms of Cyberharrasment, 52 St. Mary's L.J. 905 (2021)(discussing physical dangers posed by doxing).

42  See Emma Betuel, *Should Doxing Be Illegal?*, The Markup, Aug. 17, 2021, *available at* https://themarkup.org/the-breakdown/2021/08/17/should-doxxing-be-illegal (discussing objections to and potential abuses of anti-doxxing laws).

43  The personal identifying information of numerous categories of public servants is confidential. Tex. Gov't Code § 552.1175.

44  Tex. H.B. 611, 88th Leg., R.S. (2023).

45  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Molly Voyles)(recording available from the House Video/Audio Services Office).

46  *Id.*

47  *Id.*

48  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Rep. Gio Capriglione)(recording available from the House Video/Audio Services Office).

49  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Bryan Flatt)(recording available from the House Video/Audio Services Office).

50  Tex. H.B. 842, 88th Leg., R.S. (2023).

51  House committee bill analysis, Tex. H.B. 842, 88th Leg., R.S. (2023).

52  Tex. H.B. 842, 88th Leg., R.S. (2023).

53  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Sylvia Holmes)(recording available from the House Video/Audio Services Office).

54  Tex. H.B. 1221, 88th Leg., R.S. (2023).

55  House committee bill analysis, Tex. H.B. 1221, 88th Leg., R.S. (2023).

56  Tex. H.B. 1221, 88th Leg., R.S. (2023).

57  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Ron Steffa)(recording available from the House Video/Audio Services Office).

58  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Patti Henry)(recording available from the House Video/Audio Services Office).

59  Tex. H.B. 1442, 88th Leg., R.S. (2023).

60  *E.g.*, Brianna Hollis, *52 arrests made statewide since Texas 'street takeover' task force began*, KXAN, Aug. 16, 2023, *available at* https://www.kxan.com/news/crime/52-arrests-made-statewide-since-texas-street-takeover-task-force-began (describing prevalence and dangers of street takeovers).

61  House committee bill analysis, Tex. H.B. 1442, 88th Leg., R.S. (2023).

62  Tex. H.B. 1442, 88th Leg., R.S. (2023).

63  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Frank Gomez)(recording available from the House Video/Audio Services Office).

64  *Id.*

65  Tex. H.B. 1826, 88th Leg., R.S. (2023).

66  House committee bill analysis, Tex. H.B. 1826, 88th Leg., R.S. (2023).

67  Tex. H.B. 1826, 88th Leg., R.S. (2023).

68  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Rep. Chris Turner)(recording available from the House Video/Audio Services Office).

69  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Cory Castillo)(recording available from the House Video/Audio Services Office).

70  *Id.*

71  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Chris Bowen)(recording available from the House Video/Audio Services Office).

72  Cory Castillo, *supra* note 69.

73  Chris Bowen, *supra* note 71.

74  Tex. H.B. 2897, 88th Leg., R.S. (2023).

75  Tex. Pen. Code § 31.04.

76  House committee bill analysis, Tex. H.B. 2897, 88th Leg., R.S. (2023).

77  Tex. H.B. 2897, 88th Leg., R.S. (2023).

78  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Stephanie Gharakhanian)(recording available from the House Video/Audio Services Office).

79  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Emily Amps)(recording available from the House Video/Audio Services Office).

80  Stephanie Gharakhanian, *supra* note 78.

81  Tex. H.B. 3956, 88th Leg., R.S. (2023).

82  National Research Council, Strengthening Forensic Science in the United States: A Path Forward (1st ed. 2009) 130.

83  *See, e.g.*, The Innocence Project, *DNA Exonerations in the United States (1989–2020)*, *accessed on* Oct. 14, 2024, *available at* https://innocenceproject.org/dna-exonerations-in-the-united-states (listing uses of DNA to solve cold cases and exonerate innocent people).

84  *See* Billy Gates, *Texas DPS: DNA collection law helped solve hundreds of crimes in its first year*, KXAN, Nov. 13, 2020, *available at* https://www.kxan.com/news/crime/texas-dps-dna-collection-law-helped-solve-hundreds-of-crimes-in-its-first-year (reporting more than 250 cases solved in first year of DNA collection law).

85  House committee bill analysis, Tex. H.B. 3956, 88th Leg., R.S. (2023).; *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Rep. Reggie Smith)(recording available from the House Video/Audio Services Office).

86  Tex. H.B. 3956, 88th Leg., R.S. (2023).

87  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Brady Mills)(recording available from the House Video/Audio Services Office).

88  *Id.*

89  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Patti Henry)(recording available from the House Video/Audio Services Office).

90  Tex. H.B. 4906, 88th Leg., R.S. (2023).

91  House committee bill analysis, Tex. H.B. 4906, 88th Leg., R.S. (2023).

92  Tex. H.B. 4906, 88th Leg., R.S. (2023).

93  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Rep. Cole Hefner)(recording available from the House Video/Audio Services Office).

94  *Hearing on Interim Charge 1* Before the House Comm. on Crim. Jur., 88th Leg. Interim (July 9, 2024)(statement of Paul Shepherd)(recording available from the House Video/Audio Services Office).

95  U.S. Dep't of Justice, *What is Human Trafficking, accessed on* Oct. 13, 2024, *available at* https://www.justice.gov/humantrafficking/what-is-human-trafficking#:~:text=Human%20trafficking%2C%20also%20known%20as,or%20overt%2C%20physical%20or%20psychological.

96  Ross Jackson & Nikki Pressley, *Protecting Trafficking Victims From Prosecution: Redefining Duress*, Right on Crime, July 2024, at 4, *available at* https://rightoncrime.com/wp-content/uploads/2024/07/Protecting-Trafficking-Victims-from-Prosecution-Redefining-Duress.pdf.

97  Theodore R. Sangalis, Elusive Empowerment: Compensating the Sex Trafficked Person Under the Trafficking Victims Protection Act, 80 FORDHAM L.R. 403, 407 (2011).

98  National Human Trafficking Hotline, *National Statistics, accessed on* Oct. 13, 2024, *available at* https://humantraffickinghotline.org/en/statistics.

99  *Hearing on Interim Charge 2* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Michael Sweeney)(recording available from the House Video/Audio Services Office).

100  "It is a defense to prosecution [for prostitution] that the actor was engaged in the conduct that constitutes the offense because the actor was the victim of conduct that constitutes" human trafficking or compelling prostitution. TEX. PEN. CODE § 43.02(d).

101  *Id.* § 8.05(a)–(c).

102  Jackson & Pressley, *supra* note 96, at 5–8.

103  *Hearing on Interim Charge 2* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Lillian Garvens)(recording available from the House Video/Audio Services Office).

104  *Hearing on Interim Charge 2* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Michael Sweeney)(recording available from the House Video/Audio Services Office).

105  *Id.*

106  Jackson & Pressley, *supra* note 96, at 5.

107  Unfortunately, trafficking often goes unidentified until an arrest for something like aggravated robbery, which only reinforces the need for earlier intercepts of justice-involved youths who may be victims of trafficking. Lillian Garvens, *supra* note 103.

108  U.S. Dep't of Justice, *A Whole-of-government Approach, accessed on* Oct. 13, 2024, *available at* https://www.justice.gov/humantrafficking/whole-government-approach.

109 Tex. Gov't Code § 402.034. A similar entity housed in the Office of the Attorney General, the Human Trafficking Prevention Task Force, works to coordinate law enforcement responses statewide. *Id.* § 402.035 It has been extraordinarily successful in securing the tools we need legislatively, with 76 of the 84 recommendations it's made since 2010 becoming law. Attorney General of Texas, *Task Force Legislative Recommendations*, *accessed on* Oct. 13, 2024, *available at* https://www.texasattorneygeneral.gov/human-trafficking-section/texas-human-trafficking-prevention-task-force/task-force-legislative-recommendations.

110 *See generally* Texas Human Trafficking Prevention Coordinating Council, *Strategic Plan: Charting an End to Human Trafficking in Texas*, May 2020, *accessed on* Oct. 13, 2024, *available at* https://www.texasattorneygeneral.gov/sites/default/files/files/divisions/human-trafficking/TXHTPCC-StrategicPlan2020.pdf (providing 26-strategy statewide plan to combat human trafficking).

111 Tex. Bus. & Comm. Code ch. 114.

112 Tex. Gov't Code § 402.0351; *cf.* Tex. S.B. 1219, 86th Leg., R.S. (2019)(original language limited to transportation hubs).

113 Tex. Health and Human Servs., *Report on HHSC Human Trafficking Grant Program Initiatives*, Dec. 2022, at 3, *available at* https://www.hhs.texas.gov/sites/default/files/documents/human-trafficking-grant-program-initiatives-report-dec-2022.pdf. The program raised a mere $20,232.20 after paying its expenses. *Id.* at 5.

114 Michael Sweeney, *supra* note 104.

115 Texas Dep't of Fam. And Prot. Servs., *Children and Youth Missing from DFPS Conservatorship & Human Trafficking Data; Fiscal Year 2023 Report*, May 2024, at 4 & 10, *accessed on* Oct. 13, 2024, *available at* https://www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/Agencywide/documents/2024/2024-05-31_Children_Youth_Missing_DFPS_Conservatorship_Human_Trafficking_Data_FY2023_Report.pdf.

116 Lilian Garvens, *supra* note 103.

117 *See, e.g.*, Jackson & Pressley, *supra* note 96, at 4–6 (providing examples of trafficking victim prosecutions).

118 The Texas Court of Criminal Appeals has defined "imminent" as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989).

119 *Hearing on Interim Charge 2* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Ross Jackson)(recording available from the House Video/Audio Services Office).

120 Michael Sweeney, *supra* note 104. There's a large overlap in some of the behavior common in cases of domestic violence, in which victims often return to their abusers many times before being able to break away, and that seen in trafficking relationships. *Id; accord* Lilian Garvens, *supra* note 103.

121 Lilian Garvens, *supra* note 103.

122 Tex. Code Crim. Proc. art. 38.37.

123 *Id.* art. 38.371.

124 *Hearing on Interim Charge 2* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Sept. 16, 2024)(statement of Allen Place)(recording available from the House Video/Audio Services Office).

125 *Id.*

126 H.J. of Tex., 88th Leg., R.S. 3759 (2023).

127 Allen Place, *supra* note 124.

128 Ross Jackson, *supra* note 119.

129 Lilian Garvens, *supra* note 103.

130 *Id.*

131 The October 21st hearing remained "at ease" until October 22nd, but no substantive matters were taken up that day—the committee was simply adjourned.

132 On October 17, 2024, the U.S. Supreme Court denied a stay of execution to Robert as a state question with no federal issue on which to intervene. Justice Sotomayor's statement respecting that denial succinctly and (as committee research has confirmed) accurately summarized much of the background in the case, so most of this section will be drawn from that without repetitive citation. It's scheduled for publication in the 604th U.S. Reporter and can be found at https://www.supremecourt.gov/opinions/24pdf/24a349_8m58.pdf in the meantime. Other citations in this section may refer to the reporter's record from the original trial ("R.R." by volume and page) and from the habeas proceedings ("E.H.R.R." by volume and page).

133 9 E.H.R.R. at 186.

134 42 R.R. at 9.

135 41 R.R. at 170.

136 E.H.R.R. at 62–65.

137 42 R.R. at 96.

138 42 R.R. at 102–05.

139 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Brian Wharton)(recording available from the House Video/Audio Services Office).

140 42 R.R. at 106.

141 Brian Wharton, *supra* note 139.

142 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Donald Salzman)(recording available from the House Video/Audio Services Office).

143 Joe Moody, Jeff Leach, Rhetta Bowers, & Lacey Hull, *Response to OAG's Release About Robert Roberson Case*, Oct. 24, 2024, *available at* https://static.texastribune.org/media/files/a142510564e03b916d77bef52bc651c4/Roberson%20Rebuttal.pdf, at 3–5 & 10.

144 *Compare* 3 E.H.R.R. at 77 & ex. 6 (Sims's description of injuries), *with* 42 R.R. at 123 (Dr. Squires failing to find such injuries), *and* 2 E.H.R.R. at 62–65 (Nurse Gurganus failing to find such injuries); *cf.* 43 R.R. at 89 (Dr. Urban being asked to explain a lack of external injuries).

145 41 R.R. at 144.

146 Joe Moody et al., *supra* note 143, at 12–14.

147 References to sexual assault were still made in the prosecution's closing argument—without objection—even though they had already been revealed to be baseless at that point. 46 R.R. at 21.

148 42 R.R. at 105–07.

149 42 R.R. at 107–08.

150 42 R.R. at 109.

[151] 43 R.R. at 74.

[152] 43 R.R. at 72.

[153] *See generally* Joe Moody et al., *supra* note 143, at 6–8 (explaining deficiencies in detail)

[154] 43 R.R. at 78–79.

[155] 43 R.R. at 85–86.

[156] *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Gretchen Sween)(recording available from the House Video/Audio Services Office).

[157] Brian Wharton, *supra* note 139.

[158] 41 R.R. at 57–58.

[159] *McCoy v. Louisiana*, 584 U.S. 414 (2018).

[160] 41 R.R. at 55.

[161] 46 R.R. at 15.

[162] Brian Wharton, *supra* note 139; *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Terre Compton)(recording available from the House Video/Audio Services Office).

[163] Brian Wharton, *supra* note 139.

[164] *Compare* TEX. CODE CRIM. PROC. ch. 44 (appeal and writ of error), *with id.* ch. 11 (habeas corpus).

[165] *Roberson v. State*, No. AP-74,671, 2002 WL 34217382 (Tex. Crim. App. June 20, 2007).

[166] Gretchen Sween, *supra* note 156.

[167] Roberson, supra note 165.

[168] See generally E.H.R.R.

[169] *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Roland Auer)(recording available from the House Video/Audio Services Office); *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Francis Green)(recording available from the House Video/Audio Services Office); *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Jeffrey Singer)(recording available from the House Video/Audio Services Office).

[170] 10 E.H.R.R. at 74, 76, 212, 220, & 242.

[171] *Ward v. State*, No. CR-18-0316, 2020 WL 4726486, at *4 (Ala. Crim. App. Aug. 14, 2020).

[172] These proposals are found in the habeas record under WR-63,081-03.

[173] For example, the first footnote on the first page in both the state's proposed findings and the court's own is inexplicably in a sans serif font (Arial or similar) not used elsewhere in the rest of the document, which is in a standard serif font (Times New Roman or similar). The text is also the same, word-for-word.

[174] *Supra* note 172.

[175] Terre Compton, *supra* note 162.

[176] *Ex parte Roark*, No. WR-56,380-03, 2024 WL 4446858, at *51–54 (Tex. Crim. App. Oct. 9, 2024).

177 *Ex parte Roberson*, Nos. WR-63,081-03, 04, at *2 (Tex. Crim. App. Oct. 10, 2024)(Yeary, J., concurring)(not designated for publication).

178 Pleadings and orders can be found at https://search.txcourts.gov/Case.aspx?cn=24-0884&coa=cossup.

179 See generally Office of the Attorney General Sets the Record Straight About Nikki Curtis's Death, Rebutting Jeff Leach's and Joe Moody's Lies About Convicted Child Murderer, Ken Paxton, Attorney General of Texas, Oct. 23, 2023, available at https://www.texasattorneygeneral.gov/news/releases/office-attorney-generalsets-record-straight-about-nikki-curtiss-death-rebutting-jeff-leachs-and-joe (OAG statements); Joe Moody et al., supra note 149 (response from four House members).

180 There have been 3,604 verified U.S. exonerations since 1989—484 of them in Texas The National Registry of Exonerations, *Texas, accessed on* Oct. 24, 2024, *available at* https://www.law.umich.edu/special/exoneration/Pages/browse.aspx?View=%7BB8342AE7-6520-4A32-8A06-4B326208BAF8%7D&FilterField1=State&FilterValue1=Texas; *see* The Innocence Project, *DNA Exonerations in the United States (1989–2020), accessed on* Oct. 24, 2024, *available at* https://innocenceproject.org/dna-exonerations-in-the-united-states (providing exoneration statistics nationwide based on DNA evidence).

181 *Supra* note 132.

182 Joseph Shapiro, *Rethinking Shaken Baby Syndrome*, NPR, Jun. 29, 2011, *available at https*://www.npr.org/2011/06/29/137471992/rethinking-shaken-baby-syndrome.

183 Sue Luttner, *Dr. A. Norman Guthkelch fought injustice to the end*, Center for Health Journalism, Aug. 3, 2016, *available at* https://centerforhealthjournalism.org/our-work/insights/dr-norman-guthkelch-fought-injustice-end.

184 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Keith Findley)(recording available from the House Video/Audio Services Office).

185 Brian Wharton, *supra* note 139.

186 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Phillip McGraw)(recording available from the House Video/Audio Services Office).

187 *Id.*

188 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Kate Judson)(recording available from the House Video/Audio Services Office); *see generally* National Research Council, *supra* note 82.

189 Look no further than *Roark*, which explains many of the issues succinctly and cites other cases nationwide that have done the same. *Roark*, *supra* note 176.

190 Jeffrey Singer, *supra* note 169.

191 *Id.*

192 Kate Judson, *supra* note 188.

193 *Brooks v. State*, 323 S.W.3d 893, 896 (Tex. Crim. App. 2010)(applying standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979).

194 *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

195 *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *see* TEX. R. APP. PROC. 44.2(b) (harmless error rule).

196 Nicole L. Waters, Anne Gallegos, James Green, and Martha Rozsi, *Criminal Appeals in State Courts*, Bureau of Justice Statistics, Sept. 2015, *available at* https://bjs.ojp.gov/content/pub/pdf/casc.pdf.

197 Texas Defender Service, *An Unfulfilled Promise: Assessing the Efficacy of Article 11.073*, July 2024, *available at* https://www.texasdefender.org/wp-content/uploads/2024/10/TDS-11.073-Report_web.pdf.

198 *Id.* at 1–2 & 11–14.

199 *Id.* at 2 & 15–21.

200 *Id.* at 22–24.

201 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Estelle Hebron-Jones)(recording available from the House Video/Audio Services Office).

202 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Elsa Alcala)(recording available from the House Video/Audio Services Office).

203 *See id.* (describing court as "leaning far" to affirm convictions).

204 Texas Defender Service, *supra* note 1973. In fact, this was a complaint lodged by Robert's attorney in the United States Supreme Court as a due process issue. Gretchen Sween, *supra* note 156.

205 *Roberson*, *supra* note 177.

206 *Ex parte White*, 506 S.W.3d 39, 42–46 (Tex. Crim. App. 2016).

207 Texas Defender Service, *supra* note 197, at 25–27.

208 MD. CRIM. PROC. CODE § 8-301(a)(1)(i).

209 Elsa Alcala, *supra* note 202.

210 Donald Salzman, *supra* note 142.

211 *White*, *supra* note 206.

212 Elsa Alcala, *supra* note 202.

213 The CCA was created by TEX. CONST., art. V, § 1.

214 Gretchen Sween, *supra* note 156.

215 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 16, 2024)(statement of Allyson Mitchell)(recording available from the House Video/Audio Services Office).

216 Gretchen Sween, *supra* note 156.

217 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of John Grisham)(recording available from the House Video/Audio Services Office).

218 Brian Wharton, *supra* note 139.

219 Phillip McGraw, *supra* note 186. Robert also has a below-average IQ that compounds these issues. *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Gretchen Sween)(recording available from the House Video/Audio Services Office).

220 *Hearing on 11.073 Writs* Before the House Comm. on Crim. Jur., 88th Leg. Interim (Oct. 21, 2024)(statement of Natalie Montford)(recording available from the House Video/Audio Services Office).

221 Terre Compton, *supra* note 162.

222 Natalie Montford, *supra* note 220.

223 Phillip McGraw, *supra* note 186.

224 *E.g.*, Janna Oswald, *Autism in the Courtroom*, Texas District & County Attorneys Association, May–June 2022, *available at* https://www.tdcaa.com/journal/autism-in-the-courtroom (discussing best courtroom practices learned in case with victim on autism spectrum).

225 Rachel Slavny-Cross et al., *Autism and the Criminal Justice System: An Analysis of 93 Cases*, Autism Research, Mar. 14, 2022, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9314022/#aur2690-sec-0012.

226 Tex. Transp. Code § 502.061.

227 The Department of Health and Human Services, for example, offers a short online training for first responders, which can be found at https://www.hhs.texas.gov/services/disability/autism/autism-training-opportunities/autism-spectrum-disorders-training-program-first-responders.

228 *E.g.*, Dawn White, *North Texas law enforcement train to recognize and respond to people with autism*, CBS News, Apr. 4, 2024, *available at* https://www.cbsnews.com/texas/news/north-texas-law-enforcement-train-to-recognize-and-respond-to-people-with-autism (describing multiday training by Rockwall County officers).

229 Tex. H.B. 568, 88th Leg., R.S. (2023).

230 *See generally* State Bar of Texas, *Courtroom Accessibility Guide*, 2023, *available at* https://www.texasbar.com/AM/Template.cfm?Section=Consider_a_State_Bar_Committee&Template=/CM/ContentDisplay.cfm&ContentID=56464.

231 *See* Natalie Montford, *supra* note 220 (discussing autism's array of communication and participation challenges).

232 *E.g.*, L.P. Phillips, *Collin County case could force courts to rethink how to handle autism*, KRLD Newsradio 1080, Aug. 26, 2024, *available at* https://www.audacy.com/krld/news/local/collin-county-case-could-force-courts-to-rethink-autism (describing courtroom controversy over autism evidence affecting *mens rea* for offense).

233 Matthew J. Maenner et al., Prevalence and Characteristics of Autism Spectrum Disorder Among Children Aged 8 Years — Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020, Centers for Disease Control, Mar. 24, 2023, available at https://www.cdc.gov/mmwr/volumes/72/ss/ss7202a1.htm?s_cid=ss7202a1_w%E2%80%94the.

# EXHIBIT 45



[background conversation]

**Female Speaker 1:** One seat over here, press. We have a seat over here for press.

**Female Speaker 2:** This over here.

**Female Speaker 1:** That'd be great. Thank you.

[background conversation]

**Male Speaker 1:** Did I get older?

[background conversation]

**Female Speaker 1:** Um, I think, uh, save it for now, I can save it for now **[inaudible 00:01:05]**. Okay. So we have one more.

**Female Speaker 2:** Yeah, he's coming from **[unintelligible 00:01:10]**

**Female Speaker 1:** Okay. Okay.

[background conversation]

**Male Speaker 1:** I can tell, right?

**Male Speaker 2: [unintelligible 00:01:16]**

**Male Speaker 1:** All right. Awesome.

[background conversation]

**Male Speaker:** Yes, it does.

[background conversation]

**Female Speaker 1:** Yes, I know. **[unintelligible 00:01:31]**

[background conversation]

**Male Speaker 2:** Did you take their bio?

[laughter]

**Male Speaker 2: [unintelligible 00:01:42]**

**Chair Moody:** All right. You should have me now. Mic check, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10. This is a mic check for the **[unintelligible 00:01:53]** for everybody back there.

**Male Speaker 3:** Negative.

Completed: 10/30/2024

**Chair Moody:** 1, 2, 3, 4, 5, 6, 7, 8, 9, 10. Mic check, 1, 2, 3-- It's a little hot for you?

**Male Speaker:** Yeah, **[inaudible 00:02:06]**

**Chair Moody:** I-I mean, I'm not there to look at it, so-so stop yelling at me. One, two, three, four-- We let you in this country. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10.

**Male Speaker 1:** Just stop **[unintelligible 00:02:20]**.

**?Male Speaker 2:** [laughs] Are you a citizen now?

**Male Speaker 1:** Yeah. Hand that out **[unintelligible 00:02:25]**.

**?Male Speaker 3:** We're good.

[background conversation]

**Female Speaker 1:** Do you have a pen there?

**Male Speaker 4:** Yep.

**Female Speaker 1:** Yes. You can start filling in right here.

[background conversation]

**Female Speaker 1: [unintelligible 00:02:55]** over here.

[background conversation]

**Female Speaker 1:** Yes. Just-- We're trying to get as much public in, so y'all can fill each row.

[background conversation]

**Female Speaker 1:** Public members. Members of the public can fill in here. **[unintelligible 00:03:24]**

[background conversation]

**Female Speaker 1: [unintelligible 00:03:37]** right here **[unintelligible 00:03:38]** right here.

[background conversation]

**Female Speaker 1:** We have one more over here.

[background conversation]

**Female Speaker 1:** Yes. Would you like this right here?

**Female Speaker 3:** One more.

**Female Speaker 1:** One more?

**Female Speaker 3: [unintelligible 00:04:11]**

[background conversation]

**Male Speaker 5:** That's what I was getting **[unintelligible 00:04:33]**.

**Female Speaker 1:** And you, were you gonna **[unintelligible 00:04:36]** front row?

**Male Speaker 5:** No, no, **[unintelligible 00:04:37]**.

[background conversation]

**Female Speaker:** Okay. I think that would be good then.

[background conversation]

**Female Speaker 1:** Also another option is if we want it to sit up on the dais **[unintelligible 00:07:38]**.

[background conversation]

**Female Speaker 1:** Jeff, I'll grab it for you.

[background conversation]

**Female Speaker 1:** I'll grab it from you.

[background conversation] **[pause 00:20:11]** [background conversation]

**[pause 00:33:58]**

[background conversation] **[pause 00:40:00]**

**Chair Moody:** Okay. Time is now 12:36 PM. The House Committee on Criminal Jurisprudence will come to order. The clerk will call the roll.

**Clerk:** Chair Moody.

**Chair Moody:** Present.

**Clerk:** Vice Chair Cook.

**Vice Chair Cook:** Here.

**Clerk:** Representative Bhojani.

**Representative Bhojani:** Here.

**Clerk:** Representative Bowers.

**Representative Bowers:** Here.

**Clerk:** Representative Darby.

**Representative Darby:** Present.

**Clerk:** Representative Harrison.

**Representative Harrison:** Here.

**Clerk:** Representative Leach.

**Representative Leach:** Here.

**Clerk:** Representative Christina Morales.

**Representative Morales:** Here.

**Clerk:** Representative Schatzline?

**Representative Schatzline:** Here.

**Chair Moody:** The quorum is present. [clears throat] There's some housekeeping matters. First, I apologize for those of you who have been waiting. The committee on house administration has approved a process for the electronic submission and posting of public comments for each item on today's agenda. The public comments submitted through the portal will be posted on the electronic legislative information systems TLIS and TLO, as well as on the house website at the conclusion of today's hearing. Directions of how to submit public comments on the portal can be found on the meeting notice for this hearing.

Today, the committee will hear from invited witnesses only. If you have not filled out a witness affirmation form already, please notify the clerk and we will remedy that problem. Due to capacity constraints in this hearing room, we have two overflow rooms set up for anyone present and wanting to watch the live stream of today's proceedings. Those rooms are E1014 and E1026.

First and foremost, I wanna thank everybody for being here. Um, I apologize for the delay. Uh, as-as anyone who has been following this matter, there is an enormous amount of litigation around this topic. There's an enormous amount of conversation around this topic. Uh, and so, um, many of us have been working through that. Uh, did not mean to keep you waiting, and so please accept my apology for that.

Today, we have an impressive slate of witnesses who, I think, will surprise everyone and add important dimension to these issues. The most important witness, of course,



is Robert Roberson. I'm very disappointed to say I don't believe that will happen today, and I'd like to go over why that is. As many are well aware, there's been a flurry of litigation in the Texas Supreme Court over the weekend. The upshot of that is that a valid legal subpoena for Robert remains in effect.

If this committee wanted- if this committee wanted to take a heavy-handed approach, there are dramatic ways that we could enforce that subpoena, but we didn't issue the subpoena to create a constitutional crisis, and we aren't interested in escalating a division between branches of government. In fact, we have the greatest respect for every other facet of our government, and we want to make-- And we want all of them to come together in our purpose here, which is making sure that Robert is heard.

There's been a lot of discussion about video conferencing Robert in today. I believe that that'd be perfectly reasonable for most inmate witnesses, but Robert is a person with autism who has significant communication challenges, which was a core issue that impacted him at every stage of our judicial-- of our justice system. He's also spent most of the last two decades alone, locked away from the modern technology we now take for granted. Video conference is poorly suited for Robert specifically to provide his testimony, and would only further the harm he's already suffered.

When I thought about the accommodations to be made, I considered his needs as a person with a disability above all other things. I also weighed the fact-finding needs of this committee, the entire purpose of the subpoena. Weighing those with the concerns that were outlined by the Attorney General, our committee simply cannot agree to video conference.

That doesn't mean Robert won't testify at all. In the spirit of cooperation, we are in talks with the Attorney General's office right now about ways their position can be addressed while allowing our committee to-to hear Robert in person. I expect a quick resolution to these discussions, which are ongoing even at this moment, and I will update everyone as soon as those plans are finalized. At this time, I'd like to invite any member of the committee to make any opening remarks. Mr. Vice Chair?

**Vice Chair Cook:** No.

**Chair Moody:** No? Chairman Leach?

**Representative Leach:** Thank you, Chairman Moody, and thanks to those of you who are joining us here at the Capitol today, and to, uh, my fellow committee members, fellow legislators here in the room, uh, to Texans who are, um, who are watching on television. And welcome to all of the non-Texans who are tuned in across this country and really all over the world. We are, um, honored to sit in front of you today, and, uh, unlike Washington, to show you that government can work and that Republicans and Democrats can work together. That death penalty supporters and death penalty opponents can work together. That the branches of government, the legislative, the executive, and the judicial branches can work together.

When it comes to our fundamental duties as legislators, it's very simple, to protect, at



all costs, the fundamental rights and liberties of the people, most importantly of which is the right to life. And when it comes to the life of a potentially innocent Texan, someone who I have over the past several weeks grown from having questions and concerns about to believing he's fully innocent and was within 20 minutes and 20 steps of being executed by the state of Texas just days ago.

If we can't speak up and step up and work together to fix a system that has-- Is not broken in and of itself, but that needs fix, that has failed Robert and failed Nikki, then what are we even doing? Today, this hearing-- the purpose of this hearing, our purpose for coming together and issuing a subpoena to Mr. Roberson and to convening last week and today, and-and what is likely a subsequent hearing, is to ask questions and to find the truth, to figure out where the system went wrong, where it failed Nikki, where it failed Mr. Roberson, and to try to fix it, not only in his case, but to make sure that it never happens again.

In closing, I'd like to make very clear, members and Mr. Chairman, remind ourselves that when we take our oath of office, we solemnly swear that we will faithfully execute the duties of our office of state representative, of our state, the state of Texas, and will to the best of our ability, preserve, protect, and defend the constitution and laws of the United States and of the state of Texas.

That oath of office, I take seriously, I know each of you take seriously, and importantly, that o-oath of office is the same oath that judicial officers and executive officers take. And the legislative branch today is taking our oath seriously. And I'm honored to be here with o-our fellow members, and I welcome, um, all the people tuned in to the Texas House of Representatives. Thanks for joining us today.

**Chair Moody:** Chairman Darby.

**Representative Darby:** Thank you, Mr. Chairman. First of all, thanks to the members of the committee for being here today, and thanks to the members of the public and other fellow members of the legislature of this sitting in the third row. I wanna remind-- I wanna build on Vice Chair's, uh, Leach's comments about our role here today. Uh, I'm probably the senior member on the dais this morning. I've-I've, uh, been here for a few sessions, and I wanna- I wanna focus the-the committee and-and the- and the Texas House on our role and responsibility under our constitution.

Uh, our job is to p-pass laws. And we do so because we listen to the folks who elected us to come down here and make those decisions. To-to do the hard work, to-to focus on an issue, come up with the right policy, and then, hopefully, we'll pass that policy and it'll make a difference in people's lives. Uh, over the years, uh, certainly during my time here in the legislature, there was a flaw in the system. There was a flaw in the- in the habeas corpus, uh, process. There was not a mechanism by which, uh, people could appeal to the court to grant relief, uh, in a situation where science has changed. Now ,they refer to it as junk science, but, uh, I-I-I would say it's just science has changed. The knowledge has changed.



And so we saw problems. So in 2013, and I think Chair Moody and Chair Leach were members of this committee at the time, under Senate Bill 344, uh, this legislature took up this issue. We said, let's create some, uh, basis of understanding that would allow relief for-for, uh, people who've been charged and are serving time, uh, to be-- um, to address the concern about changing knowledge of-of science. [clears throat] We did that, and we set up steps that the- that the Court of Criminal Appeals could look at. Well, we didn't go far enough, and two years later, in 2015, we revisited the issue and we changed it again. We changed the steps.

And so what I would like this committee to focus in on what I'm-- I'm not here to determine guilt or innocence. That's not my job. What I am here to do is, has the legislature failed in properly addressing the tenants by which the Court of Appeals can review these cases? And since the implementation of this law in 2013, there have been 74 applications for writ of habeas corpus bo-- based upon junk science. Roughly, 25 of those cases were people on death row. None of those cases have been affirmatively reviewed and remanded, none of them.

The other, approximately 50, two-thirds of those-- uh, well, about half of those have been sustained. Uh, that science, uh, has-has indeed changed. And so we're gonna change our-- we allow new evidence to support a rehearing or retrial on that case. Uh, all of those cases pertain primarily to DNA analysis. We all have gotten caught up with DNA, and we understand that science. And so we recognize that that-that has the ability to determine that the accused didn't do it, but somebody else did. But there've been no-- There's no cases that have been successfully appealed that take a look at the tenants for the shaking-- the shaken baby syndrome that we're dealing with today.

Clearly, that body of evidence has changed. And so it's up to this legislative committee to look at the tenants of what's going on here. Has the Court of Appeals taken a position that is inconsistent with the statutory language that we have set out for them to follow? Are they ignoring that in saying, "Well, yes, it's changed, but it does not determine who-- the guilt or innocence." That's a level beyond which I originally envisioned in 2013 and 2015. That's a- that's a higher level. Is that a level this committee and the legislature wants the court of appeals to review these cases, that you actually have to have the scientific facts determine the innocence of the accused?

I think not. And in this case, I think the pro-- the-- so we need to be looking, and what I'm looking for with the witnesses is what are we-- uh, how are we as policymakers to look at the statute that says, this is the criteria by which, and the lens by which we will review the facts of this case and determine-determine whether or not a new trial should be justified. That's what our business is.

That's what our business is, not to determine guilt or innocence. It's not to argue about the-the death penalty. It's to determine that we as legislators have created hurdles in statute, and is the Court of Appeals following those hurdles in the spirit by which we were intending them to-to follow? That's what this committee is about. It's



not about guilt or innocence. Guilt or innocence will be a byproduct of our hard work. Thank you, Mr. Chairman.

**Chair Moody:** Chairman Darby, thank you very much. Uh, Representative Harrison.

**Representative Harrison:** Thank you, Chair. Uh, I wanna start off by, um, uh, thanking everybody who's taking the time to tune in or come to this, uh, this incredibly important hearing today. And I also wanna start off by thanking every member of the Criminal Jurisprudence Committee for voting on a bipartisan unanimous basis for the issuance of what is admittedly or what was admittedly a historic and wholly unprecedented subpoena. I'm grateful for each one of you for taking such a bold action, that even though it was historic and without press, I-I firmly believe it was absolutely necessary given the extenuating circumstances, uh, in this case.

And without wanting to get too philosophical, I do wanna remind everybody that in our country and in our state, in the great state of Texas, it is the people who write the laws that govern them. And they do that via their elected representatives in the legislature. So it is incumbent upon us to make sure that the laws that are duly enacted by the legislature are being faithfully adhered to by those who are subject to them.

And so, for people out there who have concerns, who have raised questions about separation of powers, I wanna be unequivocally clear. If you care about the maintenance of the proper functioning of our constitutional system, of separation of powers, you should be the loudest supporters and the biggest proponents of what this committee is doing here today. If the House of Representatives cannot exercise legislative oversight to make sure that our laws are not just being faithfully adhered to, but that they are not potentially being so egregiously violated that it may result in the life of a potentially innocent person being taken by the government, then I would posit there may be no matter that could be subject to legitimate legislative oversight.

The role of government, ladies and gentlemen, is the protection of life and the protection of our liberties and our freedoms, which do not come from the government, but that are endowed as our founders new and codified in our founding documents, in an- in an inalienable fashion, endow-endow-endowed to us by our creator, and is the central role of government to protect them.

So especially when we are weighing something before us as constitutional officers of the state of Texas, where a man's life literally hangs in the balance, and we are contemplating the government exercising the ultimate and most awesome power that we give a government, and that is to take a life, we cannot get this wrong. And I say that as somebody-- Ladies and gentlemen, I want the state of Texas to lead the nation just about everything, but executing potentially innocent people is not one of them.

I do not want my children, and I think I can confidently say this for my colleagues on the dais here, I do not want my children to inherit a state where potentially innocent


people may have their lives deprived from them by the government. So in-in closing, I-I wanna just thank, not just my colleagues on this committee, but every single member of the Texas House of Representatives who has spoken up and has unified and is making the conscious decision to put aside partisanship and put aside the issues that usually divide us so that we can come together in the pursuit of justice. Thank you, Chair.

**Chair Moody:** Thank you, Representative. Any other members have opening remarks? Yes, Representative Bowers.

**Representative Bowers:** Thank you, Mr. Chairman. And, um, I-I don't have much to say, but I just would like to say thank you to all the members of this committee for every bold and courageous move that was made by those here on the dais as well as those that are out in the audience. Um, there's a higher being that knew that each of us in this room would be here today, um, at this moment and for this time. And so I just wanna say thank you all for being here. Um, and it is historic that we are all sitting here, and we are going to make some decisions that hopefully will bring positive change to this state. Thank you.

**Chair Moody:** Thank you. Any other members with opening comments? No? Okay. Before I begin, uh, I'm going to just let you know, uh, who the witnesses are that we'll be hearing from today. I'm gonna list them in an order that I intend to call them. I want to be very clear that those things can change with schedules, uh, and logistics. Um, but I'll go through that list, uh, now. Dr. Phillip McGraw, John Grisham, the Honorable Elsa Alcala, Terry Compton, Kate Judson, Don Salzman, Dr. Natalie Montfort, and Gretchen Swine. At this time, the chair calls Dr. Phillip McGraw.

**[pause 01:00:44]**

**Dr. Phillip McGraw:** Matter, which one?

**Chair Moody:** Choice is yours.

**Dr. McGraw:** All right.

**Chair Moody:** Uh, now, doctor, um, we don't probably have the same, uh, audio capabilities that you're accustomed to. Um, no disrespect to the house administration, uh, but, uh, these microphones are directional. And so, uh, I wanna make sure that we're able to hear you.

**Dr. McGraw:** Okay.

**Chair Moody:** Before I do turn it over to you for your testimony, I do have to do a little bit of housekeeping. I have you registered as a witness as, uh, Phillip McGraw, PhD. You are here testifying on behalf of yourself, and you're testifying neutrally on the topic being considered today. Is that correct?

**Dr. McGraw:** That is correct.



**Chair Moody:** All right. Sir, I appreciate you taking the time to be here and, uh, I don't want to- don't want to, uh, belabor the point, so we will, uh, go ahead and turn it over to you to offer your testimony. The members up here may have some questions following up after your testimony, but, uh, we look forward to hearing from you. Thank you, sir.

**Dr. McGraw:** Well, thank you. And lemme tell you, it's, um- it's an honor, a privilege, and a responsibility to be here and, um, a-address this, uh, committee and this important topic. And, uh, I'm here today to speak about my experience, uh, with Robert Roberson, um, and learning about his case. And I want to talk about what I've done, uh, to be able to speak about this. Um, I've, uh, reviewed the transcripts and supporting documents from his trial. Um, I've done an intensive forensic interview, uh, with him.

And I-I think I am in a position to do that because, uh, a lot of my career, decades, um, have been spent in the legal arena, uh, both civil and criminal. Um, and in-in terms of my training, uh, so people know, uh, I-I do have ex-extensive training in clinical, uh, psychology and behavioral medicine or medical psychology, uh, from the great University of North Texas, um, in their PhD program. And then I completed, uh, a postdoctoral fellowship in forensic psychology. Um, and, um, spent a lot of time, uh, working in the litigation arena for a big part of my, uh, professional career.

And not to bury the lead, I am 100% convinced that we're facing a miscarriage of justice here. Uh, I say that because I do not believe, uh, that Mr. Roberson has had due process in this case. I do not believe he has yet, uh, enjoyed a fair trial, uh, in this matter. And I'll talk about that, um, in-in detail. I believe that in the United States of America, if we are going to deprive someone of their liberty, that comes at a very high standard. If we are going to deprive someone of their life, that comes at a very high standard.

A very high standard of proof, a very high standard of evidence. And when you say beyond a reasonable doubt, that's said so much that I think sometimes, it can lose its meaning. And we have to really stop and think what that means. That means that if you have 12 people on a jury, that means that there should be nothing that 12 people can go in a room and reasonably disagree about. That-that-that-- and that is a high standard, that there's not-- there should not be anything that they would go in there and say, "Well, there's nothing here that we can reasonably disagree about."

And, um, I-I-I think that when we talk about due process and fair trial, that means that all the evidence, everything that is relevant and pertinent to that trial gets before the trier of fact, whether it be a judge or a jury, and that there's fair representation. And I-I certainly don't think that standard has been met here, that that high standard by which we would deprive someone of their life, um, has been met. And I-I think that the death penalty, uh, actually hangs into balance here because if we get this wrong in-in a case like this, uh, I-I think that, uh, the death penalty could come under real attack.

Completed: 10/30/2024


And-and there are circumstances where I personally believe that it is appropriate. Um, I think back to James Barr Jr. on 6/7/'98 when, uh, he-he was dragged, uh, by King and Brewer in Jasper, Texas. And subsequently, uh, King was executed-- Brewer was executed in-in 2011, and King was executed in 2019. Uh, a third man got life in prison. I-I look at cases like that and think, you know, there are times where the death penalty just seems appropriate. Um, and it-it would be a-- uh, I think it would be unfortunate if that was taken off the table.

I'm also aware in circumstantial cases how powerful it is for an expert, a physician, for example, to come before a jury and render an opinion. Um, and I-I-I-I've spent so much time, uh, in cases and debriefing jurors after a case and know how heavily that weighs on those jurors. And I believe in this case that there was what I would refer to as triad tunnel vision because there was a-a shaken baby syndrome that was defied-- defined, uh, by a triad of symptoms. And those symptoms were subdural hematoma, brain swelling, and retinal hemorrhaging.

And that was believed, uh, to define the syndrome of shaken baby. And we now know from an evolution of science that that's just simply not the case. That there are a number of other explanations for those syndromes, and that that causation has actually been debunked. And as a result, uh, the-the Daubert test- the Daubert test, um, junk science, it's just been debunked as it's no longer a-a standard that you can look to in-in defining that.

And I think that once that was, um, looked at as the order of the day, everybody got tunnel vision. And, you know, there's something in psychology known as confirmation bias, and it's been around for a long time. Bacon first talked about it in 1889. And confirmation bias is the tendency for people to make up their minds to something and they close off openness to alternative explanations. They seek and find and hear and process only data that supports their initial belief. And they turn a deaf ear-- a deaf eye-- a-a deaf ear and a blind eye to anything other than what they passionately believed to be the case.

And I-I think we have clear evidence that that's what happened in this case. Um, the decision was this triad of symptoms were written down, and it started with the doctors that were looking at this first, and then it trickled down to investigators and police and went right through the trial process, including Mr. Roberson's defense counsel, including his own counsel. And, uh, I-I've heard and read those that are opposing these efforts say that, "Well, this really wasn't the crux of this case. It wasn't really, uh, what was going on here." And I'm-I'm sorry, but I've studied this trial transcript and it was the crux of this case. It was the center of this case.

Uh, in-in-in one summary that I've looked at, uh, as well-- I've read a summary, and I've read the actual transcript. Uh, I stopped counting at 47 times. It was mentioned, uh, in the trial transcript, shaken baby syndrome, shaken baby case, shaken baby syndrome, shaken baby case, a triad of symptoms. And let me tell you something that will seem incredibly obvious, but it is not.



Juries decide these things on what they see and hear, not on what they don't see and hear. And you would think, well, yeah, but my point is, I-I-I've often seen lawyers try to get something into the record, and it's kept out and heard them say, well, we didn't get that in, but the jury knows we had something really powerful and that's gonna stick with them. No, it's not. They decide on what they see and hear, not what they don't see and hear.

And there was a massive amount of outcome, determinative, exculpatory evidence that was never reviewed. It was never put in front of the jury. It was never heard. And you always hear, and the law is clear that the burden of proof is on the prosecution, that Mr. Roberson does not have to prove that he didn't do this. The prosecution has to prove that he did, and that's great in theory.

But having spent decades in the litigation arena, I can tell you debriefing juror after juror after juror after juror across decades, they have taught me that they sit back and say, if we are not down here for the reason that the prosecution says we are, somebody needs to explain to me an alternative explanation because we know these cases get resolved a hundred different ways before we ever get to this point. So if we're not down here for the reasons that they say we are, somebody needs to explain why. They're looking for an alternative explanation. And in this case, oh my gosh, was there an alternative explanation?

This child was an ill baby. From eight days old, the medical record shows this was-- this child was not well. The record shows that this baby had 46 doctor or hospital visits in her 23 months and few weeks of life. In the days leading up to her death, the record shows she had a 104.5 temperature. The record shows that Robert took her to the doctor twice in the week leading up to her collapse. The record shows that she was prescribed Phenergan on two days leading-- two separate days leading up to her death.

A black box warning says you do not prescribe this medication to someone under two years of age. On the second administration, it was Phenergan with codeine, a double impact that suppresses the respiratory system. We did not hear that this child had severe pneumonia. We did not hear that. And there were scans available to be looked at, and the medical examiner admitted that they were not looked at.

And I will provide to the committee. This is a calendar of the two years of this child's life. And every red notation- every red notation is a doctor or hospital visit during her young life. Uh, this was a child that was acutely and chronically ill. And when I say that this child had been diagnosed, uh, with inter-- interstitial, uh, pneumonia, on the left is a scan of her lungs. And the-the pinkish red is non-functional lung tissue according to the doctors. And I'm telling you just what the report says. I'm not playing physician here. And on the right is a normal lung.

This never got in front of a jury. [coughs] Why? Uh, because it was never looked at. It-it was never looked at. The medical examiner-- medical examiner did not, uh, review this and said so. Um, this child had collapsed several times when Rober--



Roberson was not in this child's life. This wasn't the first time this child collapsed and turned blue and had respiratory shutdown. It had happened a number of times when he wasn't around. On this occasion, he was around and took the child, uh, to the hospital.

Um, so how was this case tried without all of this stuff being put into the record? Uh, it's-it's astounding. It's astounding. Uh, even the defense counsel who did nothing to challenge the evidence stipulated that this was a shaken baby case. Um, during voir dire, I'm quoting defense counsel "every one of you related to that you had heard the term shaken baby. That it was an act of basically a lack of control of emotion. It's a bad thing, but it's not something that rises to the level of capital murder."

His own counsel says this was a shaken baby case. In opening statement, his defense counsel says, "This is, however, a shaken baby case. The evidence will show that Nikki did suffer injuries that are totally consistent with those applied by rotational forces, more commonly known as shaken baby syndrome." [clears throat] Now, Robert Roberson was offered plea deal after plea deal after plea deal and never took a plea deal because he said, "I never did anything to this child. I never put my hands on this child in anger. I didn't hurt this child. I didn't do anything to this child. I'm not gonna play-- take a plea deal for something I didn't do."

But yet his counsel stands up and says, um, more commonly known as shaken baby syndrome. On page 35 of the closing argument, defense counsel says, "Yes, I came here in opening and presented to you that there is responsibility in this case. Yes, this is a shaken baby case, but no, this is not a murder case." His counsel is stipulating this as shaken baby. And the science has marched on and now rebutted that shaken baby syndrome is a valid medical syndrome. Has said you-you cannot rely on that. That is junk science.

We've now evolved to a level that says we know that shaken baby as defined then does not create that triad of symptoms and that that triad of symptoms can be created by a number of other things such as, uh, over medication, uh, pneumonia. You could just go down the checklist here of what happened in this case. It has been reported that there was an expert psychologist that supposedly recommended to Robert, "Just take a plea deal, go to prison, and you can kill yourself once you're there."

Now, I can't verify that. I can just tell you it's in the record and has been reported, but yet he refused those plea deals, um, and went to trial where the jury was wrongly told that abuse could explain-- that only abuse could explain the death. And they heard nothing about this child's acute or chronic illness. Now, there's another factor that comes into play here. The jury was told that Mr. Roberson was guilty because he didn't respond in an expected way at the hospital when he brought the child in, flat affect. They were not informed that he was autistic.

And that did not come to-to light until 2018. Many years later when he had an active counsel that actually got him examined and formally diagnosed. Um, we see all



through this man's life, uh, which was not a spotless life, let me tell you. Uh, he got involved with drugs at one point. He, uh, um, burgled a house at one point, uh, violated his probation, but never, uh, is there any evidence of him being violent with other people, assaulting other people, uh, having impulse control disorder, rage, uh, anything of that nature. Uh, there is testimony, uh, that he was bullied, uh, because he was different and lacked social skills that are typically associated, uh, with autism or frequently associated with autism, but he never retaliated.

I sat across from, uh, Mr. Roberson at the Polunsky Unit, and I've spent a lot of my professional career, uh, studying and practicing deception detection and interrogation. Uh, I've worked with law enforcement locally, federally, um, in-in-in developing these skills and-and techniques. Um, so I didn't just go have a therapy session with him, I didn't just go talk to him.

Um, I was very mindful of, um, deceptive behaviors and, um, the first to say there are no lie behaviors. People talk about that like there are lie behaviors, there are not, but there are behaviors that correlate with lying. There are behaviors that show up when someone is, uh, goes into a stress mode that is associated with not telling the truth, and, uh, creating something, um, that is misdirection trying to take you away from, uh, something they don't want you to know about them.

I ask him hard questions. Um, I ask him point blank straight up looking him square in the eye, "Did you harm this child? Did you shake this baby? Did you put your hands on this-this child, uh, in-in anger? Did you neglect this child? Did you fail to get this child to a hospital in a timely fashion?" Um, he said he had been criticized for putting the child in the car and racing to the hospital instead of calling 911 and waiting for the ambulance. He said he made the judgment call, he could get her there faster. Um, but he was forthcoming and-and straightforward. Um, you know, it took years for specialists to put the pieces together, the pieces that the medical examiner never did.

And I think sometimes with my years in the litigation arena that sometimes we forget that the goal of prosecution is to seek justice not conviction. I think sometimes in the heat of battle and with so much time invested in cases that is easy to forget that the goal is to seek justice. And if you get in the middle of a case and you determine, wait a minute, I've got the wrong person here, or I can now see that no crime was committed, that this was a case explained by medicine. This was a case explained by disease. I need to walk away from this one.

And when you have a medical examiner that has admitted they never looked at the child's medical records, including the final week where there were multiple doctor visits. And even the child's last two days when extraordinary efforts were made to save the child's life, which meant there were efforts made to stop the swelling and relieve the pressure in the brain, yes, there were things done to the child's, uh, head.

Uh, but if you look at the pathology reports, they contradict, uh, what was concluded at the time that there were multiple blunt force trauma to the baby's head. You-you



look at the, uh, pathology reports, they say that's not true. There was one minor, uh, trauma to the head that would come if the baby fell out of bed. Uh, all of those things were available and-and these things not being considered, that's on the state, the state that's seeking to execute this man. And that's why I say there was not, ums, due process in this case. There were people that in my opinion, did not do their job.

No one, including me, can say with 100% certainty what happened in that house that morning. My professional opinion is that this is not a man with malice. This is not someone that hurt this child. What I can tell you that goes beyond opinion after examining the record, in this case, the trial transcript in this case, the medical records in this case, this man has not had due process. This man has not had a fair trial.

And if we start executing people in Texas absent due process, absent fair trial, we are going down a really dangerous road. That is not something that I can support, and I know that has not happened. As I say, it's a very high standard to take someone's life. We must have the courage to make choices that matter at times that count, and it is always the right time to do the right thing. I welcome this committee's questions.

**Chair Moody:** Doctor, thank you very much and I appreciate your testimony. I-I do have a couple of follow-up questions and then, uh, if there are other members that have questions I'll defer to them as well. I want to focus on, uh, Robert's autism. Can you help explain the disconnect that there is between interior life and external expression? How does that present itself with someone with autism and how does that affect a person that's in the criminal justice system?

**Dr. McGraw:** Well, um, how much time do we have? [laughter] Um, you know, autism is-is not a, um, um, a one-dimensional, uh, disorder. And that's why it's referred to as spectrum.

**Chair Moody:** Correct.

**Dr. McGraw:** Uh, because there is a broad range of how autism expresses itself, and it can change across time. Um, what we do know is that there is a difference between internal experience and external expression and interaction. And you certainly see that, um, with-with Robert. Um, I think that, uh, Robert is very flat of affect. Um, I-I think he is not, uh, cogniti-cognitively agile in expressing himself.

Um, and he is emotionally, um, not well developed in terms of expressing, showing emotions, or interacting with someone on an emotional plane, uh, the way you would experience 9 out of 10 people that might not be on the spectrum. Um, so you're not going to get, uh, a typical response from him in a crisis situation or a normal situation. And having spent 21 years on, um, death row, which is very confining and, uh, absent, a lot of the stimulation that people normally get, that's gonna worsen and deepen the situation, um, in most cases.

And as I say, uh, every situation is different. Uh, I can speak to Robert's situation in

Completed: 10/30/2024



that, uh, his world has constricted a-- as you would think anyone that's confined in that kind of a space. Uh, but to his credit, he has distinguished himself, um, and he is one of very few, uh, that has elevated himself to have, uh, some freedom, uh, to move about the pod. Um, he has a-a-a-a pretty much spotless record, uh, on death row, disciplinary-wise, problem-wise. Um, and he is someone that is very, uh, convicted in his faith and is a strong believer. Um, and he does have people that come and see him and visit with him.

In fact, the investigator, uh, that led, uh, the-the prosecution efforts at the time, uh, comes and sees him on a regular basis, and he's gotten comfortable with him. And that investigator has completely, um, changed his position. Believes he made a mistake, um, in, uh, pursuing Robert at the time. Has asked his forgiveness, um, which Robert has graciously extended to him. And the two of them have a-a, uh, pretty comfortable relationship where Robert can speak to him openly.

And, uh, he was much more comfortable by the time I got through talking to him than he-he was at the beginning, but still, um, he had very pushed verbalizations. He had a difficult time with eye contact. He had a difficult time, um, relating and-and responding in what I would call a predictable way, um, that you would expect with someone that was functioning, um, absent, um, the autistic diagnosis.

**Chair Moody:** How long did-- how long did you sit with him on that occasion?

**Dr. McGraw:** Uh, they give you exactly 60 minutes, and I made sure I got every second from start to finish on a stopwatch.

**Chair Moody:** How far apart were you? What was the physical scene?

**Dr. McGraw:** Uh, there's glass between us. Uh, he's on the phone, and I'm on the phone, uh, but we're maybe 3 feet between us.

**Chair Moody:** Okay. You've conducted interviews over video conference?

**Dr. McGraw:** Uh, I have, and I've conducted a number of interviews on death row between-- with the glass between myself and the, um, interviewee many times before.

**Chair Moody:** Is that something that would have been effective in your- in your meeting with Robert, given his condition?

**Dr. McGraw:** Um, you know, it's kind of a-- they-they bring him into a small room. It's probably three feet wide, maybe five feet deep, and he sits at a desk much like I'm sitting here. Um, and the glass is kind of at the front edge of this table and he kinda leans in on the phone. Um, and it's kind of a comfort zone for him. I mean, he's-- he doesn't like a whole lot of stimulation. Um, but, you know, he-he leans in and participates.

And, um, I-I asked him a-a variety of questions about history and, uh, what he could



remember and-and not remember. Uh, and, you know, some things he-he didn't have clear memory of, uh, and he owned that. Uh, I asked him questions to test his abstract thinking. Um, he-he did not do well on those things. Um, I challenged him when they said they wanted to go see his home where he found her and brought her in and he said, "Sure. I'll take you right over there."

And I said, "Does it strike you odd?" Uh, and there's, of course, a video record of this, so you can see exactly how that exchange went. But I said, "Did you feel bad? Your daughter is fighting for her life there and they say, 'I want you to get in the car and take me home.'? Did it occur to you that, 'I- I don't wanna leave. I wanna stay here with my daughter.'?" And he was like, "Well, that's what they told me I needed to do so I took 'em home. I mean, I-- so they told me to do."

Um, he was very compliant at the time. I said, "Did you wanna leave?" And he said, "Well, I-- you know, that's what they told me to do." Is-- that's what I mean he's a very compliant individual. And he-he didn't have the ability to express the emotion, "I'm not gonna leave my daughter. I'm--" He just complied and did what he was told.

**Chair Moody:** So I-- and-and that's what I was trying to drive at. And you've mentioned that he had a comfort zone. So if someone like Robert is out of his comfort zone, he's got, you know, limited affect and emotional range, limited mental agility, like you said. Um, all of those things I would think would be exacerbated if he's appearing on a screen and seeing others on a screen as you and I learned how to do during the pandemic.

**Dr. McGraw:** Well, yes. I-I-I think he needs every cue that he can have to grab onto and relate. You put him two dimensional and he doesn't-- You know, he needs cues. He needs physical feedback. And it makes it difficult if-if he-he can't have that. In his ability, we have to do everything we can to help him assist in his defense. And we can see from the trial record, uh, 21 years ago, 22 years ago, he didn't very-- he didn't have a very good facility to assist in his defense at the time.

If he had, um, ev-even when he was there every day with his lawyer sitting next to him, if he had the ability to say, "Wait a minute. I-I've told you I've turned down plea deals. I don't want to do this. Why are you standing up saying this is shaken baby case?" If he had insisted that, um, "Look, this medical examiner is not talking about the evidence here."

I mean, the-the cause of death was the child had a bacterial infection, was, uh, septicemic and-and had a necrotizing infection. It was eating lung tissue. If-if anybody here had been in that situation, we'd be saying, "Hey, we need to be talking about this. You don't need to be telling them something I've told you I didn't do. We need to be talking about an alternative explanation about why we're here." And he had a difficult time doing that when he was present at trial. If he had been on a screen, the ability to initiate contact when he's not in the room would be nil.

**Chair Moody:** Okay. And I have one more question for you, then I wanna pass it off to my colleagues that have questions. If someone was sitting in that other chair next

Completed: 10/30/2024

17



to you and their testimony was to this committee that this was not a shaken baby case, how would you reply to that?

**Dr. McGraw:** Uh, say that again.

**Chair Moody:** If someone was sitting there next to you and their testimony to us was, "This was not a shaken baby case," how would you respond to that?

**Dr. McGraw:** Well, I-I-I-I agree it was not a shaken baby case.

**Chair Moody:** Sorry. Sorry. I apologize, that it was a shaken baby case. **[inaudible 01:40:49]**

**Dr. McGraw:** Yeah, I was trying to figure out where you were going with this.

[laughter]

**Chair Moody:** Yeah, I apologize.

[background chatters]

**Dr. McGraw:** Um, um--

**Chair Moody:** That they say--

**Dr. McGraw:** Well, the first thing I would say is, there's no such thing as shaken baby syndrome. Now, listen, if-- I'm not asking people to believe that a full-grown adult cannot pick up a 20-pound child and do serious or fatal harm to that child. Of course, they can. Of course, they can. They can pick that child up and-and bash its head into a wall or throw it on the ground or whatever. But there are going to be very clear signs of that having happened that were not present in this case.

What-what is- what is known as shaken baby syndrome depends on this triad of symptoms, subdural hematoma, and brain swelling, and retinal hemorrhaging that you see in the eyes. That triad of symptoms has been debunked. That that's not what happens if-if a baby is-is shaken and that there are a myriad of other causes such as over medication, uh, or, uh, a-a-absence of oxygen to the brain or, um, septicemia, oth-other things that can cause those symptoms. If- if there- if there are alternative explanations, then that's no longer a valid syndrome.

And there are-- there have been a number of exonerations because of this. That, tha-that was the science at the time. Science evolves just like DNA technology e-evolved. And so there have been exonerations with DNA. The same thing here. There have been a number of shaken baby convictions that have been exonerated because they have come back with new science that says "There's an alternative explanation for this. You can't convict someone on something that has now been debunked by the medical community."



Even the individual who initially identified shaken baby syndrome said that "That was not the intent. I did not intend for that to be used as a prosecution for injury to a baby." And it-it has been debunked and disproven by the medical, uh, profession and is not used. So, fortunately, science has progressed, medical science has progressed, and there's now new evidence available that should be used.

**Chair Moody:** Well, I appreciate it. I do wanna apologize for misspeaking. I was up at 3:00 AM to make a flight here today. Um, so apologies for that.

**Dr. McGraw:** I know you've been very busy.

**Chair Moody:** Uh, but thank you for-- I appreciate your testimony. I may have some questions following up a little bit later, but, um, what I'm hearing from you very clearly is you've read the transcripts, you've reviewed the rec- review-reviewed the record, um, and there is- there is not any way that someone could maintain, uh, maintained that this-- that the state, uh, the state came here and said that they didn't try a-a shaken baby case. That's what they told us last week. "No, we didn't try a shaken baby case." Sounds like you've reviewed the record, and it sounds like your opinion is those facts speak loudly that that is what they tried to do in that case.

**Dr. McGraw:** Well, as I said, I stopped counting it 47 times in the record and I read you quotes from the defense. Certainly, what the defense attorney tried, uh, that was in voir dire opening statement and closing argument quotes from the defense attorney stipulating this was a shaken baby case despite Roberts, um, assertions that that was not the case and he, uh, rejected plea offers, um, and said, "I'm not- I'm not going to take a plea on something I didn't do," but yet then they got up and said, "Well, he did do it." His own lawyer said he did do it.

**Chair Moody:** Thank you. Vice Chair Cook.

**Vice Chair Cook:** Thank you, Mr. Chairman. So, Dr. Phil, before you became Dr. Phil, uh, can you tell us a little bit more about CSI?

**Dr. McGraw:** Um.

**Vice Chair Cook:** I think you've been a little modest so far when you said you've been involved in, uh, litigation. I want you to be a little bit more- a little more specific about your background.

**Dr. McGraw:** Um, as I say, um, um, I had kind of three areas of focus, clinical, um, medical psychology, and my focus in medical psychology was brain and central nervous system. And then I did a year's postdoctoral fellowship in, uh, forensic psychology or psychology in the law and, um, I am, uh, was a founder of a company called Courtroom Sciences, uh, Inc. It was the original CSI, uh, probably should have enforced that, uh.

**Vice Chair Cook:** [chuckles] I think so.



**Dr. McGraw:** Um, but, uh, we had a full-service trial science firm, and we were retained, um, by clients to evaluate, uh, cases, and, um, we did, uh, strategy for cases, we-we assisted in, uh, jury selection, uh, witness preparation, um, we often had, um, uh, mirror juries, shadow juries in the courtroom that match the jury that was in the jury box, and we were able to debrief our jury.

So, what I'm saying is, if we had 12 jurors in the box, and, uh, there's 7 women and 5 men, then we had 7 women and 5 men in the gallery, uh, that matched them. So if we had a 42-year-old woman with 2 children, a barking dog that was a Baptist with a year of college, then we had a woman out here that was 42 years old with 2 children, barking dog, a year of college that was a Baptist. 'Cause you can't talk to the jury every night, but you can talk to your shadow jury every night. And it gives you insight into that.

We mock tried cases, uh, many times before they went to actual trial, uh, to find out, um, you know, how a jury in a particular venue, uh, was likely to view a case and, uh, what was important to them and what was not important to them. The difference was at mock trial, instead of having one jury, we seated four or five, or six, and they went to independent deliberation rooms. Uh, deliberated over the actual jury charge, uh, as best, uh, we could predict what it was gonna be and all of that was videotaped and then analyzed very carefully to see what their problem-solving strategy was going to be, what was important, what was not important, so we knew what to emphasize and not emphasize.

Um, whether this particular expert was effective or the other expert was more effective, what they wanted to hear and not wanna hear. And we focused on telling the truth effectively and getting the best result we could, and sometimes [coughs] the answer was, "You need to settle." **[unintelligible 01:48:45]** Okay. [coughs] Thank you, Phil. And, um, we did criminal cases and civil cases, both defense and plaintiff.

**Vice Chair Cook:** Well, as a former client from a couple of decades ago, I've-I've seen you in action and I can attest to, um, to your skill set and, uh, just want to say thank you for being involved in this case. Thank you for being willing to be here today and take time out of your busy day, now that you're Dr. Phil in a- in a different role, um than what I knew you as a couple of decades ago. But I think I just wanted everyone to know that background. It's not like you just-- it's not the typical person talking to a few jurors. You've done this for decades, correct?

**Dr. McGraw:** No, I have.

**Vice Chair Cook:** Okay. And you said you read the record. Um, did you see, uh, discussions about a sexual assault of a child, uh, involved in the record?

**Dr. McGraw:** Uh, I saw discussions of the sexual assault early on. It was brought up concerning, uh, three anal tears, um, in a child. I believe it was, this was early on, um, and it seemed to me that it was brought up to prejudice the jury, frankly. Um, but then it was dropped out later and was not part of the jury charge. It was not something they were asked to render a finding on.

Completed: 10/30/2024



Um, and it was not something that they, uh, prosecuted on at all. I-I felt like it was-- it was there because it's, um-- if you want to inflame, um, a jury panel, then you can, uh, put that into the mix, uh, but then it was completely dropped out. It was not paid off. There was no evidence offered about it. No-no testimony was given about it. There was no-nothing in the medicals that were offered about it. It was just put in early, um, but then it was never paid off later.

**Vice Chair Cook:** Fair to say, if we were to grab 100 people off the street, that probably all hundred of those people would agree that that would prejudice the jury that they heard that type of testimony, uh, prior to going to deliberation.

**Dr. McGraw:** Well, it-it-it certainly would. And, um-- but a-as I said, you know, in-in-in opening statement, you're not allowed to argue. You're just, you know, you're just gonna say, we believe the evidence will show. And then the jury, um, is expected to say, well, they-they made that promise. Let's see whether they bring it or they don't. Uh, and then in closing argument, the opposing attorney, uh, would be expected to say they stood up and brought this up. Did they ever show you anything to do that?

And with something that inflammatory, there's a real question about whether you even want to bring up that they didn't pay it off, 'cause you're reminding them and it puts it back into the juror's mind. So do you bring it up again or do you just, uh, leave it there? It's a- it's a difficult call, but if you examine the record, you will see that there was never one word of testimony from an expert or otherwise, um, [clears throat] uh, to show that there was any e-even insinuation.

And, um, there-- Um, a-a Dr. Francis Green, um, filled out an affidavit on July 9th of this year, um, and, uh, she basically said in-in her affidavit that if-if she was going to, uh, render an opinion on what the cause of death was and what she saw. There was certainly no mention of that. Um, she disagreed with the cause of death, and she had a firm opinion that the death was caused by severe undiagnosed viral pneumonia onset of which occurred at least a week to several weeks before her collapse. That there was a viral interstitial pneumonia complicated by secre- secondary necrotizing bacterial bronchopneumonia, uh, several days to a week before the death.

Uh, necrotizing, meaning that it was actually eating tissue in the lungs. Um, and so as a result of bacterial infection, uh, she became sep-- septicemic resulting in, um, all of this coagulation, uh, reflected in lab results, and that it was a combination of drugs suppressing respiration, and this was a Phenergan, uh, or Promethazine in two forms, suppository, and-and cough syrup. And none of this other was mentioned at all anywhere. In-in that--

**Vice Chair Cook:** And I know you're not a me-medical doctor, and I don't expect that you've memorized everything about this case, but do you recall the cause of death, um, as testified to by the medical examiner?

**Dr. McGraw:** Um, she-she reviewed so little about it. She just, uh, referenced the triad of symptoms and shaken baby. And, uh, I can pull up what she said here. Um--



**Vice Chair Cook:** My-my understanding, and I've not reviewed the record to the level that you have, but, um, my understanding is-is that there's a certain designation when it is a shaken baby syndrome, um, case, and it's, you know, it's not-- it doesn't say shaken baby syndrome on the, you know, cause of death. And so I didn't know if you had-had that available.

**Dr. McGraw:** No. I can probably find it for you and, um, I'll get it for you before I leave.

**Vice Chair Cook:** Okay. Yep. Yeah. And if not, we can come back to it.

**Dr. McGraw:** Mm-hmm.

**Vice Chair Cook:** Um, what about as far as the defense attorney will go, you said that, um, you know, you would debate whether or not it was proper to bring up, you know, bring the sexual assault back up. And would it also be proper to ask for a mistrial, I mean, based upon inflammatory, um-

**Dr. McGraw:** Uh, uh--

**Vice Chair Cook:** -assertions.

**Dr. McGraw:** Ab- Absolutely. I-I-I would think that, um, absent any evidence, um, any witness, no-no evidence whatsoever, I would think you could, uh, move for a mistrial. Uh, but that's certainly not in the record.

**Vice Chair Cook:** And then as far as if you-- if in your opinion is the-the relief that, uh, the best relief that could be granted would be by the, uh, court of criminal appeals in the form of a new trial, is that-- do you believe that that's the best case scenario?

**Dr. McGraw:** Well, I certainly think at a minimum, um, there should be either an evidentiary hearing, uh, to show what has-- how this man's rights have-have been violated, um, and-and/or a new trial, which, um, I-I think would be pretty clear.

**Vice Chair Cook:** And would the two best pieces of evidence that-that you know of, would it be the, uh, CAT scan of the-- of the brain and also the photo that you showed earlier with regard to the child's lungs?

**Dr. McGraw:** I-I think that along with the history of her going into respiratory distress, absent him being in her orbit, I mean, he wasn't in her life when this started happening. And, um, listen, if-if-- I-I-I need to say I-I work with the Innocence Project Firm and, um, for a number of years, and, um, I-I-- I've-- I've had cases brought to me, um, that I look at and I've been to death row and interviewed inmates, and walked away and said, uh, I-- I'm not-

**Vice Chair Cook:** Not feeling it.



**Dr. McGraw:** -not feeling it at all. I-I-I can't in-in good conscience say that I-I can get behind this. Um, if I don't-- if I can't study the record and look the individual in the eye and passionately believe that there's been a miscarriage of justice, I just don't step up to them. Um, and-- um, so I don't get involved with everyone that's presented to me by a long shot.

**Vice Chair Cook:** Sure.

**Dr. McGraw:** Uh, but when I see something like this, you-you can't walk away.

**Vice Chair Cook:** Well, thank you for being here today-

**Dr. McGraw:** No problem.

**Vice Chair Cook:** -and thank you for your testimony.

**Representative Leach:** Yeah. Uh--

**Chair Moody:** Chairman Leach?

**Representative Leach:** Thank you. Uh, thank you, Chairman. Um, doctor, thank you for being here today. Just a few- a few quick questions that I-I really want to, um, I really wanna focus and drive home with you. And I want us to, um, to try to take a step back together because I don't know if you were able to hear some of our opening remarks, but I thought Representative Darby put it very well in-in his opening in that we are not here-- it is not our role as the legislature to retry this case.

We have to be very cognizant and careful not to act as some sort of super appellate court. Um, and I, uh, I hear those co-concerns, I share those concerns, and we have to be members laser-focused on staying in our lane. Is that make-make sense to you, doctor, of course?

**Dr. McGraw:** Certainly.

**Representative Leach:** Okay. So I-I wanna be-- this has been a very, very, uh, helpful-- a very, um, thorough and helpful overview, not only for the members of this committee, other legislators tuned in, the people here, but for all of those tuned in or watching online who are focused on this case. And I-I think the question that-- as I seek to wrap my arms around this and think about the very purpose we're here, and I-I think about representing my constituents, doctor, is I wanna ask you this question. I think this is maybe what people are-- who are tuned in right now are wondering the most. How does this happen?

If-if everything you've said is accurate, and I believe that it is in my own, uh-uh, independent review of the record, everything you've said is-is 100% accurate and there's a lot more that you haven't gotten to. Um, how does this happen in our system? And if we're here to-to-to recognize, uh, holes in the system, weaknesses in the system problems-problems in the system to strengthen our criminal justice



system, Doctor, I would ask you to answer that question. How does this happen? Because to me this is not a shaken baby case. This is an ineffective assistance of counsel case. And, uh, my hypothesis is that had Mr. Roberson had effective assistance of counsel as he's constitutionally, um, able to have, then we wouldn't be here today. Do you agree with that, and can you kind of, um, can-can you go into more in-depth on why this has happened and what we can do to fix it?

**Dr. McGraw:** Well, you know, I-I-I talked about, um, what we did, um, at CSI, for example. And, um, some people might say that, um, in America, you're entitled to the best defense money can buy. Um, and we did a lot of pro bono work. Uh, you know, we-we charge a fee or we charge nothing, um, because the-- if-if you look at the population on death row, uh, or you look at the population in prison, uh, there's an overrepresentation of minorities, there's an overrepresentation of low socioeconomic.

**Representative Leach:** Rich white guys don't get the death penalty, do they?

**Dr. McGraw:** No, they don't. Um, and they don't get a lot of prison time, uh, either one. And so the-the fact of the matter is, uh, when you get a public defender, and I-I-I know a lot of public defenders that are passionate, dedicated, and hardworking, and they got a stack of files on the corner of their desks that you can't even see over.

**Representative Leach:** Right.

**Dr. McGraw:** And then I know some that are just, you know, kind of checking the boxes. This is like everything else. There's a broad range, but I know a lot of dedicated, hardworking public defenders, um, but they're just so overworked and spread so thin that it-it's-it's just impossible, uh, to give, uh, a fair representation, uh, to every client. And, but if-if-if you look at, um, the number of exonerations, it's scary. Um, you know, you're either for the death penalty or not. And if you are for the death penalty, you have to be for doing everything in your power to ensure that those who face that ultimate sentence have had a fair trial and are guilty insofar as we can determine.

I mean, you have to do everything. You-you can't- you-you-you can't kind of say, "Sort of, maybe we've got this right." And if-if-if, you know, 1107 says you can't do, uh, junk science, you-you can't have something that has evolved, and we're gonna ignore that it's evolved and just use what was there at the time and keep them in jail even though we now know better that you- that if you- if you execute people when you now know better, uh, you need to abolish the death penalty. If-if that's the standard by which you're gonna execute people, then you got a bad system.

**Representative Leach:** So-so, uh, am I- am I correct in-in assuming that Mr. Roberson, uh, could not afford, at the time, could probably not afford CSI, correct?

**Dr. McGraw:** Um, yeah. Yeah, probably.

**Representative Leach:** Yeah. Okay. He couldn't. I mean, there's other. It's not casting aspersions on CSI.



**Dr. McGraw:** No, uh, no, I-- Listen, I-

**Representative Leach:** I've worked with CSI before and they're the best. But the, um, the-the-the point is that Mr.-Mr. Roberson simply could not afford the resources to provide himself, not only effective assistance of counsel, but the full assistance of counsel for a capital murder case in which the prosecutor decided, I-I believe, uh, grossly negligently so, to seek the death penalty on. Um, Mr.-Mr. Roberson was afforded the-the-the minimal, and that's probably even being generous and putting it nicely, the minimal assistance of counsel. And in many cases, his counsel actually worked against his interests. And so my opinion is that he had virtually no counsel.

And there-- I, like you, and I think many-many members of this committee and other legislators, we get asked-- Doctor, you might- you might know this, but we get asked all the time. We get letters from inmates on death row. We get asked very frequently to review cases, to get involved, to speak out. I've been-- since I've been in office 12 years, I've received maybe over 100 of them. And I've only gotten involved in three death penalty cases. Uh, the case of Jeff Wood, the case of Melissa Lucio, and the case now of Robert Roberson.

And-and without fail, in all three cases, it all comes back to ineffective assistance of counsel, because all of the facts that you've talked about here, all of these questions, all of the evidence that was not introduced at trial, the jury had no knowledge of it, members, none of that got in- got-- none of that is part of the appellate record. And so the system cannot work when it's built upon a foundational, um, basis that has-- that all this evidence is not part of. So our courts of appeals can't review the evidence, the-the record is so, um, defective.

The case in and of itself is so defective. And so let me ask you this in closing. Do you believe that if Mr. Roberson is simply afforded a new trial, which is all I'm asking for, I believe that's all the-the-- I don't wanna speak for the members of the committee, but that's what I want, is just a new trial where maybe we could get him effective assistance of counsel and have someone like CSI prepare him, his defense, and present all this evidence. Do you believe there's any way that he would be convicted of capital murder?

**Dr. McGraw:** I-I-I do not. I-I do not think he would be convicted. Um, I think this is a case where there was no crime committed. I don't think we have the wrong person. I don't think a crime was committed. I-I think, um, this was a-a case where tragically, um, a child was, um, chronically and acutely ill, I-I think there was some problems with medication, um, and I think that contributed. Um, but I certainly don't think that this child was aggressed against. But what I've said is, uh, when you have a circumstantial case, we don't know what happened behind those closed doors. I can't say that with 100% accuracy.

I-I would be going beyond my skill set to say what happened behind that closed door. I don't know that. Um, uh, he woke up at 5:00 AM and says he found this child on the floor, and with labored breathing, 'cause she'd been sick for quite a while. He



says he was able to, um, get her feeling okay and put her back to bed. Should he have taken her at 5:00? I wasn't there, didn't see her, don't know, but he testifies that she got to feeling better. And this wasn't a new thing. He had only had her for a couple of months, but you saw the record. You know, 46 times across two years.

Um, put her back to bed, um, then he finds her again, and now he races her to the hospital. Uh, I don't- I-I don't know that any crime took place. And I think if this full record, um, and the testimony from, uh, Dr. Green and other pathologists, I think they would say no crime was committed here at all.

**Representative Leach:** Doctor, thanks for being here. Thank you.

**Chair Moody:** Chairman Darby.

**Representative Darby:** Dr. Phil, thank you. Excuse me. Dr. Phil, thank you for coming today. Uh, your testimony is invaluable to us. Um, first of all, the name shaken baby syndrome, to me, that connotes guilt on the face of the charge. If you've been charged with shaken baby syndrome, it would indicate to me, at least, that, uh, somebody shook that baby to death. And since you were the last person to be near that child, that you were therefore guilty by simply being charged with the name. What are your thoughts on that? Whether psychologically to a jury, just being charged with shaken baby syndrome would indicate in the jury's mind that there was a crime committed, that you've now said perhaps was no crime. What are your thoughts on that?

**Dr. McGraw:** Well, I think you're, um, I think you're exactly right, um, Representative Darby. Uh, in-in psychology, we refer to something called iatrogenic label, uh, where the label it-itself creates more problems than what it describes. Um, and, uh, that is a very toxic label, obviously. And that's why I say I-I think sometimes burden of proof is-is a myth. When a jury hears something like that, they go, "Wow. Uh, if that's not what we're down here for, we have a dead child. And they're pointing fingers over here at this- at this guy, who doesn't seem to be terribly sensitive or upset. Um, and if-if we're not down here for that, somebody needs to give me a really good alternative explanation."

Because they're looking over here. It's just like this setup right here. You got that big state seal up there, and those flags beside it, and you got armed guards over here, and all. And it just-- There's an awful lot of, uh, of entrapments to this situation- trappings to this situation that make it seem awfully official. And then you got this guy over here, and the prosecutor knows the judge, and the judge knows the prosecutor, and they're calling each other by name. And, you know, the-the court clerk, um, and all is just like, "Hi, Betty, how are you today?" You know?

It's like everything seems against the guy that's there for the first time ever. And-and so there's a lot of momentum here. Somebody better have a really good alternative explanation. And there was a really good alternative explanation. The only flaw was it never got mentioned. It never got told. Which is why I made the point that jurors make decisions on what they see and hear, not on what they don't see and hear. All



of this that I talked about today, never got into the court record. It never got reported.

Uh, it-- Nobody ever put all those pieces together until 18 years later, when the Innocence Project, with pro bono lawyers and all come along and start piecing it together. And then they come to me, and I have my whole team at *Merit TV*, and everybody starts coming together. And, uh, now all of a sudden, you-you have a-a valid defense team, and now it's-- You get an alternative explanation.

**Representative Darby:** Well, you know, uh, I made a statement before you came into the- to the chamber here, but the purpose of this body and committee, in my opinion, today, is to examine our current law that's on record, that we created. There was a problem when convicted people could not get their matter heard on appeal because there was not an avenue created by the legislature. We created it. And so in 2013, we addressed that deficiency. I'm gonna-- It'll be a kind of a long-long question, but, uh, if you'll bear with me.

We said that specific facts must be available, that indicate relevant scientific evidence was currently available and was not available at the time of the conviction because the evidence was not discernible through reasonable diligence at the time of the trial. And the scientific evidence would be admissible, under the Texas Rules of Evidence, at a trial held on the date of the application. And finally, the court would have to find that if the scientific-scientific evidence had been presented at trial on a preponderance of the evidence, the person would not have been convicted. Okay.

Now, that did not go far enough. So two years later, in 2015, we passed another law and said, the courts would now consider whether the field of scientific knowledge, not junk science, as we conveniently refer to it. We'd now refer to it as the field of scientific knowledge had changed. The court would also have to consider a new item. Whether a testifying expert's scientific knowledge had changed. And so we-we created those standards. And what I'm- what I'm trying to get to, did we go far enough or did we go too far? For example, it bothers me that the Court of Appeals seems to be taking a higher standard.

They-they say that the evidence must reflect that the accused would be innocent. I don't think that's the standard by which we anticipated or created in 2013 and 2015. This almost, and several of the witnesses, I think they're gonna testify again today. It's almost as though this habeas trial is kinda like a game of football. You're gonna win or lose. I mean, instead of trying to determine, in your words, the goal is to seek justice. It doesn't appear that the- that the functionality that we've created in the Court of Appeals is designed to seek justice, or is it simply designed to see who wins and loses?

That's what's bothersome to me. If we created language that would suggest the Court of Appeals is saying, "No, that evidence has to show the accused is innocent." When I don't think we-- When we voted for this bill in 2015 and 2013, that was a level of examination that-that I don't think we created. So, I guess ultimately, I'll come to a question. The question is, do you think that our current law for scientific knowledge


has changed and whether or not-- We ha- we had a- we had an expert testify who now changed his testimony. Saying that he believes he wasn't innocent. I mean, he wasn't guilty.

Uh, do you think our current, and I've given you the factors that compose what we're trying to address here, is that science has changed. Do you believe that we followed that law, or the Court of Appeals has followed that law? And if not, how do we-- What should we include in statute that will assure that following?

**Dr. McGraw:** Well, I can answer that. Can I answer that in two parts?

**Representative Darby:** Sure.

**Dr. McGraw:** One is, I think it needs, whatever it is, needs to be followed evenly. Uh, I believe it's the Roark case that, um, last week or the week before, um, a-a new trial was granted, correct? But in this one, it-it's not. So, I mean, it seems to me like it needs to be evenly applied. Um, so I'm-I'm-I'm wondering, uh, how-how do you explain that, uh, to Mr. Roberson's family? And then secondly, I-I think there's some simple language, um, that might help. And, now, I'm not a lawyer, I don't mean to brag, but I'm not. Um-

[laughter]

**Dr. McGraw:** -if you added something to it that said, "In the event the filing is on behalf of a convicted person to be executed, the court shall stay the execution and grant the convicted person a new trial if the relevant scientific evidence was not available to the convicted person in light of his or her circumstances, and/or that relevant scientific evidence contradicts scientific evidence relied upon by the state at trial." So, if it's evolved and it wasn't available at the time, they ought to get the best science available that bears on their conviction.

It seems to me, when they're executed, they're executed for a long time. And you see something as clear as the case I cited earlier, about Mr. Byrd, it took from '97 to 2019 to execute one of those perpetrators. Uh, in a circumstantial case, how-how can you not justify saying science has evolved, they get the current science, which is what this says. And I'm happy to share this, if anybody wants it. Um, I mean, this says they get the current science.

**Representative Darby:** Well, thank you for your testimony. We would like them to share.

**Chair Moody:** Representative Bowers. Oh, I will follow up with you, Doctor, uh, and-and take you up on that offer to submit that to the committee.

**Dr. McGraw:** I will.

**Chair Moody:** Representative Bowers.



**Representative Bowers:** Thank you, Mr. Chairman. And thank you, Dr. Phil, for being here today. I am certainly a fan and, um, you know, I know that you-- your show was a spinoff from Oprah. So I-I'm certainly a fan, been a fan for a long time, and I will say to you that I am glad to have this privilege to ask you some questions, 'cause we know you ask the hard questions. You mentioned that a little bit ago. And, um, before I get to my question, my pastor, Richie Butler, said to tell you hello, and that let you know he's my pastor. Um, but I'm so glad I get to ask you the questions, and I didn't get called to your show for you to ask me the questions.

**Dr. McGraw:** Fair enough.

**Representative Bowers:** Um, but I want you, if you can, to take us back, and I promise you I will watch it. I have not watched the interview with Robert Roberson, but, um, can you take us back to that time when you did have a chance to talk to him? Since we won't get to hear from him today, um, in this- in this chamber. And I just wanna know, 'cause you mentioned, and we heard this before, that he was very flat in his responses. And we do know that he was on the- he's on the spectrum.

So I just wanted to know if you can share a little bit more about that time and moment, and what those answers, 'cause you said you asked him some pretty hard questions. And what his responses were like. And what-- You know, was there remorse there? How-how did those responses come out? I-I would just like to hear a little bit more about--

**Dr. McGraw:** Uh, yes, so I-I will. Um, when I-I sat down with him, I-- You know, they-they're-- The Polunsky Unit is, um, one of the best run units in the United States, I have to say. Um, and I've-I've been to many prisons, and talked to many convicted murderers, and, um, that unit is, I-I-I have to say, it's really well done. Um, they-they treat their prisoners with dignity and respect and, um, they-they do- they do things the right way there.

And, um, um, and I- and when I'm permitted to come in, I respect their rules as well, because everything runs-- Order is really important to keep everything running the way it should. And when they tell you that you-you're going to have an hour, I-I really try to respect that. And so I-I sat down with him in the beginning and said, "Um, listen, we're on a time clock, so I'm gonna forego a lot of small talk, and-

**Representative Bowers:** Yes.

**Dr. McGraw:** -jump right into this if it's okay with you." And he said, "Certainly." So, we jumped right into it, and I said, "You're days away, uh, from being executed and, um, you know, I wanna know how you feel about this." And I started asking him about-about things. And, um, I asked him some things like, "Are you bitter? Are you-- How do you feel about this? Are you- are you angry? Are you bitter? Are you-- How-how do you feel?" And, um, and I'm spending as much time hearing what isn't said as what is said. How he's answering and what his eye contact is. Um, and, um, he's very still, he's-he's very flat and-



**Representative Bowers:** Mm-hmm.

**Dr. McGraw:** -very robotic. And, uh, he says he's-he's not bitter at this point. It's been 21 years.

**Representative Bowers:** Yes.

**Dr. McGraw:** And I guess you can stay angry for just so long. And, um, he-he says he's-he-he's really not, and he spends a lot of time in his Bible, and-and reading the Word. And I ask him, um, I said, "You've-you've been in trouble before.

**Representative Bowers:** Mm-hmm.

**Dr. McGraw:** Tell me about-about those sort of things." I wanted to see if he tried to deflect or-

**Representative Bowers:** Mm-hmm.

**Dr. McGraw:** -minimize those things. He was very forthcoming about it. Um, he said that he had gotten into drugs at one time, and that caused him to make a lot of bad choices. And he-he got in trouble for it, and seemed to feel like he should have, that he did things he shouldn't do. Uh, violated his probation and got time added to that, uh, for it. And again, he-he didn't try to minimize or whatever. He was straight up about that. Um, I asked him about his relationship with Nikki, and-

**Representative Bowers:** Mm-hmm.

**Dr. McGraw:** -he said that he had only been around her for a couple of months, and that she was pretty standoffish with him and seemed to kind of be afraid of him, but they had started to break that down some, and that there was some warmth, and she started to sit in his lap and, uh, let her-- uh, let him hold her, and that sort of thing. Uh, I asked him what he did when he was angry, for example. Um, he said he went off by himself and spent time alone. I asked him if he ever put his fist through the wall or slammed doors or broke things or pushed people or yelled and screamed and whatever. And he said, "I just- I just kind of go off by myself. I don't, you know, whatever."

Um, I-I-I gave him some cognitive challenges. I asked him some simple things. Um, like I asked him, "Interpret this saying for me. Shallow brooks are noisy." Um, he-he-he had no idea. I said, "Still waters run deep. How about that?" No idea. I said, "If I gave you a screwdriver, a flat screwdriver, you could screw a screw in and screw a screw out with, what else could you do with it?" Couldn't think of one other thing you could do with a screwdriver. Um, no-nothing. Uh, I gave him some items to remember, and asked him to recall those not after an hour, but after about 15 minutes. I think he got one, uh, out of five. And, um, so he was having trouble. Of course, he's under a lot of stress, too, and that doesn't help.

**Representative Bowers:** Hmm.

Completed: 10/30/2024



**Dr. McGraw:** Um, and then I just asked him straight up, "Did you hurt this child?" And I really watched him. And-

**Representative Bowers:** Yes.

**Dr. McGraw:** -his blink rate is about 12, 13 per minute.

**Representative Bowers:** Mm-hmm.

**Dr. McGraw:** Uh, you go under stress if you ask a relevant question, and people that are lying that blink rate will often go to 70 or 80-

**Representative Bowers:** Hmm.

**Dr. McGraw:** -uh, in a hurry. He didn't change at all. Um, he didn't color up, he didn't stutter, start, you know, changing his patterns at all. Uh, just, "No, no, and no." And, um, I, uh, I asked him if he thought he had had a fair trial, and he-he said no. His lawyer kept saying, "Shaken baby, shaken baby." And I told him, "Why are you doing that? I-I-I-- That's not true. I don't- I don't want you saying that." But he said, "I'm trying to save you from first-degree murder. You know, that's what they're charging you with." But he said, "Well, I-I don't want you saying that."

And he said, "Well, just, you know, sit down and sit down, sit down." And, uh, he was very hopeful that he was going to get some kind of relief here and not be executed. And, um, he thinks he deserves to be free.

**Representative Bowers:** Thank you for that. Um, and thank you for giving us a snapshot of-of what that interview was like. And, um, I certainly will be going back to-to look at it, um, and-and, um, view it. But, um, and-and thank you for-for asking him questions. Like you said, the hard questions, but then certainly some simple questions. So, and-and sharing that with us. I really appreciate it. And I have to say, I'm so glad to be asking you the questions.

**Dr. McGraw:** Thank you.

**Representative Bowers:** Thank you, sir.

**Dr. McGraw:** Yes, ma'am.

**Representative Bowers:** Thank you.

**Chair Moody:** Yeah. Representative Schatzline.

**Representative Schatzline:** Thank you, Chairman. Uh, Dr. Phil, thank you for being here.

**Dr. McGraw:** Good.

**Representative Schatzline:** Um, I said this at the last hearing, and I'm gonna keep



saying it as loud as I po-possibly can. And that is that, um, justice that requires unsubstantiated assumption is not justice at all. And I think that's what's so valid about you being here and you doing that interview. Thank you for using your platform to get truth out. And so I-I had a few shotgun questions for you, um, just to get a 5,000-foot view of anyone who is watching. You said that juries decide this on what they see and hear, not what they don't see and hear. Did the jury know that Nikki had been chronically ill her entire life?

**Dr. McGraw:** No.

**Representative Schatzline:** Did the jury know that she had two recent episodes of a sudden halt to her breathing, or we would call it breathing apnea?

**Dr. McGraw:** No.

**Representative Schatzline:** Did the jury know that she was brought into the hospital with a 104-degree fever?

**Dr. McGraw:** I don't believe that was in the record.

**Representative Schatzline:** Did the jury know that one of the drugs that was given to Nikki is no longer used on children and has a black label because it makes it difficult to breathe for children?

**Dr. McGraw:** No.

**Representative Schatzline:** Did the jury know that she had been diagnosed with bacterial pneumonia?

**Dr. McGraw:** No.

**Representative Schatzline:** And you mentioned that Robert was not perfect and in some ways had a troubled past. And I think it's important to point out, because we're talking about an execution, a state-sanctioned execution. To your knowledge, has Robert ever been convicted of a violent offense before or after this trial?

**Dr. McGraw:** Uh, it's not that we've been able to find. We've seen the burglary and the drugs, but no violent crimes. No assault, no mugging, no assault with a deadly weapon, nothing like that.

**Representative Schatzline:** Right.

**Dr. McGraw:** We've not been able to find anything like that.

**Representative Schatzline:** Right. I would agree with you. So, even though a jury that's never gotten to hear any of these details, is it possible that the bacterial pneumonia, mixed with a combination of dangerous drugs, some of which are no longer available for children because they're deadly, mixed with a fall off the bed, is it



possible that these factors alone could be the cause of death?

**Dr. McGraw:** Well, according to, uh, again, I'm not a physician, but I-I can read, and according to the pathologists that have reviewed this now, definitely conclude that that is a viable cause of death for a vulnerable child that had chronic pneumonia and was septicemic.

**Representative Schatzline:** So, with that being said, do you believe that the junk science law has been violated in Robert's case?

**Dr. McGraw:** Well, I-I think it clearly has, and I think there are a number of exonerations in very parallel cases, uh, to substantiate that. And again, I-I'm not- I don't wanna get out of my lane. I'm reporting to you what the research says. I am not a physician, so I'm telling you what the physicians that have been brought into this case are reporting, and what the medical research that's available to anyone that can read reports, and what other, uh, cases that are a list of exonerations that I can share with you, uh, exonerations have taken place where they've determined that no crime was committed at all, because of exactly the things you're listing out.

**Representative Schatzline:** Yeah. Yes, I agree with you. In fact, the number that you're-you're talking about is 32. 32 exonerations, that we've been able to find, of those that have-- were convicted of shaken baby syndrome. And so, you said that the death penalty hangs in the balance here. And I-I agree with you. So, is it your opinion that a reconsideration by the Criminal Court of Appeal- of Appeals, and giving Robert a retrial actually strengthens the legitimacy of the death penalty in the state of Texas?

**Dr. McGraw:** Well, I think it does. I think there's-there's been over 5,000 years of time on death row served by innocent people that were ultimately exonerated. So, um, and Texas is second only to Illinois in the number of exonerations. So we need to get this right. If we're gonna preserve the-the death penalty, we need to show a commitment to do everything possible to get it right. And if we're not good stewards of that, then we shouldn't have the privilege of asserting it. So, if we wanna preserve it, we need to be really committed to getting it right.

**Representative Schatzline:** I couldn't agree with you more. As a member who is, uh, supportive of the death penalty, I also believe that if we are going to execute people in the state of Texas, we have to be sure, at the highest level that we can, that that person committed this crime. Um, as someone who wants to fight for individual liberties, this is- this is something that has to be at the forefront of our mind, and I couldn't agree with you more that this actually, a retrial would strengthen the position that the death penalty-penalty should be a viable option for the courts in the state of Texas. Thank you for your testimony.

**Dr. McGraw:** Thank you.

**Chair Moody:** Representative Bhojani.

Completed: 10/30/2024



**Representative Bhojani:** Thank you. Thank you, Chairman and Vice Chairman. Thank you, Dr. Phil, for being here and for letting the committee know numerous issues, uh, including the tunnel vision in trials. Uh, this is- that is a focus too narrowly on one explanation, which happened to be here, shaking- shaken baby syndrome. What changes would you suggest to prevent this kind of confirmation bias from affecting investigations and trials in the future?

**Dr. McGraw:** Well, I think there has to be, um, some focus on, uh, being sure that we aren't looking over our shoulders and doing what's historically been done, but if we get into a situation, somebody has to be willing, uh, to step up and say, "Where are we now?" Things are changing at a really rapid rate. We're learning so much more, um, a-about how things are happening, and medical science is advancing, uh, as is, we-we-we've seen it with DNA, we're seeing it with shaken baby syndrome, we're-we're seeing it a-across a lot of different fields.

So, we just need to be sure that our prosecutors, um, are really held to a standard of looking at where science is in a given area in circumstantial cases. And I say circumstantial cases because these are-- No-nobody was there that morning, so they have to look at all the circumstantial cases. And I also wanna say that the people at the hospital that morning who waved a red flag and said, "Hey, we need to take a look at this." Were not wrong.

When-when somebody shows up with a baby that is in distress like that, and you've got somebody standing there, and they don't seem terribly concerned about it and all, look, those are social worker psychological red flags. And somebody should pay attention to that because oftentimes they would be exactly right. Uh, there's a lot of- of abuse that happens with children, uh, and-and somebody, I-I would rather be wrong 99 times than miss one for sure.

So, I-I do not fault those people for asking that question and saying, "Hey, timeout, let's see what's going on here." But asking the question, and going down a-a tunnel vision, and-and-and snowballing somebody to death row are two different things. Somewhere along there where you ask the question, that's valid, but then not saying, "Okay, but let's wait a minute here. Let-let's-let's ask all the questions. Let's-- What's this child's medical history? Uh, what's the-- Let's- we've got a lung scan." They didn't wait for the lung scan before they determined it was shaken baby syndrome.

Let's-- They-they called for a-a-a brain scan and a lung scan and did not wait for the results before they decided what they were gonna do. Um, and-and that's my problem. My problem is not with them saying, "Hey, red flags here. We need to start asking some questions." Not a problem with that. The problem is they didn't follow up on available science to determine whether or not this was a chronically and acutely ill child. This child was septicemic, this child, uh, had, uh, chronic pneumonia, and there were scans done that they didn't take into account.

Not-not even the medical examiner took them into account. The medical examiner admitted a list of things that were not looked at. That's the problem. If you're gonna


see the red flags, and you should, then make sure you check all of the-the different, uh, a-areas that you can get data from.

**Representative Bhojani:** Got it. Thank you. One more question, quick question. I know there are a lot of people here that are-are listening in, that care about, you know, people live with autism. So, in future cases, how can we ensure that individuals with autism spectrum disorder receive appropriate accommodations during the trial and post-trial proceedings, they're treated fairly and their needs are fully considered in the justice system?

**Dr. McGraw:** Well, this was not diagnosed until 2018. So, no one, uh, no one gave, uh, Mr. Roberson the opportunity to be evaluated. Um, and I think it-- I-I-I did not see him 21 years ago, but I can tell you in spending time with him, and I just spent an hour with him, I cannot diagnose this individual in an hour through a glass and all that. So, but I can tell you this, we're talking about red flags. In the hour I spent talking with him, um, questions were going off in my mind about his ability to assist in his own defense.

Um, and if he was anywhere near that level of functioning 22 years ago, someone should have stepped up and said, "This individual needs to be evaluated, and the state needs-needs to do that." Now, I-I-I don't know, uh, what that evaluation would have shown. I can't-- All I know is that I've seen the report that he, uh, is on the spectrum at this point, um, and all- but I-I can't diagnose him, but I can tell you big red flags were going off when he couldn't, um, he was not showing the cognitive agility or the reasoning that I-I would have thought you would want to assist in your defense.

And so I-I would have thought an advocate would have been really nice to have-have him, um, at his side during that trial. And, uh, the autism community now is, um, so great in, uh, assisting those. Um, but I-I think that he needed to be evaluated at the time.

**Representative Bhojani:** Okay. Thank you.

**Chair Moody:** Representative Harrison, did you have any questions?

**Representative Harrison:** Yeah, just a couple quick ones that you've covered this rather extensively. Thank you so much, uh, for that. Um, just wanna go back to a couple of things. Um, one from your previous discussion with, uh, Chairman Moody on something that I-I have found concerning and I'd like you to maybe clarify some of your previous remarks with him, because I have been surprised to see, over the last few days, the state now start making assertions that this was-- That the prosecution was not predicated on a shaken baby syndrome hypothesis.

And that in fact this was not that, but that this was effectively a battery case, and that this child had been beaten. Um, how would you characterize those representations that we are now hearing from the state?



**Dr. McGraw:** Well, um, I-I-I think a-a-a careful analysis of the trial record, um, would suggest otherwise. I think all you have to do is look at the trial record, and go through and look at their arguments, and they tried the shaken baby case. I mean, if-if nothing other than the defense, uh, boding the jury on shaken baby, doing an opening statement on shaken baby, and doing a closing argument on shaken baby, uh, that's certainly what they were defending. Uh, if-if nothing more than his own representation, uh, it was a shaken baby- [laughs] it was a shaken baby case.

**Representative Harrison:** And-and that's absolutely consistent with my examination of the record in this case. And it-it was one of the early things that struck me. And-and tell me if I'm wrong here, if I'm oversimplifying this. I wanna get it right. You effectively had a case where the state, the prosecution was arguing shaken baby syndrome. And the defense attorney, his counsel said, and I believe it's a direct quote, "Yep, classic shaken baby case."

**Dr. McGraw:** I believe-

**Representative Harrison:** And given that 20 years ago, you could presume abuse, what-what-what was left for the jury exactly to decide?

**Dr. McGraw:** Yeah. It-it was just-- I-I think the argument from the defense was, um, it wasn't-- It didn't rise to the level of first-degree murder, that he snapped, or-

**Representative Harrison:** Mm-hmm.

**Dr. McGraw:** -it wasn't premeditated or whatever. Just that he lost it in the moment.

**Representative Harrison:** So-so, was there any arguments or evidence that the jury heard that this was not a shaken baby case?

**Dr. McGraw:** I-I think there were other things that went along with it, uh, that there were bruises on the left hand- left side of the face, to the jaw and to the chin, and multiple trauma to the head, but I-I think that you-you have to break it down and say, "Well, when was the trauma to the head?" Because in the-- From admission to the hospital-

**Representative Harrison:** Mm-hmm.

**Dr. McGraw:** -to the time the pathologist got involved, there were other insults to the head in lifesaving efforts. Where you try to do things to relieve pressure off the brain, but those- [chuckles] those weren't there when the baby came in, they were done when they started doing things to try to relieve the pressure.

**Representative Harrison:** Right. So-so, how much time, to those things that-that you said they were related things that kind of were brought up. How much time at the trial was spent explaining to the jury any alternative explanations for either the shaken baby triad, or for the other things that were observed on the baby? [crosstalk]-



**Dr. McGraw:** None that I could find.

**Representative Harrison:** Yeah, none. So, was there- was-was there-- Is it fair to say that there was-- Or I'll ask that, was there direct evidence of abuse at trial at all, or was it all circumstantial?

**Dr. McGraw:** It was all circumstantial. Well, uh, it was all circumstantial or reported by witnesses who later said, well, later impeached themselves by saying, "I was coerced into saying this with threats from Child Protective Services, or implied threats from Child Protective Services," or whatever. That changed their testimony.

**Representative Harrison:** I hear a lot of people out there right now saying we should just-just trust the jury. They convicted him. In your opinion, is it even a debatable question whether or not the jury had all the evidence necessary to make such a- such a decision?

**Dr. McGraw:** Well, I have to answer that, uh, two ways, Representative Harrison. I think jurors tend to get it right.

**Representative Harrison:** Mm-hmm.

**Dr. McGraw:** Uh, day in and day out, I think jurors tend to get it right.

**Representative Harrison:** Mm-hmm.

**Dr. McGraw:** Based on what they see and hear.

**Representative Harrison:** Correct.

**Dr. McGraw:** Based on what they see and hear, I think the collective IQ of a jury is 1200. I think you send them back into a room, I think most people take it seriously, I think they put their heart into it, and I think they get it right, based on what they see and hear. And I think they probably got it right in this case based on what they saw and heard. But they didn't see and hear everything they needed to see and hear to render a just verdict.

**Representative Harrison:** Do you think that's even a debatable question?

**Dr. McGraw:** Not even close.

**Representative Harrison:** Yeah. Um, if I can dig in real quick on something you-you just said, you mentioned that witnesses that may have impeached themselves. Can you give an-- is there a particular example or a particular witness that you're thinking of?

**Dr. McGraw:** Well, uh, yeah.

**Representative Harrison:** If-if there's not, it's okay. I, um--



**Dr. McGraw:** No, uh, it's-it's okay. Um, there are witnesses that testified, um, at trial, and, um, they were witnesses from, um, his, uh, past. And, um, uh-

**Representative Harrison:** The reason I actually asked, because Representative Schatzline a minute ago had made a question about, you know, whether there were substantiated or un-unsubstantiated, um, discussion of-of violent behavior in the past that came out at trial.

**Dr. McGraw:** Yeah. Okay. On page 12 of the main document.

**Speaker 1:** Of the- of the book.

**Dr. McGraw:** Okay. Got it. Let me turn to it here. Um, uh, Teddy Cox, who was Robert's girlfriend at the time, um, she was going to be, uh, the subject of a CPS investigation, so she was urged to provide information to implicate Robert, um, and was confined to a psych ward, and admitted on the stand that she changed what she said about Robert based on how she felt at the time. Uh, but rebuttal witness, Patricia Conklin, Teddy's sister, said Robert had a loving relationship with Nikki, never saw Robert spank Nikki, and Teddy had a poor reputation for truthfulness.

**Representative Harrison:** And this-this was one of the individuals that testified. That provided the witness testimony that I keep hearing about all over the place on social media. That there was evidence that he was a violent person.

**Dr. McGraw:** Yes. Della Gray, his ex-wife and mother of his two older children, uh, said that he was physically abusive, but interestingly enough, uh, said she was scared of Robert, but during their divorce proceedings, never reported any of this suspected abuse to authorities, and had a history of alcohol and drug abuse, and she lost custody of the children, and never brought any of this out. Um, she claimed, in the 2003 trial, during their divorce proceedings in the 1990s.

So, you kind of have to look at what they said at the time versus what they said when they had an agenda. Um, and, um, so I-I think these witnesses, when they were looked at as to their motives and/or were asked hard questions, tended to change their [crosstalk].

**Representative Harrison:** So, to the best of your knowledge, no-no jury has ever found him guilty of any violent acts in the past that you're aware of?

**Dr. McGraw:** No. He's been accused of it by people that had an axe to grind, but no evidence to substantiate it.

**Representative Harrison:** Real quick, um, to-- as brief as you can, what would-- how would you characterize the effect on our criminal justice system if Robert is executed in the near future?

**Dr. McGraw:** Uh, I think it would-- Um, I-I think if people really drilled down on the facts of this case and thought, given these facts, you can be executed, uh, against a



standard of reasonable doubt, I-I think it would be horrifying.

**Representative Harrison:** Horrifying. The impact on our criminal justice system if he's executed without further due process being afforded to him.

**Dr. McGraw:** Yes.

**Representative Harrison:** Is that what you're saying?

**Dr. McGraw:** Yes. I don't think he's had due process, and I don't think he's had a fair trial, and I think he should. And if at the end of all of this being presented, the decision is that he's guilty and should be, um, executed, then, um, that's a completely different story. But I think that- I think it should all be heard.

**Representative Harrison:** And all-- Just in closing, if you could maybe just, even one or two words, if you can, and just tell us whether you think these are more fact or more opinion, 'cause I know you've made a point to distinguish what you believe is fact in the case from opinion. Do you believe our-our junk science law, as intended by the legislature, has been appropriately applied in Mr. Roberson's case?

**Dr. McGraw:** I do not.

**Representative Harrison:** How firmly do you feel about that?

**Dr. McGraw:** I feel very strongly about that, because the science has evolved, and we have cutting edge experts in this case that have taken very strong positions that the cause of death in this case, um, that the cause of death in this case is more probable, um, from medical complications than abuse.

**Representative Harrison:** And if I, um, wrote down my notes, but just a quick confirmation, you firmly believe his due process rights have not been adhered to here. And-and how confident are you of that?

**Dr. McGraw:** I'm very confident that due process, um, can only be, uh, uh, can only be claimed if he is given an evidentiary hearing, which will lead to a new trial.

**Representative Harrison:** And if I wrote down correctly a minute ago, did I hear-hear you correct that in this case, your personal opinion is that no crime has been committed whatsoever?

**Dr. McGraw:** Based on the new evidence, um, from the experts, um, I-I think no crime has been committed here.

**Representative Harrison:** Thank you, Doctor. Thank you, Chair. Thanks for being here.

**Chair Moody:** Doctor, I appreciate your time. And, um, you know what, I wanna say this also. I appreciate your extensive research-



**Dr. McGraw:** Yeah.

**Chair Moody:** -into the record, in your preparation for your testimony here today. I appreciate you taking this, uh, with a great deal of seriousness. That-that we are evaluating what happened here. And for us to be able to evaluate that, we do need to rely on people that have done a deep dive into things. Uh, and-and I am- I am grateful that you have taken the time, energy, and effort, you and your team, to do that deep dive, because you wouldn't be able to answer any of these questions if you hadn't have done that research.

**Dr. McGraw:** Well, I have this knack for getting gigs where somebody does all the work and I get all the credit. And, uh, Stephanie Grenadier and her team at *Merit TV*, and the Innocence Project, and all of their people, we've-we've all worked very hard to figure this out. Um, and most of it was done before I agreed to take on the case, because I had to, uh, I had to figure out whether this was someone that, uh, I-I could passionately get behind.

**Chair Moody:** Well, uh, I certainly appreciate the time you put into it, and I think that, uh, that has certain-certainly shown through in your testimony today.

**Dr. McGraw:** Well, I appreciate the committee, and if I've, um, if-if-- I've kind of been doing this off the top of my head here as we've gone through this, and, uh, if-if I've misspoken or misstated any fact, it's all in the record here, and I'll correct it as if I- if I check anything, if I got a date wrong or something like that, I'll-I'll, uh, certainly correct it. The record is what it is. The trial record is what it is. If I said four and meant five or whatever, I'll let the record speak for itself. Certainly, what I've said is directionally correct.

**Chair Moody:** Well, we certainly appreciate your time and-

**Dr. McGraw:** Thank you.

**Chair Moody:** -and taking, uh, taking so much of-of-of your-your day to be with us here today.

**Dr. McGraw:** Well, thank all of you for taking this so seriously and speaking up for-- This is not just about this man, it's about the process. And, um, I-I hope it comes to a-a good outcome. Thank you for allowing me to speak here. It's an honor.

**Chair Moody:** Thank you.

**[pause 02:53:38]**

**Speaker 2:** Grisham.

**Chair Moody:** Hmm?

**Speaker 2:** Grisham.



**Chair Moody:** Yeah. This time the Chair calls John Grisham.

**[pause 02:55:08]**

**Speaker 2:** It's on mute.

**Chair Moody:** All right, let's see. Bullet. [silence] Mr. Grisham, are you able to hear me?

**Mr. John Grisham:** I can hear you. Yes. Can you hear me?

**Chair Moody:** Okay, perfect. All right. And now we can actually see you as well. Sir, my name is Joe Moody, I'm the chair of this committee. I appreciate your, uh, your accepting an invitation to offer testimony here today. Um, so that certainly wanna be respectful of your time. Before we start, I do have to, just as a matter of housekeeping, I have you listed as, uh, uh, um, John Grisham, representing yourself today and testifying neutral on the item, uh, before us. Is that correct?

**Mr. Grisham:** Yes. I guess I'm neutral. I'm not-- I'm-- I don't feel too neutral, but I'll-I'll say neutral.

**Chair Moody:** I-- So I'll-I'll be very clear, I don't anticipate you are very neutral in this matter whatsoever, uh, but the-- because there's no actual piece of legislation before us, you're technically, uh, every witness that's testifying before us is neutral. So, um, not to get into the-the-the mechanics of it, but I appreciate that. Um so with that being said, that all is correct?

**Mr. Grisham:** Yes. That's all correct. Yes.

**Chair Moody:** All right. Then I-I don't wanna, uh, I don't wanna take too much time on the front end. I know members might have questions once we hear from your testimony. I certainly know that, uh, the-the-the committee is specifically interested in how you got involved in Mr.-

**Mr. Grisham:** Sure.

**Chair Moody:** -Roberson's case. Uh-

**Mr. Grisham:** Sure.

**Chair Moody:** -maybe-maybe some of your background, your experience as a trial lawyer, um, how you've interacted with other issues related to wrongful convictions, and-and-and-and-and ultimately got involved here. Uh, and anything else, obviously, that you wanna offer. Uh, we'd appreciate that. Thank you, sir. And I'll-I'll turn it over to you.

**Mr. Grisham:** Well, sure. Uh, chair, uh, Chair Joe Moody and-and members of the, uh, Committee on Criminal, uh, Jurisprudence, thanks for the invitation to-to be here,



and say a few words. I-I, um, wish I could be there. Uh, it's much, much more effective. And, uh, uh, Austin's one of my favorite cities. Um, I apologize for not having prepared remarks. Uh, I've-- Um, I'm on a book tour. I don't work that much, but I'm working this time of the year when I publish. So, I've been on a lot of airplanes, and I just got to New York, and I, uh, so I'll just ramble for a few minutes and then, uh, take some questions.

Um, I sort of know what you're doing, uh, because, um, years ago, I was a member of the House Judiciary Committee and the Mississippi House of Representatives, and I had that for two terms, and we had a number of committee hearings as you do. Uh, I don't miss any of them. Uh, so I sort of know what you're- what you're going through, what you're doing, uh, but none of those hearings back then were nearly as important as this one right here. Uh, so it's my, uh, it's my, uh, honor to be here, to speak for Robert Roberson. I'm also honored to be here to, uh, offer a few words of great admiration, uh, to this committee for your actions, um, last week.

You-you literally saved a man's-- an innocent man's life. Uh, you took a bold stand against, um, injustice at the precise moment when the courts and the leaders of the state seemed hell bent on executing, uh, Robert. Uh, if not for you, uh, Robert would be in his grave today. Uh, your actions were, um, creative, to say the least, fascinating, unique, uh, courageous, uh, bipartisan, and heroic. And we all watched in disbelief last Thursday night. Uh, not just, you know, in Texas, but around the country, uh, and around the world.

I've talked to journalists in Europe the past few days doing book stuff, and they are fascinated by this case, and by the actions that this committee took last week. So, uh, you were- you were- you chose to dig deep, uh, and to, um, find the truth and recognize that Robert's life was worth fighting for.

So I'm honored to be here to meet you. Uh, Robert doesn't need me, uh, to speak for himself. He has a, uh, as you know by now, a great legal team made up of lawyers, uh, from Texas, Washington, and New York, who have worked for many years to prove his innocence. Um, one of those lawyers is a friend of mine in Washington. And about eight months ago, he asked me to, um, take a look at the case, uh, with the idea of perhaps writing an op-ed piece for a major newspaper. And I said, "Sure."

I've been on the board of the Innocence Project in New York for a long, long time, and for the past 15 years or so, we have been more and more concerned about the shaken baby syndrome, shaken baby convictions. It's something we have studied. So I was s-somewhat familiar with-- uh, with that problem, and I said, "Sure, I'll-I'll take a look." Um, my, um, understanding is that last week you guys got a-- I mean, you committee members, got a lot of, uh, testimony about the medical and scientific evidence now available that proves that Nikki did not die because she was shaken to death by anyone.

Uh, she died because of viral pneumonia, and we can prove that. Um, I'm a-- um, I'm not a scientist. I'm not a doctor. Um, I'm a lawyer and I practiced criminal law in a


small town in Mississippi for 10 years. And I had a lot of cases, a lot of clients, a lot of jury trials. I tried, uh, over 100 jury trials in 10 years. And-and I-I came to really respect the idea. We just believed in the idea of a fair trial. We all-- we still do. All Americans believed in the idea of a fair trial. We at least paid lip service to that. Uh, and I never had a client in 10 years, I thought was wrongfully convicted.

Um, I knew the judges, the prosecutors, the-the policemen, we all-- the game was played fairly. And I just never thought about wrongful convictions until, uh, I'd written probably 20 books. And I-I saw this case that-- out of Oklahoma, that fascinated me about-about a man my age who went to death row and came within five days of being executed. And so I wrote my first nonfiction book, the *Innocent Man* published in 2006, about Ron Williamson and what happened to him. And it was a fascinating entry into the world of wrongful convictions.

I-I have since become convinced that there are a lot of innocent people in prison, and that's why I do-do this work. That's why I get involved in these cases. Um, as a lawyer, it-it always bothers me when I study a case like this and I real-- I realize how unfair the trial was, um, because I've been in that-that courtroom-- those courtrooms many times, and I know what it takes to have a fair trial. Uh, Robert's trial was grossly unfair. Uh, there was nothing even, well aside from junk science. The science was terrible. The science has been debunked and discredited and disproven now for the past 15 years.

We know it's bad science. Um, the science was terrible. The jury selection was awful. From the opening bell, the prosecutor was allowed to point a finger at Robert and call him a, you know, a baby killer, whatever. That persisted throughout the trial, uh, until the- until the closing argument. Uh, the-the absolute low point in the trial was when a, uh, ER nurse was allowed to testify that Nikki, who had been sick for her whole life, but her sick-- really sick the week before she died, uh, she had, you know, violent diarrhea, fevers, upset, stomach, everything.

Uh, a nurse was allowed to testify that she saw signs of sexual abuse looking at the child's anus. And there was no allegation of sexual abuse anywhere. It was not proven, uh, by the autopsy. There was nothing there. But she was allowed to testify. When I was-- the-the defense lawyers, to their credit, uh, you know, objected. When I was a lawyer, that would've been grounds for an automatic mistrial. There's no way a prosecutor could get by with that in most courtrooms throughout the country. That's a mistrial. You stop right then and you say, "Stop it," and the jury goes home and you try again.

That didn't happen. The judge waved it through, and the prosecutor was allowed to keep use-- using the sexual abuse language, even in his closing argument. The trial was a farce. It was a pathetic trial. And that's where-- that's what I go back to in these cases. If we could go back and get a fair trial, and I think that's all Robert and his lawyers would love right now, is to get back into court, have the CCA declare a new trial. Let's go back to Palestine, Texas to Anderson County, or maybe change venue, whatever, and let's have a legal team that Robert can have with as many



lawyers as the prosecution, as many experts as the prosecution, uh, as much money as the prosecution.

Put the jury in the box and let's have a fair trial. That's all we're asking for. Um, I'll stop rambling now. I just listened to Dr. Phil and I'm, uh, astonished at the amount of research he and his staff, uh, put together in preparation. It was truly remarkable. Uh, I'm not that well-versed in the case. I'm a-- I came to it lately. I've come to it lately, but I'll try to answer any questions you may have.

**Chair Moody:** Well, Mr. Grisham, I certainly, um-- certainly appreciate that. I know you've-you've looked at some of this from a- from a-a nationwide level, right? These wrongful convictions and-and some of that that-that you've been able to delve into. Are there trends that you see, problems that emerge, things that would be helpful to-- for the committee to under-understand that you've seen in your broad-- kind of broad brush strokes over the-- over this-- uh, this issue nationwide?

**Mr. Grisham:** Sure. I mean, you start with junk science. Uh, with the Innocence Project, we have, I think our number is 370 or 375 around that, uh, DNA exonerations in the past 30 years. These are clear-cut DNA, you know, cases where they got the wrong guy. We were able to exonerate, which is not always easy even with DNA testing that you pass. But in those cases where we have the exonerations, junk science is prevalent in half the cases. And it's-it's-it's-- uh, excuse me, hang on. It's-- um, it's-it's-it is the bad analysis. It's like, uh, bite mark analysis, hair analysis, boot print analysis, arson analysis, and shaken baby.

There's just more-- there's so much junk science in our court-courtrooms and have been for the past 50 years. Unqualified experts giving opinions that are not driven by science. So junk science is a huge factor. Uh, there-there are many other factors that lead to wrongful convictions. Um, most of them are not-not present in Robert's case. And in some cases, you have everything. You have- you have the lying jailhouse snitch, the paid informant. You have false confessions, you have incompetent defense lawyers.

You-- there's a long sad list of reasons for wrongful convictions, but junk science is by far probably the-the biggest factor that we could do something about. And Texas has done a wonderful job with the- with the commissions founded in 2005, with a law you passed in '13, the amendment in 2015, um, Texas is at the forefront of cleaning up the forensics. I wish all states were doing that.

**Chair Moody:** I appreciate it. I think that's-- I think that's-- uh, I think that's-- we've seen a little bit of that. We've done some research into-- um, in fact, we did some research after the- after the death of Timothy Cole here in-in Texas on-on wrongful convictions. And what kind of some of the- some of the common threads were in-in those-- uh, in those cases so that we could start to address them. Obviously, junk science was addressed in particular in this-- uh, in this- uh, in this provision. And so, um, I think those are some-- uh, I think those are some very good points that everybody can take-take forward.



Um, I do wanna make sure, and I- and I-I wanna respect your time. I know we've got a-a limited-limited time to visit with you, but I wanna make sure if there's anybody have questions. I don't want to-- I don't wanna monopolize the short time that we have to visit with you. Anybody down here?

[indistinct conversation]

**Chair Moody:** No. Over here? Then I will-- um, it-- well, actually, I have a lot I want to go into about DNA cases. I want to be respectful of your time, [chuckles] um-um, to-to make sure that-that-- oh, sorry. Yes. Uh, sorry. I do have a question. Chairman Leach.

**Representative Leach:** Yeah. Thank you. Thank you, Chairman Moody. Mr. Grisham, thank you for joining us. Let me just ask you, uh, one question. Um, and I've-I've read a number of-of your books, and, uh, Mr. Grisham, uh, actually decided to go to law school myself and become a lawyer, uh, largely because of-of so much of what I've-- uh, what I've learned and gleaned about the practice of law and the importance of-of honest and good and knowledgeable and passionate lawyers, um, on both sides. Can I just ask you, as-as someone who sees the legal landscape nationwide, and you- you've, uh, written about, you've researched, you know a lot about these cases.

You've-you've committed yourself to the, uh, wrongful, uh, exonerations, I'm sorry, wrongful convictions and making those right. What do you think it's gonna take, um, understanding where we are right now in this case. Where-- what-- if you were us and you're trying to make the case, um, to the other branches of government to give Mr. Roberson a new trial, what would you focus on? What to you are the most troubling aspects of this case and what's it gonna take your opinion to get to achieve justice for Mr. Roberson?

**Mr. Grisham:** Well, I hope it's not a disaster. I hope it doesn't take a wrongful execution. We do not-- To my knowledge, we do not yet have a case involving clear DNA proof that we've killed the wrong person. The, uh, death penalty information center tracks all types of data for, uh, wrongful convictions and for death penalty, uh, cases. And they list about, on their website, they list about 20, uh, cases of probable innocence. Okay. Half of them are from Texas. Uh, these are probable, you can't-you can't really prove them. Okay?

They're close. There's no DNA- there's no DNA case. And so, years ago, I wrote a book about the-the premise was what are we gonna do as a nation when we wake up one day and we know by clear DNA proof, we just killed the wrong guy? That's a great question. I can't answer it. I don't know. Uh, I-I'm afraid we won't do much at all. Um, I am- I am encouraged by the declining number of death verdicts around the country, the declining number of, uh, executions, and the number of states that are out long the death penalty.

That's-that's a good sign. I tell- I tell my friends all the time, people who I grew up in supporting the death penalty because I grew up, you know, in Mississippi, Southern



Baptist and all that. I tell people all the time who support the death penalty. Uh, you can't support this death penalty. But you can- you can-- I can make one-- I can show you how to make one fair if you wanna- if you wanna make it fair for everybody. And-and keep in mind, most of-- most capital murder defendants are-are guilty. The crimes are horrible. Uh, but there are too many innocent ones. You-you could--

**Representative Leach:** Mr. Grisham-Grisham, would you- would you agree though, and-and that's-that's one area on which you-you and I might-might, uh, well, we definitely do disagree because I myself I'm a, um, death penalty supporter in the most heinous cases, much like Dr. Phil described earlier. But like-like Dr. Phil and I think like you and hopefully all of us, we can agree that the worst thing we could do for our criminal justice system is to execute someone who's potentially innocent. Certainly, someone who's definitely innocent,-

**Mr. Grisham:** Mm-hmm.

**Representative Leach:** -but even someone who is potentially innocent. With such-such substantial questions in a case such as this, um, put-- wouldn't you agree that-that pushing the pause button and going back and simply affording a new trial in front of an unbiased trier of fact so all of the evidence can be heard? Wouldn't you agree that-that that is the only right option?

**Mr. Grisham:** Yes. Especially in a case like this one where the chi-- where the science has changed. Now, not all- not all cases have this. Not all cases have, you know, science has changed so much, science has been discredited or-or-or-or, uh, you know, uh, proven to be not correct. But when-when you have a case like this where the science is just wrong, okay? It was wrong 30, 40, 50 years ago when it was first developed, sure, you have to go back to a fair trial. Let's do it all over again. Well, what's-what's the hurry?

**Representative Leach:** Right. Right. Thank you, Mr. Grisham. Appreciate your time today.

**Mr. Grisham:** Thank you.

**Chair Moody:** And-and before-before I let you go, I just, I think about this. Because DNA becomes kind of the gold standard in exonerations. I mean, when we have actual innocence cases in Texas, that's-that's kind of, we require that to be part of the-the combination of factors that-that-that's considered. If we don't have that, then you don't get to the actual innocence piece. Like we feel so strongly about DNA evidence and its reliability. Um, that's the weight we give it. But in many of those cases, in-in fact, I'll just ask you, I mean, you've looked at cases that were later, uh, later ended in exonerations via DNA evidence.

In those cases prior to the DNA exonerating that individual, weren't there people crying out loud that this-this individual is still guilty, they're guilty of sin, they did this, they-they-- they're adamant about the guilt of this individual. And then later, DNA evidence, uh, comes-comes out and exonerates them.



**Mr. Grisham:** Happens all the time. And-and we-we-we-we worship DNA, however, in most murder cases, there's no DNA, there's no body fluids, there's no-- there's nothing left behind. You know, so you have to go back to, uh, other forensics ballistics or, uh, i-i-identification or whatever. You know, most cases don't have DNA, uh, testing available. So those are much more difficult cases, uh, to exonerate than DNA. DNA has-has been a lifesaver. And-and the police are using DNA more more to-to solve crimes to-to their credit.

**Chair Moody:** Well, and-and I think- I think you made the point I was trying to make, which is if people will shout from the rafters that this person's still guilty over and over, and then DNA later exonerates them, but DNA is such a limited number of cases. It-it reasons to follow that in non-DNA cases, there are people still shouting that this person's still guilty, but in fact, they probably are not.

**Mr. Grisham:** Yeah.

**Chair Moody:** I mean, it-it has to-- those have to correlate. They have to correspond. I just-- uh, you know, we have such rare opportunity to have DNA evidence, which we all have a great deal of respect for, but all of these other cases that you just stated don't have that. And so, you know, that's-that's where a lot of this type of, um, procedural law comes into help, um, alleviate those gaps where we don't have the gold standard like DNA. So, um, now, I'm-I'm-I'm certainly grateful for your time and I wanna make sure-make sure none of the other members have questions.

Uh, wanna be respectful of your calendar, and, uh, do you have any more? No. Mr. Grisham, thank you so much and-and thank you for taking the time.

**Mr. Grisham:** Thank you very much.

**Chair Moody:** Thank you. Chair now calls Terre Compton.

**[pause 03:16:46]**

All right. She'll be--

**[pause 03:17:08]**

Good afternoon, Ms. Compton.

**Ms. Compton:** Good afternoon.

**Chair Moody:** Um, let's do this. Um, these are- these are fairly directional mics, so for us to be able to hear, you got to--

**Ms. Compton:** Get closer.

**Chair Moody:** Yeah, if you can- you can actually pull the whole microphone up to you. That'll work real well.

**Ms. Compton:** Like that?

**Chair Moody:** Yeah, that'll be perfect. Um, before I have you testify, uh, just wanna make sure I have this correct, uh, your name is Terre Compton.

**Ms. Compton:** Yes.

**Chair Moody:** You're here testifying on behalf of yourself, correct?

**Ms. Compton:** Yes.

**Chair Moody:** Okay. And you are-- you checked that you are neutral on the topic today?

**Ms. Compton:** Yes.

**Chair Moody:** Okay. Um, do you have prepared remarks for the committee today?

**Ms. Compton:** Yes.

**Chair Moody:** And then, you know what? I'm gonna let you start with that, and then we'll ask some follow-up questions if we have them.

**Ms. Compton:** Okay.

**Chair Moody:** Thank you for being here. Let me ask you this. When did you get into Austin?

**Ms. Compton:** Uh, about 11:30.

**Chair Moody:** And where-where'd you come from?

**Ms. Compton:** Palestine, Texas.

**Chair Moody:** Okay. Well, I want to say thank you for taking the time to be here with us today, and I will let you give your comment. Thank you.

**Ms. Compton:** Okay. Thank you. Uh, good afternoon, everyone. It is a great honor to be here testifying before this committee. My name is Terre Compton. I was one of the 12 jurors on the case of Robert Roberson's trial. And I took that position very seriously. Um, everything that was presented to us was all about shaken baby syndrome. That was when-- that is what our decision was based on. Nothing else was ever mentioned or presented to us to consider. If it had been told to us, we would've-- now I would've had a different opinion and I would've found him not guilty.

**Chair Moody:** I first of all, want to thank you for-for being here, and I know it was not an easy thing for you to get here. I know you have a lot of obligations back home. Uh, so I'm grateful for the time you spent. Um, I know that, uh, I know that Mr. Harrison had some questions for you. Um, and I know some of the other members


have questions for you, uh, if that's okay, but I'm gonna allow him to-to ask you questions first, if that's okay with you?

**Ms. Compton:** Uh, yes, sir.

**Chair Moody:** Okay. Representative Harrison.

**Representative Harrison:** Thank you, Chairman. And, uh, Terre, thank you for being here. Um, you drove a little- you drove a little ways to get here and-

**Ms. Compton:** Yeah. [chuckles]

**Representative Harrison:** -uh, my understanding is, uh, you've got a pretty busy, uh, life on the home front. Tell us just a couple sentences about that.

**Ms. Compton:** Uh, yes, sir. Um, I raised, um, three kids of my own, and I have multiple grandkids. And then I ended up having to adopt my four youngest grandkids and I am now raising them. We adopted them, me and my husband. My husband is 86 years old and has multiple like heart problems and stuff. He has a LVAD on his heart to where his heart is being pumped off of batteries. I am 69, so having to take in a 13-year-old, 11-year-old, a 7-year-old, and a 5-year-old straight-- the younger two we brought home straight from the hospital.

Needless to say, it is a very life-changing experience.

**Representative Harrison:** Yeah. Without a doubt. And God bless you and-and him. So you and your 86-year-old husband are raising four young children right now?

**Ms. Compton:** Yes.

**Representative Harrison:** And you live in Palestine, but you-you took the time to drive down here. Did your husband come with you or is it just you?

**Ms. Compton:** He was going to, but he didn't feel very good today, so I brought my daughter instead with me.

**Representative Harrison:** Wonderful. Well-well, thank you for, um, making being here a priority today.

**Ms. Compton:** It was very much a priority to me.

**Representative Harrison:** It's, uh, important for the committee to hear your perspective on this because you were-- uh, or maybe I'll-I'll ask it as a question. Were-were-- you-you were-- and you mentioned this in your testimony, you were on the original jury that convicted Robert Roberson. Is that right?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** And one of the reasons I think it's so important we hear



from you is because I hear a lot of people saying right now that we've got to trust the jury in-in this case. Um, and you were one of them. And the jury convicted him of murder and you are one of the-the jurors that cast a vote to convict him of murder. Is that right?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** So it's really important we hear from you. How, um-- and I've got several questions. So as-as short as you can kind of make this, what-- um, what made you feel that he was guilty of murder, that led you to cast that vote of-of guilt for him?

**Ms. Compton:** Because Nikki was dead. And from what we were told about the Bacon's shaken baby syndrome and showing the pictures of her brain with all the bleeding up in her brain, there was no other explanation that was given to us of anything else that could have happened to her.

**Representative Harrison:** Yeah. Um, so it would be fair to say from your perspective as a juror, this case was about shaken baby syndrome?

**Ms. Compton:** That was the only thing that was discussed or told to us that it was about.

**Representative Harrison:** That's the only thing?

**Ms. Compton:** Only thing. Nothing else was ever told to us, ever discussed with us. Any other options was never told to us.

**Representative Harrison:** The start of the trial, the middle of trial. And-and just to be clear, you were there for the guilt phase, and were you also there for the sentencing phase as well?

**Ms. Compton:** Yes, sir. I was there through it all.

**Representative Harrison:** And for the- for the whole time-

**Ms. Compton:** Whole thing.

**Representative Harrison:** -whole-whole time, shaken baby syndrome?

**Ms. Compton:** Yes.

**Representative Harrison:** Nothing--

**Ms. Compton:** Nothing else was ever told to us.

**Representative Harrison:** Nothing else. So I'm gonna ask you a question anyway, just because it's written it down. I wanna ask it to you. Were-were you told anything about this-this little girl, Nikki, being beaten?


**Ms. Compton:** No, in the jury room that was nothing we ever discussed. The only thing we ever discussed in the jury room was the Bacon-- uh, shaken baby syndrome.

**Representative Harrison:** So you heard nothing about Nikki beaten-- being beaten as an explanation for what you witnessed in the jury room?

**Ms. Compton:** No.

**Representative Harrison:** Not-- you never heard witness testimony or arguments from the prosecution that-that her father, Robert or anybody else had struck Nikki or that blows or hits to the head by somebody, is how she ended up in that case in the hospital?

**Ms. Compton:** No.

**Representative Harrison:** Did you hear any discussion of sexual abuse in the trial at all at-at any time?

**Ms. Compton:** Yes.

**Representative Harrison:** Did you- did you have to vote on that? Was-was he ultimately charged of-of sexual abuse?

**Ms. Compton:** No.

**Representative Harrison:** But to the best of your recollections, you-you and the jury, are you testifying here that you and-and all of your jurors heard allegations, and I-- maybe I'll ask this, were-were they graphic allegations that you heard?

**Ms. Compton:** Uh, yes, sir.

**Representative Harrison:** Yeah. Did you ever see any witness or-or-or any, uh, evidence to corroborate those things that all of you jurors were told about allegations of sexual abuse?

**Ms. Compton:** No. All it was, there was a-- what we were told, there was a nurse that testified. She testified that she was a certified SANE RN, and that she had found these tears and everything else, and that is what we were told. Um, all of-- she told this and it was brought up several times, but then when it came time toward the end of the trial, they-- somehow they disappeared. They were never any--

**Representative Harrison:** The charges?

**Ms. Compton:** Charges, they were never charged. We never had any discussion of them in the jury room. There was no other type of discussion about it in any size, shape, or form. And then come to find out, she was not even a certified SANE nurse.

**Representative Harrison:** And forgive me for the graphic nature of this, but you



were told of sexual abuse to-to such an extreme that tear-- to such-- to such an extreme that tearing was implicated and involved and told to you, the jurors. The person who said this represented a certain certification that upon cross-examination, they had to admit they were not even certified to be discussing the matter. Is that right?

**Ms. Compton:** Yes.

**Representative Harrison:** Is there any reason for you to believe that he was guilty of sexually abusing Nikki or any other child?

**Ms. Compton:** No, except for what she said.

**Representative Harrison:** Yeah. So this case was a shaken baby syndrome case, start, middle to end. Is that your recollection?

**Ms. Compton:** Yes, sir. And also to my recollection-recollection, I believe the prosecution even got-- either it was a teddy bear or a baby doll, and got it up and shook it to demonstrate to us what shaken baby syndrome was.

**Representative Harrison:** I'm really glad you-you mentioned that. Let's talk about that for a second. Um, because what is being thrown around right now-- and we'll get to this more in a minute. Um, people keep saying, the state right now, um, to defend the execution. They are saying that Nikki was-was beaten several times on the head. And you just testified a second ago, if I heard you right, you never heard anything about that?

**Ms. Compton:** No, sir.

**Representative Harrison:** Yeah. Did you-- do you have any recollection of multiple impact sites that Nikki had been beaten multiple-- on multiple parts of her head?

**Ms. Compton:** No, sir. The only thing that maybe had been mentioned was she might've had a small bruise from where she fell out of bed.

**Representative Harrison:** Yep. Were there any photos or discussions that you saw, or any evidence you saw, that made you think that anything of substance and certainly of sufficient force to kill a baby or a two-year-old was on her head? Did you see any photos of severe bruising on her faces at all?

**Ms. Compton:** No.

**Representative Harrison:** In the photos you saw, did Nikki look like she had been beaten?

**Ms. Compton:** No.

**Representative Harrison:** I wanna go to this teddy bear. Did you say it was a teddy



bear?

**Ms. Compton:** I don't remember if it was a teddy bear or a baby doll, or a-a child's baby doll or something.

**Representative Harrison:** Help me- help me understand this. Why-- um, why would a baby doll or a teddy bear be-be brought into the courtroom? What were they doing with it?

**Ms. Compton:** I think they were trying to emphasize the extent of what the shaking baby syndrome was and how violently it had to-- how violently he had shook it.

**Representative Harrison:** Can you describe to us, you know-- okay, so there-- that was the point. What did they do with the doll or with the teddy bear? Can you just describe what you saw them doing with-with the doll?

**Ms. Compton:** They grabbed it by its arms like this, and they just violently shake, shake, shake, shake, shake, shake, shake. And just tried to give us an example of what the shaking consisted of.

**Representative Harrison:** And they did this-- were they trying-- did they do this because they wanted the jury to understand what could have explained-- their theory for what was going on inside of her brain and what they believed happened to Nikki? So was-was the doll kind of a-- like a substitute for Nikki?

**Ms. Compton:** They-they-they were trying to make it a substitute for Nikki.

**Representative Harrison:** Is that what you believe you were seeing-

**Ms. Compton:** That's what I believe. Uh,--

**Representative Harrison:** -to simulate what they believed happened to her?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** Okay. Did they ever simulate the doll being hit in the head with anything?

**Ms. Compton:** No.

**Representative Harrison:** Did they ever simulate the doll being hit in the head by Robert?

**Ms. Compton:** No.

**Representative Harrison:** Did they ever simulate the doll being thrown against anything?

**Ms. Compton:** No.



**Representative Harrison:** Did they demonstrate the doll being hit in the head in any way?

**Ms. Compton:** No.

**Representative Harrison:** So the only thing you saw that simulation with that doll on was being shaken, is that right or is that wrong?

**Ms. Compton:** That is correct.

**Representative Harrison:** Do you remember if the defense counsel objected to any of this at the time?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Well, you don't recall or they didn't?

**Ms. Compton:** No, he didn't.

**Representative Harrison:** Okay. Um, did they talk about-- if-if that was the case, was there any discussion about damage to other parts of Nikki? Because, you know, if you're shaken like that, was there any discussion about other injuries that-that might be intuitive if that were to happen, for example, um, fractures or neck tissue damage?

**Ms. Compton:** No, sir.

**Representative Harrison:** Nothing-nothing about a neck damage or any other part of her body?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Um, do you have-- Based on what you heard and you sat through the whole trial, do you have any reason to believe that Robert was a violent person? Is there anything that stuck in your mind about-about that based on everything you heard?

**Ms. Compton:** No, sir.

**Representative Harrison:** Were there any- were there any alternatives that you, the jury, any alternative explanations I should say to what could have explained what-what you were seeing from the medical evidence regarding Nikki other than that she was-- had been shaken?

**Ms. Compton:** No, sir.

**Representative Harrison:** And I-I jotted this down, but during your testimony, I wanna make sure I heard it right, or maybe it was during one of your answers a second ago, you mentioned something about the deliberations in the jury room.



You-- and you-you were in there deliberating with your jurors.

**Ms. Compton:** Yes, sir.

**Representative Harrison:** What were you discussing when you were in the jury room deliberating with your jurors?

**Ms. Compton:** The only thing that we would basically discuss was the shaking of the baby and the head injuries with the bleeding and stuff that they showed us pictures for where they had cut her skin away from her brain where we could actually see the whole shape and the bleeding on her brain. And they sent those pictures around for all of us to look at. And that's what we would be looking at was all the bleeding in her brain. And that's what they told us had been done from the shaking so violently, it had burst those blood vessels.

**Representative Harrison:** And I want to- I want to peel at that for-- I mean, I assume the-the pictures were rather hard to-

**Ms. Compton:** Graphic.

**Representative Harrison:** -hard to view.

**Ms. Compton:** Yes.

**Representative Harrison:** And they were after the autopsy?

**Ms. Compton:** Yes.

**Representative Harrison:** Okay.

**Ms. Compton:** Or during, after.

**Representative Harrison:** During or after, but okay. Was there anything else that you can recall you and your fellow jurors discussing when you were in deliberations in the jury room other than was this child shaken to death?

**Ms. Compton:** No, sir.

**Representative Harrison:** You'd have no recollections of anything else discussing this child being beat, hit, or otherwise abused?

**Ms. Compton:** No.

**Representative Harrison:** Okay. I'm gonna go to the- to the medical history now 'cause that has come up a lot- a lot in this case. What did you know about- what did you know about her case? What, uh, what did you know about her-her medical history? I'll phrase it that way.

**Ms. Compton:** The only thing that we were told as jurors is that she had been sick.



That, uh, Robert had taken her to her pediatrician, I think earlier in the week and he had given her Phenergan. A couple of days later, she had been running a high fever. I believe we were told about 104. He had taken her to the emergency room. Again, they had given her some Phenergan with cough syrup in it, codeine and he'd taken her back home again. And then the next thing we were told is when she had rolled off the bed, she, I guess, was okay and he put her back in bed with him.

She-- he woke up again, she was unresponsive and that's when he took her to the emergency room.

**Representative Harrison:** So prior to basically starting 48 hours out from her death,-

**Ms. Compton:** Mm-hmm.

**Representative Harrison:** -did you have any knowledge of her medical history?

**Ms. Compton:** No.

**Representative Harrison:** And would you characterize, because I don't wanna misrepresent what you just testified to there, but in the days leading up, so the-the 48 hours roughly, you know, you knew about it, there was a doctor visit, hospital visit, um, and by the way, you-- did you under-- was it your understanding he was the one taking her to get medical care?

**Ms. Compton:** Yes.

**Representative Harrison:** On multiple occasions?

**Ms. Compton:** Yes.

**Representative Harrison:** In the last 48 hours of her life?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** Okay. Was there anything that you heard at trial that led you to believe that she was severely sick?

**Ms. Compton:** No. I just thought-- what I took it as being is that she basic-- I thought she basically had the cold run a high fever. I thought she was probably pretty sick, but nobody was ever try-- figuring out what was wrong with her.

**Representative Harrison:** Okay. Well, was there a lot of discussion in trial about her extensive medical history?

**Ms. Compton:** No.

**Representative Harrison:** Okay. I would like to ask you a few things because I think it's really important. I wanna ask you a few things that we now know and I would like


to hear you just let us know if-if you were aware of this type of-of medical history for Nikki. Were you aware that there was, um, a CAT scan done that showed only a single minor impact site to the head that had only a small amount of breathing? Did you ever see this CAT scan?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Were you aware or did the jury see, uh, CAT scans and autopsy photographs that showed only a single impact site of the head with only a small amount of subdural blood and brain swelling that would have been in fact completely consistent with a shortfall?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Were you aware, was the jury aware of a postmortem toxicology report that the medical examiner, Dr. Urban, did not consider that showed she had toxic quantities of Phenergan and Phenergan in her and Phenergan with codeine in her bloodstream at the time that the autopsy was performed?

**Ms. Compton:** No, sir.

**Representative Harrison:** Um, I'm gonna take a quick tangent here because these drugs now, are you aware that they now carry what's called an FDA black box label?

**Ms. Compton:** Yes, sir, 'cause I know the pharmacy I go to won't even carry it these days.

**Representative Harrison:** Yep. That wasn't the case back then. Um, and I'm gonna read just a couple statements to make sure everyone understands what we're talking about when we're talking about FDA black box warning.

**Ms. Compton:** Okay.

**Representative Harrison:** I wanna know if you knew this at the time y'all made your decision. Were you aware at-at that time in 2002 that Phenergan tablets and suppositories may lead to, "potentially fatal respiratory depression"?

**Ms. Compton:** No, not then.

**Representative Harrison:** Were you aware that Phenergan tablets and suppositories in patients with compromised respiratory function such as sleep apnea or-- uh, yes should be avoided?

**Ms. Compton:** No, sir. Not then.

**Representative Harrison:** Were you aware that caution is now labeled-- this is the official, this from the FDA caution should be exercised when administering


Phenergan tablets and suppositories to pediatric patients two years of age and older because of the potential for fatal respiratory depression?

**Ms. Compton:** No, not then.

**Representative Harrison:** And were you aware then that excessively large doses of antihistamines, including Phenergan tablets and suppositories in pediatric patients, "may cause sudden death"?

**Ms. Compton:** No, not then.

**Representative Harrison:** Yeah. Nikki, uh, had been surpri-- uh, prescribed these-these drugs, these cough syrups, um, that do metabolize into morphine and this was in conjunction with the fact that she had a severe respiratory infect-- infection. Were you aware that she had a severe respiratory infection?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Are you aware of the evidence that has established that Nikki's heart after she was admitted was resuscitated even after her brain had already become brain dead? It's called non-perfused, but that blood thereafter over the course of two days was being pumped through her resuscitated heart to her brain, but it didn't have the ability to end the brain. Did you know about this at all and was-- did anybody ever tell you that this could have possibly explained all the blood that was up there?

**Ms. Compton:** No, sir. From what we were basically under-- the understanding of that when she got to the emergency room, she died sometime later that day. We were never told she was put on life support or anything like that and actually survived for two more days.

**Representative Harrison:** So really quick, so I wanna pull at this. You testified you saw these autopsy photos where the dural had been pulled back and you saw all of the horrific blood up there, and you were told that was a result from shaking, but you were never told that for two days they had been arti-- pumping through her artificially stimulated heart blood up into her head?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Are you aware that there is of ev-- of evidence that after Nikki was moved to Children's Hospital in Dallas, she was receiving epinephrine and three other dru-drugs that stimulate blood flow and raised her pulse to over 200, adding to the blood flowing in and under the scalp and accumulating in the subdural space yet it was unable to enter the brain? Did you know about that?

**Ms. Compton:** No, sir. Like I said, I thought she had died there at Palestine Hospital later that day.



**Representative Harrison:** Were you aware that when the medical examiner, Dr. Urban, conducted an autopsy, she observed an accumulation of subdural blood, but that the medical examiner made no attempt to reconstruct past events to assess how that accumulation in the subdural space of her brain had occurred during Nikki's hospitalization. And that despite expert medical witness to the testimony, she determined that that blood was a sign of multiple impact sites, even though that's not consistent with anything that's outside of the-- on the exterior of her brain. Were you aware of any of this?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Were you aware of the evidence that is now well-established that Nikki, who had been very ill for most of her life, had high fevers during her last week and you might have mentioned you knew about the fever? Are you aware that she had an unidentified respiratory infra-- in-- uh, infection that included double pneumonia, both viral and bacterial? Were you aware of this?

**Ms. Compton:** No, sir.

**Representative Harrison:** Were you aware that the-the-the pneumonia had, um, advanced to the point of sepsis?

**Ms. Compton:** No, sir.

**Representative Harrison:** Were you aware of her having any blood clotting conditions or disorders that might have impacted how well she, um, or how easily she bruised and it could have impacted, um, brain activity, um, subcutaneously?

**Ms. Compton:** No, sir.

**Representative Harrison:** Okay. Um, were you aware of, um, the evidence and the witness testimony that I have heard directly from, uh, forensic lung experts that testified that her-her pneumonia had progressed so great over the period of probably three weeks, that he didn't understand how at the time of death her lungs would've been capable of even absorbing enough oxygen to maintain life?

**Ms. Compton:** No, sir.

**Representative Harrison:** If you had known that, would that have made a difference in how you voted in this case?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** How big of a difference?

**Ms. Compton:** Very much difference. I would've found him not guilty.

**Representative Harrison:** In 2002, were you aware that Mr. Roberson had autism?



**Ms. Compton:** I-I was not aware of it in 2003, the day of the trial-- the year of the trial.

**Representative Harrison:** The trial was in 2003, that's right. Um, and this is important because I have had law enforcement wi-- uh, testify here to this committee that he had a really flat affect. H-how would you describe his-his demeanor at trial? And did that have any impact on your views of, you know, his guilt or innocence?

**Ms. Compton:** It didn't have a whole lot, but I'm not-- I'm gonna say it probably did have some. He just basically sat at the table, didn't look at us, didn't pay how much attention. Just basically stared more or less straight ahead.

**Representative Harrison:** Did you find that odd?

**Ms. Compton:** It was kind of odd.

**Representative Harrison:** Would it have struck you as less odd if you knew he was, uh, had been di-diagnosed as being on the autism spectrum?

**Ms. Compton:** It probably would've because I would ex-- I would've explained what his behavior was.

**Representative Harrison:** Mm. Do you remember going back to the-- his-his attorney at the time-- Do you remember his attorney-- Um, was he arguing more that Robert was innocent of any crime or was it-- was his focus more on what type of punishment he-he should receive? How would you talk about his defense attorney? How would you describe him?

**Ms. Compton:** I thought he was more worried about what punishment he was gonna receive. I think he more or less accepted that he was guilty of the ba-- shaken baby syndrome and he was just more worried to try to get him the lesser punishments.

**Representative Harrison:** Yeah. Were y-- Did he ever, ever-- The whole trial, did the-the defense attorney ever present you with other explanations for the shaken baby syndrome triad? The-the swelling brain, the retinal hemorrhaging, and the subdural bleeding. Did he give you any other explanation that could have explained those three things?

**Ms. Compton:** No, sir. That's what made it so-- more or less this is what it is because he gave us no other options or any other type of options that we could have considered.

**Representative Harrison:** Would it have made any difference to you if at the time, if you had known that there are many other, um, things that can result in all three of those triad of symptoms?

**Ms. Compton:** Yes, it would have. It'd have gave me something else to have considered.



**Representative Harrison:** So you considered nothing else?

**Ms. Compton:** Nothing else about that. Nothing else was presented to us.

**Representative Harrison:** So you saw the three symptoms, shaken baby syndrome, the prosecution said it, and the defense attorney said it. Is that- is that right?

**Ms. Compton:** That's right.

**Representative Harrison:** Okay. Um, so just one last time, nothing you and I just got done discussing all that medical evidence was not presented to the- to the jury and you were not deliberating on that in the deliberation chambers?

**Ms. Compton:** No, sir.

**Representative Harrison:** Tell me about your history on this in recent times. You, um-- Are you a- are you aware that he had an execution date set in the- in the past few months?

**Ms. Compton:** Yes.

**Representative Harrison:** How did- how did you, uh, hear-- How'd you hear about that?

**Ms. Compton:** I actually read it on my phone because I keep a bunch of news feeds and stuff like that. 'Cause I like to keep informed of what's going on.

**Representative Harrison:** So you just-- You heard about it in the news?

**Ms. Compton:** Mm-hmm.

**Representative Harrison:** Okay. Um wha--

**Ms. Compton:** I also had-- I've also kept up like, you know, when he's had different hearings at different things, it comes across and I guess because I was on that trial, I have always kept up with things that has been going on.

**Representative Harrison:** So you've paid attention to it over the last 20 years?

**Ms. Compton:** Off and on, yes.

**Representative Harrison:** Yeah. How-- Um, what was your reaction when you heard that they had set a new execution date for him?

**Ms. Compton:** It kind of got my interest more so then, but then when I started reading about all these other things coming out about the pneumonia and the sleep apnea and the double pneumonia and all this extra stuff that has just now started to be coming out that I've read about or maybe that's been out, but I just now recently read about, it got me even more thinking and I started thinking back about all the


things that I knew about that went on in the trial and I just realized, and I just finally came to the conclusion he was an innocent man.

And I just, in good conscience, I could not live with myself thinking that I had a hand in putting an innocent man to death.

**Representative Harrison:** Wow. So when-- This had to be emotional for you. When you came to that realization, what-what kind of things did you do? Did you- did you have discussion with your-your husband or other family members about this? How was your emotional reaction?

**Ms. Compton:** I had a very big discussion with my husband and with another friend of mine, and there would be times that I'd be talking about it with my husband that I would literally start crying about it because I-I-I felt that emotional about it.

**Representative Harrison:** What made you so emotional that you started crying?

**Ms. Compton:** Because I-I just couldn't think about killing a man and that's how I looked at it. My decision 21 years ago was getting ready to come to realization and I literally, in my eyes was killing a man that I knew was innocent and I was gonna have to live with that.

**Representative Harrison:** This must have weighed on you over the last few months.

**Ms. Compton:** Very much.

**Representative Harrison:** Why? For what it's worth, not a question, but just a statement. I-I'm confident I can rep-- I'm confident in this, I can speak for everybody up here. We're all humans and, um, nobody would expect you to be judged on 2024 knowledge in 2002, 2003. Okay. You are only responsible for what you knew at the time.

**Ms. Compton:** Yes.

**Representative Harrison:** I, um, I need to bring this back to very present day 'cause we've had a lot of- a lot of developments in the last few hours, last, uh, last few days that I would like your take on-

**Ms. Compton:** Okay.

**Representative Harrison:** -as a- as someone who was on the jury. When-when this committee issued our subpoena, something that just as a matter of fact, if we had not done, he almost certainly would be dead right now. There was a lot of litigation that had started a lot of arguments, um, and the government, the state, and in this case, the Attorney General's Office made an argument on the day that we issued the subpoena. 'Cause that day or the next day, they began arguing that Robert Roberson's case was not a shaken baby case. I would like to read you a couple



quotes.

**Ms. Compton:** Okay.

**Representative Harrison:** This is from somebody in the Office of the Attorney General. "The evidence supports the fact that there were multiple blunt force impacts to the child's head." How would you respond to that claim?

**Ms. Compton:** I would like to know where they got their information from because that is not true.

**Representative Harrison:** Lemme get real, the rest of this one quote. "And there was a history of abuse from this particular inmate against this child."

**Ms. Compton:** Again, I would like to know where they're getting their information from because that is nothing that was ever brought up during the trial or at any other time.

**Representative Harrison:** There's more to this quote. Quote, "Shaken baby syndrome just doesn't play a role in this case. It's just not the central feature of this case."

**Ms. Compton:** Me being at the trial and in the jury area and the jury room, that is all that this case was based on was shaken baby syndrome and even the prosecution's star witnesses that they would have brought up psychologists, uh, doctors, all of this. The only thing that they would discuss in their testimonies and all of this was shaken baby syndrome.

**Representative Harrison:** Yeah. I'm gonna hold something up right now. I dunno if you can read it. So I'm gonna read you the first-

**Ms. Compton:** I-I-I ha- I have--

**Representative Harrison:** -I'm gonna read you the first half of this. All right?

**Ms. Compton:** I have bad eyes, so you're gonna have to get something over here closer.

**Representative Harrison:** It's okay. I can- I can read this to you.

**Ms. Compton:** Okay.

**Representative Harrison:** Uh, actually no, I have a copy. Can I-- Can-can-can she be provided a copy of that? All right. This is from an official pleading from the Office of the Attorney General when he was asking the Supreme Court to, uh, reconsider our subpoena. I'm gonna read the first part of this. You were-- And before I do that, I'm gonna ask you a question you've already answered. You were a juror on this case?



**Ms. Compton:** Yes, sir.

**Representative Harrison:** Okay. I'm gonna read the first half of this. A Texas jury convicts Roberson of beating his two-year-old daughter to death.

**Ms. Compton:** Not true.

**Representative Harrison:** Ma'am, is that what you convicted Robert of over 20 years ago?

**Ms. Compton:** No, sir.

**Representative Harrison:** How sure are you?

**Ms. Compton:** 100% sure.

**Representative Harrison:** Who would know better? You or somebody in the Office of the Attorney General right now?

**Ms. Compton:** Me, 'cause I was in the jury. I was the juror and I'm the one of them that-that made that conviction of shaken baby syndrome.

**Representative Harrison:** How does it make you feel seeing these statements by the government right now as somebody who lived through every day of the trial?

**Ms. Compton:** It has pissed me off very much.

[laughter]

[applause]

**Representative Harrison:** I am gonna wrap up now 'cause I am certain my colleagues have questions.

**Ms. Compton:** Uh, and also too, it has me pissed off about our prosecutors in Anderson County because I heard they testified that this is what it was. And personally, the prosecutors now was not the prosecutors back when the trial went on. Prosecutor back then was Doug Lowe and his assistant was Mark Calhoon. So how they even know what went on?

**Representative Harrison:** And I think-- uh, I think there was at least widespread sentiment up here when the district attorney testified, uh, that she did not come prepared. Nor did she demonstrate even a basic level of knowledge of-of the facts in this case.

**Ms. Compton:** She's not--

**Representative Harrison:** I'd-I'd like to-to wrap up here, let folks, uh--



**Ms. Compton:** I have to say she-she-she's-she is not very well thought of by a lot of people in Palestine because she [clapping] basically has no knowledge about her job most of the time.

**Representative Harrison:** Okay. All right. I wanna summarize a couple things, a couple very quick closing questions, and move on to my colleagues.

**Ms. Compton:** Oh, and I will tell you one other thing.

**Representative Harrison:** Yes ma'am.

**Ms. Compton:** To help your committee.

**Representative Harrison:** Yes.

**Ms. Compton:** Palestine Medical Regional Center is not the best hospital to take your kids to-to get anything done. They have a bad history of misdi-- misdiagnosing people and everything else. And so that does not surprise me that they probably misdiagnosed Nikki and did not get her the proper treatment and do the proper treatments when they should have.

**Representative Harrison:** Thank you for sharing that. That is helpful as we consider all the aspects of this case. Thank you very much.

**Ms. Compton:** And I know that for a fact, my husband fell off our back deck. They took him into the emergency room, they put-- and they did a CAT scan of his head and his neck.

**Representative Harrison:** Hmm.

**Ms. Compton:** They put him in for dehydration. He spent four days there, had him up walking around doing physical therapy. I got him, picked him up. He talking all nut crazy to me when I got him. I called our family doctor. They told me to take him to Tyler. I did. They did another CAT scan of his head and neck. Come to find out he had a fractured neck.

**Representative Harrison:** Hmm.

**Ms. Compton:** I got the CAT scan from the hospital. I took it to our primary care doctor. He's seen the fracture. I called the hospital and started raising Cain with them.

They sent it out to a third party. Three weeks later, I get a phone call from the third party. They said in the CAT scan from the hospital, he had a fractured neck and wanted to make sure I had gotten him and taken him to get some help. That is how good our hospital is at looking at CAT scans, diagnosing, and taking proper treatment care.

Completed: 10/30/2024



**Representative Harrison:** And-and the uh, the care and the attention to detail and the maintenance of records certainly played a central role in this case.

**Ms. Compton:** That's what I'm saying.

**Representative Harrison:** So thank you for-

**Ms. Compton:** That's the outcome I'm saying.

**Representative Harrison:** -sharing that perspective. Um, okay. I just wanna summarize a couple things. So just tell me if I'm right or wrong.

**Ms. Compton:** Okay.

**Representative Harrison:** Because I don't wanna mischaracterize anything you said here. I'm gonna run through a few things real quick.

**Ms. Compton:** Okay.

**Representative Harrison:** And then we'll-- we will let some other folks, uh, have a chance to talk to you. You were a juror for the entirety of the trial, both guilt and sentencing phase, correct?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** This was according to your testimony, a shaken baby case and only a shaken baby case. Is that right?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** You never believed and still do not believe that Nikki was beaten by anybody whatsoever, is that correct or not correct?

**Ms. Compton:** Correct.

**Representative Harrison:** You did however, hear discussions, very graphic discussions of sexual abuse of Nikki.

**Ms. Compton:** Yes.

**Representative Harrison:** And the discussions involved, um, her father being the person that did it.

**Ms. Compton:** Yes.

**Representative Harrison:** But, uh, but they were completely unsubstantiated and the charge was ultimately dropped. Is that correct?

**Ms. Compton:** I don't think there ever was a charge of sexual assault.



**Representative Harrison:** Okay. But nonetheless, you heard these unsubstantiated graphic claims in the jury. You and your fellow jurors heard this?

**Ms. Compton:** Yes, sir.

**Representative Harrison:** And you never voted on it?

**Ms. Compton:** No.

**Representative Harrison:** Okay. You are now rejecting here today, the new claim that Nikki was "beaten to death"?

**Ms. Compton:** Yes.

**Representative Harrison:** You knew very little about her relevant medical history at the time of the trial and if you knew her full history, that would've mattered a lot to you. Is that correct?

**Ms. Compton:** 100%.

**Representative Harrison:** And you're telling me that his defense attorney for the entirety of the trial never gave you one single possible or plausible explanation for what could have caused the three symptoms that they were telling you with shaken baby syndrome. Is that correct?

**Ms. Compton:** Correct.

**Representative Harrison:** And you never heard a single argument or any bit of evidence that this was not shaken baby syndrome?

**Ms. Compton:** No.

**Representative Harrison:** All right. Three questions. Did the jury hear everything that you needed to hear to make a correct decision in this case?

**Ms. Compton:** With the evidence now, no.

**Representative Harrison:** Knowing what you know now, did the jury get it right?

**Ms. Compton:** No.

**Representative Harrison:** Knowing what you know now, do you believe Robert Roberson murdered his daughter, Nikki?

**Ms. Compton:** No.

**Representative Harrison:** How strongly do you feel about that?

**Ms. Compton:** 100%.



**Representative Harrison:** Thank you for your courage. Thank you for your time. Thank you, Chairman.

**Chair Moody:** Mr. Harrison, thank you. Ms. Compton, I'm gonna ask other members if they have questions for you. I just wanna follow up on-on-on one thing, uh, and more of a statement than-than a question. Um, it takes a lot to- it takes a lot to confront a very challenging situation like this. I know it does not make you feel comfortable that Robert's sitting on death row given what you know today. And there are people when they're confronted by difficult things, they put their head in the sand 'cause it's easier than dealing with it.

And I'm grateful for you making the trip here and-and telling us your feelings. And it's okay to say you're pissed if you are because that's what we wanted to hear. Because the exact reason that this legislature created a law to go back and make sure that someone got a fair trial is because we don't typically-- we don't get to get back inside the head of the jurors. We wanna protect them after the fact just in case something happened that was a mistake. But the courts have refused to do that.

And your testimony here today gives us the opportunity to get inside that jury room to understand the way you think and to understand the way that you feel. You are exactly correct about your analysis here. And your testimony is exactly what we needed to know that our law is not working. So I want to tell you, I'm grateful for you coming here on a day's notice to talk to us. That's important. Not just to Robert, not just to this committee. It's important to the entire state of Texas and the justice system that we have.

It is going to impact so many lives that you will never interact with. And I wanna say thank you for that. Members, do you have any questions for Ms. Compton otherwise? Yes, Mr. Cook. Vice Chair Cook. Sorry.

**Vice Chair Cook:** Thank you. Thank you for your testimony today. Thank you for coming to-to Austin. And, um, just wanted to ask you a couple questions. And so, um, earlier you talked about the-- you know, the-the either the baby doll or-

**Ms. Compton:** Mm-hmm.

**Vice Chair Cook:** -the teddy bear-

**Ms. Compton:** Mm-hmm.

**Vice Chair Cook:** -that was being shaken. Uh, and so that was an example of where the prosecution was showing you, uh, what happened in this case, right?

**Ms. Compton:** Right.

**Vice Chair Cook:** Yeah. So if the court were to-- if the judge would've excluded any testimony or any evidence being presented at the trial that had nothing to do-- ba- basically everything that had to do with shaken baby syndrome would be eliminated.



So if I can just ask you to kind of just-

**Ms. Compton:** Okay.

**Vice Chair Cook:** -erase that from your memory.

**Ms. Compton:** Mm-hmm.

**Vice Chair Cook:** What other-- whatever-- uh, what other evidence did you hear of- of any type of physical abuse?

**Ms. Compton:** None.

**Vice Chair Cook:** Okay. And with regard to the sexual abuse, um, it was discussed at the beginning of the trial, is that correct?

**Ms. Compton:** Correct.

**Vice Chair Cook:** Okay. Would it be impossible for you to remove that from your- from your mind? I mean, as you sit here 20-something years later, you still remember him being accused of sexually assaulting his two-year-old daughter, correct?

**Ms. Compton:** Yes.

**Vice Chair Cook:** All right. So it's fair to say that it's-- it would've been impossible for you to have considered it while you were sitting in the jury room, you would've had that knowledge?

**Ms. Compton:** We would-- we had it in our minds and I think that probably we didn't discuss it per se. But I think it was in the back of every-every juror's mind that that happened.

**Vice Chair Cook:** Let me ask it another way. If he had been previously convicted prior to this incident, if he had been previously convicted of sexually assaulting a-a minor, would that have impacted-- would it be impossible for you to have not considered that in evaluating the evidence?

**Ms. Compton:** No. It probably would've weighed heavy.

**Vice Chair Cook:** Thank you.

**Chair Moody:** Members, do you have any other questions? Yes, Ms. Morales.

**Representative Morales:** Thank you so much. Um, your testimony today is incredibly powerful and it's going to create positive change in our state. Um, one thing that, uh, has stuck out with all of the testimony that we've heard today is that the child was given two very powerful-- I mean, strong medications. I've-I've taken both of those medications in my lifetime and I don't take them now-



**Ms. Compton:** Yeah.

**Representative Morales:** -because they're-they're very, very strong. And it's interesting what you said about, uh, the medical community there in Palestine. So I guess my question to you is, during that time of the trial, did it ever occur to you, or, you know, did it ever stand out in your mind that these medications were very, very strong and that maybe they shouldn't have been prescribed to a child? And to be honest with you, I don't know how I felt about those medications during those years 'cause, you know, medicine has evolved during, you know, the last 20 years, but I'm just curious if that, you know, if it-- if you questioned that at all at the time of the trial.

**Ms. Compton:** No, I don't think we did, because that many years ago, it was such a common drug that pediatricians or doctors, you know, prescribed for cost in this type of thing back in those days. I know previous down the road, they have changed what they do about all of that. But back in those days, I don't think it was something that we really considered it being too outta line of that being prescribed for a 2-year-old.

**Representative Morales:** Wow. And to have 'em both at the same time, it just--

**Ms. Compton:** Mm-hmm. Right. We just didn't--

**Representative Morales:** Hmm.

**Ms. Compton:** It's not something we really thought about.

**Representative Morales:** Thank you so much.

**Chair Moody:** All right, Ms. Compton. Appreciate your time and thank you for being here. Um, I don't think we have no further questions for you at this time. Um, if we had other questions later down the road, do you mind if we reach out to you?

**Ms. Compton:** No, sir.

**Chair Moody:** Okay.

**Ms. Compton:** I'm free anytime.

**Chair Moody:** All right. Thank you.

**Ms. Compton:** And thank y'all for having me and listening to me, and hopefully, we'll get this right the next time around.

**Chair Moody:** That's-that's the point. Good luck with those grandbabies [laughs].

**Ms. Compton:** [laughs] It's hard to start and over.

**[pause 04:01:26]**

**Chair Moody:** [clears throat] Chair calls the Honorable Elsa Alcala.

Completed: 10/30/2024


**[pause 04:01:45]**

**Chair Moody:** Judge, can you hear me? Let's see. [silence] Oh, there it is. [silence] Judge, are you able to hear me yet? [silence] That says it's connecting up there. Oh, there. I think it-- How about now, Judge?

**Ms. Elsa Alcala:** Oh, I can hear you, yes.

**Chair Moody:** There we are. Okay. Sorry. Technical difficulties. Um, judge, good to see you again.

**Ms. Alcala:** You, too.

**Chair Moody:** Even if only virtually. Um, before we get started, and I know we've had you before the committee before, uh, back in 2017, if I remember correctly, um, I have you registered as Elsa Alcala testifying on, uh, on behalf of yourself and testifying neutrally on the topic today.

**Ms. Alcala:** Yes, sir.

**Chair Moody:** Okay. Great. And I just- I'm gonna allow you to-to make your comments and talk about some of your background. Some of the folks up here may not know, know you have any, uh, may not understand your background, so I think it'd be worthwhile to spend a little bit of time on that. Um, but were you a judge on the Court of Criminal Appeals in 2014 or 2013, that timeframe, when Article 11.073 became law in Texas?

**Ms. Alcala:** Yes, sir.

**Chair Moody:** Okay. And how long did you serve on the Court of Criminal Appeals?

**Ms. Alcala:** I was on the Court of Criminal Appeals from 2011 to 2018, so for about seven and a half years.

**Chair Moody:** Okay. So you saw the law prior to the-the, uh-uh, creation of this particular relief, and then you saw the application of it after it became law, correct?

**Ms. Alcala:** Correct.

**Chair Moody:** Okay. Um, I'm-I'm gonna turn it over to you, uh, for your testimony. I know that I'll have some questions that I'd like to ask you and follow up to that, and I don't know if the members will as well, uh, but want to give you the floor. Thank you, Judge, for being here.

**Ms. Alcala:** Thank you so much for inviting me and thank you so much for understanding about, uh, my need to testify virtually. I'm in, uh, Colorado and I tried to get a flight over there and I just wasn't able to make the arrangements the way I'd hoped. But, um, I appreciate this committee so much for taking the time to hear all of



the testimony, and for your extraordinary intervention last week. It was peculiar, certainly, but I think it was, um, greatly appreciated by those of us who are so committed to the cause of innocence. Um, and I have the utmost respect for everybody on this committee for-for taking those steps that you did last week.

Um, what I'd like to do is make three points, um, that focus on the law. We've had a lot of testimony that talked about, uh, the science and the, um, medical issues involved in this case, but I'm gonna approach those more from the legal vantage point and the statutory vantage point because I think that's what your committee at its core is interested in. What can you do to, um, possibly modify the statutes that you've passed in order to make sure that they're being implemented the way that you hoped they would be incorporated by the judiciary?

So I'd like to make three points. The first one is to talk about Justice Sonia Sotomayor's concurring opinion last week, that I think really encapsulated the issues that are at stake before this committee, and analyzed, uh, the record succinctly as to what's going on, uh, in this case. The second point I'd like to make is, um, very briefly talk about what you just asked me about, which is, how did all this come about. What did things look like before the passage of the statute and what did they look like after? And I'll do that very briefly.

And then the third point I'd like to make is to make six possible suggestions for changing the statutes that are involved, um, and that implicate this case. Some of 'em are, I think pretty basic, and then some of 'em maybe, um, further than you're willing to go, but-but I'll just briefly mention, uh, those that-that come to mind.

**Chair Moody:** Sure.

**Ms. Alcala:** Uh-uh and I think, frankly, there's many more changes that could be made, but I-I didn't want to be here for 10 hours [laughs].

**Chair Moody:** [chuckles]

**Ms. Alcala:** I think you all will appreciate my narrowing, uh, the suggestions down to about a handful. Uh, so with respect to Justice Sonia Sotomayor, on October 17th, 2024, the litigants in this case asked the United States Supreme Court to intervene on, uh, Robert Roberson's behalf. The United States Supreme Court declined to do that, explaining that it was not a federal issue that was at stake. That really what was involved here was, um, a state statute that should be interpreted by, uh, state officials.

However, Justice Sonia Sotomayor took the, uh, position of writing a concurring opinion to-to explain how she saw the-the ca-- the case, and how she felt it should be, uh, addressed. She's made three points that I'd like to mention here. Her first point was that, Roberson, "has raised credible evidence of actual innocence," and that there was "mounting evidence" that Roberson had "committed no crime at all." This is the United States Supreme Court justice, the very top echelon of the judiciary of this country. And she reviewed this record and the-- and the legal issues and the



factual issues, and she came to the conclusion that most likely, Mr. Roberson is innocent. And I think that's a noteworthy, um, comment to obs- of-of hers that we need to respect and observe.

The second thing that she said was that, um, the state relied on the science of underl-- on the science underlying shaken baby to explain the injuries as a core part of its case. Uh, from hearing the testimony today, it appears as though we're now having revisionist history and that, uh, the prosecutors are now trying to claim that this wasn't a shaken baby case at all. And I think many of the speakers today have, um, challenged that conclusion, and rightfully so. And that was, in fact, what Justice Sotomayor also said. She said that, "The state's expert had disavowed a beating or impact only theory of death at trial." In other words, at trial, the state did rely heavily on the shaken baby evidence in order to show that the impact that occurred was from the shaking that occurred rather than from a fall from a bed, as Mr. Roberson had, uh, explained.

I briefly reviewed parts of the trial record by Dr. Squires, who was the shaken baby expert that the state relied on a trial. Squires said, "The actual brain injury, we do not feel is explained by a simple impact." She said, "There had to have been something more than just impact." So it's very clear in looking at her trial testimony that-- that the state didn't say that it was because of this impact only that-- that-- that Nikki, the child, died. Rather, at trial, the state made it very clear that this was a shaken baby case, and they used that theory in order to explain, uh, why the impact, um, was a grave cause of the result of Nikki's death.

So this was not just an impact case as it's now being portrayed. Rather, the evidence of shaken baby biometrics was at the core of the state's theory about Nikki's cause of death. Plain and simple, as Justice Sotomayor noted, this was a shaken baby case. The third comment that Justice Sotomayor made was with respect to the impact evidence, um, because it appears as though, again, with revisionist history, the state is trying to contend that this child was beaten or severely damaged by Mr. Roberson. But in fact, uh, after the trial, the trial attorneys found CAT scans that were taken directly after Nikki's admission to the emergency room, and those scans showed only minimal subdural bleeding.

The reason that's important is because it's clear that that is most consistent with what Roberson said, which was that the child fell. All of the other damage that the jury heard about and that-- and that lawyers are now, on the prosecution side, trying to point to, all of tho- that damage came from the surgical intervention by-- at the hospital to try to save Nikki's life. Uh, but that-that is certainly not attributable to any misconduct by Mr. Roberson. So I respect Justice Sotomayor greatly, uh, in her intellect. I think she examined this case, and I think she really, um, crystallized what the issues are, and why, um, it-- it's pretty clear that there's strong evidence, uh, that Mr. Roberson is actually innocent.

The second comment that I would like to make has to do, uh, briefly with, um, what the court was like before the, uh, passage of Article 11.073. I was on the court in



2011 when we first had to decide the Neal Hampton Robbins case. Uh, that was another case of a man accused of killing his child. I think, uh, that baby's name was Tristan Rivers. Um, the medical examiner in that case, uh, said that, uh, Tristan had died, I believe, from asphyxia. Many years later, other medical examiners looked at that evidence and gave, uh, and said that that was not, um, the cause of death.

And then the medical examiner herself reexamined the case. And when she did that, she withdrew her conclusion that it was asphyxia, but she said that she believed the cause of death was undetermined. I thought that that was enough for my court to grant, um, Mr. Robbins a new trial, but my court disagreed, and this-- they upheld that conviction. So to them, it really didn't matter that the medical examiner herself had changed her opin-- her medical conclusion. It didn't matter that the cause of death was undetermined. The court felt satisfied to uphold that conviction.

So after that, the legislature examined the issue of, uh, bad science used in courts, and it had other instances of bad science, like the Cameron Tood Willingham case and other cases, and that's when the legislature, um, acted to pass Article 11.073.

**Chair Moody:** Wait, can I stop? In that first case you just referred to, Judge-

**Ms. Alcala:** Yes.

**Chair Moody:** -you said your opinion, while you were in the minority, was that the law at the time should have provided relief in that case.

**Ms. Alcala:** It was complicated because-- I-- -if-if I remember correctly, the lawyers were trying to rely on, uh, false evidence theory. That the medical examiner had given false evidence at trial. But the-- the problem with science issues is that, um, at the time she gave her testimony, she wasn't lying. She wasn't trying to mislead anybody. That was what she believed the correct science was at the time. Um, so, the way I addressed it was just to try to say that, uh, we should focus less on whether she intended to lie, but just more on the fact that the-- that the testimony was mistaken.

**Chair Moody:** Got you.

**Ms. Alcala:** But as I recall, my court was-- That the precedent in the court, at the time, required, um, more proof of, um, uh, I guess, a bad intent or something like that, and she didn't have a bad intent. That was just what her training was at that time. And as she got better educated and as she got better trained, then she changed her-her scientific opinion. And that is why junk science or bad science is so different from, let's say, false evidence cases. The-- the bad science was, in fact, not correct at the time, based on information learned later. So there's not any kind of, uh, bad faith or, um, bad intent or anything like that by the experts who are giving the testimony, they are relying on-- on their best assessment at the time.

It's just that, as we know with science, it develops and people learn more and people get a better experience, and when that happens, sometimes they find out that what



they said was incorrect before. So it didn't really fall squarely within the false e-evidence, uh, jurisprudence that we had at the time, but I thought that we could make it fit, for lack of a better explanation. So, 11.0703-- 11.073 was passed, and that was a good thing, but even then, the court was discussing whether what happened in the Robbins case fell within the new science statute. Um, and I think at some point we granted relief, and then at some point we granted rehearing, and then there were lots of different, uh, concurring and dissenting opinions, and finally, Robbins got, um, the relief that he was due many years later.

But I-I looked back at my-- I dissented every single time, in favor of Robbins. Uh, uh, let me rephrase that. I either dissented or agreed each time that Robbins was entitled to relief. But what I wrote in 2016, now looking back, seems to prophesy what's actually happening here today. In-in talking about how my court had handled Robbins through the various stages of, um, the case, I said, "I do not envy the position of future litigants who must try to decipher this court's position on when relief is warranted under the new science statute." I also said, "This court's judicial decision should not require litigants to run to the legislature for a statutory response to correct our judicial mistakes. This court's judicial decisions should not give the appearance of indecision or manipulation for the achievement of a desired result."

Obviously, I was, uh, frustrated with how my court seemed, um, undif-- indifferent or unwilling, uh, to take a common sense approach in-in addressing, uh, bad science and in making sure that litigants got a fair shake at their trials.

Uh, the third comment that I would like to make has to do with some possible changes that the legislature could make in order to make sure that this doesn't happen again. Um, I think you heard about the Texas Defender Services Assessment of how 11.073 has been handled by the Court of Criminal Appeals for the last decade. And, um, it-- it's not a good picture of, um, the court. Um--

**Chair Moody:** One-one-- judge, one second.

**Ms. Alcala:** Yes, sir.

**Chair Moody:** Chairman-chairman Darby has some questions for you.

**Ms. Alcala:** Yes, sir.

**Representative Darby:** I just wanted to-- Could you elaborate on that e-- exactly from your perspective on-on how these cases have been handled? Uh, now, could you give us your understanding of what the Court of Appeals is looking to and how they're reaching these decisions now?

**Ms. Alcala:** Yes, sir. And, uh, and-and frankly, that's part of what I was about to talk about, but let me answer your question, and then- and then I can probably go into more detail. I think part of the problem is that, um, the-the court in all respects, views legislation quite narrowly. And so, for example, in this statute, it talks about-- uh, let me quote the-the language of the statute, "That the statute requires that had the


scientific evidence been available at trial on the preponderance of the evidence, the person would not have been convicted." And frankly, there's two parts of that, that I think are problematic.

One is the burden of proof of preponderance of the evidence, and the second one is the language that the person would not have been convicted. I think the Court of Criminal Appeals is looking at both of those terms harsher than it should. Um, preponderance of the evidence means more likely than not. And so, what the defense has to do to obtain relief under junk science is to say that, given the new science or what we now know about science, more likely than not, the person would not have been convicted.

Now, I look at this Roberson situation based on what has been presented here at your hearing, and I think many of us look at it and-and Dr. Phil looked at it and John Grisham and any number of people look at it and they say, "Well, of course, by a preponderance of the evidence, um, what we know now about shaken ba-- from what we know now about shaken baby, um, he would not have been convicted." Even the juror who just testified said, what we know now, he would not have been convicted, but the Court of Criminal Appeals is apparently not looking at-at that-- at-at that way. They are-they are, um, splicing out the two issues as if they're totally separate thing- things.

They're trying to say, "Well, if you just look at this impact evidence, then the jury could have relied on that in order to convict Mr. Roberson." Um, I think that's not what they should be doing. They're supposed to be looking at the totality of the evidence and-and listening to somebody like the juror who says, "Oh, no, no, that was the whole theory of the case." But I think on the appellate court, um, they end up doing much like what the Attorney General is doing here, and just picking out pieces of evidence and saying, "Oh, there was this impact, and therefore, the jury could have looked to the impact." And based on that impact, the jury-- uh, the defense has not shown that by a preponderance of the evidence, the person would not have been convicted.

It gets highly technical and-um-and-and I think some people lose their-their common sense in-- Some judges lose their common sense when they're looking at something like that.

**Representative Darby:** The question, is that a bar too high? Clearly, I mean, they have to prove their innocence. I mean, before you can even, um, have the court consider, uh, a new trial, they have to prove it. And if the evidence was never presented at the trial, how can the court come to the conclusion that by throwing out this junk science, that they would be considered- or considered innocent of the charge? It seems like that's extraordinarily high bar to have to reach, uh, for these folks to-- there's no-- I can't see how they would prove their innocence.

And clearly, the court of appeals and her-- their decisions since 2013 have not-- have used that higher standard in not throwing out cases that they probably should



have, ha-having, uh, considered this high threshold that we didn't set.

**Ms. Alcala:** I-I agree. I think they are interpreting preponderance of the evidence too high. I think one thing the legislature could do, because it is such a difficult burden for the defense, would be to-- instead of saying by a preponderance of the evidence, you could say-- you could use probable cause. For example, you could say that, had the scientific evidence been available at trial, uh, uh, does the probable cause show that the person would not have been convicted? And probable cause then is a-a lower standard that would be easier for defendants to meet, given how difficult it is as to establish the change in the science and how- and how it affected a trial.

That was frankly, one of the things I found most difficult when I was on the Court of Criminal Appeals, is that we were having to go back 20 years, and it's almost like looking into a crystal ball, well, what would the jury have done if they had known then what we know now? And it's all really speculation on the part of judges. It's not like you can go-- Most of the time you don't even hear from jurors the way y'all just did. Usually, the judges are just pretty much speculating in their own mind, how they think, uh, an error or an-- uh, a, uh, elite-- or a matter or science or whatever, affected what the jury did.

It's-it's problematic and it's difficult, and it- and it requires, uh, common sense and good judgment. But when the judges are inclined to uphold convictions or-or death sentences, if that is their leaning, then they're going to find ways to, um-t, , uh, side with, let's say the state, or if they're leaning is decide with the defense, they're gonna side with the defense. In other words, it's-it's very, um, much within the mind of the judge, how they weigh, uh, how an error or, uh, evidence issue affected the outcome of a trial. It-- it's difficult and it's complicated and it- and it-it is somewhat in the mind of- of the judge.

**Representative Darby:** Well, judge--

**Ms. Alcala:** In the particular mind of the [crosstalk]

**Representative Darby:** Another question. Uh, you were on the court in 2015, were you not?

**Ms. Alcala:** Yes, sir.

**Representative Darby:** 2015? And so-

**Ms. Alcala:** Yes, sir.

**Representative Darby:** -the legislature attempt to change these standards in 2013, which you just referred to, but in 2015, we added some more language to it and we kind of elaborated, instead of junk science, we said field of scientific knowledge. Um, and then we had-- we asked the court to consider a new item, which is whether a testifying expert's scientific knowledge had changed. How did the court view that, and-and, um, did that help you come to the right conclusion in these cases, or do



you still find, uh, were you still find an-an inadequate standard, if you will, by which the court could evaluate these cases?

**Ms. Alcala:** I, uh, was glad that the legislature did that. Um, if you read some facts, some of those Robin's opinions from, um, the-the-the first time, I think, we addressed Robbins, uh, when you passed the statute, there were some dissenters who I think, uh, felt that the medical examiners' revised opinion, uh, was not enough. Because like I said, she didn't go back and say-- originally, she said it was-- the cause of death was asphyxia. Then later, she said the cause of death was undetermined.

And what I think some of the judges said was, "Well, for her to disavow the science, she should have said the cause of death was not asphyxia." So, they wanted the direct refutation of her earlier testimony. But of course, she couldn't do that in her mind because in her mind, she didn't know what the cause of death was. So, she couldn't totally refute cause of death, she could just say, "I now believe it's undetermined." So, this language of field of scientific knowledge, I think was somewhat intended to deal more broadly with this situation where, um, the-the-the new science didn't have to like entirely refute the former science, but it did have to-- um, but-but it did allow more permissive use of the junk science statute.

Um, in the Robbins case with-- what was peculiar was that the court, um, granted relief. It was, um, late one year, I can't remember the-the year. But we had a-a-a-a court of nine judges, and meanwhile, the new statute was passed. Three of the judges retired. Then the following year, those three judges were replaced by three new judges. The state then asked the court-- they filed a motion for rehearing, asking us-- or a motion for reconsideration, I can't remember how it was phrased, but asking us to revisit the grant of relief under the 11.073 statute.

So then the new judges came-came in, and then they voted to grant the rehearing or the reconsideration. And then the case was pending for quite a while, and then ultimately, I think the new judges, um, most of the new judges decided to simply reinstate the-the former opinion. But I think Judge Richardson in particular said that in his, um, concurring opinion, I think he said in particular, that he did not think that Robbins had been entitled to relief under the original 11.073 statute, but that he felt that Robbins was entitled to relief under the-the amended one that had-had added the field of scientific knowledge terminology.

And beyond that, I'd have to go back and read Judge Richardson's opinion to see why he felt like the former one didn't cover the grant of relief, but that the amended one did. But anyway, to answer your question, I think it was important, to at least, Judge Richardson that you had amended it, because if you had not amended it, then, uh, implicitly, he would've voted to deny relief to Robbins. But, um, the-the court just looks at these statutes in an overly technical way. And, um, that is in fact what-what m-many of my complaints are about how the-the court has handled some of the cases.

Um, I don't wanna belabor the point too much, but I would like to mention the six



ideas, I suppose that I-I-I have. Uh, these have not been vetted with any of the stakeholders who may be interested in this issue, and they may have better ideas or better phrasing for what I'm talking about, or they may well oppose them. But-but these are some ways that I think that-that we could make, um, better inroads into, um, addressing junk science, uh, in-in the courtroom.

Um, I think the first thing would be, um, frankly, to avoid what happened, uh, last week, um, you could change the number of judges required to stay in execution. Last week, there were four of the nine judges who, um, I think before this body intervened, four of them had voted to stay the execution and to give further attention to, uh, Roberson's pleadings. Uh, so this came down to the vote of a single judge. The-the decision was five-four, to allow the execution at the Court of Criminal Appeals level, although four of the judges wanted to, uh, stay it or to-to not allow it to move forward. I think where the issue of innocence is involved or where junk science is involved, this court could easily say that four judges would be enough to stay in execution, that you wouldn't need a majority of five.

Um, another possible option, and this one is a long shot [chuckles], but I'll mention it only because I have thought it for quite a while, but I won't belabor the point. Uh, Texas and Oklahoma are the only two states that have two Supreme-- State Supreme Courts; a Civil Supreme Court, and a Criminal Supreme Court. Every other state in the United States and the federal government have a single Supreme Court. And, uh, the Texas Defender Service has looked at that issue in the past. They say that the Court of Criminal Appeals has a much lower reverse rate in capital punishment cases than these other states that have a single Supreme Court.

I believe the-the criminal specialization has-has turned the court into a body that really lost its common sense. It's looking for all of these technicalities. And the criminal law has become, um, much more, um, uh, prosecution favorable in Texas than in other states where, uh, where general jurisdiction judges can compare to-- can-can compare the jurisprudence to how other litigation is handled. And that obviously would involve, uh-uh, deep research, it would involve the constitutional amendment.

So, I mentioned it somewhat in passing, but I have felt that way for quite some time. And I'm not alone, many people also feel this way, including, at the time he was on the Texas Supreme Court, now Fifth Circuit Judge, Don Willett, Justice Don Willett, uh, used to express the need for a single Supreme Court in Texas. I think if we'd had that last year, you wouldn't have-- I mean, last week, you wouldn't have had that situation where the State Supreme Court was ruling one way and-and the Court of Criminal Appeals was ruling another way, and it created a-a conflict between-

**Representative Darby:** Mm-hmm.

**Ms. Alcala:** -the courts. I think all that could be avoided by having a single Supreme Court.

My third comment has to do specifically with the statute. What the Texas Defender



Service report told us is that there are too few cases that have been filed under Article 11.073. Only 74 applications have been filed under the statute in the last decade. Think about that. In all of the thousands and tens of thousands of cases litigated in Texas, uh, really, for over a decade, because these look back to several decades back, uh, the-the statute applies not only to-to after its passage, but even several decades passed, only 74 applications have been filed, and only 20-20% of those have been granted. And almost all of the grants are in DNA cases.

Only one person without an attorney was granted relief, and there have been no junk science grants in capital murder cases. I think that shows, uh, pretty clearly, that this statute is not being used, uh, the way that people had hoped it would be used to bring justice to Texas. Um, so-so what can you do about that? Um, I've mentioned what I'm about to say in the greater context of post-conviction, habeas litigation, but if the legislature wanted to start more narrowly, this would be the perfect place to do it.

I believe that, um, if a defendant has made an arguable, um, assertion that junk science was used in his- in his case-- his or her case, or if it's one of those issues that we know, uh, involve, um, historically have involved junk science, and I think that list is in the report, so I won't report my TDS so I won't repeat it. But in these types of cases, the statute could require that counsel be appointed and that funds be granted for experts, uh, defense experts. The problem is that when I raised that-- the-the Texas legislature does have a statute, I don't remember the number, that does permit trial courts to appoint counsel in writs of habeas corpus. The problem again, comes back to the Court of Criminal Appeals.

The Court of Criminal Appeals refused to enforce the statute. The Court of Criminal Appeals said that it was a wholly discretionary statute and that if the trial court chose not to appoint counsel, it would not review that denial. Um, so I would require once there's been some showing,-

**Chair Moody:** Judge--

**Ms. Alcala:** -appointed counsel-- I'm sorry. Yes, sir.

**Chair Moody:** Judge. I just wanna dig down into that. So you-- their reading of that particular provision is that that's discretionary at the trial court level and they're not gonna upset that. That's completely-- they're just completely deferential to that.

**Ms. Alcala:** Correct.

**Chair Moody:** So depending on which district court you're in front of, you either have right to counsel or not in one of the most important legal proceedings you're gonna be a part of?

**Ms. Alcala:** If it's a post-conviction habeas litigation, the court said there is no right to counsel.

none
Completed: 10/30/2024



**Representative Leach:** I have a question.

**Chair Moody:** Yeah.

**Ms. Alcala:** U-unless there's like an evidentiary hearing.

**Chair Moody:** Sure.

**Ms. Alcala:** Unless there's-

**Chair Moody:** Sure. No, I get it.

**Ms. Alcala:** -some-some rare-

**Chair Moody:** Uh, sorry, I just wanted to drill down on that point real quick. Representative Leach or Chairman Leach, sorry.

**Representative Leach:** Sure. Judge, um, good afternoon. Thank you for joining us. It's good to see you and-

**Ms. Alcala:** Oh, thank you.

**Representative Leach:** -work with you. Um, uh, can I just follow up on that and help my understanding here? Is there a federal action for-for-for grossly negligent assistance of counsel in violation of the Sixth Amendment? Is there any sort of federal relief at that point or no?

**Ms. Alcala:** There-there can be. Uh, that's gotten pretty complicated, where a lot of times, the federal courts will look to have a state court handle something, and so it can get pretty complicated a-about when somebody can get federal relief and when-- or even appointed counsel and when they can't. Um--

**Representative Leach:** Just [crosstalk]-

**Ms. Alcala:** But it gets [crosstalk]

**Representative Leach:** -mentioned in her, um, in her opi-opinion last week, uh, I don't have it in front of me right now, but she-she basically said that we don't have a-an actionable, um, federal claim, uh, for-for the Supreme Court to rule on. In other- in other words, there was no- there was no, uh, there case for them to rule on. They kicked it back down to the states. How do we get-- do you have any sort of opinion on how we- how we get a federal claim in a case like this?

**Ms. Alcala:** Well, you're not gonna get it under 11.073-

**Representative Leach:** Right.

**Ms. Alcala:** -because that's really a state statute. A lot of times they'll frame something like this, like, you pointed out before with one of the other speakers. But



this could potentially have been raised as ineffective assistance of counsel, at least in theory. But again, you have to step back to what the environment was, you know, I don't remember if it's 20 or 30 years ago. You have to step back in time and realize that back then, shaken baby was considered, uh, a plausible theory. And-and in all candor, when I was a prosecutor, I prosecuted a shaken baby case, which I now obviously, thoroughly regret, but that was how prosecutors were thought-- taught, that's how, um, that's what doctors believed and that's what the doctors said.

And so, that's the problem, is that, how do you blame a defense attorney for, let's say, conceding like he did at trial, "Oh, this is a shaken baby case," because-- and-and I don't know if this lawyer was a great lawyer or a terrible lawyer. I-I haven't dug into the record enough, and-and-and I don't wanna commit one way or the other. My point is simply that I can understand why a defense lawyer, 20, 30 years ago, knowing that that's- that was what the the-the experts were pretty universally saying, you know, I even wonder could he not even find an expert to say something different back then? Uh, you know, that part, I don't know.

Did the trial judge give him or her funds to hire an expert to try to find somebody to say something different? You know, those are all-all unanswered questions for me. But regardless, I can see how this lawyer, at the time, would've conceded shaken baby, because that's what the science was at the time, and that's why this statute is so critically important, is because it does-- this statute doesn't really assess bad faith on the part of the experts. All it says is that things have changed, and today we understand this science differently. And so that's the problem.

When you try to intertwine something like ineffective assistance of counsel, uh, you have to meet that burden, that at the time, he behaved-- he or she behaved unreasonably, and I'm not sure you could prove that in this case. I mean, it's-it's possible I- perhaps-perhaps if I've looked at it, but my suspicion is that-that that's why maybe ineffective assistance of counsel may not have been, um, something that, um, they could- they could win at the federal level. So for the federal courts to get involved, you've gotta have a federal constitutional-

**Representative Leach:** Right.

**Ms. Alcala:** -issue. And so what I'm suspecting is that-that-that these very skilled lawyers that we have here today have been unable to find a-a federal constitutional issue at play.

**Representative Leach:** Hmm. Okay. Thank you, Judge.

**Ms. Alcala:** Well, either-- I'm sorry. Let me correct that. Maybe they can't find it or maybe the time, um, um, maybe that was litigated in the past and they don't have grounds to re-litigate it-

**Representative Leach:** Right.

**Ms. Alcala:** -today. I can't speak to that.

Completed: 10/30/2024



**Chair Moody:** Okay. Representative Harrison, you had a follow-up question.

**Representative Harrison:** Yeah. Just very quickly. Thank you, Judge. Um, you mentioned a second ago that you had-- previously, you had personally had prosecuted, um, some shaken baby syndrome cases. Did I hear that right?

**Ms. Alcala:** I did one. One comes to mind.

**Representative Harrison:** One. Roughly, do you remember if you- if you remember, what year was that?

**Ms. Alcala:** I don't, but I was a prosecutor from 1989, and I-I left December 31st, 1998. And I think I tried it when I was a chief prosecutor, so that would've been in the last five years, so it would've been between, let's say, probably 1990-- sometime between 1993 and 1998-

**Representative Harrison:** Okay.

**Ms. Alcala:** -I believe.

**Representative Harrison:** So mid, late '90s. Um, where-where-- I'd like to hear from you, um, are you aware that-- and again, as this is my understanding, so feel free to correct me if you understand it differently. My understanding is, even the mon-- even amongst the elements of the medical and scientific community that are still adherence to, you know, shaken baby syndrome or AHT and-and say that it still can have some applicability in-in-in criminal cases, and-and, um, my understanding is that now, and you know, in 2024, it's sort of a diagnosis or a theory almost of last resort. Like, once all the- all the other plausible alternatives or explanations have been considered and excluded, then you could consider this as something that might, uh, be a hypothesis that matches the data.

When you were prosecuting a case like this in-in the late '90s, was it your understanding that when the-the classic triad was present, that-that that would be sufficient to determine this was shaken baby syndrome, and that abuse could therefore then be presumed? Is that-- am I facts right or am-am I wrong?

**Ms. Alcala:** I-I-I think that's right. I mean, I don't remember a whole lot about the case that I tried.

**Representative Harrison:** Okay.

**Ms. Alcala:** Um, but it was, I wanna say a-a babysitter, and she claimed she had not hurt the child, and I did not believe her because the, uh, doctors involved in the case told me that- exactly what you just said, they saw these signs in the, um, medical evidence, and because of those signs that they saw, their expert conclusion was that it was either shaken baby, I don't recall, or shaken baby impact. One or the other. But, you know, those are intertwined. That's what's kind of a fallacy that's being portrayed by-by, um, I think the prosecutors in this case, is they're trying to make it


seem as though, "Oh, these are just totally separate things."

The-the way that the impact is determined to be not from a fall, for example, is because they say that because of that triad, they can conclude that the impact was of the force of like a-a car. I remember them always saying, "Oh, no, you have to shake so hard, that it's, like, like, as if somebody had been hit by a car." It was that-that kind of, um, uh, testimony, uh, by the experts. And so, as a prosecutor, I-I didn't question, um, my experts. They, you know, were qualified and trained and educated and-and, um-

**Representative Harrison:** And-and-and-- but just real quick on the-- I think the-the heart of the question I'm trying to get at is, where the triad was-was present, and granted, you-you, of course, were relying on medical experts, um, where the triad was present in the '90s, back in that era, abuse-- It was sort of like commonplace for abuse to therefore then be presumed to have occurred?

**Ms. Alcala:** I believe it was universally--

**Representative Harrison:** That-that tracks with your recollection.

**Ms. Alcala:** I-I think I-- If I'm understanding the question, I believe-- Yes, I believe that's what the experts were saying, and I believe that's what we prosecutors relied on to pursue these convictions.

**Representative Harrison:** Okay. Thank you, Judge.

**Chair Moody:** All right. And I know that-- I think you were going through your list of recommendations, so if you want to pick up back where you- where you were.

**Ms. Alcala:** Sure. Um, I think I was talking about, um, the, um-- oh, the appointment of counsel. So, I would not only require the appointment of counsel and funds for experts, but I would also make it clear that they're entitled to appellate review if the trial judge de-decides to either deny counsel, or deny funding for experts. I think that you can't just leave that up to the-the whim or judgment of a trial judge. I think that that should be scrutinized by the appellate courts.

Uh, my fourth thought about possible statutory, uh, changes would be something I think that we- I briefly mentioned, which has to do with the burden of proof. Right now, the burden of proof is preponderance of the evidence. I think you could consider lowering-lowering that to probable cause, simply because it is so difficult to prove these cases, as we've seen in this case, that sometimes it doesn't fall squarely within, um, um, some of the language, and I-I-I think lowering the burden may make it easier, uh, to address bad science that is used in courtrooms. Um, and I think you could say that the new science probably would have changed the outcome of a trial, and that that should be enough to at least warrant a new trial.

Like Mr. Grisham said, it's not as though, uh, granting this 11.073-- 03 relief is a declaration of innocence, all that the 11.073 relief does, is prove, uh, uh, an-an



entitlement to a retrial. Innocence would be handled under a-a different ha-- post-conviction habeas, um, statute.

My fifth comment has to do with, um-- Today, the statute says whether the defendant proved that he would not have been convicted with the- with the new science. And we've-we've talked a little bit about that as well, how difficult it is to go back in time as to-- and to kind of assess whether that new science would've led to, uh, an acquittal or not. And that's a pretty difficult thing to-to do. So I was thinking that perhaps you could add language to the statute that would say, um, the following.

Uh, right now it says, "The court makes the find--" under B, "The court makes the findings described by subsections 1A and B, and also finds that had the scientific evidence been available at trial, on the preponderance of the evidence, the person would not have been convicted." That's what it says now. It could possibly say, or the state's, or defenses, or theory about a defendant's guilt or innocence, would have been materially altered. I think that's part of what we're seeing in this case, is everybody can see this and say, this was tried as a shaken baby case.

The defense lawyer acknowledged this is a shaken baby case. That was the core theory at trial. And because we know that this case was litigated under that theory, it seems to make common sense that-that now that we know that that was not a proper theory of conviction, that, um-- or a-a proper theory of guilt, that, um, that there-there should be a new trial granted. So, perhaps, if that language was altered to fo-fo-focus more on the theory of litigation that led to the conviction as compared to requiring absolute proof by a preponderance of the evidence, that there would've been a different result.

I think it's that-that suggestion that you're looking at whether the result would've been different, that that's what's causing, uh, the problems in this case, at-at least as I am assessing what's going on. Um, the sixth issue, which is my last, uh, suggestion, but I have several thoughts about it, has to do with, um, the procedural bars. The Texas Defender, uh, service report from this summer said that 28, uh, about 1/3 of the, uh-- or maybe-- of the 74 applications were denied or dismissed on the basis of procedural barriers.

Um, the-the problem with that is that when a procedural barrier is-is imp- is-is applied to a case, the court never gets to the substance at all. All it says is, um, because of this, uh, procedural reason, we are not going to even talk about the substance of the statute and whether it-it warrants relief in a case. And that, I think is problematic across the board for habeas relief, but it is particularly problematic in terms of junk science. So I think there's some real simple fixes to this. I think the legislature could expressly allow the state to agree to waive any procedural barrier in the interest of justice in any habeas case, but in particular, in, uh, junk science cases, if you want it to be more narrow.

Right now, the Court of Criminal Appeals does not allow those waivers, or at least last time I read. That may have been an issue that was before the court. I'm--



Frankly, I'm not sure that-that they ultimately decided that. But that would be a statutory fix to allow, um, waivers of procedural barriers in the interest of justice. Because right now, there's many elected district attorneys who truly are interested in justice, and they should be able to-to waive any procedural reason that would, uh, cause the court to not grant relief. Uh, uh, and that may be a little confusing, 'cause I'm gonna pull back from junk science for a second to talk about what these procedural barriers are.

Um, in habeas litigation, the court will look at whether the issue had been litigated before, and say, "Well, it was litigated before, so we're not gonna let-let you litigate it again." In general, that's fine. Where the court, in my opinion, went astray, is that, it's gone far beyond that because it not only says, was it litigated before, but the court says, could it have been litigated before? And that's when it can get pretty difficult, because if the prior lawyer was ineffective, he or she didn't bother to look.

But if the defendant had had an-an-an effective lawyer, and bothered to look, then yes, in theory, it could have been litigated before. But regardless, it wasn't litigated before. So the court is not really focusing on what did happen. The court focuses on what could have happened if the defendant had had valid counsel or good counsel.

**Chair Moody:** Well, and-and, uh--

**Ms. Alcala:** And, well--

**Chair Moody:** And also, Judge, to that point. ''Cause I think this is-- It-it also matters, you know, in that analysis of could it have been litigated. Uh, the time differential between the decision and the question we're talking about, like the-the perspective matters, right? I mean, the-- When-- I-If you--

I think it goes to this case, if you tried this issue today, uh, there are-- you know, that-that-that you're gonna have an enormous amount of evidence that comes forward, talking about shaken baby syndrome, and how it is a debunked form of science and all that stuff. So the lens- the lens by which the jury would view it, is significantly different. In fact, the-the lens by which any defense attorney is gonna evaluate is significantly different.

Going back in the day, I could say, yeah, I mean, yes, there were people back then in '02/'03 timeframe, that could have raised some questions, some concerns, maybe could-- like, maybe they could have come up with a no-- like, could have come up with a novel argument at the time, but it wasn't a prevailing objection to this type of evidence at that time. So even if you say, yes, sure, it could have been raised, well, sure, but the context matters, right? And-and so, I just-- I've had trouble trying to get my arms around that. Because we're looking backwards, and we're putting these- we're putting these constraints on the concept of what could or couldn't have happened, and we've gotta get out of that-that framework. We're trying to talk about whether there's fundamental fairness to this individual and-and-and getting into, could it have been litigated before, opens up an-- a myriad of problems.



**Ms. Alcala:** Um, so I-I would either remove all procedural barriers to all or many of the procedural barriers to the application of this statute, um, would be my first choice. My second choice would be, or alternatively, I-I would say that, uh, certainly the elected district attorney should be permitted to waive any procedural barriers in the interest of justice in order to ensure, uh, that, um, the-the right people are punished and-and the wrong people are not punished.

Um, [silence] one of the recommendations in the Texas Defender Services report this summer was that the legislature could require that, um, when the Court of Criminal Appeals dismisses or denies, uh, uh, relief under Article 1107, that the court should be required to explain its-- detail its reasons for dismissing or denying, uh, relief on-on procedural grounds. And at first, I-I wasn't convinced by that suggestion, but the more that I have thought about it, the more I think it is a-a valid, um, idea because of the fact that you legislators are in the position of trying to figure out how to make this statute work better.

But the problem is the Court of Criminal Appeals is not explaining itself as to why it's ruling the way that it's ruling. And so you are trying to have to guess, "Well, what procedural barriers did it apply and why did it apply those procedural barriers and why isn't it, um, intervening in these cases?" But if you require a detailed explanation, then maybe you will find out what-- how the court is deciding these cases. And then if you do want to be more proactive in this legislation, you could then, uh, write or-or amend your statute in order to make sure that-that you statutorily incorporate the parts of their analysis that you agree with and the parts that you disagree with.

But I do think that that additional information may be helpful in drafting the statute in such a way that you are avoiding situations like this one where, um, it's unclear what the court is thinking in-in-in reaching the decisions that it's made. Um, so I think I'll stop there. I've given you a lot of, you know, very technical information and it is complicated and-and for-- You know, most people's eyes will gloss over when you get into these technicalities. But-but this is why the system isn't working. It's because, um, I think the court has-has not been, um, has not used a common sense approach in applying these statutes.

And it's been over technical and too-- uh, and-and it leans too far, uh, to uphold convictions and sentences that I think many other Supreme courts in other states would reverse.

**Chair Moody:** Judge, thank you. Lemme make sure if there's-- I have only one last question for you, is anybody else? Chairman Leach.

**Representative Leach:** Yeah. Thank-thank you, Judge. Just one more- um, one more area I wanted to cover with you with-with maybe just one, possibly two questions. Um, as judges we-- as we look, um, forward, as we assess where we are on the- on the Roberson case now and we look forward as to what options, uh, could-could be available, um, uh, you having-having spent time as, uh, in the district


attorney's office, I believe at one point you were Chief Felony prosecutor in Harris County and then as a district court judge in Harris County and then of course on the court of, uh, criminal appeals.

So you have a unique perspective having been in the-the seat of the decision makers that are- that are currently at play here in Roberson's case, the district attorney's office, the district court and the Court of Criminal Appeals. What are- what are the options going forward for someone in Mr. Roberson's case? Um, well, let me just ask you, what-what in your-in your mind are Mr. Roberson's, uh, options going forward at this point? Of course, the-the-the wish, the hope of this-this committee would be a-a new trial could be achieved and all of this could, uh, could be retried, but is that- is that possible short of a-- how-how do we- how do we get there?

**Ms. Alcala:** Uh, that's a good question. Um, I-- this is what I believe, um, should happen. Um, um, so because of the good work of the Texas legislature, now defendants are entitled to 90 days notice before an execution date is set. Uh, we know that the last execution warrant expired, it did-- the execution didn't take place that day. So that warrant is no longer valid. So now assuming Palestine wants to continue to move forward with execution after everything we know here, they could-they could schedule an execution date 90 days from now, which takes us into 2025. But as we know, um, there's an election that's about to take place.

Three of the judges who voted against Roberson last week, in other words, they voted to permit the execution to move forward last week. Three of those five judges lost their primary elections in the Republican primary. Those are judges, Slaughter, Hervey, and Keller. So they will not be there anymore in January 2025, there'll be three new judges, whether they are Republicans or Democrats regardless, there's going to be a third of the-the court that is different starting in January 25-- 2025. So four of the judges who voted for Ro-Roberson, um, will still be on the court in January of 2025. That-that was, I think, Judge McClure, Newell, uh, Richardson and-and Newell.

They-they will be there, January 2025. You have three new judges, whether they're Republican or Democrat as well. And then you only have two judges still on the court that ruled against Roberson. Those-- That's Judge Yeary and Judge, um, Keel. In theory, even if one of the new judges again, regardless whether it's a Democrat or Republican, even if one of those new judges, uh, joins the four, then hopefully there'll be a majority of five to, um, stay-- formally stay the execution by the Court of Criminal Appeals. And, um, hopefully, they will, uh, grant rehearing of the 11.073 issue. They can do that on their own motion. They don't even need, uh, uh, a motion by defense by Roberson's attorney.

I'm sure she will do that, but they don't even need that. They could, on their own, sua sponte, take what's been filed, add the vote of the fifth new judge, stay the execution and then they can take as long as they want to dig into the issues that have been presented before this committee, that is what I hope happens. That's, I think, best case situation. Worst case situation is that the three, whoever the three new judges



are that are elected end up siding with the-the two judges who voted against Roberson, then we're back in that situation where there's a majority vote to permit the execution. And if that happens, I-I frankly don't-- I don't know of, um, a way to avoid execution.

I hope I'm wrong. I hope his lawyers, um, have ideas that-that of which I'm-I'm unaware, but, um, it-it could still happen. I-I can't imagine that happening. But I also couldn't imagine last week at 8:00 PM, uh, when he was still eligible for execution. I-I couldn't imagine that-that-that-that that was the situation taking place. I-I would never have foreseen, um, uh, that situation. And I do believe it would've been a-a tragedy if that execution had taken place. It-it's, um-- it is a credit to this organization that, um, you saw this injustice and that you did what you needed to do, uh, to try to make sure that-that innocent people are not executed in Texas and that people have valid and credible, uh, findings of guilt.

And I don't- I don't know if you're getting any criticism, but I-I don't think you should. I think we should always err on the side of justice because, you know, at most, if-if the execution still takes place, it was just a delay of a few months. And if it doesn't take place, then you have saved the life of an innocent person. So, I-I just don't understand the-

**Representative Leach:** Sure. Judge, let me-- Yeah.

**Ms. Alcala:** -un-unwillingness to grant a stay.

**Representative Leach:** Let-let me, uh, just follow up on one thing you mentioned there. You mentioned that the court could, on its own volition, sua sponte move-move forward with a- uh, with a stay of execution. Does there have to be, and-and just excuse my ignorance on-on this. I don't- I don't practice in this area. So there are, in-in my own mind, at least, no stupid questions here. And I-- um, can the court now, without a pending-- uh, without an execution warrant being active now, can the courts sua sponte now if they so wanted to. If one of those judges who didn't vote the way that, um, I think most of us would have- would have, um, liked for them to, or expected or hoped for them to.

And I have great respect for, and know many of those, uh, if not all of those judges, and I disagree with them-them on this strongly, but I still have great respect for them. If one of them, um, had a change of mind or a change of heart, could the court now sua sponte do anything?

**Ms. Alcala:** Yes. Um, and I agree with you. I have a lot of respect for my former colleagues, and I reiterate it's an extremely difficult job, um, that-that really, uh, can-can be, um, um, uh, difficult for the people who've undertaken the role. Uh, and I think I misspoke. So there's two possible things that-that could happen. One is, um, the re-- the-the, um, application for habeas relief under 11.073. The second thing is a motion for a stay of execution. So on their own motion right now, the court could sua sponte decide to reopen its 11.073 habeas decision. Uh, we used to do that sometimes at the urging of defense counsel, and sometimes one of us internally



would say, um, "You know, we need to re-look at-at this issue." And--

**Representative Leach:** Wait-wait judge, I-I-I wanna stop you there because I think- I think that that's a new-- that-that may be new information for legislators or people who are- who are tuning in. So if-if one of the current judges between now and January, if-if later today or tomorrow or next week had a change of heart or a change of mind, which I think we're all gonna still continue to hope and pray for, um, they could- they could actually act now sua sponte and claw this back into the district court?

**Ms. Alcala:** My position is yes. I mean, we did- uh, we did reopen habeas applications that, um, we had decided. We-we-we did do that. And sometimes the lawyers would file, like a suggestion for reconsideration is how they- um, they would style it because it's not a rehearing in the technical sense, but it's a-- they would style it as a suggestion for reconsideration. And I think the defense attorneys in this case may have framed it that way, but I-I'd have to go back and look at it. But yes, on their own motion, they could say, "We-we internally have decided to, um, reopen and reconsider this, um, 11.073 ruling." And I believe they could, uh, today, uh, uh, decide to reopen it and decide to order further evidentiary hearings.

Typically, what they would do is they would remand the case back to the trial court for more factual, uh, hearings. And then the trial court would make findings of fact and conclusions of law. The lawyers would have litigation down there, then the case would come back up to the Court of Criminal Appeals, and then the lawyers would file their briefs and arguments either saying that the trial court got it right or the-- in its findings of fact in conclusions of law or the trial court got it wrong. But that's typically how this habeas litigation works.

The motion to stay execution is different because there's no execution pending. So they wouldn't, uh, change their ruling on that because there's no rule, uh, there's no-no execution that's been set. You know, a third option is that the DA, um, in Palestine could just decide, uh, not to set an execution date until, um, further time maybe that DA would want to go back and listen to all the testimony. Maybe they would, um, you know, hire an- uh, an expert to come in, a prosecution expert to come in and review everything in the case in order to give-give them an impartial assessment. I mean, there's any number of things that the DA's office could do, uh, in order to, um, not seek another execution day. But, uh, yes-

**Representative Leach:** Yeah, and-

**Ms. Alcala:** -I believe you have to do something today.

**Representative Leach:** -just-just one-one last closing, uh, comment here. I'll-I'll just, uh, thank you for your testimony and for answering my questions. I just, you know, in the- in the legislature, uh, we-- well, I'll just speak for me. I know there's been, um, regular occasions where even on some major legislation on the floor of the Texas House, public for everyone to see, where I've voted a certain way and realized either right after I did, or even later after the fact, that I got that vote wrong. And we, under


our house rules have the ability to get up and to walk to the journal clerk and to, again, in front of everyone, we kind of joke about it being the walk of shame. Go up there and we change our vote.

And we can add statements into the journal. And there's been multiple occurrences where I've, you know, gotten it wrong. And, um, it sounds to me like there is a tool in the toolbox for our current court to do the same thing, or not even to say that they got it wrong, Judge, but it's just to say that they might have gotten it wrong.

**Ms. Alcala:** Correct.

**Representative Leach:** Right? So one judge, one judge saying, 'I think I got it right, but I'm-I'm willing to admit that I might have gotten it wrong," that's all it would take. Correct?

**Ms. Alcala:** Yes. And frankly, the four of them who voted for a stay really have not committed that they're gonna rule in Roberson's favor at all.

**Representative Leach:** Correct.

**Ms. Alcala:** All they said was what you just said, that they were willing to pause in order to look further. So the mere fact that there's a stay or a reconsideration, all that does is just pause it to make sure that the issue is litigated. It doesn't guarantee an outcome one way or the other.

**Representative Leach:** Which, from my perspective, Judge, is all I've ever wanted. All I've ever been asking for in working towards in this case, I've said it, using your words, is the pause button. The pause button, that's it. And, um, I know that that's what I'm gonna be praying for and hoping for. Thank you, Judge.

**Ms. Alcala:** Thank you.

**Chair Moody:** Judge, thank you. I just-just want to go down a quick path with you, um, before we excuse you. And it's always weird to say we're excusing the Judge. But, um, [laughter] um, you've been a prosecutor, right? You've-you've served as at the- uh, you've served on the district bench, presided over cases, and you've presided over the highest level of appeals in this state. All true?

**Ms. Alcala:** All true.

**Chair Moody:** Okay. So you've kind of seen how things go, and that's kind of what I wanna drill down on. Um, 'cause you've seen criminal cases and trends across the state in your time, uh, in your experience, is it fair to say that in some places the prosecution essentially gets everything that they want?

**Ms. Alcala:** Yes.

**Chair Moody:** Okay. And in some places, uh, juries go along with the state, uh,



because there's great trust that if someone was charged, then they must be guilty. There's some deference that they give to the prosecutor?

**Ms. Alcala:** Yes.

**Chair Moody:** And-and then, uh, when it comes to appeals, is it fair to say that there's another layer of extreme deference built into our system, um, that creates an injustice at times?

**Ms. Alcala:** Yes.

**Chair Moody:** So when things are at that trial court level and how we look at it through the lens of the appellate court level, right? The trial court makes rulings on evidence. And even if they're wrong- even if they're wrong, they get a lot-- that district judge gets a ton of leeway in what we call the abuse of discretion standard. Isn't that correct?

**Ms. Alcala:** Correct.

**Chair Moody:** Okay. So basically that-- what that standard means is, even if wrong, it's only, did the judge act without any legal basis at all.

**Ms. Alcala:** Correct.

**Chair Moody:** Right? And so that's the abuse of discretion standard. And then we have another-another deferential standard that we talk about, a harmless error, right? That's another deferential standard.

**Ms. Alcala:** Yes.

**Chair Moody:** That's-- And so that means if you're-you're totally wrong, no legal basis, but there's no concrete harm that's proven. So- um, so that's what- that's what harmless error means in that- in that context, right?

**Ms. Alcala:** Yeah.

**Chair Moody:** So then from there, your appeals court, they defer to the jury about all the facts, and they assume that because there was a conviction, if there was, you know, if there was any testimony at all, no matter how incredible the jury, the-- we get to-- the-the appeals court defers to the jury wholly and completely. So now we must do that as well, right? That's the way the appeals court looks at the jury fact-finding?

**Ms. Alcala:** Yes.

**Chair Moody:** Okay. And then going specifically to Article 11.073, there's a similar process in- there's a similar process in-in habeas proceedings. So the-the habeas court makes findings of fact, and those are the basis for everything that the Court of



Criminal Appeals does. Isn't that correct?

**Ms. Alcala:** In general, the court does not have to-- the court can decide that the findings of fact are not supported by the record.

**Chair Moody:** The record, right.

**Ms. Alcala:** So--

**Chair Moody:** Yeah. But- um, but, uh, the habeas court delivers-- they essentially do the legwork, build the record, and produce findings of fact and send that up. And that's, uh, that's what the Court of Criminal Appeals engages with in making their decision, right? Um--

**Ms. Alcala:** Yes, but-but sometimes the court says that on its own motion or on its own review, it's going to do whatever it does. So sometimes it follows the findings of facts. Sometimes it expressly says that the finding of fact is not supported by the evidence. And sometimes the court says on its own review, it's going to do-- [crosstalk]

**Chair Moody:** They do their own. They do their own, right. And so, going back to some of the deference we get at that trial court level, that nuclear part of the trial, which in this case, when you- in this case, when you look at that from the ha-- from the 11.073 perspective, the habeas court, is that-that trial court that's taking that-that evidence. We heard last week in-in the committee, uh, we actually saw a demonstrative of the findings of fact and conclusions of law that were submitted by the defense and the prosecutor.

Uh, and I know that that's not determinative of anything. You know, just 'cause you have a stack of paper doesn't mean, but-but other than two minor issues, the trial court adopted the state's findings of facts and conclusions of law wholly, completely, except for two minor points. And then the Court of Criminal Appeals, and I think I heard this correctly last week in testimony, wholly adopted those findings of fact and conclusions of law. And I'm not asking you to get into the minds of your former colleagues, but d-does that sound like a process where the new evidence was meaningfully engaged with that was gathered at the habeas court?

**Ms. Alcala:** Um, from the way you describe it, it-it does not.

**Chair Moody:** Okay. Well, I certainly appreciate, Judge, I-- you always have been-- had an- had an open door to talking about some of these most complicated issues. And I wanna thank you for your time, uh, it-- not just today, but in service to the state of Texas throughout your career. Um, certainly grateful for your expertise because this is really, I think, going back to Chairman Darby's point at the beginning of the hearing, this is the crux of it. What are we gonna do? And you've given us some very concrete solutions and thoughts and ideas that we can move forward from-from here.



Because while this is crystallized in Robert's case right here today, there's another Robert Roberson out there somewhere, and we need to start figuring this out. So Judge, I don't think there-- do we have any other questions before I excuse Judge Alcala? No. Judge, thank you so much. I certainly appreciate all the time you spent with us today.

**Ms. Alcala:** Thank you, Chairman.

**Chair Moody:** Chair calls Donald Salzman.

**[pause 05:25:36]**

**Mr. Donald Salzman:** Good afternoon.

**Chair Moody:** Hi, good afternoon. Um, just want to make sure that I have this correct. I have you registered as Donald Salzman here testifying on behalf of yourself, and you are testifying neutral on the topic that we have posted for today. Is that correct?

**Mr. Salzman:** That is correct.

**Chair Moody:** Okay, awesome. I'm going to open the floor to you to provide your testimony. As you've seen, I've seen you sitting here all day. The members may have witnesses or may have questions as you go. They may jump in or they may wait till you conclude, but we'll have questions as we go along. So thank you so much.

**Mr. Salzman:** Thank you, Chairman Moody and members of the committee. Um, I very much appreciate the invitation to talk with you today and your attention and focus on 11.073 and Mr. Roberson's case. Um, I do need to make clear that my testimony today is on my own behalf, not on behalf of my firm, and the views that I express are my own. Um--

**Chair Moody:** That's what the record reflects-

**Mr. Salzman:** Thank you.

**Chair Moody:** -up here. Yep.

**Mr. Salzman:** So I just want to tell you briefly how I got involved in this case. Um, I'm the pro bono counsel at Skadden, Arps, Slate, Meagher & Flom. I've been in that position full-time, pro bono counsel for 22 years. But before that, I was a public defender in, uh, Maryland, in a suburb of Washington, DC, uh, for about 15 years. And in 1997, actually while I was on parental leave with my older daughter, I was called by my boss and asked to take on a, uh, what was called a shaken baby case. It was a homicide case, um, when I would return from parental leave very soon after that.



Um, I have worked on a total of six of these abusive head trauma shaken baby theory cases, um, over my career. And I'm an-- a lawyer who has seen the arc, the evolution in the scientific understanding. That is the-- was the basis for shaken baby syndrome moved from a period, as you all have heard, where there was a presumption that if the triad existed, then if a baby died, that was abuse and murder, um, to a position now where, um, the presumption is exactly the opposite. Um, the diagnosis of a plausible other explanation, medical explanation, accident, something like that, um, has to be considered and excluded before any, um, consideration or the possibility of abuse would be, um, considered.

Um, and in those cases, I've seen how hard it is to find expert witnesses, particularly back when I started doing this in 1997, to testify to anything different. The medical community had almost total consensus. So I have a fair amount of experience with the-these types of cases. I'm happy to talk about at least one of my cases, Clarence Jones, um, who is exonerated in Maryland when a writ of actual innocence was granted to him in 2021. And I will briefly later talk about some of the parallels between Mr. Roberson's case and Mr. Jones's case.

Um, but I got involved in Robert Roberson's case when Gretchen Sween reached out to me. Um, she had heard about my experience and she asked me whether my law firm would be willing to, um, take a look at Mr. Roberson's case. Um, these are, as you've heard over the testimony last week and today, these are complex, really difficult cases. And I-I want to take a-a moment just to say I've gotten to know Gretchen Sween over the last two years. I think I can speak for my colleagues at my law firm and the Innocence Project to say that what she has done to keep Robert Roberson alive over the last eight years, with help from others, but, um, is remarkable. She's fierce, she's dedicated, and I'm proud to be associated with her.

Um, so she asked me if my law firm would take a look at Mr. Roberson's case and we took a very, very careful look. Um, and what we found are a lot of the things that you've heard over the last two days of hearings. Um, I won't go into them in detail right now, but obviously the medical records and, um, trial transcript, and, uh, expert opinions that were offered at the trial were infused, as you've heard, with shaken baby syndrome theory under several different names. And-and the terminology, the terms of art that are associated with shaken baby syndrome, abusive head trauma theory was infused in this trial.

We looked at this case, and we saw that Nikki Curtis was a very, very sick child. And we've now learned that she has-- she had pneumonia, which explains her death. When we looked at the case, we saw-- we found that that evidence that she had pneumono-- pneumonia was definitive, but it was not understood or really even discussed at trial. I've already talked about what the medical consensus was at the time that Robert Roberson was prosecuted. And I think the-the committee has heard testimony from a number of people as-- and as some committee members have said, that the district attorney's office, the attorney general's office, people who are in the community advocating for Mr. Roberson's guilt, many, many people.


There has been a retreat from the shaken baby syndrome hyproth-hypothesis that was absolutely the theory of prosecution at trial. And you've also heard discussion today from Dr. Phil and maybe other witnesses about the unconscious or sometimes conscious, but unconscious bias that infuses these cases. And I think it's important to remember, as many of the committee members have, um, expressed today and some of the witnesses, and particularly Ms. Compton, that we have to look at these cases from the point of view of what the jury heard, not what the district attorney says they told the jury, not what the medical examiner says they told the jury, but what the jury heard.

And when you read the transcript in this case, I think it's very clear what the jury heard, outdated, unverified, unreliable science that was presented to the jury as fact. And it-it was essentially, as this committee has expressed, a diagnosis of murder. Um, so I was asked to get involved and we put together a team at my firm. We looked at this case very carefully, and we concluded that there was an injustice. And I told Gretchen that I wanted to see if the Innocence Project would get involved because I had worked with the Innocence Project, the National Innocence Project, on a number of cases throughout my career, innocence cases.

Um, and so I reached out to my contacts at the National Innocence Project and asked them to take a look at Robert's case. And I think it's important for the committee to know that the Innocence Project does not get involved in every case that they're asked. They get thousands and thousands of requests. My firm helped them with a backlog of 4,000 requests for assistance because there's so many people reaching out to them, but they do an exhaustive, um, screening of their cases. They do not take a case where it looks like there might have been poor lawyering just because there was poor lawyering.

They don't take on a case because there might have been constitutional errors in the case just because there were constitutional errors, although in many of their cases they-they find them. They take on the cases when they-- after doing an exhaustive review, they believe there is compelling evidence that the person who was charged and convicted is innocent. So they did an exhaustive review of Robert Roberson's case, um, and they, um, joined the effort because, I think I can speak for them, they believe that there's been a terrible injustice and that Robert Roberson has been convicted and sentenced to death for something that was not a crime.

Um, and in many of the Innocence Project cases, the cases they get involved in, as you've heard, flawed, invalid, unscientific science and medicine has played an enormous role in the cases that they've worked on, that they've been able to prove have been wrongful convictions of innocent people. One other thing that I think it's important for you to know about the way the Innocence Project works is that they try to work in a collaborative way. They reach out to prosecutors, attorney generals, district attorneys. They-they ask to, um, meet with them to discuss the evidence, to explain why they think there might have been an injustice or why there was an injustice, and they often are taken up on that.



But in this case, it's frustrating and unfortunate that that has not been the case. The Innocence Project reached out to DA Allyson Mitchell early on when they got involved in the case and asked to meet with her. Um, she was polite, but she did not willingly and openly-openly-- she didn't openly, um, discuss the case. I had a chance to be in Palestine, Texas, in April of this year. We were reviewing their records to make sure that we had everything, um, that they had, and that was when, um, I learned that they were planning to set Robert Roberson's execution date. And I asked Allyson Mitchell if she would meet with us to talk about the new evidence that we had discovered and developed, and she said that she was not willing to do that.

The Innocence Project also sought to meet with the medical examiner in this office to share the new evidence that we've developed since the last hearing in 2021. Um, after a lot of process, the Innocence Project was told that the medical examiner would meet with them but with-- not with any of our experts for 10 or 15 minutes. Um, in a case of this severity, um, that was a disappointing, um, response. Um, I know it's late. I do want to talk about, um, one of the most significant issues that I think the members of this committee, um, has been discussing and, um, you know, I don't know, maybe it's the elephant in room-- in the room.

It is the, um, position of the district attorney, the office of the attorney general, and I think this has also seeped into the one opinion we have from a concurring judge in this case, and that's the allegation which, um, I'm gonna explain why this is really misinformation, um, that Nikki, upon her arrival at the emergency room in Palestine, had multiple bruises, um, and injuries. The, um, attorney general, just over the weekend, filed a brief that said Robert Roberson brought his two-year-old daughter Nikki to the hospital. Upon arrival, Nikki had extensive bruising to her chin, face, ears, shoulder, and mouth, and the back of her skull was mushy.

That is absolutely not true, and I'm gonna-- I'll tell you in a minute why the trial record shows that that is not true. There's also been allegations, as you've heard and you've discussed, about multiple impacts to Nikki Curtis's head. That is the theory now that the district attorney and the office of the attorney general is presenting, that this was not a shaken baby case, and as you have discussed, the CT scan, which I'll talk briefly about but you already know, absolutely refutes that.

So let me just talk about a key witness in this case, the first nurse who encountered Nikki Curtis. Her name was Kelly Gurganus. Her name is Kelly Gurganus, and she was in the ER when Robert Roberson arrived at the hospital, handed his daughter Nikki to Robert's then-girlfriend, Teddie Cox, who was-- happened to be in the hospital for a medical procedure, was in a wheelchair, and met Robert outside, um, the hospital. When Teddie Cox was brought into the hospital in a wheelchair, she said her lips are blue or she's blue or she's not breathing or something like that.

And Kelly Gurganus testified that she immediately went, she saw this bundle in Teddie Cox's, um, arms and she grabbed the child. That was-- those were her words, and she used that term several times. And I-- And obviously, that's the appropriate thing to do. But we know because of the testimony last week from



Francis Green and Dr. Auer that Nikki had a bleeding disorder, disseminated intravascular coagu-coagulation that causes even from minor medical, uh, you know, touching and procedures, bleeding.

So, Kelly Gurganus grabbed Nikki, and she testified that when she brought Nikki into the examination room, she said, "I witnessed bruising. There was what appeared to be a bruise right across here." And she was pointing, and I'll get to where she was pointing in a minute. "And down here on her medially." Medially means along the center. And later, she testified that what she was talking about was Nikki's lip and her chin. Of course, that is absolutely consistent with what Robert told the medical staff, nurses, and doctors, that Nikki had fallen out of bed, and he told one of the nurses that she-- he believed she might have hit her, um, head or face or something on a table because she was bleeding, um, when he picked her up.

Multiple times during her testimony, Nurse Gurganus was asked to describe any other injuries, bruises, or swelling on Nikki, but those bruises that she described were the only ones she described on Nikki. She was asked to describe what she observed on Nikki's head after Nikki was in-intubated, and the police arrived, they shaved Nikki's head. And she testified, "As I remember-- I remember, once the police got there, they shaved the back of her head. So, they shaved the back of her head, and I don't recall it being bruised. But it was red, and it was just mushy, like a soft spot."

Now, we know that Nikki Curtis had this bleeding disorder. We know that she was intubated. We know that doctors put a tube down her throat, and the procedure involves, you know, um, holding the child's face and head still while the breathing tube is placed down the throat. Um, we understand from Dr. Squires, who testified that when she saw Nikki at Dallas Children's Hospital, Nikki's face was taped, and there were- there were other medical devices over her face, so Dr. Squires couldn't see all of, uh, Nikki's face.

Um, in the context, in the setting of disseminated intravascular coagulation, any bruises that were seen at autopsy that are different from what Nurse Gurganus described, no one can rely on that to say that those were the product of anything other than the medical treatment that she received. Nurse Gurganus also testified that she ap-- saw other bruises developing during the time that she saw Nikki in the hospital, which is consistent, again, with the testimony of Dr. Green and Dr. Auer that Nikki had a bleeding disorder.

This is what Kelly Gurganus was asked, "So those bruises became more apparent as she was being treated?" And the answer was, "As ti-- as the time went on, more bruises were apparent." She was later asked, "And you were triggered by the bruising that had started to develop?" "Yes, sir." The testimony from the nurse who saw Nikki first described bruises developing over time, and the arguments that have been made now to defend this conviction are contrary to what the record shows.

And as I said, another nurse testified that Nikki-- that Robert Roberson told her that


he believed Nikki had fallen and hit her head or face on a table, and found blood in her mouth, cleared-- cleaned that blood with a-a washcloth, which he then showed to Brian Wharton when he was brought to his house. Um, so the-the-the bruise on Nikki's lip, the torn frenulum, the bru-- any other bruise on her face are consistent with what Robert Roberson told, uh, people at the hospital. I do want to address, uh, a different topic briefly because--

**Chair Moody:** Mr. Salzman.

**Mr. Salzman:** Sure. Of course. Yeah.

**Chair Moody:** Chairman Leach.

**Representative Leach:** Thank you, Mr. Salzman. Let me just ask you a couple of questions, kind of where you are in the timeline here. Um, was Nikki-- let me just ask, was Nikki alive when she was brought to the hospital?

**Mr. Salzman:** The medical records show that sh-- her pupil-pupils were fixed and dilated. That is a grave condition. She wasn't breathing, her lips were blue, her brain was-- essentially, according to the experts, her brain was essentially dead at that point, but she was revived because of heroic efforts in the emergency room.

**Representative Leach:** So-so when Mr. Roberson brought her in, um, she was- she was still breathing, correct?

**Mr. Salzman:** I-- She was blue. I-- um, the medical records are really not clear whether she was breathing or not.

**Representative Leach:** Okay.

**Mr. Salzman:** I don't know if you've looked at them, they are really hard to read.

**Representative Leach:** They are. Um, so we-we don't-- we-- let's just say we don't know, but she was intubated, right?

**Mr. Salzman:** She was.

**Representative Leach:** And, um, she was placed on life support, correct?

**Mr. Salzman:** She was.

**Representative Leach:** And then she was transported to Dallas Children's?

**Mr. Salzman:** A few hours later.

**Representative Leach:** A few hours later?

**Mr. Salzman:** Mm-hmm.


**Representative Leach:** And, uh, so what date would that have been?

**Mr. Salzman:** January 31st. And we don't have any records. There are no records when Ms. Sween got, uh, in-involved in this case in 2016. Any records of the transport and what procedures were performed during the transport are no longer available.

**Representative Leach:** No records at all?

**Mr. Salzman:** Absolutely none.

**Representative Leach:** Why would you-- w-why do you believe, or does the record reflect why they transported her from- uh, from Palestine to Dallas?

**Mr. Salzman:** Yeah. Nikki was in critical condition, grave condition. Palestine is a regional hospital. It-it's not a-a-

**Representative Leach:** Correct.

**Mr. Salzman:** -primary-- I mean, a-a trauma center.

**Representative Leach:** So-- and-and this is- this is a vitally important point, at least for me, and so I-I just want to stop here and make sure that-that we're all paying attention. Um, Nikki was, you just said, in critical condition?

**Mr. Salzman:** Absolutely.

**Representative Leach:** So-so there were s- there were signs, although-although maybe-maybe a long shot and not, you know, sus-- life-- sustainable life wasn't gonna be a possibility, but she was still-- there were signs of life. She was not pronounced medically--

**Mr. Salzman:** She-she was not pronounced until F-February 1st.

**Representative Leach:** Okay. So, January 31st, she was transported, intubated, put on life support. Transported from, uh, from Palestine Regional to Dallas Children's?

**Mr. Salzman:** Correct.

**Representative Leach:** And, um, what-what was her time of death on the 1st?

**Mr. Salzman:** [chuckles]. Um, Ms. Sween's gonna know that better than I. It was, um, l-later in the, um, afternoon-

**Representative Leach:** Okay.

**Mr. Salzman:** -or evening. Um--

**Representative Leach:** So, um, sh-- there was a decision made to remove life



support, correct?

**Mr. Salzman:** Yes, there was.

**Representative Leach:** Was Mr. Roberson consulted about that decision?

**Mr. Salzman:** He was not.

**Representative Leach:** At that time, on February 1st, did Mr. Roberson maintain conservatorship over Nikki?

**Mr. Salzman:** He'd been a-- Mr. Roberson had been awarded custody by a court, um, and had been involved in Nikki's care for a few months.

**Representative Leach:** As of February 1st, when the decision made-- was made to remove her from life support, no parental rights, none of Mr. Roberson's rights had been- had been terminated?

**Mr. Salzman:** That's my understanding.

**Representative Leach:** Someone made the decision, and correct me if I'm wrong when I say this, but somebody, not Mr. Roberson, made the decision to remove Nikki's life support without his permission?

**Mr. Salzman:** That is my understanding.

**Representative Leach:** Everybody getting that? We've got the removal of life support at Dallas Children's, for which Mr. Roberson, her father, who rushed her to the emergency room in Palestine, was given no say and no permission. Correct?

**Mr. Salzman:** Correct. Since we're on the topic-- [crosstalk] I'm-I'm sorry.

**Representative Leach:** Yeah. No, "Since we're on the topic--"

**Mr. Salzman:** Since we're on the topic of outrageous things, I wanted to briefly just follow up on some of the committee's questioning and the testimony about sexual assault allegations against Robert Roberson. Um, a nurse at Palestine regional hospital who testified that she was a certified sexual assault nurse examiner, when it turns out that she was not a certified sexual assault nurse examiner, examined Nikki, um, while she was in this grave condition, um, and said that she saw three tiny tears, anal tears. Um, the child abuse expert at Dallas Children's Hospital who examined Nikki said that she also saw a tiny tear. But that-that expert, Janet Squires, said that in her in- in her opinion, that was a neutral finding. That was not evidence of abuse.

In fact, she's testified that any mother would know that a child with diarrhea, vomiting, diarrhea, but dia-diarrhea is really important, um, or just diaper rash, to have that type of little skin tag as she described it, is not evidence of sexual abuse. But at trial, not only was the, um, uncertified nurse, sexual assault nurse examiner,



permitted to testify that she saw sexual abuse on Nikki. She was allowed to testify about why pedophiles might choose anal penetration. This is what the jury heard. Why a pedophile Mr. Robinson sitting right there equating him with being a pedophile. Um, and then when Janet Squires--

**Chair Moody:** Mr. Salzman.

**Mr. Salzman:** Yes, I'm sorry.

**Chair Moody:** Representative Harrison.

**Representative Harrison:** Thank you. Just very quick clarifying things. I think you glossed over something that if I understand the record in your testimony is, I think, important for people to hear. [inhales] You said, "Uncertified nurse." My understanding from the review of the record is that on direct examination, this nurse made a representation that she was SANE certified, and then, on cross, had to admit that she had lied to the jury about her credentials to even be speaking about such a matter. Um, can you comment on that, and is my understanding consistent with the facts as you understand them?

**Mr. Salzman:** You're absolutely correct, Representative Harrison. She testified on direct that she was a certified sexual assault nurse examiner, and then she admitted on cross-examination that she had never been certified. Um--

**Representative Harrison:** It's just unreal.

**Mr. Salzman:** Um, Janet Squires was asked by the prosecutor about the anal tear. And after she gave her testimony that any parent, any mother looking at that would recognize that as essentially normal and-and obviously we know that Nikki had diarrhea, the prosecutor then said, "However, Dr. Squires, you've seen a lot of child sexual abuse cases," and I'm paraphrasing, "And there are cases where children have been sexually abused when there's no evidence of sexual abuse." Now, this is a jury and- uh, and, um, this is jury that was told during voir dire. And I'm from-- I grew up in New York State, I live in Washington, DC. I know I'm mispronouncing this term. I know you-- I'm not even gonna try to pronounce it.

[coughing]

**Mr. Salzman:** Voir dire, I'm sorry.

**Speakers:** Voir dire.

[laughter]

**Mr. Salzman:** Yeah, [lipsmack] my colleagues probably would have advised me not to attempt that. Um, every juror was asked about, um, whether they could be fair when they heard evidence about sexual abuse. Robert Roberson being, um, you know, having alleged to have sexually abused his daughter.



**Representative Harrison:** What's the timing of this?

**Mr. Salzman:** During-during the trial, e-every juror, every single one I think, um, back in, um, 2003. Um, they heard evidence about it in the opening statement, then they heard this testimony.

**Representative Harrison:** Those-- I'm sorry, during juror selection, during voir dire?

**Mr. Salzman:** During juror selection, yes, sorry. The-the phase of the trial that I won't try to pronounce again. Um, and then as you've heard, the-the allegation of sexual abuse was a grounds for the death penalty. That's how it was presented to the jury, um, at the beginning of the trial, that there were two reasons that Robert Roberson was eligible for the death penalty. One was because, um, you know, he had been alleged to have murdered a child under six, and the second was based on the sexual assault grounds. Um, then, after the evidence was in, the prosecutor withdrew the grounds involving sexual abuse, but they still argued that there had been sexual abuse committed by Robert Roberson to the jury in the closing argument.

And I'll just say one other thing on this. Before the trial began, the trial judge, uh, overruled an objection from the defense about the admissibility of the sexual assault evidence, but the trial judge said to the prosecution, "You need to--" And again, I'm paraphrasing, "You need to tread carefully because if you don't prove this allegation, it's grounds for a mistrial." Um, but no mistrial was granted. So, but--

**Chair Moody:** Can-can you say that again?

**Mr. Salzman:** Yeah. The judge warned--

**Chair Moody:** At-at what point?

**Mr. Salzman:** Uh, prior to the beginning of the trial, but trial-- prior to the presentation of the evidence, the judge warned the prosecution that if they weren't able to prove that sexual assault had occurred, sexual abuse had occurred, then that would be grounds for a mistrial.

**Chair Moody:** And then did-did the Defense Council move later?

**?Representative Harrison:** Yeah.

**Mr. Salzman:** Ms-- I believe so. Ms. Sween will-- Ms. Sween knows the-the record way better than I do. I-I know-- I've read the record, but i-it's late, and I just, yeah, I don't want to misspeak. I believe so, but she will correct me if I'm wrong.

**Chair Moody:** Representative Schatzline.

**Representative Schatzline:** So, [clears throat] I just got to understand this because that's a detail that I did not realize. So, you're saying that as jurors were being selected, sexual abuse was mentioned. Um, and then when this was shown to be



unsubstantiated, there's no evidence of sexual abuse. Um, and the judge even warned, "Hey, you cannot use this unless you have the evidence or it's grounds for a mistrial." Then in the closing statements, it was said again and yet a mistrial was not granted. Am I hearing that correctly?

**Mr. Salzman:** Essentially correct. I-I don't remember at what point the request for a mistrial was made, but sexual assault was definitely discussed during the closing argument by the prosecutor after withdrawing it as a grounds for the-the capital, um, conviction.

**Representative Schatzline:** So not only was this conviction based off of, you know, junk science, but the jury is hearing after it's exposed the idea that sexual abuse is going to be discussed. It's then hearing, you know, this has been removed and then said again in the closing argument, and-and we're expecting this jury with no evidence of any of her medical history to be able to make a decision based off of, not just junk science, but fa-- really false testimony at that point.

**Mr. Salzman:** I don't disagree with you.

**Representative Schatzline:** Thank you.

**Mr. Salzman:** I think that's a-absolutely accurate.

**Chair Moody:** Okay, Representative Harrison.

**Representative Harrison:** Thanks. Sorry, not to belabor this point, but I just I-I'm gonna be honest, like I have trouble even though I've seen a lot of this in the record, I have a real hard time getting my head around this. Um, why would-- Where did sexual abuse first become a thing in this case? Why-why was the child examined for that, uh, upon presentation to the hospital? Was there- was there a suspicion, like where did this come from in the case?

**Mr. Salzman:** Ni-Nikki Curtis was a child who had bruises on her. Her father had given an explanation that medical personnel did not accept. And-and I want to echo what others have said. At the time, that was the medical consensus, but to answer your question, um, that was the scenario when this nurse decided to do an examination of Nikki Curtis's anus. So, presumably, she suspected--

**Representative Harrison:** But she- but she did that of her own volition or what?

**Mr. Salzman:** She did it of her own volition and then reported what she found to one of the doctors. But, um, what led her to go from a suspicion of physical abuse to a suspicion of sexual abuse, there-was- there was no other-- No one came up and said, "Robert Roberson has been, you know, sexually assaulting children." There was no--

**Representative Harrison:** But this- but this type of dialogue and the reason I really want to pull this, this is being thrown around, in my opinion, recklessly and



dangerously all over the internet right now that he's sexually abused and did other things to-to Nikki Curtis. Has there ever been a shr-- a scintilla of substantiated, uh, substantiated evidence to support that claim?

**Mr. Salzman:** Absolutely not.

**Representative Harrison:** Can you say that one more time?

**Mr. Salzman:** Absolutely not.

**Representative Harrison:** Um, and which, forgive me, you might have already mentioned this and I missed it. She was or he was or he was not charged with sexual abuse? It's un- it's unclear to me.

**Mr. Salzman:** Again, Ms. Sween will correct me, I believe that he was not-- the jury was not asked to, um-- [lipsmack] there-there was no-- he wasn't indicted on sexual abuse, I don't believe. I believe it was the aggrav-- you know, an aggravating factor, but again, I'm not an expert on Texas law.

**Representative Harrison:** Okay. We'll-we'll go to a different witness on that.

**Mr. Salzman:** Please-please do.

**Representative Harrison:** But-but regard- but regardless it's-- whether he was or he wasn't, it is unambiguously clear, from your understanding of the record that, um, in-from voir dire to the actual witness testimony, from somebody who was exposed as-as lying on direct examination as to her crede-credentials to even be able to do this, there had been, whether there was a charge or had been withdrawn, regardless, this was still discussed in closing arguments in the Robert Roberson case.

**Mr. Salzman:** It was.

**Representative Harrison:** Thank you.

**Mr. Salzman:** I wanted to talk a little bit about the shaken baby syndrome theory. Um, and it's-- it goes by many names. It started out as, um, whiplash shaking in the '70s and then it became shaken baby syndrome. And there was a whole shaking, no shaking campaign to teach parents not to shake their children. And then some very few doctors and biomechanical engineers started raising questions about this, about whether violent shaking could even cause these injuries. And so a new term came to light, shaking impact. Um, and now, um, we have another term, abusive head trauma, but the principles for all of these, whiplash, shaken baby syndrome, shaken impact syndrome, um, abusive head trauma, the principles are all the same. And Robert Roberson's case, his trial was riddled and infused with not only that term as-as Dr. Phil said, dozens and dozens and dozens of times shaken baby syndrome was used in the jury selection process.

I'm gonna stay away from voir dire. Um, in the jury selection process, every juror was



asked about what they know about shaken baby syndrome. As you've heard opening statement, the defense counsel conceded it was a shaken baby syndrome throughout the trial. But what's more important is that the experts used the terminology associated with this hypothesis. And I say it-it was a hypothesis that became medical consensus.

The terms were used throughout this trial. Rotational forces, shearing forces, um, slamming a-- shaking and then slamming, um, Nikki-- a child on a-a soft surface like a mattress. All of those terms, which are associated with shaken baby syndrome, abuse of head trauma were used by the experts in this case, Dr. Jill Urban and, um, and um, Dr. Janet Squires. Um, Dr. Squires testified that-- or-or gave an affidavit to the police even before Nikki's autopsy was done, that the medical findings fit a picture of shaken impact syndrome. That's how this case was prosecuted.

There was some flinging or shaking component which resulted in subdural hemorrhaging and diffuse brain injury. There was also an area of impact in the right back of the head. That is what Janet Squires wrote in a statement that was used as part of the arrest warrant. Um, shearing forces, the idea that blood vessels, uh, would be stretched and ripped and causing subdural bleeding. All of those things were testified to by Janet Squires and Jill Urban.

Um, Dr. Urban repeatedly discussed in her testimony, shaking, shaking impact, shearing forces. And yet when she was called to testify before the post-conviction hearing, the 11.073 hearing, she said that she never called this case a shaken baby case. And technically-technically in her me-- in her autopsy report, she said that the, um, cause of death was blunt force injury, but she also testified that shaking is blunt force. She said on February 5th, 2003, on Page 79 of the transcript, shaking also falls into this definition of blunt force. And when enough, and although it doesn't seem like, you know, shaking is not necessarily striking a child when you are--

When a child is, say, shaken hard enough, the brain is actually moving back and forth within-- again within the skull impacting the skull itself. And that motion is enough to actually damage the brain. So Dr. Urban was telling the jury that shaking itself is blunt force. So when you heard Ms. Compton this afternoon saying that all she heard was shaking, you can understand why. Even though the doctors at times said, some people call it shaking impact, whatever..

You know, sometimes there were brief references to, um, blows. What the jury heard was what Doc-- Dr. Urban said, shaking is blunt force. And I'm not gonna go through all of the references. There's just dozens of them, but to say now that this case, um, does not involve shaking baby syndrome alone, which is what, um, Judge Yuri said in his concurring opinion I think misses again what the jury heard. And I know this committee is looking at, you know, what-what the standard in 11.073 says now and what, you know, it-it might say differently, but I'll just say this.

How do you unpack or separate testimony like this from Dr. Urban, um, to say now that the statute doesn't apply. 11.073 was designed exactly for the Robert Roberson



case, and although the courts are not applying it the way this committee has said it wants it to be applied, um, I'll just express my view. Gretchen Sween at that hearing in 2021 met the standard that this, um, legislature set. She established that there is new science. She established that the new science is material, that it would've made a difference.

She established beyond-- by a preponderance of the evidence in-in my view, um, but unfortunately, um, you know, uh, it-- If you read the entire record in this case and read the decision of the district court judge, it's hard to square the evidentiary record that was presented to the district court judge with the opinion that was issued. Um, Dr. Urban, um, was asked whether she could unpack the role that shaking and blunt force, or impact played in Nikki's death.

Question. "And then is there any way to tell, say, I believe this much of her death was caused by the shaking and this much of her death was caused by the battering that she took?" "No. There's no way to segregate it out, no." Question, "Just all those things put together killed Nikki?" Yes." Again, I don't know how a statute that says if outdated medical science was used to, um, convict someone at their trial, and you have testimony that says from the medical examiner, "I can't unpack-- I can't tell you which-which one was more important," how it's possible to say that a juror-- that a person had a fair trial under this statute that the new science-- that the- that the outdated science didn't play a significant role in the defendant's conviction, and in this case Mr. Roberson's conviction.

Um, I want to talk a little bit. Just briefly you've heard this, but Dr. Urban, um, admitted that she did not consider any of the following, uh, information before reaching conclusions about Nikki Curtis's cause and manner of death. She didn't consider Nikki's medical history from birth, including her recent illness the week before her collapse and the drugs that she had been prescribed by her pediatrician. In fact, Dr. Urban said she didn't even know what promethazine was when she was having a conversation with defense counsel prior to trial, and during trial she never gave any indication that she knew what promethazine was.

**Chair Moody:** Yes, [crosstalk].

**Representative Harrison:** I'm sorry- I'm sorry. You're gonna have to say that again.

**Mr. Salzman:** Yeah.

**Representative Harrison:** Doctor-- You're talking about Dr. Urban.

**Mr. Salzman:** Dr. Urban.

**Representative Harrison:** The medical examiner who performed the autopsy.

**Mr. Salzman:** Correct.

**Representative Harrison:** She said what?



**Mr. Salzman:** She had a toxicology report that was attached to her autopsy report or-- and-and included in her autopsy report, she said that at autopsy they did draw-- drew blood and the toxicology--

**Representative Harrison:** No, no, the part- the part about-- you said she said somewhere in-in the transcript she did not-- effectively, she didn't know what Phenergan was.

**Mr. Salzman:** Yep. She-she had a medical-- she had a- she had a autopsy report that reported that Nikki had Phenergan or promethazine-

**Representative Harrison:** Right.

**Mr. Salzman:** -that was described there, um, in her blood at a certain concentration, um, 0.4 mgs per-- Now I'm getting beyond my area of expertise. Um--

**Representative Harrison:** Yeah, but I heard you say she-she said she did not know what that drug was.

**Mr. Salzman:** Yep.

**Representative Harrison:** Is that what she said?

**Mr. Salzman:** She did say that to defense counsel before trial. When she was asked what that was she said, "I did-- I don't know what that is." And she-- during the trial she never testified about that at all. Um--

**Representative Harrison:** So just to be very clear, the-the medical examiner who conducted the, uh, autopsy of Nikki Curtis testified or admitted to defense counsel that she was unfamiliar with a drug that a-- probably a substantial number of mothers know was. Is that- is that what I'm hearing correct?

**Mr. Salzman:** That is correct.

**Representative Harrison:** Thank you. Um--

**Mr. Salzman:** While we're talking about promethazine, um, Dr. Keenan Bora, the only medical toxicologist who has testified-- I'm-I'm sorry, provided, um, evidence in this case, um, said that the

level that Nikki Curtis had, 0.4 mgs, whatever, um, went through his calculations, um, was at least eight times higher. No, you know, at 10:00 PM on the night, um, that Robert Roberson, um, picked up Nikki from Nikki's grandmother's house, um, and is- it's possible that if she had been given Phenergan earlier than that as her last dose, that she could have had as much as 30 times the level. That's-that's what his report says. Um, there are reports that the amount shown at autopsy, 0.4, um, is a high level, and that child fatalities have occurred at levels just at three or four times that- that amount.


**Chair Moody:** Yes, Representative Schatzline.

**Representative Schatzline:** So what you're describing right now, how does that happen? How did- how did- how did she get that level of dosage? Uh, is that, you know, the fault of the physician? Is that-- how does it happen?

**Mr. Salzman:** And you're asking me to speculate. But Nikki was-- care-- in the care of both Robert and her maternal grandparents. Um, she was given double doses of Phenergan. Um, there's no way to know whether the caregivers understood that she wasn't supposed to get both prescriptions given to her at the same time.

**Representative Schatzline:** Both prescribed. She was prescribed those.

**Mr. Salzman:** We-we-- She was prescribed those drugs, and we know that she had incredibly high dangerous levels of that drug in her system when she died, and essentially just to break it down, Dr. Bora says that he can calculate the levels she had before she arrived at Palestine hospital, um, and that they were he says it's very likely that they contributed to her death.

**Representative Schatzline:** Yeah, so just-- I mean removing everything else we've talked about today, that alone, that factor alone, talking about the lifelong illness that she had, mixed with the pneumonia, and now we're getting a drug that-that halts breathing to an extent for children, and it's a dosage that is a-a dangerous amount prescribed by a doctor. That alone could cause death.

**Mr. Salzman:** That's- that is what, um, Dr. Bora, uh, provided in this affidavit.

**Representative Schatzline:** Thank you.

**Mr. Salzman:** Dr. Urban-- Oh, yes.

**Chair Moody:** Sorry. Representative Harrison.

**Representative Harrison:** Just real quick. Let me say this for a second, uh, to pick up where Representative Schatzline left off. Um, we had a prior, uh, witness earlier today who wasn't on herself, one of the jurors, um, she testified that she had heard maybe something about a cough, some kind of cough medicine maybe but it was very cursory, high level. Um, but the level of detail you just got done describing, you know, the possibly eight times, possibly all the way up to 30, because, again, as I understand it, the pediatrician wrote a script, and the ER doc wrote a script.

One was Phenergan, one was Phenergan with codeine, if he had been trying to do his job and adhere to the, um, instructions of the physician, that could possibly explain why we were getting, you know, 2x or higher. Did-- is it your understanding from the record, did the jury know anything about this?

**Mr. Salzman:** No.



**Representative Harrison:** Thank you.

**Mr. Salzman:** Dr. Urban also didn't have any of the Palestine Regional Emergency Room records related to Nikki's prior treatment or, um, her treatment on the, uh, day that she entered the hospital on-on, um, January 31st. She didn't have the CT scans as you've heard, which show a single impact in the area consistent with Robert's explanation that Nikki fell off the bed. She didn't have any of the emergency transport records, which now seem to have been lost. As I said, she didn't have any information regarding promethazine, and as I said, she didn't, at least at one point, know what that drug was.

She didn't have, um, any information about the drugs that were administered to Nikki by doctors who were trying to save her life. And Dr. Bora, in his affidavit, said that those, um, some of those medications, um, increased her heart rate, um, thinned her blood. Um, Dr. Green testified to that, I'm sorry. Um, and but Dr. Bora said that some of those drugs also lowered her threshold for seizures, um, including promethazine. Um, and Dr. Urban and all the doctors who testified at Robert's trial dismissed any other explanation for Nikki's, um, condition, including the fall from her bed as a possible explanation for what they call her injuries.

Um, and I call it her condition, because, um, really under the shaken baby syndrome hypothesis, medical findings that are associated now with a wide array, excuse me, a wide array of medical conditions are characterized as injuries, um, when, again, those conditions have to be excluded as a possible explanation, a plausible explanation, according to the American Academy of Pediatrics and the consensus paper that you heard Professor Finley talk about on, um, Wednesday in 2018, some of the most vocal, um, adherence to the abuse of head trauma, um, theory have said that-that you have to exclude plausible-plausible explanations like pneumonia or infection. Um, and there's the evidence of Nikki's death from pneumonia, and this, um, promethazine is not plausible and we-we believe and our experts believe that it is the explanation for why Nikki died.

**Chair Moody:** Representative Harrison, yes.

**Representative Harrison:** Can I pull that real quick? Um, okay, because now, and you kind of glossed over this, but it's really important the way that shaken baby syndrome a couple decs-- decades ago, if you had the triad shaken baby syndrome, you can presume abuse. Correct?

**Mr. Salzman:** Correct.

**Representative Harrison:** Okay. Whereas, as opposed to now, even the adherence to it, say, well, once you exclude all of the plausible alternatives, then you can start, you know, maybe thinking about shaking baby. Is that right?

**Mr. Salzman:** That is right.

**Representative Harrison:** So that's-that's a 180 flip from the-the prevailing wisdom



when Robert's case went to trial, is that right?

**Mr. Salzman:** That is right.

**Representative Harrison:** Um, you just said something that was very interesting, uh, as somebody who is as thoroughly familiar with the medical record, and I haven't heard somebody say it quite as definitively as you just did. You said in y'alls expert opinion, it's not that there are potentially multiple now plausible explanations for everything, um, that was sho-shown to the jury, you know, the brain swelling, retinal hemorrhaging, cerebral bleeding. You believe the other explanations actually offer more explanatory power to the point where you just said it's your opinion that those were, in fact, the cause of death. A, did I understand you correct, and-and why is that your position?

**Mr. Salzman:** Dr. Francis Green, in his affidavit, said that, in his opinion, Nikki Curtis died as a result of viral inter-interstitial pneumonia and her acute bronchopneumonia, which is bacterial pneumonia. Um, that's and-and Dr. Roland Auer, um, concurs in that opinion, um, and, um, and Keenan Bora agrees that she had sepsis due to pneumonia and that, um, promethazine or Phenergan, um, likely contributed to her death. So it's not my opinion. It's doctors who've looked at this case, new evidence, new experts, um, that's their opinion.

**Representative Harrison:** Thank you.

**Mr. Salzman:** If I might, I'd like to talk briefly about the case that I handled in Maryland, um, and I-- my-my wife and my children tell me often that I-- when-when you let me start talking about one of the innocence cases I worked on, it can go for a long time. I'm gonna keep it brief. I'm gonna try to, um, discuss only, um, the key parallels. Clarence Jones, um, had a three-month-old son, Collin, who was very sick from birth. Collin was, um, rushed to the hospital by Clarence. When he woke up and found, um, Collin choking on formula, Clarence rushed Collin to the hospital.

Colin, uh, spent seven days in the hospital before he died. He had subdural hemorrhage, he had brain swelling, he had retinal hemorrhages. Like Nikki, Collin was a chronically ill child from birth. Like Nikki, Collin had chronic recurrent infections. He had been diagnosed with pneumonia at age three weeks. So both of these children, Nikki and Collin, were susceptible to infections and had repeated infections throughout their lives. Collin's 3 months, Nikki's 27 months.

Like Nikki, Collin had a virulent infection when he collapsed and was brought to the hospital. Unlike Nikki, Collin's doctors cultured his blood sample. They grew bacteria in the s- uh, sample, and they found a virulent

bacteria called Staphylococcus aureus, which is deadly. Collin had pneumonia, which Dr. Green, looking at the lung tissue pathology slides, said was chronic.

He found it in her, um, throat, from her mouth down to her lungs. He found it in her lung tissue. And he found also evidence that she had acute bacterial necrotizing



pneumonia, which means that her flesh was literally dying and sloughing off. And you can see it in his report, which I believe was submitted to this committee. So both these children had serious infections, fatal infections.

Like Nikki, Collin had a bleeding disorder, and his hospital blood tests after his collapse, like Nikki, showed severe DIC, dissemina- disseminated intravascular coagulopathy. Collin actually had a bleeding disorder that he inherited at birth from his mother. And he had several episodes throughout his life where he had serious bleeding, his short life. Like Nikki, as I said, Collin had the triad, subdural bleeding, retinal hemorrhages, and brain swelling. And he also had other eye injuries.

The-the ophthalmologist who testified at Clarence Jones' trial said that Collin's eyes were literally filled with blood, that the retina was torn and puckered, and described injuries to Collin's eyes that-that ophthalmologist said he had never seen and testified were-were pathognomonic, which means essentially virtually diagnostic of shaken baby syndrome. Those descriptions about how retinal hemorrhages are the key to diagnosing shaken baby syndrome, that testimony was presented at, um, Robert Roberson's trial. Retinal hemorrhages were the thing that Janet Squires said, "Told you really that these eyes had been shaken." That's what Janet Squires said.

Like in, um, Robert's case, Clarence Jones' defense counsel conceded that it was a shaken baby case. In fact, Clarence Jones' defense lawyer called, uh, expert witness who conceded that Collin had been shaken. He only, you know, uh, disputed how violent the shaking had been. Clarence Jones spent 18 years in prison for something that was not a crime. And at his innocence hearing, we brought a writ of actual innocence under Maryland's writ of actual innocence law because Maryland doesn't have a progressive, um, junk science law like Texas does.

Um, during that post-conviction hearing, the prosecutors, just like the revisionist history here, pointed to bleeding that was found on Collin's rib at autopsy, which had never been discussed at trial, um, as a-- Anyway, um, pointed to that as evidence that Collin had been shaken. And, again, in the setting of disseminated intravascular coagulation, tiny amount of blood on the rib is not evidence, um, in, you know, of abuse. Um, and unlike Robert's case, though, um, after the district court-- I'm sorry, after the circuit court in Maryland ruled against us on the writ of actual innocence in- in the face of six experts who said that Collin had died of a serious infection, that this was not shaken baby syndrome.

Um, unlike Robert's case, on appeal, the Maryland appellate court reversed the circuit court and granted the writ of actual innocence. And I will point out, I know this committee is considering ways to change the statute, but the Maryland writ of actual innocence standard is essentially the standard that Judge Al-Alcala was discussing, the standard in Maryland to grant a writ of actual innocence is a substantial or significant possibility of a different outcome at trial if the jury were to have been know-known about the new evidence. And the Maryland courts have defined that standard, substantial or significant possibility of a different outcome based on new evidence as more than a mere possibility, um, and less than a probability, so less



than the preponderance standard. Um, and with that, I'm happy to answer any questions that the committee has for me.

**Chair Moody:** I know that we've had questions as we've gone along. Representative Harrison, did you, uh-- Yes, Representative-- uh, Chairman Darby.

**Representative Darby:** Uh, you were here during the Judge Alcala's testimony, uh, correct?

**Mr. Salzman:** I was, yes.

**Representative Darby:** Okay, and she outlined, I've got six, but probably five suggested changes, um, probable cause instead of preponderance of the evidence of what you just referred to.

**Mr. Salzman:** That-that's the standard in Maryland for a writ of actual innocence.

**Representative Darby:** Okay, and she, uh, suggested changing the number of judges to be able to issue a stay of execution. Single Supreme Court require funds to be granted to appoint counsel and experts to review science. Add language theory of litigation that led to the conviction. Conviction would alter the outcome and the state can waive procedural barriers. Uh, any other, uh, items of wisdom you'd like to give the committee as we take a look at this moving into the next session?

**Mr. Salzman:** So I wouldn't presume to tell this committee, you know, what Texas law should be, but I do wanna comment on--

**Representative Darby:** But you just said it's progressive. [laughs]

**Mr. Salzman:** It is progressive.

**Representative Darby:** We have a progressive junk science law, so, um--

**Mr. Salzman:** Yep, you do.

**Representative Darby:** It sounds like it's still flawed.

**Mr. Salzman:** Uh, I think the committee has expressed that view. Um, I would like to talk about the-the challenges that this type of litigation, um, that we're confronted with, the procedural barriers that Justice Alcala testified about are daunting. Um, in this case, um, allegations are that pneumonia was known at trial. Well, that's not accurate. The medical, the-the autopsy report does reference the, uh, autopsy of the lungs and says that there were neutrophils and macrophages seen, um, and I think the microscopic examination, um, essentially repeated that.

That was a pretty bland explanation, and absolutely the medical examiner did not diagnose pneumonia. No one diagnosed pneumonia, and yet, um, the district court, in her opinion, said that the pneumonia was known. Um, and, um, those types of,


um, references form the basis for procedural barriers that lawyers like Gretchen Sween and myself and my Innocence Project colleagues confront all the time. Um, the idea that--

Uh, and-and actually, I wanna- I wanna say something else. The evidence in these cases, in these innocence cases, is developed over time. Um, Gretchen, I think, talked about this on Wednesday, but the CT scans were found in a closet in the basement in 2018. Other evidence came out about, um, the lung pa-pathology slides, which hadn't been provided to Ms. Sween until, um, I think, the doctors who had to travel to Palestine to look at the tissue slides were, uh, were given the lung tissue slides which formed the basis of Dr. Green's conclusion.

Um, and, you know, Dr. Auer is not a lung pathologist. In these cases, they require very careful specific expertise. So Dr. Auer looked at these tissue slides and said, "Yeah, that looks like pneumonia." But he is not a lung pathologist. He's a brain pathologist. He told you he's, he has a PhD in- PhD in brain injury, but the only qualified lung pathologist who looked at the tissue slides in this case is Dr. Green.

And he didn't do that until after the 2021 hearing.

And that is exactly what happens in these cases. They are complex. I never thought when I went to law school that I would use the doctorate part of my jurist doctor so much in my career, but lawyers have to do that. And then they have to find the experts who help them understand the case. And the understanding, as the science is changing, the understanding about the case evolves. And these procedural, um, defaults and, you know, d-defense lawyers, you know, it's a catch-22. If you don't raise it early enough, then it's waived. If you raised it early but you weren't able to prove it, then it's waived.

So the issue of procedural defaults is especially important in cases where the medical science is the case. And so I would urge you to consider that

because, you know, this committee and the courts and the prosecutors and defense counsel and the community should wanna get to the truth. And it's hard to get to the truth, and the truth sometimes comes out in fits and starts over time as you find the right people to help you understand exactly what happened. And that is what happened in this case. Dr. Green was the one who was able to tell us exactly what happened. Dr. Bora was the one, the only medically tra-- trained medical toxicologist to look at this case, was able to explain what happened.

And at the 2021 evidentiary hearing, Dr. Downs way out of his lane, just gave very firm opinions that the promethazine was not a factor in-in Nikki Curtis's death. And he was way out of his lane, and yet his testimony, if I recall, was the only testimony that the district court judge affirmatively credited, if I remember correctly. But, again, Ms. Sween will correct me if I'm wrong. So I don't know if I answered your question. I-I realize I may not have, but--

**Chair Moody:** Representative Harrison?

Completed: 10/30/2024



**Representative Harrison:** If there's a way to do it, I'm about to ask you in a concise manner that would be-

**Mr. Salzman:** Sure.

**Representative Harrison:** -that'd be awesome. Um, one of the-- One of the things that I'm hearing just ad nauseam right now is that in addition to you guys, you guys shouldn't question the jury, the jury heard all the evidence, you know, you guys are on Monday morning quarterbacking, whatever. We've now established, I think, beyond-beyond a shadow of a doubt that the jury did not have all the relevant medical and scientific evidence that should have, uh, come to that courtroom.

The question I have though is, what's also said is there's been 20 years of appellate processes playing out. And so all of the new stuff that the committee has access to and the stuff you're pointing out and talking about, this has all been considered by the courts and they all found it, you know, insufficiently, meritorious of a new trial.

Um, my understanding, if I've heard you correctly, is you've listed off multiple things, although forgive me I didn't write them all down, so I don't wanna try and screw this up. Is there any way you could even almost just like in bullet form, is there-- and I'll phrase it this way, is there any evidence that no jury and no court has interacted with or-or contemplated as this thing has moved through the appellate, uh, process for the last two decades?

**Mr. Salzman:** Absolutely. Dr. Green's expert report has not been reviewed by any court or jury. The-the most recent, um, 11.073 petition that we filed, I guess, uh, two weeks ago or whatever was dismissed with, uh, um, you know, procedural grounds. Um, and the one that was filed in August was dismissed in-- with, uh, on procedural grounds. So Dr. Green's report has never been considered by any court.

**Representative Harrison:** And just real quick, just wait. Dr. Green's report, which in a sentence or two, what was the import of that evidence that no court has interacted with?

**Mr. Salzman:** Nikki Curtis died from chronic pneumonia, both viral and, uh, acute, um, bacterial pneumonia.

**Representative Harrison:** That's-that's evidence that no court no jury has ever interacted with in over 20 years?

**Mr. Salzman:** Correct. Dr. Borer's report, the only medical toxicologist to examine the case, um, concluded that Nikki-Nikki's promethazine levels were dangerously high and contributed to her death. No court, no jury has considered that.

**Representative Harrison:** So dru-- She had drugs in her system that were potentially at a toxic or fatal dose and no jury or court has ever interacted with or contemplated that evidence, [crosstalk]



**Mr. Salzman:** That's correct.

**Representative Harrison:** That's correct.

**Mr. Salzman:** Mm-hmm.

**Representative Harrison:** Okay.

**Mr. Salzman:** Um, the other evidence about the change in science was presented during the, um, 2021-- the 2016 to 2020/21 proceedings, but, um, the district court, uh-- Well, I'll just say that that opinion did not reflect the evidentiary record that was presented to--

**Representative Harrison:** Ho-how substantial would you characterize the-the-the body of evidence that no court or jury has ever interacted with when taken as a whole?

**Mr. Salzman:** Overwhelming evidence that Nikki Curtis died of natural causes, not any abuse by Robert Roberson.

**Representative Harrison:** So you're testifying that there is overwhelming evidence that no jury at the original tri-trial or at any of the phases of the appellate process for 20 years that she died of natural causes and they have never considered this, no courts, no jury, is that what you are testifying to here today?

**Mr. Salzman:** I can't speak to what judges who have affirmed the conviction in this case, um, have reviewed, but the evidence is overwhelming, in my opinion, that Nikki Curtis died of natural causes.

**Representative Harrison:** And at least a significant percentage of that has never been interacted with by a jury or the court- or the courts?

**Mr. Salzman:** Absolutely. The recent affidavits that were submitted in August have never been considered by any court and I-- and absolutely none of this evidence that we've been talking about today, as Ms. Compton said, was considered by the jury.

**Representative Harrison:** So the original jury-- and again, we don't like to second guess jury, Chair, but it is unambiguously true no jury has heard the body of evidence that you've just been describing for the last hour?

**Mr. Salzman:** Unambiguous-unambiguously true.

**Representative Harrison:** Thank you.

**Chair Moody:** Members, do we have any other questions for **[unintelligible 06:35:42]**

**Speaker 6:** Can you speak to the procedural grounds that the last two, uh, uh, petitions were dismissed on?

Completed: 10/30/2024



**Representative Darby:** Good question.

**Mr. Salzman:** So the court didn't explain the procedural grounds. They just referred to the, um, the statute, which I believe is 11071, which says that, um, you know, there are various procedural grounds that can bar consideration of a subsequent habeas petition, um, including, um, you know, not bring-bringing the claims, um, sufficiently soon enough, or having previously brought claims and having had them denied. Um, so there's various grounds, but the court didn't specify which one of those grounds. Um, the last several subsequent habeas petitions that were filed were dismissed on procedural grounds without any explanation.

**Chair Moody:** Members, do we have any other questions? Mr. Salzman, I want to thank you for, uh, for your time and-and your testimony. Um, and I know that, um-- I know that maybe possible that some of us we'll have some follow-up questions for you. Is that okay you make yourself available for that?

**Mr. Salzman:** I'm absolutely happy to answer any of the committee's questions at any time.

**Chair Moody:** Right. And uh, if that's okay, I think may-- I think we probably have your contact information here. Is that okay that we distribute it to the members in case they wanna reach out-

**Mr. Salzman:** Of course, yes.

**Chair Moody:** -to follow up? Thank you so much.

**Mr. Salzman:** Absolutely.

**Chair Moody:** All right.

**Mr. Salzman:** Thank you for your time.

**Speaker 6:** Thank you.

**Chair Moody:** Thank you.

[silence]

**Chair Moody:** Chair calls Katherine Judson.

**[pause 06:37:20]**

**Chair Moody:** Thank you for your time.

**Speaker 6:** Thank you.

**[pause 06:37:39]**



**Chair Moody:** Okay. Ms. Judson, can you hear me okay?

**Ms. Katherine Judson:** Now I can hear you, yes. Thank you.

**Chair Moody:** Okay. Um, appreciate you, um- appreciate you making yourself available today. I know it's been a long day and so I, uh, certainly re-- try to be respectful of everybody's time and I know these-these things will continue to talk, um. You know, the-the schedule changes as we go along. So I wanna apologize for taking so long to-to take your testimony, but I appreciate you for being patient with us.

**Ms. Judson:** Oh, please don't apologize. I've been a lawyer for a long time and, uh, waiting around is part of that.

**Chair Moody:** [laughs] Yeah, I guess that is a big part of the job for us. Um--

**Ms. Judson: [unintelligible 06:39:14]** and wait, but I'm very grateful to you for inviting me to speak with you today, and I'm especially grateful for your really, honestly, honorable efforts to seek justice in this case.

**Chair Moody:** Oh, I appreciate that. Thank you. Uh, um, I have you registered, uh, Katherine Judson testifying on behalf of yourself, uh, and neutral on the topic. Is that accurate?

**Ms. Judson:** Yes.

**Chair Moody:** Okay. I have it here that you're in Madison, Wisconsin. Is that true?

**Ms. Judson:** That's true.

**Chair Moody:** Okay. Someone was asking on the committee.

**Ms. Judson:** I'll talk a little bit about our-our geographical focus or lack thereof and hopefully clear up why you want someone from Wisconsin to talk to you. [crosstalk]

**Chair Moody:** Yeah, that's why- that's why I mentioned it. I think it's important for context purposes, but I think obviously your background and-and your explanation of your background on what you do I think is gonna probably clear that up fairly quickly. Um, as you've seen with the other witnesses today, um, just gonna invite you to make your comments on the topic that we're discussing today. Members may have questions as we go along, and so we'll-we'll-we'll jump in if we need to, and if not, we'll ask some questions at the end if that's okay with you.

**Ms. Judson:** That sounds perfect. Um, I did prepare remarks, and then, of course, I plan to make myself available for your questions.

**Chair Moody:** Fantastic. Okay. Well, we'll turn it over to you. Thank you.

**Ms. Judson:** Okay. Um, well, you've heard a lot of testimony today, so I'm gonna do

Completed: 10/30/2024


my best not to repeat any of that, but instead to give you context for Robert Roberson's case based on my work on shaken baby syndrome cases across the country and actually around the world, and also to place into context some of the arguments and responses you've heard both about SBSHT generally, and then this case specifically. So, hopefully, be able to clear all of that up.

Um, I-I wanna tell you a little bit about my background and then the organization I work for. I'm the executive director of the Center for Integrity and Forensic Sciences. Uh, we are a nonprofit organization exclusively devoted to ensuring that scientific evidence presented in courts is valid and reliable. We are headquartered in Madison, Wisconsin, but our service is not based on geography. We have consulted on cases involving forensic sciences in most states in the United States, as well as in multiple countries. Um, at our center, we have expertise in a lot of other types of cases, um, other than child abuse, but we are recognized as experts in child abuse cases.

Um, we've also weighed in on DNA issues, many other forensic, uh, errors, and much like the Innocence Project, there's a process in order to get our help. Uh, there has to be a serious error in the forensic evidence and we really take very few of the cases referred to us, um, but this one cried out to us. So, for that reason, our organization has filed three amicus briefs in Robert's case, um, and completed a thorough analysis of his case. We filed those, uh, when the case was pending with the Anderson County Trial Court, then when it went to the Court of Criminal Appeals in 2022, and finally supporting certiorari and relief at the Supreme Court of United States level.

As an attorney, my personal experience with this issue started with my first SBS case, which was a first-degree murder trial, uh, tried in 2010, and since then I have provided mostly post-conviction review services, providing direct representation in cases and also, um, consulting services. I don't think that there is an office out there that has touched more shaken baby syndrome cases than we have. Um, and I say that not to toot our own horn, but because I think it's important that, um, you understand why I feel able to give you this broad perspective.

Um, I also served as the Innocence Networks, um, shaken baby syndrome litigation coordinator from 2012 to 2014. Then I did the same job at the Wisconsin Innocence Project at the University of Wisconsin Law School until 2019 when I came here to our center. Um, during that time and currently, I consult probably on about a hundred to 200 shaken baby syndrome cases per year, although that does vary. Um, I've been published on the topic in law reviews proceedings of the American Academy of Forensic Sciences, the American Bar Association, and so on, and I've spoken before lots of groups including the, you know, prosecution and defense organizations, universities, and the National Academies of Science about forensic science and the law.

I've served as an expert witness on the topic of ineffective assistance of counsel in forensic cases, and, uh, I also teach law school, um, at the University of Wisconsin. So I wanna tell you a little bit about forensic science versus real science and the



trajectory of forensic science reform. Um, that-that movement as we understand it today really started around 2009 when the National Academies of Science drew a distinction in their, um, report Forensic Science in the United States, a path forward between real science and forensic science.

They found that the forensic sciences used in courts are largely not scientific, and after a thorough review, they found that only nuclear DNA anal- excuse me, that only nuclear DNA analysis was shown to be able to match a piece of evidence with an individual with a high degree of reliability. Then the President's Council of Advisors on Science and Technology followed up on that in 2016, outlining issues with the state of forensic science. And although they did not address it in detail in 2016, they specifically mentioned shaken baby syndrome as one of the concerns that they had moving forward that needed urgent attention.

Um, one of the concerns that both bodies raised in the development of these-- of forensic science disciplines was that they were developed with an eye toward law enforcement rather than pure scientific inquiry. So I'll give you two specific examples that I hope will resonate. Um, the first is, uh, I hope specifically in Texas this resonates that, uh, the review of bite mark cases in the United States. After DNA showed definitively that bi-bite mark comparisons could be wrong. Um, and further studies showed that bite mark matching isn't reliable. Um, and the President's Council of Advisors on, um, on Science and Technology in the National Academies of Science did not find this discipline to be reliable.

We started to see it being used somewhat less in courts and being challenged more, um, but also seeing some of the changes that a-a-are occurring in shaken baby syndrome cases to try to get out from under the scientific challenges. So I'll-I'll expl-- I'm foreshadowing this for you, but I'll explain it in a few moments. Um, then in, uh, around 2015, 2016, the FBI, um, found that, well, hair comparison analysis was shown to be flawed during that time. And then the FBI worked with the National Association of Criminal Defense Lawyers and the Innocence Project to review cases with hair comparison analysis.

In most of those cases, in fact, almost all of them, analysts testified beyond what the science could support and with more certainty than the science offered. And that's really important because those are factors that have led to unjust outcomes in lots of other types of cases, including shaken baby syndrome. Um, and those specific errors are first that unsubstantiated information is presented as fact. Right. So, in a hair comparison case, it would be that examiners have a high degree of reliability in differentiating two different hairs under the microscope, and then the second error is overstating the evidence. So, perhaps telling a jury that an examiner is never wrong, that their error rate is zero.

Um, this is a persistent theme throughout all of the forensic science disciplines. In fact, about a quarter of all exonerations involve bad forensic science, and in most of those cases, there are overstatements or false statements by examiners, um, or, you know, analysts, experts, however, they're styled.



Another great example and one that, um, should be familiar to folks in Texas looking at death penalty cases is arson. Um, arson is a good forensic science to compare to shaken baby syndrome because an expert's opinion in an arson case as an SBS is the basis for a charge and often a conviction. But arson has been treated a little differently by our courts, which I'll explain.

So like shaken baby syndrome, arson used to be a-a what essentially amounts to a diagnosis of exclusion. The term used in that community was negative corpus. That means that when you rule out all of the other possible causes of a fire, uh, then you can settle on arson. But we now know that the signs used to do that are wrong and the negative corpus procedure is fraught with error. So just like in SBS cases, signs that were previously used to determine arson could possibly be present in an arson case, just like signs previously used to determine abuse could possibly be present in a child abuse case. But they're also present for lots of other reasons.

But, unfortunately, in arson cases and also in child abuse cases, experts comp-- uh, claimed that they were reliable indicators of the crime. Right? And so given what we now know with scientific experimentation and a really careful look at arson science and fire science, we know that we can no longer look at those science and say that something is arson without more information. But given all of this, it has still been extremely difficult for folks to get any relief when they've been convicted under scientific theories and evidence now known to be false. Right?

So, we've been talking about 11.073 today, and then that was a commendable effort to try to improve the chances for wrongfully convicted people to get relief, but it has not been successful for far too many people. So, pivoting specifically to wrongful convictions in SBS/AHT, um, shaken baby syndrome, abusive head trauma shares many aspects with other faulty and discredited forensic sciences. The-the history and trajectory of the hypothesis is especially important in this case. And I know you heard from Keith Finley about these important issues last week, so I won't belabor anything, but I wanna offer a couple of highlights that are relevant to my testimony today.

The first is that in 2001, as you've heard before but it's important to underline, the American Academy of P-- of Pediatricians or of Pediatrics had a position statement about shaken baby syndrome, and that was that, uh, in relevant part, shaken baby syndrome results from extreme rotational cranial acceleration induced by violent shaking or shaking with impact. And

at the time it was diagnosed, and this was the guidance from that organization by a constellation of clinical findings in infants that include retinal hemorrhages, subdural or subarachnoid hemorrhages, and little or no evidence of external cranial trauma. That's from that 2001 position paper. It also explicitly states that the constellation of these injuries does not occur with shortfalls.

So that-- So essentially what this guidance was in 2001 is that when somebody tells you a story like Robert told physicians and hospital staff about Nikki, in his case,



that-that was a lie, that the caregiver could not possibly be telling the truth because this constellation of injuries they explicitly said does not occur with shortfalls. We now know that-that's not true, but that was the guidance at the time. They also said that the findings are, and again these are quotes, right? Rarely accidental unless there is another clear explanation, such as trauma from a motor vehicle crash.

And this was also the guidance from the National Association of Medical Examiners that the findings were the result of violent trauma and that they could never occur by accident. And shaking is an important component of that all the way through, because a single impact can certainly be the result of an accident. But you can't really imagine a situation in which a violent shaking occurs by accident, right? So that becomes an important component.

Um, but now we understand that just like in this case, some of the findings might not be trauma at all, right? They might be non-traumatic, they might be trauma related to resuscitation, especially in a child. The context of a child with a bleeding or clotting disorder, just like Nikki in this case, um, just like, um, Collin Jones, in the case Mr. Salzman just talked about. And just like the decedent in the Allen Butts case, which I'll talk about shortly.

So these positions were in accord with what was generally accepted at the time. In 1998, for example, a then leading pediatric SBS specialist wrote that the shaken baby syndrome, with or without evidence of impact is now a well-characterized clinical and pathological entity with diagnostic features and severe cases virtually unique to this type of injury.

And then he goes on to describe all of the findings we've been talking about, cerebral edema, subdural hemorrhage, and retinal hemorrhage. And this remained a consensus view through 2003, which was the time of trial and thereafter. The National Center on Shaken Baby Syndrome, for example, endorsed that view.

And during this time, it was extremely difficult to find experts to testify. And then when they did, they were subject to extreme personal and professional retaliation. Some of that continues today, but really the, um, the most extreme examples I know about are from right around this time. Some supporters of the SBS hypothesis now acknowledge that some things that aren't shaking can cause the findings historically associated with shaking.

But the fact that they may have tried to make the testimony more equivocal does not make it more correct. So if they go from saying that the error rate is zero to the error rate is infinitesimally small and we don't know what the real error rate is, it is still incorrect testimony. And, fundamentally, the important thing in any individual case is the right answer in that individual case, not a statistic.

So when we know the error rate is not zero, the question becomes whether this is the individual case where they got it wrong, not an irrelevant argument about how rare or not rare those mistakes actually are. Those are important questions of public health and improving medical diagnosis, but they are essentially meaningless to an


individual who's been charged, right? Because if their case is the one that experts got wrong, it doesn't matter if the error rate is one in a million or one in two.

The only question is the accuracy in this individual case. And so for that reason, it's pretty classic in, um, all wrongful conviction cases and exoneration cases, but particularly in SBS cases to see prosecutors try to undermine the new science by changing the theory of the case. We see it pretty routinely. And [crosstalk]

**Chair Moody:** Wait, wait, I-I wanna-- Hold on one second.

**Ms. Judson:** Of course.

**Chair Moody:** I just wanna slow down a little bit because you just said something that, uh, certainly has been implicated in the conversation around this particular case.

**Ms. Judson:** Mm-hmm.

**Chair Moody:** The changing narrative over time, I think-

**Ms. Judson:** Yes.

**Chair Moody:** -I think there's been a lot of conversation about that today including hearing from one of the trial jurors who-

**Ms. Judson:** Yes.

**Chair Moody:** -I don't know that, obviously, you know, those-those-those that have reviewed the record, they can do that. But nobody was in the-- Nobody was back there, uh, that's talked to us today other than her. And she was pretty unequivocal about how that looked then and what we're hearing today based on, you know, that, like I think- I think, um-- I don't remember who-who-who's- who called it. I think Judge Alcala talked about, um, revisionist history.

**Ms. Judson:** Yes.

**Chair Moody:** And so you seem to be zeroing in on that particular topic. So I do want you to spend a little bit of time there. 'cause I think that-that is a phenomenon that-that we're-we're kind of realizing in real time and trying to ferret this out. Um, and, you know, usually when people put stuff in pleadings and say stuff so vociferously, you know, y-you just assume that, oh, well, they're probably- the truth is probably somewhere in between. But, uh, I do want you to delve into that if you could. If-if you've got concrete examples of some cases, I think that would be helpful to us as well.

**Ms. Judson:** Yes, I am, um, I'm just about to get to a couple. Um, and I agree with you. I think it is really troubling, and again, it is something that we see unfortunately fairly routinely in, um, wrongful conviction cases. So as you might imagine, you can't



remove the bad science from the case and simply say that if we relied on the other evidence, the outcome would still be the same. This is because studies have shown that jurors give significant and sometimes outsized weight to scientific evidence, even if that evidence is not scientifically sound, which you also heard today-

**Chair Moody:** Mm-hmm.

**Ms. Judson:** -um, from Dr. Phil and some few, but not many courts have weighed in on that issue and said, um, that-that is impermissible. But specifically in SBS cases, because the expert's opinion about abuse is often the only evidence of abuse, one especially cannot pretend that if we removed the outdated opinion we would reach the same result. And it does seem, given the testimony in this case and given the testimony that's been, um, induced at these hearings, that-that is what the prosecution is attempting to do in this case.

So what, you know, our office has seen in our many cases of this type is that some adherence to the SBS hypothesis have tried to overcome the fatal flaws in its formulation by adding language of uncertainty, right? So, for example, uh, going from saying that the chi-- that it is impossible for a child to die from a household fall like Nikki had to saying, well, that's very rare, the chances are one in a million.

That's not an effective or a correct way to resolve these issues. Um, and that's because in SBS, trying to acknowledge some ambiguity does not resolve the fundamental problem, which is at its core that we do not know how accurate doctors are at looking at the findings associated with abuse and determining whether abuse occurred, but we know for sure that their error rate is not zero. And we know that for a few reasons.

One is that there are 34 exonerations with people who have been accused of crimes based on the shaken baby syndrome hypothesis, who have now been shown to be actually innocent, so 34 of those. Then there's been discovery of new evidence throughout the life of the hypothesis and reformulation of the hypothesis, which is demonstrated in the literature, as well as in this case and many other cases. And-and this is especially, um, salient across all medical diagnoses.

Um, the, uh, journal of the *American Medical Association* estimates that the error rate is 10% to 20%, that is lower when criteria for diagnosis are objective and well established. So, um, the error rate for diagnosing you with a broken arm or strep throat is pretty low. Those are straightforward-- not zero, but pretty low.

Those are straightforward tests that can be done to establish whether or not you have a condition, you know, you might do a bacterial culture in one case, you might do an X-ray in one case, and those are straightforward, um, diagnoses to make. But the error rate is higher when diagnoses are exclusionary, when they're not well established, and when they require high degrees of subjectivity. So that's exactly this case, right?

Um, child abuse was considered a diagnosis of exclusion. Um, it might be invoked



and has been invoked in cases I've worked on when a doctor simply couldn't think of another reason why the child might have the findings. Um, another example that just takes us out of child abuse that I think might be helpful for people to understand is because it's fairly common is irritable bowel syndrome. That's a pretty common diagnosis, but it's also a diagnosis of exclusion. It's a diagnosis that's made when they can't find another reason why you have gastrointestinal distress, right? And so those types of diagnoses have again, high degrees of subjectivity, not super well-established diagnostic criteria, and they are exclusionary. So those error rates are higher.

And it's understandable that you would see this shifting narrative when we start to see the science change. Cognitive biases and human nature lead us to not wanna be wrong, right? So we search for other explanations but allow us to still be right even if the ex- explanation is imperfect. We see this pretty often in wrongful conviction cases.

Um, when evidence is undermined in a wrongful conviction case, sometimes supporters of the conviction, like prosecutors or law enforcement attempt to change the theory of the case after the fact to try to explain the new information in a way that lets them preserve the conviction.

And here's a specific example that courts in Florida have shown, have said is not acceptable. So imagine a case was tried as a rape and murder case, but then post-conviction testing on the rape kit revealed DNA matching an unknown perpetrator and no DNA from the person incarcerated for the crime.

Sometimes in cases like that, prosecutors claim, contrary to the theory at trial, that the incarcerated person may not have raped the victim, but should still be on the hook as the person who murdered the vic- But should still be on the hook as the person who murdered the victim, even though all of the evidence has now been undermined with DNA.

So you can see in that example how it's fundamentally unfair and undermines the relief that you all anticipated being sought under 11.073. Changing the theory of the case simply requires a new trial, right? So in an SBS case, that might look like a trial in which doctors persistently referred to shaking, the effects of shaking, the dangerousness of shaking, terms like shaking or shaking with impact.

But then when confronted with new information about shaking and abuse, claim instead, that shaking as a mechanism was never an important part of the consideration of the case. In other words, it might look just like Robert Roberson's case.

**Chair Moody:** Mm-hmm.

**Ms. Judson:** But here, shaking is not just an isolated fact. It's intertwined permanently and inextricably with the theory of the case, which was abuse, either by shaking or shaking with impact. But shaking was always and throughout a critical



part of the alleged mechanism of abuse.

Experts said in the trial transcript that it couldn't have been just impact, um, which you heard Mr. Salzman talk about. And then there's also this, um, concerning issue of conflating shaking with blunt force trauma. That's one of the things that Dr. Urban said. Um, and Mr. Salzman read that quote for you. But she made the claim that shaking is blunt-force trauma.

And so I won't reread that but it's clear that-that both occurred and that the jury was swayed by it because when Terry Conte came in front of you today, she testified that that is exactly how the jury understood Dr. Urban's testimony.

It's also important to note that there was no evidence of contusions to the brain itself, which seems to be what Dr. Urban is talking about, although it's not totally clear. The affidavits reflect that you have seen in this case reflect that all the brain injury is a result of hypoxic ischemic encephalopathy, a lack of oxygen and blood rather than direct trauma.

So- so just to clarify, right, there have been, and be really clear, there have been some statements, um, that you all have mentioned and noticed and that I noticed too 'cause they're very concerning, that there were multiple impacts, but those claims are just untethered from the facts.

There's, per the imaging, there's one impact site. There was one site of swelling on Nikki's head based on the imaging from January 30th of 31st of 20- 2002. And it's important to remember that per Dr. Green, she had disseminated intravascular coagulopathy, which can cause bleeding with no, or trivial trauma.

In that context, other areas of small-volume bleeding without swelling could easily be misunderstood at trauma as trauma. And that's something that, um, the American Academy of Pediatricians now, or of pediatrics now cautions again. So I'll explain that to- to you in just a second.

But returning to the discussion of trial theory, it's obvious that, here, the change in theory is an effort to avoid the problems with the science, right? The fact that they're trying to change the theory now shows that the original one was fatally flawed. And in the end, there's really no genuine doubt that this was an SBS case.

Everything else is kind of cognitive gymnastics to try to make the now-discredited testimony fit with the new science. If prosecutors wanna do that, then they need to do it at a new trial. Uh-

**Chair Moody:** [crosstalk] That-that-that's

**Ms. Judson:** Mm-hmm.

**Chair Moody:** That's what I want to drill. You- you just said where I thought you were going and what your expertise leads to. So I'll be very direct 'cause I want to



crystallize that in- in the record.

**Ms. Judson:** Yes.

**Chair Moody:** You have an enormous amount of expertise when it comes to SBS. You've obviously exhibited that here for us today and- and you've looked at these cases across a vast, you know vast array of cases in multiple jurisdictions, um, dealing with lots of professionals.

I- I'll just ask you directly, based on that expertise, uh, and your background and your analysis, do you believe that the courts here in Texas should reopen Robert Roberson's case and afford him a new trial?

**Ms. Judson:** Absolutely. There's no question in my mind that he deserves a new trial.

**Chair Moody:** I don't think you can get clearer than that. Representative Harrison, did you have a follow-up question?

**Representative Harrison:** I do.

**Chair Moody:** Lemme make sure. Representative Schatzline, Bhojani, one second. Yes, Representative Harrison, go ahead.

**Representative Harrison:** Thank you. Um, I want to pick up on a couple of things here. Um, if I can find where I wrote my notes down. There we go. Um, you-- This-- um, the phraseology I think matters and I think it's the- the source of a profound amount of, if I'm honest, both intentional and unintentional misleading of the public in this case.

**Ms. Judson:** Yeah.

**Representative Harrison:** Um, and something that I really, really would like your help. Just talk slow, use small words. Okay? You're talking to a bunch of politicians up here, um-

**Speaker 1:** And an Aggie.

**Representative Harrison:** And an Aggie at that. That's right.

[laughter]

Um, gig 'em. Uh, there is a lot of pushback from people across the country when-when those of us who have taken the time to digest 20 years of facts, to the best we can, with trying to articulate this was a shaken baby syndrome case as an actual juror and as Chair Moody referenced. I mean, in no- There was no ambiguity about her testimony. That -

**Ms. Judson:** No.



**Representative Harrison:** -she understood that this was about shaking the baby, right? She had them, they had the doll, she demonstrated the shaking. She had no concept. People were talking about this as a battery case.

I mean, that- that would've been a completely anachronistic concept to the jurors, uh, 20 years ago. Where I get a lot of pushback and where I just need some help from you is people say, no, no, no, of course it wasn't shaken baby.

Or if they're-if they're trying to be slightly more nuanced well, it wasn't exclusively shaken baby. Um, and this is before the-the new, the way they're articulating it, and I'll get to that in a second. Um, they say it was written up.

The medical examiner determined this had nothing to do with shaken baby syndrome. That baby, Nikki, died of blunt force head trauma. And my understanding, but I- I want help with this is that it is not uncommon-- In fact, correct me if I'm wrong, it is- it is more normal than not for shaken baby cases to be written up by the medical examiner as blunt force head trauma. A, is that accurate? B, help me understand how- how that can be.

**Ms. Judson:** Yes. So there's no, um-- There- there's been this claim about the death certificate, which I think is what you're referring to. And there's this question about blunt force trauma being listed as a cause of death and therefore making the claim that shaking was not a crucial argument at trial.

**Representative Harrison:** Yep.

**Ms. Judson:** But that's really unavailing. And-and I'll tell you why. So medical examiners fill out death certificates without uniform language. There's not a nationwide rule about, you know, across jurisdictions about how to classify these deaths.

So different individual pathologists are free to use the terminology that they prefer, but part of the purpose of the testimony at trial is to elucidate anything that's not clear about the death certificate. And the testimony in this case clearly says shaking over and over.

The other thing that I think it's important to note, and actually I, um, really shouldn't take credit for it because Justice Sotomayor pointed it out. So I should probably give her the credit 'cause she's obviously brilliant.

Um, but she wrote about how Dr. Urban relied on shaking in part because she didn't think any of the- any of the other trauma that she was seeing or the impact that she was seeing could explain the brain injury. She called it out of proportion right? And that's really the essence of SBS. It was created and initially used to explain how a child could have extensive internal findings with little or no external injury.

**Representative Harrison:** Thank you.



**Ms. Judson:** And- Yeah, of course.

**Representative Harrison:** Um, and that goes to-- And-and I wanna, I wanna hang on this just for a second 'cause I- There's a-there's a piece of the transcript from the trial that I've got here in front of me. Because people are saying that it's just, you know, our committee or others on the outside are misrepresenting what happened in trial when, in fact, this was battery.

But I wanna read a quote from the prosecuting attorney at the original trial from the transcript, and I want you to explain to me why she might be asking this question to Dr. Urban, who was the medical examiner in this case.

And- and I quote, "Let's talk about, there is a really large discrepancy, at least in my mind, between what you see on the outside and what you see on the inside. You described a lot of different impact sites, multiple blows to the head, and you really don't see that when you look at the pictures of her face."

**Ms. Judson:** Mm-hmm.

**Representative Harrison:** Why might the prosecuting attorney be saying that you don't see evidence of different impact sites and of multiple blows to Nikki's head at the trial?

**Ms. Judson:** Yeah, it's hard from that quote for me to totally understand what she means when she says evidence of blows because there's only one spot where there's swelling. And then there's also some unexplained bleeding, but in the context of a bleeding disorder that we know can cause internal bleeding for-

**Representative Harrison:** Right.

**Ms. Judson:** -very-very little trauma or for no reason at all.

**Representative Harrison:** So I think- I think if I read you the answer, it might become more clear-

**Ms. Judson:** Okay.

**Representative Harrison:** -because I wanna help you understand this because-because you-you made a comment a second ago that I wrote down. You said, "Exterior signs of trauma were--" if I wrote you down correctly, you said "untethered from the facts." Yes.

**Ms. Judson:** Correct.

**Representative Harrison:** So here's what this-- Here is what the medical examiner, and I just-- I can-- I cannot get past ever since I first read this exchange. I cannot get this outta my head. So the prosecuting attorney is asking her own, it's a state witness, the medical examiner, and is explicit in her question to the medical


examiner to state that de-despite you talking about multiple impact sites and multiple blows to the head "you really don't see that when you look at the pictures of her face."

Here's the response to the medical examiner, which of course one would assume would be present had this child been beat to death. Um, the response from Dr. Urban, "Well, again, I think that's because just of the way children are built.

You know, like I said, they've got a lot of fat. There's a lot of fat between, say, the skin and actual bones of the skull that can absorb a lot of energy that's inflicted on the skin. The same thing. The skin is also very elastic. It's almost more stretchable in little children.

And that's another reasons you can actually get a great deal of injury to the head and not see anything on the outside because all that force is transmitted inward and without actually disrupting the skin." I- I summarize that as the, uh, medical examiner saying, well, children don't bruise. Am I misreading her answer?

**Ms. Judson:** No. That's also how-- I don't mean to laugh. It's not funny at all. It's horrifying. But it is-- it's- it's wild. Every-- I mean, I don't-- Everybody knows that children can get bruises. I think those of us with little kids can tell you.

**Representative Harrison:** But- but- but how much should it mean-

**Ms. Judson:** It means you uncovered for them.

**Representative Harrison:** And how much should it mean to people trying to get their head around the fact that the state star witness, the medical examiner, had to defend the unambiguous facts as represented by the prosecuting attorney in the original trial, that there was no exterior signs of head trauma on Nikki Curtis. How important is that or is it not?

**Ms. Judson:** No, I think that's really critical. And I think that you're, um, you're-you're getting at something that's essential, which is that when confronted with these problems and errors with the hypothesis, what the proponents of it have tended to do is engage in some hand waving to say, "No, no, no, here's why the things that you expect aren't happening."

And I don't really even know if that's true. I'm not familiar with any, you know, for example, um, medical literature that- that says that children's skin is different. Um, I think to some extent that's probably true, but the use of it in order to explain why someone would've experienced horrible trauma and not had a mark on them is the part that is, yeah, that I'm not sure can be substantiated.

**Representative Harrison:** Well, admittedly, one person's anecdotal experience, uh, is- is not the same as data, but I've got four young children and, uh, they bruise. Um, I wanna read a statement from the same statement. I read to a-- an earlier witness, the juror of what is being represented by the office of the Attorney General right now,



in this case, in litigation.

The, uh, a representative of the Office of Attorney General said this is not a shaken baby case. "The evidence supports the fact that there were multiple blunt force impacts to the child's head, and there was a history of abuse from this particular inmate against this child. Shaken baby syndrome just doesn't play a role in this case.

So whether or not it's been discredited in the community of pediatric specialists, it's just not the central feature of this case." Given what you know about the medical record in this case, how would you characterize those statements?

**Ms. Judson:** I don't think those statements are correct. There's been-- There was ample testimony about shaking. It appears just about everywhere in the re-- in the trial record. Um, I- I'm confused about how anyone can read the record and say that shaking wasn't an-

**Representative Harrison:** You said- you said you-you don't think those statements are correct. How-

**Ms. Judson:** No.

**Representative Harrison:** How wrong do you think those statements are?

**Ms. Judson:** I- I mean, it's very clear to me from reading the transcript that this was an essential part of the state's case. I- I cannot think of a way to divorce the shaking part from these other claims and fix it in any way. They're- they're so inextricably linked. It just requires a new trial. You can't speculate and pick out pieces of it and try to- And try to sort of finagle a- a correction. It's not possible.

**Representative Harrison:** I'll wrap real quick. Uh, just quick, yes or no if- if you're able, um, was there any major bruise, any significant bruising on Nikki Curtis upon presentation to the hospital?

**Ms. Judson:** No. It's my understanding that there was not.

**Representative Harrison:** Were there any fractures anywhere on her body?

**Ms. Judson:** No.

**Representative Harrison:** Were there any lacerations anywhere on her body? Is there any neck damage?

**Ms. Judson:** No.

**Representative Harrison:** Any bone damage? Any-any ti tissue damage?

**Ms. Judson:** No.

**Representative Harrison:** Any substantial bruising from hand prints on her arms or



abdomen, chest, anywhere else where he might have grabbed her when he presumably shook her to death?

**Ms. Judson:** No. No. We didn't see anything like that.

**Representative Harrison:** Nothing like that at all?

**Ms. Judson:** No. No.

**Representative Harrison:** Thank you. Thanks, Chair.

**Ms. Judson:** Of course.

**Chair Moody:** Thank you. You used the word, um, essential when referring to the shaking as a part of the theory of this case. What-- It-- I-I-I just-- I-I-I-I continue to be at a loss for the- the- the representations that are- that are made to us.

Last week we heard from the state's attorney in this case who referred to it as a component. To me, the word "component" is very different from the word "essential." Right? Component seems ancillary to something else going on.

Maybe it's a piece of the puzzle. But, um, how clear can you be? Cause I-- We have- we have certainly been digging into this case as best we can, as fast as we can. And I think a lot of people are not taking the deep dive on this, um-

**Ms. Judson:** Right.

**Chair Moody:** -but this is their opportunity to hear about it. This is the time for other people to educate themselves. When you use the word "essential" in this particular case, uh, as best and as clear as you can, as concise as you can, tell me what you mean by utilizing that word.

**Ms. Judson:** The testimony that was given in this case is almost textbook for shaken baby syndrome cases. It is reflected in the legal literature of the time, but especially, it is reflected in the medical literature of the time.

And if you want to get a conviction in one of these cases, you have to ex or pr- preclude the jury from believing that there's a reasonable accidental reason for the medical findings. And I think that the way that that has predominantly been done is to say, well, this is so much more significant of an injury than we would expect from a household fall, which is already a statement that's problematic.

But the shaking component is added, I think, to make it especially clear that it couldn't possibly have been an accident. Now, I don't know if that's incidental or it's on purpose, but that's typically how they- they play out in these cases.

And if- if you imagine, right, if there had not been a shaking component in this case, the trial, Robert's trial lawyer could have argued, given the facts and the single



impact site that the fall caused the findings. But he couldn't argue that because shaking was this essential component of the state's theory.

It was baked in. All of the explanations for why Nikki had the injuries she, or the medical findings that she had are related to the- The explanations are all things like acceleration, deceleration, shaking the brain back and forth inside the skull, tears, little vessels, and that's where the bleeding comes from.

And then this claim that Dr. Urban made that the impact from the fall was out of proportion with the suspected injury. This is also reflected in the medical literature of the time. And we now know it isn't true. And the reason why we now know it isn't true is because there have been lots of incidents that have been reliably witnessed, like from, you know, uh, like a--

Like teachers seeing a child fall on a crowded playground where multiple teachers are watching the kids would be an example of a reliably witnessed incident or a videoed incident where children had falls that initially looked like they might not be very dangerous. And then those children have really significant health consequences, sometimes even fatal consequences.

Um, so I-I-I, you know, those statements aren't true anymore, but those were the statements that were being made at the time, that it was out of proportion with a simple fall. Um, and so you don't really get there without this shaking component. I'm-I'm happy to clarify that more if it's unclear.

**Chair Moody:** No, I- no, I think you me-- and I-I-I've gotten it clear for me. I just-- I think a lot of people are trying to educate themselves about this case starting today, and that's wonderful. I'm glad that what I have found is the more people delve into what has happened here, the more uncomfortable they get. And you should be uncomfortable because of what you just said.

**Ms. Judson:** Yeah.

**Chair Moody:** You have-- You don't get to SBS without that disproportionality, you just- that you just explained. You're not-- It's not gonna be part of your case.

**Ms. Judson:** Right.

**Chair Moody:** I mean, so that has to necessarily be a, like a core component, a core essential component of what-- I mean, throw whatever word you want in there. It's-it's-it's- It is the case. And so we heard, obviously from the juror and I-I'll take her testimony as-as definitive as anybody else.

**Ms. Judson:** Yeah.

**Chair Moody:** Um, because, uh, that's what matters here.

**Ms. Judson:** She was.


**Chair Moody:** Um, you know, I think we can hear from a lot of experts, but the little-- the-the-the lady that came here who's-who's pissed, I'm gonna listen to her too.

**Ms. Judson:** Yeah.

**Chair Moody:** Um-

**Ms. Judson:** You should, because she knows. She was there. I mean, she's-- And I think that what Dr. Phil said earlier is absolutely true. Jurors, when they're presented with the correct information, typically make the correct decisions.

I mean, there are, you know, deviations from that, but for the most part it's-- it-- 100% true that jurors pay attention. They take their role seriously. They consider the information in front of them. Again, like they don't always get it right. But I think most of the time they probably do.

**Chair Moody:** That's true. I appreciate it. I- I think- I think- I think you've done a- a wonderful job in helping us, uh, educate, uh, not just ourselves, but those who are- are now turn their focus and attention to this topic. Um, and I think it's important. I want just touch on one other thing, unless other people-

**Ms. Judson:** Sure.

**Chair Moody:** -have questions. I wanna dive into one other topic. And you touched on, I think at the very beginning, and Judge Ochala talked about this idea under our statute that could it have been litigated before?

**Ms. Judson:** Yes.

**Chair Moody:** In their analysis of how we afford relief. And I mentioned to Judge Ochala, um, in-in her testimony, that's what I want to delve into with you is- is you talked about this time period, 2000-2000-- 2003, hard to find an expert that could help challenge.

So let's say you even had an attorney that could find someone what-- The context of the medical, uh, opinions at the time, how-- I mean, even if it could have been brought up at that time, what's the context of that evidence would've been lodged into, and how different is it from 2024?

**Ms. Judson:** You couldn't have set me up better if we'd scripted it, so thank you for that.

**Chair Moody:** I guarantee you I haven't.

**Ms. Judson:** Um, but I- but I have an example that I wanna give you all that is precisely on point, and I think really helps explain a lot of what's going on now with the shift in the science. And so, that's the case of a client I represented, um, for a long time. My representation ended this year when he was found to be actually



innocent.

Um, his name is Alan Butts and he lives in Ohio, and his case is remarkably similar to this one. He

was, uh, convicted in 2003, about a month after Robert was. And just like Robert, he had a two-year-old, uh, who was his stepson with pneumonia, who deteriorated over many days and had doctor's visits that did not result in an appropriate diagnosis.

This child was also treated with over-the-counter medications that like Phenergan now carry warnings against use in small children. Um, and just like Robert Allan and his partner tried to get help for the child, uh, both before he collapsed and after, and this child was on life support, um, for several days before he died. But this is the important part that fits, right?

When Alan's trial commit- commenced in March of 2003, the medical standard for making a diagnosis was set forth in the position papers that, you know, I and Professor Finley and a bunch of other people have talked about from the American Academy of Pediatrics and the National Association of Medical Examiners. And unlike Robert's- Robert's attorney, Alan's trial counsel tried to call an expert in 2003.

The expert who he called was, um, a man by the name of John Plunkett who was a forensic pathologist who was one of the first to sound the alarm on these types of cases. He was a really tireless advocate for people who were accused under this paradigm.

And he was in this trial, essentially ridiculed, because what he was testifying about, according to the courts, who considered the case, both the trial on appellate level, um, and, you know, other physicians attacked him for being outside of the medical mainstream.

What's so fascinating about all of this is that of course now his testimony would not be considered controversial. What he was saying was, children who can't-- Most of the time, children fall, when children fall, they don't die or, you know, suffer a serious brain injury. But sometimes they do, like we call them freak accidents for a reason. Sometimes falls result in really serious injury.

Um, and at that time, he pointed that out, he wrote an article about it in the, um, American Journal of Forensic Pathology in 2001, where he detailed 18 cases of reliably witnessed or videotaped except with a couple of exceptions, um, cases that involved a fall, like a household fall, a fall off a swing, um, a fall from a furniture, those kinds of things.

Um, and showed that those kids could have exactly the same findings as children who were thought to have been shaken. So our client in Ohio had the benefit of that testimony in 2003, like weeks after Robert's case. But even though it would be completely acceptable now, it was shot down. It was ignored by the jury and shot down by the courts because he was thought to be testifying outside of this



mainstream.

**Chair Moody:** So-

**Ms. Judson:** Does that-

**Chair Moody:** It's-it's-- That's absolutely what I wanted to, uh- uh, talk about 'cause we obviously are here to talk about that particular statute and how it's being inter-- kind of how it's being utilized in the courts. And that's why I think that analysis is it cre- creates disingenuous results.

Yes, there's a lot of things that could have been litigated at the time, but knowledge of the time, how that witness is impeached, how those questions go, what the science is available, like all the context matters. It looks so different.

And I think that's why it begs-- it- it begs for another trial. You- you do not have fairness. There's no fundamental fairness if we're- if we're putting- if we're putting a lens on, oh yeah, well, they could have- they could have- they could have thrown that out there.

It was possible to talk about this. Sure, it was possible, but the context matters. And-and so that's-- I just-- To-to me, when the court rejects things with that rationale, it is-- It seems very box-checky to me. Okay, well that could have been lit- litigated at the time, so we'll-we'll pass on this.

And technically, can I say that they're wrong? No, it could have been litigated at the time, but man, that's a big thing you gotta unpack just like you just did right now in that in-in-in-in the- in the Alan Butts case. It's right on point.

And I appreciate you raising that. I think that's-that's so important, so critical. When we analyze how this law goes-- how it looks going forward, we have to preclude those types of off-ramps because they're not genuine.

**Ms. Judson:** Absolutely.

**Chair Moody:** It's-- It doesn't- It doesn't get to the core of the matter that the statute was meant to get to. It allows people to essentially bury their head and move on. And that, I'm sorry, that is not what this statute was intended to do.

It was intended to open an avenue for relief because things had changed in a significant way. And if we just throw things out using this type of standard, that's not a just result. It just isn't. It's not a real analysis. Uh, I can say that, you know, yes, you can comply with this, but it's not really-- It, uh, maybe-- I guess the best way to put it is, um, maybe is in, um, compliance with the letter of the law, but not the spirit of the law.

**Ms. Judson:** Yes.



**Chair Moody:** And that is a big problem. And we run into that problem, obviously, as legislators all the time. And so that's why it's incumbent upon us to really do a kind of drill down and- and- and explain why we need these changes. So I appreciate you weighing in on that.

**Ms. Judson:** Well, I appreciate how eloquently you've- you've put that challenge. I think that's really essential.

**Chair Moody:** There's that word again. Um-

**Ms. Judson:** I- I- I use it a lot. I-I know. No, just putting a lens in front of myself about the words that I use all the time. But I think you're-- I- I- I think you're exactly right. And the procedural bar issues that Judge Ochala talked about earlier today are really important in cases like this.

Because if you put too many procedural bars in front of a person seeking relief under a change in science or a change in scientific opinion, then it's- it's unclear to me how that can possibly be fair. You're asking somebody who--

I mean, certainly in Robert's case, who has challenges with learning already to stay on top of the medical literature that plenty of physicians aren't familiar with that. It just seems wrong. It seems like the procedural bars are- are not serving a- a- a good purpose there.

**Chair Moody:** No, I think that is- I think that is crystal clear. Now Representative Harrison, did you have another question?

**Representative Harrison:** Yeah, just one quick question and- and you may not- you may not know this offhand. If so, that's fine. You mentioned-- Uh, did I hear you earlier testify that there have been 34 exonerations of Shaken baby syndrome cases that you're aware of? Was that you?

**Ms. Judson:** Yes. I believe the number is 34 in the National Registry of Exonerations. And there are many- many more, at least three times more that I know of where somebody had their trial, um, uh, their trial verdict overturned, their- their conviction overturned.

And then instead of getting a finding of actual innocence or going through a new trial and getting acquitted, they chose to, for example, accept a plea agreement because they didn't wanna go through that again. So the reason I- I point that out is because that's another 97, I think-- I could be wrong about the precise number, where court said this, uh, conviction cannot stand.

**Representative Harrison:** Because what I'm trying- I'm trying to get at, and I don't have any expectation that you could go through the 34 case by case or if you say it's three x that. Um, where in the pathway were they able to get relief? Where did the new understanding of shaken baby syndrome--



Were they able to avail themselves of that to show that they were, in fact, had been in fact, you know, locked up for a crime that they didn't commit? Because, and presumably none of them got as far as this guy 'cause it-it's a, it's correct. No-- There have been no executions in America for shaken baby syndrome. Right?

**Ms. Judson:** Not that I know of, no.

**Representative Harrison:** Yeah. Well there, there would've been one if this committee had not issued a subpoena last week.

**Ms. Judson:** Yeah.

**Representative Harrison:** But presumably the 34 exonerations there-there was a path of relief prior to, you know, four hours out, you know, having these, the legal maneuvers we had to do here. How early, how far in the process? Is it just all over the map? I mean, how- how did these exonerations come to be?

If there's like a simple way to characterize that?

'Cause that's obviously what we're struggling with here. This committee obviously believes that our- our current junk science writ is not being appropriately applied or at a minimum maybe needs inundation.

Is there a way to characterize where the other cases got the relief that- that ended up, um, exonerating them?

**Ms. Judson:** Yeah. Um, so again, like not to toot our own horn at our organization, but quite a few of those folks were our clients. So I can speak to you about the ones, certainly who we represented. Um, and the answer is there's nothing uniform. It- it absolutely runs the gamut. We have clients who got relief a year after their conviction.

We have clients who got relief decades after their convictions. It completely varies. And this phenomenon of these cases being treated in this way is actually something that legal scholars have looked at. There's a law professor at Northwestern named Deb Trukheimer who wrote a book about, um, undoing flawed, shaken baby syndrome, uh, convictions.

And what she called it was a phrase that I think is really helpful to help us understand it, is fluky justice. Because you can have, just like Robert and Alan, right, Alan's free today. Alan- Alan had his-- Alan Butts had his conviction overturned in Ohio.

He, uh, spent some time on house arrest while the prosecutors decided what they wanted to re-- to do with his case, and then they ultimately decided to dismiss it, so he's free and innocent. And Robert Roberson came within minutes of being killed.

So that, to me, is an absolute encapsulation of this idea of fluky justice. You should


get the same justice. It shouldn't matter whether you are in Ohio or Texas. Um, but because of these, not only the procedural rules, but also some like jurisdictional quirks.

And sometimes it just comes down to the individual judge you're in front of, um, that has resulted in wildly different outcomes in so many of these cases. And I- I wish I could characterize them better for you than that, but I feel like the right answer. I mean, I know that the right answer is they're all over the place and we don't always know why.

**Representative Harrison:** Thank you.

**Chair Moody:** Thank you very much, members. Do we have any other questions for Ms. Judson? Um, I want to thank you for obviously, again, thank you for your patience and thank you for- lending your expertise to our evaluation of this.

Um, I have to do something very technical. At the beginning, I made an error. I said that you were here representing yourself. I actually, the record should reflect that you were here representing the Center for Integrity and Forensic Sciences. Is that correct?

**Ms. Judson:** Thank you. Yes.

**Chair Moody:** Okay. All right. I just wanna make sure I had that clear for the record, I apologize. We try to follow our rules the best we can.

**Ms. Judson:** Well, I forgot to, so thank you very much.

**Chair Moody:** No-no, that was my error and that's why we're correcting it. Thank you for your time. I hope-

**Ms. Judson:** Thank you so much.

**Chair Moody:** -I hope you have a wonderful evening.

**Ms. Judson:** You too.

**Chair Moody:** Chair calls Dr. Natalie Montfort. Dr. Montfort, I will extend to you the same apology that I did to Ms. Judson. Um, these are long days. Um, uh, this committee has conducted hearings that go well into the middle of the night before. Uh, I've been part of a hearing that's lasted 23 hours before. Um, so we're just getting started, I guess.

[laughter]

I don't want you to feel like you have to move quickly or rush or cut something. Um, if there is something that someone re, talked about before that, you know, you can, you know, you can can move past, that's fine. If you don't wanna reit-re-be-repetitive.


But I don't want you to feel like because it is a-a late hour in the evening that you don't have the opportunity to offer your expertise because that is the reason we asked you to be here. I also know that you're, you are a practicing doctor and you did an enormous amount of moving things around to be here with us today.

So, uh, I'm grateful for you doing that and- and we wanna respect, uh, the sacrifices that you've made to be here today to offer your expertise. Um, so I-- Before I let you start, um, uh, I have you registered as Natalie Montfort on behalf of yourself, and you'll be testifying neutrally on the topic. Is that all correct?

**Dr. Natalie Montfort:** That's correct.

**Chair Moody:** Okay. Then you may begin your testimony. Thank you.

**Dr. Montfort:** Well, thank you for having me. This is important work, and it did take work to get here, but it- it's definitely worth it. Um, so as you know, my name's Dr. Natalie Montfort. I'm a clinical psychologist in Houston, so that's right. That means I'm in- in practice.

Um, I did not go into forensic psychology, but I have more than two decades of experience working with adults and children on the autism spectrum. I serve on the board of the Houston Psychological Association, and I hold an elected position with the Texas Psychological Association.

Um, and over these years I've become an expert in autism spectrum disorder throughout the lifespan. So I've met hundreds of adults on the autism spectrum, adolescents and children would definitely put it into the thousands.

Um, I'm experienced with a late-life diagnosis of autism, which is something that not all clinical psychologists do. We have many providers who see children or see people through even adolescents or high school age, but we have a- a real, you know, hole in the area of who sees and serves adults. So I never, as I mentioned, I never intended to become involved in legal proceedings.

**Chair Moody:** Oh.

**Dr. Montfort:** Is it still on?

**Chair Moody:** Yeah.

**Dr. Montfort:** There we go.

**Chair Moody:** Yeah. It's- it's directional. So--

**Dr. Montfort:** Okay. Um, but over the years I began to see my own clients drawn into the criminal justice system, either as victims or accused perpetrators. And I realized that the system was not equipped to serve them.



So autism is a lifelong neurodevelopmental condition, and it affects someone's ability to communicate and to relate with others. It affects their verbal communication, which means how they speak to others, how they understand what others say.

But it also affects nonverbal communication, like the ability to use and understand eye contact, facial expressions, or gestures. So the movements that clarify, uh, or enhance our communication. And in other words, autism is a brain-based difference in the way someone thinks about and interacts with the world.

Because autism produces deficits in social and emotional processing, people on the autism spectrum might seem odd, unemotional, detached, or even uncaring at moments when those people who are neurotypical would expect specific outward emotional reactions.

This can be especially true at times of stress. So autism is not a mental illness, a personality disorder, or a behavioral problem. In fact, people with autism like to follow the rules and routines and they're often honest, even when honesty might not be the best approach.

Because of their disability, autistic people are seven times more likely to become involved in the criminal justice system than are people who are neurotypical, meaning they don't have autism. Now, this does not mean that all people with autism exhibit criminal behavior.

In fact, they're more likely to be the victims of crime than a perpetrator of crime. But my experience has found innocent people, um, getting involved in the criminal justice system because, like I mentioned, accused perpetrators, um, of crimes, mostly because they react differently to situations than a typical person would.

**Chair Moody:** You-you-you-you may get to this but I think, and maybe some of the legislators are familiar with some of our efforts to work with law enforcement on their reaction and their interaction with individuals with autism, with-with a number of- a number of-of things but autism specifically because of what you just stated.

Are you aware of some of that training that goes on and what does that look like? Because like you're saying, you get people ensnared in the process and the process just starts working. It just starts working. [crosstalk]--

**Dr. Montfort:** That's right. That's right. And so, you know, these individuals may do things like hear and agree to Miranda rights but not fully understand them. Um, they could have a hard time assisting in their own legal defense, um, because as you heard from Dr. Phil earlier, they can be compliant and aiming to please so they can be, you know, sometimes gullible or naive, talked into things that- that they don't truly believe.

Um, you know, I know Dr. Phil spoke about how, uh, Robert was not able to say, "Hey, stop saying shaken baby syndrome, I didn't do that," you know, on his behalf. And that's absolutely what we see. So I didn't personally evaluate Mr. Roberson, um,



like Dr. Phil.

But I've reviewed the records and testimony from the 2018 assessment and agree that unquestionably he has autism. But the impact that this disability had on where he is now, convicted and on death row, cannot be overstated.

So much of the evidence that the state presented against Mr. Roberson at trial was about manifestations of his then undiagnosed autism. Right? The jury heard witness after witness say Mr. Roberson was odd, uncaring, and unemotional when he brought his daughter to the hospital trying to get her help.

For example, a nurse testified that she found it strange he'd gotten his daughter dressed before bringing her to the hospital. Um, former homicide Detective Brian Wharton recalled finding Mr. Roberson's affect disconcerting, saying quote, "He's not getting mad, he's not getting sad, he's just not right."

Uh, his reactions were misconstrued as evidence of guilt. The jury was told to believe he was callous and remorseless. So before the 2003 trial, Mr. Roberson had never received any evaluation, diagnosis, or services for autism. Therefore, no one told the jury that his lack of emotional display and his routinized actions, his labored stammer, were products of his disability.

Jurors were told to judge him as an unfeeling liar, and they heard no evidence to contextualize his responses. But at a 2018 hearing, um, the psychologist, Dr. Diane Masnick, who formally diagnosed Mr. Roberson for the first time that same year, said autism helped explain the misalignment of his feelings and his expressions.

So, for example, appearing unemotional at the hospital, also his strong reliance on routine, especially in times of stress, like getting his daughter dressed before he took her to the hospital. Right? That's what you do before a doctor's appointment and that's what you do every day, and so that's just what he did because it was routine.

Um, as an expert in autism diagnosis and treatment, I agree with the diagnosis. The testing showed Mr. Roberson is impaired in all areas of social exchanges. His ability to interpret facial expressions and his ability to express emotions.

Dr. Masnick found his social problem-solving skills were equivalent to the average 11-year-old. You know, noting that his, he struggled to understand what others said to him, um, to figure out the socially appropriate thing to do in most circumstances.

And those impairments reflect limitations in what Mr. Roberson can express and how he expresses his feelings but people with autism like Robert, love and care deeply for their family. They're often among the most loyal people I've ever interacted with. They just may not show it in the same way, and so that can be mistaken for lack of caring. Right?

So similar misconceptions have contributed to other wrongful convictions and excessive punishment for autistic people who become entangled in the criminal



justice system. Because of their disability, autistic people are seven times more likely to become involved in the criminal justice system than a neurotypical person.

Um, we know now too that autistic people are more likely to be judged as being deceptive when speaking with law enforcement, an assumption that can lead to wrongful arrests. Mr. Roberson was born autistic and has certainly always struggled to express himself and to be understood.

The fact that he went undiagnosed until 2018 is unfortunately common, particularly, for people who grow up in poverty and with unstable family circumstances. Also, the-the time period that we're talking about makes a difference as well. Even so, his autism diagnosis is consistent with records from his childhood, which identified him as a special needs child.

He was described as childlike and simplistic as a teenager and young adult by people who knew him and he received treatment for delayed speech and related impairments through Medicaid. His misdiagnosis also illuminates why he struggled in school and left after the 9th Grade.

Through the work of organizations such as the Autism Society and its Texas branch, public awareness and understanding of autism has improved considerably-considerably since the trial two decades ago. We now know it's the symptoms of Mr. Roberson's disability that have been criminalized.

The fact that he could not express his deep care and concern for his daughter because of his autism was a driving force behind his- his conviction. I welcome the committee's questions.

**Chair Moody:** I want to go back, and I thank you for that. Um, in these, and- and I may ask, um-- I am-- I may ask Gretchen these questions when she comes up as well. But in the, uh, in a death penalty case, you've got guilt, not guilt.

And in the punishment phase, there's special questions regarding future dangerousness and if there's any evidence of mitigation, obviously, because you lacked a, in this case, lacked a diagnosis of autism. How do you think a diagnosis of autism for a person like Mr. Roberson would have played on the question of mitigation?

**Dr. Montfort:** So I think it would've been very important. Um, the description of callous, unemotional uncaring, unfeeling, those sorts of things probably led to the belief that, you know, he was dangerous or would cause more trouble.

Um, my understanding is he's had a pretty impeccable record since he's been incarcerated and, you know, hasn't had difficulties, uh, there, you know, getting along with others, following rules, things like that. Um, so I do think it was an important- an important factor in the sentencing phase.

**Chair Moody:** Um, and you may or may not be aware of this when this law was



written, and it's actually been litigated and there was a- actually someone that was executed recently where this issue was litigated, um, uh, I think the last name was White.

It talked about, um, new science or appli-app-applicability of this junk science writ statute in the second phase of the trial, and this goes to some of the work that we're doing here. Um, that is actually a piece of legislation that's been passed by the Texas House multiple times to extend this remedy, not just to the guilt, not guilt phase, but to the second phase-

**Dr. Montfort:** Mm-hmm.

**Chair Moody:** -which relates to mitigation. So this is an instance where there is new scientific evidence about Mr. Roberson specifically that wasn't able to be presented at the time of trial. You had no diagnosis. And so, um, the court in one of the opinions stated, well, we think that should, that is a fair--

I'm paraphrasing now, but we think that would be a fair result to apply it to both guilt, not guilt, and to the punishment and to the punishment phase. But the black letter of the law says it applies to phase one of the trial only.

And-and so I- I say that because it is something that we have engaged in to try and-and work on, and, um, as you just stated, that type of evidence or that type of relief that was specific to the punishment face would've been incredibly important for the jury to consider.

Let's set aside all the problems we heard with guilt, not guilt. There was another piece of evidence scientifically that wasn't available at the time that also hasn't been talked about, and it's this very issue with Mr. Roberson.

**Dr. Montfort:** That's right. That's absolutely correct. Um, and we've learned more about late-life diagnosis of autism, we've learned more about adults on the autism spectrum and how they present. Um, we've learned more about, you know, how they act when under stress, um, which certainly this was, you know, the- the most stress I-I could think of.

You know, couldn't come up with a more stressful situation than an ill daughter that you-you lose and then being accused of murder.

**Chair Moody:** Yeah. Now, another thing it's-- Its- it's-- I've been a prosecutor, I've been a defense attorney. This-this is very clearly, and I don't know the attorney in this case, back in the trial court or whatever. This is very clearly an attorney that took this as this is a punishment case.

I'm-I'm just-- I'm gonna, I'm-I'm-I'm just gonna concede everything in guilt, not guilt. And I'm gonna, maybe, hopefully, they'll give him a-- I'll just-- My only goal is to maybe see if he doesn't get the death penalty. And it's kind of focused what little effort they focused on- on that space.



Um, and I think the question that-- I think that-- I think the questions that arisen here is because of our-our-our-our work, uh, in legislature to afford relief, um, in- in these arenas, that is what it steps into rectify, right?

Where those decisions are misplaced, or there's new science that comes up that-that can then be looked at with a- a new critical eye. But we also have a system of deference that, legal deference that doesn't really let us get underneath that. And I think those are the- those are the statutory-statutory barriers that we continue to face.

Um, I want to touch on this point and then open it up to questions to other folks. There was a proposition made to permit or to- or to request that Mr. Roberson could testify today virtually. Um, talked- I talked a little bit to Dr. Phil about that earlier, but I wanna talk to you about that.

Because, um, I think you've mentioned some of the- some of the indicators that- that are present in someone with autism and their ability to communicate. I'll tell you that, uh, up here, uh, Mr. Bhojani and myself met with Mr. Roberson a few weeks ago, uh, for about 90 minutes, uh, over in-in Livingston, the Polunsky unit.

And I, um, it was about what, s- six of us there. Um, they even said, you know, if you want to meet with him on your own, it's fine. I kind of decided, I have a little bit of background, family background, um, uh, dealing with, you know, adults that-that-that have these types of limitations.

And so, uh, there was a- a person on the staff that was very friendly with him, and you could see, had very good rapport with him. And I said, "No, let- let him stay- Let him stay in the room." And-and I-I noticed- um, I noticed throughout the- throughout the meeting there was, I wanna say, two to three instances. We'd have conversation, and then he'd stop, and he'd go- and he'd go one by one around us, and he goes, all right, that's right.

Joe-Joe Moody. Right? Okay. Yes. And then Kr- I think Kronda- Kronda's here. And he said, "Oh yeah, I remember. That's a weird name." All right. And he would go around and he'd- and he'd-, and he'd make-- He-he'd refer to every one of us to make sure that he remembered each one of our- our names as he went through.

And he interjected in the conversation two to three different times to do that. Um, not sure, like, not sure exactly like why he would do that, but-but that seemed to be a-a comfort part of the conversation, to be like, okay, I know who's sitting here.

**Dr. Montfort:** Right.

**Chair Moody:** I know who's talking to me. And he reconfirmed it, I wanna say three, about three times through the conversation where he'd go back through, and he wanted to make sure he knew each.

**Dr. Montfort:** Mm-hmm.


**Chair Moody:** One of us. And-

**Dr. Montfort:** And we call that kind of idiosyncratic--

**Chair Moody:** Okay.

**Dr. Montfort** --behavior. So it's something that's really-

**Chair Moody:** Yeah, explain that to me. I-I found--

**Dr. Montfort:** -specific to that individual.

**Chair Moody:** Mm-hmm.

**Dr. Montfort:** Um, that makes sense to them. That's a part of their being that we learn and pick up on by being around them. You know, it's not wrong or bad or really even pathological in most cases. It's just different.

**Chair Moody:** Mm-hmm.

**Dr. Montfort:** It's just a different way of responding to the same stimulus in- in the world. You know, the same way that you and I could look at a coffee mug sitting right here on the desk, and I might see one side of it, and you might see the other side of it.

And so I might describe it, you know, as a-a coffee mug with, uh-uh words on my side, but your side might be blank. And so, you know, we see different things in the same thing. And that happens a lot when interacting with people on the autism spectrum.

And it- it's almost as if there's two different languages, that we're trying to create this-this shared idea together. Um, but there's a bit of translation involved. And so it, you know, sounds like as he was naming people or had this way of- of relating to people that worked for him. You know, again, I didn't assess him, I wasn't there with him, but that kind of behavior that you describe is very typical.

Um, I- I also brought an article with me from 2017 that was really kind of cutting edge at- at the time, that looked at four studies that had been done, um, of people with autism, you know, in the courtroom. And it's called *Jurors and Judges Evaluation of Defendants with Autism and the Impact on Sentencing.*

So exactly what you've touched at. And again, 2017, there were four studies that the authors, um, Cooper and Ellie, were able to review. And one of the quotes was particularly striking that says, "If the jury is not informed of the defendant's diagnosis of ASD or autism, the impact of a negative demeanor may have a detrimental implication for defendants with ASD."

And I think that's, y- you know, what happened here, not only in the courtroom, but



this began at the hospital. So differences in the way that he responded to this tragic situation. You know, things like dressing his daughter before he brought her to the hospital.

The average person, you know, 100 people out on the street, might think, well, he was trying to make a bad situation look better, or he was trying to manipulate the outcome in some way, right? That's why he would change the situation. Um, but someone with autism doesn't think like 100 people on the street who don't have autism.

And so his thought may have been, again, you know, I-I don't know in this case, but someone with autism would do something like that, um, because it's part of a routine. It's just part of something they do every day. So it could be interpreted or misinterpreted, is a better word, by people who don't know them, who weren't there, and who didn't directly ask about their thinking.

And then, you know, even when we do, we have to have a-- The context B1 of low enough stress and fluid enough conversation that we could get that answer. Not just, you know, what they think you wanna hear. So Zoom, as Dr. Phil mentioned, and I know you all have talked about it, does raise some unique concerns, um, for someone like Robert who has not had the opportunity to use Zoom.

You know, I have clients who I see in person, and they do not want to meet on Zoom. You know, if we can't have our appointment in person, Zoom is out. I've been told things like the eye contact is too intense on Zoom.

There's nowhere else in the room to look without looking off-screen, which would be rude, right, according to the- the- the rules that might be used for the social situation. So it could be really uncomfortable. Um, as Dr. Phil mentioned, you know, someone who has trouble reading nonverbal cues needs more cues, not less, and Zoom would take that away.

So being able to see the committee in its entirety, um, as I see you, you know, not as little bitty ant people [laughs] because it's the camera's so far away to get you all, is very important. Um, he may not-- You know, people with autism may not read the nonverbal communication of certain people as well as they do other people.

So having the benefit of being able to see all of you, some of you familiar faces, that could be important, um, as well, you know? And you seeing him, I think, is equally important. You know, looking for those types of behaviors.

The repetitive behaviors that people with autism might exhibit under times of stress can be helpful for, you know, the- the entire interaction to develop and unfold, um, in a way that- that feels safe and comfortable to be able to get to the answers and the information that the committee needs.

**Chair Moody:** I appreciate that. And that's something that obviously, and I mentioned at the beginning, and there's a lot to consider here. I get that this is a very


unique situation. And, um, I always view accommodations through the lens of the individual that we are trying to visit with.

Um, when I, you know-- When I think about my sister, I- there are a number of accommodations that can be made for people that would be of no assistance to her whatsoever. Um--

**Dr. Montfort:** That's right.

**Chair Moody:** And so I-- It- it- it is- It's-- For-for, like you said, like for- for many people, some of those accommodations would be just fine. Would work fine. But I think I- in Mr. Roberson's case and in the communication that we received from his attorney, and she's gonna be talking to us and invite her to mention this as well.

But the problems that really-- It doesn't-- While- while maybe well-intentioned and maybe trying to figure out things, it doesn't really answer. In fact, it probably exacerbates the ability to communicate, which doesn't allow us to do our job.

Um, one last thing, and I'll let other people weigh in. I- I- I'm remembering when we were visiting with him, and I think I've seen some interviews where, um, i-it'll utilize the-the phrase multiple times "and stuff," "and stuff," "and stuff." And I think if anyone's talking to-to s-- to someone, they go, "Well, that sounds kinda flippant. We're talking about something very serious here. We're sitting in-- we're sitting, uh, with a gentleman on death row who is-- at that time he was, I think, uh, two weeks out from his execution, and stuff, and stuff. I-I-I've heard the-the-the-the concept of-of stimming. Um, can you help explain that kind of thi-thing?

**Dr. Montfort:** Absolutely.

**Chair Moody:** Yeah.

**Dr. Montfort:** So there's two things kind of that may be at play here. So one is this repetitive use of language. So I have a phrase that's worked in some places, and it may even be kinda close to working, but you-you're right, without the-- any changes in emotion, when the same phrase is applied over, and over, and over again, especially that phrase, can sound kind of uncaring, or flippant, or, you know, I mean, I just was doing stuff, right? It's like, "Well, did you hear me? Did you take my s-- my word seriously? I need a-a thoughtful answer."

And really this is not a thoughtless answer. There-there's a host of literature that even describes how people with autism learn language differently. Um, and-and so, you know, sparing you the-- our discourse that we could do on that, um, but this is characteristic of the condition, so that there may be phrases that are used and overused. They often are applied in the right situations and settings, but sometimes not quite, right? And so it can give that appearance.

And then stimming could be, you know, sometimes people with autism might repeat the last word or repeat a phrase that feels good or sounds good to them. And it can



serve several purposes, but one of them can be self-soothing. So in a stressful setting like talking to people in authority, or talking to people that have a lot to do with your fate or decisions that affect how things unfold for you in the future could be highly stressful. And so you may see more of that self-stimulatory behavior.

Um, i-it could be anything from tapping the foot, cracking knuckles, playing with hair, to doing something less functional and-and then looks more odd. But that's typically the purpose it serves. Um, and some people, many adults with autism talk about stimming. Some do it more outwardly than others, some kind of reserve it knowing that it may not be socially appropriate, and-and some describe a little less control than others. But certainly, those sorts of behaviors could also appear somebody-- make someone appear to be fidgety or off task.

You know, again, with it just not as involved or emotionally on the same level. Um, and again, it's not an indicator of guilt. Not an indicator of lack of caring, lack of concern, not even an indicator of inattention. You know, they could be attending very well and engaging in a repetitive behavior that's calming and self-soothing, not looking at you, um, and then everything goes in. They-they've understood and heard everything and are able to dialogue about it.

**Chair Moody:** Well, I-I appreciate that. I wanna make sure that other people have questions, uh, I don't monopolize all of your time. So let me-- uh, I'll look this way. Members, do you have any questions? Representative Bhojani? Yes, sir. Absolutely.

**Representative Bhojani:** Thank you, Chairman Moody. Thank you, Dr. Montfort, for being here and for giving us this testimony. Uh, as a legislator, like I'm trying to figure out are there-- do you know of any laws, um, on the books in the state right now that we could improve on for the autistic-- autism community and-and people that go through this?

**Dr. Montfort:** Oh, yes. [chuckles] Uh, absolutely. So, uh, Virginia has some of the more progressive legislative reform when it comes to people with disabilities, developmental disabilities, like autism and related conditions. Um, and so there-there is an advocacy group called D3 that's made up of attorneys, families who have loved ones that have been caught in the legal system, psychologists, doctors. So, that's, uh, a good organization to be involved with if that's something that interests.

**Representative Bhojani:** Sure, yeah.

**Dr. Montfort:** You know, I'm also open to additional communication on the-on-

**Representative Bhojani:** Yeah.

**Dr. Montfort:** -the topic because it is. It's so important.

**Representative Bhojani:** Would love to communicate with you, uh, moving forward as well. And just want to quickly make a comment. You know, thank you to all the members of this committee. Um, and-and there are some members here that have



been there all day. There are House members, uh, Representative Lacey Hull, Representative John Bucy, Representative Kronda Thimesch.

And one of our, uh, State Minister, Scot Wall, who's been sitting here all day. So I really appreciate them a-and their support throughout this process. And they've done a lot more than just being here. They've been there with, uh, Chairman Moody and myself to meet Rob, uh, Robert Roberson as well. So thanks for everybody for support.

**Dr. Montfort:** Yeah, and thank you all to the committee as well because i-it's bringing important light not only to this case but, you know, the other Roberts, um, that are-- have become entangled in the-the criminal justice system.

**Chair Moody:** Let me go to Representative Bowers real quick.

**Representative Bowers:** Thank you, Chairman Moody, 'cause I don't-

**Chair Moody:** Sorry--

**Representative Bowers: -**I don't even know--

**Chair Moody:** Sorry, I'm gonna extend that courtesy to Representative Bowers. Yes, ma'am.

**Representative Bowers:** Um, but, Dr. Montfort, thank you. Um, you mentioned that, uh, this is not a mental health issue and you mentioned that it is a disability. And it brought to mind, uh, when Chair Moody mentioned law enforcement a bill that I had last session House Bill 567 that dealt-- 568, that dealt with Alzheimer's and the training of law enforcement and all of these members and those in the audience as well helped me pass that bill last session. Um, it makes me feel that-that disability certainly needed to be-- maybe needs to be added to that.

And when you're training law enforcement 'cause I could see how the flat response, um, stimming that you've talked about could come across as negative. Um, and a question that I was thinking about as you were presenting, uh, had-- uh, we might have talked about it today, but did you mention when Robert was diagnosed, or have we talked about that today and, um, Gretchen may have that answer?

**Dr. Montfort:** So it was 2018-

**Representative Bowers:** Okay.

**Dr. Montfort:** -was the first time, so that, you know, information was not available to the jurors.

**Representative Bowers:** Right. And to have him sitting in the courtroom to go through the trial, uh, as you-- as we talked about today, shaken baby syndrome having been mentioned repeatedly. And then he's kept asking police to stop doing



that, um, 'cause that's not what I have done. Um, but as you said, it was a adult diagnosed, uh, disability and autism, uh, after the fact. So thank you for shedding light on that because, you know, really making it clear that it was not known at the time of the case.

**Dr. Montfort:** Absolutely. And even from the hospital, even being, you know, go home and show me the home. But just like Dr. Phil said, you know, if someone in authority is saying you-you need to do this now-

**Representative Bowers:** Mm-hmm.

**Dr. Montfort:** -um, or this is what I need from you. The-the pleasing rule-following nature of most people with autism, most people would not be able to advocate for themselves, um, with autism, and say, "No, I want to stay here. What are my rights? Can we do this later?-

**Representative Bowers:** Sure.

**Dr. Montfort:** -I need to talk to an attorney." All of that type of-of conflict. Um, and, you know, it's-it's not really conflict in that, but just challenging the authority figure, initiating those lines of thought. And Dr. Phil gave some great testimony about the ways that Robert, um, was, you-you know, limited in his cognitive agility.

**Representative Bowers:** Mm-hmm.

**Dr. Montfort:** I think he called it which is-is a great term, but being able to be flexible and think about all these things coming at him at once.

**Representative Bowers:** Mm-hmm.

**Dr. Montfort:** You know, he's just doing the-th-- probably most people with autism, th-the most important thing that's first and forefront which is, you know, this person of authority saying, "Take me to the house now."

**Representative Bowers:** Yes.

**Dr. Montfort:** Um, it's-- so again not necessarily evidence of lack of caring or not wanting to be with his daughter. You know, I'd read he very much wanted to be with her, but thought he had to do what was asked of him.

**Representative Bowers:** Right. And compliance would be what-

**Dr. Montfort:** Yes.

**Representative Bowers:** -what he would think to do. So thank you for that. Thank you for shedding light on that.

**Chair Moody:** Representative Harrison?

Completed: 10/30/2024



**Representative Harrison:** I'm not 100% sure it's a question, maybe it's a statement. Um, I-- you-- I just wanted to highlight something you said there at the very end. You kinda just glossed over. You didn't intend it as a throwaway line, but-- and I think it needs, uh, a moment of highlighting. You said this is just about-- it's something to the effect that this is about all the other Roberts out there. I-I understand that for most of today that has been the case in-in front of us for all of the obvious reasons.

But it-it merits repeating that what the committee is doing today is a quintessentially core function of the legislative branch because it is the legislature that writes laws in the state of Texas. It is the legislature that needs to determine wh-whether our laws are being faithfully adhered to or if they need amendment. And your testimony has been very helpful as we contemplate things, uh, things for next session.

But I just wanna make sure that-that folks heard you say that, that comment about the other Roberts because this is one application of-- in this case, our junk science writ, although there are others, uh, statutes that touch this type of case. And-and it is imperative that we get this right so that no committee on house-- no house committee on criminal jurisprudence is ever faced with a fact pattern that-that faced us a week ago. Thank you for being here and-

**Dr. Montfort:** That's right.

**Representative Harrison:** -thank you for your testimony.

**Dr. Montfort:** Thank you.

**Chair Moody:** Thank you. Members, are there any other questions for Dr. Montfort? Lemme make sure though before, um, I excuse you if you want to add anything else to your testimony or make any other comments, I want to give you that opportunity.

**Dr. Montfort:** I don't think so. Thank you. But I'm available if anybody needs to contact later.

**Chair Moody:** Okay. And then-- and so you're okay with us providing your contact information to the members of the committee if they wanna follow up with you?

**Dr. Montfort:** Absolutely.

**Chair Moody:** Okay. Thank you so much.

**Dr. Montfort:** Thank you.

**Chair Moody:** I appreciate your time.

**[pause 08:10:54]**

**Chair Moody:** Chair calls Gretchen Sween.

**Ms. Gretchen Sween:** Good evening.


**Chair Moody:** [silence] Sorry. I'm having technical difficulties with pa-with paper. I apologize. Um, for the-for the record here, I have you registered as Gretchen Sween representing yourself here today testifying neutral on the subject matter, is that all correct?

**Ms. Sween:** That's correct.

**Chair Moody:** And I want to thank you again for being here with us. Our hopes were that someone was gonna be sitting next to you. Um, I wanna invite you to testify at-at this hearing. There's been a lot said, a lot that has been developed in addition to what we talked about last week. And I want to give you the opportunity to-to weigh in on any of those points that have been made today that you'd like to expand upon, clarify, rectify. I know that, uh, Mr. Salzman said, "If-if I'm wrong about anything Gretchen will correct me."

Um, so if there's any of those notes, I wanna make sure we're able to take that. And I also would like to invite you, and we talked to Dr. Montfort about it a little bit. Uh, um, uh, you-you sent a communication, uh, to-to me as the committee chair about Robert's ability to communicate via video conference. I know we've talked to, uh, an expert about that. But, uh, I would-I would ask you to please, um, talk about that more and explain-explain that as someone who has been working with Robert for-- how many years now?

**Ms. Sween:** Over eight.

**Chair Moody:** Okay. And you saw him-- you did see him over the weekend?

**Ms. Sween:** I did.

**Chair Moody:** Okay. So I do-- in-in your testimony as you laid it out, I-I would-I would like you to address that for sure. Among the other things that-that anything else you wanted to provide to us for our consideration as-as we do our work?

**Ms. Sween:** Thank you, Chairman Moody. I will-- yeah, I'll start with the Zoom issue. Uh, I represent Robert and lawyers often have, shall we say, a problem of usurping their client's will sometimes thinking they are, you know, the client. And when I accepted service of that subpoena, I mean, I was aware that I did not have time to go consult with my client. And part of it was the extraordinary circumstance. So I made a decision to accept service, but part of it was my understanding that you were going to be giving him a remarkable opportunity, which was to be here physically present as is the law.

When you serve a subpoena on somebody, that's a default rule, physical presence. And I thought you and the world will see what I have seen for years, which is a man who has palpable impairments. Um, it's-it's so interesting that you noted the-the phrase and stuff, and stuff, and stuff.

The more Robert gets anxious, that will be a phrase I will hear and stuff, and stuff.



Boy did I hear it a lot yesterday when I visited with him. Um, but also even his letters, he's been writing me letters for years because he can never receive a letter from someone without dutifully writing the back.

And you can imagine the letters he's been receiving lately. But he has kind of a formula for how he writes his letters, and it usually begins with all these expressions of gratitude with smiley faces written in it. And then talking about, you know, he wishes he was with me at this time to help-- uses this same phrase, for example, wishes he were there to help me at this time. I mean, it doesn't make any sense but it's how-it's how he relates. And then I'll-I'll get to a certain point in the letter and I know then he's gonna answer whatever question I asked him in my last letter.

So it's not subtle. Robert's impairment is pronounced. It's been obvious from the beginning, and it was one reason we brought in a neuropsychologist to assess him. There was a concern looking at his school records, how he'd been special ed, et cetera. Did they miss intellectual disability? Because that would've been an easy way to have gotten him out from under the death penalty. But the neuropsychologist looked at his IQ testing, and although his IQ was below average, it was not in the intellectually disabled range.

But she felt that there was a high probability he was on the autism spectrum, but that-- she said, "That's a developmental disability too, you have to go do a deep dive into the person's background. You have to meet people who knew them at the time." This was a very, very extensive assessment that then produced, um, you know, test results. But it was like, "What do we do with that?" Okay, we now better understand Robert. But one thing that had always alarmed me about this trial transcript that we need to get to.

Because I have grave problems with people representing the state of Texas in any forum providing misleading descriptions of this trial in order to score points and shut down this truth-seeking function, I find it very disturbing. But one of the things you'll find when you review the trial record over and over, the nurses talking about he's odd, he's not crying the way he was supposed to, he was staring at the wall, multiple witnesses. And then Dr.-- uh, I'm sorry, Detective Wharton, who, you know, he just went off with him, showed him the house, and, uh, Detective Wharton thought this was very odd.

He didn't act like someone whose daughter was in critical condition. So this was step one of where things went off the rails and I view it today as false testimony. Because, of course, it was odd and inappropriate for a neurotypical person, which Robert is not. And if you have that insight from a professional about what someone on the autism spectrum looks like and you look back, everything he did fits. It's not odd for him, it's odd for those of us that aren't laboring under that disability.

So for me, that was another argument. But I didn't make that in the 2016 writ cause I didn't even know he had autism. I knew there were all these issues, but it wasn't until we got the diagnosis, and that was part of our more recent pleading showing how the


diagnosis was done, how it fit, how it changed the lens through which those nurses would have viewed Robert. That was step one. I've gotten way off the topic of Zoom though. [laughs] Chairman, do you want me to step back about why?

**Chair Moody:** Yeah, I do.

**Ms. Sween:** Okay. So Robert who has to sit there and he-he, you know, he doesn't read faces well, this is part of the autism. He has worked really hard. He like he learned you have to make eye contact, people expect that. So he's learned these coping mechanisms. He's never been on Zoom communicating with anybody. We do it every day. Robert had never been on Zoom until last week. There was a hearing in this cause in the trial court where I was trying to get the execution date vacated for a whole another reason.

And initially, TDCJ, I talked to the warden, he's like, "Yeah, we'll get him there." But then they decided it need to be on Zoom because of the eminence of the execution day. I didn't have time or concern about objecting because Robert was just going to be viewing. He wasn't going to be questioned. But I-I-- we then-- you know, I accepted services of this subpoena thinking he's gonna be here, a chance to-to see, assess his credibility in a way he deserves. I find out via social media on Saturday night during, you know, UT being obliterated by Georgia, regrettably, um--

**Chair Moody:** You can move past that.

**Ms. Sween:** Okay. [laughter] Um, that-that there are these, uh, comments being made by the Attorney General's office that Robert will have to appear via Zoom. Well, I will tell you, Friday morning, I received a phone call from Director Bobby Lumpkin. This is a very high up well-respected person in TDCJ. I was very taken by his graciousness. And he made a point of telling me they were aware of the subpoena, and that they wanted to do everything to make this run smoothly.

And he offered to get Robert street clothes to wear to this hearing so he would not have to appear in prison garb. I almost lost it. I was so moved by this gesture from the he-- you know, the head of the correctional division. Then I get a call from the warden, and he's like, "Yeah, we're on it." No suggestion that this was gonna be a challenge for prison personnel. So imagine my surprise when I'm learning from social media somehow there's been a change, it's somehow a safety concern, Robert can't be present.

And that was not gonna be acceptable to me that somebody who has never had to do this and has overwhelming challenges with interpersonal communication was going to be on a Zoom at a prison where from other experiences, I know is not a good set-up. At the Polunsky Unit, they have very weak internet, uh, it's out in the middle of, you know, the cows, the lake. There's not a big old cell tower right nearby. It is very spa-- and I thought, "Okay, so that's another thing, he's supposed to listen?"

And he's never done it. I-- but I get this special visit with him yesterday, and I


thought, "Is there any way--? And one of the things I wanted to ask him is about his experience on Zoom first time last week. And his response was, "I saw a bunch of heads, but I couldn't hear much." That was what he experienced. And I thought at-- and-- "No way. This is-this is-- there's-there's no compromising here that wouldn't make me someone who was failing my client.

So I don't understand how we got to that point, but I-I really-- it wasn't a matter of disrespect to this committee, Chair Moody that I went-- sent my lawyerly letter. [chuckles] But I wanted to make it clear that this is not my understanding when I accepted services of subpoena, and I did not believe this was, uh, an appropriate compromise considering--

**Chair Moody:** Representative-- sorry, Representative Leach.

**Ms. Sween:** Mm-hmm.

**Chair Moody:** Oh, sorry. Go ahead.

**Ms. Sween:** Yeah, just considering what you had stated the purpose of the interview was, it may-- it-it-- the Zoom thing would've completely defeated that.

**Chair Moody:** Uh, Gretchen, you're-you're referring to, um, the letter from Saturday from the Attorney General's office, correct?

**Ms. Sween:** I never got a letter.

**Chair Moody:** Okay.

**Ms. Sween:** I--- what I saw, I saw some things on social media 'cause there was a lot of media around this event, shall we say. Um, and that there was some chatter. Now I'm not on social media much by the way. I don't do that.

**Chair Moody:** That's-that's a good thing.

**Ms. Sween:** Um, but I-- it became-- it was brought to my attention that, um, statements were being made that were attributed to the attorney general that be for safety reasons, he could only appear via Zoom. And did not compute when I talked to people in charge of safety, and they were totally comfortable.

**Chair Moody:** Yeah.

**Ms. Sween:** And-and even said Director Lumpkin was gonna come, the Head Chaplain, Hazelwood was gonna come, and, uh, Director Dickerson, the former warden of Polunsky who stared the faith-based group and-

**Chair Moody:** Yeah.

**Ms. Sween:** -knew Robert well. They were gonna come and help make him comfortable with this. So how we go from that on Friday, to Saturday night it's-its off,


it's Zoom. I felt like this was-- and why wasn't I informed? So the whole thing got me very upset, I wrote a letter, sent it to you.

**Representative Leach:** Gretchen, let me-- so there-there was a letter sent on Saturday, and, uh, you know, there's-there's been over the past couple of weeks, and really over the past couple of days members since we voted last week. And, you know, that the court activity and all the-all the-- all-all that we've been involved with over the past several days there's been a lot of troubling things, things that-that maybe kept us up at night, we thought through and wrestled with. One of the most troubling things to me was that letter on Saturday.

And-and there's-there's-- and I just wanted to mention this on the record because I want-I want folks to be aware. You're, um, you're absolutely correct when you talk about people like Bobby Lumpkin and the warden, and I would include Bryan Collier, the Executive Director of TDCJ. I've had the pleasure as have the members of this committee of working with and collaborating with these individuals for many years. And these are some of the most decent, smartest, caring, wonderful Texans I've ever met.

And, you know, you think about prisons and correctional institutions, and the death penalty, and you-and you-- you kind of have this-this image in your mind of Alcatraz, and hard-nose, um, cops who don't care about the-- you-- guards, who don't care about the inmates. And man, I'm just telling you for the people of Texas, that is-that is not accurate. These are some of the best men and women. And the most troubling thing to me was-- to your point, we've been working with them throughout this whole process.

I was communicating last, um-- was it-- was Thursday, I've lost track of days now, just, you know, minutes leading up to Mr. Robinson's execution. , I was communicating directly with, um, Mr. Collier, with others in TDCJ just checking in with them, asking how Robert was doing. None of us really knew what was gonna happen at that time, and then Saturday morning came and that letter-- or Friday night. And to be told by the Attorney General's office that our committee cannot communicate with TDCJ.

That we were barred as legislators from having any further communications with Bryan Collier, with Bobby Lumpkin, with Kate Blifford from-- anyone from TDCJ. They said that to the chairman on behalf of this committee. And that to me was one of the most troubling aspects of this whole thing. And so because we're legally barred from communicating, I can't text Bryan Collier, I can't text Bobby, I can't call them. I've been told by the AG's office I can't do that.

I totally disagree with it by the way. But in the spirit of collaborating with the executive agency, I'm not doing so. But I'm willing to bet that they're listening right now. And so I just want those guys to know that I am deeply appreciative and grateful for them. And you know who else I know would agree with me? And that's Robert. That's Robert Robinson.



**Ms. Sween:** I think you're absolutely right.

**Representative Leach:** And so I just wanted to get that on the record. I hope those guys know how much I and the committee members appreciate them and their service to the state of Texas.

**Ms. Sween:** And I-- I'm not familiar Chair Leach with the letter you're referring to. But that's another problem that I wasn't in the loop about wha-what was in effect my own very impaired client dealing with an extraordinarily stressful situation after almost being executed.

**Representative Leach:** Right.

**Ms. Sween:** So-- and I can tell you, one of the things that happened that--'cause they were so solicitous of Robert 'cause they know Robert probably, uh, you know, as well as I do if not better. They know he's no threat to anyone. And they went and asked him what his favorite colors were-

**Representative Leach:** Yeah, this is--

**Ms. Sween:** -so he could wear something that made him comfortable. And he apparently said he doesn't really know 'cause he's only worn white for so long. But-- and how that could not move anybody, I don't know, but the people that know-- and that's why every time I'm at Polunsky, the officers treat him so sweetly, and some of that is obv-- you know, obviously, they're trained, and what-- but he's also-- he's a known quantity.

He's not a problem to anyone. And that for the record cannot be why they did this, um, switch in, you know, switch in time, uh, to, uh, change the-the-the circumstances we all understood which was Robert would be joining me here. So it was-- it has nothing, nothing, nothing to do with concerns by the prison system about Robert's safety. Um--

**Representative Harrison:** Chair?

**Chair Moody:** Yes. I'm sorry, Representative Harrison.

**Representative Leach:** Thank you, Gretchen.

**Ms. Sween:** You're welcome.

**Representative Bowers:** It's okay. I'm sorry. Did you-- no, please.

**Ms. Sween:** I was gonna segue to another concern about dishonest representations in the public field.

**Representative Harrison:** Before we go there, if you don't-- yeah, ho-hold on for just two seconds.



**Ms. Sween:** Okay.

**Representative Harrison:** You know, if you don't mind, I-I want you to get to that, but I-I want to, uh, go just a hair further with, uh, Representative Leach's line of questionings. Um, and I-- forgive me, I don't even remember which all documents this is from, but, um, can you tell me about something called group rec? What-what is this?

**Ms. Sween:** [chuckles] Yeah. Uh, first of all, group rec stands for recreation.

**Representative Harrison:** Actually before you even answer that, what-what-- how has he been confined for most of the last 20 years?

**Ms. Sween:** Most of the last 20 years, as with all inmates who are sentenced to death, uh, they're at the maximum security prison of Polunsky in a concrete box, about the size of an average bathroom. There's a slit that's a window. That's the only natural light. There's a stainless steel bunk about, you know-- it's very narrow it's-- and it's not quite even as long as a grown man like Robert, who's over six feet tall. And there's a toilet sink combo made outta the same stainless steel. And then there's a steel door and a window that has black mesh in front of it. And then there are cracks in the door.

Now, some of you may have seen this. I have only seen the photographs that are available through Public Information Act request and through my client's descriptions. They communicate to each other often through the cracks in the doors to each other. The only people touching them for years and years are the officers who shackle them to take them to showers, to take them to lawyer visits, their limited family visits. That's their physical contact. But something beautiful happened.

**Representative Harrison:** How many hours a day are they in this?

**Ms. Sween:** Uh, essentially, uh, it ends up being about 23 hours 'cause they're technically allowed one hour of rec in a bigger cage. Um, there's a-- in the interior of the pod it's a cage that has, you know, a-- you can't-you can't, you know, like do a lap. It's-it's a tiny-- it's bigger than their cell, but it's still a cage where they can-- they'll often in that like they'll do, um, things like play chess with someone in a neighboring cell-

**Representative Harrison:** Okay.

**Ms. Sween:** -by having homemade boards where they'll call out move. So in that-- when you're in the rec, you can play chess or you can have, uh-- you can do, um, some physical exercise.

**Representative Harrison:** And what I'm trying to get at 'cause we're-we're talking about the nature of-of the security risk he may or may not pose.

**Ms. Sween:** Right, right.



**Representative Harrison:** Um, so something I-- I'm told that he was one of only 13 men to participate in something called group rec.

**Ms. Sween:** Right.

**Representative Harrison:** What is that?

**Ms. Sween:** So regular rec is that one hour you're supposed to get, um-- except on weekends-- out in the bigger cage. That's the rec. Group rec, and I'm not even sure how this came about, but I-I assume it has something to do with Director Lumpkin and Dickerson working together who believe in rehabilitation. That, um, Warden Dickerson when he was at the Polunsky unit, they decided to pick a small group of men on death row that were no trouble to anyone, had absolutely no violence in their record.

And as some of my other clients who, you know, have get-- don't get along with everybody, they're like, "Those are the people nobody dislikes." Well, Robert was one of those. So they were selected to be moved to a separate pod together. So they would still be in their cells, but allowed outside of the cells than for much of the day. And it started out, apparently, it was just like they experimented how'd that go.

The first thing these guys did, they all went and hugged each other. And the, you know-- the muckety-mucks for the prison were there watching this. It wasn't like this was-this was the spontaneous thing. They wanted to hug each other as brothers. And then everywhere else apparently cheers erupted of, you know, cheering them on. So it wasn't-- there was no jealousy here. It was just a thing of beauty. Robert was one of those first ones.

And it had-- was so successful that then they extended it where much of the day, my understanding is, they were outside of the cells and able to play, you know, dominoes together or-- they now have, um, like iPad kind of things. They're not, you know-- they don't have access to much, but they could watch some things together and talk about it. Um, you have no idea how monumental this was. But Robert was checked and-- you know, selected to be one of the standard risk.

**Representative Harrison:** One of the thir-- as the 13 of them total?

**Ms. Sween:** Yes.

**Representative Harrison:** So is it fair to say that, um, the senior leadership of TDCJ did not view him as a risk?

**Ms. Sween:** Precisely. No one was selected for this where there was any doubt.

**Representative Harrison:** And when, um-- some of my colleagues who were-- who are in the rooms, I dunno who's on the dais versus in the-in the room here with us, but some of my colleagues member-- elected members of the Texas legislature went to go visit him. He-he was or he was not allowed to-to interact with them?



**Ms. Sween:** He was allowed, and I wasn't there, but I've seen pictures. He was allowed to go to the chapel where he'd never been before with this group of lawmakers and pray together, hold hands. I think they took some sel-- he kept telling me about selfies-- selfie. He didn't know-- he-he never had a sel-- he didn't know what it was. He was excited they-they took selfies. Um, he-

**Chair Moody:** [chuckles] That means he--

**Ms. Sween:** -thought that was like-

**Chair Moody:** It means he met Representative Bhojani.

**Ms. Sween:** -winning an award, um.

**Representative Harrison:** So what-- I'm sorry.

**Ms. Sween:** But it was, you know-- you don't let-- the prison is not gonna let muckety-mucks like you guys come into their prison and experience a risk.

**Representative Harrison:** Yeah. Cause what I'm trying-

**Ms. Sween:** Not gonna happen.

**Representative Harrison:** -what I'm trying to understand is there is-- there does appear to be a disjunct between TDCJ's actions in the way when they're making the security determinations that they themselves would have to live with the consequences of. And especially when-when we're talking about allowing him to interact with lawmakers, who other executive branch agencies actually had a responsibility to maintain the protection of. When he was with the lawmakers, are you-- do you know, um-- was he required to wear shackles around them or any other restraints?

**Ms. Sween:** My understanding he was not and that I believe some, uh, of the prison personnel-- like I think, uh, Director Dickerson may have come to be part of affirming this. Uh--

**Representative Harrison:** So-so based on the actions of TDCJ selecting him as one of 13 individuals to participate in experimental group rec program, the fact that he was allowed to inter-interact with multiple elected members of the Texas legislature, unrestrained and without shackles, how would you characterize-- what is your belief in TDCJ if you had to guess their actual perception of the security risk that Robert poses?

**Ms. Sween:** Zero.

**Representative Harrison:** Thank you. Thanks, Chair.

**Chair Moody:** Thank you very much. You can go ahead with-- continue with your



testimony.

**Ms. Sween:** Yes. I-I just, you know-- there have been a lot of questions about sort of the proportionality of the, you know, the proportion of the trial devoted to shaken baby. Anyone who makes a representation to a court that this is not a shaken baby case, there are only two possibilities. They have not read any of the record, or they're intentionally deceiving the court about the record. This is not subtle. It's beginning to end as you've heard over and over, but I wanna point out the causation theory.

How you knew-- how-- and how the state argued there had been a crime hinged on the testimony of two witnesses. Dr. Squires, who made the shaken baby diagnosis on September-- Feb-February 1st, 2002, which was faxed to law enforcement and used to obtain Robert's arrest. So she was the diagnosing person, and then she came in, her entire testimony is about shaken baby. What it is, how it applies in this case, how it explains Nikki's condition, and why there aren't exterior signs of abuse.

It's because everything is internal. That's what shaking does. That was the whole point of her testimony. The other causation witness, Dr. Urban, the medical examiner, where she wrote in her report, "Blunt force injuries." That was not the cause. She just listed them without saying how they cause-- how, you know-- where-- when they had been experienced. But at trial, she defined blunt force as shaking and impact, and that she could not distinguish between the two. She-- that was her testimony.

So again, shaking, shaking, shaking from the two experts who were explaining how a crime accord. Now there's been allusions to testimony of other doctors. There were two other doctors, Dr. Konjoyan who was the one that saw Nikki that week and prescribed Phenergan suppositories. Then there was the pediatrician, Dr. Ross, who saw her the next day and measured her temperature at 104.5, and prescribed Phenergan and cough syrup with codeine. Those are the two who testified that she wasn't very ill.

Her illness was not relevant, wouldn't have explained her condition. And that the thing they said as well as multiple nurses is, "A shortfall could not explain any of this." They didn't talk about shaking, that came from the professional in Dallas. They just saw odd guy and all he's saying is about a fall outta bed, and she's got internal head conditions and they're saying, "No, no." Well, guess what else happened before you even get to shaken baby? That nurse who is not certified as a SANE taking upon herself to do a sexual assault exam on a comatose 2-year-old when no one has asked her to do that.

Apparently, because I consulted with an actually certified SANE, she said, "You never do that. You do not take the initiative. Someone has to ask you to do a SANE exam because there's been some credible reason to suspect. Because everybody who has any consciousness realizes you start talking about sexual abuse of a child, the mind is going to shut down." So the nurse initiated this when she's supposed to


be working in the ER caring for a child on life support. And she is the one who apparently had pictures taken.

And some of these pictures, these-- they didn't-- I talked about last time. You can look at those pictures. This is not a battered child. There's a bruise on her chin after she's been in-intubated. You have to pull the chin down, stick the tube down their throat. This happened to Nikki twice. All right. And because they messed it up the first time because they're in code blue situation. All right. That's where this bruise comes from. Then there are tiny bruises on the face which were described by someone as maybe a handprint.

There's no photograph that looks like a handprint, you see touches. But they could be, as we now know, these touch bruises associated with the DIC we now know she has. But that nurse who should have no credibility before this court after what you've heard is the one that in between that, here's the odd father, all he's saying is a fall from bed and before the shaken baby does this sexual assault exam that was uncalled for and starts telling people, "I saw anal tears."

That was the evidence at trial. And I wanna set the record straight. That was the evidence that prompted the district attorney's office in Anderson County to add a capital murder charge. He was charged with causing the death of a child under the age of 10, I think it was then. And then they added a second capital murder charge for a-a death in conjunction with sexual assault. They charged him based on that nurse. You heard Brian Wharton say he was shocked.

They didn't ask the detective's opinion 'cause he had done-- collected evidence, sent it to DPS, blah, blah, blah. There was nothing to support this including the medical examiner and the child abuse expert. But they charged him. And then that allowed them with every witness throughout jury selection and you can see it in the transcript. They talked about shaken baby, and they talked about sexual assault of a child. And there were some people who said, "Nope, the minute I hear that, can't possibly be fair." A lot of jurors struck for that reason.

**Chair Moody:** Yes. I'm sorry, Representative Harrison.

**Representative Harrison:** And so just for clarification 'cause one of the other witnesses actually asked us to-to clarify this with you. Were you saying back-- even further, what were the original indictments? So what was he indicted for?

**Ms. Sween:** He was indicted for capital murder based on the death of a child under the age of two. So that was one count, but then he was called capital murder, death in conjunction with a sexual assault.

**Representative Harrison:** That-that came about-- that came in later or that was a--

**Ms. Sween:** Not much later.

**Representative Harrison:** Okay.

Completed: 10/30/2024



**Ms. Sween:** And remember the whole thing, from event to trial was, uh, under a year.

**Representative Harrison:** Okay.

**Ms. Sween:** So they added this-- but they added the sexual assault capital-capital not long after he was arrested. And-and, uh, Mr. Salzman was correct. There was this moment-- there's very little transcript of the pretrial proceedings. But right before trial, the judge says, "You know, I am a little concerned about this sexual assault. You really have something to hang your hat on 'cause, you know, that kinda creates problems at the appellate level."

And they're like, "No, we-we've got this." What they had was the nurse. So it's a bell sounded, you know, it's part of the opening and then she gives her testimony. This is the one place where the defense lawyers fought back a little, not enough to bring in an actual SANE nurse to rebut all this. We did that years later. We so decimated this nurse that in the findings-- let me see if I can-- our-- we had a false testimony claim about the SANE nurse and the whole sexual assault thing.

Here is what was written in both the states and then that adopted by the trial court. The court finds that even if Nurse Sims's sexual assault testimony was false, applicant has not shown that the evidence was material to the jury's verdict as the ex-- sexual abuse allegation was abandoned by the state and not submitted to the jury. You're kidding me. How is it not material?

**Representative Harrison:** Um--

**Ms. Sween:** And I also have to add 'cause this is another thing that has been misre-- they-they-they-- because they knew-they knew by the time we're doing this in post-conviction, this was bad. This looked really bad. If you read the trial transcript--

**Representative Harrison:** Did-did he move, make a motion for a mistrial-

**Ms. Sween:** He-he did.

**Representative Harrison:** -'cause that was unclear **[unintelligible 08:46:49]**.

**Ms. Sween:** What happened was-- and it was kind of a weird timing. There was an objection to it. Even they moved to sever the two counts, like don't try these together. And their belief was there wasn't enough to support that. That would just be dropped. They-- their motion to sever was denied. It goes to trial together. It's entangled with all the other falsities of the- of the trial along with the shaken baby.

But what it does is it tells the jury, "God, this-this guy is a creep, a monster, horrible. He would shake his child 'cause look what else he's doing." All right. That was their theme. Then they move to drop it or they say they're gonna drop it before it goes to the jury. That's when there was the motion for a mistrial, which was denied because oh, they're dropping it.



**Representative Harrison:** Before it goes to the jury 'cause this has come up in voir dire.

**Ms. Sween:** Oh, oh, no. When I say that-- sorry, that's like trial lawyer lingo that is totally confusing. By go to the jury, it means they get to start deliberating.

**Representative Harrison:** Got it. Sorry about that. Yeah.

**Ms. Sween:** So-- and that was also some confusion about charge he was charged with it. But based on the-the-the-the SANE nurse who wasn't a SANE, that was the charge. It was sounded with every juror opening statement. Then she had this huge role at trial. And then right before closing arguments when you get-- when you are gonna argue the charge, what the jury has to consider, they say they're gonna drop it. There's a motion for mistrial. And the argument is made by the state that, "Well, we're not saying we don't have confidence in it. We're saying, you know, the law makes us decide.

**Representative Harrison:** Because they couldn't bring multiple counts or--?

**Ms. Sween:** Which is not true.

**Representative Harrison:** No.

**Ms. Sween:** And then they make that untrue argument about the law in front of the jury. Like to explain why, you know, we really do think there was sexual abuse, but we had to pick, so we went with the shaken baby one.

**Representative Leach:** Oh wait-wait a sec. I'm sorry. I don't --

**Representative Harrison:** No, no, no, no, no.

**Representative Leach:** -mean to interject I just--

**Representative Harrison:** Please.

**Representative Leach:** Is it-is it not that the law that the defendant has an absolute right to severance if requested before the jury is sworn **[unintelligible 08:49:07]**?

**Ms. Sween:** I believe that is true. So remember he lost it before trial. The damage was done. There should have been a mistrial. But then the argument from the state ever since has been its immaterial because the jury didn't get to decide on that based on the jury charge.

**Representative Leach:** Has-has that been fleshed out anywhere in appeal?

**Ms. Sween:** It was raised, uh, in the direct appeal.

**Representative Leach:** Okay.

**Representative Leach:** Okay.


**Ms. Sween:** Not-not to this extent.

**Representative Leach:** Sure.

**Ms. Sween:** But that was made-- and-and then unfortunately in the initial state habeas the exact same argument it was made and it was found to be procedurally barred 'cause it had already been raised.

**Representative Leach:** Got it.

**Ms. Sween:** Um, and-and I believe there was-

**Representative Leach:** Sorry.

**Ms. Sween:** -actually even-- they-they repackaged it as a Brady claim that there was no way the prosecutor couldn't have known this was a misrepresentation of law to the jury. And you go-- and-and in the rebuttal closing argument, you know, prosecutor gets to go less. There's yet more. They've dropped it, but they're still arguing it. They should consider that the nurse made these allegations.

Why would anybody do that? I couldn't believe it when I read this thing. But I thought, okay, they think he's a monster 'cause they believe the shaken baby thing. They look in his record, there's not a record of violence, child abuse, any of that. Ah, but the nurse saw anal tears on a child who had diarrhea for a week and had been su-- um, prescribed suppositories [laughs] two days before. Cause when we hear anal tears, we're thinking something horrible.

We're talking about skin cracks, red like diaper rash. That is what Dr. Urban acknowledged as Mr. Salzman was saying. And Dr. Urban too. They would-- that was a bridge too far for them. And yet, again, it was sounded because I think the people trying this case had to have something to allow them to see him as this monster, which he is not.

**Representative Harrison:** And just to pull this real quick to-to close this out. Um, other than this one nurse who admitted to lying about her credentials under cross. Um, her testimony of evidence or seeing signs of sexual abuse, was there anything that the prosecution laid out as corroborating evidence to the claim?

**Ms. Sween:** None.

**Representative Harrison:** And-and did they-

**Ms. Sween:** None.

**Representative Harrison:** -attempt anything like photos that-that didn't-- you know, maybe they were unclear photos. Did they try?

**Ms. Sween:** They try-- they had-- they-- Brian Wharton's team collected all the



bedding and other materials from the house, and had it all tested to see if there was anything that would support sexual assault.

**Representative Harrison:** And?

**Ms. Sween:** And they took swabs. They did a sexual assault kit on the child, nothing.

**Representative Harrison:** So-so other-- so other than her testimony, there was nothing to corroborate that testimony.

**Ms. Sween:** Nothing.

**Representative Harrison:** Period. Full stop.

**Ms. Sween:** Full stop. And, like I said, in post-conviction, we had a very qualified SANE take a look at what had been said. She said, "If this woman had taken the SANE training, she didn't follow any of it."

**Representative Harrison:** And you said-- just clarify two things. I'm done. Um, nobody asked her to do a sexual assault examination on this child.

**Ms. Sween:** No record of that.

**Representative Harrison:** And this is the same nurse that, again, lied about her credentials, did a sexual examination on a child, uh, of her own volition, made very graphic claims in front of a jury. And without the same nurse, we wouldn't have had these claims that now are thrown all over the internet right now of hand shape-- was she the same nurse that was doing this hand shape, bruised stuff for some of the early bruising? Cause you tied her-

**Ms. Sween:** Mm-hmm.

**Representative Harrison:** -to some of the early-- what was presented when-when she presented to the hospital. What-what was she tied to in the early evidence? And that's my last question.

**Ms. Sween:** She-she was there because she was working the ER. And this is another thing that, um, the SANE nurse I've consulted with said, "In the middle of triage, your fundamental concern is the care of the patient. You shouldn't be stopping that to do a sexual assault exam that no one's asked for." Also, she seems to have been the one-- we've never been able to verify this-- that took photographs that show unidentified people without gloves grabbing at this child looking-- they're looking and taking pictures. The pictures were introduced through her. This was not a witness who should have had credibility.

**Representative Harrison:** Just-- she-- Nikki was taken to the pediatrician and to the hospital within 48 hours prior to her passing, right?



**Ms. Sween:** Yes.

**Representative Harrison:** Who took her there both-- on those times?

**Ms. Sween:** Robert.

**Representative Harrison:** Both times?

**Ms. Sween:** Both times.

**Representative Harrison:** So he sought-- I just want-- I want-- I wanna make sure that I'm understanding you really clear.

**Ms. Sween:** Mm.

**Representative Harrison:** In the 48 hours before, according to the state right now, he beat his daughter to death. Their words. He sought emergency and pediatric medical care for his daughter of his own volition. Is that cor-- is that correct or is that not correct?

**Ms. Sween:** That is correct. And I can walk you through it. It is, you know-

**Representative Harrison:** Feel free.

**Ms. Sween:** -28th of January, he and his mother take Nikki to the ER because they say she's had diarrhea for a week. She's been vomiting. They're-- they describe cold-like symptoms. Her temperature-- she has a temperature. It's not high at this point, but she has a temperature. And that's when the Phenergan suppositories are prescribed. They take her home, but then her fever shoots up.

So the next morning, which is now the 29th, Robert takes her to the pediatrician's office where that super high fever is measured and it's in the medical records. They measured it there. And he had come in reporting that it was 103. Well, then they measured at 104.5, but that's more Phenergan and the codeine. And then Nikki goes with the maternal grandparents who are supposed to keep her for a few nights because his girlfriend's in the hospital getting a hys-hysterectomy. A lot going on.

And he has his paper routes. He had three paper routes he was doing to support his little family. But part of what he told the police, it's in his statement is that, "Well, I went--" he was trying to tell them these details about, "Well, then I had to go pick up the prescription and take the medicine to the Bowmans. And then I went back to the hospital to see Teddy." And he-he-he remembers these details 'cause that's part of his autism, you know, keeping track in his mind of all his activities.

So Nikki was supposed to be with somebody else, and she was one night, but it was supposed to be three nights. On the 30th, they call him at the hospital at night saying, "Come and get Nikki because now the grandmother is sick." Nikki was still sick. She had those prescriptions for very serious medication. Of course, he wants to



go do what's right. They tell him, "Come fetch Nikki." He drives out of the country, picks her up--

**Representative Harrison:** Is this-- this is on the 30th?

**Ms. Sween:** 30th.

**Representative Harrison:** Okay.

**Ms. Sween:** Around 10:00 o'clock at night. The grandmother testified, "She didn't wanna go." [laughs] She's a 2-year-old who's sick, it's 10:00 o'clock at night, why on earth are you shoving her into the car of this man? Never understood that. But it was as if it was something wrong with Robert. She didn't wanna go with him. He's doing what you told. You told him to come get the sick child. He's doing exactly what you asked him to do. And then he drives her back to her house.

And then he would tell you as he told law enforcement, "Well, I got her some meat with cheese wrapped up in it because that's what little kids like. And I got her sippy cup." And he-he will give you all those details and talk about putting on a movie and they fall asleep. Imagine this week he's been having. Taking her, ER, doctor, picking up things, doing his paper routes. It's an-- his daugh-- his girlfriend's in the hospital getting a hysterectomy. It's an exhausting set of day. They fall asleep. He hears a strange cry in the night.

He uses almost the same language the grandmother had used in describing a similar episode he'd never heard about. Strange cry, wakes up, finds Nikki on the floor at the foot of the bed. There was a comment about blood. It was a tiny speck of blood in her mouth. He can't see anything else wrong. They stay up talking until they fall asleep again. And then, you know, the rest of this. But there's not-- there's a speck of blood on a washcloth that he gives to law enforcement. There's not-- you cannot beat a child and not leave any external signs. This is a bait and switch.

**Representative Harrison:** So claims the matter made by some, "There was a blood-soaked rag that law enforcement found during their investigation." How would you characterize that?

**Ms. Sween:** False. And I put a picture of that rag, which is in the clerk's office. All of you can go look at it. I put a picture of it in the response to the Judge Yuri concurrence that makes that assertion. I put it in the rebuttal. So you could see this is not a blood-soaked rag. You can barely see specks of blood. How dare anybody make that kind of characterization of a record they don't look at. And this is a pattern, notice. Oh, it wa-wasn't really a shaking case, even though there are dozens and dozens and dozens of ref-references.

**Representative Leach:** Gretchen, was she alive when she came into the hospital?

**Ms. Sween:** And this is difficult, Chair Leach.

Completed: 10/30/2024


**Representative Leach:** It is.

**Ms. Sween:** Um, here's what I know.

**Representative Leach:** Okay.

**Ms. Sween:** I know Robert said he woke up and she didn't seem to be breathing, and her lips were blue. And by the way, I-I always have trouble when I'm characterizing what Robert says because it's very natural, we fix it up. Robert has a very impaired way of speaking, and he speaks in very simple phrases. And I don't. So I'm not quoting him. I'm describing the substance. The substance of what he described, she wasn't breathing, her lips were blue. He tried to wake her. He thought he could hear a heartbeat. And then he's-he's-- he always tells me, "It was misting outside." It was January. So he's trying to get her dressed. Girlfriend calls, and he's explaining something's wrong with Nikki. And she's like, "Well, get her to the hospital." And he's like, "Well, I'm putting on her, you know, jacket," whatever it was.

And she's like, "Get him." And so he-he does. And then they have this weird thing where he describes the hospital emergency room door locked, and they have to go around the back, and then the nurse finds them, which, uh, Mr. Salzman was describing in her testimony. The-the salient characteristics, she said blue lips and her eyes were fixed and dilated. That, as I understand it, is a sign of brain death. But that's all she saw initially. She-she takes her, and then remember-- Then-then the violence of the code blue starts.

They're intubating her. They restart her heart. And this is in the records that she experienced tachycardia. The heart rate went from almost nothing to through these charts. And they're giving her medications to increase blood flow to keep that heart going. And now she's-she's got the breathing tube, but it turns out after she goes to X-ray, it wasn't really in. So there's a long time with this child deprived of oxygen.

If she was still with us when she gets to the hospital, I don't think anybody knows, but they revived her to the extent that she's sustained on a breathing tube. And her heart was able to be restarted. But as Dr. Auer was explaining, and this is so complex, but once you get that heart pumping blood again, but the brain has shut down, the blood's gonna then pool outside the brain. But before all of that sets in motion, there'd been the CAT scans showing small subdural bleed and one minor impact site. There is no mushy skull, not a single skull fracture. Nothing. There's a bump on the back of her head.

**Representative Leach:** Can you explain to me the decision to transport Nikki to Dallas Children's?

**Ms. Sween:** Based on the trial testimony that they recognized when they saw the CAT scan because it looked like something was wrong with her brain. It was swollen. That that was too much for the-the local hospital to handle. And I don't know if it was a weather thing or what, but she was not airlifted. She went by ground. And one of the mysteries here is where are all those records? 'Cause who knows what they did


to sustain her or, you know, whether she had a seizure.

And there's just nothing, nothing. There's an order to get her to Dallas. And then she's in Dallas where there are extensive records. There were another set of CAT scans made, they're focusing on the head. And that's where the shaken baby diagnosis was made. We're now in February 1st. The records show that there was a decision to, um, initiate, uh, termination of life.

**Representative Leach:** Okay. Can-can I just-just go back real quick before you get there?

**Ms. Sween:** Mm-hmm.

**Representative Leach:** Um, she was taken from Palestine Regional to Dallas Children's.

**Ms. Sween:** On the 31st. Yes.

**Representative Leach:** 31st. She was taken not in a hearse, but in an ambulance. Correct? She was on life support when they took her?

**Ms. Sween:** Yes.

**Representative Leach:** Okay. She arrived at Dallas Children's with a heartbeat?

**Ms. Sween:** Yes.

**Representative Leach:** And go ahead and proceed with your testimony.

**Ms. Sween:** So that's when, you know, the-the-- They called in the child abuse expert who does the shaken baby, and part of her whole thing-- She looked at those CAT scans-

**Representative Leach:** Right.

**Ms. Sween:** -and saw this is an-an impact case. It's a minor impact. All the internal blood gets interpreted as classic shaken baby, all that. It's in the document faxed from the hospital to Palestine to arrest Robert. That is the theory. Shaken baby. Very odd though to most people. You would go ahead and make this leap to capital murder when you haven't even had an autopsy, and quite frankly, don't yet have a child who is expired.

What you had is hospitals deciding with somebody, and I-I can only surmise it was the maternal grandparents who were allowed to go to the hospital. Brian, uh, Brian Wharton, I don't know that he did this, but someone on his team told Robert he was not allowed to go to the hospital and be with his dying child. And again, this is the same manifestation that leads to the-the cop tells you, "I wanna go see where Nikki fell." Okay. They tell him, but he's-he's been tormented by this his whole life. They



wouldn't allow me to go be with Nikki. And they arrest him. And-and she-- And he's definitely not included in this decision about end of life. There was also some discussion about donating her organs. He wasn't involved in any of that.

**Representative Leach:** And he was the 100% conservator, correct? He was--

**Ms. Sween:** He had been-- Yes. He-- And there was an order in November award-- he was the conservator. He continued to share responsibility for Nikki with both sets of grandmothers. Um, and he needed that help. He wanted-- He welcomed that help, but he was the one who'd been given custody because the maternal grandparents said he should have custody.

And the judge granted the custody. He had not lost custody when they made these decisions to take his daughter off life support. That happened. There was a motion filed February 4th after the-- after she's taken off life support and after she's declared dead and transferred to the medical examiner's office on February 2nd. February 4th, a motion filed. And then February 5th, it's kind of confusing. There's another motion to terminate his conservatorship. And there's no record of this court proceeding, but he says they took him to court and told him he could not go to Nikki's funeral. That's what he was told.

**Representative Leach:** I-I'm sorry. I-I-I have to drill down on this because I just am at a total loss. You're-- On February 4th, I mean, she-she's expired. She's at the medical examiner's office, and there's a motion filed to--

**Ms. Sween:** Yes. It's a very disturbing motion. 'Cause it's a motion to terminate his parental rights and for the grandparents to have power over disposition of the body, is the way it's phrased. It's very disturbing. So they are the ones that then decide what happened to her post-mortem, um, then funeral arrangements, et cetera.

**Representative Leach:** And-and, Gretchen, there's no, um, there's no records, there's no evidence, there's no testimony as to,um, as to who gave the order for her to be removed from life support. We just know it wasn't Robert.

**Ms. Sween:** The-- It's written in passive voice, but it suggests there had been conversations with the maternal grandparents. But it's not like a che-- Somebody filled out a form. And certainly it was not Robert. It was very clear that Robert was not welcome. He was accused. And remember then the cop that, uh, set in on the autopsy told her, in advance, he's been charged with capital murder. And there-- that-that she knew there'd been this shaken baby diagnosis by the child abuse expert at Dallas Children's. That was her information. She didn't look at any of the medical history, CAT scans, et cetera, et cetera.

**Representative Leach:** Just so troubling. So troubling. It just feels like he was framed. That's what everything you've just recited just--

**Ms. Sween:** Yeah. I mean, it's a travesty. And I-I-- uh, I challenge anyone who doubts my integrity as an attorney. And I do take that rather seriously. It's too easy


to, uh, trash our profession. But to suggest that I would misrepresent this record in pleading after pleading is an offense. It is- it is as bad as lying about the record, the assumption that I have been lying about this record for years. I beg you all to read this trial transcript and see if it says what I said.

**Representative Leach:** Well, and then just to- just to double down on that, Gretchen, is, uh, you know, it's-it's interesting you say that you've been referring us back to the trial record. "Go to the record. Don't just trust you. Go read." That's what we've done. That's what we've encouraged-

**Ms. Sween:** Mm-hmm.

**Representative Leach:** -others to do. It's interesting, the district attorney last week could not answer many of our questions and did the same thing; just direct us back to the trial record.

**Ms. Sween:** Sorry.

**Representative Leach:** Right? So I wanna encourage everyone listening to go read the trial record. And if the district attorney in Anderson County is listening as well, if there's anything that she or her office refutes or disputes about what's been said here today, our email addresses are easy to find. We can write a letter to this committee and enumerate, uh, what those objections might be. But for her just to refer us back to the trial record, which is what you're doing too, I've read the trial record, and it-it aligns with everything you've been saying.

**Ms. Sween:** And if I may, Chairman Leach, it's not just misrepresenting the trial record, it's misrepresenting the habeas record.

**Representative Leach:** Right.

**Ms. Sween:** And the whole point of this proceeding is how do we fix habeas, especially when we have this wonderful Article 11.073 that does not seem to be functioning? And I would say one of the problems is if you have a summary of a record that is untethered to that record, you have a real problem. That's where misrepresentations get embedded. For instance, I mean, I'll give you one example 'cause you'll know it now. You heard from Dr. Auer. He was the first person to figure out the pneumonia.

But as Dr. Salzman said, he's not a lung pathologist. He's a neuropathologist who has been studying the connection between the subdural bleeding issue and hypoxia and this lung issues. His report is-is over 60 pages long with illustrations, over 200 citations to scientific articles. That report was admitted in the habeas proceeding along with, you know, many other things that fill up the 13 volume record. But here, you know, what they say about Dr. Auer, this is the entirety of Dr. Auer in the trial court's findings.

The court finds Dr. Roland Auer testified at the evidentiary hearing that-- not even


ex-- we don't even know who Dr. Auer is, that he has any credentials whatsoever. Shortfalls can prove to be fatal, but her death was not explained by a short fall. That's true. He said it. Subdural and intradural bleeding is seen in Nikki at the hospital was caused by something other than trauma. That was one of his opinions.

He did not believe her death was caused by a combination of violent shaking and blows, and finds no evidence to support hypothesis of shaking. Hypoxia can cause retinal hemorrhages, the injuries caused by a single impact rather than multiple inj-- i-impacts. And that doesn't make sense. What injury are we talking about? Uh, Nikki had chronic interstitial pneumonia. Okay, there we go. Nikki's death was a natural death with a tiny accident component.

That's all we hear from Dr. Auer. We get pages about Dr. Urban. Pages about trial testimony, including Dr-- Uh, sorry, Detective Wharton, who had disavowed his trial testimony. The trial testimony is used to support maintaining the conviction. This is not a fair representation of the record. And if you don't send a reviewing court a fair representation of the record, I submit, they generally, whatever may be the ideal, do not have time to go dig into all the trial transcripts as you have done and the habeas record and do the comparison.

They need an honest document. And I think, respectfully, that's where things went off the rail. But I objected to all this. I documented this in filing after filing. You've heard about the Alan Butts case today. When that came out, I was filing things. I was annoying as hell, I'm sure, 'cause I was filing so much. But we can't have things that nobody reads, and then be mystified why Robert is where he is.

It's not hard to figure out there was bad science, a lot of missed, you know, missed bits of evidence in a tragedy and really bad prejudgment of a guy with a disability. That's what happened. But today we know so much more, and none of that has been acknowledged, which is why we're still here litigating whether he should get a new trial.

**Representative Harrison:** Can I, um, Mr. Chair? Can I--

**Chair Moody:** Oh, yes, Representative Harris.

**Representative Harrison:** Hey, Gretchen. I, uh, I don't exactly know the right way to articulate this question, so maybe-maybe help me a little bit. Um, you're talking about, it's-it's also the-the habeas portions of this that are problematic. It's not just what happens the records at trial but everything subsequent to that. And again, I spoke to, um, I-- Forgive me, it's been a long day. I don't know which witness I was talking about, um, where I was dealing with what I am hearing and what's being posited all over the media right now, that everything this committee is doing has been considered ad nauseum at trial and countless times throughout the appellate process.

Um, we had a-a witness earlier recount and characterize certain types of evidence that were never considered or contemplated or interacted with by any courts or



juries. Maybe just a couple sentences on-on-on your understanding of that. But-but one of the biggest manifestation, at least I should phrase, a potential manifestation of the problem you're describing, which is, I don't remember the term you-you used, but something like the-the habeas records is divorced from the facts of what actually occurred in the trial record. And something that correct--

**Ms. Sween:** And the habeas record.

**Representative Harrison:** And the habeas record. So where I'm getting at is, one, I don't wanna say that I'm saying this is an example of what you're characterizing, but how would you character-- So Judge Yuri wrote a concurrence to a recent CCA decision. That concurrence was about two pages, two and a half pages. It was circulated far and wide. And without revealing too many details, I-I think it's safe to share that when I had discussions with other, um, officials and other branches of the government, this concurrence copies of it were everywhere.

This thing went far and wide. How do you characterize that document? I think you know what I'm talking about. Um, how do you characterize that document in terms of its correlation with the facts of the trial record? And to the extent there's a delta between the two, how does this thing get created? Because we-- to your broader point, and-and to bring us full circle, we've gotta figure out how to stop the-the-the miscarriages, uh, or-or the failures of the criminal justice system that have led us here today. So--

**Ms. Sween:** Yeah.

**Representative Harrison:** Take-take those questions away.

**Ms. Sween:** All right. This is gonna involve some speculation, but I will say that I read Judge Yuri's concurrence. This is the first statement of any substance from the Court of Criminal Appeals in the habeas proceeding over several years. There's never been an analysis. And so on one hand I was quite grateful. It was like a peek inside at least one judge's thinking. And-and it's important. It was one judge. Nobody joined this. There are no citations in it to the trial or habeas record.

And starting with almost the first sentence, it is inaccurate. You mentioned blood-soaked rag. I have seen the rag. I've read the testimony about the rag. I've read the post-conviction testimony. There's no blood-soaked rag. There's specks of blood that are completely consistent, by the way, with a kid who's fallen out of bed with pneumonia and may-- and her lungs are so diseased, she may be coughing up little bits of blood.

**Representative Harrison:** And in which I just have to make put into the record 'cause he testified it the other day. The-the lead detective in the case testified that law enforcement would never have even known of the existence of the rag, except that Robert produced it on his own and gave it to law enforcement. Is that con-consistent with your knowledge of the case?



**Ms. Sween:** That is, um, exactly Detective Wharton's testimony and post-conviction testimony. And it's corroborated by the physical evidence, some of the rare physical evidence that remains in the record. Okay. So where does this come from? Where is Judge Yuri learning about a blood-soaked rag? Well, I'll tell you. The problem is you have the deceptive summary of the habeas record, but then it gets even more distorted.

The last-- the-the last thing the state filed objecting to a stay of execution was a few pages long where it makes completely unhinged representation that it goes far beyond this. Now it's nothing but a battery case talking about blood beating, you know, all this. They know better. But let me point out something 'cause this is something that-that fills me with rage about what was done to Robert and what was done in a court of law.

During the 2021 habeas proceeding, which is like a trial on the trial, Dr. Urban was one of these two witnesses brought by the state. Dr. Urban is the person who took autopsy photos that were admitted at trial. So I knew what they looked like. They had been shared with multiple experts. She had been subpoenaed because I wanted to examine her. And part of the subpoena was bring everything in your file because we'd never gotten a full file.

She elected to appear via Zoom and did not produce any additional information to me in response to my subpoena duces tecum. But she produced a brand new document I'd never seen before to state's counsel that was trying to show-- There was like a drawing with some dots on it that were supposedly where there were other impact sites. Now, first I'll say it wasn't in any bit of the record I ever received, but there was the bump on the back of the head, and then there's a-a little circle drawn on the top of the head.

I have gone over this probably ad nauseum, but that was where the pressure monitor was that led to bruising visible in the autopsy photos. But even then, even with the additional bruising this child has experienced from the medical intervention, you do not see a battered child, which is why, Representative Harrison, you keep going back to that questioning by the prosecutor. Why would a prosecutor say, "I don't see anything. There's a big discrepancy on the outside of the inside"? Why would they say that if they could point to pictures of blood and cuts and bruises? They couldn't 'cause it didn't exist.

It's a lie, but the lie gets worse. And I don't know if this is what Judge Yuri saw, but it makes me so damn angry, and I'm-- I apologize. We asked her to bring her file. She doesn't. But most of her post-conviction, direct examination was proving up these grotesque distortions of her own original autopsy photos where they're blown up and have dark shadows and make Nikki look like she'd been battered and beaten.

I obviously objected. Guess what? Objection is overruled. These distorting blowups were admitted into the record, but I also pointed out, on my cross-examination, all of her original autopsy photos were already in the record from trial and having



pleadings shown side-by-side comparisons where you can see that the original autopsy photo does not have the thing that looks like a bruise in the other one.

This is not the way it's supposed to go. And again, we go back to the trial record. If they had pictures that showed a terrible battery and blood-soaked rags and devastation of this child's beautiful little body, where was that at trial? It didn't exist.

**Representative Harrison: [unintelligible 09:22:26]** say the-the-the picture of the blood-soaked rag is in?

**Ms. Sween:** Uh, I think it's my rebuttal to-to the Yuri concurrence, which I will point out. That was the filing that then drew four dissenters when we again said, "Suggestion to reconsider," in light of you just found the science to be discredited in another case last week. And by the way, judge Yuri's concurrence suggest a real misunderstanding of the trial and post-conviction record.

**Representative Harrison:** And so what I'm trying to get at, 'cause as a legislature, we-we-- I don't-- I think we're sold that there-there are procedural infirmities here that have led us to where we are today.

**Ms. Sween:** Mm-hmm.

**Representative Harrison:** Um, what types of things, and maybe-maybe you don't have a solution right now, um, but to any of the witnesses who're listening, anybody at home, I got-- We're all ears here. I think that's fair to say.

**Ms. Sween:** Mm-hmm.

**Representative Harrison:** What types of things could the legislature, if any, could we contemplate so that we don't continue **[unintelligible 09:23:31]** situation, whether it's in Robert's case or as somebody mentioned a minute ago, you know, all the other Roberts that are out there, where we have these records, these summations of trial habeas, wherever, that are as disconnected from the underlying facts of the matter, that we end up in a situation where-- I mean, and I- and I agree. From what I understand, from-from my review of the record, it does not square with what I read and what Judge Yuri wrote when-when he concurred with that CCA opinion.

**Ms. Sween:** Which by the way was not an opinion. It was a-- I got a one sentence postcard notice saying, dismissed. That was the opinion in which he concurred within a few pages of explanation.

**Representative Harrison:** Is there anything that we could consider in terms of statutory, uh, emendations to ex-extent statutes or-or-or new statutes? Or is-is there anything that we could-- the legislature could contemplate that you think might help prevent such a massive-- and-and I-I-- you know, people are gonna take issue with this.


**Ms. Sween:** Yeah.

**Representative Harrison:** But I would characterize some of the things that I've read and some of the recent, um, pieces of litigation, and including that, you know, that-that-that concurrence, we-we are talking about distortions that contain things that I'll characterize as pretty close to falsehoods, not getting into intent.

**Ms. Sween:** [unintelligible 09:25:04]

**Representative Harrison:** You-you-- Well, feel free to characterize how-how you will.

**Ms. Sween:** Yeah.

**Representative Harrison:** But how-- I'm gonna ask this as clunkly and-and as much of a pedestrian manner as I can. How do we fix this going forward?

**Ms. Sween:** I've been thinking a lot about this because I think what is so moving about what's happening right now is there's a genuine interest in getting at the truth as a-- I can't fathom how anyone would want to do this to our criminal justice system because we as lawyers have a duty of candor to the court. We cannot just make stuff up to hold on to a conviction.

But right now, I have seen misrepresentations to the CCA, to the Supreme Court, and also, of course, to the trial court. But the trial court was complicit. The trial court adopted a record that she could not have believed-- a-a summary of the record that she could not have believed was accurate 'cause she'd sat through the evidence. But maybe the problem is in a small little community where a sitting judge, one of a few, was one of the trial prosecutors who put on that nurse who wasn't really sane certified.

And their one little hospital, their personnel are implicated in this. That must be painful. Maybe we need an innocence commission, as some states have. Certainly, there are wonderful pieces of legislation this body has enacted such as, um, Chapter 46B. The whole point of that is to stop, you know, making-- relying on lay assumptions about what mental illness is and what it looks like, and say, you know, it's complex stuff. Let's involve professionals and try to pull it out of the adversarial procedure.

So I-I think it's hard, very hard, Chair Moody, as you like to say. The hard work is the stuff that's worth doing. But it's-- that's what fairness is about, is saying, we-we aren't all experts, and certainly lawyers and judges aren't experts in all this stuff. I've learned a great deal in my time with this case, but there were so many things I didn't understand and I missed. And things came out piecemeal as I learned more.

And it took the largesse of a multinational law firm and the Innocence Project come in and help me. You know, I'm a-- I'm a-- I'm not being paid for this representation. This is a matter of the heart, but also the head. I don't like it that here in Texas, we



are not-- we're-- there's just a disconnect between the facts and the science to turn this sweet impaired man into something he is not and dishonoring his daughter in the process.

**Representative Darby:** Mr. Chair.

**Chair Moody:** Thank you. Yes, Chairman Darby.

**Representative Darby:** Just so we don't leave this, we understand the dynamics, the local dynamics that you're talking to. So you're saying that the judge, who heard the habeas trial, was part of the prosecutorial staff in the original trial? Or please go in depth about the personalities involved. 'Cause I understand small town politics.

**Ms. Sween:** Yes.

**Representative Darby:** I under--

**Ms. Sween:** I can tell by your accent.

[laughter]

**Representative Darby:** I understand how everybody's related to everybody and everybody, you know, shops at the same Piggly Wiggly, uh, they go to the same hospital. They-they have, uh, see each other in church. I mean, so you have a community that's tied at every level. And so you have a locally elected DA. And we're-- who-who is involved mechanically in hearing these evidentiary issues, and what are their connections to each other?

**Ms. Sween:** And that's important. And not to denigrate anybody. 'Cause I think it's very hard when-- Yeah. Um, uh, actually Brian Wharton was explaining to me when, he was in Palestine, he said he would run into somebody he knew was a local drug dealer at the Walmart, and they'd interact, but he did point out, "I wouldn't go traveling with him, and then think I could fairly go arrest him for something."

So I will say two things. I will say on one hand there's the small town that you know people, but then some relationships become deeper. The case was tried by elected DA Doug Lowe, along with his second chair, Mark Calhoun. Mark Calhoun was the son of a long-term judge in the county, Judge Calhoun, who by the way, was involved in the custody proceeding involving Nikki and, I believe, might have signed the order regarding, um, the termination of his rights. I'd have-- I have to confirm that. The case was tried before Bascom Bentley, beloved guy, also UT Football Hero.

Um, he tried it, and he did express on the record this concern about the sexual abuse. But by the time the end of the trial, he'd heard all this stuff about horrible shaking. He said some very angry things on the record because he had-- he came to believe she must have been shaken to death, I think. Alison Mitchell, current DA, was in the DA's office, but has no public-facing role at the trial.



The local attorney that was appointed to defend Robert was a man named Steve Evans, who still works in the community, still gets appointed on a lot of indigent defense cases. When we come back in 2016, after the last execution was stayed, Judge Bentley had, uh, passed away. And the sitting judge in the third court in Anderson County, smart Calhoun. Mark Calhoun, second chair, who prosecuted this as a shaken baby case. Doug Lowe had lost the election to his former subordinate, Allison Mitchell.

Allison Mitchell had a new deputy. They were the ones who handled this at the habeas, but the first thing they did was start to say this wasn't really a shaken baby case. That was a problem. This started in front of a judge with whom I had no experience, um, Judge Deborah Evans, who, because it's rural county, she ro-road circuit. She actually covered three counties. And I was glad to see that somehow she had been assigned because it-- you know, Mark Calhoun would've had to recuse. So I had-- I had no problems with her.

I thought she was lovely and, um, obvious-- but had never done one of these before. And-- but I was troubled by the immediate mischaracterization to her that this would not been tried as a shaken baby case. And that's where things started to go south. But I have learned much more recently that Allison Mitchell and Judge Evans are personal friends. They've traveled to London together, that she hired his son for his first criminal trial so he could then go run for county attorney in one of these other counties where his mother was a judge.

There's a lot of issues that make it difficult to see how we were getting fair adjudication in retrospect. And that became especially true when the DA would not meet with me to discuss the evidence outside of the courtroom, was not in the courtroom for most of the testimony, would not meet with the very lovely Don Salzman who traveled all the way from DC to try to meet her in the hall. You know, wouldn't do it, wouldn't meet with the Innocence Project. I mean, that is not the way this is supposed to go.

And how do I explain it? I explain it by sort of, "Let's circle the wagons. We don't want our community tarnished by this admission. We got this high-profile taste wrong." And I fear that's-- it's the opposite of what has happened. Because I'm not gonna shut up. [chuckles]

**Representative Darby:** Good.

**Ms. Sween:** I am-- I-i-if-if Robert is killed, I'm getting louder because it's emblematic of some problem I can't fully identify. But I think part of it is these relationships that blind you to what the law dictates. 'Cause ultimately, I don't think there's that much wrong with Article 11.073. It could be better, but I don't think it was followed.

**Representative Darby:** I agree.

**Ms. Sween:** And I don't totally understand what--



**Representative Darby:** So Judge Evans heard the habeas.

**Ms. Sween:** Heard the habeas.

**Representative Darby:** Advocated by DA Mitchell. I mean, she presided-- I mean she participated in the--

**Ms. Sween:** Yes. Um, DA Mitchell and her-her deputy were my opposing counsel throughout the initial habeas that led to her-- uh, the whole-- the thing I was describing with the falsified photographs and the Dr. Downs their all-purpose expert to rebut everything our expert said, despite no qualifications for any of that. Uh, there were problems with fairness that were obvious. It-it-it got worse and worse, shall we say.

**Representative Darby:** So you had to-- after the habeas trial, you had to- you had to agree on the record going up. And that's when you showed us the-

**Ms. Sween:** Correct.

**Representative Darby:** -the very thick, uh, findings of fact conclusions law that-that you felt were pertinent and were actually discussed at the trial, and-- of the habeas trial and, uh, should go up on appeal versus what you're showing us today and what you've characterized a small part of as being factually insufficient or, uh, blindly--

**Ms. Sween:** I would go further. I would say they're misleading. They're misleading about what the record established. And that's-- like I said, there had been all of these barriers inclu-- you know, I-I think I described the thing with the-the CAT scans. I don't blame that on anybody, that they were locked up in the courthouse murder closet, but the way they were handled thereafter, and they're not mentioned.

**Representative Darby:** Well, the point is--

**Ms. Sween:** Exculpatory evidence is not mentioned.

**Representative Darby:** Well, it's the barriers that we talked about, Judge Alcala talked about earlier. Uh, but the court of appeals only can provide-- preside over and decide what's up on appeal in that record. Correct?

**Ms. Sween:** The entire record is supposed to be conveyed.

**Representative Darby:** But they don't get the benefit of-of the findings of fact and conclusions of law that you had submitted to the court to approve. They only got to consider those, is that right?

**Ms. Sween:** No, they were sub-- they were submitted to the court along with my objections to the findings, which were over 150-pages long objections. But I cannot believe that they were considered based on the opinion that came out later, which says we adopt this as consistent with the record, and therefore deny relief, which is



the opinion we got. That's it.

**Representative Darby:** I-I got that wrong. So the court of appeals looked at both and adopted that-

**Ms. Sween:** Correct.

**Representative Darby:** -shorter version. Okay. So, well, I just wanted to understand the personality dynamics of how we got off track so quick.

**Ms. Sween:** Mm-hmm.

**Representative Darby:** And why we continue to remain off track. And part of it is complicated by local politics and local communities, but maybe this committee ought to consider some sort of, uh, independent commission that--

**Ms. Sween:** Change of venue. [laughs] No, um, an-an Innocence Commission. 'Cause I think there-there are thing-- there-there are whole, you know, works of scholarship about this, about the phenomenon that the more a case falls apart, that often the prosecutors involved will cling to and shift-- the theory will shift to hold on-- that I don't think it's a malicious thing, but there's some cognitive barrier in many instances to just accepting, "I could have sent an innocent guy to death row for 20 years." I bet that's hard to just accept.

**Representative Darby:** Well, and I thought you said this last week, you said it's kind of this attitude you wanna win. It becomes more about winning-

**Ms. Sween:** Right.

**Representative Darby:** -than it does seeking the truth. And that's what's so appalling to me about this whole matter is it's not an effort to find and seek the truth.

**Ms. Sween:** Right.

**Representative Darby:** It's about winning.

**Ms. Sween:** Yeah. I think so. And there-- you know, it wouldn't be something that's written about in Supreme Court cases if it weren't a common phenomenon, this problem that prosecutors forget sometimes they're representing a sovereign, and the sovereign cares about the truth. But here, I mean, when I start to think how do you take blowups of autopsy photos that have massive distortions that anybody can see and tell yourself you're in pursuit of the truth, I don't see-- I can't get my brain around that.

**Representative Darby:** Thank you.

**Representative Leach:** The-- um, Mr. Chairman, if I could ask a couple of follow-ups. Um, I-I wanna do something real quick.



**Chair Moody:** Yes, sir.

**Representative Leach:** Um, thank you. Thank you, Chairman. Um, I wanna- I wanna do something real quick, Gretchen, because I-I want to, um, show the people of Texas and those tuned in and the people in this room, I wanna- I wanna give them a glimpse as to what we are seeing and what we've seen, the-the disparity between what the-the appellate record claims are the facts and what the facts actually are.

And so to you guys in the back of the room with cameras, um, get your- get your cameras like zoomed in right up here, uh, 'cause I want you to talk real quickly about the apparent blood-soaked rag in the Yuri concurrence. And then I'm gonna show on my screen the supposed blood-soaked rag. So can you, Gretchen, succinctly and concisely explain what the-the blood-soaked rag is all about, and then I'm gonna show it for people to see?

**Ms. Sween:** In Judge Yuri's concurrence, there's a reference in to evidence that's a blood-soaked rag. And talking about this child was beaten all over the head, multiple impacts, multiple blunt force injuries to the body. There's a description of a massive battery, which is contrary to the trial record, but here is the blood-soaked rag that I-I put into a pleading to try to rebut that.

**Representative Leach:** The supposed blood-soaked rag-

**Ms. Sween:** Yeah.

**Representative Leach:** -that we've been hearing all about. Hold on. This is the blood-soaked rag?

**Ms. Sween:** Yeah. And you can see a few little specks of blood. It's an-- You know, and this is now an old piece of cloth, but the blood-soaked rags, it's been preserved. It's in the clerk's record. But where did this blood-soaked rag imagery come from? It came from DA Mitchell and her assistant in the habeas proceeding. They made this ar-- It's like, no, [laughs] it's not true. And I--

**Representative Leach:** It just doesn't-- it--it doesn't look like a blood-soaked rag to me.

**Ms. Sween:** Yeah. And you could say anything. And then once it's in print, that sounds horrible. But there is the reality; that's not a blood-soaked rag. That specks of blood consistent with a child having something happening inside that people had missed, i.e. severe interstitial viral pneumonia and bronchial bacterial pneumonia. Her lungs are falling apart inside and nobody is catching it.

**Representative Harrison:** And just make sure we heard this correctly from previous testimony. It was Mr. Roberson himself who gave this to law enforcement when they were in his home. And can you remind the committee whether or not he welcomed them into his home voluntarily or if a warrant had to be issued and executed?


**Ms. Sween:** Oh, no, he-he consented. He signed a consent to search form, led them to his house, and let them look wherever they wanted.

**Representative Harrison:** So just to make sure I'm hearing this right, a man who according to the state right now, allegedly beat his daughter to death, and then subsequently took her to the hospital to receive medical care, turned around, and then immediately welcomed law enforcement into his home.

**Ms. Sween:** And this is all the same morning.

**Representative Harrison:** Thank you.

**Ms. Sween:** And that's documented, by the way, in the police report, Detective Wharton's own report, the timing, and the, uh, cooperation. Oh, and one more thing 'cause I think one of the most powerful things that you enabled today was to have a juror speak the truth to all of us. Um, like I said, you can go read the trial record and see I have not been misrepresenting it. But also how would she remember that it is a shaken baby case if that wasn't in fact the theme that had been told to her?

She has already provided a sworn statement with a lot of this. I found her in, I think it was 2022. So after-- uh, I-- well, it was somewhere-- I don't know wha-what point I had lost, but somewhere [chuckles] I had lost. And I found her, and she told me about how this had been tried a shaken baby case. And that how the sexual assault thing had been very disturbing and about-- and I asked her, "Do you remember anything at all about pneumonia?" "No."

"Did you-- what was your memory of the medical testimony?" "Oh, that she had some little illness." Blah, blah, blah. She signed and swore to this. And that was part of the new evidence submitted in-in-- What was it? Dawn. August? August. After an execution date was set without allowing us a hearing. All the new expert reports you've heard about Dr. Green, Dr. Bora, then there's also Dr. Mack, the pediatric radiologist.

We put Dr. Auer's report in 'cause it had been disregarded. But there were also that testimony from that juror as well as the declaration from Brian Wharton. There was overwhelming evidence un dismantling all these aspects of this unfair trial that nobody could have read. And then said, "We had nothing new. We were procedurally barred." It's impossible.

**Representative Harrison:** So that sworn statement was ignored. Your estimation.

**Ms. Sween:** Right. And I've seen- I've seen new trials granted, where, I mean, you have minuscule fraction of what we came up with. And often one of the things that is seen as very material, and by the way, this is something the state argued at the-- in the habeas. Well, we hadn't found a juror.

**Representative Harrison:** Mm-hmm.

Completed: 10/30/2024



**Speaker 1:** Really?

**Ms. Sween:** Yes. That was one of the arguments because there was one-- You know, there are cases where materiality is proven, like, you know, by a-a juror declaration 'cause it is a helpful thing to have. So that was one of the things that I thought, you're right. I don't have that. I have overwhelming medical evidence. Shouldn't that be enough? But I did make an effort with some colleagues. And most of the jurors were not willing to talk or not still alive or not blah, blah, blah. Terry Compton, we found her. Her memory of the experience was lucid, and she was willing to put it all down and sign under penalty of perjury.

**Speaker 2:** Speaking of perjury, what about the nurse?

**Ms. Sween:** What about the nurse? Okay.

**Speaker 2:** Yeah. **[unintelligible 09:46:23]**

**Ms. Sween:** My experience, and you know, I-I please do not think I'm flippant about this, but I felt, you know, maybe it's as a mother or whatever, that was the part of the trial I thought was the most unfair and-and damned Robert, no matter what. I mean, anybody hearing that was not gonna see him for who he is. And having consulted with someone, you know, seeing how much was wrong with this, I thought I have to speak to her. Maybe she regrets this.

And I got a subpoena, you know, and I went to serve it. And her very nice husband let me in the house, I met the black cat, which was friendly. And then he said, "Oh, I'll call her." And it's all very, you know, small-town friendly, which is the thing I love. I get her on her husband's cell phone and start to explain. I'm-- I represent a man named Robert Roberson who was tried for capital murder here in Anderson County, you know, in 2003.

And she said she had no memory of anybody by that name. Didn't remember participating in the trial. How you don't remember being one of the star witnesses in a capital murder trial involving the death penalty in your little community? I don't know, but I thought I was shocked, and I thought, well, I can't-- why serve a subpoena on someone who's telling me she doesn't remember participation? So she's never been back into court to account for that testimony.

**Representative Harrison:** Is she still practicing? I mean, do you know if she was still a practicing nurse?

**Ms. Sween:** No comment.

**Representative Harrison:** I would like to know.

**Ms. Sween:** I don't have enough information to-to offer that to the committee.

**Representative Harrison:** Thank you.

Completed: 10/30/2024


**Chair Moody:** That's fair. Members do we- do we-- Members, do we have any other questions? Okay. Um, my plan is to excuse you unless you would like to say anything else before you close your testimony.

**Ms. Sween:** No, I mean, I feel like I've been so terribly negative. And I think that's one problem of coming across like the Cassandra here, that this doctor got it wrong, this nurse got this wrong. I'm not here to judge what people got wrong in 2002 and '3. The whole point of Article 11.073 should be that we are allowed to recognize knowledge evolves and shouldn't we allow us to revisit trials where things just were not known or were not known very well.

I think what you are doing today and what you have been doing in advancing the jurisprudence of the state by wanting to bring science into the courtroom is the most worthy of missions.

**Chair Moody:** Well, thank you very much. Gretchen, I appreciate your time again today, and I'm sure will be visiting again soon.

**Ms. Sween:** Happy to help in any way.

**Chair Moody:** All right. Thank you. Uh, real quick, um, Chair moves to correct the minutes for the hearing held on October 16th, 2024. Is there objection? The chair hears none. The motion prevails. [gavel bangs] Um, I wanna thank everyone who testified here today. Actually, let me-- before I do that, is there anybody that wants to make-make any, uh, closing remarks before I-I give mine? No? Thank you.

I do wanna thank everybody for participating today. And those-those-those of you who have testified, those of you who watched here, spent the time learning, understanding this, those that are watching at home, these are deadly serious issues, not just for Robert, but for Texas Justice. Today was incredibly valuable in understanding what happened, why, and how we can fix some of these issues in our law. I also wanna be clear about the issue of Robert testifying.

We're in the process of working out in-person testimony collaboratively, perhaps by the committee going to Robert instead of him coming to us, which is something we're fleshing out right now. Under the authority granted to and exercised by this committee under state law and House rules, our expectation is still that we're going to hear Robert. And that's going to be the next step for this committee.

Members, again, thank you for your time and attention. The committee will stand at ease and the chair will notify members of the time we will come back in. Thank you very much. The committee stands at ease.

[background conversation]

**Speaker 1:** Well, if there's anything at all I can do **[inaudible 10:01:55]**.

**Speaker 2:** Uh, 20-- 2009. And then he was kinda **[unintelligible 10:02:08]**.

**Speaker 1:** And then he **[unintelligible 10:02:08]** and came back, so-- Okay **[inaudible 10:02:10]**.

**Speaker 3:** Do you remember Byron Cook?

**Speaker 2:** Yes.

**Speaker 3:** Byron Cook proceeded **[inaudible 10:02:13]** here, **[unintelligible 10:02:18]** here.

[background conversations]

**Speaker 3:** He was **[unintelligible 10:02:27]**.

**Speaker 2:** Oh, really?

[background conversations]

[crosstalk]

**Speaker 1:** I think Drew is the right person.

**Speaker 3:** Yeah.

**Speaker 1:** I think **[inaudible 10:04:56]**.

**Speaker 3:** And he's heard all of this so he's in control. But I-I-I think **[unintelligible 10:05:01]**.

**Speaker 4:** Great charts, amazing job.

[crosstalk]

**Speaker 5:** You know, you could have refused **[unintelligible 10:05:07]** of any human being in this room.

**Speaker 3:** Yes.

**Speaker 5:** We were **[unintelligible 10:05:10]** enough to walk around the **[unintelligible 10:05:11]**.

**Speaker 1:** Joe, he--

**Speaker 3:** Joe?

**Speaker 1:** Yeah.

**Speaker 4:** No, he was- he was solid.

**Speaker 1:** Who does he work for? Is he one of the--

**?Speaker 2:** Oscar?

**?Speaker 3:** Oscar.

**Speaker 1:** Okay.

**?Alec:** I gotta go.

[background conversations]

[crosstalk]

**Speaker 1:** Right. That's why I was like **[inaudible 10:05:27]** from far away, he looked like **[unintelligible 10:05:30]**.

[crosstalk]

[background conversations]

**Speaker 1:** But thank you, yeah, we're-- At some point, I'm going to see-- 'cause it's not this one, [crosstalk] no. But if you need anything, um, if you're trying to figure out any information, whatever case, let me know. Happy to- happy to tell you what I can.

**?Speaker 3:** Thank you. I really appreciate that.

**?Alec:** All right. I'm going to get out of here so that the staff can all go home.

**?Speaker 6:** Thank you.

**?Speaker 7:** Thank you, **[unintelligible 10:07:31]** thank you.

**?Alec:** Don't forget, tomorrow would be best, sometime, for **[unintelligible 10:07:34]**.

**Speaker 4:** Okay, **[unintelligible 10:07:34]**. Uh, uh, do you-- just so it doesn't get lost, do you want to, like, email or text me as well, [crosstalk] **[unintelligible 10:07:40]**?

**?Alec:** Yeah, yeah, I don't have your cell, so here, why don't you just put it in, and then I'll-- If I can connect you to the-- to Monty, y'all can work out the details, that would be awesome.

[background conversations]

[crosstalk]

**Speaker 4:** Okay. Uh, we have texted in 2021.

**?Alec:** We have texted? [laughs] So the old text pops up.

**Speaker 4: [inaudible 10:08:15]** Just save that somehow, or whatever. That's my cell.

**?Alec:** Okay. All right. So then I'm gonna say, "This is Alec."

**Speaker 4:** Yep. Or actually, you know **[unintelligible 10:08:25]**

**?Alec: [unintelligible 10:08:27]**

[background conversations]

[crosstalk]

**Speaker 4:** Sorry my brain is not-- I have slept about three hours in the last three days, so--

**?Alec:** All right. I put your name in so that it will-- if I search you-- but I'm gonna save it right now. E-L-L-I-C-**[inaudible 10:08:42]**

**Speaker 4:** S-A-H-U-A-L-L-A.

[background conversations]

**?Alec:** Okay.

**Speaker 4:** Awesome.

**?Alec:** Great.

**Speaker 1:** Thank you.

**Speaker 4:** Thank you, appreciate you.

**?Speaker 6:** Hello.

**Speaker 4:** Yes, ma'am.

**?Speaker 7:** Do you think **[unintelligible 10:08:53]**?

**Speaker 4:** Um, so I think-- my understanding is and was **[unintelligible 10:08:58]** need to do anything. **[unintelligible 10:09:04]** is by himself, right? He didn't have to **[unintelligible 10:09:07]**. He'd be back to adjourn those. **[unintelligible 10:09:08]**

**Speaker 6:** That's a good question. Um, **[inaudible 10:09:11]** so you don't know **[unintelligible 10:09:13]**?

[background conversations]

Completed: 10/30/2024



**Speaker 4:** Right so I think he-- I think we're done. He's just going to come back and adjourn himself, you know. That's the plan. But we left it open just because, you know, it's crazy **[inaudible 10:09:23]**. [crosstalk] You know, the **[inaudible 10:09:26]** Exactly. Exactly, yeah. He's just going to come back and adjourn **[unintelligible 10:09:30]**. So-- We're good anyway, so-- [chuckles]

[background conversations]

[crosstalk]

**?Speaker 6:** And then **[inaudible 10:09:34]**.

[background conversations]

**Speaker 4:** I'll make sure **[inaudible 10:09:35]**.

[background conversations]

**?Speaker 7:** It's good to see somebody smiling so much. [chuckles] And you're tired **[unintelligible 10:09:52]**.

**Speaker 4:** It's uh, well, you know, it-s-it's rewarding work to do, so--

**Speaker 1: [unintelligible 10:09:58]** is so **[unintelligible 10:09:59]** right now.

**?Speaker 4: [unintelligible 10:10:01]**

**Speaker 1:** So it's a **[unintelligible 10:10:03]**.

[background conversations]

**?Speaker 10: [unintelligible 10:10:14]**

**Speaker 1:** I'm just, um, never, um, I never **[unintelligible 10:10:23]**.

[background conversations]

[crosstalk]

**?Speaker 7:** Still figuring it out.

**[pause 10:11:06]**

**?Speaker 1: [unintelligible 10:11:16]**

**[pause 10:11:17]**

**Speaker 1:** Did you call your brother **[unintelligible 10:11:53]**?

Completed: 10/30/2024

**?Speaker 3:** Yes.

**Speaker 1:** Is that your husband or your boyfriend?

**Speaker 3:** Yes. It's my **[inaudible 10:11:58]**.

**Speaker 1:** Oh, **[unintelligible 10:11:59]**.

**Speaker 3:** Thank you, thank you. [crosstalk]

**Speaker 1: [unintelligible 10:12:02]**

[crosstalk]

**Speaker 1:** Does he work here?

**Speaker 3:** Yes.

**Speaker 1:** Really? Where does he work?

**Speaker 3:** The Cheesecake Factory **[unintelligible 10:12:09]** Research.

**Speaker 1:** Oh, **[unintelligible 10:12:11]**.

**Speaker 3: [unintelligible 10:12:16]** be on standby for him.

**Speaker 1:** Aww.

[background conversations]

**[pause 10:12:24]**

**Speaker 1:** And it's cold in this room. Oh my God, I'm freezing.

**Speaker 3: [unintelligible 10:12:43]**

**[pause 10:12:46]**

**Speaker 3:** Oh my God, it's already ten after.

**Speaker 1:** Mm-hmm.

**Speaker 3:** [chuckles]

**[pause 10:15:18]**

**Speaker 1:** Do you like the Cheesecake Factory?

**Speaker 3:** Yes. My favorite is **[inaudible 10:16:47]** the Chicken Tortilla Soup. I love it.

Completed: 10/30/2024

**Speaker 1:** Really?

**Speaker 3:** It's so good.

**Speaker 1:** My son just sent me "I love you.'

**Speaker 3:** Oh [chuckles]

**Speaker 1:** I told him-- Normally, **[unintelligible 10:17:00]**.

[background conversations]

**Speaker 3:** How old- how old is your-your baby?

**Speaker 1:** I have a 13-year-old, a 8-year-old, and a 5-year-old.

**Speaker 3:** Oh, **[inaudible 10:17:14]** how do you do it?

**Speaker 1:** Yep, they all- they all-- they-they have their own personality. **[unintelligible 10:17:21]**

[background conversations]

**Speaker 3:** Very nice.

**[pause 10:17:24]**

**?Speaker 3:** Hey, Nellie, I'm just walking out. Um, I just got a text from, uh, Stacey, just saying, as of now, the hearing is ongoing. So--

**Speaker 1:** Oh my goodness. Well, thank you.

**Speaker 3:** Yeah.

**Speaker 1:** I appreciate it. I do wear flats in my-- Well, just **[unintelligible 10:18:25]**.

**Speaker 3:** Yeah. Yeah. Um, not **[unintelligible 10:18:29]** but--

[background conversations]

**Speaker 1:** Uh-huh.

**?Speaker 8: [unintelligible 10:18:35]**

**Speaker 1:** Mm-hmm.

**Speaker 8:** So I wanna **[unintelligible 10:18:36]**.

**Speaker 3:** I think- I think it's okay for now, honestly, because it's so quiet.

Completed: 10/30/2024

**?Speaker 1:** Everybody's gone, yeah, so I think we're good. Uh, just keep an eye on your groupies. If we need anything from you guys, but, again-

**Speaker 3:** Okay.

**Speaker 1:** -I think we should be fine. I'm hoping that they will, uh, **[unintelligible 10:18:50]** extend these till tomorrow and they're not **[unintelligible 10:18:53]** but **[unintelligible 10:18:54]**.

**?Speaker 3:** Awesome.

**Speaker 8:** Cool.

**Speaker 1:** Well, um, **[unintelligible 10:18:57]**, thank you. Because I'm if, like, down-- I was just going to put my phone. It's getting ready to die.

**Speaker 6:** I know, mine's at like 20%, which is not too bad, but.

**Speaker 3:** Do you want a charger? [silence] Kara?

**Kara:** I'm sorry?

**Speaker 3:** Do you want a charger?

**Speaker 1:** Oh, I'm good right now, thank you for asking.

**Speaker 3:** Okay. **[unintelligible 10:19:13]**

**Speaker 10:** Well, if you need my phone for anything, I'm here for you.

**Speaker 1:** Okay, cool. Thankfully, she's been, like, pretty good to Evan, which is insane, because I've just been like, I've probably said like 700 texts, that is literally no exaggeration. Like, it's just stupid.

**Speaker 8:** You're, like, a professional at this point.

**Speaker 1:** You're what?

**Speaker 8:** You're a pro-texter at this point.

**Speaker 1:** Oh.

**?Speaker 1:** Well, it's like talking like DPS and then, like, customers, and then, like **[unintelligible 10:19:42]** so-- plus all of our stuff, so.

**?Speaker 10:** Holding down the fort.

**?Speaker 1:** Yeah.

![GoTranscript]

**?Speaker 10:** We couldn't do without you. Probably, quite literally.

**Speaker 1:** Yeah, that-- all the caffeine, all the, you know?

**[pause 10:19:56]** [background noise]

**[pause 10:21:40]**

[inaudible conversations]

[silence]

[background conversations]

**[pause 10:22:21]**

**Speaker 3: [unintelligible 10:28:19]**

**Speaker 10:** What was that?

**Speaker 3: [unintelligible 10:28:23]**

**Speaker 10:** Actually no.

**Speaker 3: [unintelligible 10:28:30]**

**?Speaker 10:** Thank you. **[unintelligible 10:28:31]**

**Speaker 3:** Okay.

**?Speaker 1:** Yeah.

[background conversations]

**?Speaker 5:** Hey.

**?Speaker 3:** Ew.

**?Speaker 5:** [laughs] That was a fun hearing. Well, it is-- It is a fun **[unintelligible 10:28:44]**.

**Speaker 1:** Yes. [crosstalk] Ongoing.

**Speaker 8: [inaudible 10:28:45]**

**Speaker 5:** It is current. Um, we're gonna need to make a little posting real quick-

**Speaker 1:** Okay.

**?Speaker 5:** -um, an informational posting.

Completed: 10/30/2024

**Speaker 1:** Okay.

**?Speaker 9:** They're done for the night.

**Speaker 1:** Yes.

**?Speaker 9:** Okay. Um-- Hold on

[silence]

**?Speaker 10: [inaudible 10:29:07]**

**?Speaker 5:** A what?

**Speaker 8: [inaudible 10:29:12]**

**?Speaker 5:** Oh, it didn't **[unintelligible 10:29:16]**.

**Speaker 8:** Oh, that **[inaudible 10:29:17]**. We're not sure.

**?Speaker 5:** Uh **[inaudible 10:29:21]**

**?Speaker 9:** So we're gonna kill the live-- live stream.

**?Speaker 1:** Michael, if y'all listening.

**?Speaker 9:** Um, and then you close the **[unintelligible 10:29:29]**.

**?Speaker 8:** Let's see what he does.

**Speaker 1:** Wait for tonight?

**Speaker 8:** Yeah.

**Speaker 1:** Okay.

**Speaker 9:** The meeting is over for the evening.

**Speaker 1:** Okay.

**Speaker 9:** We're gonna make a new posting. So we're gonna put up some signs on the doors, but, um-- So we're gonna make a new posting for tomorrow-

**Speaker 1:** Okay.

**Speaker 9:** -and they're gonna meet tomorrow at some point.

**Speaker 1:** Copy.

**?Speaker 10:** That means I'm gonna **[unintelligible 10:29:49]**?

GoTranscript

**Speaker 1:** No. **[unintelligible 10:29:51]**

**Speaker 5:** Damien, I'm so surprised you and **[unintelligible 10:29:55]** didn't switch hats.

**Damien:** I know, right?

**?Speaker 5: [unintelligible 10:29:59]** I'm surprised.

[background conversation]

**?Speaker 9:** Okay, I'm going to go um, to our video, audio. Is that-- you working on that?

**?Speaker 1:** Oh, so, uh, just so I can kind of, and I-- Uh-- Okay, um--

[laughter]

[background conversations]

**?Speaker 5:** I was trying to, I was trying to- I was trying to, like, get back because the door closed so I just, like, **[unintelligible 10:30:31]**.

[crosstalk]

**?Speaker 6: [unintelligible 10:30:32]**

**?Speaker 5:** Um--

**?Speaker 6:** Who knows?

**?Speaker 5:** I think it's- it's kind of like, um, when you have **[unintelligible 10:30:38]**.

**?Speaker 1:** Okay, gotcha.

**?Speaker 3:** Might be what **[unintelligible 10:30:42]**.

**Speaker 1:** Okay.

**?Speaker 5:** But there's--

**?Speaker 3:** Maybe **[inaudible 10:30:44]**

**?Speaker 9:** We don't know.

**Speaker 1:** Okay, that's totally fine. I'm just-- It was just on my side, and they were prepared for anything that was just more of a DPS con. Like making sure, and, obviously, they were gonna like, over-plan, rather than-- [crosstalk] But maybe

because it's DPS, **[unintelligible 10:31:00]**.

[background conversation]

**?Speaker 9:** It won't be until **[unintelligible 10:31:11]**.

[crostalk]

**?Speaker 1:** Yeah, I felt like **[unintelligible 10:31:16]**

**?Speaker 9:** Yes, so it won't be right down in the morning.

**Speaker 1:** Okay.

**Speaker 3:** Okay. **[unintelligible 10:31:23]**

**?Speaker 9:** Yes, you're having a meeting with the people at 10:00.

**Speaker 3:** Yeah.

**Speaker 1:** Okay, um, so in your opinion, would there be anything like outside **[unintelligible 10:31:37]**, or-- and I think I'll let you **[unintelligible 10:31:45]** again **[unintelligible 10:31:46]**.

**?Speaker 5:** Yes, I would **[unintelligible 10:31:48]**.

[background conversations]

**?Speaker 3:** Hey, **[unintelligible 10:31:56]**.

**?Speaker 1:** Hello.

**?Speaker 5:** And at that meeting, I think it will tell us when. He may even **[unintelligible 10:32:01]**.

[background conversations]

**?Speaker 5:** We don't know at this point what the reconvene **[unintelligible 10:32:20]**.

[background conversations]

[crosstalk]

**?Speaker 5:** I think we'll **[unintelligible 10:32:32]**.

**Speaker 1:** Okay.

**?Speaker 5:** And we will know more after that meeting. We're going to do a posting

tonight that just says they're going to continue the hearing tomorrow. And **[unintelligible 10:32:47]**.

[background conversations]

[crosstalk]

**Speaker 8:** Everyone is available tomorrow right? **[unintelligible 10:33:09]**

**?Speaker 5:** Yeah. All four **[unintelligible 10:33:11]** looked through. Today or tomorrow. Yeah, **[unintelligible 10:33:14]** tomorrow.

[background conversations]

**?Speaker 3:** That was the plan all along.

[background conversations]

**Speaker 1:** Okay, um, you were **[unintelligible 10:33:36]**.

**?Speaker 5:** I was.

**?Speaker 1:** Are you like, "Ooh, this is, like, the best Monday to come back to."?

**?Speaker 5:** Well, I was actually supposed to drive back from Louisiana today, but I drove back yesterday.

**?Speaker 3:** Oh, you didn't have to do all that.

**?Speaker 5:** Last time my friend and I **[unintelligible 10:33:47]**.

[laughter]

[crosstalk]

[background conversations]

**Speaker 3:** It worked out.

**Speaker 5:** Oh, I know, he worked his ass off.

[background conversations]

**Speaker 4:** So he did.

**Speaker 5:** No, we could have handled it today, too, I know. I just-- My friend that I was going to stay and visit with yesterday, she ended up breaking her wrist and not even getting to come to the event, so I was like, "Huh, worked out well for me **[unintelligible 10:34:10]**." **[unintelligible 10:34:10]**

[laughter]

**Speaker 5:** I've had enough with my mom, I've got to see my dad, I got to see my friend.

[crosstalk]

[background conversations]

**Speaker 5:** So-- No, it was-- and so **[unintelligible 10:34:24]** hang out and then drive back **[unintelligible 10:34:26]**. No biggie, no problems.

[background conversations]

**Speaker 1:** She comes in, like, tears off **[unintelligible 10:34:31]**, and she's like, "Here you go."

[background conversations]

**Speaker 5:** I mean, so this is basically a new person.

**Speaker 1:** Yeah, this one.

[background conversations]

**Speaker 5:** Yes.

**Speaker 1:** Cool. **[unintelligible 10:35:35]** I think we should **[unintelligible 10:35:37]** and just keep **[unintelligible 10:35:38]** a little bit.

**Speaker 5:** Oh, that's **[inaudible 10:35:39]**.

[background conversations]

**Speaker 1:** All right, awesome. Thank you, guys.

**?Speaker 10:** Thank you.

[background conversations]

**Speaker 1:** Okay, we locked up the office, dropped the key.

[background conversations]

**Speaker 1:** Okay, see y'all later.

[background conversations]

**?Speaker 3:** Thank y'all

Completed: 10/30/2024

**Speaker 1:** Text us if you need us.

[background conversations]

**?Speaker 10:** Where do they keep all the **[unintelligible 10:38:07]**?

**[pause 10:38:09]**

[background conversations]

**?Speaker 3:** [laughs]

**Speaker 10:** Yeah.

**?Speaker 3:** Keep moving **[unintelligible 10:39:23].**

**?Speaker 10:** It's just funny because, yeah, **[unintelligible 10:39:24]**.

**?Speaker 3:** It's just funny because, like, I feel like **[unintelligible 10:39:29]** I just spend all this time on this **[unintelligible 10:39:33]**. That's me all the time, so it's a little weird. **[unintelligible 10:39:37]**

**?Speaker 10:** But if that had not been there, then, like, what do I do? **[unintelligible 10:39:44]**

[background conversations]

**Speaker 3:** So, now I think I've got it down. I think I know what he wants. I think I understand he's done it **[unintelligible 10:39:53]**.

**Speaker 10:** Yeah.

**Speaker 3:** Actually by accident, because I usually do it on my period, and that one time, I didn't **[unintelligible 10:40:00]**, like, as we want it. Uh

**Speaker 10:** I've had to do that, and it's stressful. But you're trying to write legibly, and--

**Speaker 3:** No, I'm not that bad at writing, but, like, I just-- I felt like he liked that, because I was just, like, handing him the paper as we went. And so then, like, midway through the hearing, that's why he didn't do like the crunching one, because I started, since he gave me, like, the script, just the voice script.

**Speaker 10:** Yeah.

**Speaker 3:** So then I just started giving-- You know what I mean?

**Speaker 10:** Yeah, I saw it.



**Speaker 3:** I was like, "Okay," **[unintelligible 10:40:30]** so, like, and then he likes that. And-- But then with the crunching one, it's different, because when I tried to make a note about it, and then he's just-- [laughs] It messed up his flow. It messed up his flow.

**Speaker 10:** For real. I was wondering how quickly you put it down. It's a whole lot of paper.

**Speaker 3:** I didn't know what to say 'cause it's a technical paper.

[laughter]

[background conversations]

**Speaker 10:** Uh, okay.

[background conversations]

**Speaker 3:** I don't think he flies his own plane.

**Speaker 10:** Is he a pilot? He's not a pilot.

**Speaker 3:** I don't know. I do not think that--

**Speaker 10:** I didn't know that he was-- I was impressed with this one. Are we leaving the lights on?

**Speaker 3:** Yeah. Yeah. Because don't they automatically turn off?

[background conversations]

**Speaker 3:** You know how they turn off with motion sensor? Okay, let's do the-- Yeah, let's leave them on, and then it'll be like the motion sensor. You know what I mean?

[background conversations]

**Speaker 3:** But if it's motion sensor, when he walks in, won't they turn on?

**?Speaker 10:** Yes, but I've been in meetings where it's like, there's like a couple of sporadic people around moving, and the lights start to go out.

**Speaker 3:** I know. I-- Oh, oh, oh. Let's remember whenever he gavels back in to like--

[background conversations]

**Speaker 3:** I don't think-- Well, I mean, we'll see what happens, but I wonder how long, like-- I was just making sure it was locked.

**Speaker 5:** What did she say?

[background conversations]

**?Speaker 10:** Leave the lights on. No. [laughs]

[background conversations]

**Speaker 10:** That was funny.

[background conversations]

**Speaker 3:** Yeah, **[unintelligible 10:44:34]** just-- I'm curious.

**Speaker 10:** I think all I have to do is-- Oh, I took notes.

**Speaker 3:** Oh, thank you. Thanks.

[background conversations]

**Speaker 3:** I love- I love **[unintelligible 10:44:44]**. You did so great.

[background conversations]

**Speaker 3:** I need to figure it out. Maybe because she's gotta sign the minutes, you know?

[background conversations]

**Speaker 3:** Dad just texted me. He said he saw me several times on the news today. [chuckles]

**Speaker 10:** That's funny

**Speaker 3:** Thanks, Dad. **[unintelligible 10:46:23]**

**Speaker 10:** [laughs]

**Speaker 3: [unintelligible 10:46:26]**

**[pause 10:46:28]**

**[10:53:21] [END OF AUDIO]**

# EXHIBIT 46

# United States Court of Appeals
# for the Fifth Circuit

---

No. 25-10359

---

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2025

Lyle W. Cayce
Clerk

In re David Wood,

*Movant.*

---

Motion for an order authorizing
the United States District Court
for the Northern District of Texas
to consider a successive 28 U.S.C. § 2254 application

---

## UNPUBLISHED ORDER

Before Elrod, *Chief Judge*, Smith and Engelhardt, *Circuit Judges*.
Per Curiam:

David Wood was convicted and sentenced to death in 1992 following
the brutal murder of six girls and young women in the desert northeast of
El Paso. Now, just eight days before his scheduled execution, he moves for a
stay of execution and for authorization to file a second or successive habeas
petition per 28 U.S.C. § 2244.

Wood's motion seeks authorization on four claims: actual innocence,
*Brady* violations, false testimony, and ineffective assistance of counsel. Only
the *Brady* claim and part of the false testimony claim have a reasonable like-
lihood of meeting § 2244(b)'s strict threshold for authorization. We accord-
ingly grant Wood's motion for authorization to file a second or successive
habeas petition as to those claims, and we deny the motion as to the other

claims. Because we do not analyze the merits of Wood's claim at this stage, we deny his motion to stay his March 13, 2025, execution.

## I. Evidence at trial

We begin by summarizing the relevant evidence presented at Wood's capital murder trial. There were four key categories of evidence.

First, two of Wood's fellow prison inmates, James Sweeney and Randy Wells, testified that Wood confessed to committing the murders, including details of his *modus operandi*. Wells, for example, testified that Wood confessed to tying the girls to his pickup truck and to a tree, stretching the girls out, digging a grave, and raping them. Wells also testified that he covered some of Wood's tattoos with new ones because one girl had seen the tattoos and escaped. Evidence was presented at trial "that Wells testified in order to receive the benefit of a reduced sentence in another case, Sweeney had no agreement to receive any compensation for his testimony, but both men hoped to receive reward money offered by the El Paso police department."[1]

Second, Judith Kelling testified that Wood raped her. That evidence was admitted to prove identity and M.O. because "the location, time, and circumstances of the assault upon Kell[ing] were strikingly similar to that of the six murders at issue here."[2] Kelling testified that Wood, who was driving a tan pickup, asked if she needed a ride and drove her out to the desert in the area where the other girls were found. Wood tied her to the front of his truck

---

[1] *Wood v. Dretke*, No. 3:01-CV-2103-L, 2004 WL 1243169, at *27 (N.D. Tex. June 4, 2004) (magistrate judge's report and recommendation adopted in 2006 WL 1519969 (N.D. Tex. June 2, 2006)).

[2] *Wood v. State*, No. AP-71,594 (Tex. Crim. App. Dec. 13, 1995) (slip op. at 2) (direct appeal of conviction and sentence). The Court of Criminal Appeals ("CCA") mistakenly spelled Kelling's name as "Kelly."

and dug a hole behind some bushes. He then began ripping Kelling's clothes off and forced her to the ground. Wood suddenly heard voices, and he ordered Kelling back into the truck and drove to another part of the desert. Wood forced Kelling to remove her clothes, and then he gagged and tied her to a bush. Wood then raped Kelling after ordering her to say that she was 13 years old. Immediately afterwards, Wood began hearing voices again and drove away, leaving Kelling naked in the desert and telling her to "always remember, I'm free." The jury knew that Kelling was a prostitute and a heroin addict.

Third, Steve Robertson, a chemist at the Texas Department of Public Safety, testified that fibers found at one of the victim's graves matched fibers recovered from a vacuum cleaner bag that Wood and his girlfriend had left in their old apartment. Robertson testified that the number of fibers found at the gravesite and on the victim's shirt indicated that Wood had come in contact with her within hours of her murder. Wood also called his own expert at trial to testify about the fiber evidence.

Finally, witnesses testified that they saw the victims with Wood—or a man matching Wood's description—or getting into a beige pickup truck or red Harley motorcycle matching the description of Wood's vehicles.

## II. Statutory framework

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts lack jurisdiction over second or successive habeas applications unless certain exceptions apply. 28 U.S.C. § 2244(b)(1)-(2); *Blackman v. Davis*, 909 F.3d 772, 777 (5th Cir. 2018). At the threshold, any claim "that was presented in a prior [federal habeas corpus] application shall be dismissed." § 2244(b)(1). All other claims must likewise be dismissed unless, as relevant here,

> (i) [T]he factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

§ 2244(b)(2)(B)(i)–(ii).

A petitioner must satisfy *both* subsections—(b)(2)(B)(i) and (ii)—for authorization to issue. That's a high bar, and Congress designed it that way because "[f]ederal habeas review of state convictions . . . intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (quotation omitted). We have described (B)(ii)'s requirement "as a strict form of innocence, roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley*." *Johnson v. Dretke*, 442 F.3d 901, 911 (5th Cir. 2006) (cleaned up).

At this stage, Wood need only make a *prima facie* showing that he satisfies the requirements of subsections (b)(2)(B)(i) and (ii). § 2244(b)(3)(C). "'If in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirement for the filing of a second or successive petition, we shall grant the application.'" *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014) (quoting *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003) (per curiam)). Importantly, we do not rule on the ultimate merits at this stage; we merely "determine[] if this 'second or successive' habeas application deserves fuller review by the district court." *In re Will*, 970 F.3d 536, 541 (5th Cir. 2020).

When our court grants a motion to file, that grant is tentative; it is but the first step in a two-step process for authorization to file. *In re Swearingen*, 556 F.3d 344, 349 (5th Cir. 2009) (per curiam). "[B]efore addressing the

merits of the successive petition, the district court must independently determine whether the petition *actually satisfies* the stringent § 2244(b)(2) requirements." *Id.* at 347.

### III. Claim 1: actual innocence

Wood's first claim is that he is "actually innocent" of the crime. The Fifth Circuit, however, "'does not recognize freestanding claims of actual innocence on federal habeas review.'" *In re Raby*, 925 F.3d 749, 755 (5th Cir. 2019) (quoting *Swearingen*, 556 F.3d at 348). Thus, we decline to authorize that claim on the merits. *Id.*

"If, however, one (or more) of [Wood's] claims satisfies the dual requirements of § 2244(b)(2)(B), a credible showing of actual innocence would allow him to pursue the claim, despite a procedural bar" or a failure to satisfy AEDPA's statute of limitations. *Id.*; *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). Neither of those bars is relevant to our disposition of this motion, so we do not consider Wood's "actual innocence" evidence except to the extent it undergirds his other claims.

### IV. Claim 2: *Brady* violations

Wood seeks authorization for a claim that the state violated *Brady* by suppressing favorable, material evidence.[3] "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Our inquiry into whether the allegedly suppressed informa-

---

[3] *See Brady v. Maryland*, 373 U.S. 83 (1963) (holding that a prosecutor's failure to turn over material, exculpatory evidence to the defendant violates due process).

tion is material is applied to "the suppressed evidence collectively, not item-by-item." *Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996) (quotation omitted).

For us to grant the motion for authorization, Wood must make a *prima facie* showing that

> (1) his *Brady* claim was not presented in a prior application; (2) the factual predicate for the *Brady* claim "could not have been discovered previously through the exercise of due diligence"; and (3) he can establish by "clear and convincing evidence that, but for [the *Brady*] error, no reasonable factfinder would have found him guilty."

*Will*, 970 F.3d at 541 (quoting § 2244(b)(2)(B)(i)–(ii)).  Wood has not previously asserted a *Brady* claim in a federal habeas petition, and the state does not dispute that.  Thus, we inquire whether Wood has shown that he is "reasonably likely" to meet the "stringent requirements" of subsections (b)(2)(B)(i) and (ii).  *Campbell*, 750 F.3d at 530 (cleaned up).

Wood asserts that the state suppressed four pieces of evidence in violation of *Brady*: (1) evidence suggesting that Michael Plyler, not Wood, sexually assaulted Kelling; (2) memos cataloguing police surveillance of Wood; (3) one of Kelling's interviews with the police; and (4) a failed polygraph test and biological samples taken from Sal Martinez.

## A.

Wood avers that the state withheld favorable, exculpatory evidence that a man named Michael Plyler—not Wood—raped Kelling, that Plyler was known as "Skeeter," and that Plyler (like Wood) drove a beige Nissan pickup truck and a Harley motorcycle.  As evidence for that assertion, Wood points to (1) a January 2025 sworn declaration of Ramona Dismukes; and (2) a folder on Michael Plyler created by the police task force that investigated the murders.

Dismukes states in her declaration that her sister-in-law, Cheryl, disappeared the same summer as the murder victims. Ex. 62 ¶¶ 1, 3. Dismukes heard rumors that someone who looked like her sister was seen "in the area of all the bars and where girls used to trick." Ex. 62 ¶ 9. Dismukes went to the area to inquire about Cheryl, and she met Judith Brown Kelling, who "was out [there] tricking." *Id.* Kelling told Dismukes that Michael Plyler, whom she knew as "Skeeter," was the man who raped her in the desert. Ex. 62 ¶ 10. Dismukes states that "I showed Judith a picture of David Wood and she'd never even seen him before. The cops had made a deal with Judith to drop charges against her in exchange for testifying against David. She didn't even know who David was." Ex. 62 ¶ 11. Dismukes "went to the El Paso police and told them about my conversation with Judith. The cops told me to stay away." Ex. 62 ¶ 13.

### 1. Innocence

Under § 2244(b)(2)(B)(ii), we assume that Wood can prove "the facts underlying the claim." Here, the "fact" underlying the claim is what *Dismukes*, not Kelling, stated.[4] Taking everything Dismukes said—*i.e.* the "facts underlying the claim"—as true, it proves that Dismukes told the state about what Kelling relayed to her. It does not prove the truth of what *Kelling* told Dismukes; it merely demonstrates that the state was on notice of what *Dismukes* relayed.

Taking the declaration as "proven," as we must under the statute, the state had information about Dismukes's coming forward about her conversa-

---

[4] *See Charboneau v. Davis*, 87 F.4th 443, 457 (9th Cir. 2023), *cert. denied*, 145 S. Ct. 179 (2024) ("[W]e conclude that the 'facts' that are to be taken as 'proven' under § 2244(b)(2)(B)(ii) are not the ultimate facts, but simply the evidentiary proffer underlying the claim—namely, that a particular witness made a given statement at a given time or that a specific document contains certain statements.").

tion with Kelling.  The state received, from Dismukes, evidence that Kelling identified Plyler as her accuser and fabricated her testimony against Wood in exchange for a deal.

And there is more.  The state had a task force folder on Michael Plyler that was created during its investigation of the murders.  That folder indicates that Plyler had a beige Nissan pickup and a red Harley motorcycle, just like David Wood.[5]

Had the state turned over Dismukes's report and the Plyler folder to the defense, the defense would have called Dismukes as a witness, and her testimony would have severely undermined Kelling's credibility with the jury.  To be sure, the jury knew that Kelling was a prostitute and a heroin addict, but it did *not* know that Kelling had identified another person as her attacker or that she had a deal with the state in exchange for her testimony.[6]

If Dismukes had testified to the facts she states in her declaration—that Kelling identified Plyler as her attacker but falsely framed Wood—that would have destroyed the state's case so thoroughly that every reasonable juror would have had a reasonable doubt about Wood's guilt.  In a trial that the state described as "purely a circumstantial-evidence case," Kelling's testimony was a crucial linchpin.  On direct appeal, the CCA explained that the Kelling evidence was "extremely important to the State's case":

> The identity of the murderer was a disputed issue at trial, obviously critical to both sides.  Other evidence linking [Wood] to the murders consisted of the testimony of his former cellmates, circumstantial evidence and witness testimony placing [Wood]

---

[5] Wood received a copy of the task force folder on Plyler around 2009, and he asserts that his copy is "partially obscured and in black and white."  Wood references the Plyler folder as "exhibit 63," but he failed to attach that exhibit to this motion for authorization.

[6] On cross-examination, Kelling stated that she had received no deal from the state.

with one of the victims on the night of her disappearance. But
[Wood] impeached his former cellmates with their lengthy
criminal history and vigorously attacked their testimony as the
product of deal-making with the State. The remaining evi-
dence was not so compelling or undisputed as to render unnec-
essary the extraneous offense evidence. Under these circum-
stances the State's need for the evidence was great.

*Wood v. State*, No. AP-71,594 (Tex. Crim. App. Dec. 13, 1995) (slip
op. at 7-8).[7]

Dismukes's testimony would have severely undermined the Kelling
evidence, which was foundational to the state's circumstantial case against
Wood. That is "clear and convincing evidence that, but for [the *Brady*] error,
no reasonable factfinder would have found [Wood] guilty."
§ 2244(b)(2)(B)(ii).

## 2. Due diligence

For us to grant his motion for authorization, Wood must also make a
*prima facie* showing that "the factual predicate for the claim could not have
been discovered previously through the exercise of due diligence."
§ 2244(b)(2)(B)(i). He has done so.

Under AEDPA, "due diligence is measured against an objective stan-
dard, as opposed to the subjective diligence of the particular petitioner of
record. The burden to make such a showing, of course, remains the peti-
tioner's." *Johnson*, 442 F.3d at 908. "[T]he *Brady* and due diligence analy-
ses are not collapsed where the record demonstrates that the defendant or
defense counsel was aware of the potential *Brady* material but failed to pursue
investigation of that ultimate claim." *Id.* at 910. "[T]rial counsel may rely,

---

[7] Based on the evidence presented at trial, the CCA characterized the Kelling evi-
dence as "very compelling" and "unassailable." *Id.* at 7.

absent notice to the contrary, on representations by the prosecutor." *Will*, 970 F.3d at 543.  Our inquiry is whether the record "includes evidence that would put a reasonable attorney on notice of the existence of [the evidence]." *Johnson*, 442 F.3d at 908.

On the record before us, Wood had no reason to know that Dismukes spoke with Kelling or with the police.  He had no reason to know that Dismukes knew anything about Plyler or that she had any information that would have been helpful to his defense.  And he had no reason to believe that there was significant exculpatory value to the task force records about Plyler until Dismukes came forward.  In short, "a reasonable attorney would [not] have been put on notice of the existence" of the *Brady* evidence.  *Blackman*, 909 F.3d at 779; *Johnson*, 442 F.3d at 908.

### 3.  Statute of limitations

The state avers that Wood's claim does not satisfy AEDPA's statute of limitations in § 2244(d).

The text of § 2244(b)(3)(C) allows us to grant Woods's motion only if he makes a *prima facie* case of the requirements "*of this subsection*"—subsection (b).  That is separate from subsection (d), which sets out the statute of limitations.  *See In re McDonald*, 514 F.3d 539, 543 (6th Cir. 2008) ("[I]nvestigating compliance with the one-year statute of limitations outlined in 28 U.S.C. § 2244(d)—clearly a separate subsection from 28 U.S.C. § 2244(b)—is not within the purview of the court of appeals' consideration of applications requesting authorization to file a second or successive habeas corpus petition pursuant to 28 U.S.C. § 2244(b)."); *In re Rosado*, 7 F.4th 152, 156 (3d Cir. 2021) (Bibas, J.) (collecting cases) (holding that § 2244(b)(3)(C) does not *require* a court of appeals to consider § 2244(d)'s timeliness requirement).

We have held that we *may* consider the state's affirmative § 2244(d)

limitations defense in considering the § 2244 motion for authorization. *In re Burton*, 111 F.4th 664, 666 (5th Cir. 2024) (explaining that circuit precedent "permit[s] us to consider the timeliness of the successive petition"); *Campbell*, 750 F.3d at 532 n.9 ("We have the authority to deny a motion to authorize based on timeliness.").

But we have never in a published opinion held that that authority came from our gatekeeping authority under § 2244(b)(3)(C) or that we *must* consider the § 2244(d) timeliness bar.[8] Indeed, we have suggested otherwise. In *In re Henderson*, 462 F.3d 413, 417 (5th Cir. 2006) (per curiam), we granted a § 2244 motion when the prisoner had "made a *prima facie* showing of mental retardation," even though "[w]e note[d] that, unless the doctrine of equitable tolling applies, [his] successive petition is time-barred" under § 2244(d). We declined to address equitable tolling, finding it "premature for us to address it" and leaving the issue to the district court. *Id.*

We need not decide whether § 2244(b)(3)(C) requires Wood to establish a *prima facie* case that he satisfies the one-year limitations of § 2244(d). The key factual predicate of his *Brady* claim—the Dismukes declaration—is only about two months old.

---

[8] *See In re Salazar*, 443 F.3d 430, 434 n.2 (5th Cir. 2006) (per curiam) (leaving open the "question of whether, in our role as 'gatekeeper' under § 2244(b)(3)(C), we have the statutory authority to deny a motion for authorization solely on the basis of timeliness under § 2244(d)(1)(C)"); *Graham v. Johnson*, 168 F.3d 762, 787 n.20 (5th Cir. 1999) ("We express no opinion as to whether a court of appeals should consider the timeliness of a habeas application in deciding a prisoner's motion for authorization to file it."); *but see In re Wood*, 648 F. App'x 388, 390 (5th Cir. 2016) ("Finally, this court must determine whether Wood's claim is barred by the statute of limitations." (citing § 2244(d))); *Buchanan v. Lamarque*, 121 F. App'x 303, 316 (10th Cir. 2005) ("[H]e must also make a prima facie showing that the claims are not barred by . . . § 2244(d)(1). Although this requirement is not expressly set forth in § 2244(b)(3), we see no reason to authorize the filing of a second or successive petition in the absence of such a prima facie showing.").

B.

Wood has made a *prima facie* showing that he satisfies the requirements of § 2244(b) to file a second or successive habeas application asserting a *Brady* claim. We therefore grant his motion for authorization with respect to that claim.

We leave to the district court, if it authorizes the application, to determine in the first instance whether Wood's proffered evidence constitutes *Brady* material. Under *Brady*, the materiality of evidence is considered collectively, not item-by-suppressed-item. *Spence*, 80 F.3d at 994. Thus, all four of the alleged *Brady* violations would be part of the same claim for which we authorize filing.

## V.  False testimony

Wood next seeks authorization to file a claim that the state elicited testimony it knew to be false in violation of *Napue* and *Giglio*.[9] "To establish a due process violation under *Giglio*, a habeas petitioner must show '(1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false.'" *Raby*, 925 F.3d at 756 (quoting *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007)).

Wood alleges four grounds for his false-testimony claim: (1) Wells and Sweeney fabricated their testimony that Wood confessed; (2) Sweeney testified falsely about his financial motivation; (3) Kelling testified falsely that Wood sexually assaulted her and that she received a deal; and (4) Robertson, the state's fiber expert, testified falsely.

In his first federal petition, Wood raised a claim that Wells and

---

[9] *See Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972).

Sweeney fabricated their testimony about Wood's confession, so Wood is barred from reasserting that ground here. § 2244(b)(1). As to Wood's other allegations, Wood states a *prima facie* case that his false-testimony claim satisfies § 2244(b)(2)(B)(ii).

The key "facts underlying the [false testimony] claim" come from the same Dismukes declaration underlying the *Brady* claim. As discussed in part IV.A, Wood has stated a *prima facie* case that those facts, "if proven and viewed in light of the evidence as a whole," are "sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [Wood] guilty." § 2244(b)(2)(B)(ii). Our due-diligence and statute-of-limitations analyses of the *Brady* claim likewise apply here.

Accordingly, we grant Wood's motion for authorization to file his false-testimony claim except to the extent he alleges Wells and Sweeney falsely testified about Wood's confession.[10]

## VI. Ineffective assistance of counsel

Finally, Wood seeks authorization to file a claim that his counsel was ineffective for several reasons not previously alleged in his first federal habeas petition. But the factual predicate for each of the ineffective-assistance grounds Wood raises was available to him at trial or, at the very latest, when he filed his first federal petition. The claim is therefore barred under § 2244(b)(2)(B)(i), and we accordingly deny authorization to file it.

\* \* \* \* \*

For the foregoing reasons, Wood's motion for authorization is

---

[10] For the avoidance of doubt, we do *not* hold that § 2244(b) bars Wood's argument that Sweeney testified falsely *as to his financial motives for testifying*.

GRANTED only as to his *Brady* claim and his false testimony claim.[11]

"We reiterate that this grant is tentative in that the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits, if the court finds that the movant has not satisfied the [28 U.S.C. § 2244] requirements for the filing of such a motion." *Swearingen*, 556 F.3d at 349.

We GRANT IN PART AND DENY IN PART Wood's motion for authorization to file a second or successive habeas application. Because we make no determination on the merits at this stage, Wood's motion to stay his execution is DENIED.



**A True Copy**
**Certified order issued Mar 11, 2025**

*Jyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

---

[11] Authorization for the false testimony claim is granted only to the extent described in part V.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

March 11, 2025

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

    No. 25-10359     In re: David Wood

Dear Ms. Mitchell,

Enclosed is a copy of the judgment issued as the mandate.

    Sincerely,

    LYLE W. CAYCE, Clerk

    By: _____
    Mary Frances Yeager, Deputy Clerk
    504-310-7686

cc w/encl:
    Ms. Claire Davis
    Ms. Naomi Fenwick
    Ms. Rachel Leigh Patton
    Mr. Jeremy Schepers