No. 25-40622

IN THE
# United States Court of Appeals for the Fifth Circuit

*In re* ROBERT LESLIE ROBERSON, III
*Movant*

On Motion for Authorization to File
a Successive Petition for a Writ of Habeas Corpus
in the United States District Court

## OPPOSITION TO MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for
Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

ELLEN STEWART-KLEIN
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936–1400
Ellen.Stewart-Klein@oag.texas.gov

*Counsel for Respondent*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent*
Eric Guerrero, Director
TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent*
Ellen Stewart-Klein
Assistant Attorney General / Assistant Criminal District Attorney
OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Movant*
Robert Leslie Roberson III

*Counsel for Movant*
Callie Heller & Emma V. Rolls
Assistant Federal Public Defenders
Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102

Gretchen S. Sween
712 Upson Street
Austin, TX 78703

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES .............................................................. iii

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUE ............................................................ 1

STATEMENT OF THE CASE ............................................................. 2

    I.    Procedural History ............................................................ 2

    II.   Statement of Facts ........................................................... 6

        A. Guilt Evidence .......................................................... 7

        B. Punishment Evidence ................................................. 18

           1. State's Evidence .................................................... 18

           2. Roberson's Evidence ............................................. 20

           3. State's Rebuttal .................................................... 25

        C. State Habeas Evidence .............................................. 28

SUMMARY OF THE ARUGMENT ...................................................... 34

STANDARD OF REVIEW ............................................................... 35

ARGUMENT ............................................................................. 36

I.    The Court Should Deny Roberson's Motion Because He Does Not Meet the Standards Under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition ............................ 36

   A. Roberson cannot make a prima facie showing that he meets the § 2244(b) requirements to proceed because he was not diligent ..................................................... 36

   B. Roberson fails to make a prima facie showing of innocence under § 2244(b)(2)(B)(ii) and his due process claim is barred ......................................................... 41

      1. Roberson fails to demonstrate that the evidence as a whole "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." .......................... 41

      2. Roberson fails to raise a prima facie claim of constitutional error ........................................... 54

II.    The Statue of Limitations Precludes Authorization ................. 59

CONCLUSION ........................................................... 62

CERTIFICATE OF SERVICE ............................................. 64

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................ 65

ELECTRONIC CASE FILING CERTIFICATIONS ............................. 65

iii

# TABLE OF AUTHORITIES

## Cases

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) ...................................... 35

*Andrew v. White*, 604 U.S. 86 (2025) ....................................................... 55

*Baker v. State*, No. 12-14-00185-CR, 2015 WL 3958107,
 (Tex. App.—Tyler June 30, 2015, pet. ref'd) .......................................... 50

*Barnes v. King*, No. 09-3116, 2010 WL 5907137,
 (D. Minn. Nov. 17, 2010) ........................................................................ 51

*Baylies v. Doberstein*, No. Civ.A PC97-6046,
 2003 WL 22389562, (R.I.Super., Sep. 10, 2003) ................................... 50

*Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018) ................................... 38

*Burns v. Washington*, No. 18-10606, 2019 WL 3067928,
 (E.D. Mich. July 12, 2019) ...................................................................... 46

*Cash v. Maxwell*, 565 U.S. 1138 (2012) ................................................... 58

*Cavazos v. Smith*, 565 U.S. 1 (2011) ........................................... 38, 39, 60

*Cf. Holland v. Fla.*, 560 U.S. 631(2010) ................................................... 37

*Coleman v. Thompson,* 501 U.S. 722 (1991) ............................................ 37

*Commonwealth v. Wagner*, No. 1397 MDA 2021,
 2023 WL 2544662, (Pa. Super Mar. 17, 2023) ................................. 49, 50

*Curtis v. State*, No. 23-1030, 2024 WL 4761825,
 (Iowa App., Nov. 13, 2024) ..................................................................... 53

*Dickerson v. Miller*, No. 2-CV-0074-GKF-SH,
 2025 WL 899344, (N.D. Okla. March 24, 2025) ..................................... 51

*Edwards v. Vannoy*, 593 U.S. 255 (2021) ................................................57

*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009)........................3

*Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012)........................3

*Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996) ....................3

*Ex parte Roark*, 707 S.W.3d 157 (Tex. Crim. App. Oct. 9, 2024).............5

*Felker v. Turpin*, 518 U.S. 651 (1996).......................................................35

*Flanagan v. Johnson*, 154 F.3d 196 (5th Cir. 1998) .........................49, 61

*Garcia v. Tex.*, 564 U.S. 940 (2011)..........................................................57

*Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016) ...................................46

*Graham v. Collins*, 506 U.S. 461 (1993) ..................................................57

*Herrera v. Collins*, 506 U.S. 390 (1993) .......................................3, 43, 56

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014)..........................................59

*In re Jones*, 998 F.3d 187 (5th Cir. 2021) ................................................59

*In re Lewis*, 484 F.3d 793 (5th Cir. 2007) ................................................59

*In re Milam*, 838 F. App'x 796 (5th Cir. 2020) ..................................39, 60

*In re S. Children*, 2024-Ohio-538, 236 N.E.3d 356,
 (Ohio Ct. App. 1st Dist. Hamilton County 2024) ..................................51

*In re Soliz*, 938 F.3d 200 (5th Cir. 2019) ...........................................39, 60

*In re Tex. House of Representatives*, 702 S.W.3d 330 (Tex. 2024) ............5

*In re Rodney Reed*, No. 24-50529,
  Unpublished Order 3 (Nov. 5, 2024) ......................................................... 61

*Interest of L.V.*, 209 A.3d 399 (Pa. Super. 2019) .................................... 52

*Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006) ...................................... 38

*Johnson v. Espinoza*, No. 19CV1036 GPC (WVG),
  2020 WL 1028504, (S.D. Cal. Mar. 3, 2020) ............................................ 46

*Kansas v. Carr*, 577 U.S. 108 (2016) ........................................................ 55

*K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080 (Pa. Super 2015) ................. 52

*Lawrence v. Florida*, 549 U.S. 327 (2007) ............................................... 61

*McCrory v. Alabama*, 144 S. Ct. 2483 (2024) .......................................... 56

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) ............................................. 62

*Massey v. Peabody Coal Co.*, 387 F. App'x. 344,
  (4th Cir. July 6, 2010) .............................................................................. 53

*Milam v. Jimerson*, No. 25-40579, 2025 WL 2680581,
  (5th Cir. Sept. 19, 2025) .......................................................................... 36

*Napue v. Illinois*, 360 U.S. 264 (1959) .............................................. 58, 59

*Owens v. Boyd*, 235 F.3d 356 (7th Cir. 2000) .................................... 40, 61

*Parnell v. White*, No. 23-5103, 2024 WL 4198643,
  (10th Cir. 2024) ........................................................................................ 51

*Patterson v. Pirraglia*, No. 4:24-CV-04014-VLD,
  (D.S.D. Jan. 10, 2025) .............................................................................. 49

*Payne v. Tennessee*, 501 U.S. 808 (1991) ................................................ 55

*People v. Miller*, No. 346321, 2020 WL 4554873,
 (Mich. Ct. App. Aug. 6, 2020) ................................................... 49

*Pierre v. Vannoy*, 891 F.3d 224 (5th Cir. 2018) ...................................... 58

*Schlup v. Delo*, 513 U.S. 298 (1995) ..................................................... 54

*Shelby v. Cain*, No. 1:21-cv-406-HSO-RPM, 2023 WL 2563229,
 (S.D. Miss. March 17, 2023) ................................................... 49

*Sissoko v. State*, 236 Md. App. 676, 182 A.3d 874, (2018) ............... 49, 50

*State v. Butts*, No. 22AP-763, 2023 WL 4883377,
 (10th Dist. Aug. 1, 2023) ........................................................ 48

*Teague v. Lane*, 489 U.S. 288 (1989) ..................................................... 57

## Statues

28 U.S.C. § 2244 ................................................................... Passim

Tex. Code Crim. Proc. art. 37.071 ................................................ Passim

## Rules

Fifth Cir. R. 28.2.1 ......................................................................... i

Fed. R. App. P. 32 ...................................................................... 65

## Constitutional Provisions

U.S. Const. amend. XIV ........................................................... 55, 58

Movant Robert Roberson **is scheduled for execution after 6:00 p.m. on October 16, 2025.** Roberson is a Texas inmate convicted and sentenced to death in 2003 for the capital murder of his two-year-old daughter Nikki Curtis. Roberson has filed six subsequent state habeas applications; two of which remain pending. Roberson continues to litigate incrementally, drawing from a pool of defense experts that work on Shaken Baby Syndrome (SBS) and Abusive Head Trauma (AHT) cases throughout the country. But because Roberson fails to meet the statutory requirements Roberson's motion and his motion for stay of execution should be denied. The Director responds separately to the motion for stay.

## STATEMENT OF JURISDICTION

This Court lacks jurisdiction under 28 U.S.C. § 2244(b) because Roberson fails to meet the necessary exceptions to the prohibition of successive filings permitted under § 2244(b). Further, his claims are time barred by § 2244(d)(1).

## STATEMENT OF THE ISSUE

The only issue before this Court is whether Roberson makes a prima facie showing that he meets an exception under 28 U.S.C. § 2244(b).

## STATEMENT OF THE CASE

## I.     Procedural History

In February 2003, a jury found Roberson guilty of capital murder for the death of his two-year-old daughter, Nikki Curtis. 5.CR.620.[1] Based on the jury's answers to the special issues, the trial court sentenced Roberson to death. *Id.* at 641–42; Tex. Code Crim. Proc. art. 37.071, § 2(g). The Texas Court of Criminal Appeals (CCA) affirmed his conviction and death sentence on June 20, 2007. *Roberson v. State*, No. AP-74,671, 2002 WL 34217382 (Tex. Crim. App. June 20, 2007) (not designated for publication). The Supreme Court denied certiorari. *Roberson v. Texas*, No. 07-8536, 552 U.S. 1314 (2008).

The CCA subsequently denied relief on Roberson's initial postconviction application for a writ of habeas corpus, in which he raised thirty-four grounds for relief. *Ex parte Roberson*, Nos. WR-63,081-01,

---

[1]     The Respondent employs the following citation conventions: "CR" refers to the clerk's record of pleadings and documents filed during Roberson's capital-murder trial. "RR" refers to the reporter's record of transcribed trial proceedings. "SX" refers to the State's trial exhibits. "SHCR–04" refers to the clerk's record of pleadings and documents filed during Roberson's third subsequent state habeas proceeding. "SHRR–03" refers to the reporter's record of transcribed second subsequent state habeas proceedings. All references are preceded by volume number and followed by page number.

WR-63,081-02, 2009 WL 2959738 (Tex. Crim. App. Sept. 16, 2009) (per curiam) (not designated for publication). On the same day, the CCA dismissed as a subsequent application a document titled "Notice of Desire to Raise Additional Habeas Corpus Claims." *See id.*

Roberson filed a federal habeas petition, including forty-five claims, which was denied and dismissed with prejudice. *Roberson v. Dir., TDCJ-CID*, No. 2:09CV327, 2014 WL 5343198, at *5, 62 (E.D. Tex. Sept. 30, 2014). This Court affirmed that decision. *Roberson v. Stephens*, 619 F. App'x 353, 359 (5th Cir. 2015). The Supreme Court denied certiorari review. *Roberson v. Stephens*, 577 U.S. 1150 (2015).

After his execution date was set, Roberson brought a second subsequent writ application in state court asserting that "(1) new scientific evidence contradicts evidence of [SBS] that the State relied on at trial. . . (2) his conviction was secured using false, misleading, and scientifically invalid evidence, *see Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009); *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012), (3) he is actually innocent, *see Herrera v. Collins*, 506 U.S. 390 (1993); *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), and (4) the use of false scientific testimony violated his due process right to a

fundamentally fair trial." *Ex parte Roberson*, No. WR-63,081-03, 2023 WL 151908, at *1 (Tex. Crim. App. Jan. 11, 2023).

The CCA granted Roberson's motion to stay his execution and remanded the claims to the trial court for consideration. *Id.* Following a hearing, the trial court made findings of fact and conclusions of law recommending that the court deny habeas relief on all four of his claims. *Id.* The CCA conducted an independent review of the habeas record, concluded that it supported the trial court's findings of fact and conclusions of law, and thus, adopted them, denying habeas relief on all of Roberson's claims. *Id.* The Supreme Court again denied certiorari. *Roberson v. Texas*, 144 S. Ct. 129 (2023).

On August 1, 2024, after Roberson was again set for execution, he filed a fourth state habeas application based on three additional expert opinions that raised similar claims as his prior application. *Ex parte Roberson*, No. WR-63,081-04, 2024 WL 4143552, at*1 (Tex. Crim. App. Sept. 11, 2024) (per curiam) (not designated for publication); *see also* SHCR-04.4–161. The CCA denied Roberson's motion to stay and dismissed the application as abusive. *Id.* at *2. Again, the Supreme Court denied certiorari. *Roberson v. Texas*, 145 S. Ct. 3 (2024).

On October 14, 2024, Roberson filed a fifth state habeas application requesting relief based on the CCA's recent opinion in *Ex parte Roark*, 707 S.W.3d 157 (Tex. Crim. App. Oct. 9, 2024), a shaken baby case in which the CCA granted relief under Article 11.073 of the Texas Code of Criminal Procedure. The CCA again denied Roberson's motion to stay and dismissed the application as abusive.[2] *Ex parte Roberson*, No. WR-63,081-05 (Tex. Crim. App. Oct. 16, 2024) (per curiam) (not designated for publication).

On the night of Roberson's previous execution date, the Texas Supreme Court halted his execution based on a legislative subpoena from the Texas House of Representatives Committee on Criminal Jurisprudence that requested Roberson's testimony. *In re Tex. House of Representatives*, 702 S.W.3d 330, 334–36 (Tex. 2024). The Texas Supreme

---

[2]    Roberson also "suggested" that the CCA reconsider prior rulings on multiple occasions. Suggestion to Reconsider on Court's Own Initiative and Motion to Hold for Adjudication of *Ex Parte Roark*, *Ex parte Roberson*, No. WR-63,081-03 (Tex. Crim. App. April 24, 2024); Suggestion to Reconsider on Court's Own Initiative Considering New Expression of Legislative Intent and the State's Concession in Markedly Similar Case that Relief Under Article 11.073 is Warranted, *Ex parte Roberson*, No. WR-63,081-03 (Tex. Crim. App. Oct. 7, 2024); Suggestion to Reconsider on Court's Own Initiative Considering New Expression of Legislative Intent and the State's Concession in Markedly Similar Case that Relief Under Article 11.073 is Warranted, *Ex parte Roberson*, No. WR-63,081-04 (Tex. Crim. App. Oct. 7, 2024). All Roberson's "suggestions" were denied by the CCA without written order.

Court ultimately ruled "that the Texas Constitution's separation-of-powers provision and our general separation-of-powers jurisprudence do not permit judicial enforcement of a legislative subpoena that would require canceling a long-scheduled execution." *Id.* at 346.

Roberson then filed his sixth application in state court reasserting his claim of actual innocence and entitlement to relief under Article 11.073, but with additional evidence. He also claimed that the CCA's application of Article 11.073 violated his federal constitutional rights. *Ex parte Roberson*, No. WR-63,081-06 (Tex. Crim. App.). This matter remains pending. More recently, Roberson filed a seventh state writ application. *Ex parte Roberson*, No. WR-63,081-07 (Tex. Crim. App.) This also remains pending before the CCA.

Finally, a little more than two weeks before his execution, Roberson filed the instant motion for authorization and an associated motion for stay.

## II.  Statement of Facts

The CCA summarized the relevant guilt and punishment evidence in its direct appeal opinion. *Roberson v. State*, 2002 WL 34217382, at *1–

3, 9–11. The court's summary is fully supported by the trial facts presented below.

## A.    Guilt Evidence

In 2003, an Anderson County jury found Roberson guilty of capital murder for the killing of his two-year-old daughter, Nikki Curtis. 5.CR.643–45. The indictment alleged Roberson "intentionally or knowingly cause[d] the death of an individual, Nikki Curtis, a person under the age of six years, by causing blunt force head injuries, by manner and means unknown to the grand jury." 1.CR.2.

Nurse Kelly Gurganus was working in the Palestine Regional Medical Center on January 31, 2002, when Roberson and a woman in a wheelchair appeared in the ER with Nikki. 41.RR.63–66. Nikki was flaccid, limp, blue, and appeared to be dead. 41.RR.66–67. When Gurganus laid Nikki on the bed, she observed bruising, including around

Nikki's head. 41.RR.67. More bruises became apparent during treatment. 41.RR.67–68, 75. She asked Roberson what happened, and he indicated Nikki had fallen off the bed. 41.RR.69. Gurganus thought his story was implausible. 41.RR.69. When Gurganus talked to Roberson again, he told her he thought Nikki fell off the bed around 5:30 in the

morning and he had tried to wake her up every hour. 41.RR.70. Gurganus was triggered because she did not understand why Roberson would try to wake Nikki up every hour if he thought something was wrong. In her mind, that would indicate head injury. 41.RR.70. When Gurganus tried to speak to Nikki's maternal grandparents, the Bowmans, in a separate room, Roberson immediately and "very rapidly ran" over to them, preventing them from speaking alone. 41.RR.71. Gurganus further testified that although she could not recall any bruises on the back of Nikki's head, it was red and mushy. 41.RR.72.

Robin Odem, the Chief Nursing Officer, interacted with Roberson and Teddie Cox, Roberson's wife who already happened to be at the hospital that day. 41.RR.81–82, 84. Roberson told Odem that Nikki had been ill earlier in the week, and when he tried to get Nikki ready to pick up Teddie from the hospital, she was not responding. 41.RR.85. Roberson stated Nikki had been crying so he let her sleep in the bed with him. 41.RR.94–95. He indicated Nikki had fallen off the bed, and that she had blood in her mouth that he cleaned up. 41.RR.86–87. When asked about the blood, Roberson said Nikki must have hit a table when she fell. 41.RR.87. Roberson also repeatedly mentioned he would check on Nikki

and wake her up every couple of hours, comments Odem felt were not right, as that is what is done with people who have head injuries. 41.RR.95. Roberson initially indicated Nikki fell off the bed "last night" but then later claimed it was around five in the morning. 41.RR.96. He indicated he did not get up to go to the hospital to go pick up Teddie until 10:00 a.m. when his alarm went off. 41.RR.97.

Nurse Andrea Sims also worked in the ER. She also catalogued the injuries she observed in examining Nikki. 41.RR.115–20. Injuries included: (1) bruising across the chin; (2) swelling to the back of her head, which was mushy; (3) bruises in each ear; (4) a handprint across the face; (5) bruises around her left eye; (6) discoloration under her chin; (7) a red mark on her head; and (8) discoloration on her shoulder. 41.RR.115–19. In her experience, head injuries like Nikki's are usually from a massive car wreck or a massive impact. 41.RR.123. Sims described one area of redness as intentional injury. 41.RR.135. Nikki's head injuries were so severe she had to be transported to Texas Children's Hospital. 41.RR.135.

Sergeant Brian Wharton, Chief of Detectives with the Palestine Police Department, went to Palestine Regional Medical Center to investigate. 41.RR.152–54. He observed Nikki had abrasions on her chin

and cheeks and took pictures of her "head injuries." 41.RR.154. Wharton and another detective then accompanied Roberson back to his house where they took more photos. 41.RR.155–58. Roberson told Wharton Nikki was found at the foot of his bed. 41.RR.160–61. He did not mention that she struck anything. 41.RR.162. He saw no blood on the floor, which was carpeted, but he did obtain a wash rag Roberson used to clean her mouth. 41.RR.162–63. There was also a bed pillow stained with blood. 41.RR.163.

Wharton then took Roberson to the police station for an interview. 41.RR.164. In his statement, Roberson described the days leading up to Nikki's injures and how she had been sick but left in the care of other family members. 41.RR.167–69. It was only on the night before her death that Roberson had to pick up Nikki because Mrs. Bowman was sick. 41.RR.168. Roberson did not notice any injuries when he picked Nikki up. 41.RR.169. He said they slept in his bed, until around 5:00 a.m. when he heard her cry and saw her at the foot of the bed. 41.RR.169. According to Roberson, Nikki had a blood on her lips, a bruise under her chin, and spot on her face. 41.RR.169. They sat up for two hours and went back to sleep until the alarm went off. 41.RR.169–70. He said at that point Nikki

was not moving, was a little blue, but appeared to be breathing. 41.RR.169. He called Teddie, who told him to take Nikki to the hospital. 41.RR.169. When Nikki would not wake up, he grabbed her face, shook it, and slapped her a few times. 41.RR.170. He stated he did not know what caused her injury, calling Nikki clumsy. 41.RR.170.

After the lead detective returned from the hospital and spoke with Roberson, Roberson provided a supplemental statement. 41.RR.171–72. He again mentioned it was Teddie who told him to go to the hospital after he called her first, rather than an ambulance. 41.RR.171. Wharton believed Roberson's story was not consistent with Nikki's injuries, and Roberson was charged with capital murder. 41.RR.175–76. He did not consider the injuries he observed to be trivial. 41.RR.176–77.

Dr. John Ross, a pediatrician who was partners with Nikki's primary care physician, testified about Nikki's medical history and recurring ear infections. 42.RR.3–7, 10. Days before her death, Nikki was ill, yet her test results were normal and "she looked pretty good despite" a fever. 42.RR.10–12. On the day Roberson brought Nikki to the ER, Dr. Ross was called to Nikki's room 42.RR.12–14. He subsequently ruled out illness causing her condition. 42.RR.14. According to her grandparents,

11

Nikki had been improving since Dr. Ross saw her days earlier. 42.RR.14, 16–17. Roberson's story of a fall was inconsistent with what he saw. 42.RR.17–18. Dr. Ross noted the "bogginess" on the back of Nikki's scalp and bruises on her chin, cheek, and jaw. 42.RR.18. Nikki had a large subdural hematoma, and her brain had shifted to the left. 42.RR.19. He told the family the problem was the head injury, not illness, and he did not know if Nikki would survive. 42.RR.20. Dr. Ross believed Nikki's injuries were intentionally inflicted. 42.RR.21.

Courtney Berryhill was Teddie Cox's eleven-year-old niece. 42.RR.45, 49. She testified that she saw Roberson shake Nikki hard and spank her to get her to stop crying. 42.RR.51–52, 60–61. Berryhill refused to ever go back to Roberson's home again because of how Roberson abused Nikki. 42.RR.52.

Rachel Cox was Teddie Cox's ten-year-old daughter. 42.RR.65–66. She testified that Roberson had once beaten her with a belt and that he had a bad temper. 42.RR.67. Rachel said that Roberson would discipline Nikki by shaking and spanking her, noting he had shaken her about ten different times. 42.RR.69–70. She said that Roberson had threatened to kill Nikki. 42.RR.70–71.

Dr. Thomas Konjoyan treated Nikki when she came into the ER on two occasions. 42.RR.79–81. When Roberson brought Nikki in with her head injuries, she was unconscious, not breathing, and had swelling at the back of her skull described as boggy. 42.RR.82–83. Dr. Konjoyan saw bruising on her left jaw. 42.RR.83. Nikki's condition surprised him because "she looked so good" two days prior and her deterioration did not fit the picture of a virus that went bad quickly. 42.RR.83. Further, Nikki's head injury did not match with a short fall and "would be basically impossible" or "very unlikely." 42.RR.84–85.

Dr. Janet Squires, a pediatrician from Dallas specializing in child abuse and neglect, saw Nikki on February 1, while she was on life support. 42.RR.91–92, 95. She saw minimal bruising, but she could not move Nikk's head to examine the back of it or see Nikki's chin due to taping and a surgical collar. 42.RR.96–98. Dr. Squires admitted she was "a little embarrassed" she did not observe the torn frenulum, but her evaluation was informed by her knowledge that there would be other investigations of Nikki's body. 42.RR.112. She could not say that Nikki had been sexually abused. 42.RR.99–100. Swelling on the right side of Nikki's head indicated a blow. 42.RR.103. Dr. Squires explained shaken

13

baby syndrome (SBS) yet noted there was an impact that could have caused a lot of the damage. 42.RR.105–07, 120. She thought a single impact did not explain Nikki's condition and that there was some shaking component. 42.RR.107–08. Dr. Squires believed Nikki was the victim of child abuse and the amount of force was very violent. 42.RR.113–14.

Teddie Cox testified that she feared leaving Nikki alone with Roberson.[3] 42.RR.133–134, 147–48. She had even been recently hospitalized to receive psychiatric care for depression and attempted suicide because she blamed herself for Nikki's death based on her absence the night Nikki was injured. 42.RR.131–33; 43.RR.3. Cox described Roberson as having a violent temper and explained that he would yell at Nikki and "whip" her. 42.RR.168–69. Roberson did not want custody and did not care about Nikki. 42.RR.163–66. Nikki cried in Roberson's presence and refused to be held by him, but she had no such qualms with other people. 42.RR.166–67. The night Nikki was injured was the only time Cox left Nikki with Roberson for an extended period because Cox

---

[3]    Outside the presence of the jury in inadmissible testimony, Cox explained that Roberson's own mother did not want Nikki left with him, saying "One of these days he's going to kill her and it's going to be too late for anyone to do anything about it.'" 42.RR.136.

was afraid that Roberson would "whip her or get onto her." 42.RR.168. When Nikki cried, Roberson would grow angry and would "tell [Nikki] to shut up or he was going to whip her butt" and to "shut her damn mouth." 42.RR.170. Roberson would also say "'[i]f you don't shut up I'm going to beat your ass.'" 42.RR.170. Roberson usually used a hand to beat Nikki but would also use a board or paddle. 42.RR.171. He would beat her "hard." 42.RR.171. One time Roberson stuffed Nikki under the covers of his bed and threatened her when she would not sleep next to him. 42.RR.172–75. Another time Roberson threw Nikki on the bed and violently shook her so much that Cox almost left Roberson. 42.RR.175–77.

Cox described Roberson as mad when he had to go watch Nikki just prior to her injuries. 42.RR.180–81. On the morning of Nikki's injuries Cox spoke with Roberson. He did not mention Nikki's injuries first, rather he talked about when Cox would be released from the hospital. 42.RR.183. Roberson then told Cox he had to go to the hospital anyway to bring Nikki because she was not breathing. 42.RR.183. Roberson did not seem upset. 42.RR.183–84. Cox called Roberson back around five minutes later, and he had not left yet. 42.RR.184. When Roberson pulled

15

into the hospital parking lot, he still did not seem to be in hurry. 42.RR.185–86. Cox testified that Roberson told her he and Nikki "had fallen asleep watching a movie that night and that he heard her crying and he woke up and Nikki was at the foot, close to the foot of the bed, but she was on the floor." *Id.* at 187. Cox then explained Roberson then told her a different version: "He had told me that she'd fell off and hit her head on the brick." *Id.* at 188. In the weeks that followed, Roberson did not mention Nikki in their phone conversations and did not want to talk about her. 42.RR.189–90. When Cox eventually asked Roberson if he killed Nikki, he told her that if he did do it, he did not remember and "snapped." 42.RR.190.

Dr. Jill Urban, a forensic pathologist, testified that in her opinion Nikki's death was a homicide, and she went over multiple injuries to Nikki. 43.RR.64, 67–77, 84–85, 91. Six other medical examiners signed off on her report. 43.RR.66–67. She found there were multiple blows, including a torn frenulum, and multiple impacts over the entirety of Nikki's head. 43.RR.58, 71, 74. She tried to account for injuries that occurred during treatment. 43.RR.78–79. Dr. Urban noted blunt force injuries could be caused by shaking and impacts. 43.RR.78. In her

16

opinion, the blunt force injuries caused Nikki's death. 43.RR.85. It was a combination of shaking and battering that killed Nikki. 43.RR.85–86.

The State's final witness, Verna Bowman Nikki's step-grandmother testified that Nikki had been afraid of her father. 43.RR.100, 133. On one occasion, she suspected that Roberson had inflicted bruises on Nikki that he blamed on Rachel. 43.RR.143–46.

The defense's only witness was Patricia Conklin, Teddie's sister, who testified that she never saw Roberson be mean to Nikki and thought they got along well. 44.RR.10, 13–14, 16, 27. She also thought Teddie and Rachel had a bad reputation for truthfulness. 44.RR.18.

During closing argument, the prosecution highlighted that this was no mere shaken baby case but involved a child who was beaten and received multiple blows to the head. 46.RR.25. In reply to the defense's closing, the prosecution again noted this case involved multiple injuries and impacts, not just shaking. 46.RR.61, 63–64, 66, 68. The jury found him guilty. 5.CR.643–45.

### B.     Punishment Evidence

### 1.     State's Evidence

At punishment, the State presented Roberson's criminal history, which included a conviction for burglary of a habitation and two for theft by check. 47.RR.5–6; 52.RR.(SX84–86). A TDCJ disciplinary report attached to State's Exhibit 84 noted Roberson had pled guilty to hitting another inmate. 47.RR.138. And a TDCJ case summary observed that Roberson had been arrested fifteen times. 52.RR.(SX86).

Della Gray was Roberson's ex-wife and the mother of his two older children. 47.RR.7–10. Roberson began "hitting" and "beating on" Gray even before they got married. 47.RR.10. Gray testified that once she "wasn't doing something [Roberson] wanted and he took a coat hanger and he put it around my throat and tried to choke me" as she "fought for [her] life." 47.RR.15. Another time when Gray "wasn't walking fast enough for him" and "was complaining because [she] was pregnant, "Roberson "hauled off and punched [her] in the nose," leaving it crooked to that day. 47.RR.16. And on yet another occasion, Gray recounted that "we got in[to] a fight, he took [a fireplace] shovel, and started beating me on my rear end with it." 47.RR.17. Roberson beat Gray when she was

pregnant with both of his children, including punching her in the stomach. 47.RR.18, 26–27. One time when she was eight months pregnant, Gray remembered that Roberson "raised his hand back and punched me in my stomach. It was hard enough to make me bend over and just about get sick." 47.RR.27. Gray explained that "[w]hen we didn't get what he wanted and if I didn't give him what he wanted [Roberson] would get mad and hit me." 47.RR.18. Once Gray witnessed Roberson slap Gray's aunt after Gray's aunt got in the middle of a fight between Gray and Roberson. 47.RR.20.

Roberson was unattached to his older children. 47.RR.21. One time Gray observed bruising on her son's face after he was left alone with Roberson. 47.RR.22–23. As with Nikki Curtis, Roberson claimed that his son sustained his facial injuries falling off a bed. 47.RR.23. Another time Roberson barricaded himself in a room with his screaming two-year-old daughter. 47.RR.22–25. When the two emerged, his daughter had a hickey on her neck. 47.RR.24. After this incident, Roberson's daughter, who often smiled, became subdued and no longer smiled. 47.RR.25. Gray did not call CPS while she was with Roberson because she was afraid and felt unsafe in Palestine even at the time of trial. 47.RR.26.

19

On cross-examination, Gray admitted she had been involved in a lengthy custody battle against Roberson and his mother, which she ultimately lost. 47.RR.27–28. Gray only had a long-distance relationship with her older children and did not provide child support. 47.RR.26, 31–32. Gray readily admitted that she disliked Roberson and his mother, but she asserted that her dislike did not color her testimony. 47.RR.19. Gray thought that Roberson should pay for what he did, but she did not believe Roberson or anyone else deserved to die. 47.RR.28–29. Gray admitted to some prior drug and alcohol abuse, but she eventually became a certified nurse assistant and had never been convicted of a felony. 47.RR.29–31.

Erica Marie Gomez, age sixteen, testified that Roberson had dated her neighbor, Annalisa Morris. 47.RR.40–42. One day Gomez's brother, who was sixteen at the time, had a verbal argument with Morris at a bus stop. 47.RR.44–45. Roberson then hit Gomez's brother hard in the jaw and took off running. 47.RR.45–46. Gomez's brother had not threatened Roberson either verbally or physically. 47.RR.53.21

### 2. Roberson's Evidence

Lieutenant T.J. Choat of the Anderson County Sheriff's Office and Larry Ward, an Anderson County jail administrator, testified that

Roberson had not caused any problems while awaiting trial in jail. 47.RR.69–77. Dr. John Krusz testified that Roberson suffered from "postconcussional type syndrome" based on Roberson's purported history of traumatic brain injuries. 47.RR.81, 87. Roberson was taking medication for depression. 47.RR.98. Dr. Krusz related that Roberson's IQ was 85 based on other expert testing. 47.RR.89. Dr. Krusz suggested it was possible that Roberson's emotional problems, low IQ, and impulsivity resulting from brain damage could have factored into Nikki's killing but Roberson would be able to behave in a controlled, structured environment like prison. 47.RR.97–06.

On cross-examination, Dr. Krusz conceded that his major work was "in the treatment of chronic pain and migraine headaches." 47.RR.108–09. Dr. Krusz also conceded that: he could not say that Roberson's brain damage made him kill Nikki but that it was only a factor; other people with brain damage do not necessarily kill their children; and Roberson would still have to deal with the consequences of his brain damage even in prison. 47.RR.110–12. Dr. Krusz admitted that Roberson had not told him about abusing his ex-wife and children. 47.RR.112. Dr. Krusz also acknowledged that Roberson's drug abuse, including his use of

intravenous drugs, could have contributed to his brain damage. 47.RR.119. Dr. Krusz agreed that it was a possibility that Roberson had an antisocial personality disorder. 47.RR.130–31; *but see* 48.RR.22 (testimony that testing had not been done). Roberson told Dr. Krusz that he had no remembrance of killing Nikki and "basically said he didn't know what happened." 47.RR.133.

Dr. Billy Burleson, psychologist for the state prison system, interviewed Roberson and reviewed some of his records. 47.RR.135–38. Dr. Burleson did not think that Roberson would be dangerous in prison and was not aggressive. 47.RR.138, 143. On cross-examination, Dr. Burleson agreed that there are female correctional officers and young inmates in TDCJ. 47.RR.142. He also believed that Dr. Goodness's testing reflected that Roberson was mildly psychopathic. 47.RR.142–43; *but see* 48.RR.90–91 (Dr. Goodness disagreed). Roberson told Dr. Burleson that he did not remember killing Nikki. 47.RR.144.

Dr. Kelly R. Goodness was a forensic psychologist who reviewed Roberson's records, interviewed and tested Roberson, and interviewed Roberson's family and other relevant individuals. 48.RR.10, 20–21. Dr. Goodness had talked to Roberson about the offense, and he told her

22

"[t]hat he had lost it, that Nikki was crying, and that he had shook her." 48.RR.24. Then Dr. Goodness corrected herself, "That was one of his accounts. Let me back up a second. At first he told me he didn't remember and after I convinced him that was not going to fly with me, he then told me that he lost it." *Id.* Roberson dropped out of high school in the eleventh grade and got his GED in 1986. 48.RR.28. Dr. Goodness noted that Roberson and his first wife had substance abuse issues, and their children had been abused—although it was not clear to Dr. Goodness if Roberson, his mother, or his ex-wife had abused them. 48.RR.29–30, 45.Dr. Goodness was aware of at least fifteen prior arrests, mostly nonviolent but including a misdemeanor assault-by-threat charge and an allegation made by Roberson's brother's girlfriend that was ultimately not pursued. 48.RR.50. Roberson spent "a major portion of his adulthood in prison," "about eight years." 48.RR.30.

Dr. Goodness agreed that Roberson had brain damage. 48.RR.31. Dr. Goodness further diagnosed Roberson with several mental illnesses, including depression, a cognitive disorder, substance dependence, and antisocial personality disorder. 48.RR.31–32, 38–40. Dr. Goodness acknowledged Roberson's previous fight in custody but said it was an

23

isolated incident. 48.RR.32–33. Roberson had poor memory and impulse control. 48.RR.35–36. Dr. Goodness tested Roberson's IQ at 89 and was aware of three total IQ test results that were low average to below average. 48.RR.26, 35.

Dr. Goodness implied that Roberson had only gotten custody of Nikki because his mother pushed him and that he lacked the skills to raise a child. 48.RR.40–41. Dr. Goodness thought that the fact that Nikki was not bonded to Roberson, that Nikki was fussy around the time of the murder, that Roberson was caring for Nikki alone for the first time, as well as multiple other stressors in Roberson's life contributed to the murder. 48.RR.41–44. Dr. Goodness also thought that Roberson's drug and alcohol abuse were a factor in the offense. 48.RR.46. Dr. Goodness opined that Roberson was a low risk for violence in prison. 48.RR.56.

On cross-examination, Dr. Goodness acknowledged that Roberson had used cocaine, crack, and methamphetamines in the past, and she believed that "he would use drugs if were to be able to access them." 48.RR.72. Dr. Goodness noted that Roberson had said he was sorry, but she was "not quite sure he's sorry of what he did. He may be more sorry for himself." 48.RR.80. Her report stated that Roberson flew into a rage

24

the night before Nikki was killed because Nikki hit him in the mouth.[4] 48.RR.81. Dr. Goodness also admitted to seeing a statement where Roberson was accused of rape and was aware that the reason charges were not pursued was the victim left the state and could not be found. 48.RR.94. Concerning this charge, Roberson apparently claimed he had fallen asleep on a couch and later found his brother's girlfriend preforming oral sex on him. 48.RR.94–95.

### 3.    State's Rebuttal

Forensic psychologist Dr. Thomas Allen interviewed Roberson and reviewed his records. 48.RR.109, 116–17, 120. Dr. Allen noted that the offense—which showed shaking and blunt force trauma—was "pretty brutal," that Roberson delayed taking Nikki to the hospital, and that Roberson displayed a lack of remorse. 48.RR.130–32. As a child, Roberson may have been beaten by his father and abused substances, including alcohol, marijuana, crack, cocaine, and methamphetamine. 48.RR.132. Dr. Allen counted that Roberson had up to seventeen arrests by

---

[4]    In discussing the crime, Goodness disagreed with the prosecution's assertion that Nikki was beaten, and the prosecutor rejoined that he thought that the pathologist disagreed with her. 48.RR.84.

adulthood. 48.RR.133. Roberson was also violent with his first wife and kids. 48.RR.133. He posed a "significant level of risk" to women and children. 48.RR.134. Dr. Allen observed that, in the sexual assault charges against Roberson, he initially absolutely denied them, and then changed his story to say that he had a history of sexual relations with his brother's girlfriend. 48.RR.135–36. Outside the presence of the jury, Dr. Allen explained he had also talked to Rachel Cox (Teddie Cox's daughter) who told Allen that Roberson had "whupped (sic) her one time for nothing," "would cuss at her and call her a bitch," "used to have her sit naked on his lap," and "would try to look at us when we pee-peed." 48.RR.138. In front of the jury, Dr. Allen stated that Roberson was "at risk for committing acts of sexual violence," that he was a psychopath, that it was probable that he would commit violence in the future, and that he exhibited some predatory behavior. 48.RR.141. Roberson would be less of a risk in prison because there were fewer women or children for him to harm. 48.RR.141–43.

Dr. David Self, a psychiatrist, also interviewed Roberson. 48.RR.156, 158. Dr. Self disagreed with Dr. Krusz's diagnosis of post-concussion syndrome and saw no evidence of it. 48.RR.160. Dr. Self

explained that Roberson lacked impulse control and had a history of abusing alcohol, marijuana, crack, cocaine, and methamphetamine. 48.RR.164. Dr. Self thought that Roberson was an "ongoing moderate risk of future criminal acts of violence." 48.RR.166. But he would be more dangerous outside of prison and "[y]ou would not want him living next to you or your children." 48.RR.166. In an in-camera discussion, both Drs. Self and Allen agreed that Roberson was a bully who preyed upon the defenseless. 47.RR.63. The doctors both stated that "absolutely" or with "absolute certainty" that Roberson should not be left alone with the judge's wife or children. 47.RR.65.

Teddie Cox also testified at punishment. 48.RR.177. She stated that, about twelve or thirteen years ago, she had told her sister, who told Roberson, that some men were going to rape her. 48.RR.177. They then all drove over to a house where Roberson confronted one of the men and repeatedly stabbed him in the head with a box cutter. 48.RR.177, 179. He then jumped in the car and took off after a resident or owner of the house came out with a shotgun. 48.RR.178–79.

At closing, the prosecutor noted how offensive it was that Roberson would "pummel [his two-year-old daughter] to death, leave her to die, and

go to sleep." 49.RR.15. He graphically described Roberson "beat[ing] [Nikki] about the face and head." 49.RR.27, 29. The same day, the jury answered the special sentencing issues in such a way as to require imposition of the death penalty. 49.RR.44–45.

## C.   State Habeas Evidence

In his first state habeas application, Roberson did not challenge his conviction by alleging alternative causes of death. But, in a document filed in the CCA, Roberson claimed he was high on cocaine the night of the offense and Teddie Cox's sister, Heather Berryhill, killed Nikki. Inmate Correspondence, *Ex parte Roberson*, No. WR-63,081-01 (Tex. Crim. App. Mar. 19, 2007).

In his 2016 state habeas application, Roberson sought relief under Article 11.073 of the Texas Code of Criminal Procedure claiming he was actually innocent, and that false evidence was presented at trial. 1SHCR-03.2–3. Roberson initially alleged that Dr. Harry J. Bonnell concluded that "no reasonable medical examiner could have concluded that SBS/AHT was the cause of Nikki's death because there are multiple other explanations for her medical condition that cannot be ruled out." 1 SHCR-03.52. Dr. Bonnell pointed to meningitis and a short fall as explanations.

1SHCR-03.53–56. Roberson also relied on expert opinions from Dr. Janice Ophoven, Dr. John Plunkett, and Dr. Kenneth Monson, to support his claims. 1SHCR-03.59–87.

The trial court held a hearing on Roberson's claims. Dr. Ophoven, a forensic pathologist specializing in pediatrics, testified Nikki had an impact to the head, but she did not believe Nikki's death could be conclusively called a homicide. 3SHRR-03.13, 32–34. She found there was only a single impact and disagreed that multiple impacts occurred. 3SHRR-03.6–77; 4SHRR-03.77, 144. Dr. Ophoven opined that short falls can kill in rare circumstances and Nikki's head injury was consistent with a short fall, although she could not say that a short fall happened. 4SHRR-03.28, 38, 101. She did not believe shaking injured Nikki Curtis. 4SHRR-03.76, 123. Dr. Ophoven also did not believe science supports the diagnosis of shaking on basis of retinal bleeding, subdural hemorrhage, and brain swelling. 4SHRR-03.123. She stated that AHT is still recognized as a diagnosis. 4SHRR-03.124. Further, there is controversy over SBS and many people believe she is wrong. 4SHRR-04.163.

Dr. Kenneth Monson, PhD, a professor of mechanical engineering, testified short falls can cause serious injury, although it is uncommon.

5SHRR-03.27, 37, 105. In his opinion, Nikki falling off the bed from a standing position could have resulted in her death. 5SHRR-03.82. Dr. Monson also testified that despite studies questioning SBS/AHT, it remains a recognized diagnosis, and he could not say that shaking cannot kill a child. 5SHRR-03.121–22. He agreed that no one testified at trial that Nikki was killed by shaking alone, so shaking alone was a moot point. 5SHRR-03.122. Moreover, Dr. Monson testified that although he thought it was unlikely given Nikki's size, he could not testify that shaking did not play an important role in Nikki's death. 5SHRR-03.99, 122–23. He agreed that if multiple impacts were found, that might lead to finding of abuse as opposed to a fall. 5SHRR-03.135.

Roberson then shifted from claiming meningitis as the cause of Nikki's death and asserted pneumonia and medications were responsible. Dr. Carl Wigren, a forensic pathologist, testified that after looking at slides of Nikki's lungs, he believed pneumonia and medications led to Nikki's death. 5SHRR-03.180, 183, 201–02, 227–244. He believed there was only a single impact to Nikki's head rather, not multiple impacts. 5SHRR-03.156, 172, 207. Dr. Wigren asserted that a short fall could lead to injuries like Nikki's. 5SHRR-03.217–18. In Dr. Wigren's

opinion, Nikki's death was not a homicide, and shaking did not play a role. 5SHRR-03.244.

Dr. Diane Mosnik is a clinical neuropsychologist, forensic psychologist, and forensic neuropsychologist. 7SHRR-03.64. She diagnosed Roberson with Autism Spectrum Disorder. 7SHRR-03.91. Dr. Mosnik used this diagnosis to explain some of Roberson's behaviors described by trial witnesses. 7SHRR-03.109–29. She also opined that Roberson's confession to Dr. Goodness was coerced, Dr. Goodness was unethical in discussing it, and the confession was unreliable. 7SHRR-03. 132–37.

Dr. Roland Auer, a neuropathologist licensed in Canada, offered similar testimony to Dr. Wigren, opining that Nikki's death was caused by a combination of pneumonia and medication. 8SHRR-03.5–6, 46–68, 91–97. Dr. Auer was not certified in forensics. 8SHRR-03.10. He stated that short falls can be fatal, but Nikki's death was not explained by a short fall. 8SHRR-03.24. He did not believe Nikki's death was caused by a combination of shaking and blows. 8SHRR-03.34, 38–39. Dr. Auer thought there was only a single impact. 8SHRR-03.79. He testified Nikki was susceptible to bruising once her heart stopped. 8SHRR-03.77–78. Dr.

Auer concluded that Nikki's death was from natural causes. 8SHRR-03.103–04.

Dr. Urban provided an affidavit rebutting claims about this being a shaken baby case by citing the multiple impacts to Nikki's head. 2nd Supp SHCR-03.37–38. After hearing all of Roberson's evidence in that hearing, she held to her belief as to the cause of death. 9SHRR-03.39, 205, 213–20. She noted that she did not know if there is a shaking component, but there was definitely an impact component. 9SHRR-03.117, 193, 204–08. It was not typical to see injuries like Nikki's from short falls. 9SHRR-03.211. Dr. Urban did not think pneumonia was responsible for Nikki's death. 9SHRR-03.103–05. She remained convinced Nikki's death was a homicide and there was nothing in her report to correct. 9SHRR-03.114, 127. Further, Dr. Urban noted there can be forceful impact on the head that leaves no, or minimal, external mark. 9SHRR-03.150, 176. Dr. Urban again concluded there were multiple impacts. 9SHRR-03.176.

Dr. James Downs, who was board certified in anatomic pathology, clinical pathology, and forensic pathology, observed the state habeas proceedings and agreed with Dr. Urban's findings. 10SHRR-03.11, 18, 45. He believed the cause of death was multiple blunt force injuries, not

illness, overdose, or a short fall. 10SHRR-03.45, 47, 83, 86, 96, 210, 240–43. He ruled Nikki's death a homicide. 10SHRR-03.22. Dr. Downs did not believe lethal head trauma requires a skull fracture. 10SHRR-03.81–82. Further, Dr. Downs observed the same three impact sites that Dr. Urban found on Nikki's head, plus two more. 10SHRR-03.36–40. Both Dr. Downs and Dr. Urban discussed how the CT scans relied on by Roberson would not show what could be seen during an autopsy by looking at the tissue. 9SHRR-03.59, 206–07, 216; 10SHRR-03.29, 96, 101–02, 244–45.

The trial court entered findings of fact and conclusions of law rejecting Roberson's claims based on Article 11.073, false testimony, and actual innocence. 4th Supp SHCR-03.264–75. This Court denied all of Roberson's claims based on the trial court findings and its own independent review. *See Ex parte Roberson*, No. WR-63,081-03, 2023 WL151908 (Tex. Crim. App. Jan. 11, 2023).

In his fourth state habeas application, Roberson presented opinions from three additional experts. 1SHCR-04.20–24. First, Dr. Francis Green, an expert in lung pathology who reviewed Nikki's lung tissue and opined that Nikki had pneumonia that led to her death. 1SHCR-04.20–22. Second, Dr. Keenan Bora, an expert in medical toxicology who

33

described how Nikki's medications, combined with her pneumonia, likely hastened her death. 1SHCR-04.22. Third, Dr. Julie Mack, a pediatric radiologist who reviewed CAT scans and concluded there was only one single minor impact on Nikki's head.[5] 1SHCR-04.23. She also reviewed chest x-rays supporting Dr. Green's conclusion on pneumonia. 1SHCR-04.24. The CCA dismissed the application for failing to satisfy "the requirements of Article 11.071, Section 5." *Ex parte Roberson*, No. WR-63,081-04, 2024 WL 4143552 (Tex. Crim. App. Sept.11, 2024) (per curiam) (not designated for publication).

## SUMMARY OF THE ARGUMENT

Roberson is not entitled to authorization under 28 U.S.C. § 2244(b) because he fails to show that his proposed claims are predicated on previously unavailable facts that call into question the accuracy of his conviction for capital murder. *See* § 2244(b)(2)(B). Roberson's claims are also time-barred, *see* § 2244(d)(1), and meritless. Accordingly, this Court should deny Roberson's Motion.

---

[5]    Dr. Mack's opinion that there was only one impact site based on the CT scan was repeatedly discussed in the third state habeas proceedings. E.g., 5SHRR-03.172; 8SHRR-03.19, 22; 10SHRR-03.171.

## STANDARD OF REVIEW

A habeas petitioner must "obtain leave from the court of appeals before filing a second habeas petition in the district court." *Adams v. Thaler*, 679 F.3d 312, 321 (5th Cir. 2012); *see Felker v. Turpin*, 518 U.S. 651, 664 (1996); 28 U.S.C. § 2244(b)(3)(A). Under § 2244(b),

> (2)     A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless-
>
> . . .
>
> (B)
>
>> (i)     the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>>
>> (ii)     the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Roberson's Motion fails to make a prima facie showing that he satisfies the requirements of § 2244(b). *See* 28 U.S.C. § 2244(b)(3)(C). His claims are also barred by the statute of limitations in § 2244(d)(1).

35

# ARGUMENT

**I.    The Court Should Deny Roberson's Motion Because He Does Not Meet the Standards Under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition.**

Roberson seeks authorization and a stay of execution to raise "one claim: his conviction violates his federal right to due process because it rests on since-invalidated forensic science." Mot.1. But this claim fails to satisfy § 2244(b), and his motion for authorization should therefore be denied.

> **A.    Roberson cannot make a prima facie showing that he meets the § 2244(b) requirements to proceed because he was not diligent.**

Roberson argues his claim is based upon new science and thus satisfies § 2244(b)(2)(B)(i). Mot.48–51. But Roberson fails to show that the "factual predicate for the claim could not have been discovered previously through the exercise of due diligence." *Milam v. Jimerson*, No. 25-40579, 2025 WL 2680581, at *5 (5th Cir. Sept. 19, 2025).

To begin, it is indisputable that if Roberson is actually innocent of this crime, Roberson would know as much through his personal knowledge of the events surrounding Nikki's death. If Roberson did not assault Nikki, he has been fully aware of that fact since Nikki died and

throughout the entirety of his legal proceedings. He would have necessarily known that any trial testimony suggesting that he played a role in Nikki's death was categorically false, and he could have related the same to his trial, appellate, state habeas, and federal habeas attorneys, who could have pursued his legal remedies. To the extent Roberson complains that all his prior attorneys ignored his input, that is not an exception to section 2244(b)'s successiveness bar. *Cf. Holland v. Fla.*, 560 U.S. 631, 650 (2010) ("We recognize that, in the context of procedural default, we have previously stated, without qualification, that a petitioner "must 'bear the risk of attorney error.'")(citing *Coleman v. Thompson,* 501 U.S. 722, 752–753 (1991)).

Roberson states that "[t]he factual predicate for Roberson's claim did not develop until well after the 2010 filing of his initial habeas petition." Mot.45; *Roberson v. Director, TDCJ-ID*, 2:09-cv-00327-JRG-RSP (E.D. Tex.), ECF No. 11 (petition filed Sept. 14, 2010). In particular, Roberson asserts that various pieces of underlying evidence were not available until 2016, 2018, 2020, 2024, and 2025. Mot.46. However in 2011, three justices of the Supreme Court observed "[d]oubt has increased in the medical community "over whether infants can be fatally

injured through shaking alone." *Cavazos v. Smith*, 565 U.S. 1, 13–15 (2011) (Ginsburg, Breyer, & Sotomayor dissenting). The *Smith* dissent notes numerous studies dating back to 2003 discussing issues with SBS, noting in a parenthetical that one study opined that "[b]y the end of 1998, it had become apparent that 'there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS.'" *Id.* at 13.

Petitioners seeking to proceed under the new-facts provision of § 2244(b)(2)(B) must conclusively demonstrate that the factual predicate of the claim could not have been discovered sooner with the exercise of due diligence. *See* § 2244(b)(2)(B)(i). This inquiry is objective and turns on what reasonable defense counsel would have done based on the information available to them at the trial (and thereafter). *See Blackman v. Davis*, 909 F.3d 772, 779 (5th Cir. 2018). The question is whether "a reasonable attorney would have been put on notice of the existence" of the factual predicate of the petitioner's claim. *Blackman*, 909 F.3d at 779; *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006).

Here, under his own theory, Roberson cannot plausibly argue that a reasonable attorney would not have been aware of the factual predicate

of his claim. Roberson's theory is that he is actually innocent, and he was convicted based on now-debunked or invalid SBS science. But if Roberson did not commit the offense as described at trial, he has known that since 2003 and cannot credibly suggest that he did not relate that crucial fact to his counsel. And, according to members of the Supreme Court, the literature has existed to challenge an SBS diagnosis since at least 1998. *Smith*, 565 U.S. at 13-15. *Smith* itself is dated October 31, 2011, *i.e.*, during the pendency of Roberson's first federal writ. *Id*. at 1*; Roberson v. Dir., TDCJ-CID*, No. 2:09CV327, 2014 WL 5343198 (E.D. Tex. Sept. 30, 2014). Roberson could have amended his petition to raise his claim if necessary. *In re Soliz*, 938 F.3d 200, 204 (5th Cir. 2019) (denying request to file successive habeas petition where court decision was published four months before denial of initial habeas application); *In re Milam*, 838 F. App'x 796, 799 (5th Cir. 2020). A reasonable attorney was on notice of this claim much earlier than 2010 and certainly by the time Roberson's petition was denied in 2014.

Roberson may point to the various pieces of evidence developed or obtained in 2016, 2018, 2020, 2024, and 2025 as precluding him from raising this claim in its current form in his 2010 initial federal habeas

application. However, in the related context of the statute-of-limitations, the clock is not reset every time that a petitioner acquires a new piece of information. *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998) ("[Petitioner] is confusing his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim . . . [§] 2244(d)(1)(D) does not convey a statutory right to an extended delay, in this case more than seven years, while a habeas petitioner gathers every possible scrap of evidence that might . . . support his claim."); *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) ("[T]he time commences when the factual predicate 'could have been discovered through the exercise of due diligence,' not when it was actually discovered by a given prisoner," or "when the prisoner recognizes [the] legal significance [of important facts]."). The relevant question is when Roberson's attorneys could have first discovered the factual predicate of his claim, not when he discovered the most recent piece of evidence supporting the claim.[6]

---

[6]    As Roberson recognizes, his initial federal habeas counsel believed that arguing that this was an SBS case was in Roberson's favor because it showed that he did not knowingly or intentionally kill his daughter. Mot.44 n.17; Pet. at iii, *Roberson v. Director, TDCJ-ID*, 2:09-cv-00327-JRG-RSP (E.D. Tex.), ECF

In sum, Roberson fails to show that his claim meets the exception under § 2244(b)(2)(B)(i).

**B. Roberson fails to make a prima facie showing of innocence under § 2244(b)(2)(B)(ii) and his due process claim is barred.**

    **1. Roberson fails to demonstrate that the evidence as a whole "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense."**

Roberson fails to make a prima facie showing of innocence under § 2244(b)(2)(B)(ii). Citing his evidence purportedly undermining the reliability of SBS and denying what was proved at trial, Roberson asserts his innocence. But all Roberson has produced is a classic battle of experts and an unproven assertion that SBS is junk science. He fails to demonstrate that the evidence as a whole "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no

---

No. 11. His federal attorneys were thus aware of the SBS evidence—they just made the litigation decision that the evidence *helped* Roberson. And it is indeed conspicuous that Roberson's attorneys conceded that they "assume that Roberson probably did contribute to the death of his two-year-old daughter." *Id.*

reasonable factfinder would have found [him] guilty of the underlying offense." § 2244(b)(2)(B)(ii).

Roberson has repeatedly drawn from a pool of experts who travel the country testifying on behalf of the defense in SBS/AHT cases to file multiple state writs challenging the facts of his conviction. As CNN reported in an extensive analysis in 2021, defense attorneys across the country are utilizing a group of experts to seek relief in SBS/AHT cases even though those experts are really part of a small minority that mainstream practitioners call "denialists." State's Motion to Dismiss at Exhibit A at 1–2, 38–41, 46–48, 51–53, 63, 68, *Ex parte Roberson*, No. WR-63,081-06, (exhibit attached for the Court's convenience as Exhibit A).

After repeatedly failing to get relief, Roberson contends it is only possible now to understand the cause of Nikki's death. Mot.46. But the basis of his claim is that the medical consensus on SBS has fundamentally changed which is incorrect. *Id*. Despite his assertions this is so, he fails to overcome the evidence in the record that Nikki died of blunt force trauma as he was indicted and convicted of. Roberson's "new" scientific evidence, at most, engages a "battle of the experts" regarding

the cause of death. When that evidence is considered in light of the trial and appellate record as a whole it "falls far short" of showing that Roberson is actually innocent of capital murder. *Herrera*, 506 U.S. at 417.

The indictment charged Roberson with causing the death of Nikki Curtis "by causing blunt force head injuries, by a manner and means unknown to the grand jury." 1.CR.02. The forensic pathologist who performed Nikki's autopsy[7], Dr. Urban, testified at trial and at the state writ hearing that Nikki's death was a homicide, that she had sustained multiple impacts,[8] and that she died due to blunt force head injuries. 4th Supp SHCR-03.266. (nos. 26, 27, 29); 43.RR.67–78, 85; 9SHRR-03.49, 114, 117, 176, 193, 213. Dr. Urban's autopsy report was signed by six other medical examiners. SX 48. And although Dr. Urban discussed

---

[7]    Dr. Urban's autopsy notes described a "2-by-1 1/2-inch, faint yellow-brown contusion" on Nikki's forehead, "two 1/4-inch contusions on the right side of [Nikki's] chin," a "faint red abrasion on the left cheek," "frenulum laceration," a "1/4-inch dark purple contusion on the right side of the lower lip," "a 2 1/2-by-1 1/2-inch aggregate of blue-purple contusions on the back of the head," "a 1 1/2-by-1-inch group of red-purple with some yellow-green contusions on the back of the right shoulder," and "a 1/2-inch abrasion on her left forearm and a 1/4-inch abrasion on her left foot." 9SHRR-03.19–22, 35; SX 48 (51.RR.113–120).

[8]    Dr. Urban identified "several different points where the hemorrhage is very dense and very intense and it's consistent with an impact." 9SHRR.38. She identified "three discrete impact sites on the top of the head, on the back of the head, and then on the left side of the head." *Id.* at 49.

shaking as a mechanism for injury in children and could not say there were not shaking components to Nikki's injuries, Dr. Urban **never** testified that Nikki was shaken to death. *See* 43.RR.54–98; 9SHRR-03.7–220; 4th Supp SHCR-03.266–67 (nos. 28, 30). And Dr. Squires, a pediatrician who examined Nikki while she was on life support, testified at trial that there was evidence of an impact to the back of Nikki's head. 4th Supp SHCR-03.266 (no. 21); 42.RR.107. She testified that Nikki's death was caused by a combination of shaking and impact. 4th Supp SHCR-03.266 (nos. 21, 22); 42.RR.120. During the state habeas proceedings, Dr. Downs outlined his findings of injury and testified he also concluded the cause of death was multiple blunt force injuries. 10SHRR-03.33–47.

Further, ER Nurse Andrea Sims testified at trial that Nikki had bruising on her chin and around her eyes, a handprint on her face, and that the back of her skull was bruised and "mushy." 41.RR.111–26. And ER Nurse Kelly Gurganus testified that "the back of her head. . .was red and it was just mushy like a soft spot." *Id.* at 72. Nikki had significant external signs of trauma that were separate and apart from the classic triad of symptoms for which Roberson now offers alternative diagnoses.

44

Roberson's expert testimony demonstrates a controversy within the medical community regarding SBS but does not show it is an invalid diagnosis. Furthermore, CNN also published an article describing how there is broad consensus among pediatricians that SBS/AHT is legitimate. State's Motion to Dismiss at Exhibit B at 3–5, 9, *Ex parte Roberson*, No. WR-63,081-06, (exhibit attached for the Court's convenience as Exhibit B). According to child abuse pediatricians "[c]riminal defense lawyers also have oversimplified how doctors diagnose abusive head trauma" and there are many factors to consider. Exhibit B at 4. Dr. Sandeep Narang, a child abuse pediatrician and lawyer who reviewed this case at the request of one of Roberson's supporters, told CNN he thought there was a clear reasonable basis for the conviction and "a high probability of abusive head trauma" given the evidence. Exhibit B at 5, 7. Dr. Narang noted the signs of impact in multiple different locations and "reviewed the case in light of today's science." Exhibit B at 7. And after reviewing this case, Dr. Narang concluded Nikki was unequivocally the victim of AHT. Exhibit B at 5.

Although many courts have recognized that a diagnosis of SBS is a matter of debate and presents a question of credibility, Roberson does not

cite to any courts that have held it to be "junk science." *See, e.g.*, *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016); *Burns v. Washington*, No. 18-10606, 2019 WL 3067928, at *6 (E.D. Mich. July 12, 2019) (finding the state appeals court's conclusion that SBS is not "junk science" but "a question of credibility, a so-called battle of the experts," to be reasonable); *Johnson v. Espinoza*, No. 19CV1036 GPC (WVG), 2020 WL 1028504, at *15 (S.D. Cal. Mar. 3, 2020) (summarizing that "far from being junk science," SBS "remains the subject of significant debate among medical professionals") (internal quotations omitted).

Like here, in *Gimenez*, the petitioner had presented "a battle between experts who have different opinions about how [the victim] died." *Id.* at 1143. Gimenez was not entitled to relief because he "presented literature revealing not so much a repudiation of triad-only [SBS], but a vigorous debate about its validity within the scientific community" that "continues to the present day." *Id.* at 1145.

Indeed, Roberson's own expert testimony did not establish SBS has been invalidated. Professor Kenneth Monson, his expert on biomechanics, and Dr. Janice Ophoven, a pediatric forensic pathologist, testified at the state writ hearing that SBS is still a recognized diagnosis

in the medical field. 4SHRR-03.67; 5SHRR-03.121–22. Further, Professor Monson could not say that shaking cannot kill a child, agreed that no one testified at trial that Nikki was killed by shaking alone, and agreed that "the question of shaken baby alone" was moot because there was evidence of an impact. 5SHRR-03.122.

To be sure, Roberson's experts disagree with the State's testimony concerning the cause of death. But Roberson's version of events—that Nikki's traumatic injuries were caused by an unlikely, tragic coincidence of her underlying medical conditions—ignores the testimony from several witnesses at trial that had seen Roberson shaking and abusing Nikki. In addition, Roberson confessed to losing it and shaking Nikki, and there was testimony from multiple witnesses about his bad temper, as well as the shaking, threatening, and hitting of Nikki. 48.RR.24; *Roberson,* 2002 WL 34217382, at *2–3.

Roberson's additional expert opinions are just more support for the theories already addressed in his many state habeas proceedings. Dr. Downs, who observed the habeas hearings, remained convinced the cause of death was multiple blunt force injuries. 10SHRR-03 18.45, 47, 83, 86, 240–43. Dr. Urban also held to her belief as to the cause of death after

listening to the testimony. 9SHRR-03.39, 127, 205, 213–20. Further, both
Dr. Downs and Dr. Urban discussed how the CT scans would not show
what could be seen during an autopsy by looking at the tissue. 9SHRR-
03.59, 206–07, 216; 10SHRR-03.29, 96, 101–02, 244–45. Thus, even
considering the additional expert opinions from his fourth and sixth state
habeas application, Roberson fails to prove he is actually innocent,
especially in light of the other evidence. *See* Concurring Opinion 2–3, *Ex
parte Roberson*, Nos. WR-63,081-03, 04 (Tex. Crim. App. Oct. 10, 2024)
(Yeary, J., concurring on denial of suggestion for reconsideration and
motion for stay of execution).

But this Court should also consider the credibility of the experts he
presents, for example, Dr. Michael Laposata, an expert mentioned in
CNN's reporting who believes Nikki Curtis had a blood clotting disorder.
Exhibit A at 35–37; Mot.30–31. In that reporting, a pediatric
hematologist-oncologist disputed Dr. Laposata's testimony about a blood
disorder in another case and described it as a "red herring." Exhibit A at
36–37. Dr. Laposata, along with several of Roberson's previous experts,
have testified in cases together throughout the country. *See, e.g., State v.
Butts*, No. 22AP-763, 2023 WL 4883377, at *2 (10th Dist. Aug. 1, 2023)

(noting Drs. Laposata, Auer, and Mack, all testified in a 2021 hearing on an SBS case out of Ohio); *Patterson v. Pirraglia*, No. 4:24-CV-04014-VLD, 2025 WL 71857 (D.S.D. Jan. 10, 2025) (Drs. Mack, Auer, and Ophoven, testified at a trial in an AHT case); *Shelby v. Cain*, No. 1:21-cv-406-HSO-RPM, 2023 WL 2563229, at *5 (S.D. Miss. March 17, 2023) (Drs. Mack, Ophoven, and Monson testified at a state hearing on an SBS case in 2018); *People v. Miller*, No. 346321, 2020 WL 4554873, at *2 (Mich. Ct. App. Aug. 6, 2020) (Drs. Ophoven, Mack, and Green testified in an SBS/AHT case); *Commonwealth v. Wagner*, No. 1397 MDA 2021, 2023 WL 2544662, at *3–4 (Pa. Super Mar. 17, 2023) (Drs. Ophoven and Laposata testified for the defendant in an SBS case where the trial court found Ophoven "less than credible" and the jury convicted the defendant despite their testimony).

In addition to his "red herring" testimony discussed in the CNN investigation, Dr. Laposata has been criticized by courts and medical colleagues in other cases. For instance, in one case, the trial court found the defense experts, which included Dr. Laposata, "displayed significant bias in that they were advocates for a change in the prevailing view in the medical community that [AHT] is an accepted diagnosis." *Sissoko v.*

*State*, 236 Md. App. 676, 182 A.3d 874, 887–89 (2018). Further, the trial court found "the opinions of the defense experts were "not . . . well founded in the medical literature[.]" *Id.* at 889. One of Dr. Laposata's colleagues once testified in another case that Dr. Laposata's program at the hospital where they worked flouted Medicare regulations, that he did not comply with laboratory licensing requirements, and that he failed to comply with hospital regulations. *Baylies v. Doberstein*, No. Civ.A PC97-6046, 2003 WL 22389562, at *1–4 (R.I.Super., Sep. 10, 2003). The court found that Dr. Laposata's testimony was successfully countered by numerous expert witnesses, largely discredited on cross-examination, and "singularly unimpressive." *Id.* at *5.

Dr. Ophoven has been found "less than credible" by one court where the jury rejected her testimony along with Dr. Laposata's. *Wagner*, 2023 WL 2544662, at *4. A Texas jury disbelieved her testimony in a separate case. *Baker v. State*, No. 12-14-00185-CR, 2015 WL 3958107, at *4–5 (Tex. App.—Tyler June 30, 2015, pet. ref'd) (not designated for publication). Another court has declared Dr. Ophoven once "rendered herself unavailable and decided not to live up to her promise to appear

and assist [the defense] at the trial." *Barnes v. King*, No. 09-3116, 2010 WL 5907137, at *9 (D. Minn. Nov. 17, 2010).

Dr. Auer once provided an opinion that was contradicted by two of the prosecution's expert witness and one of the defense's other expert witnesses. *Parnell v. White*, No. 23-5103, 2024 WL 4198643, at *3 (10th Cir. 2024); *Parnell v. White*, No. 22-CV-0232-CVE-SH, 2023 WL 5407398, at *14–15 (N.D. Okla. Aug. 22, 2023). Accordingly, a federal district court found a reasonable juror would give his opinion less weight. *Parnell*, 2023 WL 5407398, at *15. Recently, in another case, the federal district court concluded that the Oklahoma Court of Criminal Appeals reasonably found that Dr. Auer "brazenly discounts all other medical opinions," noting that he admitted he had no training in pediatrics or child abuse but still believed every doctor who the saw the victim, the medical examiner, and the defense's other witnesses were wrong. *Dickerson v. Miller*, No. 2-CV-0074-GKF-SH, 2025 WL 899344, at *22, 24 (N.D. Okla. March 24, 2025). An Ohio court found Dr. Auer's opinion not credible because it was based on incorrect information. *In re S. Children*, 2024-Ohio-538, 236 N.E.3d 356, 366–67 (Ohio Ct. App. 1st Dist. Hamilton County 2024).

A judge once gave Dr. Mack's testimony less weight when it comes to pediatric radiology because she "had not focused in pediatric radiology for an extended period of time." *Interest of L.V.*, 209 A.3d 399, 407 (Pa. Super. 2019). In that case, Dr. Mack's testimony was rebutted by a pediatric radiologist who questioned Dr. Mack's conclusions, disagreed with her testimony the child may have had a metabolic bone disease, and found a child was a victim of non-accidental trauma. *Id.* at 408. The trial court agreed the child was abused, noting the 26 bone fractures. *Id.* at 409. More troubling, Dr. Mack was once sued for medical negligence after a child she helped treat was injured by shaking and the child's father was convicted of felony child abuse. *K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1085–89 (Pa. Super 2015). There, experts reviewing the case made the following findings:

> [Dr. Mack] missed important findings on several radiology studies and failed to pursue with appropriate radiographs her diagnosis of multiple rib fractures and appeared to advocate for a benign interpretation of worrisome findings that confused medical colleagues[,] and[ ] her actions were a key reason why the child's abuse continued to its ultimate tragic ending. She violated both [LGH's] policies on child abuse and the Pennsylvania mandate to report suspected abuse under the standard of care and state law.

*Id.* at 1101.

As to Dr. Green, his expert opinion in a case was once found to be less well reasoned and documented than other experts, and that his analysis was contrary to medical literature. *Massey v. Peabody Coal Co.*, 387 F. App'x. 344, 346–48 (4th Cir. July 6, 2010). Further, the judge found Dr. Green failed to reconcile his "internally inconsistent" opinion with some of the objective medical evidence in the record. *Id.* at 349. In Iowa, a court held that Drs. Green, Ophoven, and Auer's opinions failed to establish an actual innocence claim where they conflicted with the State's expert opinions and were inconsistent with the defense's own trial experts. *Curtis v. State*, No. 23-1030, 2024 WL 4761825, at *7–11 (Iowa App., Nov. 13, 2024).

Taken together, Roberson's experts have been criticized by courts, their medical peers, and even other defense experts for their minority views and other lapses. Considering the source of these expert opinions and their troubling history, Roberson falls well short of the required showing that "the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

53

Further despite Roberson's assertions that only now has the science of denying SBS come into the mainstream, Mot.45–46, Roberson's third state habeas application where he was granted a hearing began with Dr. Bonnell pointing to meningitis and a short fall as explanations for Nikki's death. 1 SCHR-03, 53, 55–56. Indeed, Roberson has shifted from his own changing stories, to admitting the crime to Dr. Goodness, to blaming Heather Berryhill for the murder, to his current short fall/pneumonia/medication/blood disorder defense. *See supra*, Statement of Facts. All these various defenses evoke the feeling of spaghetti thrown at the wall as described in CNN's investigation. Exhibit A at 31–37.

Roberson merely presents a battle of experts not true evidence of actual innocence. It is undisputed Nikki died the first night Roberson had to take care of her alone. 42.RR.168. He falls short of showing that "'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

### 2.  Roberson fails to raise a prima facie claim of constitutional error.

Roberson's sole claim for relief is that "his conviction violates his federal right to due process because it rests on since-invalidated forensic science." Mot.1. However, Roberson's proposed due process claim would

require this Court to recognize a new constitutional rule, and therefore he cannot show that "but for *constitutional* error, no reasonable factfinder would have found [him] guilty of the underlying offense." § 2244(b)(2)(B)(ii) (emphasis added). To be sure, the Supreme Court has recognized that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (citation omitted); *Kansas v. Carr*, 577 U.S. 108, 123 (2016) (citation omitted); *Andrew v. White*, 604 U.S. 86, 91–92 (2025). But in those cases, the Court did not rule that scientific evidence presented at trial—*later* discredited or undermined to some degree by scientific advancements—was so unduly prejudicial that it rendered the trial fundamentally unfair. Rather, in *Payne*, *Carr*, and *Andrew*, the Court, respectively, addressed the introduction of victim impact statements during sentencing, the issue of a joint sentencing proceeding, and the introduction of potentially irrelevant evidence at trial. *Id.*

Thus, where the Supreme Court has considered the admission of certain evidence unduly prejudicial such that it rendered the trial

fundamentally unfair, the Court was tasked with determining whether the evidence was wrongfully (i.e. unduly) admitted *at the time of trial*. This is not the same as Roberson's claim. Roberson does not argue that SBS evidence was wrongfully admitted at the time of trial; instead, he argues that because scientific advancements now undermine the reliability such evidence, his trial was fundamentally unfair in violation of the Due Process Clause.[9] Mot.46–50. The Supreme Court has not created a constitutional rule that the admission of scientific evidence— which was called into question many years after the fact due to scientific advancements—deems a trial fundamentally unfair or gives rise to a due process claim.[10]

---

[9]    This distinction matters. Roberson is not contending that some *process* employed in his case—for instance, the trial court's admission of irrelevant evidence or a prosecutor's improper argument—deemed his trial fundamentally unfair. He merely shoehorns a non-cognizable quasi-actual-innocence claim based on new scientific developments into a due process claim. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").

[10]    The Supreme Court recently denied certiorari review in an Alabama case raising substantially the same the same argument as Roberson. *See generally McCrory v. Alabama*, 144 S. Ct. 2483, 2483-89 (2024) (statement of Justice Sotomayor respecting the denial of certiorari).

To extend precedent in the way Roberson now proposes would violate the rule against retroactive application of a new constitutional rule in habeas proceedings.[11] *See Teague*, 489 U.S. at 311. Roberson simply cannot obtain federal habeas relief based on his proposed claim because it is not a cognizable constitutional claim on habeas review. *Garcia v. Tex.*, 564 U.S. 940, 941 (2011) (refusing to stay execution and noting that "[o]ur task is to rule on what the law is, not what it might eventually be."). Accordingly, Roberson cannot make a prima facie showing that he meets § 2244(b)'s requirement that "but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." § 2244(b)(2)(B)(ii).

---

[11]    Federal habeas is not an appropriate forum to recognize or implement new constitutional rules of criminal procedure. *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion). For the most part, such rules do not apply to convictions that became final before the rule was announced. *Id*. There is a lone exception applicable to rules placing primary conduct beyond the government's power to proscribe or a class of persons beyond the government's power to punish in certain ways. *See Graham v. Collins*, 506 U.S. 461, 477 (1993). However, "new [constitutional] procedural rules do not apply retroactively on federal collateral review." *Edwards v. Vannoy*, 593 U.S. 255, 275–76 (2021) (eliminating an earlier "watershed exception" for procedural rules). Here, Roberson is asking for a new procedural rule not available at the time of his conviction in 2003. But *Teagu*e and *Edwards* plainly foreclose its recognition in this forum.

Indeed, Roberson's claim more squarely fits under the principles underlying false testimony claims. But the Supreme Court in that context has held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Roberson, of course, cannot contend the State knew of any falsity of the testimony at the time of trial because he relies on "new" scientific evidence. "There is a long line of unbroken precedent from . . . the U.S. Supreme Court holding that false trial testimony does not implicate a defendant's due process rights if the State was unaware of the falsity at the time the testimony was given." *Pierre v. Vannoy*, 891 F.3d 224, 230 (5th Cir. 2018) (Ho, J., concurring), *as revised* (June 7, 2018), *cert. denied*, 139 S. Ct. 379 (2018). The Supreme Court has "never held" that the unknowing use of false testimony violates the Due Process Clause, and it is "unlikely ever to do so." *Cash v. Maxwell*, 565 U.S. 1138 (2012) (Scalia, J., dissenting from denial of certiorari). "All we have held is that 'a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment.'" *Id.* (quoting *Napue*, 360 U.S. at 269) (emphasis in

original). This Court should reject Roberson's attempt to shoehorn what is really a defective *Napue* claim into a fundamental unfairness claim.

Regardless, and lack of a viable constitutional claim aside, Roberson's new evidence does not show Roberson's trial was fundamentally unfair. *See* Section I.B(1), *supra*. Consequently, Roberson's due process claim based on purportedly bad science would fail even if it existed in the first place.

## II.   The Statue of Limitations Precludes Authorization.

This Court has "the authority to deny a motion to authorize based on timeliness." *In re Campbell*, 750 F.3d 523, 532 n.9 (5th Cir. 2014); *see also In re Jones*, 998 F.3d 187, 189 (5th Cir. 2021); *In re Lewis*, 484 F.3d 793, 795 (5th Cir. 2007). Section 2244(d)(1) applies a one-year limitations period to any federal habeas petition. Roberson clearly proceeds under § 2244(d)(1)(D), establishing the start of limitations as "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Roberson argues that a continuous flow of information and "new" science has essentially prevented him from raising this claim until now. Mot.45–46, 53–54. But the record and the law disagree.

It is axiomatic that *if* Roberson did not murder Nikki, he would have known that prior to trial and the presentation of his guilt-phase case. He argues now that the science has finally evolved such that he can prove his innocence. But as discussed above, there were numerous studies going back to at least 1998 that cast doubt regarding SBS. *Smith*, 565 U.S. at 13 (Ginsburg, J., dissenting). Indeed, the *Smith* decision itself was issued in 2011, during the pendency of Roberson's first federal petition when he could have amended his claims. *See In re Soliz*, 938 F.3d at 204; *In re Milam*, 838 F. App'x at 799.

Even if this Court were to give Roberson every benefit of the doubt on the scientific advancement regarding SBS, Roberson presents here essentially the same claims he presented in his 2016 state habeas subsequent application. There, he asserted "(1) new scientific evidence contradicts evidence of Shaken Baby Syndrome that the State relied on at trial. . . (2) his conviction was secured using false, misleading, and scientifically invalid evidence,[] (3) he is actually innocent,[] and (4) the use of false scientific testimony violated his due process right to a fundamentally fair trial." *Ex parte Roberson*, 2023 WL 151908, at *1

(citations omitted). After full evidentiary development of these claims, including a hearing, the CCA denied relief on January 11, 2023.

He did not then bring his ground to federal habeas court. And even though he sought certiorari from that decision, that is of no moment here. *See Lawrence v. Florida*, 549 U.S. 327, 332 (2007) (holding that the pendency of certiorari review of a state postconviction proceeding does not toll the limitations period). He waited over a year after the conclusion of his third state habeas proceedings to file his fourth state habeas application (which was dismissed as abusive), and then only after another execution date was set.

Roberson asserts, though, that it wasn't until this fourth application that he was able to put it all together. Mot.28–29. But again, the clock is not reset every time Roberson acquired a new piece of information. *See Flanagan*, 154 F.3d at 199; *Owens*, 235 F.3d at 359; *see also In re Rodney Reed*, No. 24-50529, Unpublished Order 3 (Nov. 5, 2024) (finding that no intervening evidence, including multiple state habeas proceedings and an evidentiary hearing on actual innocence, triggered the "availability" of his claims based on new scientific evidence).

Finally, Roberson argues that even if he is late under § 2244(d)(1), he should be excused under *McQuiggin v. Perkins*, 569 U.S. 383 (2013), because he is actually innocent. As discussed above, *see* I.B(1) *supra*, he fails to make this showing. Thus, the claims now raised are barred by the statute of limitations, and the motion should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Roberson's Motion for Order Authorizing the District Court to Consider Second or Successive Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2244.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for Criminal
Justice

TOMEE M. HEINING
Chief, Criminal Appeals

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General

State Bar No. 24028011
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936–1400
Fax: (512) 320–8132
ellen.stewart-klein@oag.texas.gov

*Attorneys for Respondent*

# CERTIFICATE OF SERVICE

I do hereby certify that on October 5, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing (ECF) system of the Court. The ECF system sent a "Notice of Electronic Filing" (NEF) to the following attorneys of record, who consented in writing to accept the NEF as service of this document by electronic means:

Callie Heller & Emma V. Rolls
Assistant Federal Public Defenders
Western District of Oklahoma
215 Dean A. McGee Ave., Suite 707
Oklahoma City, OK 73102
Callie_Heller@fd.org
Emma_Rolls@fd.org

Gretchen S. Sween
712 Upson Street
Austin, TX 78703
gsweenlaw@gmail.com

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12883 words; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft 365 Word (the same program used to calculate the word count).

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General